ACCEPTED
04-15-00118-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
10/12/2015 12:54:12 PM
KEITH HOTTLE
CLERK

## NO. 04-15-00118-CV

_____

IN THE FOURTH COURT OF APPEALS
AT SAN ANTONIO, TEXAS

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
10/12/2015 12:54:12 PM
KEITH HOTTLE
Clerk

_____

**SHIRLEY ADAMS, CHARLENE BURGESS, WILLIE MAE HERBST JASIK, WILLIAM ALBERT HERBST, HELEN HERBST AND R. MAY OIL & GAS COMPANY, LTD.,**

**Appellants**

**V.**

**MURPHY EXPLORATION & PRODUCTION CO. - USA, A DELAWARE CORPORATION,**

**Appellee**

_____

On Appeal from the 218TH District Court of Atascosa County, Texas
Honorable Stella Saxon, Presiding

_____

## APPELLANTS' REPLY BRIEF

_____

Mary A. Keeney
State Bar No. 11170300
mkeeney@gdhm.com
John B. McFarland
State Bar No. 13598500
jmcfarland@gdhm.com
GRAVES, DOUGHERTY, HEARON & MOODY
A Professional Corporation
401 Congress Avenue, Suite 2200
Austin, Texas  78701
Telephone:  (512) 480.5682
Facsimile:   (512) 480.5882
**ATTORNEYS FOR APPELLANTS
SHIRLEY ADAMS, CHARLENE BURGESS,
WILLIE MAE HERBST JASIK, WILLIAM
ALBERT HERBST, HELEN HERBST AND
MAY OIL & GAS COMPANY, LTD.**

**ORAL ARGUMENT REQUESTED**

**October 12, 2015**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ............................................................................. iv

ISSUES PRESENTED .................................................................................... vii

SUMMARY OF THE ARGUMENT ...................................................................1

ARGUMENT.....................................................................................................2

I.      The trial court erred in granting summary judgment for
        Murphy. (Issue One)................................................................................2

        A.      Murphy's interpretation of Paragraph 25 of the
                Leases renders the term "offset" meaningless .............................2

        B.      Murphy's attempts to justify giving no meaning to
                the term "offset" violate basic rules of contract
                construction ..................................................................................4

        C.      The Herbsts are not rewriting the Leases but are,
                instead, giving Paragraph 25 its only reasonable,
                utilitarian result..........................................................................6

        D.      Murphy's expert affidavit, on which it based its
                motion for summary judgment, does not support
                the trial court's decision ...............................................................9

        E.      Industry understanding supports the Herbsts'
                interpretation of Paragraph 25 .....................................................13

        F.      Resort to expert testimony on understanding in the
                industry is unnecessary, and Murphy's expert does
                not credibly express that understanding .....................................15

# TABLE OF CONTENTS
## (Continued)

II. The trial court erred in awarding Murphy attorney's fees. (Issue Two)........................................................................18

    A. The trial court had no statutory authority to award attorney's fees.............................................................18

    B. If the trial court had authority to award fees under the UDJA, it abused its discretion in awarding fees on appeal.............................................................................20

CONCLUSION AND PRAYER........................................................22

CERTIFICATE OF COMPLIANCE................................................24

CERTIFICATE OF SERVICE.........................................................25

APPENDIX.......................................................................................26

# INDEX OF AUTHORITIES

**<u>Cases:</u>**                                                                          **<u>Page(s):</u>**

*Americo Life, Inc. v. Myer*,
   440 S.W.3d 18 (Tex. 2014) ........................................................................ 9

*Cmty Improvement Ass'n of Lake Conroe Hills, Inc. v. Beckham*,
   No. 07-03-00036-CV, 2004 WL 2000666
   (Tex. App.—Amarillo 2004, no pet.) (mem. op.) ...................................4

*Commercial Union Assurance Co. v. Silva*,
   75 S.W.3d 1 (Tex. App.—San Antonio 2001, pet. denied) ................... 3

*Contreras v. Clint Ind. Sch. Dist.*,
   347 S.W.3d 413 (Tex. App.—El Paso 2011, no pet.) ........................ 16

*DaimlerChrysler Motors Co., LLC v. Manuel*,
   362 S.W.3d 160 (Tex. App.—Fort Worth 2012, no pet.) .................. 3, 4

*Etan Indus. v. Lehmann*,
   359 S.W.3d 620 (Tex. 2011) ................................................................18

*Frost Nat. Bank v. L&F Distributors, Ltd.*,
   165 S.W.3d 310 (Tex. 2005) ................................................................ 8

*Kachina Pipeline Co. v. Lillis*,
   ___ S.W.3d ___, No. 13,0596,
   2015 WL 5889109 (Tex. October 9, 2015) ........................................... 11

*MBM Fin. Corp. v. Woodlands Operating Co., L.P.*,
   292 S.W.3d 660 (Tex. 2009) ...........................................................2, 18

*Nat'l Union Fire Ins. Co. v. CBI Industries*,
   907 S.W.2d 517 (Tex. 1995) ............................................................. 16

# INDEX OF AUTHORITIES
## (Continued)

**Cases:**                                                               **Page(s):**

*Occidental Permian Ltd. v. Helen Jones Foundation*,
333 S.W.3d 392
(Tex. App.—Amarillo 2011, pet. denied) ........................................ 16

*Reagan v. Marathon Oil Co.*,
50 S.W.3d 70 (Tex. App-Waco 2001, no pet.) .........................................21

*Springer Ranch, Ltd. v. Jones*,
421 S.W.3d 273 (Tex. App.—San Antonio 2013, no pet.)...................8, 9

*State Farm Lloyds v. Gulley*,
399 S.W.3d 242 (Tex. App.—San Antonio 2012, pet. denied) .............. 3

*Uniroyal Goodrich Tire Co. v. Martinez*,
977 S.W.2d 328 (Tex. 1998) ............................................................... 10

*United Interests, Inc. v. Brewington, Inc.*,
729 S.W.2d 897 (Tex. App.—Houston [14th Dist.] 1987,
writ ref'd n.r.e.) ...................................................................................21

*Winslow v. Acker*,
781 S.W.2d 322 (Tex. App.—San Antonio 1989, writ denied) .............19

*XCO Production Co. v. Jamison*,
194 S.W.3d 622 (Tex. App.—Houston [14th Dist.]....................16, 17

# INDEX OF AUTHORITIES
## (Continued)

**<u>Other Authorities:</u>**

THE AMERICAN HERITAGE DICTIONARY at 21 (5th ed. 2011)............................ 6

Williams & Meyer's Manual of Oil and Gas Terms,
p. 718 (1994 Ed.) ...............................................................1, 14

# ISSUES PRESENTED

1.    The district court erred in granting Murphy's motion for summary judgment, which allows Murphy to satisfy its obligation to drill an offset well simply by drilling a well anywhere on the Herbst Leases.

2.    The district court erred in awarding Murphy attorney's fees on appeal because (a) the district court had no authority to award fees and (b) the award was an abuse of discretion.

## SUMMARY OF ARGUMENT

An offset well is a "well drilled on one tract of land *to prevent the drainage* of oil or gas to an adjoining tract of land, on which a well is being drilled or is already in production." Williams & Meyers' *Manual of Oil and Gas Terms*, p. 718 (1994 ed.) (emphasis added). Paragraph 25 of the Herbst leases ("Leases") provides that, if a well is drilled on adjacent lands and within 467 feet of the leased premises, the lessee must either drill an offset well, release sufficient acreage adjacent to the draining well to allow the Lessor to drill an offset well, or pay compensatory royalty. Murphy drilled a well on the Leases over 2,100 feet from the draining well and contends it is an "offset well" under Paragraph 25. Such a well does not qualify as an offset well under Paragraph 25.

Murphy argues that a well drilled anywhere on the leased premises satisfies its obligation under Paragraph 25, as long as the well is completed in the same formation as the draining well. This argument deprives the word "offset" of any meaning and ignores the plain language and intent of Paragraph 25, which is to protect the leased premises from drainage.

Murphy also argues that the well on the adjacent land is not in fact draining the leased premises. There is no evidence in the record to support

that contention. More to the point, Paragraph 25 does not require the Lessor to prove that the well is draining the leased premises. The very purpose of Paragraph 25 is to eliminate the need for that proof.

The trial court erred in awarding Murphy attorneys' fees on appeal, based on its counterclaim for declaratory judgment. A request for declaratory judgment "tacked onto" a breach of contract claim cannot be a basis for a fee award. *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 669-70 (Tex. 2009).

## ARGUMENT

**I.   The trial court erred in granting summary judgment for Murphy. (Issue One)**

The district court erred in holding that Murphy's drilling of a well more than 2,100 feet from a well on adjacent property satisfies Murphy's obligation to drill an offset well under its Leases with the Herbsts.

### A.   Murphy's interpretation of Paragraph 25 of the Leases renders the term "offset" meaningless.

Murphy asserts (at 4) that the Leases "give[] the operator discretion over when and where to drill" and, therefore, Murphy has the discretion to locate an offset well anywhere on the leased premises. Nothing in the Leases says this. Murphy's interpretation of the Leases to allow the lessee

2

to locate the offset well anywhere on the leased premises renders the word "offset" a meaningless, redundant term. As the Herbsts pointed out in their initial brief (at 14), omit the word "offset" from Paragraph 25 and Murphy's interpretation would be reasonable. Murphy fails to address either this point or the basic rule of construction that all words in the Leases are to be given effect. *See State Farm Lloyds v. Gulley*, 399 S.W.3d 242, 247 (Tex. App.—San Antonio 2012, pet. denied) (Courts should "give effect to all the provisions of the contract so that none will be rendered meaningless."); *Commercial Union Assurance Co. v. Silva*, 75 S.W.3d 1, 3 (Tex. App.—San Antonio 2001, pet. denied) (Courts should "give meaning to every sentence, clause and word" in a contract.).

The terms "well" and "offset well" should not be interpreted to mean the same thing. Interpreting two different terms "to have the same meaning . . . would render one or the other term meaningless or redundant." *DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 185 (Tex. App.—Fort Worth 2012, no pet.).

The Leases use the term "well" in many other provisions, including the two paragraphs immediately preceding Paragraph 25. *See, e.g.*, ¶¶ 3, 6, 7, 14, 18, 23, 24 (SCR 150 – 170). The term "offset well" appears only in

3

Paragraph 25. "'When a contract uses different language in proximate and similar provisions, we commonly … assume that the parties' use of different language was intended to convey different meanings.'" *Id.* (citation omitted). *See also Cmty Improvement Ass'n of Lake Conroe Hills, Inc. v. Beckham*, No. 07-03-00036-CV, 2004 WL 2000666 at *4 (Tex. App.—Amarillo 2004, no pet.) (mem. op.) (declining to interpret different words to have the same meaning). The Court should reject the trial court's acceptance of Murphy's argument that any "well" is an "offset well."

**B.** **Murphy's attempts to justify giving no meaning to the term "offset" violate basic rules of contract construction.**

Murphy argues (at 10) that the word "such" in Paragraph 25 justifies not giving any meaning to the term "offset." Murphy asserts that, because the word "such" appears before the word "offset," the phrase "such offset well" must be an "internal cross-reference to 'drilling operations on the leased acreage.'" Murphy then makes the further leap to say that this "internal cross-reference" must mean that *any* drilling operations anywhere on the Leases satisfies the duty to drill an offset well. This contorted reading of Paragraph 25 is contrary to the rules of construction cited above and is not reasonable. Nothing in the word "such" indicates an intent to

4

render the word "offset" meaningless. The word "such" is simply a reference to the "offset well" that must be drilled.

In another attempt to justify ignoring the term "offset," Murphy argues (at 10) that drilling to a depth adequate to test the same formation satisfies the "ordinary and industry" meaning of the term "offset" because drilling a well to that depth serves as a "counterbalance" or a "[s]et off as an equivalent against." The depth requirement in the Leases, however, is an *additional* vertical requirement beyond the horizontal offsetting distance requirement. Drilling a well to the same vertical depth as the triggering well but locating that well 2,100 feet or several miles away could not possibly "offset" the triggering well. Moreover, the duty to drill to this vertical depth still exists if one deletes the word "offset" from Paragraph 25. Therefore, this reading of Paragraph 25 continues to render the term "offset" meaningless.

Murphy argues (at 9) that Paragraph 25(3), which gives Murphy the option to release acreage instead of drilling, supports Murphy's claim that it can drill the offset well anywhere it wants because Paragraph 25(3) does not define the acreage that must be released. Paragraph 25(3) supports the Herbsts' construction of the offset requirement, not Murphy's. Paragraph

5

25(3) specifies that the acreage released must be "sufficient to constitute a spacing unit equivalent in size to the spacing unit that would be allocated under this lease to such well or wells on the *adjacent* lands." SCR 155, 166 (emphasis added). "Adjacent" means "[c]lose to," "lying near," "[n]ext to" or "adjoining." THE AMERICAN HERITAGE DICTIONARY at 21 (5th ed. 2011). Paragraph 25(3) plainly requires Murphy to release acreage "next to" the lands where the triggering well is located. The provision also requires the acreage to be in a sufficient amount to allow the Herbsts or their new lessee to drill a well in compliance with Railroad Commission ("RRC") spacing rules. Murphy's suggestion that it could release acreage on the far side of the leased premises and satisfy this provision only highlights the unreasonableness of its interpretation.

C. **The Herbsts are not rewriting the Leases but are, instead, giving Paragraph 25 its only reasonable, utilitarian result.**

The Herbsts are not, as Murphy alleges (at 11), trying to rewrite the Leases or add terms that are not there. Instead, the Herbsts give meaning to all of the words that *are* there.

Murphy asserts (at 9) that the Leases could have included a specific distance limitation and the fact that they do not must mean that Murphy

6

can locate the well anywhere on the leased premises. The absence of a specific distance limitation is reasonable and readily explained. By avoiding a specific distance limitation, the Leases properly grant the lessee *some* flexibility in locating the offset well.

The Herbsts' recognition that Murphy has some flexibility in locating the offset well does not, as Murphy claims (at 9), constitute the creation of a "*per se* unreasonable" "moving-target distance." On the contrary, this concession recognizes the practicalities inherent in locating a well. There could be a pipeline or a habitable structure or some other obstacle situated next to the lease line. Paragraph 7 of the Leases prohibits drilling a well "nearer than 200 feet to the house or barn now on said land" without the landowner's consent. SCR 152, 163. These potential circumstances could impact how closely Murphy would be able to locate the well to the lease line. Giving the lessee "an inch" of flexibility to address potential obstacles to drilling, however, does not equate to giving the lessee permission to take "a mile." That is precisely the unreasonable position Murphy takes here. Under Murphy's reasoning, a lessee with these provisions on a 25,000 acre lease could locate an offset well many miles from the well triggering the duty to offset. That makes no sense.

7

Murphy further argues (at 11-12) that imposing *any* range of distances for an offset well equates to implying terms the parties did not agree to. On the contrary, interpreting Paragraph 25 to require Murphy to place the well in close proximity to the triggering well is not rewriting the Leases: it is giving meaning to the term "offset" and fulfilling the purposes of Paragraph 25 to protect against any presumed drainage.

Courts do not rewrite contracts but they also do not interpret them in a way that renders them "unreasonable, inequitable, and oppressive." *Springer Ranch, Ltd. v. Jones*, 421 S.W.3d 273, 287 (Tex. App.—San Antonio 2013, no pet.) (quoting *Frost Nat. Bank v. L&F Distributors, Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005)). Courts "construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served.'" *Id.* The only reasonable, utilitarian interpretation of Paragraph 25 is to require an offset well to be close to the well it is supposed to "offset." How close will depend on the particular circumstances on the leased premises. But drilling a well over 2,100 feet – or 20 miles – from the triggering well is not reasonable and would not serve the issues addressed in Paragraph 25. Murphy's claims (at 3-4) that it could make more money by drilling the well where it did serves none of the objectives of Paragraph

8

25. The Herbsts' construction of Paragraph 25 "is the only plausible construction." *Springer Ranch*, 421 S.W.3d at 286.

The issue in this case is not how close to the adjacent well Murphy's offset well must be located. The issue is whether, by drilling a well over 2,100 feet from the adjacent well, Murphy satisfied its obligations under Paragraph 25. No reasonable construction of Paragraph 25 would support Murphy's argument that its well, more than 2,100 feet away, is an "offset well" under Paragraph 25.

Murphy cites (at 9) *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 24-25 (Tex. 2014), for the proposition that courts "think [the parties to a contract] meant not only what they said but also what they did not say." That notion supports the Herbsts, not Murphy. What the parties said here was that a well Murphy drilled to comply with Paragraph 25 had to be an "offset well." The parties did not say that Murphy could drill a "well" anywhere it chose and still comply with Paragraph 25.

**D. Murphy's expert affidavit, on which it based its motion for summary judgment, does not support the trial court's decision.**

In the trial court, Murphy contended that extrinsic testimony from its expert was necessary support for its summary judgment motion. ("Extrinsic

evidence is admissible *and necessary* to explain the meaning of 'off-set well' as used in Paragraph 25 of the Leases." (Emphasis added)). SCR 123. In their initial brief, the Herbsts explained (at 28-34) the many flaws in the affidavit from Murphy's expert, whose opinion was based on a misreading of RRC rules, orders, and form and his own *ipse dixit*. The Herbsts also set out the law that opinion testimony generally raises only a question of fact. *See Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 338 (Tex. 1998).

Murphy makes no attempt in its brief to challenge the Herbsts' briefing on either the pervasive defects in Murphy's expert affidavit or the law that such expert testimony can do no more than raise a fact issue. Instead, in an about-face, Murphy now denies the need for the expert testimony it relied on to persuade the trial court to rule in its favor.[1] *See* Br. at 15 (asserting Murphy's expert affidavit "is not necessary").

Although Murphy now distances itself from its expert, Murphy still cites its expert's affidavit for the claim that "there is little to no drainage" in

---

[1] On page 15 of its brief, Murphy suggests the trial court did not rely on Murphy's expert affidavit, stating that the "trial court's judgment reflects that it construed the Leases as unambiguous and without reference to the Murphy's expert affidavit." While the trial court's judgment does not mention Murphy's expert affidavit, it does not reject it either. Moreover, the trial court granted Murphy's motion, which relied heavily on the affidavit as the centerpiece of its argument. Murphy's suggestion that the trial court ruled for it without regard to Murphy's key argument is without any support in the record.

the Eagle Ford Shale and therefore "no reason to drill a well near the lease line." *See* Br. at 11 (citing SCR 177). Murphy suggests (at 11) that it is proper to rely on its expert for this claim so that it can show the Herbsts' "profound misunderstanding of the characteristics of horizontal shale wells and the commercial context of the Leases."

Murphy's expert does not actually say there is "little to no drainage," and does not address drainage specific to the oil and gas under the leased premises at all. No actual testing was ever conducted with respect to drainage of these leased premises. He says that the RRC "assigned lease line spacing rules that reflect" that "a relatively modest amount of reservoir is drained by each horizontal well." SCR 177. Murphy's expert further states that "[e]arly indications" of recent "pilot programs" are that wells may be located "as close as 225 feet" without drainage. SCR 177.

Murphy's reliance on these statements to show the "commercial context" of the Leases is mistaken. The relevant commercial context for the Leases is the commercial context "in which the contract was negotiated." *See Kachina Pipeline Co. v. Lillis*, ___ S.W.3d ___, No. 13,0596, 2015 WL 5889109 at *3 (Tex. October 9, 2015) (stating court may consider "the commercial or other setting in which the contract was negotiated"). These

11

statements by Murphy's expert, made in 2014, have nothing to do with the commercial context at the time the Leases were negotiated in 2009. Murphy's expert speaks to what he claims is known about the Eagle Ford field as of 2014, not what was known in 2009, when the Leases were signed.

The commercial context when the parties executed these Leases in 2009 was exactly what Paragraph 25 indicates it was – a concern that drainage might occur if wells were drilled on neighboring tracts within 467 feet of the lease line. The RRC did not have special "lease line spacing rules" for the Eagle Ford in 2009 but instead, had the spacing rule that formed the basis for the offset well drilling requirement in the Leases – *i.e.*, 467 feet. Those RRC rules, which reduced from the standard 467 feet to 330 feet the well spacing distance from the lease line – a spacing requirement designed to protect against drainage – were not adopted until more than a year later, in November of 2010. Even then, the RRC adopted them only as temporary rules until the RRC could acquire more information about the Eagle Ford field. SCR 88-92. The RRC did not make these spacing rules permanent until almost two years later, in 2012. SCR 93-97. The pilot projects that Murphy's expert also relies on for his statements regarding

the risk of drainage in the Eagle Ford similarly did not exist in 2009 when the Leases were executed.

Finally, Murphy misses the point that the purpose of Paragraph 25 was to eliminate any requirement that the Lessor prove drainage from the adjacent well in order to trigger the Lessee's obligation to drill an offset well. The Lessee's obligations under Paragraph 25 were triggered by the drilling of a well within 467 feet of the lease line. Murphy then had the option to either drill an offset well, release sufficient acreage adjacent to the draining well to allow an offset well to be drilled, or pay compensatory royalty. The parties agreed that no proof of actual drainage by the adjacent well was necessary to trigger the Lessee's obligations.

E. **Industry understanding supports the Herbsts' interpretation of Paragraph 25.**

On page 16 of its brief, Murphy suggests the Herbsts opposed this Court's consideration of industry understanding regarding what constitutes an offset well. Not so. The Herbsts' briefing properly acknowledged that courts use the generally accepted meaning that a term has been given in the oil and gas industry, if it is consistent with the plain language of the lease. *See* Br. at 23-24.

13

It is Murphy, not the Herbsts, that is ignoring industry understanding of what an "offset well" is. Murphy's argument (at 11) that there is no need for the well to be close to the triggering well because no drainage is, in fact, occurring, is an artful way of saying that the offset well provisions in the Leases were never intended to protect against the risk of drainage. In fact, Murphy's expert said precisely that in his affidavit: "Plaintiffs' contention that an offset well, as used in the Lease, exists to protect their acreage from drainage is not correct." SCR 177.

This position cannot be squared with the industry understanding of the term "offset well." Williams & Meyers' *Manual of Oil and Gas Terms*, p. 718 (1994 ed.), defines an offset well as a "well drilled on one tract of land *to prevent the drainage* of oil or gas to an adjoining tract of land, on which a well is being drilled or is already in production." (Emphasis added.) The other dictionary definitions provided to the trial court and to this Court in the Herbst' initial brief (at 24-25) also make plain that protection from drainage *is* the principal purpose of an offset well.

As the Herbsts' expert Gregg Robertson correctly states:

14

[T]he inclusion of a provision such as the one in paragraph 25 requiring remedies by the Lessee should a well be drilled on offset acreage has only one, sole purpose – to prevent, compensate and mitigate the drainage of the leased premises by the offending well. Common sense precludes any other construction.

SCR 240.

If Murphy believed no drainage was possible in the Eagle Ford, Murphy should not have accepted leases with these offset provisions. It should not now be allowed to deprive the Herbsts of the benefit of their bargain based on its claim that no drainage is actually occurring. Allowing this argument to prevail undermines the key purpose of Paragraph 25, which was designed to relieve the lessors of the difficult and expensive burden of proving drainage. *See* Herbsts' Initial Br. at 21-23 (discussing difficulties lessors experienced in proving drainage occurred).

**F. Resort to expert testimony on understanding in the industry is unnecessary, and Murphy's expert does not credibly express that understanding.**

Although Murphy contends in its brief that it does not need its expert affidavit, it alternatively contends that it would be proper to consider its expert's opinions because extrinsic evidence is proper here. Industry

15

understanding can be determined without resort to Murphy's expert affidavit, and, as the definitions discussed above and in the Herbsts' initial brief conclusively show, that industry understanding rejects Murphy's position.

The word "offset" has a plain dictionary meaning and expert testimony cannot be used to contradict that meaning. Expert testimony that "does not comport with the plain language of the leases" is "no evidence." *Occidental Permian Ltd. v. Helen Jones Foundation*, 333 S.W.3d 392, 399 (Tex. App.—Amarillo 2011, pet. denied). *See also Nat'l Union Fire Ins. Co. v. CBI Industries*, 907 S.W.2d 517, 521 (Tex. 1995) ("[E]xtrinsic evidence is inadmissible to contradict or vary the meaning of the explicit language of the parties' written agreement."). Murphy's expert affidavit contradicts the explicit language of the Leases and is "no evidence" of the meaning of Paragraph 25.

The cases Murphy cites in its brief in support of expert testimony are inapposite. *Contreras v. Clint Ind. Sch. Dist.*, 347 S.W.3d 413, 420 (Tex. App.—El Paso 2011, no pet.), involved an expert affidavit to explain the medical term "complication" in a settlement agreement – a word not readily understood in the medical context. Similarly, *XCO Production*

16

*Co. v. Jamison*, 194 S.W.3d 622, 629-30 (Tex. App.—Houston [14th Dist.] 2006, pet. denied), involved a tax expert's testimony regarding the accounting methodology and terms used in a partnership agreement – not words readily defined in a dictionary. Moreover, unlike Murphy's expert, the expert in *XCO* did not contradict the plain meaning of words in the agreement. *See id.* at 629, n.4.

If, however, expert testimony is appropriate, Murphy's expert's testimony is not conclusive but is, instead, both illogical and contradicted by the very RRC documents on which he relies. It is also directly controverted by the Herbsts' expert, Gregg Robertson, who has over 35 years of experience in the oil and gas industry. SCR 238-42. And Mr. Robertson's testimony is not based on his bare opinions but, instead on the dictionary and industry definitions in the Herbsts' motion papers; the Leases; his vast experience in the oil and gas business, including experience reviewing hundreds of oil and gas leases; his knowledge of RRC rules and industry practice and terminology; and his review of Mr. McBeath's competing affidavit. SCR 238-42.

## II. The trial court erred in awarding Murphy attorney's fees. (Issue Two)

### A. The trial court had no statutory authority to award attorney's fees.

There is no legal basis for awarding Murphy any attorney's fees in this case. The Herbsts sued Murphy for breach of contract. SCR 5-11. Murphy counterclaimed for attorneys' fees under Chapters 37 and 38 of the Texas Civil Practice and Remedies Code. SCR 116. Neither provides a basis for a recovery of fees by Murphy.

Murphy argues (at 17) that it is entitled to recover fees under Chapter 37, which is the Uniform Declaratory Judgments Act (UDJA). Murphy does not discuss the 2009 and 2011 Texas Supreme Court cases that the Herbsts relied on in their brief – *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 669-70 (Tex. 2009), and *Etan Indus. v. Lehmann*, 359 S.W.3d 620, 624 (Tex. 2011). Both of these cases hold that, when a request for declaratory judgment is merely "tacked onto" a breach of contract claim, it cannot be a basis for a fee award. *MBM*, 660 S.W.3d at 670; *Etan*, 359 S.W.3d at 624. Here, Murphy's UDJA counterclaim sought to determine whether Murphy had breached the Leases (SCR 115-16) and was "part and parcel" of the contract claim. *MBM Fin. Corp.*, 292 S.W.3d at 671.

18

Murphy ignores these authorities. Instead, Murphy relies (at 17) on a 1989 case neither party cited in the trial court, *Winslow v. Acker*, 781 S.W.2d 322, 328 (Tex. App.—San Antonio 1989, writ denied). *Winslow* is not on point. First, in *Winslow*, the "appellants' lawsuit sought recovery of their alleged proportion of the overriding royalty interests which were assigned to appellees," but the appellees' counterclaim would settle "*all future disputes* as to the granting of royalties under the partition deed." *Id.* at 328 (emphasis added). Thus, the court found that the declaratory relief would resolve issues beyond those presented in the plaintiffs' suit. *Id.* Second, the court had another ground for allowing the relief – the appellants had waived any right to challenge the declaratory judgment action. *Id.* Third, the issue of whether attorney's fees could be recovered as part of a declaratory judgment action was not even at issue – appellees had non-suited their request for fees. *Id.* at 323.

Murphy claims (at 18) that its declaratory judgment action, like that in *Winslow*, involved a "proper interpretation of the Leases [that] will reach beyond the current dispute." An examination of the relief the trial court granted in this case shows that Murphy is wrong. The trial court did not

19

decide anything other than the current dispute. It ruled, using language proposed by Murphy:

> a. Paragraph 25 of the Leases is unambiguous;
>
> b. The Herbst #1H Well, on which Murphy commenced drilling operations June 8, 2012, was drilled as an off-set well pursuant to Paragraph 25 of the Leases and satisfies the requirements of Paragraph 25 of the Leases; and
>
> c. Murphy has not breached the Leases with regard to the drilling and completion of the Herbst #1H Well and does not owe compensatory royalties or any other obligations under Paragraph 25 as a result.

SCR 415.

These "declarations" do nothing more than resolve the breach of contract dispute for which the Herbsts filed suit. They do not, as Murphy suggests (at 18), "reach beyond the current dispute." They address only the well in question and the issue of whether Murphy breached the agreement by drilling that well instead of another one. Those are the very issues covered by the Herbsts' breach of contract action.

## B. If the trial court had authority to award fees under the UDJA, it abused its discretion in awarding fees on appeal.

If the Court holds that a fee award under the UDJA is available, the Court should nevertheless reverse the district court's award here. The trial court denied fees incurred in the trial court, reasoning that the Herbsts

20

"had the right to present their arguments to the Court for the Court to make a determination . . . and should not be penalized by having to pay huge amounts of attorney's fees." RR 47, *l.* 2 - 5. The trial court then awarded conditional fees to Murphy in the event the Herbsts sought appellate review. SCR 486. Having effectively found that it was not "equitable or just" to award trial court fees, the court had no basis for then holding that the Herbsts should be "penalized" with fees if they sought review in this Court.

Murphy argues (at 20) there is no "rule or statute" or "policy or rationale" to prevent a trial court from denying trial court fees but awarding appellate fees. There may not be a formal rule or a statute, but there is strong policy and rationale for holding that the trial court abuses its discretion when it makes such an award.

As the court of appeals stated in *Reagan v. Marathon Oil Co.*, 50 S.W.3d 70, 83-84 (Tex. App-Waco 2001, no pet.), such an award "could serve only to place a financial disincentive" on parties to exercise their right to appeal. Both *Reagan* and *United Interests, Inc. v. Brewington, Inc.*, 729 S.W.2d 897, 906 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.), reversed trial

21

courts that did what the trial court did here. Penalizing parties for seeking appellate review of a trial court's decision is not appropriate.

Murphy argues (at 20) that these cases are "not controlling" but fails to provide any reason why the same result should not obtain here. Nor has Murphy provided the court with any decision where a trial court did this and was affirmed on appeal.

## CONCLUSION AND PRAYER

For the reasons stated, the Herbsts respectfully pray that the Court reverse the trial court's grant of summary judgment for Murphy as well as its award of fees and remand this case to the trial court for further proceedings. The Herbsts seek such other and further relief, including the costs of this appeal, to which they may be entitled.

Respectfully submitted,

GRAVES DOUGHERTY HEARON & MOODY, P.C.

By: /s/ Mary A. Keeney

Mary A. Keeney
State Bar No. 11170300
mkeeney@gdhm.com
John B. McFarland
State Bar No. 13598500
jmcfarland@gdhm.com
401 Congress Ave., Suite 2200
Austin, Texas 78701
Telephone: (512) 480-5682
Facsimile: (512) 480-5882
**ATTORNEYS FOR APPELLANTS
SHIRLEY ADAMS, CHARLENE
BURGESS, WILLIE MAE
HERBST JASIK, WILLIAM
ALBERT HERBST, HELEN
HERBST AND R. MAY OIL &
GAS COMPANY, LTD.**

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Tex. R. App. P.9.4 because it contains 4,676 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4(i)(l).  The undersigned relied on the word count of MS Word, the computer program used to prepare the brief.

 /s/   Mary A. Keeney
Mary A. Keeney

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2015, a true and correct copy of the foregoing was served on counsel for Appellee via email and/or electronic service as shown below:

Macey Reasoner Stokes
Jason A. Newman
Baker Botts L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, Texas  77002-4995
ATTORNEYS FOR APPELLEE MURPHY EXPLORATION &
PRODUCTION COMPANY - USA
Macey.stokes@bakerbotts.com
Jason.newman@bakerbotts.com


　　　　　　　　　　　　 /s/   Mary A. Keeney
　　　　　　　　　　　　 Mary A. Keeney

# APPENDIX

## TAB

1.   Williams & Meyers' *Manual of Oil and Gas Terms*, p. 718 (1994 ed.)

2.   THE AMERICAN HERITAGE DICTIONARY at 21 (5th ed. 2011)

3.   Order Setting Aside Final Judgment In Part And Entering Amended Final Judgment (SCR 485-86)

4.   Final Judgment (SCR 414-16)

5.   Oil and Gas Leases
     a.   Shirley Adams lease (SCR 150-59)
     b.   William Herbst lease (SCR 161-70)

6.   Affidavit of John McBeath (SCR 172-79)

7.   Affidavit of Gregg Robertson (SCR 238-42)

8.   RRC Field Rules for Eagle Ford Field
     a.   Nov. 2010 order adopting temporary field rules (SCR 88-92)
     b.   June 2012 order making rules permanent (SCR 93-97)

9.   Herbsts' Petition (SCR 5-11)

10.  Murphy's Counterclaim (SCR 115-16)

11.  Excerpt from Murphy's Motion for Summary Judgment (SCR 123)

12.  Excerpt from Court Reporter's Record

13.  Cases

# TAB 1

Williams & Meyers' *Manual of Oil and Gas Terms*, p. 718 (1994 ed.)

## Offset drilling rule

*Syn.:* OFFSET WELL COVENANT. *See* 1 B. Kramer and P. Martin, *Pooling and Unitization* 2-3 (3d ed. 1989).

## Offset royalty

A royalty payable under the provisions of an occasional lease in lieu of the drilling of an offset well.

When a lessee has separate leases on two adjacent tracts, *A* and *B*, if he drills a well on tract *A* which drains tract *B*, under the OFFSET WELL COVENANT (*q.v.*) he will normally be obligated to drill an offset well on tract *B* to protect it from drainage. The drilling of such additional well may be uneconomic in that existing wells suffice to recover the oil or gas in place. Under these circumstances, the lessee may elect to pay the owners of royalty interests in tract *B* an offset royalty, if the lease of tract *B* contains an offset royalty clause, instead of drilling the offset well otherwise required. The offset royalty may be a flat annual sum or may be measured in some other way, *e.g.,* by the royalty which would have been paid if the offset well had been drilled and placed in production. One type of offset royalty clause appears in Foster v. Atlantic Refining Co., 329 F.2d 485, 20 *O.&G.R.* 422 (5th Cir. 1964).

For a case concluding that an overriding royalty owner was entitled to recover offset royalty for drainage when the drilling of a well on the drained tract was precluded by the lessor who was also the lessor of the tract containing the draining well, see Cook v. El Paso Natural Gas Co., 560 F.2d 978, 58 *O.&G.R.* 206 (10th Cir. 1977).

*See also* COMPENSATORY ROYALTY; SUBSTITUTE ROYALTY.

## Offset royalty clause

An express lease clause permitting the lessee to pay royalty in lieu of drilling an offset well. *See* OFFSET ROYALTY.

## Offset well

(1) A well drilled on one tract of land to prevent the drainage of oil or gas to an adjoining tract of land, on which a well is being drilled or is already in production.

Prior to spacing regulations, wells along a surface property line were sometimes drilled in such profusion that they looked somewhat like fence posts. Under spacing regulations, wells are required to be drilled on tracts of a specified size. Where the spacing unit is forty acres, the well can be drilled in the center. This type of development of an oil field is called direct offsetting, since the wells will be directly north and south or east and west of each other. Where the spacing unit is 20 acres, the well on each unit must be diagonal with the well on the next unit. This pattern of development is called DIAGONAL OFFSETTING (*q.v.*)

*See also* EQUIDISTANT OFFSET RULE.

# TAB 2

The American Heritage Dictionary at 21 (5th ed. 2011)

*We will adhere to our plan.* —*tr.* To cause to adhere; make stick. [French *adhérer* < Latin *adhaerēre*, to stick to : *ad-*, ad- + *haerēre*, to stick.]

**ad·her·ence** (ăd-hîr′əns, -hĕr′-) *n.* **1.** The process or condition of adhering. **2.** Faithful attachment; devotion: *"Adherence to the rule of law . . . is a very important principle"* (William H. Webster).

**ad·her·ent** (ăd-hîr′ənt, -hĕr′-) *n.* A supporter, as of a cause or individual: *a vote that pleased adherents of education reform.* ❖ *adj.* **1.** Sticking or holding fast. **2.** *Botany* Joined but not united. Used of dissimilar parts or organs. —**ad·her′ent·ly** *adv.*

**ad·he·sin** (ăd-hē′sĭn, -zĭn) *n.* Any of various substances present on the cell membranes of bacteria that facilitate binding to the cell of a host and that are used as antigens in some vaccines because their location on the cell surface makes them accessible to antibodies. [ADHES(ION) + -IN.]

**ad·he·sion** (ăd-hē′zhən) *n.* **1a.** The process or condition of sticking or staying attached: *the adhesion of the glue to wood.* **b.** *Physics* The physical attraction or joining of two substances, especially the macroscopically observable attraction of dissimilar substances. **2.** *Medicine* **a.** A condition in which bodily tissues that are normally separate grow together. **b.** A fibrous band of scar tissue that binds together normally separate anatomical structures. **3.** Attachment or devotion, as to a religion or belief. [French *adhésion* < Latin *adhaesiō, adhaesiōn-* < *adhaesus,* past participle of *adhaerēre,* to adhere; see ADHERE.]

**ad·he·si·ot·o·my** (ăd-hē′zē-ŏt′ə-mē) *n., pl.* **-mies** Surgical division or separation of adhesions.

**ad·he·sive** (ăd-hē′sĭv, -zĭv) *adj.* **1.** Tending to adhere; sticky. **2.** Gummed so as to adhere. **3.** Tending to persist; difficult if not impossible to shake off: *"He feels an adhesive dread, a sudden acquaintance with the . . . darker side of mankind"* (George F. Will). ❖ *n.* A substance, such as paste or cement, that provides or promotes adhesion. —**ad·he′sive·ly** *adv.* —**ad·he′sive·ness** *n.*

**adhesive tape** *n.* A tape lined on one side with an adhesive.

**ad hoc** (ăd hŏk′, hōk′) *adv.* For the specific purpose, case, or situation at hand and for no other: *a committee formed ad hoc to address the issue of salaries.* ❖ *adj.* **1.** Formed for or concerned with one specific purpose: *an ad hoc compensation committee.* **2.** Improvised and often impromptu: *"On an ad hoc basis, Congress has . . . placed . . . ceilings on military aid to specific countries"* (New York Times). [Latin : *ad,* to + *hoc,* neuter accusative of *hic,* this.]

**ad hoc·ism** also **ad-hoc·ism** (ăd hŏk′ĭz-əm, hō′kĭz-) *n.* The tendency to establish temporary, chiefly improvisational policies and procedures to deal with specific problems.

**ad hom·i·nem** (hŏm′ə-nĕm′, -nəm) *adj.* **1.** Attacking a person's character or motivations rather than a position or argument: *Debaters should avoid ad hominem arguments that question their opponents' motives.* **2.** Appealing to the emotions rather than to logic or reason. [Latin : *ad,* to + *hominem,* accusative of *homō,* man.] —**ad hom′i·nem′** *adv.*

✦**USAGE NOTE** As the principal meaning of the preposition *ad* suggests, the *homo* of *ad hominem* was originally the person to whom an argument was addressed, not its subject. The phrase denoted an argument designed to appeal to the listener's emotions rather than to reason, as in the sentence *The Republicans' evocation of pity for the small farmer struggling to maintain his property is a purely ad hominem argument for reducing inheritance taxes.* This usage appears to be waning; in our 1997 survey, only 37 percent of the Usage Panel found this sentence acceptable. The phrase now chiefly describes an argument based on the failings of an adversary rather than on the merits of the case: *Ad hominem attacks on one's opponent are a tried-and-true strategy for people who have a case that is weak.* Ninety percent of the Panel found this sentence acceptable. The expression now also has a looser use in referring to any personal attack, whether or not it is part of an argument, as in *It isn't in the best interests of the nation for the press to attack him in this personal, ad hominem way.* This use was acceptable to 65 percent of the Panel. Presumably, the Panel would have similar reactions to the modern coinage *ad feminam.*

**ad·i·a·bat·ic** (ăd′ē-ə-băt′ĭk, ā′dī-ə-) *adj.* Of, relating to, or being a reversible thermodynamic process that occurs without gain or loss of heat and without a change in entropy. [< Greek *adiabatos,* impassable : *a-,* not; see A–[1] + *diabatos,* passable (*dia-,* dia- + *batos,* passable < *bainein,* to go; see gʷā- in App. I).] —**ad′i·a·bat′i·cal·ly** *adv.*

**a·dieu** (ə-dyōō′, ə-dōō′) *interj.* Used to express farewell. ❖ *n., pl.* **a·dieus** or **a·dieux** (ə-dyōōz′, ə-dōōz′) A farewell. [Middle English < Old French *a dieu,* (I commend you) to God : *a,* to (< Latin *ad;* see AD–) + *Dieu,* God (< Latin *deus;* see dyeu- in App. I).]

**A·di·ge** (ä′dĭ-jā′, ä′dĭ-jĕ′) A river of northeast Italy rising in the Alps and flowing about 410 km (255 mi) generally south then east to the Adriatic Sea at the Gulf of Venice.

**ad in·fi·ni·tum** (ăd ĭn′fə-nī′təm) *adv. & adj.* To infinity; having no end. [Latin *ad,* to + *īnfīnītum,* accusative of *īnfīnītus,* infinite.]

**ad in·ter·im** (ĭn′tər-əm) *adj.* During or taking place within an intermediate interval of time; temporary: *an ad interim appointment.* [Latin *ad,* to, for + *interim,* the meantime.] —**ad interim** *adv.*

**a·di·os** (ä′dē-ōs′) *interj.* Used to express farewell. [Spanish *adiós* < *a Diós,* to God : *a,* to (< Latin *ad;* see AD–) + *Dios,* God (< Latin *deus;* see dyeu- in App. I).]

**a·dip·ic acid** (ə-dĭp′ĭk) *n.* A white crystalline dicarboxylic acid, $C_6H_{10}O_4$, derived from oxidation of various fats, slightly soluble in water and soluble in alcohol and acetone, and used especially in the manufacture of nylon and polyurethane foams. [< Latin *adeps, adip-,* fat.]

**ad·i·po·cere** (ăd′ə-pō-sîr′) *n.* A brown, fatty, waxlike substance that forms on dead animal tissues in response to moisture. [ADIPO(SE) + Latin *cēra,* wax.]

**ad·i·po·cyte** (ăd′ə-pō-sīt′) *n.* See **fat cell.**

**ad·i·po·nec·tin** (ăd′ə-pə-nĕk′tĭn) *n.* A polypeptide hormone that is secreted by fat cells and regulates glucose and lipid metabolism, especially by increasing insulin sensitivity and muscle uptake of glucose and by decreasing glucose production in the liver. [Latin *adeps, adip-,* fat + Latin *nectere,* to bind; see ned- in App. I + -IN.]

**ad·i·pose** (ăd′ə-pōs′) *adj.* Of, relating to, or composed of animal fat; fatty. ❖ *n.* The fat found in adipose tissue. [New Latin *adipōsus* < *adeps, adip-,* fat.] —**ad′i·pose′ness, ad′i·pos′i·ty** (-pŏs′ĭ-tē) *n.*

**adipose fin** *n.* A fleshy rayless fin located on the back of a fish between the dorsal fin and the caudal fin, found in certain fishes such as salmon, trout, and catfishes.

**adipose tissue** *n.* A type of connective tissue that contains stored cellular fat.

**Ad·i·ron·dack chair** (ăd′ə-rŏn′dăk′) *n.* An outdoor armchair having an angled back and seat made of wide, usually wooden slats.

**Adirondack Mountains** A group of mountains in northeast New York between the St. Lawrence River valley in the north and the Mohawk River valley in the south. The range is part of the Appalachian system and rises to 1,629 m (5,344 ft).

**ad·it** (ăd′ĭt) *n.* An almost horizontal entrance to a mine. [Latin *aditus,* access < past participle of *adīre,* to approach : *ad-,* ad- + *īre,* to go; see ei- in App. I.]

**adj.** *abbr.* **1.** adjective **2.** adjunct **3. Adj.** adjutant

**ad·ja·cen·cy** (ə-jā′sən-sē) *n., pl.* **-cies 1.** The state of being adjacent; contiguity. **2.** A thing that is adjacent.

**ad·ja·cent** (ə-jā′sənt) *adj.* **1.** Close to; lying near: *adjacent cities.* **2.** Next to; adjoining: *adjacent garden plots.* [Middle English < Latin *adiacēns, adiacent-,* present participle of *adiacēre,* to lie near : *ad-,* ad- + *iacēre,* to lie; see yē- in App. I.] —**ad·ja′cent·ly** *adv.*

**adjacent angle** *n.* Either of two angles having a common side and a common vertex.



**Adirondack chair**

**ad·jec·ti·val** (ăj′ĭk-tī′vəl) *adj.* Of, relating to, or functioning as an adjective. —**ad′jec·ti′val·ly** *adv.*

**ad·jec·tive** (ăj′ĭk-tĭv) *n. Abbr.* **a.** or **adj. 1.** The part of speech that modifies a noun or other substantive by limiting, qualifying, or specifying and distinguished in English morphologically by one of several suffixes, such as *-able, -ous,* and *-est,* or syntactically by position directly preceding a noun or nominal phrase. **2.** Any of the words belonging to this part of speech, such as *white* in the phrase *a white house.* ❖ *adj.* **1.** Adjectival: *an adjective clause.* **2.** *Law* Specifying the processes by which rights are enforced, as opposed to the establishing of such rights; remedial: *adjective law.* **3.** Not standing alone; derivative or dependent. [Middle English < Old French *adjectif* < Late Latin *adiectīvus* < *adiectus,* past participle of *adicere,* to add to : *ad-,* ad- + *iacere,* to throw; see yē- in App. I.] —**ad′jec·tive·ly** *adv.*

**adjective pronoun** *n.* A pronoun acting as an adjective, such as *which* in *which dictionaries?*

**ad·join** (ə-join′) *v.* **-joined, -join·ing, -joins** —*tr.* **1.** To be next to; be contiguous to: *property that adjoins ours.* **2.** To attach: *"I do adjoin a copy of the letter that I have received"* (John Fowles). —*intr.* To be contiguous. [Middle English *ajoinen* < Old French *ajoindre, ajoin-* < Latin *adiungere,* to join to : *ad-,* ad- + *iungere,* to join; see yeug- in App. I.]

**ad·join·ing** (ə-joi′nĭng) *adj.* Neighboring; contiguous.

**ad·journ** (ə-jûrn′) *v.* **-journed, -journ·ing, -journs** —*tr.* To suspend until a later stated time. —*intr.* **1.** To suspend proceedings to another time or place. **2.** To move from one place to another: *After the meal, we adjourned to the living room.* [Middle English *ajournen* < Old French *ajourner : a-,* to (< Latin *ad-;* see AD–) + *jour,* day (< Late Latin *diurnum* < Latin *diurnus,* daily < *diēs,* day; see dyeu- in App. I).] —**ad·journ′ment** *n.*

**Adjt.** *abbr.* adjutant

**ad·judge** (ə-jŭj′) *tr.v.* **-judged, -judg·ing, -judg·es 1a.** To determine or decide by judicial procedure; adjudicate. **b.** To order judicially; rule. **c.** To award (damages, for example) by law. **2.** To regard, consider, or deem: *was adjudged incompetent.* [Middle English *ajugen* < Old French *ajuger* < Latin *adiūdicāre;* see ADJUDICATE.]

**ad·ju·di·cate** (ə-jōō′dĭ-kāt′) *v.* **-cat·ed, -cat·ing, -cates** —*tr.* **1.** To make a decision (in a legal case or proceeding), as where a judge or arbitrator rules on some disputed issue or claim between the parties. **2.** To study and settle (a dispute or conflict): *The principal adjudicated the students' quarrel.* **3.** To act as a judge of (a contest or an aspect of a contest). —*intr.* **1.** To make a decision in a legal case or proceeding: *a judge adjudicating on land claims.* **2.** To study and settle a dispute or conflict. **3.** To act as a judge of a contest. [Latin *adiūdicāre, adiūdicāt-,* to award to (judicially) : *ad-,* ad- + *iūdicāre,* to judge (< *iūdex,* judge; see JUDGE).] —**ad·ju′di·ca′tion** *n.* —**ad·ju′di·ca′tive** *adj.* —**ad·ju′di·ca′tor** *n.*

**ad·junct** (ăj′ŭngkt′) *n.* **1.** Something attached to another in a dependent or subordinate position. See Synonyms at **attachment. 2.** A person associated with another in a subordinate or auxiliary capacity. **3.** *Grammar* A clause or phrase added to a sentence that, while not essential to the sentence's structure, amplifies its meaning, such as *for several hours* in *We waited for several hours.* **4.** *Logic* A nonessential attribute of a thing. ❖ *adj.* **1.** Added or connected in a subordinate or auxiliary capacity: *an adjunct clause.* **2.** Attached to a faculty or staff in a temporary or auxiliary capacity: *an adjunct professor of history.* [< Latin *adiūnctus,* past participle of *adiungere,* to join to; see ADJOIN.] —**ad·junc′tion** (ə-jŭngk′shən) *n.* —**ad·junc′tive** *adj.*

**ad·ju·ra·tion** (ăj′ə-rā′shən) *n.* An earnest, solemn appeal. —**ad·jur′a·to′ry** (ə-jŏŏr′ə-tôr′ē) *adj.*

**ad·jure** (ə-jŏŏr′) *tr.v.* **-jured, -jur·ing, -jures 1.** To command or enjoin solemnly, as under oath: *"adjuring her in the name of God to declare*



**adjacent angle**
The common vertex is *O;* angle *AOB* is adjacent to angle *BOC.*

| ă | pat | oi | boy |
|---|---|---|---|
| ā | pay | ou | out |
| âr | care | ŏŏ | took |
| ä | father | ŏŏr | lure |
| ĕ | pet | ōō | boot |
| ē | be | ŭ | cut |
| ĭ | pit | ûr | urge |
| ī | bite | th | thin |
| îr | pier | *th* | this |
| ŏ | pot | zh | vision |
| ō | toe | ə | about, |
| ô | paw | | item |
| ôr | core | | |

**Stress marks:** ′ (primary); ′ (secondary), as in **dictionary** (dĭk′shə-nĕr′ē)

# TAB 3

Order Setting Aside Final Judgment in Part and
Entering Amended Final Judgment (SCR 485-86)

| | | |
|---|---|---|
| SHIRLEY ADAMS, CHARLENE BURGESS, | § | IN THE DISTRICT COURT |
| WILLIE MAE HERBST JASIK, | § | |
| WILLIAM ALBERT HERBST, | § | |
| HELEN HERBST and | § | |
| R. MAY OIL & GAS COMPANY, LTD., | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| vs. | § | 218th JUDICIAL DISTRICT |
| | § | |
| MURPHY EXPLORATION & | § | |
| PRODUCTION CO.-USA, | § | |
| A DELAWARE CORPORATION, | § | |
| Defendant. | § | |
| | § | ATASCOSA COUNTY, TEXAS |

FILED 2:40 O'CLOCK P M
MARGARET E. LITTLETON, DISTRICT CLERK

FEB 10 2015

CLERK DISTRICT COURT ATASCOSA CO., TX
_____ DEPUTY

## ORDER SETTING ASIDE FINAL JUDGMENT AND ENTERING AMENDED FINAL JUDGMENT — IN PART

On February 2, 2015, came on to be considered the Motion for New Trial, Motion to Vacate or Modify the Judgment, and Motion to Reconsider the Court's Decision on Partial Summary Judgment Motions, filed by Plaintiffs Shirley Adams, Charlene Burgess, Willie Mae Herbst Jasik, William Albert Herbst, Helen Herbst, and R. May Oil & Gas Company, Ltd. The Court has considered the motions, the response filed by Murphy Exploration & Production Co.-USA, and the arguments presented by counsel and is of the opinion that Plaintiffs' motions should be granted in part and denied in part and modified in part for the following reasons:

1. The December 15, 2014 Final Judgment was presented to the Court without proper notice to Plaintiffs, in violation of Texas Rule of Civil Procedure 305;

2. The December 15, 2014 Final Judgment improperly awards appellate attorney's fees to Murphy. The Court finds that those fees are not recoverable under either Chapter 37 or Chapter 38 of the Texas Civil Practice & Remedies Code. The Court further finds that it would be neither equitable nor just to award those fees. The Court further finds that those fees are not

2250162.1

485

*Final Judgment*

The Court vacates and modifies its ~~order~~ in part with regard to the award of appellate fees to Murphy. The Court modifies paragraph 3 of its December 15, 2014 final judgment in this matter and finds that should Plaintiffs appeal this Final Judgment, Murphy will expend reasonable and necessary attorneys' fees in the amount of $25,000 for defending the matter in the Court of Appeals, $7500 for responding to a petition for review, and $20,000 in the event the Supreme Court orders briefing on the merits and grants the petition. Therefore, should Plaintiffs unsuccessfully appeal this Amended Final Judgment, they are ordered to pay Murphy's reasonable and necessary attorney's fees on appeal as directed in this judgment.

3. The Court finds that its rulings on Plaintiffs' Motion for Partial Summary Judgment and Defendant's Motion for Partial Summary Judgment should stand.

IT IS THEREFORE ORDERED THAT Plaintiffs' Motion for New Trial, Motion to Vacate or Modify the Judgment, and Motion to Reconsider the Court's Decision on Partial Summary Judgment Motions is denied, except that the December 15, 2014 Final Judgment in this case is vacated and modified solely with regard to paragraph 3 as reflected in this order.

IT IS FURTHER ORDERED THAT Plaintiffs' Motion for Partial Summary Judgment is DENIED AND Defendant's Motion for Partial Summary Judgment is GRANTED.

Costs are taxed against Plaintiffs.

IT IS FURTHER ORDERED that all other relief requested in this cause is DENIED.

SIGNED this 10th day of February, 2015.

STELLA SAXON, Judge Presiding

# TAB 4

Final Judgment (SCR 414-16)

CAUSE NO. 13-05-0466-CVA

SHIRLEY ADAMS, CHARLENE          §     IN THE DISTRICT COURT
BURGESS, WILLIE MAE HERBST       §
JASIK, WILLIAM ALBERT HERBST,    §
HELEN HERBST and                 §
R. MAY OIL & GAS COMPANY, LTD.,  §
                                 §
        *Plaintiffs*             §
                                 §
                                 §
vs.                              §     218 TH JUDICIAL DISTRICT
                                 §
MURPHY EXPLORATION &             §
PRODUCTION CO. USA, A DELAWARE   §
CORPORATION,                     §
                                 §
        *Defendant.*             §     ATASCOSA COUNTY, TEXAS

## FINAL JUDGMENT

WHEREAS, Plaintiffs Shirley Adams, Charlene Burgess, Willie Mae Herbst

Jasik, William Albert Herbst, Helen Herbst, and R. May Oil & Gas Company, Ltd. (collectively

"Plaintiffs") filed a Motion for Partial Summary Judgment on September 5, 2013.

WHEREAS, Murphy Exploration & Production Company—USA ("Murphy")

filed its Motion For Partial Summary Judgment on January 24, 2014.

· WHEREAS, the cross-motions for partial summary judgment concerned the two

leases executed by Plaintiffs Shirley Adams and William Herbst covering the following tracts of

land:

> 302.0 acres of land, more or less, in the Octavius A. Cook Survey
> No. 195, A-176, in Atascosa County, Texas, and being the same
> land set aside to Shirley Mae Herbst Adams in Division No. 5 in an
> Agreement on Division of Estate dated October 20, 1993, recorded
> in Volume 865, Page 506 of the Deed Records of Atascosa
> County, Texas."

> 302.0 acres of land, more or less, in the Mark H. Moore Survey
> No. 185, A-559 and the Octavius A. Cook Survey No. 195, A-176
> in Atascosa County, Texas, and being the same land set aside to
> William Albert Herbst in Division No. 4 in an Agreement on

**CIVIL**

"Division of Estate dated October 20, 1993, recorded in Volume 865, Page 506 of the Deed Records of Atascosa County, Texas."

The two leases together are referred to as the "Leases."

WHEREAS, On September 2, 2014, the Court heard oral argument on both Motions for Partial Summary Judgment. On November 14, 2014, the Court, having considered the motions, responses, and arguments of counsel, GRANTED Murphy's Motion for Partial Summary Judgment and DENIED Plaintiffs' Motion for Partial Summary Judgment.

WHEREAS, On _____, Murphy moved for entry of final judgment in this matter. Having considered the motion, the Court hereby GRANTS Murphy's Motion for Entry of Final Judgment.

It is, therefore, ORDERED, ADJUDGED, AND DECREED as follows:

1.      Based upon the Court's Order granting Murphy's Motion for Partial Summary Judgment and denying Plaintiffs' Motion for Partial Summary Judgment, the Court finds that judgment should be entered and is hereby RENDERED in favor of Murphy, and the Court DECLARES as follows:

a.      Paragraph 25 of the Leases is unambiguous;

b.      The Herbst #1H Well, on which Murphy commenced drilling operations June 8, 2012, was drilled as an off-set well pursuant to Paragraph 25 of the Leases and satisfies the requirements of Paragraph 25 of the Leases; and

c.      Murphy has not breached the Leases with regard to the drilling and completion of the Herbst #1H Well and does not owe compensatory or other royalties or any other obligations under Paragraph 25 as a result.

2.      The Court has found that Murphy's attorneys' fees in the amount of $120,853.36 and costs in the amount of $5,119.71 are reasonable and necessary and it is

CIVIL

equitable and just for Plaintiffs to pay Murphy's ~~attorney's fees~~ and costs.  Therefore, Plaintiffs are ORDERED to pay ~~Murphy's reasonable and necessary attorneys' fees in the amount of~~ ss 12.15.2014 ~~$120,853.36 and~~ costs in the amount of $5,119.71.

3.      The Court has further found that, should Plaintiffs appeal this Final Judgment, Murphy will expend reasonable and necessary attorneys' fees in the amount of $150,000 to defend the appeal.  Therefore, should Plaintiffs unsuccessfully appeal this Final Judgment, they are ORDERED to pay Murphy's reasonable and necessary attorneys' fees on appeal in the amount of $150,000.

4.      Plaintiffs TAKE NOTHING by their claims.

5.      This is a final judgment, finally disposing of all claims and all parties, and is appealable.

SIGNED this _15_ day of _December_, 2014

_____
JUDGE PRESIDING

# TAB 5

Oil and Gas Leases
a. Shirley Adams Lease (SCR 150-59)
b. William Herbst Lease (SCR 161-70)

Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the Public Records: Your social security number or your driver's license number.

Producers 88 (7/69) Paid-Up
With 640 Acres Pooling Provision

## OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this __14th__ day of __August__, 2009, between SHIRLEY MAE HERBST ADAMS, whose address is P. O. Box 37, Karnes City, Texas 78118, Lessor (whether one or more), and

ALVIN M. BARRETT & ASSOCIATES INC., a Texas Corporation, 11202 Sandstone Street, Houston, Texas 77072, Lessee.

### WITNESSETH:

1.      Lessor, in consideration of Ten and No/100 Dollars and other good and valuable consideration, the receipt of which is hereby acknowledged, and of the covenants and agreements of Lessee hereinafter contained, does hereby grant, lease and let unto Lessee the land covered hereby for the purposes and with the exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas, sulphur and all other minerals (whether or not similar to those mentioned), together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, telephone lines, employee houses and other structures on said land, necessary or useful in Lessee's operations in exploring, drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any other land adjacent thereto. The land covered hereby, herein called "said land, is located in the County of __Atascosa__, State of __Texas__, and is described as follows:

> 302.0 acres of land, more or less, in the Octavius A. Cook Survey No. 195, A-176 in Atascosa County, Texas, and being the same land set aside to Shirley Mae Herbst Adams in Division No. 5 in an Agreement on Division of Estate dated October 20, 1993, recorded in Volume 865, Page 506 of the Deed Records of Atascosa County, Texas.

~~This lease also covers and includes, in addition to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition.~~ Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment hereunder, said land shall be deemed to contain __302.0__ acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights and options hereunder.

2.      Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of __three (3) years__ from the date hereof, hereinafter called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3.      As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipe line to which lessee may connect its wells, the equal ~~one-eighth (1/8)~~ one-fifth (1/5th) part of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such ~~one-eighth (1/8)~~ one-fifth (1/5th) part of such oil at the wells as of the day it is run to the pipe line or storage tanks, lessor's interest, in either case, to bear ~~one-eighth (1/8)~~ one-fifth (1/5th) of the cost of treating oil to render it marketable pipe line oil; (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, ~~one-eighth (1/8)~~ one-fifth (1/5th) of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, ~~at the mouth of the well of one-eighth (1/8)~~ one-fifth (1/5th) of such gas and casinghead gas; (c) ~~To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one-tenth (1/10) either in kind or value at the well or mine at lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton~~ If, at the expiration of the primary term or at any time or times thereafter, there is any well on said land or on lands with which said land or any portion thereof has been pooled, capable of producing oil or gas, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells, but in the exercise of such diligence, lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety (90) consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety (90) day period, lessee shall pay or tender, by ~~check or draft of lessee~~, as royalty, a sum equal to ~~one dollar ($1.00)~~ twenty-five dollars ($25.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety (90) day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, and may be deposited in the __PAY DIRECTLY TO LESSOR__ ~~Bank at~~_____, or its successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time that lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, lessee may, in lieu of any other method of payment herein

Adams Shirley Herbst 302 ac lease to Barrett.bar



ATTA

EXHIBIT

3a

provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownerships thereof, as lessee may elect. Any payment hereunder may be made by check or draft of lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above on or before the last date for payment. Nothing herein shall impair lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

3A. "Gross Proceeds", as used herein, shall mean the total proceeds received by Lessee for any non-affiliated third-party sale of such oil, gas or other substance; provided, however, if any contract covering oil, gas or other substance produced from the lands covered hereby, or any contract used for the purpose of establishing the price of Lessor's royalty oil or gas, provides for any deduction for the expenses of production (except for Lessor's proportionate share of actual costs of extricating the sulphur, if any, from the gas and shrinkage, if any, resulting from such extraction), post production, gathering, dehydration, compression, transportation, manufacturing, treating, or marketing of such oil or gas, then such deduction shall be added to the price received by Lessee for such oil or gas so that Lessor's royalty shall not be charged directly or indirectly with any such expenses. Provided, however, should said gas contract provide for a deduction for transportation, shrinkage, or treating to make gas marketable downstream from Lessee's sales meter, and such deduction be levied by a bona fide non-affiliated third party, then in such event, Lessor's Royalty Share shall bear its proportionate share of non-affiliated third party transportation shrinkage and treating deductions, but no other post production costs shall be deducted from Lessor's Royalty Share.

3B. The phrase "free of cost(s)" or "free of all costs", as used herein, shall mean that the royalty interest shall not be charged and shall not bear any costs whatsoever in connection with the exploration, production, gathering, compression, transportation (except "Third Party Transportation Costs", as hereinafter defined, actually incurred by Lessee), marketing or "Treating", as hereinafter defined, of oil, gas or other substance produced hereunder. Provided, however, that Lessor's royalty shall bear its proportionate share of applicable production, windfall profits and severance taxes properly assessable against and attributable to said royalty interest. "Treating" shall mean those methods used by Lessee at the lease to remove contaminants from the wellhead hydrocarbons as may be necessary to place the hydrocarbons in a merchantable condition. Provided, however, should it be necessary for Lessee to install an amine unit on the leased premises in order to make said gas marketable, Lessor shall bear its prorata share of shrinkage of such gas as contaminants are removed from the gas stream processed by said amine plant. However, Lessor shall not bear its prorata share of fuel gas, amine, compression or other costs necessary to operate said amine plant. "Third Party Transportation Costs" shall mean the tariff rate based transportation costs incurred by Lessee in an arm's length transaction with a bona fide third party that is not a subsidiary or affiliate of Lessee in order to take gas and/or liquid hydrocarbons from the point that such hydrocarbons have been separated, treated (if necessary), processed (if performed) and placed in a merchantable condition.

4. Lessee is hereby granted the right, at its option, to pool or unitize any land covered by this lease with any other land covered by this lease, and/or with any other land, lease, or leases, as to any or all minerals or horizons, so as to establish units containing not more than 80 surface acres, plus 10% acreage tolerance; provided, however, units may be established as to any one or more horizons, or existing units may be enlarged as to any one or more horizons, so as to contain not more than 640 surface acres plus 10% acreage tolerance, if limited to one or more of the following: (1) gas, other than casinghead gas, (2) liquid hydrocarbons (condensate) which are not liquids in the subsurface reservoir, (3) minerals produced from wells classified as gas wells by the conservation agency having jurisdiction. If larger units than any of those herein permitted, either at the time established, or after enlargement, are prescribed by special field rules or permitted by statewide Rule 86 for horizontal wells for the drilling or operation of a well at a regular location, or for obtaining maximum allowable from any well to be drilled, drilling, or already drilled, any such unit may be established or enlarged to conform to the size prescribed by special field rules or permitted by statewide Rule 86 for horizontal wells. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Each of said options may be exercised by Lessee at any time and from time to time while this lease is in force, and whether before or after production has been established either on said land, or on the portion of said land included in the unit, or on other land unitized therewith. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be mineral, royalty, or leasehold interests in lands within the unit which are not effectively pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted upon said land under this lease. There shall be allocated to the land covered by this lease within each such unit (or to each separate tract within the unit if this lease covers separate tracts within the unit) that proportion of the total production of unitized minerals from the unit, after deducting any used in lease or unit operations, which the number of surface acres in such land (or in each such separate tract) covered by this lease within the unit bears to the total number of surface acres in the unit, and the production so allocated shall be considered for all purposes, including payment or delivery of royalty, overriding royalty and any other payments out of production, to be the entire production of unitized minerals from the land to which allocated in the same manner as though produced therefrom under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation of any unit hereunder which includes land not covered by this lease shall not have the effect of exchanging or transferring any interest under this lease (including, without limitation, any shut-in royalty which may become payable under this lease) between parties owning interests in land covered by this lease and parties owning interests in land not covered by this lease. Neither shall it impair the right of Lessee to release as provided in paragraph 5 hereof, except that Lessee may not so release as to lands within a unit while there are operations thereon for unitized minerals unless all pooled leases are released as to lands within the unit. At any time while this lease is in force Lessee may dissolve any unit established hereunder by filing for record in the public office where this lease is recorded a declaration to that effect, if at that time no operations are being conducted thereon for unitized minerals. Subject to the provisions of this paragraph 4, a unit once established hereunder shall remain in force so long as any lease subject thereto shall remain in force. If this lease now or hereafter covers separate tracts, no pooling or unitization of royalty interests as between any such separate tracts is intended or shall be implied or result merely from

the inclusion of such separate tracts within this lease but Lessee shall nevertheless have the right to pool or unitize as provided in this paragraph 4 with consequent allocation of production as herein provided. As used in this paragraph 4, the words "separate tract" mean any tract with royalty ownership differing, now or hereafter, either as to parties or amounts, from that as to any other part of the leased premises.

5. Lessee may at any time and from time to time execute and deliver to Lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations, as to the released acreage or interest.

6. Whenever used in this lease the word "operations" shall mean operations for and any of the following: drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

7. Lessee shall have the use, free from royalty, of water, other than from Lessor's water wells, and of oil and gas produced from said land in all operations hereunder. Lessee shall have the right at any time to remove all machinery and fixtures placed on said land, including the right to draw and remove casing. No well shall be drilled nearer than 200 feet to the house or barn now on said land without the consent of the Lessor. Lessee shall pay for damages caused by its operations to growing crops and timber on said land.

8. The rights and estate of any party hereto may be assigned from time to time in whole or in part and as to any mineral or horizon. All of the covenants, obligations, and considerations of this lease shall extend to and be binding upon the parties hereto, their heirs, successors, assigns, and successive assigns. No change or division in the ownership of said land, royalties, or other moneys, or any part thereof, howsoever effected, shall increase the obligations or diminish the rights of Lessee, including, but not limited to, the location and drilling of wells and the measurement of production. Notwithstanding any other actual or constructive knowledge or notice thereof of or to Lessee, its successors or assigns, no change or division in the ownership of said land or of the royalties, or other moneys, or the right to receive the same, howsoever effected, shall be binding upon the then record owner of this lease until thirty (30) days after there has been furnished to such record owner at his or its principal place of business by Lessor or Lessor's heirs, successors, or assigns, notice of such change or division, supported by either originals or duly certified copies of the instruments which have been properly filed for record and which evidence such change or division, and of such court records and proceedings, transcripts, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division. If any such change in ownership occurs by reason of death of the owner, Lessee may, nevertheless pay or tender such royalties, or other moneys, or part thereof, to the credit of the decedent in a depository bank provided for above.

9. In the event Lessor considers that Lessee has not complied with all its obligations hereunder, both express and implied, Lessor shall notify Lessee in writing, setting out specifically in what respects Lessee has breached this contract. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by Lessor. The service of said notice shall be precedent to the bringing of any action by Lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on Lessee. Neither the service of said notice nor the doing of any acts by Lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that Lessee has failed to perform all its obligations hereunder. If this lease is cancelled for any cause, it shall nevertheless remain in force and effect as to (1) sufficient acreage around each well as to which there are operations to constitute a drilling or maximum allowable unit under applicable governmental regulations, (but in no event less than forty acres), such acreage to be designated by Lessee as nearly as practicable in the form of a square centered at the well, or in such shape as then existing spacing rules require; and (2) any part of said land included in a pooled unit on which there are operations. Lessee shall also have such easements on said land as are necessary to operations on the acreage so retained.

10. Lessor hereby warrants and agrees to defend title to said land by, through and under Lessor, but not otherwise. Lessor's rights and interests hereunder shall be charged primarily with any mortgages, taxes or other liens, or interest and other charges on said land, but Lessor agrees that Lessee shall have the right at any time to pay or reduce same for Lessor, either before or after maturity, and be subrogated to the rights of the holder thereof and to deduct amounts so paid from royalties or other payments payable or which may become payable to Lessor and/or assigns under this lease. If this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether Lessor's interest is herein specified or not), or no interest therein, then the royalties and other moneys accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by Lessor) shall be paid out of the royalty herein provided. This lease shall be binding upon each party who executes it without regard to whether it is executed by all those named herein as Lessor.

11. If, while this lease is in force, at, or after the expiration of the primary term hereof, it is not being continued in force by reason of the shut-in well provisions of paragraph 3 hereof, and Lessee is not conducting operations on said land by reason of (1) any law, order, rule or regulation, (whether or not subsequently determined to be invalid) or (2) any other cause, whether similar or dissimilar, (except financial) beyond the reasonable control of Lessee, the primary term hereof shall be extended until the first anniversary date hereof occurring ninety (90) or more days following the removal of such delaying cause, and this lease may be extended thereafter by operations as if such delay had not occurred, provided Lessee notifies Lessor in writing of such extension and justifying cause within thirty (30) days of its commencement and shall pay Twenty-Five and No/100 Dollars ($25.00) per acre for each ninety (90) days said lease is extended.

a) In the event any party is rendered unable, wholly or in part, by Force Majeure (as hereinafter defined) to carry out its obligations under this agreement, then the party relying on such Force Majeure (or its or their representatives) shall give thirty (30) days written notice of the Force Majeure with reasonably full particulars concerning it to the other party. The obligations of the party relying on the Force Majeure, insofar as they are affected

by the Force Majeure, shall be suspended during the continuation of all the Force Majeure and for a reasonable period thereafter not to exceed thirty (30) days.

b) The term "Force Majeure" as here employed shall include acts of God, strikes, lockouts, or the public enemy, wars, blockade, insurrections, riots, epidemics, landslides, lightning, fires, floods, tornadoes, hurricanes, explosions, acts or requests, inability or unavoidable delay in obtaining governmental permits or authorizaton for drilling or other operations to be controlled hereunder, any other governmental action, governmental delay, restraint, inaction, rules or orders of federal, state or municipal governments or of any federal, state or municipal officer or agent purporting to act under duly constituted authority, interruptions of transportation, freight embargoes, unavailability of drilling rigs, equipment or essential personnel, any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming Force Majeure.

IN WITNESS WHEREOF this instrument is executed on the date first above written:

SEE ADDENDUM CONTAINING PARAGRAPHS 12 THROUGH 51 ATTACHED HERETO AND MADE A PART HEREOF FOR ALL PURPOSES.

Adams Shirley Market 302 as lease to Barrett bar

4

## ADDENDUM

NOTWITHSTANDING anything to the contrary hereinabove provided, it is expressly agreed and stipulated by and between the Lessor and Lessee that:

12.) Reference in this lease to "other minerals" shall be deemed to include, in addition to oil and gas, only such related sulphur and hydrocarbons as may be produced therewith and extracted therefrom and shall not include coal, lignite, uranium, fissionable materials, other sulphur, or any unrelated or hard minerals.

13.) The right to maintain this lease in force and effect beyond the expiration of the primary term by the payment of shut-in royalties as is set out in paragraph 3 supra, is a recurring right which may be exercised by Lessee from time to time but shall not exceed an aggregate or cumulative period of time of more than three (3) years.

14.) The right of Lessee to pool the acreage covered by this lease with other acreage, as is provided for in paragraph 4 supra, is hereby limited to the extent that if a well is drilled on the leased acreage and this pooling privilege is exercised, then at least one-half (½) of the unit must be land covered by this lease, or one-half (½) of this lease must be included within the unit, and if the well is drilled on the acreage pooled with this lease, then at least one-third (1/3rd) of the unit must be land covered by this lease, or one-third (1/3rd) of this lease must be included within the unit, at Lessee's discretion; provided, however, if the amount of acreage remaining which has not theretofore been included in a pooled unit or allocated to a producing well is insufficient to satisfy the above requirement, then all such remaining available acreage shall be included within such unit. Anything herein to the contrary notwithstanding, it is understood and agreed that the provisions of this paragraph 14.), shall not apply to the pooling of this lease with any other Oil, Gas and Mineral Leases dated August 14, 2009, executed by Mary Ann Herbst May, Helen Louise Herbst, William Albert Herbst, Charlene Ann Burgess, Shirley Mae Herbst Adams, Susan G. Herbst or William Albert Herbst and wife, Susan G. Herbst, as Lessor to Alvin M. Barrett & Associates Inc., as Lessee that covers other acreage not covered by this lease.

15.) In the event a pooled unit is created under the provisions of paragraph 4 supra, production, drilling, or reworking operations on said unit shall not be effective to maintain this lease in force as to acreage outside of such unit beyond the end of the primary term. However, this lease may be maintained in force as to such unpooled acreage in any other manner provided herein.

16.) In the event Lessee exercises any pooling privilege granted, Lessee agrees to furnish Lessor with a copy of any unit designation within thirty (30) days after the same is filed for record.

17.) The royalties which are to be paid under the terms of this lease for the production of oil or gas after the end of the primary term or continuous development, whichever later occurs, shall never be less than FIFTY AND NO/100 DOLLARS ($50.00) per net mineral acre per annum for the number of acres which are being held under each well, and the accounting period for such royalties shall be from January 1st through December 31st of each year during the tenure of this lease, commencing with January 1st following the first production of oil and/or gas from the leased premises, and in the event that there has been a deficiency of royalty payments made during the accounting period for which such minimum royalty payments are due, the Lessee shall have a period of ninety (90) days within which to make up such deficiency from and after having received written notice from the Lessor of such deficiency, and Lessee shall be deemed conclusively to have received such notice as of the date that same was mailed in a United States Post Office by certified mail, return receipt requested, addressed solely to the Operator as designated at the Railroad Commission, irrespective of the ownership of this lease. Evidence of such mailing shall be by Postal Receipt Form P.S. 3811. Should Lessee fail to make up such deficiency within the prescribed time, this lease shall terminate as to all parties, but such termination shall not relieve Lessee of the obligation of paying a minimum royalty in accordance with the terms of this lease to its date of termination. It is provided, however, that such lease termination in the preceding sentence shall not apply to BOPCO, L.P., BMT O&G TX L.P., KEYSTONE O&G TX, L.P., LMBI O&G TX, L.P., SRBI O&G TX, L.P., THRU LINE O&G TX, L.P., and any affiliates thereof, but any unpaid minimum royalty shall bear interest at the rate of ten percent (10%) per annum or the maximum lawful rate of interest for such sums, whichever is the lesser amount. Lessee is in nowise obligated to maintain this entire lease in force and effect, and upon releasing a portion of the acreage covered hereunder shall be relieved of this minimum royalty provision as to the acreage so released from and after the date of such release, and if released on other than an anniversary date, Lessee shall be liable for a prorata part of the annual minimum royalty up to the date of said release. This minimum royalty provision shall not be applicable to the period of time for which the shut-in royalties have been paid under the terms of this lease.

18.) Lessee agrees to pay for any actual surface damages caused by its operations on the leased premises to growing crops, grass, cattle, roads, fences, and improvements on said land; and further, within 120 days after the completion of any well, weather permitting, to fill and level all slush pits used in connection therewith and stock pile base material brought in to said site for Lessor; and upon abandonment of any well or other structure or facility on said land, to reasonably restore the surface of said land so occupied by such well, structure or facility to as near its natural state as possible. Lessee further agrees to pay Lessor the sum of THREE THOUSAND FIVE HUNDRED AND NO/100 DOLLARS ($3,500.00) per acre for the site location ~~for any well~~ that may be drilled on the leased premises, such payment to be made prior to moving on the location, and, furthermore, to pay the sum of THREE THOUSAND FIVE HUNDRED AND NO/100 DOLLARS ($3,500.00) per acre for each acre to be regularly used by Lessee for roadways, tank batteries, or other above ground facility placed on the land by Lessee. Lessee shall consult with surface owner or Lessor prior to cutting, erecting or altering any fence. Any changes to any fence such as, but not limited to erecting new fence, cutting any existing fence, altering any existing fence, etc. shall be done by a fence contractor mutually acceptable to Lessor and Lessee or surface owner, to Lessor or surface owner's reasonable specifications and at Lessee's expense. When requested by Lessor, Lessee will fence, with a good and substantial fence capable of turning livestock of ordinary demeanor, or in a high fenced area, a like kind fence, all permanent type facilities it places on the leased premises. All roadways to be regularly used by Lessee must be improved with base material with a minimum of six (6) inch compacted and regularly maintained.

SIGNED FOR IDENTIFICATION _Shirley Mae Herbst Adams_

19.) Lessee, his agents, servants, employees, contractors, or sub-contractors shall not be permitted to carry firearms on to the leased premises, nor to fish or hunt thereon, and any breach of this covenant such person shall not again be permitted to come on to the leased premises.

20.) The parties recognize that it is difficult to control fishing or the hunting of game on the leased premises and to ascertain the monetary damages to Lessor's surface rights caused by any such unauthorized activity. Lessee therefore covenants that if any of its officers, agents, employees, servants or invitees bring on to the leased premises a dog or firearms of any description without the expressed written permission of Lessor, Lessee will immediately pay to Lessor the sum of $1,000.00 for each of such incidents as agreed liquidated damages. Such payment is in addition to any fine or fines which might be imposed under the appropriate statutes or to any injunctive relief to which Lessor may be entitled from a court of equity.

21.) Lessee shall not have the right to use water from Lessor's water wells or surface water without Lessor's written consent. Lessee's right to take and use water from Lessor's wells not drilled by Lessee on the leased premises shall not include the right to use fresh water from any fresh water sands or strata underlying the leased premises for any secondary recovery operations that may be conducted on the leased premises.

22.) Lessor shall have the right, at Lessor's own risk and expense, and in accordance with the regulations of the Railroad Commission of Texas, to utilize for fresh water well purposes the well bore of any well drilled by Lessee on the leased premises prior to the permanent plugging and abandoning of any such oil or gas well. In the event that, prior to the time Lessee permanently plugs and abandons any such well, Lessee is furnished an approved (by the Railroad Commission of Texas) copy of Form P13, Lessee, instead of permanently plugging any such well, will plug the well at the base of the fresh water sand and install a cap on the surface end of the casing, following which Lessee will file, in the appropriate Railroad Commission District Office, the approved copy of Form P13, with two copies of Form W3, Plugging Record, in accordance with the statewide Rules 14(a) and 80 of the Railroad Commission of Texas. If Lessor assumes ownership of the well bore Lessor also assumes all liability for said well bore.

It is further agreed that Lessee will contact Lessor via telephone or facsimile to advise Lessor that Lessee is ready to abandon said well, and Lessor will have twenty-four (24) hours from such time he is advised of such plugging decision to advise Lessee whether Lessor wishes to take over said well bore to produce fresh water.

If Lessee drills a separate water well on the leased premises and when the Lessee's need for the same has ceased, the water well will be left open and become the property of Lessor, if Lessor so desires and so notifies Lessee, subject to the rules and regulations or laws promulgated by any state, federal or local regulatory body having jurisdiction over the same.

Lessor further agrees, from and after the date of the turnover of a well, to indemnify, defend and hold harmless Lessee from any and all liability that may arise relative to Lessor's taking over said well. Lessor will not indemnify Lessee for any acts it did to the well bore or casing prior to turning over the well bore.

23.) a) VERTICAL WELLS: At the expiration of the primary term or the extended term hereof, or upon the expiration of the continuous operations as provided below, this lease shall terminate except insofar as it covers the following, and the amount of acreage which may be included in pooled units under Paragraph 4 above shall be limited to the acreage amounts prescribed by the government regulatory body having authority, but in no event shall the retained acreage be larger than 640.0 acres.

b) HORIZONTAL WELLS: The maximum authorized size of pooled units and retained units for horizontal wells (either oil or gas) shall be calculated according to the following formula A (acreage) = [L (actual lateral length drilled) x .11488] + 320, or such larger unit prescribed by special field rules or permitted by statewide Rule 86 for horizontal wells, but in no event larger than 640 acres.

24.) As used in the terms of this lease, the words "if operations for drilling are not commenced" or "commencement of drilling operations" shall be defined as the date on which the drilling of a well has actually commenced and commonly called "spudded in"; and the "completion of a well" shall be defined as the first date on which the completion rig has actually moved off the leased premises, or the date on which oil and/or gas is first produced from the well, whichever event occurs first. Any subsequent work done on the well will be deemed reworking operations.

25.) It is hereby specifically agreed and stipulated that in the event a well is completed as a producer of oil and/or gas on land adjacent and contiguous to the leased premises, and within 467 feet of the premises covered by this lease, that Lessee herein is hereby obligated to, within 120 days after the completion date of the well or wells on the adjacent acreage, as follows:

(1) to commence drilling operations on the leased acreage and thereafter continue the drilling of such off-set well or wells with due diligence to a depth adequate to test the same formation from which the well or wells are producing from on the adjacent acreage; or

(2) pay the Lessor royalties as provided for in this lease as if an equivalent amount of production of oil and/or gas were being obtained from the off-set location on these leased premises as that which is being produced from the adjacent well or wells; or

(3) release an amount of acreage sufficient to constitute a spacing unit equivalent in size to the spacing unit that would be allocated under this lease to such well or wells on the adjacent lands, as to the zones or strata producing in such adjacent well.

SIGNED FOR IDENTIFICATION: *Shirley Mae Herbst Adams*

Adams Shirley Herbst 102 ac kum to Burrez bw

26.) In the event Lessee does not remove all property and fixtures placed on the leased premises within ONE HUNDRED EIGHTY (180) DAYS after the termination of this lease, and does not make suitable arrangements with the Lessor within said period of time to leave such property on the premises for a set additional period of time, title to all of such property so left on the leased premises shall pass to and vest in Lessor.

27.) Once royalty checks have commenced being tendered, the mineral owner will be paid within sixty (60) days after the end of the month the production leaves the leased premises. If payments are not forthcoming within the designated period, interest will again accrue on the unpaid balance at the statutory rate. If more than twelve (12) months transpire between royalty payments the lease shall expire as to those lands within the retained tract or pooled unit for such well, except where delay was caused by title problems or force majeure per Paragraph 11, or unless this lease is otherwise held in effect in any other manner provided herein.

28.) The mineral owners' royalty shall bear no cost or expense (direct or indirect) encountered by the Lessee or Lessee's subsidiaries prior to or subsequent to production. This rule is to apply regardless of where the royalty is fixed in the lease or division order and until title to any such oil or gas has changed from Lessee to its purchaser.

In any event, the Lessee assumes all risk of loss for the oil or gas once it leaves the leased premises.

29.) Should Lessee have title to said lands, or any portion thereof, examined and have a title report or opinion(s) rendered, Lessee shall furnish to Lessor a copy of each such title report or opinion and any supplements thereto. A copy of each such report or opinion rendered shall be mailed to Lessor at the above address within ninety (90) days after the receipt by Lessee of each report or opinion. Lessee shall not be liable in any way for the contents of any such report or opinion rendered and delivered to Lessor.

30.) Lessee shall promptly close all gates which Lessee, Lessee's agents, servants and/or employees may use in Lessee's operations on the leased premises, to prevent the escape of cattle or stock of Lessor through any open gates. Lessee further agrees to comply with all reasonable rules and regulations imposed by Lessor with regard to opening and closing and locking all such gates. If as a result of Lessee's failure to keep all gates locked any of the Lessor's cattle or livestock escape, then Lessee shall promptly reimburse to the Lessor all expenses incurred in rounding up such cattle or livestock and transporting them to the pasture from which they escaped. Additionally, if this paragraph is violated, Lessee shall pay to Lessor, at Lessor's address first given above, a penalty of Five Hundred Dollars ($500.00) per violation, within 15 days of such violation. If Lessor so specifies, any gate installed over a cattle guard will be a sliding gate. All cattle guards will be wide enough to easily accommodate farm equipment.

31.) Before building any pipelines upon said premises, Lessee is required to consult with Lessor or the Surface Owner as to the location of same and such mutual agreement will not be unreasonably withheld. It is the intention of the Lessor to assist operator in selecting the route that will cause the least amount of damage or interruption to the Lessor's operations. Lessee must also bury all pipelines at least thirty-six (36") inches below the surface. Standard farmland double-ditching method will be used by Lessee in construction of the pipeline by separating the topsoil from the subsoil during excavation and during the backfill operation, said subsoil must be placed in the open ditch first and then the topsoil will be placed in the ditch to complete the backfilling operation. The width of the trench to be excavated is limited to twelve (12") inches unless the pipeline is greater than six inches (6") in diameter. All pipelines across the leased premises will be permanently identified and located by markings at all fence lines or roads traversed by such pipelines. In the event the premises is not subject to production from this tract or a pooled unit, or in the event Lessee transports gas from lands in which Lessor has no interest, then Lessee must not install or lay a pipeline across these lands without first securing an easement for such pipeline. Should a gas pipeline from wells on the premises or lands pooled therewith be built, Lessee is not required to obtain an easement, but will nevertheless be liable for all surface damages. Lessee, at all times while this lease is in effect, is required to maintain the pipeline right-of-way in order to prevent or correct sinkage, settlement and erosion of the soil as occasioned by its pipelines. No compressor shall be located within one-half (½) mile of a dwelling, but in any event, Lessee shall have the right to have at least one compressor at a mutually acceptable site on premises, permission for which shall not be unreasonably withheld.

32.) Lessee shall have the right to drill such water wells as may be necessary for its operations on the premises. Fresh water use shall be restricted to the actual drilling for oil or gas on the leased premises or lands pooled therewith and shall not be used in any manner for secondary recovery flooding of any productive oil reservoir. Any water well drilled by Lessee on the leased premises shall be drilled in a workmanlike manner and completed in accordance with the general practices in the area for the completion of water wells to be used for the production of water for livestock and domestic purposes (using windmills or other down hole pumping equipment normally used in the area). Any water well so drilled shall be drilled in order to accept a minimum of 4.5-inch O.D. casing. In the event Lessee shall drill a water well on Lessor's premises, then upon Lessee's permanent cessation of use of such water well, the Lessee shall leave the water well and the casing therein for the use of the Lessor, at Lessor's option and at Lessor's risk, however, the Lessee may remove any pump and motor installed by the Lessee.

33.) Lessee agrees to furnish Lessor a daily report for each day that drilling completion or reworking operations are being conducted on a well or wells located on said lands. The report will be transmitted via facsimile to Lessor's representative, if requested. Lessee further agrees to give Lessor at least twelve (12) hours advance notice of any logging, testing and coring operations to be conducted in any well drilled on said lands in order that Lessor may have a representative present at such operations. At Lessee's office and during Lessee's regular office hours, Lessor shall have access to all information concerning the drilling, coring, testing and completing of all wells, including the driller's log and all electrical logs and surveys, and to all accounting books and records, production charts, records and information, concerning the production, processing, transportation, sale and marketing of oil and gas from said lands. Lessee agrees to furnish Lessor with one (1) final print of all driller's logs, electrical logs and surveys obtained in the drilling of all wells on said lands, and one (1) copy of all core analyses and test results obtained from all wells. One (1) copy of all applications and reports filed by Lessee with the Texas Railroad Commission or other regulatory

SIGNED FOR IDENTIFICATION: *Shirley Mae Herbet Adams*

agencies in connection with Lessee's operations hereunder shall also be mailed to Lessor. Lessor has the right to be present and observe the measurement of all production from each producing well. All information, data and copies to be furnished by Lessee under the provisions of this paragraph shall be furnished to Lessor until Lessee is advised in writing to the contrary. Any data submitted to Lessor shall be time delayed by at least sixty (60) days from completion and/or plugging and abandoning of the subject well. Lessee shall have no liability to Lessor or to any third party for their reliance upon such information unless the information furnished is intentionally false or misleading. Should Lessor request more than one (1) copy of the information to be furnished by Lessee under the provisions of this paragraph, Lessee agrees to furnish, at Lessor's cost and expense, such additional copies as may be requested by Lessor. Lessor agrees to maintain in confidence all information furnished by Lessee pursuant to the provisions of this paragraph for so long as this lease is maintained in force and effect as to the lands and depths on which producing wells are located and information is furnished with respect thereto, and Lessor agrees not to divulge such information to any third party during such period of confidentiality. It is agreed and provided, however, that if Lessee or Lessee's agent or subcontractors release any such information to the industry, or if any such information is otherwise released through no fault of Lessor, Lessor shall not be further bound by this agreement of confidentiality as to the information released by Lessee or Lessee's agents or subcontractors or otherwise.

34.)    Within one hundred twenty (120) days (weather permitting) after the completion or abandonment of any well drilled or worked over on the leased premises, Lessee agrees that it will fill and level all slush pits, holes, ruts, ditches and drains and remove all non-water based drilling mud, shale and chemicals from said premises and will restore the surface of the leased premises, as nearly as possible, to its condition prior to the commencement of such operations. Lessee will cut the banks of all slush pits and let them drain and dry before leveling to insure no bog hole will be created. In the event of failure of Lessee to comply with this paragraph, within the time specified as aforesaid, Lessor shall notify Lessee, by Certified Mail, Return Receipt Requested, of non-compliance of this paragraph. If Lessee does not comply with this paragraph within 30 days of said notification, Lessee shall pay to Lessor one and one-half times the actual cost to Lessor for making said repairs as agreed as liquidated damages on account of Lessee's failure to carry out its obligation as provided in this paragraph. Nothing herein shall release Lessee from any liability for damages suffered by Lessor as a result of a blow-out or other damages occurring during Lessee's operations hereunder, and Lessee shall be fully responsible for any and all damages resulting therefrom.

35.)    Salt water must not be disposed of on the premises without the written consent of Lessor.

36.)    The provisions contained herein regarding acreage covered by this lease to be held by drilling operations on or production from any pooled unit or units shall not be altered or amended by any pooling, unitization or like agreement or instrument, or any amendment thereto or ratification or acknowledgment thereof, unless the same shall be specifically designated as an amendment of such paragraph for such purpose. It is further agreed that neither this lease nor any terms or provisions hereof will be altered, amended, extended or ratified by any division order or transfer order executed by Lessor, Lessor's successors, heirs, agents, or assigns, but that any division order or transfer order will be solely for the purpose of confirming the extent of Lessor's interest in production of oil and gas from the herein described premises, or any land or lands pooled therewith, and to comply with statutory requirements. In the event of production, all division orders prepared by Lessee and its assigns will eliminate all references to ratification of Lessee's acts, ratification of the unit and ratification of gas or oil purchase contracts. If such statements are contained therein, such ratifications are void and of no effect. Any amendment, alteration, extension or ratification of this lease, or of any term or provision of this lease, will be made only by an instrument clearly denominating its purpose and effect, describing the specific terms or provisions affected and the proposed change or modification thereof, and executed by the party against whom any such amendment, alteration, extension or ratification is sought to be enforced, and any purported amendment, alteration, extension or ratification not so drafted will be of no force or effect.

37.)    Lessee shall furnish Lessor copies of all assignments of working interests within ninety (90) days from recording said assignment. Any assignee shall also provide Lessor with a name, address and telephone number for the contact person for the assignee.

38.)    All notices and information to be given hereunder shall be in writing and shall be sent by United States Mail or fax, postage prepaid and addressed to the party to whom such notice is given as follows:

If to Lessor:    Shirley Mae Herbst Adams, P. O. Box 37, Karnes City, Texas, 78118 telephone 830-780-2157
If to Lessee:    Alvin M. Barrett & Associates Inc., a Texas Corporation, 11202 Sandstone Street, Houston, Texas 77072, 281/498-5878

39.)    Within ninety (90) days after this lease has expired or any portion thereof has been forfeited and upon written request by Lessor, Lessee or any assignee thereof must furnish Lessor, or Lessor's heirs or assigns, with a recordable release of this lease or such portions which have been forfeited by Lessee or its assigns under the terms of this lease agreement. If Lessee or Lessee's assigns fail to provide the Release in the time required, Lessee will immediately pay to Lessor the sum of $500.00 as agreed liquidated damages.

40.)    Notwithstanding the termination of this lease as to part of the leased premises under the above provisions, Lessee shall have and retain such easements of ingress and egress over the remainder of the leased premises as shall be necessary to enable Lessee to develop and operate the portion or portions of this lease then in effect for the production of oil and gas therefrom, and it is further agreed that it shall not be necessary for Lessee to remove or relocate any pipe lines, tank batteries or other surface equipment or installations from any portions of the leased premises as to which this lease has terminated for so long as same remain necessary for the development and operation of such portions of this lease as continue in force and effect. It is provided however, in no event shall Lessee be permitted to have more than one road leading to the location of a drilling or producing well. Upon the occurrence of any partial termination of this lease, Lessor shall have, and expressly reserves, an easement through the said lands and the depths and formations retained by Lessee in order to enable the exploration and/or production of oil, gas and/or

SIGNED FOR IDENTIFICATION: _Shirley Mae Herbst Adams_

other minerals in and from any depths and lands which are not thereafter subject to this Lease. The easement reserved herein shall be fully assignable by Lessor to any party, including any other oil, gas and mineral lessee, of depths or lands not then subject to this lease, and in the event Lessor assigns such easement to any third party, Lessee herein shall look only to such third party, provided Lessor gives Lessee notice of said easement and its assignment, and not to Lessor, for any claims, costs, expenses or damages occasioned by such third party's use of the easement herein reserved, specifically including, but not limited to, any claims that such third party's activities interfered with or damaged Lessee's wells, reserves, equipment, operations or other rights hereunder.

41.) LESSEE SHALL INDEMNIFY AND HOLD LESSOR HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, ACTIONS, LIABILITY, LOSS, DAMAGE OR EXPENSE OF EVERY KIND AND NATURE, INCLUDING, BUT NOT LIMITED TO, REASONABLE ATTORNEY'S FEES AND COSTS, FOR DAMAGE TO PROPERTY OF ANY PERSON, FIRM OR CORPORATION OR FOR INJURY TO OR DEATH OF ANY PERSON, INCLUDING, BUT NOT LIMITED TO, THE EMPLOYEES OF LESSEE, ITS SUCCESSORS, ASSIGNS, CONTRACTORS OR SUBCONTRACTORS, WHICH MAY, IN WHOLE OR IN PART, BE CAUSED BY OR RESULT FROM OPERATIONS CONDUCTED HEREUNDER OR THE ENJOYMENT OF THIS LEASE OR THE EXERCISE OF ANY RIGHT GRANTED HEREUNDER OR ANY OBLIGATION IMPOSED HEREBY. IN THE EVENT THIS LEASE IS HELD OR INTERPRETED TO BE WITHIN THE SCOPE OF AN AGREEMENT AS DEFINED AND PROHIBITED BY CHAPTER 127 OF THE TEXAS CIVIL PRACTICE AND REMEDIES CODE ("CHAPTER 127"), THE INDEMNITY PROVIDED HEREIN SHALL BE AMENDED AND CONSTRUED TO LIMIT AND TO EXCEPT FROM ITS APPLICATION ANY INDEMNITY FOR ANY LOSS OR LIABILITY OCCURRING UNDER CIRCUMSTANCES THAT SUCH INDEMNITY IS PROHIBITED OR LIMITED BY THE APPLICATION OF CHAPTER 127 AND LESSEE SHALL INDEMNIFY AND HOLD HARMLESS LESSOR, THE SURFACE OWNER AND THEIR RESPECTIVE SUCCESSORS, LEGAL REPRESENTATIVES, ASSIGNS, AGENTS, CONTRACTORS, AND EMPLOYEES, ONLY TO THE EXTENT OF THE MAXIMUM COVERAGES AND DOLLAR LIMITS OR LIABILITY PERMITTED BY CHAPTER 127; AND THIS LIMITED INDEMNITY OBLIGATION SHALL BE SUPPORTED BY AVAILABLE LIABILITY INSURANCE FURNISHED BY LESSEE (AND LESSEE SHALL FURNISH TO LESSOR CERTIFICATES OR OTHER EVIDENCE OF LIABILITY INSURANCE BEING IN FORCE AND EFFECT). TO THE EXTENT THAT THE INDEMNITY PROVIDED HEREIN IS LIMITED OR INAPPLICABLE UNDER CHAPTER 127, THE LAW OF CONTRIBUTION SHALL APPLY.

42.) Lessee, at Lessee's own expense, will provide and maintain in force during the existence of this Lease a commercial general liability insurance in the amount of at least $3,000,000.00, covering Lessor as well as Lessee, for any liability for property damage or personal injury arising as a result of Lessee's conducting operations on or off these premises pursuant to this Lease, the exercise of any right granted hereunder or any obligation imposed hereby or associated in any way with activities conducted by Lessee on or impacting the premises. This insurance is to be carried by one or more insurance companies authorized to transact business in Texas. Lessee will furnish Lessor with certificates of all insurance required by this Lease.

43.) LESSEE MUST COMPLY WITH ALL VALID LAWS, ORDINANCES, AND REGULATIONS, WHETHER STATE, FEDERAL, OR MUNICIPAL, APPLICABLE TO THE PREMISES. THE USE WHICH LESSEE MAKES AND INTENDS TO MAKE OF THE PREMISES WILL NOT RESULT IN THE DISPOSAL OR OTHER RELEASE OF ANY HAZARDOUS SUBSTANCE OR SOLID WASTE ON OR TO THE PREMISES. IN THE EVENT THAT ANY HAZARDOUS SUBSTANCES, SOLID WASTES OR OTHER POLLUTANTS ARE DISPOSED OR RELEASED ON AND/OR UNDER THE PREMISES, RESULTING IN THE CONTAMINATION OR POLLUTION TO THE PREMISES OR ANY ADJOINING PROPERTY, ARISING OUT OF SAID CONTAMINATION OR POLLUTION, CAUSED BY OR CONSENTED TO BY THE LESSEE, THE LESSEE SHALL INDEMNIFY AND HOLD HARMLESS THE LESSOR AND LESSOR'S HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, AND ASSIGNS, FROM AND AGAINST ANY AND ALL LIABILITY FROM THE RULES AND REGULATIONS OF THE TEXAS RAILROAD COMMISSION, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT OF 1980, THE RESOURCE CONSERVATION AND RECOVERY ACT OF 1976, OR ANY OTHER STATE OR FEDERAL STATUTE, RULE OR REGULATION NOW IN EXISTENCE OR HEREINAFTER ENACTED RELATING TO SUCH SUBSTANCE OR WASTE AND LESSEE HAS THE ABSOLUTE RESPONSIBILITY FOR ALL CLEANUP OF SAID POLLUTION OR CONTAMINATION OR RECLAMATION OF THE PREMISES AND ALL COSTS AND EXPENSES THEREOF.

44.) IT IS AGREED THAT ANY SUITS AT LAW WILL BE INITIATED IN THE COURT OF PROPER JURISDICTION OF THE STATE OF TEXAS IN THE COUNTY WHERE THE LAND OR ANY PART THEREOF BE LOCATED WITH APPEALS TO THE APPELLATE COURT OF THE STATE OF TEXAS AND THAT THE LAW OF TEXAS WILL CONTROL IN CONSTRUING THIS LEASE.

45.) Lessor hereby warrants title to Lease premises against claims by, through or under Lessor, but not otherwise, and Lessor's liability on such warranties shall in no event exceed the value of bonus paid to Lessor herein for any portion having defective title.

46.) Lessee shall promptly pay the owner of the surface of the leased premises a reasonable sum for any damages resulting to the surface of said premises and the crops and improvements located thereon which may be caused by or result from the operations of Lessee hereunder or pursuant to any grants hereunder, and Lessee will restore same to substantially their present condition, so far as can be reasonably be done, as concerns any material change in the surface of such premises caused by or resulting from operations of Lessee hereunder. Lessee agrees that if any oil based mud or drilling compound containing hydrocarbon base or any material which is harmful to the soil is used in Lessee's operations of the Leased Premises, Lessee shall dispose of all such mud, compounds and materials from the Leased Premises in strict compliance with the applicable rules of the Railroad Commission of Texas before

SIGNED FOR IDENTIFICATION: _Shirley Mae Herbst_

158

filling in the pit(s), leveling and restoring the surface, and all such harmful materials shall be disposed of by the Lessee. Drilling mud not containing any of said harmful substances may be disposed of in accordance with Texas Administrative Code, Title 16, Part 1, Chapter 3, Rule 3.8 "Water Protection", Lessor herein grants to Lessee permission to landfarm all water base drilling mud with a chloride concentration of 3,000 milligrams per liter (mg/L) or less; drilled cuttings, sands, and silts obtained while using water based drilling fluid with a chloride concentration of 3,000 (mg/L) or less; and wash water used for cleaning drill pipe and other equipment from the drill sites used by Lessee on lands covered by this Oil and Gas Lease.

47.)    Lessee is hereby given the option to extend the primary term of this lease for an additional three (3) years from the expiration of the original primary term. This option may be exercised by Lessee at any time during the last year of the original primary term by paying the sum of Five Hundred and No/100 Dollars ($500.00) per net mineral acre to the Lessor, or their heirs and assigns. This payment shall be based upon the number of net mineral acres then covered by this lease, and all of the provisions of this lease shall apply equally to this payment including, but not limited to, the provisions regarding changes in ownership. Should this option be exercised as herein provided, it shall be considered for all purposes as though this lease originally provided for a primary term of six (6) years. In the event this lease is being maintained by any provisions hereof at the expiration of the original primary term, Lessee shall have a period of thirty (30) days from the date this lease ceases to be so maintained within which to exercise this option.

48.)    Lessee is hereby granted all rights necessary to conduct seismic operations upon the leased premises. If Lessee elects to conduct 3D seismic operations upon the leased premises, Lessee agrees to pay the surface owner $15.00 per acre for each acre of the leased premises covered by said 3D seismic operation. After completion of such seismic operations, Lessee must restore the land to its original condition just prior to such operations and shall pay the surface owner and any tenants the actual amount of extraordinary damages, if any, not customarily caused by seismic operations, all normal and customary damages being included within the sum of $15.00 per surface acre provided above.

49.)    All covenants, obligations and liabilities of Lessee contained in this Lease shall survive the termination or expiration of this lease and Lessee shall remain wholly responsible and liable for the performance thereof notwithstanding such termination or expiration.

50.)    Lessee agrees to provide a gate guard to control access to Lessor's property while drilling any oil or gas well. Lessor must consent to the location of any roads, which consent may not be unreasonably withheld.

51.)    The parties agree that they may record a Memorandum of the LEASE in lieu of recording this Lease.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

_Shirley Mae Herbst Adams_
SHIRLEY MAE HERBST ADAMS

LESSOR

ALVIN M. BARRETT & ASSOCIATES INC.

BY: _____

Its _____

LESSEE

THE STATE OF TEXAS          §
COUNTY OF ATASCOSA          §
        This instrument was acknowledged before me on this 31st day of August, 2009, by SHIRLEY MAE HERBST ADAMS.

ALFRED ALLEN STEINLE
Notary Public, State of Texas
My Commission Expires
March 31, 2013

NOTARY PUBLIC, STATE OF TEXAS

THE STATE OF TEXAS          §
COUNTY OF HARRIS            §
        This instrument was acknowledged before me on this _____ day of _____, 2009, by _____ of ALVIN M. BARRETT & ASSOCIATES, INC., a Texas Corporation, on its behalf.

NOTARY PUBLIC, STATE OF TEXAS

Prepared in the Law Office of:
Alfred A. Steinle
P. O. Box 400
Jourdanton, Texas 78026

Adams Shirley Herbst 102 as lease to Barrett.bar

10

Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the Public Records: Your social security number or your driver's license number.

Producers 88 (1/87) Paid-Up
With 640 Acres Pooling Provision

## OIL, GAS AND MINERAL LEASE

THIS AGREEMENT made this __14th__ day of __August__, 2009, between WILLIAM ALBERT HERBST, whose address is 23385 FM 791, McCoy, Texas 78113, Lessor (whether one or more), and

ALVIN M. BARRETT & ASSOCIATES INC., a Texas Corporation, 11202 Sandstone Street, Houston, Texas 77072, Lessee,

### WITNESSETH:

1.      Lessor, in consideration of Ten and No/100 Dollars and other good and valuable consideration, receipt of which is hereby acknowledged, and of the covenants and agreements of Lessee hereinafter contained, does hereby grant, lease and let unto Lessee the land covered hereby for the purposes and with the exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas, sulphur and all other minerals (whether or not similar to those mentioned), together with the right to make surveys on said land, lay pipe lines, establish and utilize facilities for surface or subsurface disposal of salt water, construct roads and bridges, dig canals, build tanks, power stations, telephone lines, employee houses and other structures on said land, necessary or useful in Lessee's operations in exploring, drilling for, producing, treating, storing and transporting minerals produced from the land covered hereby or any other land adjacent thereto. The land covered hereby, herein called "said land, is located in the County of _ Atascosa__, State of __Texas__, and is described as follows:

302.0 acres of land, more or less, in the Mark H. Moore Survey No. 185, A-559 and the Octavius A. Cook Survey No. 195, A-176 in Atascosa County, Texas, and being the same land set aside to William Albert Herbst in Division No. 4 in an Agreement on Division of Estate dated October 20, 1993, recorded in Volume 865, Page 506 of the Deed Records of Atascosa County, Texas.

This lease also covers and includes, in addition, to that above described, all land, if any, contiguous or adjacent to or adjoining the land above described and (a) owned or claimed by Lessor by limitation, prescription, possession, reversion or unrecorded instrument or (b) as to which Lessor has a preference right of acquisition. Lessor agrees to execute any supplemental instrument requested by Lessee for a more complete or accurate description of said land. For the purpose of determining the amount of any bonus or other payment hereunder, said land shall be deemed to contain __302.0__ acres, whether actually containing more or less, and the above recital of acreage in any tract shall be deemed to be the true acreage thereof. Lessor accepts the bonus as lump sum consideration for this lease and all rights and options hereunder.

2.      Unless sooner terminated or longer kept in force under other provisions hereof, this lease shall remain in force for a term of __three (3) years__ from the date hereof, hereinafter called "primary term", and as long thereafter as operations, as hereinafter defined, are conducted upon said land with no cessation for more than ninety (90) consecutive days.

3.      As royalty, lessee covenants and agrees: (a) To deliver to the credit of lessor, in the pipe line to which lessee may connect its wells, the equal one-eighth (1/8) one-fifth (1/5th) part of all oil produced and saved by lessee from said land, or from time to time, at the option of lessee, to pay lessor the average posted market price of such one-eighth (1/8) one-fifth (1/5th) part of such oil at the wells as of the day it is run to the pipe line or storage tanks, lessor's interest, in either case, to bear one-eighth (1/8) one-fifth (1/5th) of the cost of treating oil to render it marketable pipe line oil; (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, one-eighth (1/8) one-fifth (1/5th) of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well of one-eighth (1/8) one-fifth (1/5th) of such gas and casinghead gas; (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one-tenth (1/10) either in kind or value at the well or mine at lessee's election except that on sulphur mined and marketed, the royalty shall be one dollar ($1.00) per long ton. If, at the expiration of the primary term or at any time or times thereafter, there is any well on said land or on lands with which said land or any portion thereof has been pooled, capable of producing oil or gas, and all such wells are shut-in, this lease shall, nevertheless, continue in force as though operations were being conducted on said land for so long as said wells are shut-in, and thereafter this lease may be continued in force as if no shut-in had occurred. Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells, but in the exercise of such diligence, lessee shall not be obligated to install or furnish facilities other than well facilities and ordinary lease facilities of flow lines, separator, and lease tank, and shall not be required to settle labor trouble or to market gas upon terms unacceptable to lessee. If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety (90) consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety (90) day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) twenty-five dollars ($25.00) for each acre of land then covered hereby. Lessee shall make like payments or tenders at or before the end of each anniversary of the expiration of said ninety (90) day period if upon such anniversary this lease is being continued in force solely by reason of the provisions of this paragraph. Each such payment or tender shall be made to the parties who at the time of payment would be entitled to receive the royalties which would be paid under this lease if the wells were producing, and may be deposited in the __PAY DIRECTLY TO LESSOR__ Bank at _____, or its successors, which shall continue as the depositories, regardless of changes in the ownership of shut-in royalty. If at any time that lessee pays or tenders shut-in royalty, two or more parties are, or claim to be, entitled to receive same, lessee may, in lieu of any other method of payment herein

Herbst Wm 302 ac lease to Barrett bar

V/B.H

EXHIBIT
36

ATTACHME

provided, pay or tender such shut-in royalty, in the manner above specified, either jointly to such parties or separately to each in accordance with their respective ownerships thereof, as lessee may elect. Any payment hereunder may be made by check or draft of lessee deposited in the mail or delivered to the party entitled to receive payment or to a depository bank provided for above on or before the last date for payment. Nothing herein shall impair lessee's right to release as provided in paragraph 5 hereof. In the event of assignment of this lease in whole or in part, liability for payment hereunder shall rest exclusively on the then owner or owners of this lease, severally as to acreage owned by each.

3A. "Gross Proceeds", as used herein, shall mean the total proceeds received by Lessee for any non-affiliated third-party sale of such oil, gas or other substance; provided, however, if any contract covering oil, gas or other substance produced from the lands covered hereby, or any contract used for the purpose of establishing the price of Lessor's royalty oil or gas, provides for any deduction for the expenses of production (except for Lessor's proportionate share of actual costs of extricating the sulphur, if any, from the gas and shrinkage, if any, resulting from such extraction), post production, gathering, dehydration, compression, transportation, manufacturing, treating, or marketing of such oil or gas, then such deduction shall be added to the price received by Lessee for such oil or gas so that Lessor's royalty shall not be charged directly or indirectly with any such expenses. Provided, however, should said gas contract provide for a deduction for transportation, shrinkage, or treating to make gas marketable downstream from Lessee's sales meter, and such deduction be levied by a bona fide non-affiliated third party, then in such event, Lessor's Royalty Share shall bear its proportionate share of non-affiliated third party transportation shrinkage and treating deductions, but no other post production costs shall be deducted from Lessor's Royalty Share.

3B. The phrase "free of cost(s)" or "free of all costs", as used herein, shall mean that the royalty interest shall not be charged and shall not bear any costs whatsoever in connection with the exploration, production, gathering, compression, transportation (except "Third Party Transportation Costs", as hereinafter defined, actually incurred by Lessee), marketing or "Treating", as hereinafter defined, of oil, gas or other substance produced hereunder. Provided, however, that Lessor's royalty shall bear its proportionate share of applicable production, windfall profits and severance taxes properly assessable against and attributable to said royalty interest. "Treating" shall mean those methods used by Lessee at the lease to remove contaminants from the wellhead hydrocarbons as may be necessary to place the hydrocarbons in a merchantable condition. Provided, however, should it be necessary for Lessee to install an amine unit on the leased premises in order to make said gas marketable, Lessor shall bear its prorata share of shrinkage of such gas as contaminants are removed from the gas stream processed by said amine plant. However, Lessor shall not bear its prorata share of fuel gas, amine, compression or other costs necessary to operate said amine plant. "Third Party Transportation Costs" shall mean the tariff rate based transportation costs incurred by Lessee in an arm's length transaction with a bona fide third party that is not a subsidiary or affiliate of Lessee in order to take gas and/or liquid hydrocarbons from the point that such hydrocarbons have been separated, treated (if necessary), processed (if performed) and placed in a merchantable condition.

4. Lessee is hereby granted the right, at its option, to pool or unitize any land covered by this lease with any other land covered by this lease, and/or with any other land, lease, or leases, as to any or all minerals or horizons, so as to establish units containing not more than 80 surface acres, plus 10% acreage tolerance; provided, however, units may be established as to any one or more horizons, or existing units may be enlarged as to any one or more horizons, so as to contain not more than 640 surface acres plus 10% acreage tolerance, if limited to one or more of the following: (1) gas, other than casinghead gas, (2) liquid hydrocarbons (condensate) which are not liquids in the subsurface reservoir, (3) minerals produced from wells classified as gas wells by the conservation agency having jurisdiction. If larger units than any of those herein permitted, either at the time established, or after enlargement, are prescribed by special field rules or permitted by statewide Rule 86 for horizontal wells for the drilling or operation of a well at a regular location, or for obtaining maximum allowable from any well to be drilled, drilling, or already drilled, any such unit may be established or enlarged to conform to the size prescribed by special field rules or permitted by statewide Rule 86 for horizontal wells. Lessee shall exercise said option as to each desired unit by executing an instrument identifying such unit and filing it for record in the public office in which this lease is recorded. Each of said options may be exercised by Lessee at any time and from time to time while this lease is in force, and whether before or after production has been established either on said land, or on the portion of said land included in the unit, or on other land unitized therewith. A unit established hereunder shall be valid and effective for all purposes of this lease even though there may be mineral, royalty, or leasehold interests in lands within the unit which are not effectively pooled or unitized. Any operations conducted on any part of such unitized land shall be considered, for all purposes, except the payment of royalty, operations conducted upon said land under this lease. There shall be allocated to the land covered by this lease within each such unit (or to each separate tract within the unit if this lease covers separate tracts within the unit) that proportion of the total production of unitized minerals from the unit, after deducting any used in lease or unit operations, which the number of surface acres in such land (or in each such separate tract) covered by this lease within the unit bears to the total number of surface acres in the unit, and the production so allocated shall be considered for all purposes, including payment or delivery of royalty, overriding royalty and any other payments out of production, to be the entire production of unitized minerals from the land to which allocated in the same manner as though produced therefrom under the terms of this lease. The owner of the reversionary estate of any term royalty or mineral estate agrees that the accrual of royalties pursuant to this paragraph or of shut-in royalties from a well on the unit shall satisfy any limitation of term requiring production of oil or gas. The formation of any unit hereunder which includes land not covered by this lease shall not have the effect of exchanging or transferring any interest under this lease (including, without limitation, any shut-in royalty which may become payable under this lease) between parties owning interests in land covered by this lease and parties owning interests in land not covered by this lease. Neither shall it impair the right of Lessee to release as provided in paragraph 5 hereof, except that Lessee may not so release as to lands within a unit while there are operations thereon for unitized minerals unless all pooled leases are released as to lands within the unit. At any time while this lease is in force Lessee may dissolve any unit established hereunder by filing for record in the public office where this lease is recorded a declaration to that effect, if at that time no operations are being conducted thereon for unitized minerals. Subject to the provisions of this paragraph 4, a unit once established hereunder shall remain in force so long as any lease subject thereto shall remain in force. If this lease now or hereafter covers separate tracts, no pooling or unitization of royalty interests as between any such separate tracts is intended or shall be implied or result merely from

the inclusion of such separate tracts within this lease but Lessee shall nevertheless have the right to pool or unitize as provided in this paragraph 4 with consequent allocation of production as herein provided. As used in this paragraph 4, the words "separate tract" mean any tract with royalty ownership differing, now or hereafter, either as to parties or amounts, from that as to any other part of the leased premises.

5. Lessee may at any time and from time to time execute and deliver to Lessor or file for record a release or releases of this lease as to any part or all of said land or of any mineral or horizon thereunder, and thereby be relieved of all obligations, as to the released acreage or interest.

6. Whenever used in this lease the word "operations" shall mean operations for and any of the following: drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals, excavating a mine, production of oil, gas, sulphur or other mineral, whether or not in paying quantities.

7. Lessee shall have the use, free from royalty, of water, other than from Lessor's water wells, and of oil and gas produced from said land in all operations hereunder. Lessee shall have the right at any time to remove all machinery and fixtures placed on said land, including the right to draw and remove casing. No well shall be drilled nearer than 200 feet to the house or barn now on said land without the consent of the Lessor. Lessee shall pay for damages caused by its operations to growing crops and timber on said land.

8. The rights and estate of any party hereto may be assigned from time to time in whole or in part and as to any mineral or horizon. All of the covenants, obligations, and considerations of this lease shall extend to and be binding upon the parties hereto, their heirs, successors, assigns, and successive assigns. No change or division in the ownership of said land, royalties, or other moneys, or any part thereof, howsoever effected, shall increase the obligations or diminish the rights of Lessee, including, but not limited to, the location and drilling of wells and the measurement of production. Notwithstanding any other actual or constructive knowledge or notice thereof of or to Lessee, its successors or assigns, no change or division in the ownership of said land or of the royalties, or other moneys, or the right to receive the same, howsoever effected, shall be binding upon the then record owner of this lease until thirty (30) days after there has been furnished to such record owner at his or its principal place of business by Lessor or Lessor's heirs, successors, or assigns, notice of such change or division, supported by either originals or duly certified copies of the instruments which have been properly filed for record and which evidence such change or division, and of such court records and proceedings, transcripts, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division. If any such change in ownership occurs by reason of death of the owner, Lessee may, nevertheless pay or tender such royalties, or other moneys, or part thereof, to the credit of the decedent in a depository bank provided for above.

9. In the event Lessor considers that Lessee has not complied with all its obligations hereunder, both express and implied, Lessor shall notify Lessee in writing, setting out specifically in what respects Lessee has breached this contract. Lessee shall then have sixty (60) days after receipt of said notice within which to meet or commence to meet all or any part of the breaches alleged by Lessor. The service of said notice shall be precedent to the bringing of any action by Lessor on said lease for any cause, and no such action shall be brought until the lapse of sixty (60) days after service of such notice on Lessee. Neither the service of said notice nor the doing of any acts by Lessee aimed to meet all or any of the alleged breaches shall be deemed an admission or presumption that Lessee has failed to perform all its obligations hereunder. If this lease is cancelled for any cause, it shall nevertheless remain in force and effect as to (1) sufficient acreage around each well as to which there are operations to constitute a drilling or maximum allowable unit under applicable governmental regulations, (but in no event less than forty acres), such acreage to be designated by Lessee as nearly as practicable in the form of a square centered at the well, or in such shape as then existing spacing rules require; and (2) any part of said land included in a pooled unit on which there are operations. Lessee shall also have such easements on said land as are necessary to operations on the acreage so retained.

10. Lessor hereby warrants and agrees to defend title to said land by, through and under Lessor, but not otherwise. Lessor's rights and interests hereunder shall be charged primarily with any mortgages, taxes or other liens, or interest and other charges on said land, but Lessor agrees that Lessee shall have the right at any time to pay or reduce same for Lessor, either before or after maturity, and be subrogated to the rights of the holder thereof and to deduct amounts so paid from royalties or other payments payable or which may become payable to Lessor and/or assigns under this lease. If this lease covers a less interest in the oil, gas, sulphur, or other minerals in all or any part of said land than the entire and undivided fee simple estate (whether Lessor's interest is herein specified or not), or no interest therein, then the royalties and other moneys accruing from any part as to which this lease covers less than such full interest, shall be paid only in the proportion which the interest therein, if any, covered by this lease, bears to the whole and undivided fee simple estate therein. All royalty interest covered by this lease (whether or not owned by Lessor) shall be paid out of the royalty herein provided. This lease shall be binding upon each party who executes it without regard to whether it is executed by all those named herein as Lessor.

11. If, while this lease is in force, at, or after the expiration of the primary term hereof, it is not being continued in force by reason of the shut-in well provisions of paragraph 3 hereof, and Lessee is not conducting operations on said land by reason of (1) any law, order, rule or regulation, (whether or not subsequently determined to be invalid) or (2) any other cause, whether similar or dissimilar, (except financial) beyond the reasonable control of Lessee, the primary term hereof shall be extended until the first anniversary date hereof occurring ninety (90) or more days following the removal of such delaying cause, and this lease may be extended thereafter by operations as if such delay had not occurred, provided Lessee notifies Lessor in writing of such extension and justifying cause within thirty (30) days of its commencement and shall pay Twenty-Five and No/100 Dollars ($25.00) per acre for each ninety (90) days said lease is extended.

a) In the event any party is rendered unable, wholly or in part, by Force Majeure (as hereinafter defined) to carry out its obligations under this agreement, then the party relying on such Force Majeure (or its or their representatives) shall give thirty (30) days written notice of the Force Majeure with reasonably full particulars concerning it to the other party. The obligations of the party relying on the Force Majeure, insofar as they are affected

163

by the Force Majeure, shall be suspended during the continuation of all the Force Majeure and for a reasonable period thereafter not to exceed thirty (30) days.

b) The term "Force Majeure" as here employed shall include acts of God, strikes, lockouts, or the public enemy, wars, blockade, insurrections, riots, epidemics, landslides, lightning, fires, floods, tornadoes, hurricanes, explosions, acts or requests, inability or unavoidable delay in obtaining governmental permits or authorizaton for drilling or other operations to be controlled hereunder, any other governmental action, governmental delay, restraint, inaction, rules or orders of federal, state or municipal governments or of any federal, state or municipal officer or agent purporting to act under duly constituted authority, interruptions of transportation, freight embargoes, unavailability of drilling rigs, equipment or essential personnel, any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming Force Majeure.

IN WITNESS WHEREOF this instrument is executed on the date first above written

SEE ADDENDUM CONTAINING PARAGRAPHS 12 THROUGH 51 ATTACHED HERETO AND MADE A PART HEREOF FOR ALL PURPOSES.

4

# ADDENDUM

NOTWITHSTANDING anything to the contrary hereinabove provided, it is expressly agreed and stipulated by and between the Lessor and Lessee that:

12.) Reference in this lease to "other minerals" shall be deemed to include, in addition to oil and gas, only such related sulphur and hydrocarbons as may be produced therewith and extracted therefrom and shall not include coal, lignite, uranium, fissionable materials, other sulphur, or any unrelated or hard minerals.

13.) The right to maintain this lease in force and effect beyond the expiration of the primary term by the payment of shut-in royalties as is set out in paragraph 3 supra, is a recurring right which may be exercised by Lessee from time to time but shall not exceed an aggregate or cumulative period of time of more than three (3) years.

14.) The right of Lessee to pool the acreage covered by this lease with other acreage, as is provided for in paragraph 4 supra, is hereby limited to the extent that if a well is drilled on the leased acreage and this pooling privilege is exercised, then at least one-half (½) of the unit must be land covered by this lease, or one-half (½) of this lease must be included within the unit, and if the well is drilled on the acreage pooled with this lease, then at least one-third (1/3rd) of the unit must be land covered by this lease, or one-third (1/3rd) of this lease must be included within the unit, at Lessee's discretion; provided, however, if the amount of acreage remaining which has not theretofore been included in a pooled unit or allocated to a producing well is insufficient to satisfy the above requirement, then all such remaining available acreage shall be included within such unit. Anything herein to the contrary notwithstanding, it is understood and agreed that the provisions of this paragraph 14.), shall not apply to the pooling of this lease with any other Oil, Gas and Mineral Leases dated August 14, 2009, executed by Mary Ann Herbst May, Helen Louise Herbst, William Albert Herbst, Charlene Ann Burgess, Shirley Mae Herbst Adams, Susan G. Herbst or William Albert Herbst and wife, Susan G. Herbst, as Lessor to Alvin M. Barrett & Associates Inc., as Lessee that covers other acreage not covered by this lease.

15.) In the event a pooled unit is created under the provisions of paragraph 4 supra, production, drilling, or reworking operations on said unit shall not be effective to maintain this lease in force as to acreage outside of such unit beyond the end of the primary term. However, this lease may be maintained in force as to such unpooled acreage in any other manner provided herein.

16.) In the event Lessee exercises any pooling privilege granted, Lessee agrees to furnish Lessor with a copy of any unit designation within thirty (30) days after the same is filed for record.

17.) The royalties which are to be paid under the terms of this lease for the production of oil or gas after the end of the primary term or continuous development, whichever later occurs, shall never be less than FIFTY AND NO/100 DOLLARS ($50.00) per net mineral acre per annum for the number of acres which are being held under each well, and the accounting period for such royalties shall be from January 1st through December 31st of each year during the tenure of this lease, commencing with January 1st following the first production of oil and/or gas from the leased premises, and in the event that there has been a deficiency of royalty payments made during the accounting period for which such minimum royalty payments are due, the Lessee shall have a period of ninety (90) days within which to make up such deficiency from and after having received written notice from the Lessor of such deficiency, and Lessee shall be deemed conclusively to have received such notice as of the date that same was mailed in a United States Post Office by certified mail, return receipt requested, addressed solely to the Operator as designated at the Railroad Commission, irrespective of the ownership of this lease. Evidence of such mailing shall be by Postal Receipt Form P.S. 3811. Should Lessee fail to make up such deficiency within the prescribed time, this lease shall terminate as to all parties, but such termination shall not relieve Lessee of the obligation of paying a minimum royalty in accordance with the terms of this lease to its date of termination. It is provided, however, that such lease termination in the preceding sentence shall not apply to BQPCO, L.P., BMT O&G TX L.P., KEYSTONE O&G TX, L.P., LMBI O&G TX, L.P., SRBI O&G TX, L.P., THRU LINE O&G TX, L.P., and any affiliates thereof, but any unpaid minimum royalty shall bear interest at the rate of ten percent (10%) per annum or the maximum lawful rate of interest for such sums, whichever is the lesser amount. Lessee is in nowise obligated to maintain this entire lease in force and effect, and upon releasing a portion of the acreage covered hereunder shall be relieved of this minimum royalty provision as to the acreage so released from and after the date of such release, and if released on other than an anniversary date, Lessee shall be liable for a prorata part of the annual minimum royalty up to the date of said release. This minimum royalty provision shall not be applicable to the period of time for which the shut-in royalties have been paid under the terms of this lease.

18.) Lessee agrees to pay for any actual surface damages caused by its operations on the leased premises to growing crops, grass, cattle, roads, fences, and improvements on said land; and further, within 120 days after the completion of any well, weather permitting, to fill and level all slush pits used in connection therewith and stock pile base material brought in to said site for Lessor; and upon abandonment of any well or other structure or facility on said land, to reasonably restore the surface of said land so occupied by such well, structure or facility to as near its natural state as possible. Lessee further agrees to pay Lessor the sum of THREE THOUSAND FIVE HUNDRED AND NO/100 DOLLARS ($3,500.00) per acre for the site location for each well that may be drilled on the leased premises, such payment to be made prior to moving on the location; and, furthermore, to pay the sum of THREE THOUSAND FIVE HUNDRED AND NO/100 DOLLARS ($3,500.00) per acre for each acre to be regularly used by Lessee for roadways, tank batteries, or other above ground facility placed on the land by Lessee. Lessee shall consult with surface owner or Lessor prior to cutting, erecting or altering any fence. Any changes to any fence such as, but not limited to erecting new fence, cutting any existing fence, altering any existing fence, etc. shall be done by a fence contractor mutually acceptable to Lessor and Lessee or surface owner, to Lessor or surface owner's reasonable specifications and at Lessee's expense. When requested by Lessor, Lessee will fence, with a good and substantial fence capable of turning livestock of ordinary demeanor, or in a high fenced area, a like kind fence, all permanent type facilities it places on the leased premises. All roadways to be regularly used by Lessee must be improved with base material with a minimum of six (6) inch compacted and regularly maintained.

SIGNED FOR IDENTIFICATION: _William Elbert Halst_ _____

19.) Lessee, his agents, servants, employees, contractors, or sub-contractors shall not be permitted to carry firearms on to the leased premises, nor to fish or hunt thereon, and any breach of this covenant such person shall not again be permitted to come on to the leased premises.

20.) The parties recognize that it is difficult to control fishing or the hunting of game on the leased premises and to ascertain the monetary damages to Lessor's surface rights caused by any such unauthorized activity. Lessee therefore covenants that if any of its officers, agents, employees, servants or invitees bring on to the leased premises a dog or firearms of any description without the expressed written permission of Lessor, Lessee will immediately pay to Lessor the sum of $1,000.00 for each of such incidents as agreed liquidated damages. Such payment is in addition to any fine or fines which might be imposed under the appropriate statutes or to any injunctive relief to which Lessor may be entitled from a court of equity.

21.) Lessee shall not have the right to use water from Lessor's water wells or surface water without Lessor's written consent. Lessee's right to take and use water from Lessor's wells not drilled by Lessee on the leased premises shall not include the right to use fresh water from any fresh water sands or strata underlying the leased premises for any secondary recovery operations that may be conducted on the leased premises.

22.) Lessor shall have the right, at Lessor's own risk and expense, and in accordance with the regulations of the Railroad Commission of Texas, to utilize for fresh water well purposes the well bore of any well drilled by Lessee on the leased premises prior to the permanent plugging and abandoning of any such oil or gas well. In the event that, prior to the time Lessee permanently plugs and abandons any such well, Lessee is furnished an approved (by the Railroad Commission of Texas) copy of Form P13, Lessee, instead of permanently plugging any such well, will plug the well at the base of the fresh water sand and install a cap on the surface end of the casing, following which Lessee will file, in the appropriate Railroad Commission District Office, the approved copy of Form P13, with two copies of Form W3, Plugging Record, in accordance with the statewide Rules 14(a) and 80 of the Railroad Commission of Texas. If Lessor assumes ownership of the well bore Lessor also assumes all liability for said well bore.

It is further agreed that Lessee will contact Lessor via telephone or facsimile to advise Lessor that Lessee is ready to abandon said well, and Lessor will have twenty-four (24) hours from such time he is advised of such plugging decision to advise Lessee whether Lessor wishes to take over said well bore to produce fresh water.

If Lessee drills a separate water well on the leased premises and when the Lessee's need for the same has ceased, the water well will be left open and become the property of Lessor, if Lessor so desires and so notifies Lessee, subject to the rules and regulations or laws promulgated by any state, federal or local regulatory body having jurisdiction over the same.

Lessor further agrees, from and after the date of the turnover of a well, to indemnify, defend and hold harmless Lessee from any and all liability that may arise relative to Lessor's taking over said well. Lessor will not indemnify Lessee for any acts it did to the well bore or casing prior to turning over the well bore.

23.) a) VERTICAL WELLS: At the expiration of the primary term or the extended term hereof, or upon the expiration of the continuous operations as provided below, this lease shall terminate except insofar as it covers the following, and the amount of acreage which may be included in pooled units under Paragraph 4 above shall be limited to the acreage amounts prescribed by the government regulatory body having authority, but in no event shall the retained acreage be larger than 640.0 acres.

b) HORIZONTAL WELLS: The maximum authorized size of pooled units and retained units for horizontal wells (either oil or gas) shall be calculated according to the following formula A (acreage) = [L (actual lateral length drilled) x .11488] + 320, or such larger unit prescribed by special field rules or permitted by statewide Rule 86 for horizontal wells, but in no event larger than 640 acres.

24.) As used in the terms of this lease, the words "if operations for drilling are not commenced" or "commencement of drilling operations" shall be defined as the date on which the drilling of a well has actually commenced and commonly called "spudded in"; and the "completion of a well" shall be defined as the first date on which the completion rig has actually moved off the leased premises, or the date on which oil and/or gas is first produced from the well, whichever event occurs first. Any subsequent work done on the well will be deemed reworking operations.

25.) It is hereby specifically agreed and stipulated that in the event a well is completed as a producer of oil and/or gas on land adjacent and contiguous to the leased premises, and within 467 feet of the premises covered by this lease, that Lessee herein is hereby obligated to, within 120 days after the completion date of the well or wells on the adjacent acreage, as follows:

(1) to commence drilling operations on the leased acreage and thereafter continue the drilling of such off-set well or wells with due diligence to a depth adequate to test the same formation from which the well or wells are producing from on the adjacent acreage; or

(2) pay the Lessor royalties as provided for in this lease as if an equivalent amount of production of oil and/or gas were being obtained from the off-set location on these leased premises as that which is being produced from the adjacent well or wells; or

(3) release an amount of acreage sufficient to constitute a spacing unit equivalent in size to the spacing unit that would be allocated under this lease to such well or wells on the adjacent lands, as to the zones or strata producing in such adjacent well.

SIGNED FOR IDENTIFICATION: _William Albird Hertel_

166

26.) In the event Lessee does not remove all property and fixtures placed on the leased premises within ONE HUNDRED EIGHTY (180) DAYS after the termination of this lease, and does not make suitable arrangements with the Lessor within said period of time to leave such property on the premises for a set additional period of time, title to all of such property so left on the leased premises shall pass to and vest in Lessor.

27.) Once royalty checks have commenced being tendered, the mineral owner will be paid within sixty (60) days after the end of the month the production leaves the leased premises. If payments are not forthcoming within the designated period, interest will again accrue on the unpaid balance at the statutory rate. If more than twelve (12) months transpire between royalty payments the lease shall expire as to those lands within the retained tract or pooled unit for such well, except where delay was caused by title problems or force majeure per Paragraph 11, or unless this lease is otherwise held in effect in any other manner provided herein.

28.) The mineral owners' royalty shall bear no cost or expense (direct or indirect) encountered by the Lessee or Lessee's subsidiaries prior to or subsequent to production. This rule is to apply regardless of where the royalty is fixed in the lease or division order and until title to any such oil or gas has changed from Lessee to its purchaser.

In any event, the Lessee assumes all risk of loss for the oil or gas once it leaves the leased premises.

29.) Should Lessee have title to said lands, or any portion thereof, examined and have a title report or opinion(s) rendered, Lessee shall furnish to Lessor a copy of each such title report or opinion and any supplements thereto. A copy of each such report or opinion rendered shall be mailed to Lessor at the above address within ninety (90) days after the receipt by Lessee of each report or opinion, Lessee shall not be liable in any way for the contents of any such report or opinion rendered and delivered to Lessor.

30.) Lessee shall promptly close all gates which Lessee, Lessee's agents, servants and/or employees may use in Lessee's operations on the leased premises, to prevent the escape of cattle or stock of Lessor through any open gates. Lessee further agrees to comply with all reasonable rules and regulations imposed by Lessor with regard to opening and closing and locking all such gates. If as a result of Lessee's failure to keep all gates locked any of the Lessor's cattle or livestock escape, then Lessee shall promptly reimburse the Lessor all expenses incurred in rounding up such cattle or livestock and transporting them to the pasture from which they escaped. Additionally, if this paragraph is violated, Lessee shall pay to Lessor, at Lessor's address first given above, a penalty of Five Hundred Dollars ($500.00) per violation, within 15 days of such violation. If Lessor so specifies, any gate installed over a cattle guard will be a sliding gate. All cattle guards will be wide enough to easily accommodate farm equipment.

31.)     Before building any pipelines upon said premises, Lessee is required to consult with Lessor or the Surface Owner as to the location of same and such mutual agreement will not be unreasonably withheld. It is the intention of the Lessor to assist operator in selecting the route that will cause the least amount of damage or interruption to the Lessor's operations. Lessee must also bury all pipelines at least thirty-six (36") inches below the surface. Standard farmland double-ditching method will be used by Lessee in construction of the pipeline by separating the topsoil from the subsoil during excavation and during the backfill operation, said subsoil must be placed in the open ditch first and then the topsoil will be placed in the ditch to complete the backfilling operation. The width of the trench to be excavated is limited to twelve (12") inches unless the pipeline is greater than six inches (6") in diameter. All pipelines across the leased premises will be permanently identified and located by markings at all fence lines or roads traversed by such pipelines. In the event the premises is not subject to production from this tract or a pooled unit, or in the event Lessee transports gas from lands in which Lessor has no interest, then Lessee must not install or lay a pipeline across these lands without first securing an easement for such pipeline. Should a gas pipeline from wells on the premises or lands pooled therewith be built, Lessee is not required to obtain an easement, but will nevertheless be liable for all surface damages. Lessee, at all times while this lease is in effect, is required to maintain the pipeline right-of-way in order to prevent or correct sinkage, settlement and erosion of the soil as occasioned by its pipelines. No compressor shall be located within one-half (½) mile of a dwelling, but in any event, Lessee shall have the right to have at least one compressor at a mutually acceptable site on premises, permission for which shall not be unreasonably withheld.

32.)     Lessee shall have the right to drill such water wells as may be necessary for its operations on the premises. Fresh water use shall be restricted to the actual drilling for oil or gas on the leased premises or lands pooled therewith and shall not be used in any manner for secondary recovery flooding of any productive oil reservoir. Any water well drilled by Lessee on the leased premises shall be drilled in a workmanlike manner and completed in accordance with the general practices in the area for the completion of water wells to be used for the production of water for livestock and domestic purposes (using windmills or other down hole pumping equipment normally used in the area). Any water well so drilled shall be drilled in order to accept a minimum of 4.5-inch O.D. casing. In the event Lessee shall drill a water well on Lessor's premises, then upon Lessee's permanent cessation of use of such water well, the Lessee shall leave the water well and the casing therein for the use of the Lessor, at Lessor's option and at Lessor's risk, however, the Lessee may remove any pump and motor installed by the Lessee.

33.)     Lessee agrees to furnish Lessor a daily report for each day that drilling completion or reworking operations are being conducted on a well or wells located on said lands. The report will be transmitted via facsimile to Lessor's representative, if requested. Lessee further agrees to give Lessor at least twelve (12) hours advance notice of any logging, testing and coring operations to be conducted in any well drilled on said lands in order that Lessor may have a representative present at such operations. At Lessee's office and during Lessee's regular office hours, Lessor shall have access to all information concerning the drilling, coring, testing and completing of all wells, including the driller's log and all electrical logs and surveys, and to all accounting books and records, production charts, records and information, concerning the production, processing, transportation, sale and marketing of oil and gas from said lands. Lessee agrees to furnish Lessor with one (1) final print of all driller's logs, electrical logs and surveys obtained in the drilling of all wells on said lands, and one (1) copy of all core analyses and test results obtained from all wells. One (1) copy of all applications and reports filed by Lessee with the Texas Railroad Commission or other regulatory agencies in connection with Lessee's operations hereunder shall also be mailed to Lessor. Lessor has the right to be

SIGNED FOR IDENTIFICATION: _William Allof Herbst_

present and observe the measurement of all production from each producing well. All information, data and copies to be furnished by Lessee under the provisions of this paragraph shall be furnished to Lessor until Lessee is advised in writing to the contrary. Any data submitted to Lessor shall be time delayed by at least sixty (60) days from completion and/or plugging and abandoning of the subject well. Lessee shall have no liability to Lessor or to any third party for their reliance upon such information unless the information furnished is intentionally false or misleading. Should Lessor request more than one (1) copy of the information to be furnished by Lessee under the provisions of this paragraph, Lessee agrees to furnish, at Lessor's cost and expense, such additional copies as may be requested by Lessor. Lessor agrees to maintain in confidence all information furnished by Lessee pursuant to the provisions of this paragraph for so long as this lease is maintained in force and effect as to the lands and depths on which producing wells are located and information is furnished with respect thereto, and Lessor agrees not to divulge such information to any third party during such period of confidentiality. It is agreed and provided, however, that if Lessee or Lessee's agent or subcontractors release any such information to the industry, or if any such information is otherwise released through no fault of Lessor, Lessor shall not be further bound by this agreement of confidentiality as to the information released by Lessee or Lessee's agents or subcontractors or otherwise.

34.) Within one hundred twenty (120) days (weather permitting) after the completion or abandonment of any well drilled or worked over on the leased premises, Lessee agrees that it will fill and level all slush pits, holes, ruts, ditches and drains and remove all non-water based drilling mud, shale and chemicals from said premises and will restore the surface of the leased premises, as nearly as possible, to its condition prior to the commencement of such operations. Lessee will cut the banks of all slush pits and let them drain and dry before leveling to insure no bog hole will be created. In the event of failure of Lessee to comply with this paragraph, within the time specified as aforesaid, Lessor shall notify Lessee, by Certified Mail, Return Receipt Requested, of non-compliance of this paragraph. If Lessee does not comply with this paragraph within 30 days of said notification, Lessee shall pay to Lessor one and one-half times the actual cost to Lessor for making said repairs as agreed as liquidated damages on account of Lessee's failure to carry out its obligation as provided in this paragraph. Nothing herein shall release Lessee from any liability for damages suffered by Lessor as a result of a blow-out or other damages occurring during Lessee's operations hereunder, and Lessee shall be fully responsible for any and all damages resulting therefrom.

35.) Salt water must not be disposed of on the premises without the written consent of Lessor.

36.) The provisions contained herein regarding acreage covered by this lease to be held by drilling operations on or production from any pooled unit or units shall not be altered or amended by any pooling, unitization or like agreement or instrument, or any amendment thereto or ratification or acknowledgment thereof, unless the same shall be specifically designated as an amendment of such paragraph for such purpose. It is further agreed that neither this lease nor any terms or provisions hereof will be altered, amended, extended or ratified by any division order or transfer order executed by Lessor, Lessor's successors, heirs, agents, or assigns, but that any division order or transfer order will be solely for the purpose of confirming the extent of Lessor's interest in production of oil and gas from the herein described premises, or any land or lands pooled therewith, and to comply with statutory requirements. In the event of production, all division orders prepared by Lessee and its assigns will eliminate all references to ratification of Lessee's acts, ratification of the unit and ratification of gas or oil purchase contracts. If such statements are contained therein, such ratifications are void and of no effect. Any amendment, alteration, extension or ratification of this lease, or of any term or provision of this lease, will be made only by an instrument clearly denominating its purpose and effect, describing the specific terms or provisions affected and the proposed change or modification thereof, and executed by the party against whom any such amendment, alteration, extension or ratification is sought to be enforced, and any purported amendment, alteration, extension or ratification not so drafted will be of no force or effect.

37.) Lessee shall furnish Lessor copies of all assignments of working interests within ninety (90) days from recording said assignment. Any assignee shall also provide Lessor with a name, address and telephone number for the contact person for the assignee.

38.) All notices and information to be given hereunder shall be in writing and shall be sent by United States Mail or fax, postage prepaid and addressed to the party to whom such notice is given as follows:    _WAH_

If to Lessor:    William Albert Herbst, 23385 FM 791, McCoy, Texas 78113, telephone _830-256-4443_
If to Lessee:    Alvin M. Barrett & Associates Inc., a Texas Corporation, 11202 Sandstone Street, Houston, Texas 77072, telephone 281/498-5878

39.) Within ninety (90) days after this lease has expired or any portion thereof has been forfeited and upon written request by Lessor, Lessee or any assignee thereof must furnish Lessor, or Lessor's heirs or assigns, with a recordable release of this lease or such portions which have been forfeited by Lessee or its assigns under the terms of this lease agreement. If Lessee or Lessee's assigns fail to provide the Release in the time required, Lessee will immediately pay to Lessor the sum of $500.00 as agreed liquidated damages.

40.) Notwithstanding the termination of this lease as to part of the leased premises under the above provisions, Lessee shall have and retain such easements of ingress and egress over the remainder of the leased premises as shall be necessary to enable Lessee to develop and operate the portion or portions of this lease then in effect for the production of oil and gas therefrom, and it is further agreed that it shall not be necessary for Lessee to remove or relocate any pipe lines, tank batteries or other surface equipment or installations from any portions of the leased premises as to which this lease has terminated for so long as same remain necessary for the development and operation of such portions of this lease as continue in force and effect. It is provided however, in no event shall Lessee be permitted to have more than one road leading to the location of a drilling or producing well. Upon the occurrence of any partial termination of this lease, Lessor shall have, and expressly reserves, an easement through the said lands and the depths and formations retained by Lessee in order to enable the exploration and/or production of oil, gas and/or other minerals in and from any depths and lands which are not thereafter subject to this Lease. The easement reserved

SIGNED FOR IDENTIFICATION: _William Albert Herbst_

168

herein shall be fully assignable by Lessor to any party, including any other oil, gas and mineral lessee, of depths or lands not then subject to this lease, and in the event Lessor assigns such easement to any third party, Lessee herein shall look only to such third party, provided Lessor gives Lessee notice of said easement and its assignment, and not to Lessor, for any claims, costs, expenses or damages occasioned by such third party's use of the easement herein reserved, specifically including, but not limited to, any claims that such third party's activities interfered with or damaged Lessee's wells, reserves, equipment, operations or other rights hereunder.

41.) LESSEE SHALL INDEMNIFY AND HOLD LESSOR HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, ACTIONS, LIABILITY, LOSS, DAMAGE OR EXPENSE OF EVERY KIND AND NATURE, INCLUDING, BUT NOT LIMITED TO, REASONABLE ATTORNEY'S FEES AND COSTS, FOR DAMAGE TO PROPERTY OF ANY PERSON, FIRM OR CORPORATION OR FOR INJURY TO OR DEATH OF ANY PERSON, INCLUDING, BUT NOT LIMITED TO, THE EMPLOYEES OF LESSEE, ITS SUCCESSORS, ASSIGNS, CONTRACTORS OR SUBCONTRACTORS, WHICH MAY, IN WHOLE OR IN PART, BE CAUSED BY OR RESULT FROM OPERATIONS CONDUCTED HEREUNDER OR THE ENJOYMENT OF THIS LEASE OR THE EXERCISE OF ANY RIGHT GRANTED HEREUNDER OR ANY OBLIGATION IMPOSED HEREBY. IN THE EVENT THIS LEASE IS HELD OR INTERPRETED TO BE WITHIN THE SCOPE OF AN AGREEMENT AS DEFINED AND PROHIBITED BY CHAPTER 127 OF THE TEXAS CIVIL PRACTICE AND REMEDIES CODE ("CHAPTER 127"), THE INDEMNITY PROVIDED HEREIN SHALL BE AMENDED AND CONSTRUED TO LIMIT AND TO EXCEPT FROM ITS APPLICATION ANY INDEMNITY FOR ANY LOSS OR LIABILITY OCCURRING UNDER CIRCUMSTANCES THAT SUCH INDEMNITY IS PROHIBITED OR LIMITED BY THE APPLICATION OF CHAPTER 127 AND LESSEE SHALL INDEMNIFY AND HOLD HARMLESS LESSOR, THE SURFACE OWNER AND THEIR RESPECTIVE SUCCESSORS, LEGAL REPRESENTATIVES, ASSIGNS, AGENTS, CONTRACTORS, AND EMPLOYEES, ONLY TO THE EXTENT OF THE MAXIMUM COVERAGES AND DOLLAR LIMITS OR LIABILITY PERMITTED BY CHAPTER 127; AND THIS LIMITED INDEMNITY OBLIGATION SHALL BE SUPPORTED BY AVAILABLE LIABILITY INSURANCE FURNISHED BY LESSEE (AND LESSEE SHALL FURNISH TO LESSOR CERTIFICATES OR OTHER EVIDENCE OF LIABILITY INSURANCE BEING IN FORCE AND EFFECT). TO THE EXTENT THAT THE INDEMNITY PROVIDED HEREIN IS LIMITED OR INAPPLICABLE UNDER CHAPTER 127, THE LAW OF CONTRIBUTION SHALL APPLY.

42.) Lessee, at Lessee's own expense, will provide and maintain in force during the existence of this Lease a commercial general liability insurance in the amount of at least $3,000,000.00, covering Lessor as well as Lessee, for any liability for property damage or personal injury arising as a result of Lessee's conducting operations on or off these premises pursuant to this Lease, the exercise of any right granted hereunder or any obligation imposed hereby or associated in any way with activities conducted by Lessee on or impacting the premises. This insurance is to be carried by one or more insurance companies authorized to transact business in Texas. Lessee will furnish Lessor with certificates of all insurance required by this Lease.

43.) LESSEE MUST COMPLY WITH ALL VALID LAWS, ORDINANCES, AND REGULATIONS, WHETHER STATE, FEDERAL, OR MUNICIPAL, APPLICABLE TO THE PREMISES. THE USE WHICH LESSEE MAKES AND INTENDS TO MAKE OF THE PREMISES WILL NOT RESULT IN THE DISPOSAL OR OTHER RELEASE OF ANY HAZARDOUS SUBSTANCE OR SOLID WASTE ON OR TO THE PREMISES. IN THE EVENT THAT ANY HAZARDOUS SUBSTANCES, SOLID WASTES OR OTHER POLLUTANTS ARE DISPOSED OR RELEASED ON AND/OR UNDER THE PREMISES, RESULTING IN THE CONTAMINATION OR POLLUTION TO THE PREMISES OR ANY ADJOINING PROPERTY, ARISING OUT OF SAID CONTAMINATION OR POLLUTION, CAUSED BY OR CONSENTED TO BY THE LESSEE, THE LESSEE SHALL INDEMNIFY AND HOLD HARMLESS THE LESSOR AND LESSOR'S HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, AND ASSIGNS, FROM AND AGAINST ANY AND ALL LIABILITY FROM THE RULES AND REGULATIONS OF THE TEXAS RAILROAD COMMISSION, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT OF 1980, THE RESOURCE CONSERVATION AND RECOVERY ACT OF 1976, OR ANY OTHER STATE OR FEDERAL STATUTE, RULE OR REGULATION NOW IN EXISTENCE OR HEREINAFTER ENACTED RELATING TO SUCH SUBSTANCE OR WASTE AND LESSEE HAS THE ABSOLUTE RESPONSIBILITY FOR ALL CLEANUP OF SAID POLLUTION OR CONTAMINATION OR RECLAMATION OF THE PREMISES AND ALL COSTS AND EXPENSES THEREOF.

44.) IT IS AGREED THAT ANY SUITS AT LAW WILL BE INITIATED IN THE COURT OF PROPER JURISDICTION OF THE STATE OF TEXAS IN THE COUNTY WHERE THE LAND OR ANY PART THEREOF BE LOCATED WITH APPEALS TO THE APPELLATE COURT OF THE STATE OF TEXAS AND THAT THE LAW OF TEXAS WILL CONTROL IN CONSTRUING THIS LEASE.

45.) Lessor hereby warrants title to Lease premises against claims by, through or under Lessor, but not otherwise, and Lessor's liability on such warranties shall in no event exceed the value of bonus paid to Lessor herein for any portion having defective title.

46.) Lessee shall promptly pay the owner of the surface of the leased premises a reasonable sum for any damages resulting to the surface of said premises and the crops and improvements located thereon which may be caused by or result from the operations of Lessee hereunder or pursuant to any grants hereunder, and Lessee will restore same to substantially their present condition, so far as can be reasonably be done, as concerns any material change in the surface of such premises caused by or resulting from operations of Lessee hereunder. Lessee agrees that if any oil based mud or drilling compound containing hydrocarbon base or any material which is harmful to the soil is used in Lessee's operations of the Leased Premises, Lessee shall dispose of all such mud, compounds and materials from the Leased Premises in strict compliance with the applicable rules of the Railroad Commission of Texas before filling in the pit(s), leveling and restoring the surface, and all such harmful materials shall be disposed of by the Lessee. Drilling mud not containing any of said harmful substances may be disposed of in accordance with Texas

SIGNED FOR IDENTIFICATION: _William Albert Herbst_

169

Administrative Code, Title 16, Part 1, Chapter 3, Rule 3.8 "Water Protection". Lessor herein grants to Lessee permission to landfarm all water base drilling mud with a chloride concentration of 3,000 milligrams per liter (mg/L) or less; drilled cuttings, sands, and silts obtained while using water based drilling fluid with a chloride concentration of 3,000 (mg/L) or less; and wash water used for cleaning drill pipe and other equipment from the drill sites used by Lessee on lands covered by this Oil and Gas Lease.

47.) Lessee is hereby given the option to extend the primary term of this lease for an additional three (3) years from the expiration of the original primary term. This option may be exercised by Lessee at any time during the last year of the original primary term by paying the sum of Five Hundred and No/100 Dollars ($500.00) per net mineral acre to the Lessor, or their heirs and assigns. This payment shall be based upon the number of net mineral acres then covered by this lease, and all of the provisions of this lease shall apply equally to this payment including, but not limited to, the provisions regarding changes in ownership. Should this option be exercised as herein provided, it shall be considered for all purposes as though this lease originally provided for a primary term of six (6) years. In the event this lease is being maintained by any provisions hereof at the expiration of the original primary term, Lessee shall have a period of thirty (30) days from the date this lease ceases to be so maintained within which to exercise this option.

48.) Lessee is hereby granted all rights necessary to conduct seismic operations upon the leased premises. If Lessee elects to conduct 3D seismic operations upon the leased premises, Lessee agrees to pay the surface owner $15.00 per acre for each acre of the leased premises covered by said 3D seismic operation. After completion of such seismic operations, Lessee must restore the land to its original condition just prior to such operations and shall pay the surface owner and any tenants the actual amount of extraordinary damages, if any, not customarily caused by seismic operations, all normal and customary damages being included within the sum of $15.00 per surface acre provided above.

49.) All covenants, obligations and liabilities of Lessee contained in this Lease shall survive the termination or expiration of this lease and Lessee shall remain wholly responsible and liable for the performance thereof notwithstanding such termination or expiration.

50.) Lessee agrees to provide a gate guard to control access to Lessor's property while drilling any oil or gas well. Lessor must consent to the location of any roads, which consent may not be unreasonably withheld.

51.) The parties agree that they may record a Memorandum of the LEASE in lieu of recording this Lease.

IN WITNESS WHEREOF, this instrument is executed on the date first above written.

_____
WILLIAM ALBERT HERBST

LESSOR

ALVIN M. BARRETT & ASSOCIATES INC.

BY:_____

Its_____

LESSEE

THE STATE OF TEXAS      §
COUNTY OF ATASCOSA      §
This instrument was acknowledged before me on this ___31st___ day of August, 2009, by WILLIAM ALBERT HERBST.

_____
NOTARY PUBLIC, STATE OF TEXAS

ALFRED ALLEN STEINLE
Notary Public, State of Texas
My Commission Expires
March 31, 2013

THE STATE OF TEXAS      §
COUNTY OF HARRIS        §
This instrument was acknowledged before me on this ___ day of _____, 2009, by ___ of ALVIN M. BARRETT & ASSOCIATES, INC., a Texas Corporation, on its behalf.

_____
NOTARY PUBLIC, STATE OF TEXAS

Prepared in the Law Office of:
Alfred A. Steinle
P. O. Box 400
Jourdanton, Texas 78026

# TAB 6

Affidavit of John McBeath (SCR 172-79)

| | | |
|---|---|---|
| SHIRLEY ADAMS, CHARLENE | § | IN THE DISTRICT COURT |
| BURGESS, WILLIE MAY HERBST | § | |
| JASIK, WILLIAM ALSBERT HERBST, | § | |
| HELEN HERBST and | § | |
| R. MAY OIL & GAS COMPANY, LTD., | § | 218TH JUDICIAL DISTRICT |
| | § | |
| Plaintiffs, | § | |
| V. | § | |
| | § | |
| MURPHY EXPLORATION & | § | ATASCOSA COUNTY, TEXAS |
| PRODUCTION CO.-USA | § | |
| A DELAWARE CORPORATION | § | |
| | § | |
| Defendant. | § | |

## AFFIDAVIT OF JOHN C. MCBEATH, P.E.

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

Before me, the undersigned authority, on this day personally appeared John C. McBeath, and stated the following:

1.    "My name is John C. McBeath. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2.    I am a Vice President of Platt, Sparks & Associates, Consulting Petroleum Engineers, Inc. ("Platt Sparks").

AFFIDAVIT OF JOHN C. McBEATH, P.E.                                                    Page 1

3. My employer, Platt Sparks is a petroleum engineering consulting firm that provides consulting services to its clients in the oil and gas industry with regard to a wide array of oil and gas related issues including, but not limited to, regulatory compliance and filings, reservoir engineering studies, log analysis, reserve determination, economic analysis, fair market value determinations, reservoir simulation, damage analysis, and lease royalty provision analysis. A significant portion of my practice involves advising clients with respect to Eagle Ford Shale ("EFS") formation exploration and development issues. I have numerous clients involved in this trend and routinely advise them on issues such as permitting wells, regulatory compliance, operational issues and other petroleum engineering matters. As such, I am familiar with terminology and issues applicable to operations within the EFS.

4. I am a 1987 graduate of the University of Texas at Austin with a Bachelor of Science degree in Petroleum Engineering. I am a licensed Professional Engineer in Texas, Wyoming, and California, a member of the Society of Petrophysicists and Well Log Analysts, and a member of the Society of Petroleum Evaluation Engineers. A copy of my resume is attached as Exhibit JCM 1.

5. I have reviewed PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT dated September 5, 2013. I have been asked by counsel for Murphy to respond to Plaintiffs' assertion that the Herbst B 1H Well is not an "offset well" under paragraph 25 of the leases at issue. ("Shirley Lease" and "William Lease") Specifically, I have been asked whether the term "offset well" is a specialized term within the industry, and if so, whether it has a commonly understand meaning within the industry.

6. The following is a list of information considered in my study:

AFFIDAVIT OF JOHN C. McBEATH, P.E.                                    Page 2

a.      Pleadings and court filings provided by Attorneys

b.      Publically available data on EFS wells

c.      Published Papers on technical aspects of the EFS

d.      Publically available information from Investor Presentation materials of Operators in the EFS.

e.      Texas Railroad Commission ("RRC") rules and regulations

f.      RRC hearing information, including proposals for decision and final orders.

g.      Affidavit of Mr. Kane Heinen

7.      The EFS is a formation that underlies much of South Texas. It lies directly below the Austin Chalk formation and has long been recognized as the hydrocarbon source rock for the Austin Chalk. The EFS lies directly above the Buda Limestone formation. The EFS varies in thickness from 20 feet to over 500 feet and in quality from top to bottom with the Upper portion being carbonate-rich and the Lower portion shale-rich. The productive part of the EFS is divided into oil, wet gas and dry gas areas. Exhibit JCM 1 contains a map from the Energy Information Administration ("EIA") showing the different producing areas of the EFS. Although a few wells historically produced from the formation, development began in earnest in 2008 with the drilling of wells in La Salle County by PetroHawk. These wells were the discovery of the Hawkville (Eagle Ford) Field. Development has continued through current with most activity concentrated in the oil and wet gas windows due to attractive liquids prices. Drilling efficiency has improved significantly as well as the fine tuning of hydraulic fracture stimulation treatments. Current development includes twenty-six Counties located in six RRC

AFFIDAVIT OF JOHN C. McBEATH, P.E.                        Page 3

174

districts. Exhibit JCM 3 is map from the RRC website showing the EFS development as of January 2014.

8. The Lucas "A" 1H well was drilled by Comstock Oil & Gas, LP in December 2011, targeting the EFS. The RRC well completion papers and directional surveys all indicate that the horizontal lateral was landed in the EFS. The form W-2 filed by Comstock indicates that the well was completed on February 23, 2012. Exhibit JCM 4 is a collection of RRC forms relating to the Lucas "A" 1H well. I have also reviewed the RRC completion papers and directional survey for the Murphy Herbst B 1H well. Drilling was initiated on Murphy's Herbst B 1H well on June 8, 2012. The Herbst well horizontal lateral was also completed in the EFS. Exhibit JCM 5 is a collection of RRC forms relating to the Herbst B 1H well.

9. Drilling began on the Murphy Herbst B 1H well less than 120 days after the Comstock Lucas "A" 1H well was completed.

10. Based on the information contained in the Affidavit of Mr. Kane Heinen, it is clear that the Herbst B 1H well was drilled by Murphy to fulfill their obligation under paragraph 25 of the Shirley and Williams leases.

11. The Murphy Herbst B 1H well was drilled to a depth adequate to test the same formation from which the Comstock Lucas "A" 1H well produces.

12. Based on my review of Plaintiffs' petition and motion for summary judgment, it is my understanding that Plaintiffs contend that the Murphy Herbst B 1H well is not an offset well to the Lucas "A" 1H well because it is not as close as legally possible to the lease line of the Lucas "A" lease. Plaintiffs' use of the term "offset well" is not consistent with the industry use of the term.

AFFIDAVIT OF JOHN C. McBEATH, P.E.                                    Page 4

**175**

13. The term "offset well" is a specialized term within the oil and gas industry and is commonly understood within the industry as describing any well drilled on an adjacent lease or property. The term "offset well" can also refer to the closest well, even if it is located on another lease. It is my opinion that Plaintiffs are viewing the term "offset well," as used in paragraph 25 of the Lease, as "direct offset well". A direct offset well is also a specialized term within the oil and gas industry, and is commonly understood to be a well that is located directly across a lease line or other legal boundary. A direct offset well can be located at the closest legal location or even closer if the operator applies for and receives an RRC Rule 37 exception. A direct offset well is sometime called an immediate offset well. Direct offset wells and immediate offset wells are included within the term offset wells, but not all offset wells are direct or immediate offset wells.

14. The term "offset well" is used in RRC Rule 36 to define which wells can be used to estimate the escape rate for use in calculating a radius of exposure for a well subject to Rule 36. The RRC has never limited the wells available in this determination to wells directly across the lease line, and Rule 36 is further evidence of how the term offset well is understood within the industry.

15. RRC form H-1, related to RRC Rule 46, shows that the term "offset well" is understood within the industry to describe any well drilled on adjacent property. The H-1 form requires offset wells within ½ mile of the subject well to be identified on a map.

16. Finally, RRC Proposals for Decisions ("PFD") and Final Orders ("FO") 01-0249550, 8A-0211820, 04-0213270 and 7C-0240684 contain further examples of the RRC's use of the terms offset well, direct offset well and immediate offset well. These PFDs and FOs further confirm that each of these specialized terms have a commonly understood

AFFIDAVIT OF JOHN C. McBEATH, P.E. Page 5

industry meaning, and that the term "offset well" is any well located on an adjacent property, not just a well located directly across the lease line at the closest legal location. That is a "direct offset well."

17. Based on my experience working with operators and other participants within the industry, the usage of these terms by the RRC is consistent with how the terms are commonly understood within the industry.

18. I have reviewed the Shirley lease, dated August 14, 2009, and it is my opinion that the Lease was drafted specifically for horizontal drilling in the EFS. The lease contains specific language regarding horizontal wells and the size of pooled units associated with horizontal wells. By August 2009, there was significant EFS development activity nearby in Live Oak and Karnes Counties.

19. Plaintiffs' contention that an offset well, as used in the Lease, exists to protect their acreage from drainage is not correct. Due to the reservoir characteristics of the EFS, the formation will not produce without large multi-stage hydraulic fracture jobs that provide pathways between the formation and the wellbore. In the early development of the trend, it was recognized that even with these hydraulic fracture stimulation jobs, a relatively modest amount of reservoir is drained by each horizontal well. The RRC assigned lease line spacing rules that reflect this reality. Recently, several operators have installed pilot programs to test the sensitivity of well spacing to well recoveries. Early indications confirm that spacing horizontal laterals as close as 225 feet results in well recoveries comparable to much wider spaced laterals.

**177**

20. The reservoir characteristics of the EFS further support my conclusion that the specialized term "offset well," as used in Paragraph 25 of the Lease, is not commonly understood as a well drilled within 350 feet of the Lease line, as Plaintiffs contend.

21. Plaintiffs refer to Williams and Meyers' Manual of Oil & Gas Terms for the definition of Offset Clause. The definition of Offset Clause refers to Offset Well, another definition in Williams & Meyers. Although Williams and Meyers states that the Offset Well is intended to prevent drainage, neither definitions refer to a specific distance requirement for an Offset Well. As stated above, the conventional concept of drainage across lease lines has limited application in the EFS. Williams & Meyers offset well definition does refer to "direct offsetting" when discussing wells that are directly across lease line on equal-sized spacing units. Plaintiffs also refer to two on-line dictionaries having the same definition of offset well. Before reading the Plaintiffs' motion I had not encountered these sources. As stated above, it is my opinion that the term offset well encompasses the more narrowly defined direct offset well. The on-line definitions used by Plaintiffs' more accurately describe direct offset wells. My personal copy of "A Dictionary of Petroleum Terms" 2nd ed. contains the following definition:

> offset well *n*: a well drilled on a tract of land next to another owner's tract on which there is a producing well.

22. Based on my review of the information discussed above and my professional experience in the industry for the past 25 years, it is my opinion that the Herbst B 1H well drilled by Murphy on the Shirley and William leases is an offset well as that term is commonly understood and used in the industry and paragraph 25 of the leases.

AFFIDAVIT OF JOHN C. McBEATH, P.E.                                   Page 7

Further, Affiant sayeth not.



John C. McBeath, P.E.
Texas Registered Engineering Firm F-1493

SUBSCRIBED TO AND SWORN before me this 22nd day of January 2014.



Notary Public in and for the State of Texas

MICHELLE T. GILBERT
Notary Public, State of Texas
My Commission Expires
May 09, 2014

AFFIDAVIT OF JOHN C. McBEATH, P.E.                    Page 8

# TAB 7

Affidavit of Gregg Robertson (SCR 238-42)

CAUSE NO. 13-05-0466-CVA

| | | |
|---|---|---|
| SHIRLEY ADAMS, CHARLENE BURGESS, WILLIE MAE HERBST JASIK, WILLIAM ALBERT HERBST, HELEN HERBST and R. MAY OIL & GAS COMPANY, LTD., Plaintiffs, vs. MURPHY EXPLORATION & PRODUCTION CO.-USA, A DELAWARE CORPORATION, Defendant. | § § § § § § § § § § § § § § § | IN THE DISTRICT COURT<br><br><br><br>218th JUDICIAL DISTRICT<br><br><br><br>ATASCOSA COUNTY, TEXAS |

| | |
|---|---|
| STATE OF TEXAS | § |
| COUNTY OF NUECES | § |

Before me, the undersigned authority, on this day personally appeared Gregg Robertson, and stated the following:

1.      "My name is Gregg Robertson. I am over 18 years of age, of sound mind, and capable of making this affidavit. Except where indicated otherwise, the facts stated in this affidavit are within my personal knowledge and are true and correct.

2.      For the past thirty-five years I have worked in the family oil and gas business in Corpus Christi, Texas that was founded by my father in 1975. We have provided consulting geological services to other companies, operated a well service company for twenty years, operated oil and gas production for thirty years and have been partners with numerous other oil and gas companies in various oil and gas exploration and production ventures. My father was instrumental in providing geologic supervision to the early pioneers in the Austin Chalk Trend beginning in 1974, and I joined with Petrohawk Energy to drill the initial discovery wells for the Hawkville (Eagle Ford Shale) Field in 2008.

1

EXHIBIT

*A*

2083219.1

238

3. My educational background includes a B.A. in English from Sewanee: The University of the South in 1978, followed by studies at the graduate school of Geology at the University of Texas, Austin from 1979-1980.

4. I have reviewed the Plaintiffs' Motion for Partial Summary Judgment in the above-described and numbered cause, the Affidavit of John C. McBeath, P.E., and the Railroad Commission filings for the Comstrock Oil & Gas, LP #1H Lucas "A" well and the Murphy Exploration and Production #1H Herbst "B" well, as well as the relevant portion of the Oil, Gas and Mineral Leases covering the land where the Herbst well is drilled. I have been asked whether the term "offset well" is a specialized term within the industry, and what its commonly understood meaning is within the industry. More specifically, I have been asked whether the Murphy #1H Herbst "B" Well is an "offset well" to the Comstock #1H Lucas "A" Well, as that term is used in Paragraph 25 of the Herbst leases.

5. It is my opinion that the Murphy #1H Herbst "B" Well is not an "offset well" to the Comstock #1H Lucas "A" Well, as that term is used in the industry and in the oil and gas lease. An "offset well", as that term is used in the industry, is a well drilled as close as possible to the offending well in order to prevent or minimize drainage from the leased premises by the offending well.

6. It is my understanding that there is no dispute that the governing Oil, Gas, and Mineral Leases are in effect and contain a Paragraph 25 with the "offset well provision", that the Comstock well was permitted and actually drilled closer than the 467' buffer provided by the offset well provision, and that Murphy is relying upon the Herbst "B" #1H well to satisfy the remedies required by the lease when a well is drilled within 467 feet of the leased premises.

2

7.    Mr. McBeath's affidavit has two arguments to support his opinion that the Murphy #1H Herbst "B" Well satisfies Murphy's obligations under Paragraph 25 of the Herbst leases: First, Mr. McBeath makes a distinction between the term "offset well" and the conjecture of a more specifically used term in the industry of "direct offset well". Second, Mr. McBeath argues that the lease provision relating to an offset well has nothing to do with the potential for drainage of the leased premises by the Comstock well ("Plaintiff's contention that an offset well, as used in the Lease, exists to protect their acreage from drainage is not correct." — McBeath, page 6). Neither of these arguments has any credibility based upon conventional oilfield usage, traditional construction of the English language nor common sense.

8.    Regarding Mr. McBeath's argument as to the purpose of Paragraph 25 of the leases: based upon my involvement in the construction of several hundred oil and gas leases, and specifically over one hundred oil and gas leases in the past five years for the development of Eagle Ford Shale reserves, the inclusion of a provision such as the one in paragraph 25 requiring remedies by the Lessee should a well be drilled on offset acreage has only one, sole purpose - to prevent, compensate and mitigate the drainage of the leased premises by the offending well. Common sense precludes any other construction. In fact, Paragraph 25 requires the lessee to drill an "offset well" if an offending well is drilled, which is specifically defined in the lease as a well drilled within 467' of the leased premises, which at the time the lease was executed, defined a well drilled closer to the lease than Railroad Commission rules would allow. The stated distance of a well from the leased premises defines the specific intent that the corresponding location of an "off-set well" drilled under Paragraph 25 (1) should be equally as close to the offending well as possible to protect the Lessors' reserves from drainage by the offending well. For Murphy to state that the Herbst well, located over 2100 feet away from the offending well and being also as

3

2083219.1

far away as the configuration of the lease would allow, satisfies the Leases' offset remedy cannot be supported by standard oilfield practice, the intent of the parties in negotiating the lease, or common sense.

9. Mr. McBeath's attempt to explain a presumed difference between "an offset well" and "a direct offset well" has no basis in standard oilfield practices. I have never seen in any written contract nor heard in any conversation, such a distinction being made. Asserting that there is no connection between the term "offset well" and a specific distance from a lease line is a contrived and desperate attempt to explain Murphy's actions in this matter. It deserves no further rebuttal.

10. In the highly competitive and intense development setting of the Eagle Ford Shale Trend, it has been my practice and that of my partners in the drilling of over 300 wells across 265,000 acres, to contact offset operators prior to setting up a drilling pattern that begins 330 feet from the common property boundary. There are numerous alternatives to starting a development program on an adjacent lease to another operator rather than drilling the closest offset well first. To do so without attempting to contact the offset operator first is akin to dropping the glove to start a duel. Likewise, should this event occur, it is incomprehensible that a Lessee would unilaterally drill a knowingly contentious location such as the Murphy #1H Herbst "B" Well without conducting transparent conversations with the Lessors first. If the Herbst tract of land merited the drilling of a well, there was no purpose served for either Murphy or the Lessors by leaving the potential for drainage by the offsetting Comstock well unchallenged. In fact, the proper development of the Herbst tract will require at least two additional wells, which will both be significantly closer to the Comstock well than the current Herbst "B" well. There is nothing in the facts, viewed through the perspective of standard oilfield practices, nor in Mr. McBeath's

4.

2083219.1

affidavit, (which become specious when viewed through the perspective of the standard construction of the English language and by common sense), that supports Murphy's claim that its #1H Herbst "B" Well is an adequate remedy to satisfy its obligations under Paragraph 25 for protection from an offending offset well. "

FURTHER, AFFIANT SAYETH NOT

_____
Gregg Robertson

STATE OF TEXAS          §
                       §
COUNTY OF NUECES        §

Subscribed and sworn to before me, the undersigned authority on this the 21st day of April, 2014.



DONNA ANN MESMER
MY COMMISSION EXPIRES
February 19, 2018

_____
Notary Public in and for the State of Texas

5

2083219.1

# TAB 8

RRC Field Rules for Eagle Ford Field
a. Nov. 2010 Order Adopting Temporary Field Rules (SCR 88-92)
b. June 2012 Order Making Rules Permanent (SCR 93-97

**RAILROAD COMMISSION OF TEXAS**
**OFFICE OF GENERAL COUNSEL**
**HEARINGS SECTION**

OIL AND GAS DOCKET NOS.
01-0266450 AND 01-0266477

IN THE EAGLEVILLE (EAGLE FORD-1) FIELD, ATASCOSA, GONZALES, LA SALLE, MCMULLEN AND WILSON COUNTIES, TEXAS

**FINAL ORDER**
**APPROVING THE APPLICATION OF EOG RESOURCES, INC.**
**FOR A NEW FIELD DESIGNATION AND**
**ADOPTING TEMPORARY FIELD RULES FOR THE**
**EAGLEVILLE (EAGLE FORD-1) FIELD**
**ATASCOSA, GONZALES, LA SALLE, MCMULLEN AND**
**WILSON COUNTIES, TEXAS**

The Commission finds that after statutory notice in the above-numbered docket heard on July 29, 2010, the presiding examiner has made and filed a report and recommendation containing findings of fact and conclusions of law, for which service was not required; that the proposed application is in compliance with all statutory requirements; and that this proceeding was duly submitted to the Railroad Commission of Texas at conference held in its offices in Austin, Texas.

The Commission, after review and due consideration of the examiner's report and recommendation, the findings of fact and conclusions of law contained therein, hereby adopts as its own the Findings of Fact Nos. 1 through 15, with the exception of No. 7, and Conclusions of Law Nos. 1 through 5, with the exception of No. 4, contained therein, and incorporates said findings of fact and conclusions of law as if fully set out and separately stated herein.

Therefore, it is **ORDERED** by the Railroad Commission of Texas that the application of EOG Resources, Inc. for a new field designation for the Eagleville (Eagle Ford-1) Field (ID No. 27135 700), Atascosa, Gonzales, La Salle, McMullen and Wilson Counties, Texas, be and hereby is approved.

It is further **ORDERED** that the Dilworth (Eagle Ford), ID No. 24806 300, Leesville (Eagle Ford), ID No. 52930 250, and Pilgrim (Eagleford), ID No. 71486 600, Fields are hereby consolidated into the Eagleville (Eagle Ford-1) Field, ID No. 27135 700, Atascosa, Gonzales, La Salle, McMullen and Wilson Counties, Texas.

Wells in the subject fields shall be transferred into the Eagleville (Eagle Ford-1) Field without requiring new drilling permits and plats.

It is further **ORDERED** that the following Field Rules shall be adopted on a temporary basis for the Eagleville (Eagle Ford-1) Field, Atascosa, Gonzales, La Salle, McMullen and Wilson Counties, Texas.

Attachment e

**RULE 1**: The entire correlative interval from 10,294 feet to 10,580 feet as shown on the log of the EOG Resources, Inc. - Milton Unit, Well No. 1 (API No. 42-255-31608), Section 64, John Randon Survey, A-247, Karnes County, Texas, shall be designated as a single reservoir for proration purposes and be designated as the Eagleville (Eagle Ford-1) Field.

**RULE 2**: No well for oil or gas shall hereafter be drilled nearer than THREE HUNDRED THIRTY (330) feet to any property line, lease line, or subdivision line. There is no minimum between well spacing requirement. The aforementioned distances in the above rule are minimum distances to allow an operator flexibility in locating a well; and the above spacing rule and the other rules to follow are for the purpose of permitting only one well to each drilling and proration unit. Provided however, that the Commission will grant exceptions to permit drilling within shorter distances and drilling more wells than herein prescribed, whenever the Commission shall have determined that such exceptions are necessary either to prevent waste or to prevent the confiscation of property. When exception to these rules is desired, application therefor shall be filed and will be acted upon in accordance with the provisions of Commission Statewide Rules 37 and 38, which applicable provisions of said rules are incorporated herein by reference.

In applying this rule, the general order of the Commission with relation to the subdivision of property shall be observed.

Provided, however, that for purposes of spacing for horizontal wells, the following shall apply:

a. A take point in a horizontal drainhole well is any point along a horizontal drainhole where oil and/or gas can be produced from the reservoir/field interval. The first take point may be at a different location than the penetration point and the last take point may be at a location different than the terminus point.

b. No horizontal drainhole well for oil or gas shall hereafter be drilled such that the first and last take point are nearer than ONE HUNDRED (100) feet to any property line, lease line or subdivision line.

d. For each horizontal drainhole well, the perpendicular distance from any take point on such horizontal drainhole between the first take point and the last take point to any point on any property line, lease line or subdivision line shall be a minimum of THREE HUNDRED THIRTY (330) feet.

For the purpose of assigning additional acreage to a horizontal well pursuant to Rule 86, the distance from the first take point to the last take point in the horizontal drainhole shall be used in such determination, in lieu of the distance from penetration point to terminus.

89

In addition to the penetration point and the terminus of the wellbore required to be identified on the drilling permit application (Form W-1H) and plat, the first and last take points must also be identified on the drilling permit application (Remarks Section) and plat. Operators shall file an as-drilled plat showing the path, penetration point, terminus and the first and last take points of all drainholes in horizontal wells, regardless of allocation formula.

If the applicant has represented in the drilling application that there will be one or more no perf zones or "NPZ's" (portions of the wellbore within the field interval without take points), then the as-drilled plat filed after completion of the well shall be certified by a person with knowledge of the facts pertinent to the application that the plat is accurately drawn to scale and correctly reflects all pertinent and required data. In addition to the standard required data, the certified plat shall include the as-drilled track of the wellbore, the location of each take point on the wellbore, the boundaries of any wholly or partially unleased tracts within a Rule 37 distance of the wellbore, and notations of the shortest distance from each wholly or partially unleased tract within a Rule 37 distance of the wellbore to the nearest take point on the wellbore.

A properly permitted horizontal drainhole will be considered to be in compliance with the spacing rules set forth herein if the as-drilled location falls within a rectangle established as follows:

a.    Two sides of the rectangle are parallel to the permitted drainhole and 33 feet on either side of the drainhole;

b.    The other two sides of the rectangle are perpendicular to the sides described in (a) above, with one of those sides passing through the first take point and the other side passing through the last take point.

Any point of a horizontal drainhole outside of the described rectangle must conform to the permitted distance of the nearest property line, lease line or subdivision line measured perpendicular from the wellbore.

For any well permitted in this field, the penetration point need not be located on the same lease, pooled unit or unitized tract on which the well is permitted and may be located on an Offsite Tract. When the penetration point is located on such Offsite Tract, the applicant for such a drilling permit must give 21 days notice by certified mail, return receipt requested to the mineral owners of the Offsite Tract. For the purposes of this rule, the mineral owners of the Offsite Tract are (1) the designated operator; (2) all lessees of record for the Offsite Tract where there is no designated operator; and (3) all owners of unleased mineral interests where there is no designated operator or lessee. In providing such notice, applicant must provide the mineral owners of the Offsite Tract with a plat clearly depicting the projected path of the entire wellbore. In the event the applicant is unable, after due diligence, to locate the whereabouts of any person to whom notice is required by

this rule, the applicant must publish notice of this application pursuant to the Commission's Rules of Practice and Procedure. If any mineral owner of the Offsite Tract objects to the location of the penetration point, the applicant may request a hearing to demonstrate the necessity of the location of the penetration point of the well to prevent waste or to protect correlative rights. Notice of Offsite Tract penetration is not required if (a) written waivers of objection are received from all mineral owners of the Offsite Tract; or, (b) the applicant is the only mineral owner of the Offsite Tract. To mitigate the potential for well collisions, applicant shall promptly provide copies of any directional surveys to the parties entitled to notice under this section, upon request.

**RULE 3:** The acreage assigned to the individual oil or gas well for the purpose of allocating allowable oil production thereto shall be known as a proration unit. The standard drilling and proration units are established hereby to be EIGHTY (80) acres. No proration unit shall consist of more than EIGHTY (80) acres except as hereinafter provided. All proration units shall consist of continuous and contiguous acreage which can reasonably be considered to be productive of oil. No double assignment of acreage will be accepted.

If after the drilling of the last well on any lease and the assignment of acreage to each well thereon in accordance with the regulations of the Commission there remains an additional unassigned acreage of less than EIGHTY (80) acres, then and in such event the remaining unassigned acreage up to and including a total of FORTY (40) acres may be assigned as tolerance acreage to the last well drilled on such lease or may be distributed among any group of wells located thereon, so long as the proration units resulting from the inclusion of such additional acreage meet the limitations prescribed by the Commission.

For the determination of acreage credit in this field, operators shall file for each oil or gas well in this field a Form P-15 <u>Statement of Productivity of Acreage Assigned to Proration Units</u>. On that form or an attachment thereto, the operator shall list the number of acres that are being assigned to each well on the lease or unit for proration purposes. For oil or gas wells, operators shall be required to file, along with the Form P-15, a plat of the lease, unit or property; provided that such plat shall not be required to show individual proration units.

**RULE 4:** The maximum daily oil allowable for a well in the field shall be determined by multiplying 800 barrels of oil per day by a fraction, the numerator of which is the acreage assigned to the well for proration purposes and the denominator of which is the maximum acreage authorized by these field rules for proration purposes, exclusive of tolerance acreage. Each oil well shall have unlimited net gas-oil ratio authority.

It is further **ORDERED** that all overproduction in the Eagleville (Eagle Ford-1) Field, Atascosa, Gonzales, La Salle, McMullen and Wilson Counties, Texas, is hereby canceled.

The Eagleville (Eagle Ford-1) Field is a hydrogen sulfide field and shall be regulated pursuant to Statewide Rule 36.

91

It is further **ORDERED** that these rules are temporary and effective until May 2, 2012, or until Commission staff evaluates appropriate data after notice and opportunity for hearing as offered by the Commission prior to the expiration of the rules. After this notice and opportunity for hearing, should the evidence evaluated during review be insufficient to sustain spacing or proration unit rules, these temporary rules, on the Commission's own motion, may be modified or terminated.

Each exception to the examiners' proposal for decision not expressly granted herein is overruled. All requested findings of fact and conclusions of law which are not expressly adopted herein are denied. All pending motions and requests for relief not previously granted or granted herein are denied.

This order will not be final and effective until 20 days after a party is notified of the Commission's order. A party is presumed to have been notified of the Commission's order three days after the date on which the notice is actually mailed. If a timely motion for rehearing is filed by any party at interest, this order shall not become final and effective until such motion is overruled, or if such motion is granted, this order shall be subject to further action by the Commission. Pursuant to TEX. GOV'T CODE §2001.146(e), the time allotted for Commission action on a motion for rehearing in this case prior to its being overruled by operation of law, is hereby extended until 90 days from the date the parties are notified of the order.

Done this 30th day of November, 2010.

RAILROAD COMMISSION OF TEXAS


_____
**Chairman Victor G. Carrillo**


_____
**Commissioner Elizabeth A. Jones**


_____
**Commissioner Michael L. Williams**

**ATTEST:**


_____
**Secretary**

92

## RAILROAD COMMISSION OF TEXAS
## OFFICE OF GENERAL COUNSEL
## HEARINGS SECTION

OIL AND GAS DOCKET
NO. 01-0274323

IN THE EAGLEVILLE (EAGLE FORD-1)
FIELD, ATASCOSA, DIMMIT, GONZALES,
LA SALLE, MCMULLEN, WILSON AND
ZAVALA COUNTIES, TEXAS

### ORDER NUNC PRO TUNC

### AMENDING AND MAKING PERMANENT THE
### FIELD RULES FOR THE
### EAGLEVILLE (EAGLE FORD-1) FIELD
### ATASCOSA, DIMMIT, GONZALES, LA SALLE, MCMULLEN,
### WILSON AND ZAVALA COUNTIES, TEXAS

In conference at its office in Austin, Texas, the Railroad Commission of Texas took up for consideration in its Final Order entered on May 15, 2012, the matter of amending and making permanent the Field Rules for the Eagleville (Eagle Ford-1) Field, Atascosa, Dimmit, Gonzales, La Salle, McMullen, Wilson and Zavala Counties, Texas. The Commission finds that, due to clerical error, the Final Order entered on May 15, 2012, omitted the reference to a vertical well in Field Rule No. 4.

Accordingly, it is **ORDERED** that the Final Order in Docket No. 01-0274323 be, and the same is hereby amended *nunc pro tunc,* so that Field Rule No. 4 for the Eagleville (Eagle Ford-1) Field contains the reference to a vertical well and the order now reads as follows:

**RULE 1:** The entire correlative interval from 10,294 feet to 10,580 feet as shown on the log of the EOG Resources, Inc. - Milton Unit, Well No. 1 (API No. 42-255-31608), Section 64, John Randon Survey, A-247, Karnes County, Texas, shall be designated as a single reservoir for proration purposes and be designated as the Eagleville (Eagle Ford-1) Field.

**RULE 2:** No well for oil or gas shall hereafter be drilled nearer than THREE HUNDRED THIRTY (330) feet to any property line, lease line, or subdivision line. There is no minimum between well spacing requirement. The aforementioned distances in the above rule are minimum distances to allow an operator flexibility in locating a well; and the above spacing rule and the other rules to follow are for the purpose of permitting only one well to each drilling and proration unit. Provided however, that the Commission will grant exceptions to permit drilling within shorter distances and drilling more wells than herein prescribed, whenever the Commission shall have determined that such exceptions are necessary either to prevent waste or to prevent the confiscation of property. When exception to these rules is desired, application therefor shall be filed and will be acted upon

93

in accordance with the provisions of Commission Statewide Rules 37 and 38, which applicable provisions of said rules are incorporated herein by reference.

In applying this rule, the general order of the Commission with relation to the subdivision of property shall be observed.

Provided, however, that for purposes of spacing for horizontal wells, the following shall apply:

a.    A take point in a horizontal drainhole well is any point along a horizontal drainhole where oil and/or gas can be produced from the reservoir/field interval. The first take point may be at a different location than the penetration point and the last take point may be at a location different than the terminus point.

b.    No horizontal drainhole well for oil or gas shall hereafter be drilled such that the first and last take point are nearer than ONE HUNDRED (100) feet to any property line, lease line or subdivision line.

d.    For each horizontal drainhole well, the perpendicular distance from any take point on such horizontal drainhole between the first take point and the last take point to any point on any property line, lease line or subdivision line shall be a minimum of THREE HUNDRED THIRTY (330) feet.

For the purpose of assigning additional acreage to a horizontal well pursuant to Statewide Rule 86, the distance from the first take point to the last take point in the horizontal drainhole shall be used in such determination, in lieu of the distance from penetration point to terminus.

In addition to the penetration point and the terminus of the wellbore required to be identified on the drilling permit application (Form W-1H) and plat, the first and last take points must also be identified on the drilling permit application (Remarks Section) and plat. Operators shall file an as-drilled plat showing the path, penetration point, terminus and the first and last take points of all drainholes in horizontal wells, regardless of allocation formula.

If the applicant has represented in the drilling application that there will be one or more no perf zones or "NPZ's" (portions of the wellbore within the field interval without take points), then the as-drilled plat filed after completion of the well shall be certified by a person with knowledge of the facts pertinent to the application that the plat is accurately drawn to scale and correctly reflects all pertinent and required data. In addition to the standard required data, the certified plat shall include the as-drilled track of the wellbore, the location of each take point on the wellbore, the boundaries of any wholly or partially unleased tracts within a Rule 37 distance of the wellbore, and notations of the shortest

distance from each wholly or partially unleased tract within a Rule 37 distance of the wellbore to the nearest take point on the wellbore.

A properly permitted horizontal drainhole will be considered to be in compliance with the spacing rules set forth herein if the as-drilled location falls within a rectangle established as follows:

a.      Two sides of the rectangle are parallel to the permitted drainhole and 33 feet on either side of the drainhole;

b.      The other two sides of the rectangle are perpendicular to the sides described in (a) above, with one of those sides passing through the first take point and the other side passing through the last take point.

Any point of a horizontal drainhole outside of the described rectangle must conform to the permitted distance of the nearest property line, lease line or subdivision line measured perpendicular from the wellbore.

For any well permitted in this field, the penetration point need not be located on the same lease, pooled unit or unitized tract on which the well is permitted and may be located on an Offsite Tract. When the penetration point is located on such Offsite Tract, the applicant for such a drilling permit must give 21 days notice by certified mail, return receipt requested to the mineral owners of the Offsite Tract. For the purposes of this rule, the mineral owners of the Offsite Tract are (1) the designated operator; (2) all lessees of record for the Offsite Tract where there is no designated operator; and (3) all owners of unleased mineral interests where there is no designated operator or lessee. In providing such notice, applicant must provide the mineral owners of the Offsite Tract with a plat clearly depicting the projected path of the entire wellbore. In the event the applicant is unable, after due diligence, to locate the whereabouts of any person to whom notice is required by this rule, the applicant must publish notice of this application pursuant to the Commission's Rules of Practice and Procedure. If any mineral owner of the Offsite Tract objects to the location of the penetration point, the applicant may request a hearing to demonstrate the necessity of the location of the penetration point of the well to prevent waste or to protect correlative rights. Notice of Offsite Tract penetration is not required if (a) written waivers of objection are received from all mineral owners of the Offsite Tract; or, (b) the applicant is the only mineral owner of the Offsite Tract. To mitigate the potential for well collisions, applicant shall promptly provide copies of any directional surveys to the parties entitled to notice under this section, upon request.

**RULE 3:** The acreage assigned to the individual oil well for the purpose of allocating allowable oil production thereto shall be known as a proration unit. The standard drilling and proration units are established hereby to be EIGHTY (80) acres. No proration unit shall consist of more than EIGHTY (80) acres except as hereinafter provided. All proration units shall consist of continuous and contiguous acreage which can reasonably

be considered to be productive of oil. No double assignment of acreage will be accepted. Additional acreage may be assigned to each horizontal drainhole well in accordance with Statewide Rule 86.

If after the drilling of the last well on any lease and the assignment of acreage to each well thereon in accordance with the regulations of the Commission there remains an additional unassigned acreage of less than EIGHTY (80) acres, then and in such event the remaining unassigned acreage up to and including a total of FORTY (40) acres may be assigned as tolerance acreage to the last well drilled on such lease or may be distributed among any group of wells located thereon, so long as the proration units resulting from the inclusion of such additional acreage meet the limitations prescribed by the Commission.

An operator, at his option, shall be permitted to form optional drilling units of FORTY (40) acres. A proportional acreage allowable credit will be given for a well on a fractional proration unit.

For the determination of acreage credit in this field, operators shall file for each oil or gas well in this field a Form P-15 Statement of Productivity of Acreage Assigned to Proration Units. On that form or an attachment thereto, the operator shall list the number of acres that are being assigned to each well on the lease or unit for proration purposes. For oil or gas wells, operators shall be required to file, along with the Form P-15, a plat of the lease, unit or property; provided that such plat shall not be required to show individual proration units. There is no maximum diagonal limitation in this field.

**RULE 4:** The maximum daily oil allowable for a well in the field shall be determined by multiplying 2,000 barrels of oil per day by a fraction, the numerator of which is the acreage assigned to the well for proration purposes and the denominator of which is the maximum acreage authorized by these field rules for a vertical well for proration purposes, exclusive of tolerance acreage. Each oil well shall have unlimited net gas-oil ratio authority.

**RULE 5:** A flowing oil well will be granted administratively, without necessity of filing fees unless the Commission requires filing fees in the future for Statewide Rule 13(b)(5)(a) exceptions, a six month exception to Statewide Rule 13(b)(5)(a) regarding the requirement of having to be produced through tubing. A revised completion report will be filed once the oil well has been equipped with the required tubing string to reflect the actual completion configuration. This exception would be applicable for new drills, reworks, recompletions or for new fracture stimulation treatments for any flowing oil well in the field. For good cause shown, an operator may obtain administratively, without necessity of filing fees unless the Commission requires filing fees in the future for Statewide Rule 13(b)(5)(a) exceptions, an extension for an additional three months. If the request for an extension of time is denied, the operator may request a hearing.

**RULE 6:** An oil well will be granted administratively, without necessity of filing fees

unless the Commission requires filing fees in the future for Statewide Rule 51(a) exceptions, a six month exception to the provisions of Statewide Rule 51(a) regarding the 10 day rule for filing the potential test after testing of the well. This will allow for the backdating of allowables on the oil wells without requiring a waiver to be secured from all field operators. This rule will grant the Commission the authority to issue an allowable back to the initial completion date for all oil wells in the field to prevent unnecessary shut-ins to alleviate potential overproduction issues related to the completion paperwork filings and producing the oil wells without tubing. If an extension of time is granted under Rule 5, the exception to Statewide Rule 51(a) under this rule is automatically extended for the additional time.

It is further **ORDERED** that all overproduction in the Eagleville (Eagle Ford-1), Dilworth (Eagle Ford), Leesville (Eagle Ford) and Pilgrim (Eagleford) Fields, Atascosa, Dimmit, Gonzales, La Salle, McMullen, Wilson and Zavala Counties, Texas, is hereby canceled.

The Eagleville (Eagle Ford-1) Field is a hydrogen sulfide field and shall be regulated pursuant to Statewide Rule 36.

Done this 26th day of June, 2012.

**RAILROAD COMMISSION OF TEXAS**

**(Order approved and signatures affixed by OGC Unprotested Master Order dated June 26, 2012)**

97

# TAB 9

Herbsts' Petition (SCR 5-11)

CAUSE NO. 13-05-0466-CVa

| | | |
|---|---|---|
| SHIRLEY ADAMS, CHARLENE BURGESS, | § | IN THE DISTRICT COURT |
| WILLIE MAE HERBST JASIK, | § | |
| WILLIAM ALBERT HERBST, | § | |
| HELEN HERBST and | § | |
| R. MAY OIL & GAS COMPANY, LTD., | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| vs. | § | 218 JUDICIAL DISTRICT |
| | § | |
| MURPHY EXPLORATION & | § | |
| PRODUCTION CO.-USA, | § | |
| A DELAWARE CORPORATION, | § | |
| Defendant. | § | |
| | § | ATASCOSA COUNTY, TEXAS |

PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs Shirley Adams, Charlene Burgess, Willie Mae Herbst Jasik, William Albert Herbst, Helen Herbst, and R. May Oil & Gas Company, Ltd., file this Original Petition complaining of Murphy Exploration & Production Co. – USA, a Delaware Corporation, and for their cause of action respectfully show as follows:

I.      Discovery Level

1.      Pursuant to TEX. R. CIV. P. 190.1, Plaintiffs intend that discovery be conducted under Level 2 as defined by Rule 190.3 of the Texas Rules of Civil Procedure.

II.      Parties

2.      Plaintiff Shirley Adams is an individual residing in Karnes County, Texas. Plaintiffs Charlene Burgess, Willie Mae Herbst Jasik, William Herbst, and Helen Herbst are individuals residing in Atascosa County, Texas. R. May Oil & Gas Company, Ltd., is a Texas limited partnership located in Atascosa County, Texas.

FILED 2:17 O'CLOCK P M
MARGARET E. LITTLETON, DISTRICT CLERK

MAY 2 4 2013

CLERK DISTRICT COURT ATASCOSA CO., TX
BY_____DEPUTY

1

3.     Murphy Exploration & Production Co. – USA, a Delaware Corporation ("Murphy"), is registered to do business and performs business in this state.

4.     Defendant Murphy Exploration & Production Co. – USA may be served by serving its registered agent for service of process, CT Corporation System, at its registered office at 350 N. St. Paul Street, Suite 2900, Dallas, Texas 75201.

### III.     Jurisdiction & Venue

5.     The court has jurisdiction over this proceeding because the amount in controversy exceeds this court's minimum jurisdictional requirements.

6.     Venue is proper in Atascosa County pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 15.002(a)(1) because it is the county where the events giving rise to this claim occurred. Venue is also proper under Tex. Nat. Res. Code Ann. § 91.404, which provides that a "payee has a cause of action for nonpayment of oil or gas proceeds or interest on those proceeds as required in Section 91.402 or 91.403 of this code in any court of competent jurisdiction in the county in which the oil or gas well is located." Further, venue is proper in Atascosa County under Tex. Civ. Prac. & Rem. Code Ann. § 15.035 because it is a place for performance of obligations under the Lease. Finally, venue is required to be in Atascosa County pursuant to paragraph 44 of both Leases at issue here and described below.

### IV. Facts

7.     Plaintiffs are, and at all times relevant to this petition were, the owners of all of the royalties in the following tracts of land located in Atascosa County, Texas

- 302 acres of land (the "Shirley Tract"), more or less, in the Octavius A. Cook Survey No. 195, A-176 in Atascosa County, Texas and being the same land set aside to Shirley Mae Herbst Adams in Division No. 5 in an Agreement on

2

Division of Estate dated October 20, 1993, recorded in Volume 865, Page 506 of the Deed Records of Atascosa County, Texas.

- 302 acres of land (the "William Tract"), more or less, in the Mark H. Moore Survey No. 185, and the Octavius A. Cook Survey No. 195, A-176 in Atascosa County, Texas and being the same land set aside to William Albert Herbst in Division No. 4 in an Agreement on Division of Estate dated October 20, 1993, recorded in Volume 865, Page 506 of the Deed Records of Atascosa County, Texas.

8. Plaintiff Shirley Mae Herbst Adams is the owner of the executive rights and the surface and mineral estates in the Shirley Tract, subject to the Shirley Lease described below and the royalty interests owned by the other Plaintiffs. Plaintiff William Albert Herbst is the owner of the executive rights and the surface and mineral estates in the William Tract, subject to the William Lease described below and the royalty interests owned by the other Plaintiffs.

9. Effective August 14, 2009, Plaintiffs Shirley Mae Herbst Adams for the Shirley Tract and William Albert Herbst for the William Tract, executed and delivered oil and gas leases to Alvin M. Barrett & Associates, Inc., a Texas Corporation ("Barrett"), granting, leasing, and letting the land described above in Paragraph 7 for the purpose of exploring, drilling, mining for, and producing oil and gas from the described land. Copies of the leases and Memorandum of the leases are attached hereto as Exhibits A and B and incorporated by reference. Barrett subsequently assigned the leases to Murphy. The lease of the Shirley Tract is referred to herein as the Shirley Lease and the lease of the William Tract is referred to as the William Lease.

10. Comstock Oil & Gas, LP has recently drilled a well on the tract just to the southwest of the Shirley and William Leases – its Lucas "A" Lease, called the Lucas "A" #1H.

3

The well was completed in the Eagleville (Eagle Ford-1) Field. It first produced in March 2012. Railroad Commission records indicate that, through March 1, 2013, the well had produced 45,630 barrels of oil and 60,530 mcf of natural gas. According to the permit plat filed with the Railroad Commission, the lateral of the well is located 350 feet from the boundaries of the Shirley and William Leases.

11. Murphy has drilled its Herbst Unit B #1H horizontal well on the Shirley and William Leases. The well was spudded on June 7, 2012, and completed on July 7, 2012. The lateral of the well is located some 450 feet from the *northeast* line of the Shirley and William Leases. This would make the Herbst Unit B #1H well approximately 1800 feet from the southwest boundaries of the Shirley Lease and the William Lease. See plat attached as Exhibit C showing the lease and unit boundaries and the location of the two wells.

12. The Offset Clauses in the Shirley Lease and the William Lease are identical. Found in Paragraph 25 of each Lease, the Offset Clauses provide that, if a well "is completed as a producer of oil and/or gas on land adjacent and contiguous to the leased premises, and within 467 feet of the premises covered by this lease, ... [then], within 120 days after the completion date of the well or wells on the adjacent acreage," Lessee must either:

(1) commence drilling operations on the leased acreage and thereafter continue the drilling of such off-set well or wells with due diligence to a depth adequate to test the same formation from which the well or wells are producing from on the adjacent acreage: or

(2) pay the Lessor royalties as provided for in this lease as if an equivalent amount of production of oil and/or gas were being obtained from the off-set location on these leased premises as that which is being produced from the adjacent well or wells; or

(3) release an amount of acreage sufficient to constitute a spacing unit equivalent in size to the spacing unit that would be allocated under this lease to such well or wells on the adjacent lands, as to the zones or strata producing in such adjacent well.

4

13. Murphy has done none of these three things.

### V. Causes of Action

14. Plaintiffs incorporate the factual allegations contained in Section IV as if set forth fully at length.

### Cause of Action:  Breach of Contract

15. Plaintiffs sue for underpayment of royalties due under the Offset Clauses in the Shirley and William Leases. Plaintiffs seek monetary relief over $200,000 as well as non-monetary relief determining their rights under the Offset Clauses in the Shirley and William Leases. At this time, Plaintiffs are not seeking monetary relief of more than $1,000,000, but reserve the right to amend and seek recovery of amounts in excess of that amount if warranted. Plaintiffs allege that the amount of underpayment under the Shirley and William Leases increases each month that the Lucas "A" #1H continues to produce oil and/or gas and Defendant fails to drill an offset well or release acreage pursuant to the terms of the Offset Clauses contained in the Shirley and William Leases.

16. All conditions precedent to Plaintiffs' recovery have occurred.

17. Plaintiffs seek recovery of the underpaid royalties due under Offset Clauses in the Shirley and William Leases. Plaintiffs seek recovery of interest pursuant to the terms of the Shirley and William Leases. Plaintiffs seek all reasonable and necessary attorneys' fees that they have incurred. *See* Tex. Civ. Pr. & Rem. Code §§ 38.001-38.006; Tex. Nat. Res. Code Ann. § 91.406. Plaintiffs also seek recovery of their costs of court.

## Cause of Action: Declaratory Judgment

18.     Plaintiffs move the Court to issue declaratory judgments and construe the rights of the parties to the Shirley and William Leases, including the rights of all royalty owners, pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code. Specifically, Plaintiffs seek a declaratory judgment of the Court that: (i) Murphy, as the lessee under the Shirley and William Leases, is required either to drill an offset well within 350 feet of the boundary between the Shirley and William Leases and the lands on which the Lucas "A" #1H is located or to pay substitute royalties or release acreage per the terms of the Offset Clauses in each Lease; (ii) Murphy is required to pay offset royalties per the terms of the Offset Clauses based on all production from the Lucas "A" #1H that occurs more than 120 days after the commencement of production on that well until Murphy either releases acreage or drills an offset well in accordance with the terms of the Leases; and (iii) the Herbst Unit B #1H horizontal well drilled by Murphy does not qualify as an offset well under the Offset Clauses of the Leases.

19.     Plaintiffs pray for recovery of their costs and reasonable and necessary attorneys' fees under Texas Civil Practice and Remedies Code § 37.009.

## VI. Request for Disclosure

20.     Under TEX. R. CIV. P. 194, Plaintiff requests that Defendants disclose within 30 days of the service of this request, the information described in 194.2.

## VII. Prayer

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray as follows:

(i) that Defendant Murphy Exploration & Production Co. – USA be served with citation in accordance with the law;

(ii) for recovery of all royalties due under the Offset Clauses in the Shirley and William Leases;

(iii) for declaratory judgments as set forth above;

(iv) for pre- and post-judgment interest;

(v) for costs of court;

(vi) for recovery of attorneys' fees; and

(vii) for such other and further relief to which Plaintiffs may show themselves entitled.


Dated: May 22 , 2013   Respectfully submitted,

John B. McFarland
State Bar No. 13598500
jmcfarland@gdhm.com
Mary A. Keeney
State Bar No. 11170300
mkeeney@gdhm.com
GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
401 Congress Avenue, Suite 2200
Austin, Texas 78701-3744
(512) 480-5682 Telephone
(512) 480-4882 Telecopier

**ATTORNEYS FOR PLAINTIFFS**

# TAB 10

Murphy's Counterclaim (SCR 115-16)

12. Murphy drilled the Herbst Well as an offset to the Lucas Well, specifically to satisfy its obligations under Paragraph 25. On information and belief, the Herbst Well was drilled to a depth adequate to test the same formation as the Lucas Well, as required by Paragraph 25. Plaintiffs are now receiving royalties from the Herbst Well. Neither Paragraph 25, nor any other portion of the Leases, requires Murphy to drill a well in a specific location or within a specific distance from the boundaries of the Leases. Murphy, acting a reasonably prudent operator, selected the best location for the Herbst Well and drilled a successful well adequate to test the same Eagle Ford formation in which the Lucas Well was completed.

13. Thus, Murphy has fully complied with the obligation under Paragraph 25 to drill an off-set well with due diligence to a depth adequate to test the same formation.

## IV. COUNTERCLAIM

### A. Declaratory Judgment

14. Murphy incorporates the foregoing paragraphs by reference as if fully set forth herein.

15. Murphy seeks a declaration that Paragraph 25 of the Leases is unambiguous as a matter of law and that Murphy has complied with Paragraph 25.

16. Specifically, Murphy seeks a declaration that Paragraph 25 requires Murphy "to commence drilling operations on the leased acreage and thereafter continue the drilling of such off-set well or wells with due diligence to a depth adequate to test the same formation from which the well or wells are producing from on the adjacent acreage."

17. Murphy seeks a further declaration that "off-set well" as used within Paragraph 25 of the Leases is a specialized term with a commonly understood meaning within the industry and that by drilling the Herbst Well, Murphy complied with Paragraph 25 of the Leases.

18.     Finally, Murphy seeks a declaration that it has not breached the Leases, and that it does not owe compensatory or other royalties to Plaintiffs as a result.

19.     Alternatively, in the event the Court were to find that the Lease is susceptible to two reasonable interpretations, Murphy seeks a declaration from this Court that Paragraph 25 of the Leases is ambiguous in that it does not define the term "off-set well" and that term, as used in Paragraph 25, is capable of more than one reasonable interpretation.

20.     Murphy seeks a further declaration that "off-set well" is a specialized term with a commonly understood meaning within the industry and that by drilling the Herbst Well, Murphy complied with the intent of the parties and industry practice as expressed in Paragraph 25 of the Leases.

21.     Finally, Murphy seeks a declaration that it has not breached the Leases, and that it does not owe compensatory or other royalties to Plaintiffs as a result.

## C.     Attorneys' Fees and Costs

22.     Pursuant to Chapters 37 and 38 of the Texas Civil Practice & Remedies Code, Murphy seeks its reasonable and necessary attorneys' fees, costs, and expenses in prosecuting its counterclaim.

## V.     CONCLUSION AND PRAYER

Murphy requests that the Court, after trial or final hearing, enter judgment in its favor:

(a)     that Plaintiffs take nothing by reason of this suit;

(b)     that the Court enter declarations that:

    (i)     Paragraph 25 of the Leases is unambiguous;

    (ii)    The Herbst Well satisfies Paragraph 25 of the Leases; and

# TAB 11

Except from Murphy's Motion for
Summary Judgment (SCR 123)

A.    **The Herbst Well Qualifies As An Offset Well Under Paragraph 25 Of The Leases.**

Under Paragraph 25 of the Leases, once a well is drilled within 467 feet of the Lease boundary, Murphy has an obligation, within 120 days, to do one of three things: (1) drill an offset well, (2) pay compensatory royalties as if the triggering well was completed on the Lease, or (3) release acreage. Murphy chose to drill an offset well, which is required to be drilled "to a depth adequate to test the same formation from which the well or wells are producing from on the adjacent acreage." (Leases ¶ 25.)

The Herbst Well complies with each and every requirement of Paragraph 25 of the Leases. The Herbst Well was drilled within 120 days of the completion of the Lucas Well on the adjacent property. (Heinen Aff. ¶ 11.) The Herbst Well was drilled to an adequate depth to test the same formation from which the Lucas Well was producing. (McBeath Aff. ¶ 11.) And, as noted above, Murphy drilled the Herbst Well on the Leases specifically to offset the Lucas Well. (Heinen Aff. ¶ 9.)

B.    **"Off-set well" Is A Specialized Term With A Commonly Understood Meaning Within The Oil And Gas Industry.**

1.    **Extrinsic evidence is admissible and necessary to explain the meaning of "off-set well" as used in Paragraph 25 of the Leases.**

Extrinsic evidence is "admissible to give the words of a contract a meaning consistent with that to which they are reasonably susceptible, *i.e.*, to interpret contractual terms." *Mescalero Energy Inc. v. Underwriters Indem. Gen. Agency, Inc.*, 56 S.W.3d 313, 320 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (quoting *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (Tex. 1995)). As such, "even with unambiguous contracts courts may consider the commercial context of the transaction." *GTE Sw., Inc. v. Pub. Util. Comm'n*, 102 S.W.3d 282, 295 (Tex. App.—Austin 2003, pet. dism'd) (internal quotation marks omitted). With specialized industry or trade terms, the term "may require extrinsic evidence of the

**123**

# TAB 12

Excerpt from Court Reporter's Record

REPORTER'S RECORD

VOLUME 1 OF 1

Trial COURT NO. 13-05-0466-CVA

SHIRLEY ADAMS,                    ) IN THE DISTRICT COURT
CHARLENE BURGESS,                 )
WILLIE MAE HERBST,                )
WILLIAM ALBERT                    )
HERBST, HELEN HERBST              )
AND OIL AND GAS,  )
COMPANY, LTD                      )
                                  )
VS                                ) 218TH JUDICIAL DISTRICT
                                  )
MURPHY EXPLORATION &              )
PRODUCTION COMPANY USA )
A DELAWARE CORPORATION ) ATASCOSA COUNTY, TEXAS

---

MOTION FOR RECONSIDERATION
February 10, 2015

---

On the 10th day of February, 2015 the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Stella Saxon, held in Jourdanton, Atascosa County, Texas by agreement.

Proceedings reported by computerized stenotype machine.

unsuccessful. We think it's totally inappropriate to have it. Even if they do succeed, we don't automatically get fees. All we get is a remand back to Your Honor and an opportunity to prove our damages.

THE COURT: Prove whatever you can prove.

Okay. Well, I gave careful consideration to your arguments, your authorities and struggled with this issue of offset. And frankly, my ruling was and still is that Murphy complied with the specific terms of the lease. That Mr. Steinle if he wanted and the parties wanted to limit where that offset drill needed to be placed on the adjacent property in terms of how many feet from the lease line that could have been put in the lease, but it wasn't. And so the well was drilled within the timeframe required. And the Court has found it to be an offset well. And the Court of Appeals may very well tell me that was incorrect. And I welcome that finding if that is the finding. I am not a big fan of limiting parties access to the courts. And frankly my thinking on not awarding attorney's fees as a result of the trial proceeding was that the Plaintiffs were certainly entitled to their thoughts

as to the offset well needing to be drilled closer and had the right to present their arguments to the Court for the Court to make a determination on that, and should not be penalized by having to pay huge amounts of attorney's fees. And so attorney's fees were not awarded. And I will change my order to the extent of reducing the amount of attorney's fees reasonable and necessary on appeal. And the Court of Appeals can then determine whether or not that's an appropriate decision by this Court as well. So fix me up something that comports with my ruling, y'all both sign it, and I will be happy to sign it as well.

MS. KEENEY: Well, Your Honor, I did prepare something that does -- an amended final judgment that does deny the appellate fees. And it seems to me our rights to an appeal would be consistent with that, that there would be no fees on appeal, there would be no fees at trial.

MR. NEWMAN: I thought Your Honor just said you were going to reduce them?

MS. KEENEY: I would submit that they should be reduced to zero. That's what this judgment does.

MR. NEWMAN: Well, Your Honor, I think -- We would agree, again as we have said, we have

# TAB 13

Cases

440 S.W.3d 18
Supreme Court of Texas.

AMERICO LIFE, INC., Americo Financial Life and Annuity Insurance Company,
Great Southern Life Insurance Company, The Ohio State Life Insurance
Company, and National Farmers Union Life Insurance Company, Petitioners,

v.

Robert L. MYER and Strider Marketing Group, Inc., Respondents.

No. 12–0739.   |   Argued Nov. 6, 2013.   |   Decided
June 20, 2014.   |   Rehearing Denied Oct. 3, 2014.

**Synopsis**

**Background:** Sellers of insurance companies filed petition for confirmation of arbitration award against buyers, and buyers moved to vacate award. The 193rd Judicial District Court, Dallas County, Carl Ginsberg, J., denied sellers' petition and granted buyers' motion. Sellers appealed. The Dallas Court of Appeals, 315 S.W.3d 72, reversed and remanded. Review was granted. The Supreme Court, 356 S.W.3d 496, reversed. On remand, the Dallas Court of Appeals, 371 S.W.3d 537, reversed and remanded. Buyers petitioned for review.

**Holdings:** The Supreme Court, Brown, J., held that:

[1] in arbitration agreement, "independent" and "impartial" were not interchangeable, and thus parties did not intend to require impartiality of party-appointed arbitrators, and

[2] conflict existed between arbitration agreement and arbitration group's rules as to impartiality of party-appointed arbitrators, and thus agreement controlled.

Judgment of Court of Appeals reversed.

Johnson, J., filed dissenting opinion, in which Willett, Lehrmann, and Boyd, JJ., joined.

West Headnotes (13)

**[1]    Alternative Dispute Resolution** ☞ Agreement or submission as determinative

25T    Alternative Dispute Resolution

25TII   Arbitration

25TII(E)   Arbitrators

25Tk228   Nature and Extent of Authority

25Tk230   Agreement or submission as determinative

Arbitrators derive their power from the parties' agreement to submit to arbitration.

Cases that cite this headnote

**[2]   Alternative Dispute Resolution** ⚬ Agreement or submission as determinative

25T   Alternative Dispute Resolution

25TII   Arbitration

25TII(E)   Arbitrators

25Tk228   Nature and Extent of Authority

25Tk230   Agreement or submission as determinative

Arbitrators have no independent source of jurisdiction apart from the parties' consent.

Cases that cite this headnote

**[3]   Alternative Dispute Resolution** ⚬ Appointment

25T   Alternative Dispute Resolution

25TII   Arbitration

25TII(E)   Arbitrators

25Tk221   Appointment

Arbitrators must be selected pursuant to the method specified in the parties' agreement.

Cases that cite this headnote

**[4]   Alternative Dispute Resolution** ⚬ Appointment

25T   Alternative Dispute Resolution

25TII   Arbitration

25TII(E)   Arbitrators

25Tk221   Appointment

Arbitration panel selected contrary to the contract-specified method lacks jurisdiction over the dispute.

Cases that cite this headnote

**[5]   Contracts** ⚬ Language of contract

**Contracts** ⚬ Extrinsic circumstances

95   Contracts

95II   Construction and Operation

95II(A)   General Rules of Construction

95k147   Intention of Parties

95k147(2)   Language of contract

95   Contracts

95II   Construction and Operation

95II(A)   General Rules of Construction

95k169   Extrinsic circumstances

Written contract must be construed to give effect to the parties' intent expressed in the text as understood in light of the facts and circumstances surrounding the contract's execution, subject to the limitations of the parol-evidence rule.

3 Cases that cite this headnote

**[6]      Evidence** 🔑 Grounds for admission of extrinsic evidence

157   Evidence

157XI   Parol or Extrinsic Evidence Affecting Writings

157XI(D)   Construction or Application of Language of Written Instrument

157k448   Grounds for admission of extrinsic evidence

When interpreting an integrated writing, the parol-evidence rule precludes considering evidence that would render a contract ambiguous when the document, on its face, is capable of a definite legal meaning.

3 Cases that cite this headnote

**[7]      Contracts** 🔑 Extrinsic circumstances

**Evidence** 🔑 Grounds for admission of extrinsic evidence

95   Contracts

95II   Construction and Operation

95II(A)   General Rules of Construction

95k169   Extrinsic circumstances

157   Evidence

157XI   Parol or Extrinsic Evidence Affecting Writings

157XI(D)   Construction or Application of Language of Written Instrument

157k448   Grounds for admission of extrinsic evidence

Parol-evidence rule does not prohibit considering surrounding facts and circumstances that inform the contract text and render it capable of only one meaning.

3 Cases that cite this headnote

**[8]      Alternative Dispute Resolution** 🔑 Appointment

25T   Alternative Dispute Resolution

25TII   Arbitration

25TII(E)   Arbitrators

25Tk221   Appointment

For purposes of arbitration agreement's provision requiring that each arbitrator in three-arbitrator panel, which included two party-appointed arbitrators and arbitrator appointed

by party-appointed arbitrators, was knowledgeable, independent businessperson or professional, "independent" and "impartial" were not interchangeable, and thus parties did not intend to require impartiality of party-appointed arbitrators; industry norm for tripartite arbitrators when agreement was executed was that party-appointed arbitrators were advocates, and arbitration group's rules when agreement was executed presumed that party-appointed arbitrators would not be impartial unless parties specifically agreed otherwise.

1 Cases that cite this headnote

**[9]** **Contracts** Language of contract

95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k147 Intention of Parties
95k147(2) Language of contract

To determine the parties' intent, the Supreme Court examines the express language of their agreement.

Cases that cite this headnote

**[10]** **Alternative Dispute Resolution** Umpire or Third Arbitrator

**Alternative Dispute Resolution** Appointment and qualification

25T Alternative Dispute Resolution
25TII Arbitration
25TII(E) Arbitrators
25Tk239 Umpire or Third Arbitrator
25Tk240 In general
25T Alternative Dispute Resolution
25TII Arbitration
25TII(E) Arbitrators
25Tk239 Umpire or Third Arbitrator
25Tk242 Appointment and qualification

In a "tripartite arbitration," each party-appointed arbitrator ordinarily advocates for the appointing party, and only the third arbitrator is considered neutral.

Cases that cite this headnote

**[11]** **Alternative Dispute Resolution** Appointment and qualification

25T Alternative Dispute Resolution
25TII Arbitration
25TII(E) Arbitrators
25Tk239 Umpire or Third Arbitrator

25Tk242    Appointment and qualification

Conflict existed between arbitration agreement, which required appointment of party-appointed arbitrators and third arbitrator who were knowledgeable, independent businesspeople or professionals, and arbitration group's rules, which were incorporated into agreement and which were modified after execution of agreement to require impartiality on part of arbitrators, and thus agreement controlled; parties chose short list of arbitrator qualifications, which included "knowledgeable" and "independent" but not "impartial." 9 U.S.C.A. § 5.

Cases that cite this headnote

**[12]    Alternative Dispute Resolution** 🗝 Construction

25T    Alternative Dispute Resolution
25TII    Arbitration
25TII(B)    Agreements to Arbitrate
25Tk136    Construction
25Tk137    In general

When an arbitration agreement incorporates by reference outside rules, the specific provisions in the arbitration agreement take precedence and the arbitration rules are incorporated only to the extent that the rules do not conflict with the express provisions of the arbitration agreement.

1 Cases that cite this headnote

**[13]    Alternative Dispute Resolution** 🗝 Construction

25T    Alternative Dispute Resolution
25TII    Arbitration
25TII(B)    Agreements to Arbitrate
25Tk136    Construction
25Tk137    In general

Under the rule providing that arbitration rules are incorporated into an arbitration agreement only to the extent that the rules do not conflict with the express provisions of the agreement, a conflict can exist when an agreement and incorporated rules speak to the same point, and when the agreement and incorporated rules speak to the same point, the agreement's voice is the only to be heard.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*20** Edwin R. DeYoung, Roger B. Cowie, Locke Lord LLP, Dallas, G. Alan Waldrop, Mike A. Hatchell, Susan A. Kidwell, Locke Lord LLP, Austin, TX, for Petitioners.

Amy L. Saberian, Craig T. Enoch, Melissa Prentice Lorber, Enoch Kever PLLC, D. Douglas Brothers, George Brothers Kincaid & Horton, L.L.P., Peter E. Ferraro, The Ferraro Law Firm, Austin, TX, for Respondents.

**Opinion**

Justice BROWN delivered the opinion of the Court, in which Chief Justice HECHT, Justice GREEN, Justice GUZMAN and Justice DEVINE joined.

This is an arbitration case. The petitioners contend the court of appeals erroneously imposed a requirement for the selection of arbitrators beyond those the parties agreed upon in their arbitration agreement. For the reasons explained below, we reverse.

# I

In 1998, Robert Myer and Strider Marketing Group, Inc. (collectively Myer) sold a collection of insurance companies to the petitioners (collectively Americo). The parties agreed on an up-front payment to Myer for the businesses and executed a "trailer agreement" to provide for additional payments based on the businesses' future performance. The trailer agreement included an arbitration clause with six paragraphs of terms agreed upon by the parties, including:

> 3.3 Arbitration. In the event of any dispute arising after the date of this Agreement among the parties hereto with reference to any transaction contemplated by this Agreement the same shall be referred to three arbitrators. Americo shall appoint one arbitrator and Myer shall appoint one arbitrator and such two arbitrators to select the third.... Each arbitrator shall be a knowledgeable, independent businessperson or professional.
>
> ...
>
> The arbitration proceedings shall be conducted in accordance with the commercial arbitration rules of the American Arbitration Association, except that Americo and Myer each shall be entitled **\*21** to take discovery as provided under Federal Rules of Civil Procedure Nos. 28 through 36 during a period of 90 days after the final arbitrator is appointed and the arbitrators shall have the power to issue subpoenas, compel discovery, award sanctions and grant injunctive relief. The arbitrators shall be entitled to retain a lawyer to advise them as to legal matters, but

such lawyer shall have none of the relationships to Americo or Myer (or any of their Affiliates) that are proscribed above for arbitrators.

The agreement combines terms expressly chosen by the parties with the incorporation by reference of American Arbitration Association rules to govern the arbitration proceeding. When the parties executed their agreement, AAA rules did not require arbitrator-impartiality, but by the time Americo invoked arbitration in 2005 after disputes arose concerning the additional payments to Myer, the AAA rules by default required that "[a]ny arbitrator shall be impartial and independent ... and shall be subject to disqualification for ... partiality or lack of independence...." AAA Commercial Arbitration Rules R–17(a)(I) (2003).

Myer alleged that Americo's first-choice arbitrator, Ernest Figari, Jr., was partial toward Americo, and successfully moved the AAA to disqualify him. Americo objected to Figari's disqualification but named another arbitrator, about whom Myer likewise complained, and whom the AAA likewise struck. Myer did not object to Americo's third appointee, who ultimately served on the panel. The arbitration proceeding resulted in a unanimous award in Myer's favor amounting to just over $26 million in payments due, breach-of-contract damages, and attorneys' fees.

When Myer moved to confirm the award in the trial court, Americo renewed its objection to Figari's disqualification. Americo argued that in disqualifying Figari for partiality, the AAA failed to follow the arbitrator-selection process specified in the parties' agreement, which provided only that "each arbitrator shall be a knowledgeable, independent businessperson or professional." The trial court determined the arbitration agreement was ambiguous but ultimately agreed with Americo's reading and vacated the award. Myer appealed, and the court of appeals reversed on the ground that Americo had waived its objection to Figari's removal. We reversed that decision. *Americo Life, Inc. v. Myer,* 356 S.W.3d 496 (Tex.2011) (per curiam). On remand, the court of appeals again reversed, this time on the merits, holding the arbitration agreement was unambiguous and the arbitration panel was properly appointed under both the terms of the agreement and the AAA rules. Nearly ten years after arbitration proceedings commenced between the parties, their case again comes before this Court.

## II

**[1]** **[2]** **[3]** **[4]**  Arbitrators derive their power from the parties' agreement to submit to arbitration. *City of Pasadena v. Smith,* 292 S.W.3d 14, 20 (Tex.2009). They have no independent source of jurisdiction apart from the parties' consent. *I.S. Joseph Co. v. Mich. Sugar Co.,* 803 F.2d 396, 399 (8th Cir.1986). Accordingly, arbitrators must be selected pursuant to the method specified in the parties' agreement. *Brook v. Peak Int'l, Ltd.,* 294 F.3d 668, 672–73 (5th Cir.2002). An arbitration panel selected contrary to the contract-specified method lacks jurisdiction over the

dispute. Accordingly, courts "do not hesitate to vacate an award when an arbitrator is not selected according to the contract-specified method." *Bulko v. Morgan Stanley DW, Inc.,* 450 F.3d 622, 625 (5th Cir.2006). So we look to the arbitration agreement to **\*22** determine what the parties specified concerning the arbitrator-selection process.

 **[5]**   **[6]**   **[7]**   A written contract must be construed to give effect to the parties' intent expressed in the text as understood in light of the facts and circumstances surrounding the contract's execution, subject to the limitations of the parol-evidence rule. *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.,* 352 S.W.3d 462, 469 (Tex.2011). Facts and circumstances that may be considered include the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give context to the parties' transaction. *See id.* (citing 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 32.7 (4th ed.1999)). When interpreting an integrated writing, the parol-evidence rule precludes considering evidence that would render a contract ambiguous when the document, on its face, is capable of a definite legal meaning. *Sun Oil Co. (Del.) v. Madeley,* 626 S.W.2d 726, 731–32 (Tex.1981). The rule does not, however, prohibit considering surrounding facts and circumstances that inform the contract text and render it capable of only one meaning. *See id.; Wellington,* 352 S.W.3d at 469.

## III

### A

 **[8]**   **[9]**   To determine the parties' intent, we examine the express language of their agreement. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.,* 341 S.W.3d 323, 333 (Tex.2011). In their agreement, the parties directly addressed the issue of arbitrator qualifications and agreed on a short list of requirements, namely that each arbitrator must be a "knowledgeable, independent businessperson or professional." Americo argues the court of appeals improperly added "impartial" to the parties' list of qualifications. Myer counters that because "independent" and "impartial" are essentially synonymous, Americo was always obligated to name an impartial arbitrator.

 **[10]**   We disagree that "independent" may be read interchangeably with "impartial." Various dictionary definitions might support some overlap between the two words, but when applied in the arbitration context, they carry distinct meanings. The parties in this case agreed to "tripartite arbitration," through which each party would directly appoint an arbitrator, and the two party-appointed arbitrators would agree on a third panelist. This method was commonplace when the parties executed their agreement in 1998. *See Burlington N. R.R. Co. v. TUCO Inc.,* 960 S.W.2d 629, 630 & n. 2 (Tex.1997) (describing the method as "often-used"). In a tripartite arbitration,

each party-appointed arbitrator ordinarily advocates for the appointing party, and only the third arbitrator is considered neutral. *See, e.g., Winfrey v. Simmons Foods, Inc.,* 495 F.3d 549, 552 (8th Cir.2007) (noting the "industry custom that party arbitrators are frequently not required or expected to be neutral for ruling on disputes"); *Lozano v. Md. Cas. Co.,* 850 F.2d 1470, 1472 (11th Cir.1988) (per curiam) ("An arbitrator appointed by a party is a partisan only one step removed from the controversy and need not be impartial."); *Metro. Prop. and Cas. Ins. Co. v. J.C. Penney Cas. Ins. Co.,* 780 F.Supp. 885, 892 (D.Conn.1991) (In tripartite arbitration, "each party's arbitrator 'is not individually expected to be neutral.' ") (quoting *Soc'y for Good Will to Retarded Children v. Carey,* 466 F.Supp. 722, 728 (E.D.N.Y.1979)); *Matter of Astoria Med. Grp. (Health Ins. Plan of Greater N.Y.),* 11 N.Y.2d 128, 227 N.Y.S.2d 401, 182 N.E.2d 85, 87 (1962) ( "[T]here has grown a common acceptance of the fact that the **\*23** party-designated arbitrators are not and cannot be 'neutral,' at least in the sense that the third arbitrator or a judge is.").

In fact, the arbitration agreement in *Burlington,* like the agreement in this case, "did not specify whether the two arbitrators that the parties unilaterally selected ... would be neutral or would represent the interests of the party appointing them." *Burlington,* 960 S.W.2d at 630. But in *Burlington,* unlike this case, there was "no dispute ... that the parties intended and understood that the party arbitrators would be aligned with, act as advocates for, and ultimately side with the appointing party." *Id.*

The AAA rules in place when the agreement was executed likewise reflect the prevalence of this practice. At that time, the rules provided that "[u]nless the parties agree otherwise, an arbitrator selected unilaterally by one party is a party-appointed arbitrator and not subject to disqualification pursuant to Section 19." AAA Commercial Arbitration § 12 (1996). Section 19 contained procedures to challenge arbitrators for partiality. *See id.,* § 19. Accordingly, the AAA rules presumed party-appointed arbitrators were non-neutral, and the parties would have to "agree otherwise" to rebut this presumption.

The only indication the parties sought to "agree otherwise" is their requirement that party-appointed arbitrators be "independent." Americo argues that the parties chose the word "independent" not to require impartiality, but to proscribe arbitrators employed by or otherwise under the control of one of the parties. Americo's argument is certainly plausible; the practice of appointing arbitrators who are somehow formally associated with the party appointing them is not unheard of. *See, e.g., Astoria,* 227 N.Y.S.2d 401, 182 N.E.2d at 86 (party appointed "one of the incorporators of [the company] and its president from 1950 to 1957" who was at the time "a member of its board of directors and one of its paid consultants"); *Hooters of Am., Inc. v. Phillips,* 173 F.3d 933, 939 (4th Cir.1999) ("Under the [terms of the arbitration agreement], Hooters is free to devise lists of partial arbitrators who have existing relationships, financial or familial, with Hooters and its management."). Indeed, to prevent this practice, some arbitration agreements expressly prohibit it. *See, e.g., Burlington,* 960 S.W.2d at 630 ("While [the arbitration agreements]

prohibit the parties from selecting their own employees as arbitrators, [they] do not specify whether the two arbitrators that the parties unilaterally selected ... would be neutral or would represent the interests of the party appointing them.").

Additional agreement terms lend support to Americo's interpretation. The agreement provides that arbitrators "shall be entitled to retain a lawyer to advise them as to legal matters, but such lawyer shall have none of the relationships to Americo or Myer (or any of their Affiliates) that are proscribed above for arbitrators." The only term that can be fairly read as a proscription of a "relationship" between a party and its chosen arbitrator is the requirement that all arbitrators be "independent" of the party appointing them. But it does not follow that an "independent" arbitrator must also be impartial; indeed, an independent arbitrator could be partial or impartial. However, if we follow Myer's suggestion that "independent" is synonymous with "impartial," it becomes unclear what "relationship" the agreement is attempting to proscribe. Impartiality is a state of mind, but "independent" necessarily refers to a relationship—the subject is free from someone or something.

**\*24** The industry norm for tripartite arbitrators when the parties executed their agreement was that party-appointed arbitrators were advocates, and the AAA rules in place at that time presumed such arbitrators would not be impartial unless the parties specifically agreed otherwise. Given the pervasiveness of the practice, and the clear AAA presumption the parties had to rebut, we believe the parties would have done more than require its arbitrators to be "independent" if they wished them to be impartial. "Independent" and "impartial" are not interchangeable in this context, and therefore we conclude the parties did not intend to require impartiality of party-appointed arbitrators.

## B

**[11]** Having concluded the terms of the agreement do not require impartial party-appointed arbitrators, we turn to the effect of the incorporated-by-reference AAA rules on arbitrator qualifications. There is no dispute the AAA rules would govern matters on which the agreement is silent. The question is whether AAA rules on arbitrator qualifications can, as the court of appeals concluded, supplement terms agreed on by the parties that specifically speak to the same point.

The court of appeals reasoned that the rules and the agreement "can be read together and harmonized to avoid any irreconcilable conflict." *Myer v. Americo Life, Inc.,* 371 S.W.3d 537, 543 (Tex.App.-Dallas 2012). In other words, because "impartial" could be added without negating any expressly chosen qualifications, it was proper to do so to effectuate all the agreement's provisions. But this cannot be the end of our inquiry, or the specifically chosen terms of any agreement would be hopelessly open-ended whenever outside rules are incorporated by reference.

**[12]** When an arbitration agreement incorporates by reference outside rules, "the specific provisions in the arbitration agreement take precedence and the arbitration rules are incorporated only to the extent that they do not conflict with the express provisions of the arbitration agreement." *Szuts v. Dean Witter Reynolds, Inc.,* 931 F.2d 830, 832 (11th Cir.1991). The Federal Arbitration Act, which the parties agree governs their agreement, requires that if an agreement provides "a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed." 9 U.S.C. § 5. Similarly, the AAA rules in effect when the parties executed their agreement, as well as when arbitration was invoked, both provide that "[i]f the agreement of the parties names an arbitrator or specifies a method of appointing an arbitrator, that designation or method shall be followed." AAA Commercial Arbitration Rules § 14 (1996), R–12 (2003).

**[13]** Any attempt to harmonize the AAA impartiality rule with the parties' expressly chosen arbitrator qualifications misses the point. We do not construe "conflict" between an agreement and incorporated rules so narrowly as to find it exists only if the rule contradicts the agreement. A conflict can exist when an agreement and incorporated rules speak to the same point. Even if both can be followed without contradiction, they conflict because the parties have already addressed the matter and are not in need of gap-filling from the AAA rules. When the agreement and incorporated rules speak to the same point, the agreement's voice is the only to be heard.

Here, the parties chose a short list of arbitrator qualifications, and in doing so we must assume they spoke comprehensively. The parties chose "knowledgeable" and "independent" but not "impartial," and we think they meant not only what they **\*25** said but also what they did not say. *See CKB & Assocs. v. Moore McCormack Petroleum, Inc.,* 734 S.W.2d 653, 655 (Tex.1987) (*expressio unius est exclusio alterius*—the naming of one thing excludes another). And though we can concede the parties embraced some uncertainty by adopting AAA rules that were subject to change, we cannot conceive that they agreed to be bound by rules that would alter the express terms of their agreement. Nor can we imagine they took the trouble to expressly agree on some terms if their decision to incorporate AAA rules would leave those terms open to alteration. The AAA impartiality rule conflicts with the parties' agreement because the parties spoke on the matter and did not choose impartiality. When such a conflict arises, the agreement controls. *Szuts,* 931 F.2d at 832.

* * *

Because the AAA disqualified America's first-choice arbitrator for partiality, the arbitration panel was formed contrary to the express terms of the arbitration agreement. The panel, therefore, exceeded its authority when it resolved the parties' dispute. *See City of Pasadena,* 292 S.W.3d at 20; *I.S. Joseph Co.,* 803 F.2d at 399. Because the arbitrators exceeded their authority, the arbitration award must be vacated. *See* 9 U.S.C. § 10(a); *Bulko,* 450 F.3d at 625. Accordingly, we

reverse the court of appeals' judgment and reinstate the trial court's order vacating the arbitration award.

Justice JOHNSON filed a dissenting opinion, in which Justice WILLETT, Justice LEHRMANN and Justice BOYD joined.

Justice JOHNSON, joined by Justice WILLETT, Justice LEHRMANN, and Justice BOYD, dissenting.

The parties in this case agreed to arbitrate disputes regarding Robert Myer's sale of life insurance companies to Americo for tens of millions of dollars, and agreed that the arbitration proceedings would be conducted in accordance with the commercial arbitration rules of the American Arbitration Association (AAA). When this dispute arose and Myer challenged the first two arbitrators appointed by Americo, the AAA disqualified them. Americo protested the disqualification of the first arbitrator it appointed, reserved the right to challenge his disqualification, eventually named an arbitrator who was not disqualified, and arbitrated. After completion of the arbitration, Americo sought to have the trial court vacate the award. The court did so on the basis that the AAA improperly disqualified Americo's first appointed arbitrator, the panel was improperly constituted, and the award was void. The court of appeals reversed and remanded.

The Court holds that the trial court did not err by voiding the arbitration award because in their agreement (the trailer agreement) the parties established the exclusive qualifications and selection method for arbitrators. I agree with the court of appeals that the trailer agreement and provisions of the AAA rules which the parties specifically agreed would govern any arbitration proceedings are unambiguous, can be harmonized, and both can be given effect. Accordingly, the parties should be bound by the arbitrator selection provisions of both, as they agreed.

Myer sold multiple insurance companies to Americo. In 1998 they entered into a trailer agreement containing the following provisions regarding disputes:

> 3.3 Arbitration. In the event of any dispute arising after the date of this Agreement among the parties herein with reference to any transaction contemplated **\*26** by this Agreement, the same shall be referred to three arbitrators. Americo shall appoint one arbitrator and Myer shall appoint one arbitrator and such two arbitrators to select the third.... Each arbitrator shall be a knowledgeable, independent businessperson or professional.
>
> ...

> The arbitration proceedings shall be conducted in accordance with the commercial arbitration rules of the American Arbitration Association, except that Americo and Myer each shall be entitled to take discovery as provided under Federal Rules of Civil Procedure Nos. 28 through 36 during a period of 90 days after the final arbitrator is appointed and the arbitrators shall have the power to issue subpoenas, compel discovery, award sanctions and grant injunctive relief. The arbitrators shall be entitled to retain a lawyer to advise them as to legal matters, but such lawyer shall have none of the relationships to Americo or Myer (or any of their Affiliates) that are proscribed above for arbitrators.

Disputes arose, Americo demanded arbitration in 2005, and each party appointed an arbitrator. Myer objected to Ernest Figari, the arbitrator appointed by Americo. In its letter to the AAA about Figari, Myer protested that the parties "have not agreed to the appointment of a non-neutral arbitrator in this proceeding, and [Myer] requires that any arbitrator must qualify as an impartial and independent arbitrator." The AAA disqualified Figari as well as a second Americo appointee. Finally, Americo appointed the arbitrator who served on the panel. That panel eventually rendered a unanimous award for Myer.

The trial court granted Americo's motion to set aside the award because the panel was improperly constituted and the award was void. The court entered findings of fact and conclusions of law, some of which were: (1) the arbitrator selection method in the AAA rules did not apply because the parties agreed on specific procedures and standards for appointing arbitrators; (2) the AAA was required to follow the procedures in the first paragraph of section 3.3 of the trailer agreement and it did not; and (3) the arbitrators were not required to be neutral or meet the "impartial and independent" standard of the AAA rules.

The court of appeals reversed. *Myer v. Americo Life, Inc.,* 371 S.W.3d 537, 542–46 (Tex.App.-Dallas 2012, pet. granted). It held that the trailer agreement was not ambiguous, the AAA rules applied to "proceedings" which included the arbitrator selection process, the arbitrator selection process complied with the trailer agreement and AAA rules that it specified, the applicable AAA rules required impartial arbitrators absent the parties' specific agreement otherwise, the parties did not specifically agree otherwise, and the AAA did not disregard its own rules in disqualifying Figari. *Id.* I agree with the court of appeals' analyses and conclusions.

I also agree with a great deal of what the Court says, and certainly with the authorities it cites for fairly standard, unremarkable principles of contract interpretation. For example, I agree that the language in the trailer agreement that requires arbitrators to be "independent" cannot be read interchangeably with "impartial." 440 S.W.3d 18, 21–22. I agree that in determining the intent of parties to an agreement we first and foremost, examine the express language of their agreement. *Id.* at 22 (citing *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.,* 341 S.W.3d 323, 333 (Tex.2011)). I agree that written contracts must be construed to give effect to the parties'

intent as they expressed it in the text of the contract, and **\*27** as the text is understood in light of the facts and circumstances surrounding the contract's execution, subject to the limitations of the parol evidence rule. *Id.* at 22 (citing *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.,* 352 S.W.3d 462, 469 (Tex.2011)). I agree that "[w]hen an arbitration agreement incorporates by reference outside rules, 'the specific provisions in the arbitration agreement take precedence and the arbitration rules are incorporated only to the extent that they do not conflict with the express provisions of the arbitration agreement.' " *Id.* at 24 (quoting *Szuts v. Dean Witter Reynolds, Inc.,* 931 F.2d 830, 832 (11th Cir.1991)). But I view the Court, in the end, as giving only lip service to those principles and authorities.

The Court says that the parties agreed to an arbitrator selection process and decided what qualifications their arbitrators must possess by specifying that each arbitrator must be a "knowledgeable, independent businessperson or professional." 440 S.W.3d at 20. So far, so good. But it then determines that the parties "spoke comprehensively," by listing the requirements they desired as to arbitrators. While acknowledging the parties also agreed that the AAA rules would govern the proceedings, the Court draws two conclusions with which I disagree. The first is its response to the court of appeals' conclusion that the AAA rules and the trailer agreement can be read together and harmonized to avoid any irreconcilable conflict. The Court's response is

> In other words, because [as the court of appeals held] impartiality could be added without negating any expressly chosen qualifications, it was proper to do so to effectuate all the agreement's provisions. *But this cannot be the end of our inquiry, or the specifically chosen terms of any agreement would be hopelessly open-ended whenever outside rules are incorporated by reference.*

*Id.* at 24 (emphasis added). The second conclusion with which I disagree is the Court's conclusion that the AAA provisions as to arbitrator impartiality conflict with the parties' specific agreement because of the added impartiality requirement. *Id.* at 23–25.

As to the Court's concern of "hopelessly open-ended" terms in the agreement, the trailer agreement executed by these sophisticated parties specifies that each appointed arbitrator "shall be a knowledgeable, independent businessperson or professional." But it also provides that the AAA rules apply to the proceedings. At the time the parties entered into the trailer agreement, the 1996 AAA rules were in effect. Those rules specified that

> The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter AAA) or under its commercial Arbitration Rules. *These rules and any amendment of them shall apply in the form obtaining at the time the demand for arbitration or submission agreement is received by*

> *the AAA*. The parties, by written agreement, may vary the procedures set forth in these rules.

AAA Commercial Arbitration § 1 (1996) (emphasis added). That provision is not in the least ambiguous or unclear. The parties could have, but did not, incorporate the 1996 rules into their agreement while excluding any amendments to the rules. Then their agreement would not have been "open-ended" as the Court describes it. Rather, the parties incorporated language specifying that their disputes would be resolved according to whatever AAA rules were in effect when the demand for arbitration was made. The Court's conclusion **\*28** that the parties could not have meant exactly what they said because the terms of their agreement would "leave those terms open to alteration" is a judicial re-making of the parties' agreement. If the parties to a contract want its terms to be open to alteration, they are entitled to make it so. If they do not, they can make it so. But whichever way they choose should be honored by the courts.

As to the Court's conclusion that there is a conflict between the arbitrator requirements in the trailer agreement and those in the AAA rules, there is no dispute that the 2003 AAA Rules apply. And as the court of appeals explained, the 2003 rules provide that when parties have agreed to each name an arbitrator, the standards of rule R–17 with respect to impartiality and independence will apply unless the parties have "specifically agreed" that the arbitrators are to be non-neutral and do not have to meet such standards. *Myer,* 371 S.W.3d at 543 (citing AAA Commercial Arbitration Rule R–12(b) (2003)). Rule R–17 provides that

> Any arbitrator shall be impartial and independent and shall perform his or her duties with diligence and in good faith, and shall be subject to disqualification for ... partiality or lack of independence.

AAA Commercial Arbitration Rule R–17(a) (2003). The trailer agreement provides that arbitrators will be knowledgeable, independent businesspeople or professionals. But Americo and Myer did not "specifically agree" that the arbitrators would be non-neutral and need not meet the Rule R–17 standards. Therefore, in addition to the qualifications the parties set out in the first paragraph of section 3.3 of the trailer agreement, the parties also agreed that (1) the AAA arbitration rules in effect at the time arbitration was demanded would apply, and (2) pursuant to the 2003 rules that were in effect when arbitration was demanded, the arbitrators would be impartial and perform their duties with diligence and good faith.

The Court concludes that the provisions in the trailer agreement and those in Rule R–17 conflict. It reaches that conclusion by *assuming* that the parties listed in their separate agreement all the requirements they desired of their arbitrators. But the trailer agreement language does not support such an assumption. To the contrary, the language of section 3.3 of the trailer agreement demonstrates just the opposite—that when the parties intended to supplant, vary, or circumscribe the provisions of the AAA rules, they knew exactly how to specifically do so:

> The arbitration proceedings shall be conducted in accordance with the commercial arbitration rules of the American Arbitration Association, *except that Americo and Myer each shall be entitled to take discovery as provided under Federal Rules of Civil Procedure Nos. 28 through 36 during a period of 90 days after the final arbitrator is appointed and the arbitrators shall have the power to issue subpoenas, compel discovery, award sanctions and grant injunctive relief....* (emphasis added)

Neither section 3.3 of the trailer agreement listing the arbitrator requirements nor any other part of the trailer agreement includes language addressing, much less specifically providing for, non-neutral arbitrators. And courts should not "rewrite agreements to insert provisions parties could have included." *Tenneco Inc. v. Enter. Prods. Co.,* 925 S.W.2d 640, 646 (Tex.1996).

Further, contracts must be considered in their entirety, with all provisions harmonized, if possible, and all provisions given effect to the extent possible. *FPL Energy, LLC v. TXU Portfolio Mgmt. Co.,* **\*29** *L.P.,* 426 S.W.3d 59, 63 (Tex.2014). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). By assuming the parties included all the arbitrator qualifications they desired in the trailer agreement, the Court confounds the intent of the parties as unambiguously expressed by the words they used in their agreement and the provisions of the AAA rules they incorporated into their agreement. That assumption leads the Court to determine that the trailer agreement and the AAA rules conflict when in reality they can be harmonized as our extensive contract interpretation precedent requires.

In the end the Court misses the mark: the parties' unambiguous agreement and AAA Rule R–17 requiring arbitrator impartiality can be harmonized, and the parties did not expressly agree that the arbitrators could be non-neutral as they were required to do if they intended to negate the applicable AAA rules requiring impartiality. The parties were entitled to make whatever agreement they chose, open to alteration or not. Because the provisions of the trailer agreement and Rule R–17 can be harmonized, the provisions of both can be given effect. The provisions require the arbitrators to be impartial.

I would affirm the judgment of the court of appeals. Because the Court does not, I respectfully dissent.

## All Citations

440 S.W.3d 18, 57 Tex. Sup. Ct. J. 831

**End of Document**                                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 2000666
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

*Memorandum Opinion*
Court of Appeals of Texas,
Amarillo.

COMMUNITY IMPROVEMENT ASSOCIATION
OF LAKE CONROE HILLS, INC., Appellant
v.
Don A. BECKHAM and Heidi L. Beckham, Appellees.

No. 07-03-0036-CV.   |   Sept. 8, 2004.

From the 410th District Court of Montgomery County; No. 01-11-07177-CV; K. Michael Mayes, Presiding.

**Attorneys and Law Firms**

Don Stocking and Michael Y. McCormick, for Community Improvement Assoc. of Lake Conroe Hills.

Kenneth Mahand, for Don A. Beckham.

Before QUINN, REAVIS, and CAMPBELL, JJ.

*Memorandum Opinion*

BRIAN QUINN, Justice.

**\*1** The Community Improvement Association of Lake Conroe Hills, Inc. (the Association) complains in 13 issues of a take-nothing judgment entered in favor of appellees Don A. Beckham and Heidi L. Beckham (the Beckhams). The Association had sued the Beckhams to enforce deed restrictions, declare their construction endeavors a nuisance, and recover civil damages and attorney's fees. We reverse and render in part, reverse and remand in part for further proceedings and affirm in part.

## *Background*

The Beckhams own a home in the Lake Conroe Hills subdivision, which subdivision is subject to restrictive covenants. They began renovating the home in May 2000. The renovations continued into the year 2002 and were not completed by the time of trial. Furthermore, much of the work was done by Don Beckham himself, and during their construction, the Beckhams left materials, supplies, equipment, and trash on the property. Various other residents of the subdivision complained about this to the Association. The latter, in response, requested the Beckhams to clean their property. They did not but rather continued with their construction.

The renovations included excavation of the land at the rear of the house and the erection of a patio. Apparently, the floor of the patio served as the ceiling of a 1000 square foot space that the Beckhams were finishing to resemble the first floor of a three story home. Also erected below the patio but next to this 1000 square foot area was a small brick and windowed edifice. Other items were also built on the property. They included a retaining wall that eventually had to be replaced and a metal tower standing higher than the roof of the home. The tower was to be used to receive high definition television signals from Houston, Texas.

The Association eventually sued the Beckhams for nuisance and to enforce various of the restrictive covenants. Initially, the Beckhams chose to represent themselves and answered the petition with a general denial. Later, requests for admissions were served upon them, which requests they failed to answer in a timely manner. And, though they attempted to relieve themselves of the effect of their omission, the trial court struck only three of the deemed admissions.

Eventually, the Beckhams retained counsel when they were served with a motion for summary judgment filed by the Association. They also later sought an extension of time to respond to the motion. The extension was granted, and the summary judgment was subsequently denied. The case was then tried to a jury. The latter held for the Beckhams, and judgment was eventually entered reflecting that verdict.

## *Issue 1-Late Response to Motion for Summary Judgment*

In its first issue, the Association complains of the trial court's decision to extend the time in which the Beckhams had to respond to its motion for summary judgment. We overrule the point.

An appellate court cannot review an order overruling a motion for summary judgment via appeal after a conventional trial on the merits. *Motor 9, Inc. v. World Tire Corp.,* 651 S.W.2d 296, 299

(Tex.App.-Amarillo 1983, writ ref'd n.r.e.). Given this, the fact that the trial court at bar overruled the motion for summary judgment, and the fact that a conventional trial on the merits has been held, any question about the validity of the trial court's decision to extend the deadline at issue is effectively moot or irrelevant. This is so because to afford the first issue any meaning or effect would require us to also decide whether the extension affected the trial court's decision to deny the summary judgment motion. Yet, because we cannot review the decision to deny the motion, it does not matter if the trial court legitimately afforded the Beckhams more time to respond to the motion. So, we overrule the first issue.

### *Issue 2-Striking of Deemed Admissions*

**\*2** In its second issue, the Association argues that the trial court erred in striking three of the 38 deemed admissions made by the Beckhams. We overrule the issue.

The Beckhams failed to respond to admissions served on them. Consequently, they were deemed admitted against them. However, upon their motion, the trial court struck three of the admissions. The three involved were:

35. You knowingly violated the Deed Restrictions.

36. You willfully violated the Deed Restrictions.

37. All of the facts contained in *Plaintiff's First Amended Original Petition* are true and correct.

According to the Association, the trial court erred in permitting their amendment or withdrawal because the Beckhams failed to show good cause to justify the action. Yet, other than simply mentioning Texas Rule of Appellate Procedure 198.3 in general, the Association provided us with no legal authority discussing the concept of good cause or illustrating why the reasons proffered by the Beckhams to justify their omission failed to satisfy the applicable standard. This falls short of complying with the requirements of Rule 38.1(h) of the Texas Rules of Appellate Procedure. The latter obligates an appellant to include within its argument "appropriate citations to authorities...." Since the Association did not do so, it waived its complaint. *See State Farm Lloyds, Inc. v. Williams,* 960 S.W .2d 781, 789 (Tex.App.-Dallas 1997, pet. dism'd by agr.) (holding that the failure to cite to supporting authority waives the issue).

### *Issues 3, 4, 5 and 12-Nuisance*

Issues three, four, five, and twelve involve the question of nuisance. Through them, the Association attacks the trial court's 1) refusal to grant it a directed verdict and judgment notwithstanding the verdict on the issue and 2) refusal to exclude pictures depicting the condition of other parcels of property in the subdivision. We sustain the issues.

The deed restrictions at issue provided:

> No noxious or offensive trade or activity shall be carried on or maintained on any lot in said subdivision, nor shall anything be done thereon which may be or become a nuisance in the neighborhood. A nuisance shall include but not be limited to: a truck larger than three-quarter ton parked on lots or roads or permanently kept on property; any motor vehicle not properly licensed by the State of Texas; junk or wrecking yards; automobiles, trucks or other vehicles used for parts.

Moreover, the Beckhams admitted that the construction material, supplies, equipment, trash and debris "located on [their] property for more than 6 months ... created a nuisance," "a dangerous condition," "a threat to the health and safety of [their] neighbors," "a threat to the health and safety of [their] neighbors' children," and "a threat to the health and safety of the community of Lake Conroe Hills subdivision as a whole." [1] These admissions wrought a two-fold effect. First, being classified as judicial in nature, the admissions prevented the Beckhams from offering any evidence at trial that contradicted them. *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 905 (Tex.2000); *Marshall v. Vise,* 767 S.W.2d 699, 700 (Tex.1989). Second, they also relieved the trial court from the obligation of submitting an issue to the jury on the topic. *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d at 905.

**\*3** Thus, to the extent that the trial court admitted the pictures alluded to above "for the purposes of ... the question of nuisance," it erred. Simply put, the Beckhams were prohibited from tendering evidence that contradicted their admission that they created a nuisance. *Horizon/CMS Healthcare Corp. v. Auld, supra; Marshall v. Vise, supra.* And, since they were barred from tendering it, the trial court could not admit it.

Moreover, having admitted the existence of a nuisance, the Beckhams were not entitled to the submission of, nor was the Association obligated to request, a jury issue on the matter. *Horizon/ CMS Healthcare Corp. v. Auld, supra.* Rather, the circumstance afforded the trial court no avenue other than to direct a verdict finding that a nuisance existed. Simply put, the admissions resolved any factual dispute regarding, and established the Association's right to, judgment as a matter of law on the claim. *See Rudolph v. ABC Pest Control, Inc,.* 763 S.W.2d 930, 932 (Tex.App.-San Antonio 1989, writ denied) (stating that a directed verdict is proper if the evidence conclusively proves facts that establish a party's right to judgment as a matter of law).

Finally, we conclude that the errors were harmful. This is so because the jury determined that no nuisance arose, and judgment was entered on that verdict. Had it not been for the errors, the jury could not have had the opportunity to so rule.

### *Issues 6, 7, 8, and 11-Erection of Tower*

The next issues which we address, namely six, seven, eight, and eleven, involve the erection of the metal tower. Through them, the Association argues that the trial court erred when it refused to 1) direct a verdict or grant a judgment notwithstanding the verdict finding that the construction of the tower without advance approval from the Association violated the deed restrictions and 2) submit a jury instruction informing the jurors that the words "building" and "structure" were synonymous. It is also contended that the jury's verdict that said construction did not violate the restrictions lacks evidentiary support. We overrule each point.

The particular restriction in dispute is found in paragraph "1" of the document and provides that:

> No *building* shall be erected, placed or altered on any lot, property or area in this subdivision until the building plans, specifications and plot plans showing the location of such *building* have been approved in writing by LAKE CONROE HILLS LIMITED, or its designated representative, or such architectural control committee as may be established, as to conformity and harmony of external and structural design and quality with existing structures in the subdivision and as to the location of the *building* and in conformity with the declarations, reservations, protective covenants, limitations, conditions and restrictions, as hereinafter set out.

(Emphasis added). Given the wording utilized in paragraph 1, we must first conclude that the tower constituted a building before we can sustain the Association's issues. This we cannot do.

**\*4** Deed restrictions are subject to the same rules of interpretation applicable to contracts. *Pilarcik v. Emmons,* 966 S.W.2d 474, 478 (Tex.1998). So, when construing them, we strive to give effect to the parties' intent as garnered from the document as a whole and the words used in it. *Cross Timbers Oil Co. v. Exxon Corp,* 22 S .W.3d 24, 26 (Tex.App.-Amarillo 2000, no pet.). We must also afford those words their plain, ordinary, and generally accepted meaning, unless the document requires otherwise. *Id.; see Air Park-Dallas Zoning Committee v. Crow Billingsley Airpark, Ltd.,* 109 S.W.3d 900, 909 (Tex.App.-Dallas 2003, no pet.) (stating that words in a restrictive covenant will be given their commonly accepted meaning). With this said, we turn to the words before us.

The term "building" commonly denotes "a structure" having "a roof and walls." *Webster's Revised Unabridged Dictionary* (1998). On the other hand, the word "structure" usually denotes

"something ... that is constructed" or "arranged in a definite pattern." *Id.* Given this, one can readily see that though the two words may be related, they are not the same. While a building can be considered a structure for it is "something that is constructed" and "arranged in a definite pattern," not everything that can be built in a definite pattern is a building. For instance, the water fountain appearing at the entrance of Texas Tech University is unquestionably constructed and most definitely arranged in a certain pattern but it has no walls or roof. So, while one could reasonably consider it a structure, it could hardly be deemed a building. And, this leads us to hold that the words "structure" and "building" are not *per se* synonymous.

Furthermore, our holding is further supported by the deed restrictions themselves. In paragraph 3(G) of same there appears the following:

> Except for townhouses and multi-family dwellings ... no *building or structure* shall be erected on any lot nearer than four ... feet including roof overhang from an interior lot line....

(Emphasis added). As can be seen, both the words "building" and "structure" are used. What makes this significant is the rule requiring us to give meaning to every word contained in the document. *Cherokee Water Co. v. Freeman,* 33 S.W.3d 349, 354 (Tex.App.-Texarkana 2000, no pet.) (stating that the court is required to give effect to all words used and is not permitted to assume that the drafter intended some words to have no effect). Yet, if we were to adopt the Association's argument that the two words mean the same thing, we would effectively be rendering one or the other redundant, that is, we would be violating the rule expressed in *Freeman.* So, due to the fact that the individual who drafted the restrictions included both words in the paragraph, authority compels us to presume that the drafter intended the words have different meanings.

In view of our foregoing observations, we cannot but find that the trial court acted properly in refusing to instruct the jury that "building" and "structure" meant the same thing. [2] Nor can one who sees the pictures of the metal tower contained in the record deny that the item lacked both walls and a roof. And, because it lacked such characteristics, it was within the province of the jury to conclude that the tower was not a "building" as that term is commonly understood. Consequently, the trial court had basis upon which to refuse to submit the instruction sought by the Association, and some evidence existed to support the jury's finding that the Beckhams did not violate paragraph 1 by failing to obtain approval as a condition precedent to erecting the tower.

### Issues 9 and 10-Construction Period

**\*5** In their ninth and tenth issues, the Association complains of a partial directed verdict granted in favor of the Beckhams. Through it, the trial court found that the six-month construction period

mentioned in paragraph 3(J) of the deed restrictions only applied to new construction, as opposed to alterations or additions to an existing residence. And, since the Beckhams were simply modifying an existing home, the trial court refused to ask the jury if the Beckhams violated 3(J) and instead directed a verdict on the matter. We sustain the Association's ninth issue and overrule the tenth.

Paragraph 3(J) provides:

> CONSTRUCTION. All materials used in the exterior construction of any residence or other structure must be approved by Lake Conroe Hills Limited or its assigns or nominees before any structure may be erected and only new construction materials may be used except for used brick. No concrete blocks shall be used in said construction and all buildings shall be built on a slab or solid concrete beam foundation or standing on concrete blocks. In no event shall any old house or building be moved on any lot or lots in said subdivision. *The exterior construction of any kind and character, be it the primary residence, garage, porches, or appendages thereto, shall be completed within six (6) months after the start of foundation.*

(Emphasis added). As can be seen, nothing in the provision expressly limits the application of the italicized sentence to new construction. Moreover, the plain wording of that sentence belies any notion that the restriction merely encompasses only the construction of new houses. Indeed, we cannot ignore the fact that the person who drafted the restrictions used the phrase "of any kind and character" to describe the type of exterior construction subject to the six-month period. Simply put, exterior construction "of any kind and character" is all encompassing. And, that the person who drafted the deed restrictions may have referred to the alteration of existing structures elsewhere in the document but omitted the term in the italicized sentence does not convince us otherwise. This is due to the inherent breadth of the word "any." "Any" means, in the context before us, "all." So, when exterior construction "of any kind and character" must be completed within six months, the passage cannot reasonably be read as meaning only "some" types of construction.

Moreover, to adopt the Beckhams' interpretation of the phrase would lead to an absurd result. For instance, those building a new home would have to complete the exterior within six months. Yet, if one sought to make extensive additions or alterations to the exterior of an existing house (*e.g.* additions increasing the size of the house two-fold) he could take as many years as he chose to finish the job and, consequently, keep the external appearance of his property in unsightly disarray as long as he chose. That makes no sense, and we cannot accord an absurd meaning to the words of a document. *Criswell v. European Crossroads Shopping Center, Ltd.,* 792 S.W.2d 945, 948 (Tex.1990).

**\*6** In sum, we find that the six-month restriction was not intended to apply and cannot reasonably be read as applying only to the construction of a new house. Instead, it encompassed additions and alterations to the exterior of an existing house. And, since the record indisputably revealed that the Beckhams failed to complete the exterior portion of the alterations to their home within six months of their initiation, the trial court erred in directing a verdict in favor of the Beckhams on the matter. This very same indisputable evidence also leads us to conclude that there was no need to ask the jury if the deed restriction had been violated. Again, a jury need not be asked about issues which involve no factual dispute. *Horizon/CMS Healthcare Corp. v. Auld, supra.* Thus, we reject the Association's contention that such an issue had to be submitted to the jury. Finally, we hold that the error committed *viz* the partial directed verdict was harmful since it deprived the Association of opportunity to recover upon one of its claims.

## Issue 13-Civil Damages and Attorney's Fees

In its final issue, the Association asserts that the trial court erred in failing to award it civil damages and attorney's fees. We sustain the issue.

A court may assess civil damages for the violation of a restrictive covenant in an amount not to exceed \$200 for each day of the violation. TEX. PROP.CODE ANN. § 202.004(c) (Vernon 1995). However, since the language of the statute is permissive in nature, the award of such damages is left to the trial court's discretion. *Air Park-Dallas Zoning Committee v. Crow-Billingsley Air Park, Ltd.,* 109 S.W.3d at 912. At bar, the trial court did not consider the assessment of civil damages because the jury found there was no violation of the deed restrictions. Since we have determined that the six-month time period in paragraph 3(J) of the restrictions was violated, the case should be remanded for a determination of the civil damages to be awarded, if any.

Next, the award of attorney's fees is not discretionary. Instead, the legislature stated that the trial court "shall allow [attorney's fees] to a prevailing party who asserted" an action for breach of a restrictive covenant pertaining to realty. TEX. PROP.CODE ANN. § 5.006(a) (Vernon 2004). Nevertheless, it lies within the trial court's bailiwick to determine the reasonableness of the fees for we cannot find facts. *Briargrove Park Property Owners, Inc. v. Riner,* 867 S.W.2d 58, 62 (Tex.App.-Texarkana 1993, writ denied). Therefore, we must remand the issue of attorney's fees to the trial court as well.

In summary, we reverse the judgment to the extent it denies the Association recovery upon its claim of nuisance and the claim involving the violation of paragraph 3(J) of the deed restrictions and render judgment in favor of the Association upon those two claims. We next reverse and remand that portion of the judgment denying the Association damages and attorney's fees and awarding the Beckhams their costs of court. In all other things, the judgment is affirmed.

## All Citations

Not Reported in S.W.3d, 2004 WL 2000666

### Footnotes

1    Their admissions arose due to the Beckhams' failure to timely respond to the Association's requests for admissions. TEX.R. CIV. P. 198.2(c) (stating that if a response is not timely filed, the request is considered admitted without the necessity of a court order). Moreover, the trial court refused to allow them to withdraw or amend the admissions, which decision the Beckhams did not appeal.

2    In arriving at our holding we distinguish *Mitchell v. Gaulding,* 483 S.W.2d 41 (Tex.Civ.App.-Waco 1972, writ ref'd n.r.e.), a case upon which the Association relies. There, the restrictions contained the word "structure," and the court held that a radio tower was a "structure." *Id.* at 43. Yet, the operative word appearing in the restriction at bar is "building," not "structure." So *Mitchell v. Gaulding* is quite inapposite.

---

**End of Document**                                            © 2015 Thomson Reuters. No claim to original U.S. Government Works.

75 S.W.3d 1
Court of Appeals of Texas,
San Antonio.

COMMERCIAL UNION ASSURANCE COMPANY PLC, Sirius Insurance Company
(U.K.) PLC, Northern Assurance Company Limited, The Indemnity Marine Assurance
Company Limited, and The Ocean Marine Assurance Company Limited, Appellants,

v.

Arnulfo Flores SILVA, and Maria Calzoncin Cervantes and Gregorio Cervantes,
Individually and as Legal Heir for the Use and Benefit of All Persons Entitled to
Recover for the Wrongful Death of Humberto Javier Cervantes Calzoncin, Appellees.

No. 04–00–00536–CV.   |   May 30, 2001.
|   Rehearing Overruled March 25, 2002.

Insured's judgment creditors brought action to recover from surplus lines liability insurer. The
365th Judicial District Court, Maverick County, Amado Abascal, III, J., entered default judgment
in favor of creditors. Insurer appealed. The Court of Appeals, 988 S.W.2d 798, reversed and
remanded. On remand, the 365th Judicial District Court, Maverick County, Amado Abascal, III,
J., entered judgment for creditors. Insurer appealed. The Court of Appeals, Rickhoff, J., held
that insurer was not liable for injuries arising out of use of products sold for use in Mexican
manufacturing plant.

Reversed and rendered.

West Headnotes (10)

**[1]    Insurance**  🔑 Application of Rules of Contract Construction

> 217   Insurance
> 217XIII   Contracts and Policies
> 217XIII(G)   Rules of Construction
> 217k1806   Application of Rules of Contract Construction

Insurance contracts are subject to the same rules of construction as other contracts.

Cases that cite this headnote

**[2]    Contracts**  🔑 Language of Contract

> 95   Contracts
> 95II   Construction and Operation

95II(A)   General Rules of Construction

95k147   Intention of Parties

95k147(2)   Language of Contract

Court's primary goal in contract interpretation is to give effect to the written expression of the parties' intent.

Cases that cite this headnote

**[3]    Contracts** 🔑 Construction as a Whole

95   Contracts

95II   Construction and Operation

95II(A)   General Rules of Construction

95k143.5   Construction as a Whole

Court must read all parts of a contract together, striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative.

Cases that cite this headnote

**[4]    Insurance** 🔑 Ambiguity in General

**Insurance** 🔑 Questions of Law or Fact

217   Insurance

217XIII   Contracts and Policies

217XIII(G)   Rules of Construction

217k1808   Ambiguity in General

217   Insurance

217XIII   Contracts and Policies

217XIII(G)   Rules of Construction

217k1863   Questions of Law or Fact

Whether an insurance policy is ambiguous is a legal question decided by examining the entire contract in light of the circumstances present when the parties entered into the contract.

Cases that cite this headnote

**[5]    Insurance** 🔑 Ambiguity in General

217   Insurance

217XIII   Contracts and Policies

217XIII(G)   Rules of Construction

217k1808   Ambiguity in General

Insurance policy is not "ambiguous," as a matter of law, if the court can give it a definite legal meaning.

Cases that cite this headnote

**[6]** **Contracts** Existence of Ambiguity

95 Contracts

95II Construction and Operation

95II(A) General Rules of Construction

95k143 Application to Contracts in General

95k143(2) Existence of Ambiguity

Ambiguity in a contract does not arise simply because the parties advance conflicting interpretations.

Cases that cite this headnote

**[7]** **Contracts** Existence of Ambiguity

95 Contracts

95II Construction and Operation

95II(A) General Rules of Construction

95k143 Application to Contracts in General

95k143(2) Existence of Ambiguity

Contract is "ambiguous" if, after applying construction rules, it is subject to two or more reasonable interpretations.

Cases that cite this headnote

**[8]** **Insurance** Ambiguity, Uncertainty or Conflict

217 Insurance

217XIII Contracts and Policies

217XIII(G) Rules of Construction

217k1830 Favoring Insureds or Beneficiaries; Disfavoring Insurers

217k1832 Ambiguity, Uncertainty or Conflict

217k1832(1) In General

If an insurance policy is subject to more than one reasonable interpretation, the court must adopt the construction most favorable to the insured when it resolves the uncertainty.

Cases that cite this headnote

**[9]** **Insurance** Exclusions, Exceptions or Limitations

217 Insurance

217XIII Contracts and Policies

217XIII(G) Rules of Construction

217k1830 Favoring Insureds or Beneficiaries; Disfavoring Insurers

217k1835 Particular Portions or Provisions of Policies

217k1835(2) Exclusions, Exceptions or Limitations

Where an ambiguity involves an exclusionary provision of an insurance policy, the court must adopt the construction urged by the insured as long as that construction is not

unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.

Cases that cite this headnote

**[10] Insurance** 🔑 Scope of Coverage

217 Insurance
217XVII Coverage—Liability Insurance
217XVII(B) Coverage for Particular Liabilities
217k2359 Manufacturers' or Contractors' Liabilities
217k2361 Scope of Coverage

Phrase "within the territory described," as used to in provision of liability policy providing coverage for injuries occurring "anywhere in the world with respect to damages because of bodily injury or property damage arising out of a product which was sold for use or consumption" with in the United States, its territories or possessions, or Canada, modified "for use or consumption" and not "sold," and thus insurer was not liable under policy for injuries that allegedly arose out of use of insured's products sold for use in Mexican manufacturing plant.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*2** Amy Nilsen, Harold K. Watson, Locke Liddell & Sapp, L.L.P., Houston, for Appellant.

Claudio Heredia, Eugene D. Stewart, Knickerbrocker, Heredia, Jasso & Stewart, Eagle Pass, for Appellee.

HARDBERGER, Chief Justice, RICKHOFF, and STONE, Justices.

**Opinion**

RICKHOFF, Justice.

This appeal, which involves the interpretation of an insurance policy, is brought by Commercial Union Assurance Company PLC, Sirius Insurance Company (U.K.) PLC, Northern Assurance Company Limited, The Indemnity Marine Assurance Company Limited, and The Ocean Marine Assurance Company Limited (collectively, the defendants) from a bench trial verdict in favor of Francisca Silva, individually and as legal heir for the use and benefit of all persons entitled to recover for the wrongful death of Arnulfo Flores Silva, and Maria Calzoncin Cervantes and

Gregorio Cervantes, individually and as legal heir for the use and benefit of all persons entitled to recover for the wrongful death of Humberto Javier Cervantes Calzoncin (collectively, the plaintiffs).

Defendants bring three issues on appeal: the trial court erred in (1) holding the policy provided coverage, (2) allowing plaintiffs' expert to testify about the meaning of the policy, and (3) refusing to apply res judicata to bar plaintiffs' claims. We agree that the policy does not provide coverage for the plaintiffs' claims; therefore, we reverse and render judgment in favor of the defendants.

## BACKGROUND

Non-party Texas Recreation Corporation ("TRC") is a Texas company that manufactures pool equipment. TRC contracted with TRC International to manufacture certain products in Mexico, and TRC provided equipment to TRC International, including heaters with open flames. The defendants were TRC's insurers. During the pendency of the insurance policy, a fire at the Mexico plant killed a number of employees, including plaintiffs' decedents. TRC made a demand on the defendants for defense and indemnity, and defendants denied coverage.

In 1992, plaintiffs filed a wrongful death action against TRC and TRC International in Maverick County, Texas district court. In May 1993, defendants sued TRC and plaintiffs in federal court, seeking a declaration of non-coverage in the wrongful death suit. Service was attempted on plaintiffs' lawyer, who refused service. In September 1993, TRC filed for bankruptcy protection. In January 1995, plaintiffs obtained a judgment against TRC. In September 1995, the federal court ruled that **\*3** defendants had no duty to defend or indemnify TRC. This judgment was later affirmed by the Fifth Circuit. In January 1996, TRC assigned to plaintiffs "any and all claims, demands, and causes of action they have against Defendants." In December 1997, plaintiffs sued the defendants in Maverick County district court to collect on the wrongful death judgment. After a bench trial, the court found in favor of plaintiffs and awarded judgment for the full amount of the insurance policy, plus prejudgment interest.

## "POLICY TERRITORY"

In their first issue on appeal, defendants assert the trial court erred in concluding that plaintiffs' claims in the wrongful death action arose within the "policy territory" as that phrase is used in the policy.

### The Policy

The policy applies "only to bodily injury or property damage which occurs within the policy territory." "Policy territory" is defined as "(1) the United States of America, its territories or possessions, or Canada, or (2) international waters or air space, provided the bodily injury or property damage does not occur in the course of travel or transportation to or from any other country, state, or nation, or (3) anywhere in the world with respect to damages because of bodily injury or property damage arising out of a product which was *sold for use or consumption within the territory described in paragraph (1)* provided the original suit for damages is brought within such territory...." (Emphasis added.)

The trial court found that a "reasonable construction of the definition of 'policy territory' is that both prepositional phrases modify the verb 'sold' such that worldwide coverage applies if the product was (1) sold for use or consumption and (2) sold within the territory described in paragraph (1)." The court also found that "[c]onstruing the definition of 'policy territory' to require that the use or consumption of the product occur within the United States would be contrary to the clear intent of the policy to expand coverage for bodily injury claims arising from a products hazard." Defendants contend this interpretation is incorrect. Defendants assert the policy covers only products intended for use or consumption in the United States. Therefore, defendants conclude, an accident occurring in Mexico arising out of a product intended for use in Mexico is not within the "policy territory," and thus not covered.

### Rules of construction

**[1]** **[2]** **[3]** Insurance contracts are subject to the same rules of construction as other contracts. *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 433 (Tex.1995); *National Union Fire Ins. Co. v. CBI Indus.,* 907 S.W.2d 517, 520 (Tex.1995); *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex.1994). Our primary goal, therefore, is to give effect to the written expression of the parties' intent. *Beaston,* 907 S.W.2d at 433; *Forbau,* 876 S.W.2d at 133. We must read all parts of the contract together, *Beaston,* 907 S.W.2d at 433, striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative. *United Serv. Auto. Ass'n v. Miles,* 139 Tex. 138, 161 S.W.2d 1048, 1050 (1942).

**[4]** **[5]** **[6]** **[7]** **[8]** **[9]** Whether an insurance policy is ambiguous is a legal question decided by examining the entire contract in light of the circumstances present when the parties entered into the contract. *State Farm Fire & Cas. Co. v. Vaughan,* 968 S.W.2d 931, 933 (Tex.1998). A policy is not ambiguous, as a matter of law, if the court can give it a definite legal meaning. *Id.* An ambiguity does not arise simply because the parties advance conflicting interpretations. **\*4** *Forbau,* 876 S.W.2d at 134. A contract is ambiguous if, after applying these rules, it is subject to two or more reasonable interpretations. *National Union,* 907 S.W.2d at 520. If the policy is subject to more than one reasonable interpretation, we must adopt the construction most favorable to the insured when we resolve the uncertainty. *Vaughan,* 968 S.W.2d at 933. Where an ambiguity involves an exclusionary provision of an insurance policy, we "must adopt the construction ...

urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *National Union Fire Ins. Co. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991). An insurer who relies on an exclusion carries the burden to prove that it applies. TEX. INS.CODE ANN. art. 21.58(b) (Vernon Supp.2001).

*Analysis*

 **[10]**   Plaintiffs argue that the definition of "policy territory" places two limitations upon the insured's actions in selling its product in order for coverage to exist for product claims arising outside the country. The first limitation, on the nature of the sale, requires that the product must be "sold for use or consumption." The second limitation, on the location of the sale, requires that the sale occur within the United States, its territories or possessions, or Canada. Plaintiffs conclude that "within the territory described" modifies both "sold" and "for use and consumption." We disagree.

Plaintiffs' reading grammatically strains the language, because it reads the adverbial phrase as modifying the distant verb "sold" rather than the prepositional phrase "for use or consumption" immediately preceding it. Moreover, this reading renders "for use or consumption" as surplusage, as there would be coverage for any sale in the United States or Canada, regardless of where the product sold was used or consumed. Therefore, we hold that the policy is not ambiguous and the phrase "within the territory described" modifies "for use or consumption" and not "sold." *See generally Atlantic Mutual Ins. Co. v. Truck Ins. Exch.,* 797 F.2d 1288 (5th Cir.1986); *Vinocur's Inc. v. CNA Ins. Co.,* 132 A.D.2d 543, 517 N.Y.S.2d 277 (N.Y.App.Div.1987). [1] Here, the products were sold for use in the manufacturing plant operated by T.R.C. International S.A. de C.V. in Mexico; thus, the policy does not provide coverage for plaintiffs' claims.

## CONCLUSION

Because we hold that the policy does not provide coverage for the plaintiffs' claims, we do not address defendants' second and third issues on appeal. We reverse the trial court's judgement and render a take-nothing judgment in favor of the defendants.

**All Citations**

75 S.W.3d 1

Footnotes

1    The common thread running through these cases is that the court focused on where the product was intended to be used: in *Atlantic Mutual,* the product (although ultimately shipped abroad) was intended to be used in the U.S.; in *Vinocur's,* the product (although ultimately shipped abroad) was sold for use in the United States.

**End of Document**                                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

347 S.W.3d 413
Court of Appeals of Texas,
El Paso.

Irma CONTRERAS, Appellant,

v.

CLINT INDEPENDENT SCHOOL DISTRICT
and Access Administrators, Inc., Appellees.

No. 08–10–00160–CV.    |    Aug. 10, 2011.

**Synopsis**

**Background:** Health plan participant brought action against school district and district's plan administrator for breach of contract, after they refused to pay for four revision surgeries allegedly needed due to skin laxity following weight loss after gastric bypass surgery. The 448th District Court, El Paso County, Susan Larsen, J., granted summary judgment in favor of defendants, and participant appealed.

**Holdings:** The Court of Appeals, Guadalupe Rivera, J., held that:

[1] summary judgment affidavit of participant's surgeon was insufficient to controvert school district and health plan administrator's medical expert's opinion that subsequent revision surgeries to remove excess skin was not encompassed by settlement agreement;

[2] letter from medical expert did not create an inference that participant's need for additional surgeries were due to complications from earlier surgeries;

[3] medical expert's opinion was admissible to explain meaning of term "complication" in parties' settlement agreement; and

[4] and affirmative defenses of accord and satisfaction, release, and res judicata were not only relevant to plan participant's breach of contract claim, but were also specifically tailored to that claim in defendant's motion for summary judgment.

Affirmed.

West Headnotes (7)

**[1]** **Judgment** 🔑 Insurance

**Judgment** 🔑 Labor and employment

228 Judgment
228V On Motion or Summary Proceeding
228k182 Motion or Other Application
228k185.3 Evidence and Affidavits in Particular Cases
228k185.3(12) Insurance
228 Judgment
228V On Motion or Summary Proceeding
228k182 Motion or Other Application
228k185.3 Evidence and Affidavits in Particular Cases
228k185.3(13) Labor and employment

Summary judgment affidavit of participant's surgeon was insufficient to controvert school district and health plan administrator's medical expert's opinion that subsequent revision surgeries to remove excess skin did not arise from medical complications from previous surgeries, and thus, were not encompassed by settlement agreement between the parties, even though surgeon opined the subsequent surgeries were medically necessary; surgeon's affidavit did not state that the medical necessity arose from medical complications from the previous surgery.

Cases that cite this headnote

**[2]** **Compromise and Settlement** 🔑 Discharge from Liability

**Insurance** 🔑 Construction and Effect of Settlement or Release

89 Compromise and Settlement
89I In General
89k14 Operation and Effect
89k16 Discharge from Liability
89k16(.5) In general
217 Insurance
217XXVII Claims and Settlement Practices
217XXVII(E) Construction and Effect of Settlement or Release
217k3390 In general

Letter from school district, and district's health plan administrator's medical expert, in which he noted doctors in his office do additional skin revision surgical procedures for patients at no cost "since we feel we should have removed enough skin the first time" did not create an inference that plan participant's need for additional revision surgeries were due to complications from earlier surgeries, and thus, should have been encompassed by settlement agreement; nothing in expert's opinion established that loose skin was a complication for such a surgery.

Cases that cite this headnote

**[3]    Evidence** 🔑 Grounds for admission of extrinsic evidence

157  Evidence

157XI  Parol or Extrinsic Evidence Affecting Writings

157XI(D)  Construction or Application of Language of Written Instrument

157k448  Grounds for admission of extrinsic evidence

Although extrinsic evidence is generally not admissible to vary the terms of an unambiguous agreement, extrinsic evidence may be admissible to give the words of a contract a meaning consistent with that to which they are reasonably susceptible, i.e., to interpret contractual terms.

1 Cases that cite this headnote

**[4]    Health** 🔑 Proximate cause

**Health** 🔑 Gross or obvious negligence and matters of common knowledge

198H  Health

198HV  Malpractice, Negligence, or Breach of Duty

198HV(G)  Actions and Proceedings

198Hk815  Evidence

198Hk821  Necessity of Expert Testimony

198Hk821(3)  Proximate cause

198H  Health

198HV  Malpractice, Negligence, or Breach of Duty

198HV(G)  Actions and Proceedings

198Hk815  Evidence

198Hk821  Necessity of Expert Testimony

198Hk821(4)  Gross or obvious negligence and matters of common knowledge

In medical cases, the general rule is that expert testimony is necessary to establish causation as to medical conditions laying outside the common knowledge and experience of jurors.

Cases that cite this headnote

**[5]    Judgment** 🔑 Insurance

**Judgment** 🔑 Labor and employment

228  Judgment

228V  On Motion or Summary Proceeding

228k182  Motion or Other Application

228k185.3  Evidence and Affidavits in Particular Cases

228k185.3(12)  Insurance

228  Judgment

228V  On Motion or Summary Proceeding

228k182 Motion or Other Application

228k185.3 Evidence and Affidavits in Particular Cases

228k185.3(13) Labor and employment

Doctor's expert opinion listing possible medical complications from surgical procedure, and stating that health plan participant's loose skin was not a "complication" arising from surgical procedures performed to excise excessive skin after gastric bypass surgery, was admissible, at summary judgment stage in participant's breach of contract action, to explain meaning of term "complication" in settlement agreement under which employer and plan administrator agreed to pay for certain surgeries and any complications resulting therefrom; settlement agreement did not define "complication," and issue of whether excess skin was a complication from previous surgeries was not within realm of lay knowledge and experience.

Cases that cite this headnote

**[6]    Appeal and Error** 👈 Judgment

30 Appeal and Error

30V Presentation and Reservation in Lower Court of Grounds of Review

30V(B) Objections and Motions, and Rulings Thereon

30k223 Judgment

A party cannot raise new reasons why a summary judgment should have been denied for the first time on appeal.

Cases that cite this headnote

**[7]    Judgment** 👈 Motion or Other Application

228 Judgment

228V On Motion or Summary Proceeding

228k182 Motion or Other Application

228k183 In general

School district and district's health plan administrator's affirmative defenses of accord and satisfaction, release, and res judicata were not only relevant to plan participant's breach of contract claim, but were also specifically tailored to that claim in defendant's motion for summary judgment, where defendants asserted that participant's revision surgeries were not complications from her previous surgeries, and therefore, she could not succeed on her breach-of-contract claim, and further, that participant's additional skin revision surgeries were new surgeries from which she had already agreed to financially release defendants.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*415** James D. Lucas, El Paso, TX, for Appellant.

Mark C. Walker, Cox Smith Matthews Incorporated, El Paso, TX, James Heidelberg, San Antonio, TX, for Appellees.

Before CHEW, C.J., McCLURE, and RIVERA, JJ.

## *OPINION*

GUADALUPE RIVERA, Justice.

Irma Contreras, Appellant, appeals the trial court's summary judgment in favor of Clint Independent School District and Access Administrators, Inc., Appellees, stemming from her suit for breach of contract. In six issues, Contreras attacks whether a material fact existed, whether the submitted expert's opinion was relevant, and whether Appellees were entitled to rely on their affirmative defenses of accord and satisfaction, release, and res judicata. We affirm.

## BACKGROUND

On July 8, 2003, Irma Contreras had gastric bypass surgery, which Appellees paid for. She then lost over one hundred pounds, prompting Dr. Dale Reynolds to recommend that Contreras undergo five surgical procedures, which he believed were medically necessary, that consisted of excision of excessive skin and subcutaneous tissues of the thighs, buttocks, abdomen, breasts, and arms. Appellees, however, refused to pay for those surgeries, claiming that they were cosmetic. In response, Contreras sued Appellees for breach of contract, breach of fiduciary duty, and engaging in unfair settlement practices.

After much negotiation, the parties settled the dispute and signed a settlement agreement. According to the terms of the agreement, Appellees agreed to pay the costs for the five surgeries recommended by Dr. Reynolds, including a sixth surgery for lipectomy, and any complications resulting therefrom. The settlement agreement also stated that in consideration for the sums paid by Appellees, Contreras would release, acquit and forever discharge Appellees from any and all claims, demands, and causes of actions growing out of, resulting from, or connected in any way with those claims constituting the subject matter of the lawsuit. In addition, Contreras executed an Agreed Order of Dismissal with prejudice for her causes of action against Appellees.

**\*416** Six months after receiving the surgeries listed in the settlement agreement, Dr. Miller informed Contreras that an additional four revision surgeries were needed due to skin laxity. Those surgeries included revision of excess skin of the thigh, revision of excision of excess skin of the left arm, revision of excess skin of the abdomen, and revision of suction assisted lipectomy of the trunk. And on March 9, 2007, Dr. Miller performed ten surgical procedures for skin laxity, which he believed were medically necessary. However, Appellees refused to pay for those procedures, claiming that they were cosmetic and did not arise from complications from the previous surgeries.

Consequently, on January 6, 2009, Contreras filed suit against Appellees, claiming breach of contract. In essence, Contreras argued that her revision surgeries were complications arising from her previous surgeries, and therefore, pursuant to the settlement agreement, Appellees were obligated to pay for them. In response, Appellees moved for summary judgment, alleging affirmative defenses of accord and satisfaction, release, and res judicata, and that they did not breach the settlement agreement as Contreras' revision surgeries were not complications resulting from the previous surgeries. In support of their motion, Appellees attached a letter and affidavit by Dr. Henderson, which opined that the revision surgeries performed were cosmetic in nature and were not due to any complications resulting from the previous surgeries. Contreras responded to Appellees' motions for summary judgment by attaching an affidavit from Dr. Miller, which stated that the surgeries were medically necessary. After entertaining arguments on the matter, the trial court granted Appellees' motion, finding that there were no genuine issues of material fact to be resolved.

### DISCUSSION

Contreras now raises six issues for our review. Issue One alleges that a material fact existed as to whether the revision surgeries resulted from previous surgical complications. Issues Two, Three, and Four challenge whether Appellees' summary-judgment evidence was legally sufficient to defeat Contreras' breach-of-contract claim. And Issues Five and Six contest whether the trial court erred by granting summary judgment on Appellees' claims for accord and satisfaction, release, and res judicata. For the reasons discussed below, we find no merit in any of the issues raised.

### Genuine Issue of Material Fact

[1] In Issue One, Contreras asserts that the trial court erred by finding no genuine issue of material fact existed concerning whether her revision surgeries were complications arising from her previous surgeries. According to Contreras, two items of evidence raised such material facts: (1) Dr. Miller's affidavit, which opined that the surgeries were medically necessary; and (2) Dr. Henderson's letter, which acknowledged that the doctors in his office perform revision surgical

procedures at no cost "since [they] feel that [they] should have removed enough skin the first time...." Relying on those two pieces of evidence, Contreras asserts that there is an inference that any leftover excess skin was a complication from the original surgeries, that is, that Dr. Miller failed to remove enough skin the first time.

### *Standard of Review*

We review *de novo* a trial court's decision to grant a motion for summary judgment. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). When moving for summary judgment, the movant **\*417** bears the burden of showing that no genuine issues of material fact exist and that he is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548 (Tex.1985). In determining whether there are disputed issues of material fact, we take as true all evidence favorable to the nonmovant and indulge every reasonable inference in the nonmovant's favor. *Nixon,* 690 S.W.2d at 548–49. When the defendant moves for summary judgment, he must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense to be entitled to summary judgment as a matter of law. *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997). The burden then shifts to the plaintiff to produce competent controverting summary judgment evidence that raises a genuine issue of material fact. *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995). If no genuine issue of material fact exists, summary judgment, therefore, should be granted as a matter of law. *Haase v. Glazner,* 62 S.W.3d 795, 797 (Tex.2001).

### *Application*

Here, Dr. Miller claimed that the revision surgeries were necessary to remove excess skin so that Contreras' skin would not lose its elasticity. Thus, he concluded that "the revision surgeries performed by me were medically necessary and not for cosmetic purposes." However, the issue before the trial court was not whether the surgeries were medically necessary to achieve the objective of reducing the amount of loose skin, but whether the surgeries were due to complications arising out of the previous surgeries. Although the affidavit explained why Dr. Miller believed the surgeries were medically necessary, it did not state that the necessity arose from medical complications from the previous surgeries. In short, Dr. Miller's affidavit did not controvert Appellees' medical expert's opinion, stating that the revision surgeries were not the result of any complications resulting from the previous surgeries.

 **[2]**   Contreras also asserts that Dr. Henderson's letter provided an inference that her revision surgeries were due to complications. Specifically, she points to Dr. Henderson's statements that

the doctors in his office do such additional surgical procedures for patients at no cost "since we feel that we should have removed enough skin the first time, so we would not have to go back to surgery." Thus, she alleges that had Dr. Miller removed enough excess skin during the previous surgeries, she would not have had to undergo the additional surgeries.

However, Dr. Henderson's letter never opined that additional excess skin is a complication from the previous surgeries. Indeed, nothing in his letter opinion or affidavit establishes that loose skin is a complication from such a surgery. According to the definition of "complication," which Dr. Henderson provided to the trial court, a postoperative complication is a "hematoma, wound breakdown or dehiscence, pulmonary embolism, heart attack, stroke, infection or death." Loose skin, according to the summary judgment record, has never been included within that category. Thus, we decline, as did the trial court, to infer that Dr. Henderson's letter could establish that Contreras' additional revision surgeries were due to surgical complications.

In summary, because Contreras produced no evidence controverting Appellees' expert evidence that her revision surgeries were not due to complications, we hold that the trial court did not err by holding no material fact existed as to whether the **\*418** complained-of surgical procedures were complications encompassed by the settlement agreement. *See Jordan v. Geigy Pharm.,* 848 S.W.2d 176, 180 (Tex.App.-Fort Worth 1992, no pet.) (concluding that because appellant failed to meet appellee's summary-judgment proof with competent controverting evidence, summary judgment was proper). Therefore, since Contreras could not prove that Appellees breached the settlement agreement, her breach-of-contract claim failed, and Appellees were entitled to summary judgment as a matter of law. *See B & W Supply, Inc. v. Beckman,* 305 S.W.3d 10, 16 (Tex.App.-Houston [1st Dist.] 2009, pet. denied) (stating that the "essential elements of a breach of contract claim are (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach"); *see also Sci. Spectrum,* 941 S.W.2d at 911 (stating that if the defendant conclusively negates at least one essential element of the plaintiff's cause of action, he is entitled to summary judgment as a matter of law). Issue One is overruled.

## Legal Sufficiency

Contreras' next three issues challenge whether Appellees' summary-judgment evidence was legally sufficient to defeat Contreras' breach-of-contract claim. We apply the same standard of review as cited above for reviewing legal sufficiency challenges to motions for summary judgments. *See Ibrahim v. Young,* 253 S.W.3d 790, 802 (Tex.App.-Eastland 2008, pet. denied). Of course, if the movant's summary judgment proof is legally insufficient, the nonmovant need not even respond to it. *M.D. Anderson Hosp. and Tumor Inst. v. Willrich,* 28 S.W.3d 22, 23 (Tex.2000).

### *Was Dr. Henderson's Opinion Relevant?*

In Issue Two, Contreras asserts that Dr. Henderson's affidavit is irrelevant to whether Appellees breach the settlement agreement by refusing to pay for her revision surgeries. She argues that Dr. Henderson's opinion concerning whether insurance companies generally cover second revision surgeries and whether Dr. Miller should be paid for such surgeries was not relevant to the meaning of the term "complication" as used in the settlement agreement. Rather, Contreras alleges that those statements go to the interpretation of an insurance contract or to the standard of care governing Dr. Miller's ability to charge for the revision surgeries. They do not, according to Contreras, ascribe a meaning to the term "complication" as that term is interpreted within the medical community and thus the settlement agreement.

 **[3]**   **[4]**   The parties did not define the term "complication" in the settlement agreement. Although extrinsic evidence is generally not admissible to vary the terms of an unambiguous agreement, extrinsic evidence may "be admissible to give the words of a contract a meaning consistent with that to which they are reasonably susceptible, i.e., to 'interpret' contractual terms." *Mescalero Energy, Inc. v. Underwriters Indem. General Agency, Inc.,* 56 S.W.3d 313, 320 (Tex.App.-Houston [1st Dist.] 2001, pet. denied) (quoting *National Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 521 (Tex.1995)). And expert testimony may be useful in explaining the commonly understood meaning in the industry of a specialized term. *Mescalero,* 56 S.W.3d at 320. In medical cases, the general rule is that expert testimony is necessary to establish causation as to medical conditions laying outside the common knowledge and experience of jurors. **\*419** *Guevara v. Ferrer,* 247 S.W.3d 662, 665 (Tex.2007). Therefore, whether complications arose from the surgical procedures performed on Contreras and more specifically, whether excess skin is a complication from those previous surgeries, would require expert testimony as that is not within the realm of lay knowledge and experience.

 **[5]**   And here, Dr. Henderson did provide a medical definition of "complication" by stating that a complication is a "hematoma, wound breakdown or dehiscence, pulmonary embolism, heart attack, stroke, infection or death." As noted by Appellees, that definition is found on the Medical University of South Carolina's website. *See* After Surgery: Discomforts and Complications, available at http://www.muschealth. com/gs/healthtopic.aspx?action=showpage&pageid=P01390 (last visited Aug. 8, 2011). Moreover, Dr. Henderson opined that Contreras' loose skin was not a complication arising from the surgical procedures performed. These are not matters within the realm of lay knowledge and experience. In other words, Dr. Henderson's definition of "complication," as that term is interpreted within the medical community, was relevant to give the settlement term a meaning consistent with that to which it was reasonably susceptible, and we cannot say that the trial court abused its discretion by accepting Dr. Henderson's definition of complication. *See XCO Production Co. v. Jamison,* 194 S.W.3d 622, 629 n. 4 (Tex.App.-

Houston [14th Dist.] 2006, pet. denied) (determining that expert tax lawyer's interpretation of terms in partnership agreement was admissible to explain their specialized meaning); *Presswood v. Goehring,* No. 01–04–00134–CV, 2005 WL 1365188, at *3 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (mem. op., not designated for publication) (noting that medical terminology is unfamiliar to laypersons). Issue Two is overruled.

### *Was Dr. Henderson's Opinion Free from Contradiction and Inconsistencies?*

In Issue Three, Contreras contends that the trial court erred by not excluding Dr. Henderson's affidavit for the reasons that it was controverted, that it addressed a subject matter for which the trier of fact did not need to be guided by an expert, and that it was not clear, positive, and direct, or free from contradictions and inconsistencies. *See Anderson v. Snider,* 808 S.W.2d 54, 55 (Tex.1991) (per curiam) (summary judgment may be granted on the "uncontroverted testimony of an expert witness if the subject matter is such that a trier of fact would be 'guided solely by the opinion testimony of experts, if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted' ") (quoting TEX.R. CIV. P. 166a(c)). However, we have already determined that Dr. Miller's affidavit did not controvert Dr. Henderson's opinion, and that expert medical testimony was necessary to establish the meaning of "complication" within the settlement agreement; thus, we do not address these arguments further. Moreover, we decline to address Contreras' third argument, namely, whether Dr. Henderson's affidavit was free from contradictions and inconsistencies, finding the same to be inadequately briefed.

The Rules of Appellate Procedure require the briefing party to provide a legal argument and authorities that support that argument to maintain the point at issue. *See* Tex.R.App. P. 38.1; *Dodge v. Dodge,* 314 S.W.3d 82, 85 (Tex.App.-El Paso 2010, no pet.); *Ratsavong v. Menevilay,* 176 S.W.3d 661, 666 (Tex.App.-El Paso 2005, pet. denied), *cert. denied,* 549 U.S. 886, 127 S.Ct. 253, 166 L.Ed.2d 149 (2006). This is not done by merely uttering brief conclusory **\*420** statements, unsupported by analogous legal authority. *Dodge,* 314 S.W.3d at 85.

Here, Contreras asserts in three conclusory sentences that Dr. Henderson's opinion that her revision surgeries were not to treat complications contradicted his earlier statements that insurance companies may consider skin laxity a medical problem as it can result in yeast, fungal, and bacterial infections. She does not provide any argument explaining how the statements render the affidavit inconsistent, nor does she cite to authority holding such statements create inconsistencies. Accordingly, we hold Contreras failed to adequately brief her argument. *In re Estate of Rogers,* 322 S.W.3d 361, 363 n. 1 (Tex.App.-El Paso 2010, no pet.); *Sterling v. Alexander,* 99 S.W.3d 793, 799 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (cases holding issue inadequately briefed when party failed to cite any authority and to make a cogent argument). Issue Three is overruled.

### *Defining "Complication "*

In Issue Four, Contreras argues that the trial court improperly allowed Dr. Henderson to craft his own definition of complication, rather than apply a dictionary or ordinary meaning to the term. However, we have already concluded that expert medical testimony was necessary to establish the meaning of complication as that term is defined within the medical community and also within the settlement agreement. Moreover, to the extent that Contreras argues that Appellees failed to provide any definition in their summary judgment motion that supported Dr. Henderson's view that the revision surgeries were not due to complications from the previous surgeries, our review of the record has found two such definitions cited by Appellees: (1) that a "complication is an unexpected medical event directly resulting from the performance of a surgery ... [which include] shock, hemorrhage, wound infection, deep vein thrombosis, pulmonary complications, urinary retention and reaction to anesthesia;" and (2) that a "surgical complication is any undesirable, unintended, and direct result of surgery affecting the patient which would not have occurred had the surgery gone as well as could reasonably be hoped." The first definition appears on the Medical University of South Carolina's website, and the second definition comes from the World Journal of Surgery. Thus, Contreras' arguments on these grounds fail.

 **[6]** Contreras further asks us to apply her own definition of complication as found at an online medical cite, *www.medicinenet.com.* However, Contreras did not present her definition to the trial court. "Issues not expressly presented to the trial court by written motion, answer or other response" to the motion for summary judgment "shall not be considered on appeal as grounds for reversal." TEX.R. CIV. P. 166a(c). Indeed, a party cannot raise new reasons why a summary judgment should have been denied for the first time on appeal. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678–79 (Tex.1979). Accordingly, Issue Four is overruled.

### **Accord and Satisfaction, Release, and Res Judicata**

 **[7]** Contreras' next two issues are fairly simple, and we will not dwell on them for long. In her fifth issue, Contreras asserts that the trial court abused its discretion by granting summary judgment on grounds of accord and satisfaction, release, and res judicata when Appellees, according to the terms of the settlement agreement, agreed to not only pay for the costs of certain surgeries, but also the costs of any complications resulting from those procedures. **\*421** In essence, Contreras maintains that her skin laxity was a complication from those procedures, which invoked her breach-of-contract claim and made Appellees' affirmative defenses of accord and satisfaction, release, and res judicata irrelevant. Similarly, in her sixth issue, Contreras alleges that Appellees' failed to specifically allege how their affirmative defenses of accord and satisfaction, release, and

res judicata applied to her issue that Appellees would pay for any complications resulting from her previous surgeries.

However, it is clear from a reading of Appellees' motion for summary judgment, that they were asserting that Contreras' revision surgeries were not complications from her previous surgeries, and therefore, she could not succeed on her breach-of-contract claim. And because there was no evidence that Appellees breached the settlement agreement, Appellees contended that Contreras' additional revision surgeries were new surgeries from which Contreras already agreed to financially release Appellees from. Thus, Appellees' affirmative defenses of accord and satisfaction, release, and res judicata were not only relevant to Contreras' breach-of-contract claim, but also specifically tailored to that claim in their motion. Accordingly, Issues Five and Six are overruled.

## CONCLUSION

Having overruled Contreras' issues, we affirm the trial court's judgment. [1]

## All Citations

347 S.W.3d 413, 271 Ed. Law Rep. 1188

Footnotes

[1]     Appellees raise other issues as to why summary judgment was proper, but we have already implicitly addressed those issues in our discussion above. Moreover, we need only address those issues necessary to final disposition of the appeal. *See* TEX.R.APP. P. 47.1.

**End of Document**                                                                     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

362 S.W.3d 160
Court of Appeals of Texas,
Fort Worth.

DAIMLERCHRYSLER MOTORS COMPANY, LLC, Appellant and Appellee,

v.

Tommy J. MANUEL, Tommy Manuel Auto Leasing, Inc.,
and Manuel Auto Sales, Ltd., Appellees and Appellants.

No. 02–07–00299–CV. | Feb. 24, 2012.

**Synopsis**
**Background:** Franchised automobile dealer brought breach of contract action against automobile manufacturer. After bench trial, the 141st District Court, Tarrant County, Len A. Wade, J., entered judgment in favor of dealer but denied recovery of dealer's attorney fees. Manufacturer appealed and dealer cross-appealed.

**Holdings:** The Court of Appeals, Anne Gardner, J., held that:

[1] "best efforts" provision of agreement was not so vague as to be unenforceable;

[2] evidence was legally sufficient to support finding that manufacturer breached best efforts provision, which required manufacturer to use best efforts to resolve administrative protest by third party;

[3] evidence was legally sufficient to support finding that manufacturer and dealer intended to retain the right to actual damages for breach of sales agreement;

[4] dealer's experts' reliance on manufacturer's planning potential did not render experts' opinions unreliable;

[5] prejudgment interest accrued from date of demand letter for damages expressly referencing and demanding damages for breach of contract at issue; and

[6] provision of contract that non-breach party's sole remedy in a breach of contract claim would be out-of-pocket expenses that could not be mitigated did not preclude dealer's recovery of statutory attorney's fees.

Affirmed in part, reversed in part, and remanded.

West Headnotes (36)

**[1]    Appeal and Error** 🔑 Conclusiveness in General

**Appeal and Error** 🔑 Total failure of proof

30   Appeal and Error
30XVI   Review
30XVI(I)   Questions of Fact, Verdicts, and Findings
30XVI(I)3   Findings of Court
30k1008   Conclusiveness in General
30k1008.1   In General
30k1008.1(1)   In general
30   Appeal and Error
30XVI   Review
30XVI(I)   Questions of Fact, Verdicts, and Findings
30XVI(I)3   Findings of Court
30k1010   Sufficiency of Evidence in Support
30k1010.2   Total failure of proof

Findings of fact that are unchallenged are binding on an appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding.

Cases that cite this headnote

**[2]    Contracts** 🔑 Trade and Business

95   Contracts
95II   Construction and Operation
95II(C)   Subject-Matter
95k202   Trade and Business
95k202(1)   In general

Provision of agreement executed by franchised automobile dealer and automobile manufacturer, which required manufacturer to use its "best efforts" to resolve administrative protest lodged by third party against manufacturer, so as to allow dealer to open another dealership, was not so vague as to be unenforceable; agreement set forth the measurable goal or guideline of establishing the other dealership by a particular date, and resolution of protest was necessary for establishment of other dealership.

1 Cases that cite this headnote

**[3]    Contracts** 🔑 Reasonable Time

95 Contracts
95II Construction and Operation
95II(D) Place and Time
95k212 Reasonable Time
95k212(1) In general

What is a "reasonable time" under contractual language depends upon the facts and circumstances as they existed at the time the contract was formed.

Cases that cite this headnote

**[4] Contracts** 🔑 Trade and Business

95 Contracts
95II Construction and Operation
95II(C) Subject-Matter
95k202 Trade and Business
95k202(1) In general

Fact that automobile manufacturer eventually settled administrative protest by third party, allowing franchised dealer to open another automobile dealership, did not, by itself, establish that manufacturer used best efforts to resolve protest, as required by contract executed between manufacturer and dealer, where contract identified its goal as the opening of the other dealership by particular date, and dealership was not opened by that date.

1 Cases that cite this headnote

**[5] Contracts** 🔑 Weight and sufficiency in general

95 Contracts
95V Performance or Breach
95k322 Evidence
95k322(3) Weight and sufficiency in general

Evidence was legally sufficient to support finding that automobile manufacturer breached best efforts provision of contract executed between franchised automobile dealer and manufacturer, which required manufacturer to use best efforts to resolve administrative protest by third party in order to allow opening of another dealership by dealer, where manufacturer acted to delay resolution of administrative protest through litigation strategy, manufacturer delayed in making offer to third party to resolve protest, and manufacturer made no effort to settle with third party until approximately nine months after filing of protest.

1 Cases that cite this headnote

**[6] Appeal and Error** 🔑 Reasons for Decision

30 Appeal and Error
30XVI Review
30XVI(A) Scope, Standards, and Extent, in General
30k851 Theory and Grounds of Decision of Lower Court
30k854 Reasons for Decision
30k854(1) In general

Automobile manufacturer did not fail to challenge every basis supporting trial court's award of damages in favor of automobile dealer in dealer's breach of contract claim, and thus Court of Appeals would review manufacturer's challenge, despite argument that manufacturer's appellate issue only challenged damages awarded on lost profits but that trial court could have rested its damage award on claims for lost salary and rental income; although manufacturer discussed damages award in short-hand form as "lost profits," manufacturer's overarching contention was that limitation-of-damages clause of agreement between manufacturer and dealer limited dealer's damages to out-of-pocket expenses that could not be mitigated. Rules App.Proc., Rule 38.1(f).

Cases that cite this headnote

**[7] Appeal and Error** 🔑 Nature of remedy by dismissal

30 Appeal and Error
30XIII Dismissal, Withdrawal, or Abandonment
30k775 Nature of remedy by dismissal

Appellate courts should reach the merits of an appeal whenever reasonably possible.

Cases that cite this headnote

**[8] Damages** 🔑 Direct or indirect consequences

115 Damages
115III Grounds and Subjects of Compensatory Damages
115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)1 In General
115k16 Direct or indirect consequences

At common law, the term "actual damages" encompasses both direct and consequential damages.

1 Cases that cite this headnote

**[9] Damages** 🔑 Direct or indirect consequences

115 Damages
115III Grounds and Subjects of Compensatory Damages
115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)1 In General
115k16 Direct or indirect consequences

"Direct damages," also known as general damages, are those inherent in the nature of a breach of obligation between the parties, and they compensate a plaintiff for a loss that is conclusively presumed to have been foreseen by the defendant as a usual and necessary consequence of the defendant's act.

1 Cases that cite this headnote

**[10]  Damages**  Mode of estimating damages in general

115  Damages
115VI  Measure of Damages
115VI(C)  Breach of Contract
115k117  Mode of estimating damages in general

One measure of direct damages in a contract claim is the "benefit of the bargain" measure, which utilizes an expectancy theory and evaluates the difference between the value as represented and the value received.

2 Cases that cite this headnote

**[11]  Damages**  General and special damage

**Damages**  Proximate or Remote Consequences

115  Damages
115I  Nature and Grounds in General
115k5  General and special damage
115  Damages
115III  Grounds and Subjects of Compensatory Damages
115III(A)  Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)1  In General
115k17  Proximate or Remote Consequences
115k18  In general

"Consequential damages," also referred to as special damages, are those said to result naturally but not necessarily from the wrongful act because they require the existence of some other fact beyond the relationship of the parties.

1 Cases that cite this headnote

**[12]  Damages**  Natural and Probable Consequences of Breaches of Contract

**Damages**  Under circumstances within contemplation of parties

115  Damages
115III  Grounds and Subjects of Compensatory Damages
115III(A)  Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)1  In General
115k21  Natural and Probable Consequences of Breaches of Contract
115k22  In general

115 Damages

115III Grounds and Subjects of Compensatory Damages

115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses

115III(A)1 In General

115k21 Natural and Probable Consequences of Breaches of Contract

115k23 Under circumstances within contemplation of parties

Damages that might be considered consequential in one contract may be direct damages in another; the distinction between direct and consequential damages under the common law is not absolute.

1 Cases that cite this headnote

**[13] Damages** Breach of contract

115 Damages

115III Grounds and Subjects of Compensatory Damages

115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses

115III(A)1 In General

115k35 Pecuniary Losses

115k40 Loss of Profits

115k40(2) Breach of contract

Lost profits may be either direct or consequential damages, depending on their nature, in a breach of contract case.

Cases that cite this headnote

**[14] Damages** Breach of contract

115 Damages

115III Grounds and Subjects of Compensatory Damages

115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses

115III(A)1 In General

115k35 Pecuniary Losses

115k40 Loss of Profits

115k40(2) Breach of contract

Profits lost on other contracts or relationships resulting from a breach of contract are generally classified as indirect or consequential damages; however, lost profits that represent the benefit-of-the-bargain measure of damages required to restore the plaintiff to the economic position he would have enjoyed if the contract had been performed are direct damages when shown to be conclusively presumed to have been foreseen by the parties as a usual and necessary consequence of a breach.

2 Cases that cite this headnote

**[15] Damages** Effect of provisions of contract

115 Damages

115VI   Measure of Damages
115VI(C)   Breach of Contract
115k118   Effect of provisions of contract

Settlement agreement and sales agreement executed between automobile manufacturer and dealer were required to be construed together in determining damages for manufacturer's breach of sales agreement; agreements were attached, settlement agreement contained numerous references to sales agreement, limitation-of-damages provision in settlement agreement stated that it applied to any claims for damages by virtue of breach of settlement agreement or sales agreement, and settlement agreement provided that, to the extent it conflicted with any other agreement, settlement agreement prevailed.

Cases that cite this headnote

**[16]   Damages** 👈 Loss of Profits

115   Damages
115III   Grounds and Subjects of Compensatory Damages
115III(A)   Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)1   In General
115k35   Pecuniary Losses
115k40   Loss of Profits
115k40(1)   In general

There is no bright-line rule that lost profits always constitute consequential damages under the common law.

Cases that cite this headnote

**[17]   Damages** 👈 Effect of provisions of contract

115   Damages
115VI   Measure of Damages
115VI(C)   Breach of Contract
115k118   Effect of provisions of contract

Provisions of settlement agreement and sales agreement executed between automobile manufacturer and franchised automobile dealer were ambiguous in regard to damages available for breach of sales agreement, and therefore court could consider intent of parties in interpreting damages provisions, where sales agreement limited manufacturer's damages liability to out-of-pocket expenses, but settlement agreement provided that it prevailed to extent of any conflict with sales agreement and stated that parties were liable for any actual damages.

Cases that cite this headnote

**[18]   Damages** 👈 Breach of contract in general

115 Damages
115IX Evidence
115k183 Weight and Sufficiency
115k189 Breach of contract in general

Evidence was legally sufficient to support finding that automobile manufacturer and dealer intended to retain the right to actual damages for breach of sales agreement executed between parties, which contained ambiguous limitation of damages provisions, even though there was no specific testimony of parties' subject intent regarding limitation of damages provisions, where there was evidence that, due to circumstances surrounding manufacturer's planning, negotiation, and implementation of dealership project, parties intended to allocate risk of delay in project to manufacturer by having manufacturer retain liability for any actual damages incurred by dealer.

Cases that cite this headnote

**[19] Evidence ☞ Damages**

157 Evidence
157XII Opinion Evidence
157XII(D) Examination of Experts
157k555 Basis of Opinion
157k555.9 Damages

General test for reliability of expert opinions, rather than test for reliability of scientific opinions, was applicable to determine admissibility of expert evidence on lost profits damages in franchised automobile dealer's breach of contract action against automobile manufacturer.

Cases that cite this headnote

**[20] Damages ☞ Loss of profits and expenses incurred**

115 Damages
115VI Measure of Damages
115VI(C) Breach of Contract
115k124 Prevention or Obstruction of Performance
115k124(3) Loss of profits and expenses incurred

"Yardstick" method, in which comparable established business is used as comparison, was appropriate method for determining automobile dealer's lost profits damages in dealer's breach of contract action against automobile manufacturer; method had previously been accepted for calculating lost profits, and business compared to was also owned and operated by dealer.

Cases that cite this headnote

**[21] Damages** 🔑 Loss of profits and expenses incurred

115   Damages
115VI   Measure of Damages
115VI(C)   Breach of Contract
115k124   Prevention or Obstruction of Performance
115k124(3)   Loss of profits and expenses incurred

There is no one proper method for determining lost profits as damages.

Cases that cite this headnote

**[22] Damages** 🔑 Loss of profits

115   Damages
115IX   Evidence
115k183   Weight and Sufficiency
115k190   Loss of profits

The amount of loss must be proven, in a claim for lost profits damages, by competent evidence with reasonable certainty by whatever method is chosen, but the rule regarding such proof is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise.

Cases that cite this headnote

**[23] Damages** 🔑 Loss of profits

115   Damages
115IX   Evidence
115k183   Weight and Sufficiency
115k190   Loss of profits

What constitutes reasonably certain evidence of lost profits is a fact intensive determination; at a minimum, opinions or estimates of lost profits must be based upon objective facts, figures, or data from which the amount of lost profits may be ascertained.

Cases that cite this headnote

**[24] Damages** 🔑 Loss of Profits

115   Damages
115III   Grounds and Subjects of Compensatory Damages
115III(A)   Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)1   In General
115k35   Pecuniary Losses
115k40   Loss of Profits
115k40(1)   In general

Where estimates of lost profits are based on objective facts or data and there are firm reasons to expect a business to yield a profit, recovery of lost profits damages is not

prohibited simply because the enterprise is new; it is the activity that is the enterprise, and if the activity is well-established, the fact that a newly formed entity is engaging in the activity will not preclude recovery.

Cases that cite this headnote

**[25] Evidence** ⊶ Damages

157 Evidence
157XII Opinion Evidence
157XII(D) Examination of Experts
157k555 Basis of Opinion
157k555.9 Damages

Automobile dealer's experts' reliance on automobile manufacturer's planning potential did not render experts' opinions unreliable, in calculation of dealer's lost profits damages for delay in opening new dealership, in breach of contract action against manufacturer; manufacturer's own dealer placement manager testified that planning potential was common methodology prepared and used by automobile manufacturers and that in type of market at issue, it was the best number available to capitalize and plan a dealership.

Cases that cite this headnote

**[26] Evidence** ⊶ Damages

157 Evidence
157XII Opinion Evidence
157XII(D) Examination of Experts
157k555 Basis of Opinion
157k555.9 Damages

Automobile dealer's experts' reliance on analysis of another dealership owned by dealer did not render experts' opinions unreliable as to calculation of dealer's lost profits damages for delay in opening new dealership, in breach of contract action against manufacturer; manufacturer's own dealer placemen manager testified that management by dealer-principal was most important factor in profitability of a dealership, and experts testified that they chose a dealership owned and managed by dealer for comparison because using a dealership owned by someone else would have injected too many uncertainties into comparison.

Cases that cite this headnote

**[27] Appeal and Error** ⊶ By other evidence in general

30 Appeal and Error
30XVI Review
30XVI(J) Harmless Error

30XVI(J)10   Admission of Evidence
30k1051   Facts Otherwise Established
30k1051(1)   By other evidence in general

Any error in admission of expert testimony calculating automobile dealer's lost profit damages based on period of time during which new dealership was delayed in opening, rather than on subsequent years of new dealership's actual operation, was harmless error, in dealer's breach of contract action against manufacturer arising out of delay in opening of new dealership; trial court's finding as to damages was also supported by evidence relating to amounts for rental and salary.

Cases that cite this headnote

**[28]   Interest** ☞ Contract and sales matters

**Interest** ☞ Demand for Payment of Principal

219   Interest
219III   Time and Computation
219k39   Time from Which Interest Runs in General
219k39(2.5)   Prejudgment Interest in General
219k39(2.30)   Contract and sales matters
219   Interest
219III   Time and Computation
219k46   Demand for Payment of Principal
219k46(1)   In general

Prejudgment interest on automobile dealer's breach of contract damages against automobile manufacturer accrued from date of demand letter for damages expressly referencing and demanding damages for breach of contract at issue, rather than from date of letter referencing unrelated claim arising from different alleged contract, where claims were separate, involved two different contracts entered into, if at all, at different times, and related to different occurrences and actions.

1 Cases that cite this headnote

**[29]   Interest** ☞ Demand for Payment of Principal

**Interest** ☞ Commencement of Action

219   Interest
219III   Time and Computation
219k46   Demand for Payment of Principal
219k46(1)   In general
219   Interest
219III   Time and Computation
219k47   Commencement of Action
219k47(1)   In general

For a breach-of-contract claim, prejudgment interest begins to accrue on the earlier of: (1) 180 days after the date a defendant receives written notice of a claim, or (2) the date suit is filed.

1 Cases that cite this headnote

**[30]    Interest** ⚷ Form and sufficiency of demand

219   Interest
219III   Time and Computation
219k46   Demand for Payment of Principal
219k46(2)   Form and sufficiency of demand

A claim need not demand an exact amount or list every element of damage in order to trigger accrual of prejudgment interest.

Cases that cite this headnote

**[31]    Appeal and Error** ⚷ Cases Triable in Appellate Court

**Appeal and Error** ⚷ Costs and Allowances

30   Appeal and Error
30XVI   Review
30XVI(F)   Trial De Novo
30k892   Trial De Novo
30k893   Cases Triable in Appellate Court
30k893(1)   In general
30   Appeal and Error
30XVI   Review
30XVI(H)   Discretion of Lower Court
30k984   Costs and Allowances
30k984(1)   In general

The abuse of discretion standard applies to the trial court's factual findings as they relate to prejudgment interest on a damages award, but the de novo standard applies to the trial court's application of the law to the facts.

1 Cases that cite this headnote

**[32]    Costs** ⚷ Discretion of court

102   Costs
102VIII   Attorney Fees
102k194.12   Discretion of court

If all elements are established under statute providing for attorney's fees where a party presented claim to opposing party and opposing party did not tender amount owed within 30 days, and there is proof of reasonableness of fees, an award of fees is mandatory. V.T.C.A., Civil Practice & Remedies Code § 38.001.

3 Cases that cite this headnote


**[33] Appeal and Error** 🗝 Fees

> 30 Appeal and Error
> 30V Presentation and Reservation in Lower Court of Grounds of Review
> 30V(B) Objections and Motions, and Rulings Thereon
> 30k226 Costs
> 30k226(2) Fees

Automobile manufacturer waived choice-of-law complaint as to statutory attorney's fees sought by automobile dealer in dealer's breach of contract action against manufacturer, where manufacturer failed to raise matter before trial and failed to object to admission of attorney's fees evidence at trial. V.T.C.A., Civil Practice & Remedies Code § 38.001.

2 Cases that cite this headnote


**[34] Costs** 🗝 Contracts

> 102 Costs
> 102VIII Attorney Fees
> 102k194.24 Particular Actions or Proceedings
> 102k194.32 Contracts

Provision of contract executed between automobile manufacturer and automobile dealer, providing that non-breaching party's sole remedy in a breach of contract claim would be out-of-pocket expenses that could not be mitigated, did not preclude dealer's recovery of statutory attorney fees in breach of contract claim against manufacturer; attorney fees were more in the nature of costs than damages. V.T.C.A., Civil Practice & Remedies Code § 38.001.

1 Cases that cite this headnote


**[35] Appeal and Error** 🗝 Ordering New Trial, and Directing Further Proceedings in Lower Court

> 30 Appeal and Error
> 30XVII Determination and Disposition of Cause
> 30XVII(D) Reversal
> 30k1178 Ordering New Trial, and Directing Further Proceedings in Lower Court
> 30k1178(1) In general

Appropriate remedy for any failure by automobile dealer to segregate his attorney's fees, between those incurred prosecuting claims for which fees were recoverable under statute and those incurred prosecuting claims for which fees were not recoverable, was remand for dealer to offer evidence of segregated amounts. V.T.C.A., Civil Practice & Remedies Code § 38.001.

Cases that cite this headnote

**[36] Costs** ☛ Attorney fees on appeal or error

102 Costs
102X On Appeal or Error
102k252 Attorney fees on appeal or error

If an award of trial attorney's fees is mandatory under statute providing for attorney's fees where a party presented claim to opposing party and opposing party did not tender amount owed within 30 days, an award of appellate attorney's fees is also mandatory. V.T.C.A., Civil Practice & Remedies Code § 38.001.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*165** Richard H. Gateley, Brackett & Ellis, P.C., Fort Worth, TX, for Appellant.

George C. Haratsis, Brittani W. Rollen, McDonald Sanders, P.C., Fort Worth, TX, for Appellee.

PANEL: GARDNER and WALKER, JJ.; and DIXON W. HOLMAN (Senior Justice, Retired, Sitting by Assignment).

## OPINION

ANNE GARDNER, Justice.

## I. INTRODUCTION

Following a bench trial in this breach of contract case, the trial court rendered judgment for damages against Appellant and Cross–Appellee DaimlerChrysler Motors Company, LLC (Chrysler) and in favor of Appellees and Cross–Appellants Tommy J. Manuel, Tommy Manuel Auto Leasing, Inc., and Manuel Auto Sales, Ltd. (collectively, Manuel) but denied recovery of Manuel's attorney's fees. [1] In four issues, Chrysler contends (1) that the best efforts provision in its contract with Manuel is unenforceable or that Chrysler conclusively proved that it complied with the best efforts provision by ultimately settling a protest by a competing dealer of Manuel's application for a new dealership, (2) that Manuel's damages from delay in opening the new

dealership are consequential damages barred by limitation-of-damages provisions in the parties' contracts, (3) that the trial court abused its discretion by admitting unreliable expert testimony regarding damages for lost profits, and (4) that the trial court erred in calculating prejudgment interest. In his cross-appeal, Manuel contends that the trial court erred by failing to award him any trial and appellate **\*166** attorney's fees. We affirm in part and reverse and remand in part.

## II. BACKGROUND [2]

**[1]** Chrysler manufactures Chrysler, Dodge, Dodge Truck, and Jeep motor vehicles. Tommy Manuel has been a franchised automobile dealer in the Dallas–Fort Worth area for forty-seven years, including twenty-five years as a franchised Chrysler and Dodge dealer in Fort Worth and Richardson. At the time of trial, Tommy Manuel owned or controlled at least nine motor vehicle dealerships in the Dallas–Fort Worth market.

### A. Historical Backdrop

In the mid–1990s, as number three of the "Big Three" in that day, Chrysler developed a market realignment plan called "Project 2000" to reorganize, relocate, and establish more motor vehicle dealerships to improve sales in the Dallas–Fort Worth area and to better compete with its rivals, Ford and General Motors. As an essential part of Project 2000, Chrysler sought to have its various Dallas–Fort Worth franchised dealers agree to waive their rights to protest the establishment or relocation of other dealerships in the Dallas–Fort Worth area.

Texas and other states closely regulate the distribution and sale of automobiles. In response to the superiority of economic power and bargaining strength of American automobile manufacturers in their relationships with dealers that had developed by the 1950s, with dealers completely dependent upon those manufacturers for their supply of automobiles, Congress [3] and state legislatures enacted regulatory schemes to protect retail dealers from perceived abusive and oppressive acts by the manufacturers. [4] In accord with the policy of protecting dealers and consumers, the United States Supreme Court upheld the constitutionality of a California statute that prohibited manufacturers from relocating or adding new dealerships to their market areas where the effect of such added competition would be injurious to existing franchisees and to the public interest. [5] The Court held that a state may, consistent with due process, provide that the filing of a protest by an existing dealer can, without a prior hearing, prevent another dealer from relocating or establishing a new dealership in the existing dealer's defined market area until after a hearing and resolution of the protest. [6]

The Texas Motor Vehicle Commission Code (TMVC), this State's first regulation **\*167** of the motor vehicle manufacturer-dealer relationship, was adopted in 1971.[7] The policy of the TMVC, set forth in what is now section 2301.001 of the occupations code, is to ensure a sound system of distribution and sale of motor vehicles for the protection of the public interest and welfare of the citizens of Texas through exercise of this State's police power.[8]

The TMVC, as do similar state statutory schemes like California's, provides a procedure by which an existing dealer may protest the establishment or relocation of a dealership that will sell the same line or make of vehicles in the same county or within fifteen miles of the existing dealership.[9] The filing of a notice of protest triggers an administrative proceeding requiring a hearing before the Commission, in which the applicant for the new dealership has the burden to establish "good cause" for establishing or relocating the dealership at the proposed location.[10] In the meantime, filing of the notice effects an immediate statutory stay as to any action by the applicant to establish or relocate the proposed new dealership or relocation until the protest is resolved.[11] Among its findings of fact, the trial court found that a hearing and final resolution of the protest could take years. Complicating matters in this case, the TMVC provides that any agreement waiving terms of the TMVC is void and unenforceable.[12]

## B. Project 2000

By mid-July of 1999, after several years of efforts to obtain agreements for the realignment of the Dallas–Fort Worth market from its various dealers in the area, Chrysler had circulated and obtained settlement agreements, including waivers of the right to protest, from each of the Dallas–Fort Worth area dealers participating in Project 2000, with the exception of Manuel. Manuel was aware of Chrysler's plan but was not originally a Project 2000 participant for several reasons. Chrysler had litigation pending against one of Manuel's dealerships (and other dealerships in Texas and California) for allegedly seeking fraudulent warranty credits from Chrysler for engine cores (the *Cores* litigation), and Manuel had a protest against Chrysler pending before the Commission arising out of the *Cores* litigation. Additionally, Manuel had bought and operated for twenty-five years a successful dealership in Richardson with a "trip," that is, three lines—Chrysler, Dodge car, and Dodge truck. Chrysler had been trying to buy the Chrysler line from Manuel for many years, and he had refused to sell it. Chrysler desired the Chrysler line to keep Manuel from protesting other dealers in that market area as well as to give that "point" to another dealer to complete the Project 2000 market realignment. Chrysler approached Manuel last regarding Project 2000 because it knew that Manuel would **\*168** be the most expensive to deal with. Joe Park, Chrysler's Dallas zone manager at the time, recalled at trial, "We had to get him out of the way."

In mid-August 1999, during a meeting of Dodge truck dealers in San Antonio, Chrysler representatives from Detroit and the Dallas zone office met with Manuel about joining Project

2000, and the parties proceeded to negotiate. Chrysler offered Manuel $5 million for his Chrysler line at the Richardson dealership, and Manuel bargained for $15 million and another dealership to replace it. The parties discussed possible locations for an additional dealership, and Park told Manuel that the other dealers had signed waivers of the right to protest relocations or additional dealerships in joining Project 2000. By the end of August 1999, the two parties had arrived at a comprehensive agreement.

### C. The Agreements
Manuel signed two written agreements dated August 31, 1999, after reviewing them with his attorney (who had represented him in the *Cores* litigation). One was a settlement and release agreement (the Settlement Agreement) similar to those entered into with the other dealers participating in Project 2000. Pursuant to the Settlement Agreement, Chrysler paid Manuel $15.34 million to settle the *Cores* litigation, to relinquish the Chrysler line at his Richardson dealership, and to waive any right to protest the other dealers involved in Project 2000. The second agreement, attached to and referenced in the Settlement Agreement, was titled "Agreement to Enter into Sales and Service Agreement" (the AESSA). By the AESSA, Chrysler agreed to enter into a franchise agreement with Manuel for a new Chrysler–Jeep dealership in South Arlington (the South Arlington dealership), conditioned upon Manuel providing the land, building the facility, and furnishing the capital investment for the new dealership by January 1, 2001.

The Settlement Agreement stated that the South Arlington dealership was "subject to the possibility that it may be protested" by another dealer and that a protest "can significantly delay the establishment or relocation of the dealership subject to the protest." The AESSA in turn provided that, in the event of a protest against the South Arlington dealership, Chrysler would "use its best efforts to litigate or settle the protest or lawsuit in order to allow the establishment of [the South Arlington] dealership."

Pursuant to the terms of the Settlement Agreement, Manuel ceased selling Chrysler vehicles at his Richardson dealership within thirty days after the agreements were signed in August 1999. As required by the AESSA, Manuel created a new corporation (Tommy Manuel Chrysler–Jeep, Inc.) and filed his application with the Commission for the new dealership in South Arlington in December, which was approved on January 14, 2000. Manuel purchased property for the South Arlington dealership in April 2000.

### D. Meador's Protest
On January 28, 2000, Meador Chrysler–Plymouth, Inc. (Meador), one of the other dealerships that was part of Project 2000 and whose dealer-principal had signed a protest waiver, filed a notice of protest against the creation of the South Arlington dealership, which would be located less than fifteen miles from Meador's existing dealership. The filing of Meador's protest was unexpected

by both Manuel and Chrysler, and it triggered the statutory stay of Manuel's attempts to open the South Arlington dealership.

Chrysler's zone manager and other representatives met with Mr. Meador and his **\*169** business associate on a number of occasions, requesting that Meador withdraw its protest. Chrysler moved to have the protest dismissed by the Commission, acting as Meador's attorney-in-fact as provided by Meador's settlement agreement. Failing that effort, on March 31, 2000, Chrysler filed suit in federal district court in the Western District of Texas, obtained a stay of the administrative proceeding, and sought injunctive relief and to compel arbitration of the issues raised by Meador's protest. The federal court initially stayed the state administrative proceeding but, after a hearing, denied all relief on June 7, 2000, abated the suit in its own court, and returned the protest to the Commission for resolution. Chrysler then sought and obtained permission to file an interlocutory appeal of the adverse ruling and intervened in the administrative proceeding before the Commission. In July 2000, Chrysler filed its appeal to the Fifth Circuit Court of Appeals from the federal district court's adverse decision. Also in July of 2000, pursuant to a strategy agreed upon at a meeting between Manuel and Chrysler and their respective attorneys, Manuel filed a separate suit in state court against Meador for damages resulting from the delay of the establishment of his new dealership caused by Meador's protest.

In September 2000, some eight months after the protest had been filed, Chrysler had intensive settlement negotiations with Meador. Chrysler ultimately settled the Meador protest in October 2000 by giving Meador a letter of intent for an additional dealership and paying Meador $17,000 in attorney's fees. In November 2000, Chrysler advised Manuel to proceed with building his facility for the new dealership in South Arlington, and the Meador protest was formally dismissed on December 21, 2000.

### E. This Suit

It was undisputed that the years 2000 and 2001 were exceptionally good years for car sales in the Dallas–Fort Worth market, but Manuel was not able to complete and open the South Arlington dealership until February 2002. A significant downturn in sales and a steep decline of the American market share of automobiles began in 2002. They were continuing at the time of trial, and the new dealership sustained a loss for 2002 and subsequent years.

In 2004, Manuel sued Chrysler for breach of contract and other causes of action, seeking damages caused by the delay in opening the South Arlington dealership as the result of Chrysler's failure to resolve Meador's protest, the costs Manuel incurred in litigating Meador's protest before the state agency and in state court, and attorney's fees. Manuel contended that Chrysler failed to use its best efforts as required by the AESSA to litigate or settle the Meador protest, thereby causing the delay in the opening of the South Arlington dealership.

The trial court granted summary judgments to Chrysler on most of Manuel's causes of action, including breach of contract, but on the morning of trial on damages, the trial judge announced during opening statements that he would hear evidence regarding breach of the best efforts clause by Chrysler. The parties tried the case to the bench over a sporadic period of about six weeks regarding that issue and damages. Among its findings of fact, the trial court found that Chrysler failed to use its best efforts to resolve the Meador protest and that Chrysler "breached the contract." [13] The trial court rendered **\*170** a final judgment awarding Manuel $370,668.50 in damages plus prejudgment interest but denied Manuel recovery of attorney's fees. Both parties appealed. Chrysler seeks reversal of the trial court's judgment and rendition of a take-nothing judgment, and Manuel seeks remand for a new trial on the issue of attorney's fees.

### III. BEST EFFORTS

By its first issue, Chrysler argues that the AESSA's best efforts clause is unenforceable because it lacks measurable goals and guidelines and that even if the best efforts clause is enforceable, the goal of the agreement was the opening of the South Arlington dealership, meaning best efforts are irrelevant because that goal was ultimately met. Chrysler alternatively contends that the evidence conclusively established that Chrysler used its best efforts to resolve the Meador protest. [14]

### A. Enforceability of "Best Efforts" Clause

#### 1. Standard of Review

When a contract is unambiguous, interpretation of the written instrument is a question of law for the court. *MCI Telecomm. Corp. v. Tex. Util. Elec. Co.,* 995 S.W.2d 647, 650–51 (Tex.1999) (citing *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983)); *see Heil Co. v. Polar Corp.,* 191 S.W.3d 805, 809–10 (Tex.App.-Fort Worth 2006, pet. denied) ("The interpretation of an unambiguous contract is a question of law, which we review de novo."). More specifically, the enforceability of a contract is a legal issue that we review de novo. *See Elijah Ragira/VIP Lodging Grp., Inc. v. VIP Lodging Grp., Inc.,* 301 S.W.3d 747, 754 (Tex.App.-El Paso 2009, pet. denied); *Chavez v. McNeely,* 287 S.W.3d 840, 843–44 (Tex.App.-Houston [1st Dist.] 2009, no pet.).

#### 2. Goals and guidelines

 [2]  Chrysler first argues that "best efforts" is a vague standard that is rarely held enforceable. But Chrysler's own general counsel and legal department drafted the settlement agreements and AESSAs used to implement Project 2000. Moreover, and to the contrary, courts enforce contractual best efforts clauses in a wide variety of circumstances. *See* E. Farnsworth, *Farnsworth on Contracts* § 7.17c (2d ed. 2001) (stating it is no longer the case that "a duty defined only in

terms of best efforts" is too indefinite to be enforceable) (citations omitted); Kenneth A. Adams, *Understanding "Best Efforts" and Its Variants (Including Drafting Recommendations),* 50 No. 4 Practical Lawyer, Aug. 2004, at 17 (noting courts in most jurisdictions have held best efforts clauses enforceable). "Whatever the test of best efforts, there is no question but that courts today regard the standard of best efforts—like that of good faith—as a workable standard in a variety of circumstances." E. Farnsworth, *On Trying to Keep One's Promises: The Duty of Best* **\*171** *Efforts in Contract Law,* 46 U. Pitt. L.Rev. 1, 12 (1984).

Courts construing a best efforts provision that does not specify the performance to be required commonly hold the promisor to the standard of the diligence a reasonable person would use under the circumstances. *See, e.g., CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.,* 809 S.W.2d 577, 578 (Tex.App.-Dallas 1991, writ denied) (op. on reh'g) (comparing performance of best efforts with that of average prudent operator in light of circumstances of case); *see also Bloor v. Falstaff Brewing Corp.,* 601 F.2d 609, 614–15 (2d Cir.1979) (holding licensor could not treat licensees brands less favorably than its own); *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.,* 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142, 144 (1972) (holding publisher who promised best efforts to promote author's book not restricted from also promoting competing series); *Farnsworth,* 46 U. Pitt. L.Rev. at 7–8 ("Best efforts is a standard that has diligence as its essence ....").

Chrysler, quoting from the Dallas court of appeals opinion in *CKB,* specifically complains that the best efforts clause in this case lacks measurable goals and guidelines. 809 S.W.2d at 580. In that case, CKB had agreed to use its best efforts to refine crude oil into specific volumes of refined products, as set out in the agreement in a schedule specifying percentages of total refinery output for each product. *Id.* at 578. Instead of refining the crude oil to produce the quantities specified in the contract, CKB operated the refinery to produce the highest dollar yield on the crude. *Id.* at 579, 582. Moore McCormack sued CKB for breach of contract, and the trial court rendered summary judgment in Moore McCormacks favor. *Id.* at 580. CKB appealed. *Id.*

As Chrysler points out, the *CKB* court described the provision for "best efforts" in a contract as a nebulous standard.... Under some circumstances, a party could use best efforts to achieve a contractual goal and fall well short. Under different circumstances, an effort well short of ones best may suffice to hit a target. *See id.* at 581. Thus, that court reasoned, "To be enforceable, a best efforts contract must set some kind of goal or guideline against which best efforts may be measured." *Id.* at 581–82 (citing *Pinnacle Books, Inc. v. Harlequin Enters.,* 519 F.Supp. 118, 121 (S.D.N.Y.1981)). The court concluded that when sufficient guidelines exist, a party that performs within the guidelines fulfills the contract regardless of the quality of its efforts. *Id.* at 582. Only when a party misses the guidelines would a court measure the quality of its efforts "by the circumstances of the case ... and by comparing the party's performance with that of an average, prudent, comparable operator." *Id.* (citing *Bloor,* 601 F.2d at 613–14; *Pinnacle,* 519 F.Supp.

at 122; *Arnold Prods., Inc. v. Favorite Films Corp.,* 176 F.Supp. 862, 866 (S.D.N.Y.1959)). Ultimately, the court affirmed the summary judgment against CKB because it concluded that CKB made *no efforts* to meet the production standards specified in the contract, stating: "As a matter of law, no efforts cannot be best efforts." *Id.* (citing *Bloor,* 601 F.2d at 613–14). [15] Thus, the *CKB* **\*172** court did not further explore the "goal or guideline" standard.

Chrysler argues that the best efforts clause in the AESSA is unenforceable because it fails to set forth a measurable goal or guideline in that no date was specified by which Chrysler was required to litigate or settle the Meador protest. Manuel responds that, reading the contract as a whole, the AESSA required Chrysler to settle or litigate the Meador protest in a manner that allowed Manuel to open the South Arlington dealership on or before January 1, 2001. Manuel references language in the AESSA stating that he was required to build and complete the facilities for the South Arlington dealership before January 1, 2001, that the establishment of the South Arlington dealership was of "major importance" to Chrysler, and that "time is of the essence."

In *Herrmann Holdings, Ltd. v. Lucent Technologies, Inc.,* the contract required Lucent to use its "reasonable best efforts" to file registration paperwork with the Securities and Exchange Commission (SEC) "as promptly as practicable" or "in the most expeditious manner practicable." 302 F.3d 552, 556 (5th Cir.2002). Rejecting the very argument by Lucent that Chrysler makes here, the Fifth Circuit Court of Appeals held that Herrmann Holdings's pleadings stated a claim for breach of contract, significantly stating that "[r]equiring contracting parties *to fix a date certain* in order to set a temporal guideline in which to complete a certain task demands more definiteness than Texas law requires." *Id.* at 560 (emphasis added).

Here, the best efforts provision states: "[Chrysler] will use its best efforts to litigate or settle the protest or lawsuit in order to allow the establishment of [the South Arlington] dealership." The best efforts provision does not include language similar to the "as promptly as practicable" or "in the most expeditious manner practicable" language in *Herrmann Holdings,* but the AESSA does specifically and expressly contemplate establishing the South Arlington dealership by January 1, 2001. [16] Even absent such language, we cannot interpret the best efforts provision as placing no deadline at all for Chrysler to litigate or settle the Meador protest because doing so reads the January 1, 2001 deadline out of the AESSA and renders the best efforts clause itself meaningless. *See id.* Rather, the goal or objective of the best efforts provision in the AESSA, in light of the agreement as a whole, was for Chrysler to use its best efforts to litigate or settle the Meador protest in such a period of time that Manuel could establish the South Arlington dealership by January 1, 2001.

Moreover, other courts have held enforceable "best efforts" requirements in contracts that contained none of the defining language in *Herrmann Holdings. See, e.g., First Union Nat'l Bank v. Steele Software Sys. Corp.,* 154 Md.App. 97, 838 A.2d 404, 428–29, 433, 448 (2003) (holding

"best efforts" is a standard in and of itself and is therefore enforceable, noting that even where "best efforts" is not defined it is "a standard that has diligence as its essence" **\*173** and a term that "takes its meaning from the circumstances"); *see also Coady Corp. v. Toyota Motor Dist., Inc., 361 F.3d 50, 59 (1st Cir.2004)* (" 'Best efforts' is implicitly qualified by a reasonableness test—it cannot mean everything possible under the sun.") (citing *Macksey v. Egan,* 36 Mass.App.Ct. 463, 633 N.E.2d 408, 413 & n. 16 (1994)); *Baron Fin. Corp. v. Natanzon,* 509 F.Supp.2d 501, 513–14 (D.Md.2007) (applying Maryland law and holding best efforts clause enforceable and defined in terms of reasonableness highly dependent upon surrounding circumstances); Mark P. Gergen, *The Use of Open Terms in Contract,* 92 Columbia L.Rev. 997, 1000 (1992) ("Best efforts clauses and other terms that require a party to use reasonable diligence in performance are obviously like a negligence rule.").

 [3]   This is in accord with the well-established rule that, where a contract does not fix the time for performance (which is Chrysler's specific complaint about the AESSA), it will be presumed that the agreement is to be performed within a reasonable time. *Hewlett–Packard Co. v. Benchmark Elecs., Inc.,* 142 S.W.3d 554, 563 (Tex.App.-Houston [14th Dist.] 2004, pet. denied); *CherCo Props., Inc. v. Law, Snakard & Gambill, P.C.,* 985 S.W.2d 262, 266 (Tex.App.-Fort Worth 1999, no pet.). What is a reasonable time depends upon the facts and circumstances as they existed at the time the contract was formed. *CherCo Props., Inc.,* 985 S.W.2d at 266. Therefore, even if the January 1, 2001 date specified in the AESSA for opening the new dealership were not controlling (and it is undisputed that the protest was not resolved in time for Manuel to build his facility and open for more than a year after that date), we hold that the best efforts provision in the AESSA had a measurable timeline or goal of resolving any protest by settlement or litigation within a reasonable time and was thus enforceable. We overrule the first part of Chrysler's first issue.

## B. The Quality of Chrysler's Efforts

 [4]   Chrysler next argues that, even if the best efforts clause is enforceable, the AESSA's only goal was the opening of the South Arlington dealership and that because Chrysler's efforts eventually settled the protest, it met the goal because the South Arlington dealership eventually opened. Thus, Chrysler, citing *Herrmann Holdings,* 302 F.3d at 559, argues that the "analysis ends" and that whether Chrysler used its best efforts is irrelevant. But the Fifth Circuit's opinion in *Herrmann Holdings* is again instructive in rejecting this argument. In that case, Lucent eventually filed the registration paperwork with the SEC, and the SEC approved the transaction. *Id.* at 557. But by that time, the Herrmanns had been damaged by the decline in Lucent's stock price. *Id.* The Fifth Circuit held that the Herrmanns had stated a plausible claim for breach of the best efforts clause; in other words, that Lucent eventually filed the paperwork and that the SEC eventually approved the transaction did not negate as a matter of law the allegations of a breach by Lucent of the best efforts clause. *Id.* at 561.

The goal of the contract here—a goal Chrysler itself identified as having major importance—was not just opening the South Arlington dealership someday, but opening the dealership by January 1, 2001. Using the *CKB* analysis, we consider the "performance ... of an average, prudent, comparable operator" under the circumstances of the case to determine the quality of Chrysler's performance. *See* 809 S.W.2d at 582. We conclude that, even absent a date certain by which Chrysler was obligated to litigate or settle the protest, the fact that Chrysler eventually settled **\*174** the Meador protest so that the South Arlington dealership opened a year later than contemplated does not establish as a matter of law that Chrysler met the goal. We overrule this part of Chrysler's first issue.

## C. Legally Sufficient Evidence of Breach of Best Efforts Clause

 **[5]**   In the final part of its first issue, Chrysler argues that, even if it missed the goal of timely resolving the protest, the evidence nevertheless conclusively establishes that it used its best efforts. Manuel responds that, under the evidence, that issue was one of fact that was properly resolved against Chrysler by the trial court as fact finder.

## 1. Standard of Review

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998), *cert. denied,* 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex. L.Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas,* 228 S.W.3d 649, 651 (Tex.2007); *City of Keller v. Wilson,* 168 S.W.3d 802, 807, 827 (Tex.2005).

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex.1991). The trial court's findings of fact are reviewable for legal sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994).

Whether a contractual best efforts obligation has been met or fulfilled is usually a question of fact because it is heavily dependent upon the particular circumstances of the case. *See, e.g., Mor–Cor Packaging Prods., Inc. v. Innovative Packaging Corp.,* 328 F.3d 331, 334 (7th Cir.2003) (Posner, J.) (characterizing best efforts as a standard in and of itself and stating whether standard is met is question of fact involving "the application of a standard, 'best efforts,' to the particular facts of

the case"); *Informed Physician Servs., Inc. v. Blue Cross and Blue Shield of Md., Inc.,* 350 Md. 308, 711 A.2d 1330, 1342 (1998) (confirming that what constitutes reasonable efforts is largely a question of fact); *Widewaters Prop. Dev. Co. v. Katz,* 38 A.D.3d 1220, 836 N.Y.S.2d 746, 748 (N.Y.App.Div.2007) (noting that whether the obligation to use best efforts has been fulfilled will almost invariably involve an issue of fact); *First Union Nat'l Bank,* 838 A.2d at 428 (stating that factual determination may be required as to whether party used best efforts).

## 2. Analysis

Chrysler argues that the AESSA did not obligate it to pay any money to Meador and urges that its other efforts to resolve Meador's protest were reasonable and prudent in settling the protest within nine months. Chrysler points to evidence that its zone manager Joe Park (1) met with **\*175** Meador's co-owner and sales manager (because Mr. Meador was ill and unavailable) soon after Meador filed its protest and urged withdrawal of the protest; (2) remained in constant contact with them; (3) later talked to Mr. Meador, who would not overrule his co-owner's answer of "no"; and (4) finally reminded Meador's representatives that Meador's protest was a breach of Meador's own contractual agreement not to protest other relocations or new dealerships in Project 2000. But Park never offered money to Meador to withdraw its protest because he did not think he needed to since Meador had signed a contract. Park also testified that he did not think Meador wanted money and instead wanted to delay Manuel's dealership as long as possible. Chrysler thus continued on its litigation path, seeking to have the administrative protest dismissed, obtaining a stay of those proceedings, and filing suit in federal court against Meador for an injunction and to compel arbitration regarding the validity of the protest.

In *CKB,* the Dallas court of appeals stated that "[w]hen a party misses the guidelines, courts measure the quality of its efforts by the circumstances of the case and by comparing the party's performance with that of an average, prudent, comparable operator." 809 S.W.2d at 582 (citations omitted). While there is evidence of the circumstances surrounding Meador's protest, of Chrysler's efforts to have Meador withdraw that protest (which Chrysler refers to as evidence of efforts to settle), and of Chrysler's eventual settlement of the protest, the evidence is undisputed that Chrysler and Meador did not exchange settlement proposals until September 2000 and that they did not reach a settlement until October 4, 2000.

The trial court could have reasonably inferred that Chrysler wanted to "clear the market" for all of the dealerships participating in Project 2000 and that Chrysler's strategy was, in effect, to remove the protest waiver issue to federal court and seek arbitration to avoid a determination of that issue by the Commission under the Texas regulatory scheme (which is not to say that such a strategy was unreasonable per se). The federal district court denied injunctive relief and Chrysler's motion to compel arbitration on June 7, 2000, and issued an eleven-page order explaining the reasons, including that the validity of the protest waiver under the terms of the TMVC was more appropriately for the agency to decide and that Manuel was not a party and would not be bound

by an arbitration award or a decision from the federal court. *See DaimlerChrysler Motors Corp. v. Meador Chrysler–Plymouth, Inc.,* No. A–00–CA–216–SS, at \*10–11 (W. Dist. Tex. June 7, 2000). Hence the federal court abated the suit in its own court and returned the issue to the administrative agency for decision. *Id.* [17] At least by that point, as the trial court in this case noted during closing arguments, Chrysler must have had "some understanding" of the unlikelihood of success with its litigation efforts. Yet Chrysler still did nothing to settle for several more months. During that time, Chrysler pursued its interlocutory **\*176** appeal to the Fifth Circuit Court of Appeals and strategized with Manuel to coordinate his filing suit in state court against Meador, all of which only further delayed the resolution of the Meador protest. After settling with Meador in October 2000, Chrysler notified Manuel that he could proceed with building his facility in November 2000, and the protest was formally dismissed in December 2000. By that time, all of the other Project 2000 dealers in the area were selling cars. But Manuel was unable to begin building his new dealership facility by reason of the pending protest until after the settlement and, consequently, was not able to open for business until February 2002.

What would a prudent, comparable automobile manufacturer have done? As was acknowledged by the parties in the Settlement Agreement, Chrysler and Manuel both knew from the outset that a protest could entail significant delay, and Chrysler knew that a protest by any dealer participating in Project 2000 would present a significant obstacle to the accomplishment of its planned market realignment. The testimony was undisputed that Chrysler had planned all along to pay dealers for their agreement not to protest for that very reason and had budgeted $50 million toward preventing or resolving protests such as that filed by Meador in order to implement Project 2000 in the Dallas–Fort Worth area. Chrysler budgeted $11.2 million to pay another dealer for a protest waiver but ended up paying that dealer $1 million and giving him a new point (a new dealership), and Chrysler paid $1 million to another dealer who was not a Project 2000 participant in order to settle a threatened protest within a few days after that dealer approached Chrysler.

Although Chrysler offered evidence that Meador only wanted to delay Manuel's new dealership as long as possible, there was contradictory evidence that Meador might have been interested in a settlement and that it wanted a "point". Chrysler had two open points and a substantial remaining budget of around $30 million after payments to Manuel and other dealers but did not offer either money or a point to Meador until late September 2000, so there is no way to know what Meador would have accepted at an earlier date. And Chrysler's witnesses were unable to explain why Chrysler never offered any of its multi-million dollar budget to settle the Meador protest.

Chrysler argues that the AESSA did not obligate it to pay any money to Meador, that it had no contractual obligation to use the $50 million it had allocated to its budget to settle protests by dealers, and that it could simply have "ignored" settling with Meador until it had fully litigated its pending federal court and administrative proceedings. Chrysler reasons that Manuel's position (and the trial court's finding of failure to use best efforts) imposed "an additional burden" on

Chrysler of settlement. Chrysler argues that its choice to litigate rather than settle was solely within its discretion under the AESSA, that it was entitled to exercise its legal right to enforce Meador's agreement to waive the statutory right to protest, and that there was no prohibition in either the AESSA or the Settlement Agreement against Chrysler trying to hold Meador to its agreement. According to Chrysler, punishing it for choosing to pursue litigation rather than to settle would strip Chrysler of its right to access to the courts to enforce its rights.

By all of these arguments, Chrysler overlooks its agreement in the AESSA that contractually obligated it to use its best efforts not simply to litigate but "to litigate *or settle* the protest or lawsuit *in order to allow the establishment of the South Arlington dealership.*" [Emphasis **\*177** added]. The question is not *whether* Chrysler should have litigated, as we agree that was its right. Rather, the question is *when* did Chrysler's choice to litigate to the exclusion of making any efforts toward settlement become unreasonable. *See CKB,* 809 S.W.2d at 582 (stating that when a party fails to meet goal or guideline, court measures quality of its efforts by circumstances and comparison of performance of the prudent comparable operator); *see also Herrmann Holdings,* 302 F.3d at 559 (stating court may look to circumstances of case and compare party's performance in similar cases in determining whether party failed to exercise best efforts).

According to a letter from Manuel's counsel, Chrysler assured Manuel in mid-June 2000 that it was going to dismiss the federal appeal and attempt to settle with Meador while Manuel filed suit and litigated against Meador in state court. Although Manuel did file and litigate that suit, Chrysler still made no effort to settle with Meador until late September. As held by the court in *CKB,* "[N]o efforts cannot be best efforts." *See* 809 S.W.2d at 582.

Applying the appropriate standard of review, we hold that there is legally sufficient evidence to support the trial courts finding that Chrysler breached the best efforts provision in the AESSA. *See Cent. Ready Mix Concrete,* 228 S.W.3d at 651; *City of Keller,* 168 S.W.3d at 807, 827; *see also Martinez,* 977 S.W.2d at 334. We overrule the remainder of Chrysler's first issue.

## IV. LIMITATION OF DAMAGES

By its second issue, Chrysler contends that the trial court erred by awarding Manual damages of $370,668.50 based upon Manuel's claim for lost profits for the one-year period during which Manuel was not able to open the South Arlington dealership. Chrysler relies upon the AESSA's limitation-of-damages provision, which limits recoverable damages solely to "out-of-pocket expenses that cannot be mitigated," and argues that Manual is barred from recovering lost profits as damages by waiver of "incidental and consequential damages" in both the AESSA and the Settlement Agreement. [18] Chrysler complains that the trial court erred as a matter of law in disregarding these contractual limitations of damages. Alternatively, Chrysler contends that, if

the trial court concluded that the limitation of damages provisions were ambiguous, there is no evidence to support the trial court's finding of fact that the parties' intent was to allow recovery of "actual damages" under the Settlement Agreement.

## A. Preservation of Error

[6]   Manuel first asks us to summarily overrule Chrysler's second issue because Chrysler failed to negate every basis supporting the judgment. Specifically, Manuel argues that Chrysler only challenges "lost profits" but that the trial court could have rested its damage award on Manuel's individual claims for lost salary and rental income for which there is evidence and which Manuel asserts are independent grounds not challenged on appeal.

[7]   Rule of appellate procedure 38.1(f) provides that "[t]he statement of an issue or point will be treated as covering every subsidiary question that is fairly included." Tex.R.App. P. 38.1(f). In this regard, the Supreme Court of Texas has stated that **\*178** "disposing of appeals for harmless procedural defects is disfavored"; that appellate courts are to construe appellate briefs "reasonably, yet liberally, so that the right to appellate review is not lost by waiver"; and that "appellate courts should reach the merits of an appeal whenever reasonably possible." *Perry v. Cohen,* 272 S.W.3d 585, 587 (Tex.2008).

While Chrysler's second issue discusses the damages awarded in short-hand form as "lost profits," Chrysler's overarching contention is that the limitation-of-damages clause of the AESSA limits Manuel's damages to out-of-pocket expenses that cannot be mitigated.[19] None of Manuel's damage claims—whether for lost profits, lost owner's salary, or lost rental income—are for out-of-pocket expenses; each claim seeks recovery of benefit-of-the-bargain damages as if the contract had been performed. *See Bechtel Corp. v. CITGO Prods. Pipeline Co.,* 271 S.W.3d 898, 927 (Tex.App.-Austin 2008, no pet.)* (stating that expectation damages are designed to award the claimant "the benefit of his bargain by being put in as good a position as he would have been had the contract or promise been performed").

Whether Manuel may recover *any* damages (which would include lost profits, lost salary, and lost rentals) other than out-of-pocket expenses is fairly included within Chrysler's second issue; lost owner's salary and rental income are not independent, unchallenged grounds supporting the trial court's judgment. *See* Tex.R.App. P. 38.1(f); *Perry,* 272 S.W.3d at 586–87; *cf. Reliford v. BNSF Ry. Co.,* No. 02–09–00322–CV, 2011 WL 255795, at \*1 (Tex.App.-Fort Worth Jan. 27, 2011, no pet.)* (mem. op.) (holding appellant failed to challenge each independent ground supporting judgment because jury found statute of limitations barred claim and appellant only complained of charge error on his affirmative cause of action). Thus, we will address the merits of Chrysler's second issue.

## B. Applicable Law

Included within the resolution of Chrysler's second issue are legal determinations relating to the interpretation of contracts, the consideration of separate writings together, ambiguity, and the differences between direct and consequential damages for breach of contract.

## 1. Rules of Interpretation and Contract Construction

Interpretation of an unambiguous contract is a question of law for the court to decide de novo. *Coker,* 650 S.W.2d at 393. Our primary concern in construing a written contract is to ascertain the objective intent of the parties as expressed in the contract. *Id.; City of the Colony v. N. Tex. Mun. Water Dist.,* 272 S.W.3d 699, 722 (Tex.App.-Fort Worth 2008, pet. dismissed). We examine and consider the entire document in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.,* 207 S.W.3d 342, 345 (Tex.2006); *Coker,* 650 S.W.2d at 393; *City of the Colony,* 272 S.W.3d at 722.

We examine all parts of the agreement in light of the circumstances surrounding the formation of the contract. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 591 (Tex.1996). Instruments **\*179** pertaining to the same subject matter must be considered together to ascertain the intent of the parties. *In re Prudential Ins. Co.,* 148 S.W.3d 124, 135 (Tex.2004) (orig. proceeding); *see City of Keller,* 168 S.W.3d at 811 (even writings executed at different times must be considered together if they pertain to the same transaction); *DeWitt County Elec. Co-op., Inc. v. Parks,* 1 S.W.3d 96, 102 (Tex.1999). We view the contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served." *Frost Nat'l Bank v. L & F Distribs., Ltd.,* 165 S.W.3d 310, 312 (Tex.2005) (quoting *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex.1987)); *Clark v. Cotten Schmidt, L.L.P.,* 327 S.W.3d 765, 772 (Tex.App.-Fort Worth 2010, no pet.).

Whether a contract is ambiguous is a question of law for the court. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003). Lack of clarity does not create an ambiguity, and a contract is not ambiguous merely because the parties advance conflicting interpretations. *Id.; City of the Colony,* 272 S.W.3d at 722. We determine whether a contract is ambiguous by considering the contract as a whole in light of the circumstances present when the parties entered into it. *Universal Health Servs., Inc. v. Renaissance Women's Grp., P.A.,* 121 S.W.3d 742, 746 (Tex.2003). The trial court should ascertain the objective intent of the parties as expressed in the writing itself. *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981). A contract is ambiguous when its meaning remains uncertain or subject to more than one reasonable interpretation after it is subjected to applicable rules of interpretation. *Frost Nat'l Bank,* 165 S.W.3d at 312; *Coker,* 650 S.W.2d at 393–94. It is only after a determination by the trial court that the contract is in fact ambiguous that parol evidence becomes admissible, and then only to assist the fact finder in determining what the

subjective intent of the parties was at the time they entered into the contract. *See Sun Oil Co.,* 626 S.W.2d at 731; *see also Coker,* 650 S.W.2d at 395.

### 2. Law on Contract Damages

Because the agreements do not define the terms "actual damages" or "consequential damages," we presume that the parties intended their ordinary meanings. *Cherokee Cnty. Cogeneration Partners, L.P. v. Dynegy Mktg. & Trade,* 305 S.W.3d 309, 314 (Tex.App.-Houston [14th Dist.] 2009, no pet.). The trial court found, and neither party disagrees, that the AESSA did not involve the sale of goods or services. Therefore, we will apply common-law definitions rather than those set forth in Article 2 of the UCC. *See id.* (holding supply contract for purchase of natural gas to operate cogeneration facility not a contract for sale of goods and thus applying common law rather than UCC definition of consequential damages); *Wade & Sons, Inc. v. Am. Standard, Inc.,* 127 S.W.3d 814, 823 (Tex.App.-San Antonio 2003, pet. denied) (noting different definitions used for direct and consequential damages under Texas common law and as Texas courts have interpreted the UCC).

 **[8]** **[9]** **[10]** At common law, the term "actual damages" encompasses both "direct" and "consequential" damages. *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 816 (Tex.1997); *Henry S. Miller Co. v. Bynum,* 836 S.W.2d 160, 163 (Tex.1992) (Phillips, C.J., concurring). "Direct damages," also known as "general damages," are those inherent in the nature of the breach of the obligation between the parties, and they compensate a plaintiff for a loss that is conclusively presumed to have been foreseen by the defendant as a usual and necessary consequence of the defendant's act. *Arthur Andersen & Co.,* 945 S.W.2d at 816; **\*180** *Cherokee Cnty.,* 305 S.W.3d at 314. One measure of direct damages is the "benefit of the bargain" measure, which utilizes an expectancy theory and evaluates the difference between the value as represented and the value received. *See Mood v. Kronos Prods., Inc.,* 245 S.W.3d 8, 12 (Tex.App.-Dallas 2007, pet. denied) (generally, measure of damages for breach is that which restores injured party to position he would have had if contract had been performed); *Frost Nat'l Bank v. Heafner,* 12 S.W.3d 104, 111 n. 5 (Tex.App.-Houston [1st Dist.] 1999, pet. denied) (citing *Henry S. Miller,* 836 S.W.2d at 163).

 **[11]** "Consequential damages," also referred to as "special damages," are those said to result naturally but not necessarily from the wrongful act because they require the existence of some other fact beyond the relationship of the parties. *Arthur Andersen,* 945 S.W.2d at 816 (consequential damages not necessarily referable to the breach, but the loss must still have been reasonably foreseeable or within the contemplation of the parties); *Henry S. Miller,* 836 S.W.2d at 163; *Cherokee Cnty.,* 305 S.W.3d at 313–14; *Tenn. Gas Pipeline Co. v. Technip USA Corp.,* No. 01–06–00535–CV, 2008 WL 3876141, at \*8–9 (Tex.App.-Houston [1st Dist.] 2008, pet. denied) (mem. op.) (op. on reh'g).

[12]   Damages that might be considered "consequential" in one contract may be direct damages in another. As Judge Cardozo wrote many years ago, the distinction between direct and consequential damages under the common law is not absolute: "There is need to keep in mind that the distinction is not absolute, but relative. To put it in other words, damage which is general in relation to a contract of one kind may be classified as special in relation to another." *Kerr S.S. Co. v. Radio Corp. of Am.,* 245 N.Y. 284, 157 N.E. 140, 141 (1927) (also noting that damages for delay may be direct in some instances and consequential in others); *see Rexnord Corp. v. DeWolff Boberg & Assocs., Inc.,* 286 F.3d 1001, 1004 (7th Cir.2002) (Posner, J.) (stating that common law "distinguishes between direct and consequential damages, the difference lying in the degree to which the damages are a foreseeable (that is, a highly probable) consequence of a breach"); *Computrol, Inc. v. Newtrend, L.P.,* 203 F.3d 1064, 1071 n. 5 (8th Cir.2000) ("We are not convinced that the [contract's] restriction on 'special, incidental, or consequential damages,' standing alone, precludes the recovery of lost profits.... [I]t is incorrect to classify mechanically ... lost profits ... as consequential damages."). If the language of the contract indicates that the parties contemplated lost profits as the probable result of the breach, then those lost profits are more properly seen as a part of the contract, itself, and thus a form of direct damages. *ViaStar Energy, LLC v. Motorola, Inc.,* No. 1:05–CV–1095–DFH–WTL, 2006 WL 3075864, at *5–6 (S.D.Ind. Oct. 26, 2006); *see also* White & Summers, Uniform Commercial Code § 10–4 (Update 2011) (noting that it is a "fallacy" to assume that damages to a buyer, such as those resulting from delay, are inherently consequential, since damages that are consequential under one contract may be direct or ordinary under another); 11 Corbin on Contracts § 56.6 (2005) (noting courts' difficulty in establishing a workable distinction between general and special damages, and observing that the appropriate distinction of claimed damages varies with the context). Even under the UCC, it has been noted that consequential damages under § 2.715(2) may overlap with difference in value damages recoverable under § 2.714(2). **\*181** White & Summers, Uniform Commercial Code § 10–4.[20]

[13]   [14]   Lost profits may be either "direct" or "consequential" damages, depending on their nature. *Cherokee Cnty.,* 305 S.W.3d at 314; *Mood,* 245 S.W.3d at 12; *Cont'l Holdings, Ltd. v. Leahy,* 132 S.W.3d 471, 475 (Tex.App.-Eastland 2003, no pet.). As Chrysler argues, profits lost on other contracts or relationships resulting from the breach (such as resale of property to a third party) are generally classified as indirect or consequential damages. *See Mood,* 245 S.W.3d at 12; *Leahy,* 132 S.W.3d at 475. However, lost profits that represent the benefit-of-the-bargain measure of damages required to restore the plaintiff to the economic position he would have enjoyed if the contract had been performed are "direct" damages when shown to be "conclusively presumed" to have been foreseen by the parties as a usual and necessary consequence of a breach. *See Cherokee Cnty.,* 305 S.W.3d at 314.

## C. Analysis

## 1. Relevant Contractual Language

In relevant part, the limitation-of-damages provision in the AESSA states:

> In the event of default under this Agreement, *the sole liability of the defaulting party is payment of the other party's out-of-pocket expenses that cannot be mitigated. Both [Manuel] and [Chrysler] waive all rights to other compensatory damages or to consequential or punitive damages* under any theory of law or cause of action. [Emphasis added.]

The Settlement Agreement, to which the AESSA is attached as "Exhibit A," also contains a limitation-of-damages provision, which states as follows:

> [Manuel] and [Chrysler] *waive any claims they may have for incidental or consequential damages,* for punitive or exemplary damages, and for jury trial, that may arise by virtue of any breach of this [Settlement] Agreement *or the AESSA,* or by virtue of any transaction based in whole or in part upon a provision of this [Settlement] Agreement *or the AESSA. The parties remain liable for any actual damages.* [Emphasis added.]

The Settlement Agreement also provides that

> [t]his [Settlement] Agreement is not part of the Sales and Service Agreement of any dealership. The terms of any Sales and Service Agreement prevail if there is any conflict. *To the extent that there is any conflict between this [Settlement] Agreement and any other agreement or document other than a Sales and Service Agreement between [Chrysler]* **\*182** *and [Manuel], the terms of this [Settlement] Agreement prevail.* [Emphasis added.]

## 2. Agreements Must Be Construed Together

 **[15]**   Chrysler first contends that only the limitation-of-damages provision in the AESSA (limiting Manuel's recovery solely to "out of pocket expenses that cannot be mitigated") applies because the trial court found that Chrysler failed to use its best efforts and only the AESSA contains a "best efforts" clause.[21]  But Manuel replies that the Settlement Agreement must be considered together with and applies to any breach of the AESSA and further states that the Settlement Agreement prevails over the AESSA in the event of a conflict, meaning the trial court correctly awarded damages pursuant to the Settlement Agreement's limitation-of-damages provision, which provides that "[t]he parties remain liable for any actual damages."

Chrysler does not challenge the trial court's finding that the Settlement Agreement and the AESSA "comprise the entire agreement between the parties." That finding mirrors ¶ 3(*l* ) of

the AESSA, which states that "[t]his Agreement, together with the [Settlement Agreement] executed contemporaneously with this agreement, is the entire Agreement between [Manuel] and [Chrysler]." The Settlement Agreement refers to and describes the purpose of the AESSA to "allow Manuel to apply to the State of Texas for permission to establish a Chrysler, Plymouth, and Jeep Dealership in Tarrant County, within the Dallas Market at the location set forth in Exhibit A [the AESSA]."

The Settlement Agreement contains numerous other references to the AESSA. And significantly, the limitation-of-damages provision in the Settlement Agreement also states that it applies to "any claims for damages by virtue of any breach of this [Settlement] Agreement *or the AESSA*." [Emphasis added]. Finally, the Settlement Agreement provides that, to the extent of any conflict with any other agreement (other than a Sales and Service Agreement, not at issue here), which would include the AESSA, "*the terms of this [Settlement] Agreement prevail.*" [Emphasis added.]

We agree with Manuel that the two agreements must be construed as one instrument and interpreted together. Although the AESSA limits Chrysler's liability for breach of that agreement to "out-of-pocket expenses that cannot be mitigated," the Settlement Agreement states that it applies to any breach of that agreement *or the AESSA,* that it prevails to the extent of any conflict with the AESSA, and that "[t]he parties remain liable for *any* actual damages." [Emphasis added.]

### *183  3. Lost Profits May Be Direct or Consequential Damages

 [16]   There is no bright-line rule that lost profits always constitute consequential damages under the common law (as Chrysler seems to contend), and Chrysler's cases holding that lost profits are consequential damages are not persuasive. For example, *Tooke v. City of Mexia,* 197 S.W.3d 325, 329 (Tex.2006), did not involve common law consequential damages but instead interpreted section 271.153 of the Texas Local Government Code, which limits recovery to the "balance due and owing" under a contract with a city plus interest, thereby excluding recovery *under that statute* for all lost profits as consequential damages.[22]

*In Leahy,* 132 S.W.3d at 475, also relied upon by Chrysler, the limitation-of-damages provision expressly excluded recovery for "lost profits," both direct or consequential. Neither the AESSA nor the Settlement Agreement in this case even mentions "lost profits," nor do the limitation-of-damages provisions purport to allocate that risk to either party, even though the lost profits were the only type of damages that Manuel would likely suffer from a significant delay caused by a protest from another dealer and that very risk was expressly mentioned in the Settlement Agreement and addressed by both the Settlement Agreement and the AESSA. Courts have construed limitation-of-damages clauses to preclude both direct and consequential lost profits where the clauses expressly waived damages for either lost profits or consequential damages, but have held that

direct lost profits were not precluded where only "consequential" damages, either generally or "including" lost profits, were waived. *Compare id.* (limitation-of-liability clause precluded both direct and consequential lost profits where contract waived damages for "*loss of profits, loss of business,* or any other indirect or consequential damages" (emphasis added)), *with Cherokee Cnty.,* 305 S.W.3d at 314 (holding direct lost profits recoverable although contract disallowed "consequential" damages), and *Tenn. Gas,* 2008 WL 3876141, at \*6–8 (holding clause limiting recovery of consequential damages "including ... lost profits" barred only consequential lost profits). [23]

The recent *Cherokee County* case supports recovery of lost profits for resale to third parties as direct damages in the face of a limitation-of-damages clause, similar to the one in this case, which waived recovery of consequential damages without mentioning lost profits. *See* 305 S.W.3d at 315. In that case, a long-term contract for purchase of gas to operate a cogeneration facility contained a provision allowing the buyer to use the gas to operate the facility or to resell the gas to third parties. *Id.* at 311. When the seller failed to deliver the required volumes of gas as the claimed result of weather disruptions, the buyer sued for damages based on the difference between the amount it would have to pay under the contract and the much higher amount that it would have received by selling the gas to third parties during that **\*184** period. *Id.* at 311–12. The seller contended that the damages amounted to lost profits waived by the clause prohibiting recovery of consequential damages, and the trial court granted summary judgment to the seller. *Id.* at 312. The Houston Fourteenth Court of Appeals reversed and remanded, holding that the lost profits from the buyer's inability to resell gas not delivered to customers at the higher market value were "direct" damages not precluded by the waiver of "consequential" damages contained in the contract. *Id.* at 314–15. Holding that the contract was not a sale of goods controlled by the UCC, the court used the common law definition of "consequential damages" and held that, by the parties' express agreement that the buyer could resell the gas to a third party, the contract thereby implicitly authorized the buyer to profit from increases in the market price of the gas; thus, any wrongful interference with that contract right "would naturally and necessarily cause [the buyer] to suffer direct damages in the form of profits on the [a]greement itself." [24] *Id.* at 315 & n. 11. Thus, depending on the unique circumstances of each case, including the specific language of the contract, lost profits may be direct or consequential damages.

## 4. Ambiguity Concerning Recoverable Damages

### a. Conflict Concerning Recoverable Damages

 **[17]**   Considering the contracts together, the AESSA limits Chrysler's liability to out-of-pocket expenses, but the Settlement Agreement provides that it "prevails" to the extent of any conflict with the AESSA and states that the parties "remain liable for any actual damages." The first and

most obvious conflict is between the AESSA, which limits recovery to out-of-pocket expenses and excludes consequential damages, and the Settlement Agreement, which allows recovery for actual damages. The second conflict is between the retention of liability for "any actual damages" and the waiver of consequential damages, both within the same paragraph of the Settlement Agreement.

Chrysler attempts to reconcile the obvious conflict between the limitation to "out-of-pocket expenses" in the AESSA and the retention of liability for "actual damages" in the Settlement Agreement by focusing on a waiver of "consequential" damages contained in both agreements. Chrysler argues that the lost profits damages awarded to Manuel are barred from recovery under both agreements as "consequential damages" because they constituted only anticipated lost income from collateral contracts, that is, retail sales that Manuel claimed his new dealership could have made to third parties during its first year of operation had it opened on time. But as discussed above, lost profits are not per se consequential damages solely because sales to third parties are involved. *See, e.g., Cherokee Cnty.,* 305 S.W.3d at 314–15.

Chrysler also posits that one measure of direct "actual damages" is "out-of-pocket expenses" and that interpreting the retention of liability for "actual damages" so as to allow Manuel's recovery only of out-of-pocket expenses (by reason of the waiver of consequential damages) is consistent with the limitation of damages in the AESSA to out-of-pocket expenses. While this **\*185** proposed construction superficially harmonizes the two clauses, the limitation-of-damages clause in the AESSA already uses the term "out-of-pocket expenses." It is not reasonable to interpret both terms, that is, "actual damages" and "out-of-pocket expenses," to have the same meaning as that would render one or the other term meaningless or redundant. *See Cmty. Improvement Ass'n of Lake Conroe Hills, Inc. v. Beckham,* No. 07–03–00036–CV, 2004 WL 2000666, at \*4 (Tex.App.-Amarillo 2004, no pet.)* (mem. op.) (declining to interpret different words used in document to have the same meaning, effectively rendering one or the other redundant); *Cherokee Water Co. v. Freeman,* 33 S.W.3d 349, 354 (Tex.App.-Texarkana 2000, no pet.)* (holding that construing different terms to have same meaning would render some words to be meaningless); *see also Penncro Assocs., Inc.,* 499 F.3d at 1157* ("When a contract uses different language in proximate and similar provisions, we commonly ... assume that the parties' use of different language was intended to convey different meanings."). Thus, we must assume that the use of the term "actual damages" rather than "out-of-pocket expenses" in the Settlement Agreement was for a purpose and means something other than "out-of-pocket expenses."

Chrysler next argues that reading the limitation of damages clause in the Settlement Agreement so that the more specific waiver of consequential damages controls over the more general term "actual damages" leads to a conclusion that the parties intended to retain liability only for actual damages that are not incidental or consequential, meaning direct damages may be recovered but that Manuel's lost profits are unrecoverable consequential damages. Chrysler cites *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133–34 (Tex.1994)* for the secondary rule of construction that

specific provisions control over general provisions.[25] But *Forbau* further states that "[t]his is but an application of our long-established rule that '[n]o one phrase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions.' " *Id.* (quoting *Guardian Trust Co. v. Bauereisen,* 132 Tex. 396, 403–05, 121 S.W.2d 579, 583 (1938)). And it bears repeating that lost profits are not per se consequential damages solely because there will be a subsequent sale to third parties. *See, e.g., Cherokee Cnty.,* 305 S.W.3d at 314–15.

Chrysler's proposed interpretation—that the more specific waiver of consequential **\*186** damages controls over the more general term "actual damages," meaning Manuel may only recover lost profits that are "direct damages"—is reasonable. But this does not end our analysis because Chrysler's interpretation is not the only reasonable interpretation of the agreements. Manuel contends that the two agreements are ambiguous because they conflict on their face when read together.[26] Specifically, Manuel points out that the Settlement Agreement expressly provides that it "prevails" in the event of a conflict with the AESSA and that the Settlement Agreement's limitation of damages provision expressly states that it applies to a breach of the AESSA. Manuel also points to the inherent conflict between the Settlement Agreement's purported waiver of consequential damages and simultaneous retention of liability for *any* actual damages. Given these conflicts and the provisions in the AESSA that time was of the essence and that Chrysler had the obligation to use its best efforts to litigate or settle any protest so that the South Arlington dealership could open by January 1, 2001, Manuel's interpretation of the agreements—preserving the right to recover *any* actual damages—is also reasonable.

After applying the applicable rules of interpretation and considering all of the circumstances surrounding the execution of the agreements; the lack of specific waiver of lost profits in either agreement; and the lack of any definition of consequential, compensatory, or actual damages, we are left with terms that remain subject to more than one reasonable interpretation. They are therefore ambiguous as a matter of law, and we hold that the trial court did not err by implicitly finding that the contracts are ambiguous.

### b. Evidence of Parties' Intent

**[18]** While the trial court did not make an explicit conclusion of law that the contract was ambiguous, it implicitly did so because it made a finding of fact that the parties "intended to retain the right to actual damages." Chrysler argues in the last part of its second issue that there is no evidence to support the trial court's finding of the parties' intent because no witness provided parol evidence of the parties' intent concerning the damage waiver provisions since neither Manuel's attorney nor Chrysler's attorney—the only persons who drafted or negotiated wording changes in the agreements—were asked any questions on this topic and because no changes were made in the damage limitations in the agreements.

Chrysler provides no case law stating that parol evidence of the parties' true intent as an issue of fact is required when a contract is ambiguous. Rather, the rule is that parol evidence of intent of the parties *may* be considered when the court has determined that a contract is ambiguous. *Philadelphia Am. Life Ins. Co. v. Turner,* 131 S.W.3d 576, 587 (Tex.App.-Fort Worth 2004, no pet.) (citing *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995), and *Sage* **\*187** *St. Assocs. v. Northdale Constr. Co.,* 863 S.W.2d 438, 445 (Tex.1993)). The primary and best evidence of the parties' intent remains the agreement itself, considered in light of all of the surrounding facts and circumstances. *See Emerald Tex., Inc. v. Peel,* 920 S.W.2d 398, 402 (Tex.App.-Houston [1st Dist.] 1996, no writ) (citing *City of Pinehurst v. Spooner,* 432 S.W.2d 515, 518 (Tex.1968)). The fact finder may consider other evidence that may be helpful in illuminating the parties' true intent. *Sw. Airlines Co. v. Jaeger,* 867 S.W.2d 824, 829–30 (Tex.App.-El Paso 1993, writ denied), *disapproved of on other grounds by Dallas Market Ctr. Dev. Co. v. Liedeker,* 958 S.W.2d 382, 386–87 (Tex.1997), *overruled, Torrington Co. v. Stutzman,* 46 S.W.3d 829, 840 n. 9 (Tex.2000). Moreover, parties do not ordinarily contract with reference to what happens if there is a breach. "Parties generally have their minds addressed to performance of contracts—not to their breach or the consequences which will follow a breach." *See* 24 R. Lord, Williston on Contracts § 64:15 (4th ed. 1999).

In this case, there is legally sufficient evidence to support the trial court's finding that the parties intended to retain the right to actual damages, even though there is not specific testimony of their subjective intent regarding the limitation of damages provisions. That evidence included the agreements themselves; the circumstances surrounding Chrysler's planning, negotiations, and implementation of Project 2000; the sophistication and longstanding relationship of the parties; the parties' negotiations; Chrysler's need for franchised dealers to be able to sell Chrysler's motor vehicles to the public; the purpose of the agreement for a franchise, which was for both Chrysler and Manuel to make profits from car sales; the overriding importance to success of the marketing plan such that each participating dealer agreed to waive the right to protest another dealer; and, finally, the recognition by both parties that a protest might nevertheless be made and result in significant delay in opening the new dealership. [27]

Chrysler agreed in the AESSA to grant a franchise to Manuel, and the AESSA specifically set forth Chrysler's "planning potential" for Manuel's new dealership as 1,076 vehicles to be supplied by Chrysler in the new dealership's first year so that Manuel could resell those vehicles to consumers. As conditions required for Chrysler to grant Manuel the franchise, Manuel was to acquire suitable land for the construction of the dealership and provide building and site plans to be approved by Chrysler for a facility—the minimum requirements for which were specifically set forth (excluding a body shop) in the AESSA as 20,350 square feet of facility including a new vehicle showroom for six vehicles, a parts department of 5,500 square feet, a service department of 11,500 square feet with 22 service stalls, and 110,100 square feet of total land area. The AESSA stated these

requirements were based upon Chrysler's "planning potential" of "1076 units" for the first year of operation of the dealership. Additionally, in November 2001, Chrysler prepared for Manuel a "Dealer Agreement Portfolio" including a document signed by Manuel and titled "DAP–3," which forecast the new dealership's **\*188** net profit as $702,674 for its first year of actual operation based upon Chrysler's estimated "planning potential" for the new dealership's first year of actual operation along with parts and service, minus expenses.

Jim Dimond, Chrysler's national market representation manager in 2000 and whose department developed Project 2000, testified his department determined dealer planning potential. Chrysler purchased data on auto registrations from all parts of the country, demographic data with population and income levels, and counts of competitive dealers in market areas. Dimond explained that "planning potential" is each market's share of "forward looking financial volumes." As Dimond noted, the AESSA cautioned that planning potential was not intended to predict the number of units that the dealer would sell or that Chrysler would sell to the dealer and that number might change with market conditions. Nevertheless, he admitted that Chrysler used planning potential for the number of anticipated sales for the first year for a new franchised-dealership because it is "the best number if we have no track record."

Dimond described the South Arlington area as a growing market with a strong population and increasing income where Chrysler needed to establish more "points." Dimond explained that the only way that a dealer can sell cars in the United States and the only way a manufacturer can distribute cars for sale to consumers is through a franchised dealership. As relevant here, the TMVC defines a "franchise" as one or more contracts between a franchised dealer as franchisee and a manufacturer (or distributor) as franchisor, in which: "(A) the franchisee is granted the right to sell and service new motor vehicles manufactured or distributed by the franchisor or to service motor vehicles under the contract and a manufacturer's warranty" and "(D) the franchisee's business substantially relies on the franchisor for a continued supply of motor vehicles, parts, and accessories." Tex. Occ.Code Ann. § 2301.002 (West 2008).

Van Gray, Chrysler's national dealer placement manager in 1998 and 1999, testified that Chrysler would not have undertaken the risky venture of slating a new dealership in the South Arlington area unless it thought the dealership could make money. It belabors the obvious to say that Chrysler and Manuel were sophisticated parties in the automobile business and, as reflected by the agreements, that both knew a protest from another dealer was possible and could result in significant delay. But the AESSA placed the obligation to use best efforts to litigate or settle the protest on Chrysler (requiring only that Manuel cooperate with Chrysler) and provided that time was of the essence, and Manuel's actual damages could be no other than the profits he lost by reason of the delay caused by Chrysler's failure to use its best efforts to litigate or settle the Meador protest.[28]

Considering the evidence favorable to the trial court's finding concerning the parties' intent if a reasonable factfinder could and disregarding evidence contrary to the finding unless a reasonable factfinder could not, we hold that legally sufficient evidence supports the trial court's **\*189** finding that the parties intended to retain liability for the damages awarded to Manuel in this case. *See Cent. Ready Mix Concrete Co.,* 228 S.W.3d at 651; *City of Keller,* 168 S.W.3d at 827. There was ample evidence from which the trial court could reasonably have found that the parties intended to allocate the risk of delay from any protest to Chrysler such that it was to retain liability for "any actual damages" including Manuel's lost profits, rentals, or salary resulting from such a delay. We therefore overrule Chrysler's second issue.

## V. RELIABILITY OF EXPERTS

By its third issue, Chrysler contends that the trial court abused its discretion in admitting the testimony of Allen Wilkerson, Manuel's CPA, and Dr. James R. Vinson, Manuel's economist, regarding "lost profits" of the new dealership in this case because both experts' opinions were based upon an unreliable methodology and foundation. Chrysler characterizes the testimony and opinions as falling into the "scientific testimony arena" subject to its *Daubert/Robinson* challenge and running objection to the testimony at trial. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592–93, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993); *E.I. duPont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995).

For Manuel's primary damage model, his experts determined lost profits from the South Arlington dealership's delay in opening from November 2001 to November 2002 based upon actual data from Manuel Dodge (the Richardson dealership) for that period. Vinson referred to the damages model as the "business plan model," which he said is accepted in the industry for financing and venture capital for projected profitability and which has been relied upon in other Texas cases.

Vinson testified that he asked Wilkerson to use Chrysler's online manual for the specific criteria per unit and the Richardson dealership's actual records during the same period regarding actual profits and expenses as a "yardstick," which he testified was the most comparable business to the South Arlington dealership because it was, like the South Arlington dealership, also a two-line dealership (after Manuel ceased selling the Chrysler line) that was actually in operation during that period, located in a similar area with similar demographics, and was under the same ownership and management.

Vinson chose the figure of 1,076 new units because Chrysler calculated that number as the "planning potential" for anticipated sales from that dealership for 2001 as a performance guideline based on Manuel's historical experience of operating at or near Chrysler's planning potential. Wilkerson performed the calculations comparing the proposed South Arlington dealership and the

Richardson dealership, and he testified that the "adjusted forecasted income loss" to the South Arlington dealership, because it was not open during 2001, was $864,468. Wilkerson also testified that Manuel would have, in addition, personally earned an owner's salary of $475,632 and collected rent paid to him by the dealership entity in the amount of $600,000. Thus, Manuel's total net profit according to Vinson and Wilkerson would have been $1,940,100 for the period that he could not open the South Arlington dealership.

Chrysler challenged the admissibility of the testimony of both experts as being based upon an unreliable foundation and methodology, contending that: (1) their damage model was not an acceptable methodology for calculating lost profits; (2) neither witness considered actual sales of the new dealership after it finally **\*190** opened in 2002; (3) nor did they consider other comparable dealerships in the area but instead used as their "benchmark" Manuel's own most successful dealership from a different market for a "shining star year" of sales; (4) they relied upon Chrysler's "planning potential" for 2001 to estimate future sales and did no independent market or demographic analysis; (5) they failed to include start-up costs for the new business; and (6) they used estimates of Dodge sales to formulate opinions on Chrysler/Jeep sales.

## A. Reliability Test

 **[19]**   We do not regard the *Robinson* test for reliability of scientific opinions to be applicable to the expert opinions in this case. Instead, we hold that the general reliability test of *Gammill* is more appropriate. *Compare Robinson,* 923 S.W.2d at 556 (relying on *Daubert* and identifying six nonexclusive factors for determining whether scientific evidence is reliable), with *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726 (Tex.1998) (holding factors listed in *Daubert* and *Robinson* cannot be applied to all expert testimony, but general requirements of Texas Rule of Evidence 702 for reliability still require trial court to determine whether testimony is supported by more than credentials and *ipse dixit* of expert and to ensure that opinion comports with applicable professional standards and has a reliable basis in the knowledge and experience of the discipline); *see also Paschal v. Great W. Drilling, Ltd.,* 215 S.W.3d 437, 448 (Tex.App.-Eastland 2006, pet. denied) (holding *Gammill* test appropriate for expert testimony of a certified public accountant regarding analysis of financial records for tracing of embezzled funds).

## B. Methodology

 **[20]**   Chrysler argues that the method utilized by Vinson for determining lost profits was improper. Chrysler's own expert, however, did not testify that the methodology used by Manuel's experts was improper, nor did he propose another method or calculate or offer an opinion as to what the actual sales for 2001 would have been for the twelve months that the South Arlington dealership was not open. *See KMG Kanal–Muller–Gruppe Deutschland GmbH & Co. v. Davis,* 175 S.W.3d 379, 396 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (holding testimony of expert with doctorate in economics, who taught a university course in corporate evaluation and whose method of business

valuation was not shown to have been rejected by any authority or opposing expert, was reliable under *Gammill* ).

 **[21]**    There is no one proper method for determining lost profits as damages. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 50 (Tex.1998) (noting that supreme court was "not retreating from our refusal to endorse one method for determining lost profits") (citing *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 85 (Tex.1992)). The "yardstick" method used by Vinson, consisting of a study of profits from business operations that are closely comparable to that of a plaintiff, has been accepted for calculating lost profits and, in particular, for new businesses. *See Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 667 (5th Cir.1974) (recognizing "yardstick" and "before and after" as two generally recognized methods of determining lost profits as damages). Texas courts have accepted the yardstick analysis specifically for determining lost profits from a new business by using a comparable established business that is also owned and operated by the plaintiff, as in this case. *See, e.g.,*  **\*191**  *Signal Peak Enters. of Tex., Inc. v. Bettina Invs., Inc.,* 138 S.W.3d 915, 925 (Tex.App.-Dallas 2004, pet. struck) (holding expert opinion proper for lost profits based on projected revenues minus projected operating expenses for plaintiff's own existing business); *America's Favorite Chicken Co. v. Samaras,* 929 S.W.2d 617, 629 (Tex.App.-San Antonio 1996, writ denied) (describing model presented by expert as having intelligent, objective basis by taking into account historical operations of other franchises operated by plaintiff, potential for failure of new franchise, and other factors including plaintiff's experience in the industry as well as historical data on his franchise operations); *Pena v. Ludwig,* 766 S.W.2d 298, 303 (Tex.App.-Waco 1989, no writ) (holding reasonableness or reliability of methodology went to weight and not admissibility where profits of established business of plaintiff could serve as a reliable basis for calculating lost profits of new business; plaintiff was primarily responsible for operating both shops and familiar with their management and financial condition, and factual data from established business provided sound basis for probable loss to new business). Thus, we reject Chrysler's assertion that the expert testimony was unreliable because it was based on the "yardstick" method.

## C. Foundational Data

We interpret Chrysler's remaining complaints in its third issue as challenging the underlying foundational data relied upon by Vinson and Wilkerson. *See Merrell Dow Pharms. v. Havner,* 953 S.W.2d 706, 712 (Tex.1997) ("The substance of the [expert's] testimony must be considered.... The underlying data should be independently evaluated in determining if the opinion itself is reliable."). In this regard, Chrysler's complaints merge with a legal sufficiency type analysis for lost profits damages. Once a plaintiff has chosen a particular methodology of evaluation, "recovery of lost profits must be predicated on one complete calculation." *Holt Atherton,* 835 S.W.2d at 85.

 **[22]**   **[23]**   **[24]**    The amount of the loss must be proven by competent evidence with "reasonable certainty" by whatever method is chosen, but the rule regarding such proof is intended to be

"flexible enough to accommodate the myriad circumstances in which claims for lost profits arise." *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex.1994) (reaffirming *Sw. Battery Corp. v. Owen,* 131 Tex. 423, 425–26, 115 S.W.2d 1097, 1098–99 (1938)). What constitutes reasonably certain evidence of lost profits is a "fact intensive determination." *Holt Atherton,* 835 S.W.2d at 85. At a minimum, opinions or estimates of lost profits must be based upon objective facts, figures, or data from which the amount of lost profits may be ascertained. *Springs Window Fashions Div., Inc. v. The Blind Maker, Inc.,* 184 S.W.3d 840, 884–85 (Tex.App.-Austin 2006, pet. granted, judgm't vacated w.r.m.) (op. on reh'g). Where estimates are based on objective facts or data and there are firm reasons to expect a business to yield a profit, recovery is not prohibited simply because the enterprise is new. *Tex. Instruments, Inc.,* 877 S.W.2d at 280. It is the activity that is the enterprise, and if the activity is well-established, the fact that a newly formed entity is engaging in the activity will not preclude recovery. *Id.*

### 1. Reliance on "Planning Potential"

 [25]   In November 2001, before the opening of the dealership, Chrysler prepared and Mr. Manuel signed a document introduced into evidence and referred to as a DAP–3, which projected net profits for the first year of operation of the South Arlington dealership based upon the number of units Chrysler estimated for anticipated sales during the first year of actual **\*192** operation. Chrysler now says that its estimate is "not reliable" and should not have been used by Manuel's experts to project sales. However, Van Gray, Chrysler's own national dealer placement manager responsible for placing, planning, and relocating dealerships, testified that planning potential is a common methodology prepared and used by automobile manufacturers. In a new "green field market" such as South Arlington, it was the "best number" available to capitalize and plan a dealership. In an established market, he said, planning potential would be similar to minimum sales responsibility. Gray further testified that Chrysler performs extensive market research as to where dealerships are to be located and as to what the planning potentials should be. Manuel's experts accepted that Chrysler had properly evaluated the market and the resulting anticipated sales based upon data researched by its market research company, Urban Sciences. They testified that planning potential is consistently used as an industry standard and concluded that it was reasonable to use the planning potential assigned in the AESSA by Chrysler itself as the estimate for sales of new vehicles for that year by the dealership. Thus, the experts' reliance on Chrysler's planning potential did not render their opinions unreliable.

### 2. Comparable Dealership

 [26]   Chrysler's expert (1) criticized Manuel's experts' use of Manuel's Richardson dealership's operation for 2001 as a comparable dealership by which to ascertain the new dealership's anticipated net profits for that year, (2) thought that Manuel's experts should have used subsequent actual years of operation for the new dealership, and (3) believed that Chrysler's number of units of 1076 was "too high" to use as estimated actual sales for that year. Manuel's experts, Vinson and

Wilkerson, testified that they forecast lost profits based upon the Richardson dealership during the same time period because it was under Manuel's same experienced ownership and management in the same year that the South Arlington dealership was unable to open, because it sold two lines made by Chrysler, as did the South Arlington dealership, and because the demographics were comparable. Vinson and Wilkerson testified that they chose a dealership owned and managed by Manuel because using other dealerships would inject too many uncertainties and extraneous variables into the comparison. Chrysler's dealer placement manager, Van Gray, agreed that management by the dealer-principal is the most important factor in the profitability of a dealership.

Additionally, Vinson and Wilkerson testified that the Richardson dealership and Manuel's West Loop Dodge dealership were the only two of Manuel's dealerships that they could have used for the year in question. They did not use the West Loop Dodge dealership in Fort Worth because it sold other lines of vehicles not manufactured by Chrysler, and it would have been extremely difficult to separate out the expenses and revenues attributable to Chrysler vehicles. They did not use Manuel's Lancaster dealership as a basis for comparison because Manuel did not own that store during the relevant time period.

Chrysler also criticizes Manuel's experts' choice of using Manuel Dodge as its yardstick because that dealership sold Dodge trucks, and the Dallas–Fort Worth area is the biggest truck market in the world and more likely to be profitable for that reason. But Wilkerson testified that the gross profit per vehicle was within the same range for both dealerships. He tested the damage model by comparing it to gross profit per unit for other area dealers doing business in 2001 and concluded that **\*193** the model was very conservative. We hold that the experts' reliance on the Richardson dealership as the most comparable dealership did not render their opinions unreliable.

### 3. Applicable time period

 **[27]**   Chrysler's argument that Vinson and Wilkerson should have used subsequent years of the South Arlington dealership's actual operation versus Manuel's damage model based on the 2001 period during which the dealership was delayed in opening was arguably the most contentious subject of the trial as to damages. The dealership opened in February of 2002. However, both Chrysler's and Manuel's witnesses agreed that the years of 2000 and 2001 were exceptionally great years for Chrysler sales in the Dallas/Fort Worth area, whereas the significant downturn in the automobile market began in 2002, when registrations for Chrysler vehicles declined by 20 percent and profit for all dealers fell $8.2 million. The downturn was continuing at the time of trial. The South Arlington dealership had a loss of $482,000 in 2002. But Manuel's experts testified that looking at actual performance in 2002 would not accurately reflect how the dealership would have performed in 2001. Wilkerson testified that the difference between actual and projected sales was $1.1 million.

Each of these areas of contention was hotly disputed. We cannot say that the trial court abused its discretion in admitting the expert testimony on this record. *See Cooper Tire & Rubber Co. v. Mendez,* 204 S.W.3d 797, 800 (Tex.2006) (stating trial court's determination of reliability of expert's opinion reviewed for abuse of discretion). Chrysler's own estimate, reflected in its DAP–3 for Manuel's South Arlington dealership's net profit for its first year of operation, was $702,674. The DAP–3 listed as "fixed expenses" a salary of $240,000 for Tommy Manuel and $540,000 in rent to him for a total of $780,000 to Tommy Manuel, personally. The "actual damages" of $370,668.50 awarded by the trial court were well within the range of Chrysler's own estimate of net profits as well as those of Manuel's witnesses.

Moreover, even if there was an error in admission of the expert testimony, it was harmless. The trial court's finding as to damages is supported by the evidence as to the amounts for rental and salary estimated to be paid to Mr. Manuel by the dealership, which Vinson testified could be considered either as added to net profit or as fixed expense. *See Springs Window Fashions,* 184 S.W.3d at 887 (holding evidence—also provided by Vinson—that significant portion of net income was distributed to corporation's owner as compensation and benefits constituted evidence supporting award for lost profits for business otherwise operating at a loss) (citing *Bettius & Sanderson, P.C. v. Nat'l Union Fire Ins. Co.,* 839 F.2d 1009, 1014 (4th Cir.1988) (explaining concept in context of a professional corporation, which would otherwise never be able to show lost profits because its net income for tax purposes is usually near zero even if shareholders are earning large incomes)). Accordingly, we overrule Chrysler's third issue.

## VI. PREJUDGMENT INTEREST

 **[28]**    In its final judgment, the trial court awarded Manuel damages of $370,668.50 plus prejudgment interest of $126,425.88, calculated at the per diem rate of $83.78 and representing "prejudgment interest on past damages having accrued at the lawful rate of eight and one-quarter percent (8.25%) per annum from January 12, 2003 until the date of this judgment." Chrysler contends in its fourth issue that **\*194** the trial court erred in miscalculating the amount of prejudgment interest because it used an incorrect date of accrual (180 days after the date Chrysler received the first of two notices of a claim on July 16, 2002), incorrectly granting Manuel more than $35,000 in unearned prejudgment interest.

 **[29]**   **[30]**   **[31]**    For a breach-of-contract claim, prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim, or (2) the date suit is filed. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 532 (Tex.1998). A claim "is a demand for compensation or assertion of a right to be paid." *Toshiba Mach. Co., Am. v. SPM Flow Control, Inc.,* 180 S.W.3d 761, 785 (Tex.App.-Fort Worth 2005, pet. granted, judgm't vacated w.r.m.). A claim need not demand an exact amount or list every element

of damage. *Id.* "The abuse of discretion standard applies to the trial court's factual findings as they relate to prejudgment interest; but the de novo standard applies to the trial court's application of the law to the facts." *Id.; see also Figueroa v. Davis,* 318 S.W.3d 53, 66 (Tex.App.-Houston [1st Dist.] 2010, no pet.).

Chrysler does not contest the trial court's finding of fact that Chrysler received two written notices from Manuel, one on July 16, 2002, and the other on May 31, 2004. Chrysler's contention is that the first time it had notice of any claim against it for damages for breach of the AESSA or Settlement Agreement was Manuel's May 31, 2004 demand letter and that the July 16, 2002 written notice was for an entirely different claim on which Manuel did not prevail in the trial court. Therefore, Chrysler argues that the written notice of that other claim cannot constitute the date from which prejudgment interest was to run.

In the July 16, 2002 letter, Manuel asserted that Chrysler had orally agreed at the June 14, 2000 strategy meeting to dismiss its appeal in federal court and attempt to negotiate a settlement with Meador while Manuel sued Meador in state court for damages as a result of Meador's protest and that the Chrysler representatives present at the meeting "unanimously agreed" to reimburse Manuel for Manuel's legal fees and expenses.

Pursuant to the alleged agreement reached at the meeting, Manuel filed suit against Meador in Tarrant County District Court on July 12, 2000. Manuel continued the state court suit against Meador to a conclusion, claiming breach of contract, fraud, and promissory estoppel, and seeking damages for lost profits, lost income, loss of opportunity, rental and salary.[29] Manuel eventually agreed to submit the case against Meador to binding arbitration, pursuant to which a take-nothing judgment was rendered against Manuel in June 2002.

Tommy Manuel testified that he hand-delivered a brown envelope to the Dallas zone manager containing his letter demand of July 16, 2002, together with documents consisting of hourly billings by Manuel's attorney and his expert in that case, for reimbursement by Chrysler of his attorney's fees and expenses incurred in connection with his state court litigation against Meador. Chrysler denied any such agreement to reimburse Manuel for attorney's fees and expenses in the state court litigation. After a series of discussions **\*195** and repeated oral demands by Manuel to Chrysler representatives, Chrysler notified Manuel by a February 26, 2004 letter that Chrysler would not meet the demand for the attorney's fees and expenses.[30]

The second demand letter of May 21, 2004, which Chrysler contends constitutes the only "written notice" of Manuel's claim against Chrysler, reiterated Manuel's claim that Chrysler had agreed to pay his attorney's fees and expenses in prosecuting the suit in state court against Meador. But the second letter also made demand for payment of the damages that Manuel had sustained as the result of the delay in opening the South Arlington dealership, including lost profits.

Manuel relies upon *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* in which the supreme court held that a stand-still agreement tolling the running of limitations for filing of a suit against Johnson & Higgins pending resolution of other litigation, rather than a later formal DTPA demand letter, was sufficient written notice of a claim against Johnson & Higgins for purposes of accrual of prejudgment interest. *See* 962 S.W.2d at 531. In particular, Manuel cites language of the court noting that at the time of the stand-still agreement, Johnson & Higgins had sufficient information to obtain a settlement without incurring any prejudgment interest and that it was not necessary that the document give specific notice to the other party, so long as it demands compensation or asserts a right to payment. *See id.* Manuel argues that the July 16, 2002 letter similarly sufficiently asserted his right to payment and points to the documents attached to that letter, which he describes as including documentation of other damages, including lost profits, as well as attorney's fee statements and expert witness expenses. He also refers to testimony of a Chrysler representative about possible settlement options with Manuel, including damages of over two million dollars based upon that witness's own review of the July 16, 2002 demand letter.

We do not find *Johnson & Higgins* to be analogous to this case for several reasons. First, the standstill agreement and the later DTPA letter in that case involved the same claim against Johnson & Higgins, not two separate claims as in this case. Secondly, the other litigation was ongoing at the time the standstill agreement was entered into and arose from the same occurrence, so that Johnson & Higgins had ample notice of the nature of the claim. Thirdly, as the supreme court pointed out, the "standstill agreement plainly says that 'Kenneco asserts that, to the extent underwriters are found not to be liable [in the federal action] ..., J & H is liable to Kenneco for the amounts which Kenneco has claimed under the Policy." Through the specific language of the standstill agreement, itself, it was clear that Kenneco was asserting a right to be paid for the same amounts claimed in the federal suit. Thus, Johnson & Higgins had sufficient information at that time to obtain a settlement without incurring any prejudgment interest at all. *See Owens–Illinois, Inc. v. Estate of Burt,* 897 S.W.2d 765, 769 (Tex.1995) ("[A] defendant must have notice and an opportunity to settle a claim.").

In contrast, this case involved two separate claims under two different contracts entered into, if at all, at different times and related to different occurrences and suits. We agree with Chrysler that the final judgment used the wrong date from which to calculate prejudgment interest. **\*196** The subject of the letter of July 16, 2002, used by the court as the start date is not the claim on which Manuel prevailed, and we can find no mention in that letter or in the accompanying documentation that can be interpreted even to suggest a right to damages against Chrysler upon which this suit was based. Prejudgment interest cannot be based on an unrelated claim arising from a different alleged contract (the alleged oral agreement of June 14, 2000), made under entirely different circumstances (the strategy meeting of Chrysler and Manuel and their respective lawyers), and which was not a part of the contracts that were the basis of this lawsuit. The May 27, 2004 demand

letter for damages, which expressly references and demands damages for breach of the AESSA and Settlement Agreement against Chrysler, is the correct date of written notice. The date of the later demand letter was less than 180 days before Manuel filed this suit on June 9, 2004. Therefore, the accrual date for purposes of calculating prejudgment interest is June 9, 2004, the date on which Manuel filed this suit. *See Johnson & Higgins,* 962 S.W.2d at 532. We sustain Chrysler's fourth issue. Calculating an 8.25% rate on $370,668.50 from June 9, 2004 to May 31, 2007 gives a total of $90,985.08. We modify the judgment to instead award only that amount of prejudgment interest.

## VII. ATTORNEY'S FEES

In his cross-appeal, Manuel contends in four issues that the trial court erred by failing to award him trial and appellate attorney's fees. Chrysler responds that the trial court did not err because Michigan law applies and does not permit recovery of attorney's fees for breach of contract actions, because the AESSA prohibits recovery of attorney's fees, and because an award of appellate attorney's fees is not mandatory.

 **[32]** A party can recover attorney's fees under civil practice and remedies code chapter 38 if the claim is one listed in section 38.001, such as for breach of contract, and if the party (1) is represented by an attorney, (2) presented his or her claim to the opposing party or that party's duly authorized agent, and (3) the opposing party did not tender the just amount owed within thirty days. *See Tex. Civ. Prac. & Rem.Code Ann. §§ 38.001*, .002 (West 2008). If all of the statutory elements are established and there is proof of the reasonableness of the fees, an award of fees under section 38.001 is mandatory. *See AMX Enters., L.L.P. v. Master Realty Corp.,* 283 S.W.3d 506, 516 (Tex.App.-Fort Worth 2009, no pet.).

### A. Trial Attorney's Fees
 **[33]** Chrysler does not dispute whether Manuel established each of the statutory elements but instead contends that Manuel may not recover attorney's fees for other legal reasons. First, Chrysler argues that Michigan law applies and that Michigan law does not permit the recovery of attorney's fees in breach of contract actions. However, Chrysler did not file a motion or otherwise request that the trial court take judicial notice of Michigan law until after the trial. While we do not hold that a motion seeking judicial notice of the law of another state will always be untimely if filed after trial, Chrysler's posttrial motion was untimely in this case. Choice-of-law matters may be waived, and we hold that Chrysler waived its choice-of-law complaint in this case by failing to raise the matter before trial, by failing to object to the admission of evidence at trial concerning Manuel's attorney's fees, and by cross-examining Manuel's attorney about the segregation of attorney's fees, all of which are inconsistent with Chrysler's appellate **\*197** contention that Michigan law prevents the recovery of attorney's fees in this case. [31] *See Gen. Chem. Corp. v. De La Lastra,* 852 S.W.2d 916,

920 (Tex.1993) (holding party waived application of maritime law to case "by failing to object to evidence and jury questions regarding damages which are not recoverable under maritime law"); *Burlington N. & Santa Fe Ry. Co. v. Gunderson, Inc.,* 235 S.W.3d 287, 290 (Tex.App.-Fort Worth 2007, pet. withdrawn) (holding trial court permitted to presume Texas and other state's law similar because party failed to file motion requesting judicial notice of other state's law).

[34] Chrysler also argues that the AESSA's limitation-of-damages provision bars recovery of Manuel's attorney's fees because it provides that the non-breaching party's sole remedy will be out-of-pocket expenses that cannot be mitigated. Chrysler reasons that Manuel waived any claims for other damages and that attorney's fees are incidental damages. But Texas law provides that attorney's fees are more in the nature of costs than damages. *See, e.g., Alma Grp., L.L.C. v. Palmer,* 143 S.W.3d 840, 846 (Tex.App.-Corpus Christi 2004, pet. denied); *see also Heliflight, Inc. v. Bell/ Agusta Aerospace Co., LLC,* No. 4:06–CV–425–A, 2007 WL 4373259, at *2 (N.D.Tex. Dec. 12, 2007) (mem. op.). The AESSA does not purport to prohibit recovery of costs or attorney's fees in state court litigation. Therefore, we hold that the AESSA does not prohibit the recovery of Manuel's attorney's fees.

[35] Chrysler next argues that the trial court properly denied Manuel's request for attorney's fees because Manuel failed to segregate his attorney's fees between those incurred prosecuting claims for which attorney's fees are recoverable and those incurred prosecuting claims for which attorney's fees are not recoverable. To support its contention, Chrysler relies on *Green Int'l, Inc.,* 951 S.W.2d at 389, in which the supreme court stated: "A failure to segregate attorney's fees in a case containing multiple causes of action, only some of which entitle the recovery of attorney's fees, can result in the recovery of zero attorney's fees." However, this statement from *Green Int'l, Inc.* has been characterized as dicta and is inconsistent with a subsequent supreme court opinion which holds that the failure to segregate attorney's fees does not bar all recovery of attorney's fees. *See Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 314 (Tex.2006) ("Chapa's failure to segregate her attorney's fees does not mean she cannot recover any. Unsegregated attorney's fees for the entire case are some evidence of what the segregated amount should be."); *see also Air Routing Int'l Corp. (Canada) v. Britannia Airways, Ltd.,* 150 S.W.3d 682, 693 (Tex.App.-Houston [14th Dist.] 2004, no pet.) (holding statement in *Green* concerning nonrecovery of fees for failure to segregate is nonbinding dicta). Under *Chapa,* remand is the appropriate remedy so that Manuel may offer evidence of the segregated amount of reasonable **\*198** and necessary attorney's fees. *See Chapa,* 212 S.W.3d at 314.

As mentioned, Chrysler does not contend on appeal that Manuel failed to establish any of the section 38.001 or 38.002 requirements, and it appears from our review of the record that Manuel presented evidence of each statutory requirement. Indeed, Manuel presented evidence that reasonable and necessary attorney's fees in this case exceeded $480,000 through trial, with at least another $125,000 for an appeal through the supreme court. Thus, even assuming that Manuel's

attorney fee evidence consisted only of unsegregated fees, the trial court erred by failing to award him any attorney's fees. *See AMX Enters., L.L.P.,* 283 S.W.3d at 516 (stating section 38.001 fee award mandatory if statutory elements met and proof of reasonableness presented). We therefore sustain Manuel's first three issues and remand this case for a new trial concerning the segregated amount of reasonable and necessary attorney's fees for Manuel's breach of contract claim.

## B. Appellate Attorney's Fees

 [36]   Manuel contends in his final issue that the trial court erred by failing to award him any appellate attorney's fees, arguing that if an award of trial attorney's fees is mandatory under section 38.001, an award of appellate attorney's fees is likewise mandatory. *See End Users, Inc. v. Sys. Supply For End Users, Inc.,* No. 14–06–00833–CV, 2007 WL 2790379, at *6 (Tex.App.-Houston [14th Dist.] Sept. 27, 2007, no pet.)* (mem. op.) (citing *Lee v. Perez,* 120 S.W.3d 463, 469 (Tex.App.-Houston [14th Dist.] 2003, no pet.)* (holding appellate attorney's fees mandatory if trial fees mandatory under section 38.001). Chrysler, citing several cases, responds that the factfinder may award appellate attorney's fees but is not required to do so. *See Anderson, Greenwood & Co. v. Martin,* 44 S.W.3d 200, 221 (Tex.App.-Houston [14th Dist.] 2001, pet. denied); *see also Hunsucker v. Fustok,* 238 S.W.3d 421, 431 (Tex.App.-Houston [1st Dist.] 2007, no pet.); *Clements v. Minn. Life Ins. Co.,* 176 S.W.3d 258, 265 (Tex.App.-Houston [1st Dist.] 2004, no pet.), *superseded by statute on other grounds as recognized by State Farm Life Ins. Co. v. Martinez,* 216 S.W.3d 799, 804 (Tex.2007); *Neal v. SMC Corp.,* 99 S.W.3d 813, 818 (Tex.App.-Dallas 2003, no pet.); *Olivares v. Porter Poultry & Egg Co.,* 523 S.W.2d 726, 732 (Tex.Civ.App.-San Antonio 1975, no writ).

Although Chrysler correctly cites the general rule that the factfinder may but is not required to award appellate attorney's fees, none of Chrysler's cases specifically addresses the scenario present here—whether appellate attorney's fees are mandatory when trial attorney's fees are mandatory under section 38.001 of the civil practice and remedies code. The *Anderson* court, although it stated the general rule, held earlier in the opinion that the fee claimant could not prevail on its contract claim, meaning there was no basis for the recovery of *any* attorney's fees. *See* 44 S.W.3d at 221; *cf. Lee,* 120 S.W.3d at 469 n. 27 (distinguishing and declining to follow *Anderson* ). *Hunsucker* concerned appellate attorney's fees for an appeal of an order dismissing a medical malpractice suit for failure to file an expert report, *see* 238 S.W.3d at 423–24, 431, and *Clements* addressed an intervenor's attorney's fees under the insurance code. *See* 176 S.W.3d at 265–66. Finally, the *Olivares* court rejected the appellant's contention that appellate attorney's fees for breach of contract and quantum meruit claims are never recoverable. *See* 523 S.W.2d at 732.

On the other hand, Manuel cites authority for the proposition that appellate attorney's **\*199** fees are mandatory if trial attorney's fees are mandatory under section 38.001. *See End Users, Inc.,* 2007 WL 2790379, at *6. In *End Users, Inc.,* the claimant presented uncontested evidence that $30,000 was a reasonable fee for an appeal to the court of appeals and that $25,000 was a reasonable fee

for an appeal to the Texas Supreme Court. *Id.* Because the evidence was uncontested, the court of appeals modified the trial court's judgment to award the uncontested amount of appellate attorney's fees. *Id.*

We agree with our sister court of appeals and hold that if an award of trial attorney's fees is mandatory under civil practice and remedies code section 38.001, an award of appellate attorney's fees is likewise mandatory. Unlike the *End Users, Inc.* court, though, we cannot simply modify the trial court's judgment concerning the award of appellate attorney's fees because the evidence concerning those fees was not conclusive. Therefore, we sustain Manuel's fourth issue but remand this case for a new trial concerning the amount of Manuel's reasonable and necessary appellate attorney's fees. *See World Help v. Leisure Lifestyles, Inc., 977 S.W.2d 662, 684 (Tex.App.-Fort Worth 1998, pet. denied)* (remanding for consideration of appellate attorney's fees when evidence not conclusive).

## VIII. CONCLUSION

Having overruled Chrysler's first three issues and having sustained Chrysler's fourth issue, we affirm as modified the portion of the trial court's judgment awarding damages to Manuel and affirm as modified the prejudgment interest awarded to Manuel. In addition, having sustained each of Manuel's four issues, we reverse the portion of the trial court's judgment awarding no attorney's fees to Manuel and remand this case to the trial court for a new trial concerning the amount of Manuel's reasonable and necessary trial and appellate attorney's fees.

## All Citations

362 S.W.3d 160

## Footnotes

1  Tommy J. Manuel; Tommy Manuel Chrysler–Jeep, Inc.; and Manuel Dodge, Ltd. were plaintiffs in the trial court. During the pendency of this appeal, Tommy Manuel Chrysler–Jeep, Inc. changed its name to Tommy Manuel Auto Leasing, Inc., and Manuel Dodge, Ltd. changed its name to Manuel Auto Sales, Ltd.

2  The trial court made extensive findings of fact—twenty-nine pages' worth. Findings of fact that are unchallenged are binding on an appellate court unless the contrary is established as a matter of law or there is no evidence to support the finding. *McGalliard v. Kuhlmann, 722 S.W.2d 694, 696 (Tex.1986); Raman Chandler Props., L.C. v. Caldwell's Creek Homeowners Ass'n, Inc., 178 S.W.3d 384, 390 (Tex.App.-Fort Worth 2005, pet. denied).* We draw the bulk of the facts recited below from the trial court's unchallenged findings, which from our review of the record are supported by sufficient evidence.

3  *See* Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–1225 (1956).

4  *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 439 U.S. 96, 101–02 & n. 5, 99 S.Ct. 403, 407–08 & n. 5, 58 L.Ed.2d 361 (1978)* (listing then-existing federal and state statutes and quoting from Senate committee report as to its grave concern that the disparity in economic power and bargaining strength had enabled manufacturers to, in effect, write the rules by which the two

parties conduct their business affairs as set forth in the sales agreements or franchises that the manufacturer prepares for the dealer's signature) (quoting S.Rep. No. 84–2073, at 2 (1956)).

5     *Id.* at 107–08, 99 S.Ct. at 410–11.

6     *Id.*

7     *See* Act of April 7, 1971, 62nd Leg., R.S., ch. 51, 1971 Tex. Gen. Laws 89. The TMVC has been amended almost every session since its inception. Currently, the regulatory function is performed by the Motor Vehicle Division of the Texas Department of Transportation, and the substantive law is now codified as Chapter 2301 of the Texas Occupations Code. *See, e.g.,* Tex. Occ.Code § 2301.001 (West 2004). Current sections of the occupations code referenced in this opinion correspond to sections of the former TMVC in effect at the time of the events and suit that remain substantially unchanged.

8     *See id.*

9     *See* Tex. Occ.Code Ann. § 2301.652 (West Supp. 2011).

10     *Id.*

11     *See id.* § 2301.803 (West Supp. 2011).

12     *See id.* § 2301.003 (West 2004).

13     The trial court's findings of fact and conclusions of law do not expressly state that Chrysler breached the AESSA (as opposed to the Settlement Agreement), but only the AESSA contains a best efforts clause.

14     Manuel urges us to summarily overrule Chrysler's first issue, arguing that an independent basis exists for the judgment in that the trial court could have based its breach of contract finding on breach of paragraph 3 of the Settlement Agreement. But the trial court specifically found that Chrysler failed to use its best efforts to resolve the Meador protest, a provision contained only in the AESSA. The trial court had also previously granted summary judgment against Manuel for breach of the Settlement Agreement and made no finding, and none was requested, that Chrysler failed to comply with paragraph 3 of the Settlement Agreement. Thus, we will consider Chrysler's first issue on the merits.

15     As Manuel notes, other Texas courts have encountered best efforts clauses in a variety of contracts without discussion of how such a clause should be interpreted. *See, e.g., Malatt v. C & R Refrigeration,* 179 S.W.3d 152, 158 (Tex.App.-Tyler 2005, no pet.) (holding best efforts clause did not require actual sale of machine but implying reasonable time); *Aquila Sw. Pipeline, Inc. v. Harmony Exploration, Inc.,* 48 S.W.3d 225, 233–34 (Tex.App.-San Antonio 2001, pet. denied) (interpreting Section 2.306(b) of UCC, which expressly imposes a best efforts standard upon the parties to a contract for exclusive dealing in goods).

16     That Chrysler agreed to an extension of time for Manuel to establish and open the dealership when Meador's protest was not resolved by that time is further indication that time was of the essence. *See Siderius, Inc. v. Wallace Co.,* 583 S.W.2d 852, 864 (Tex.Civ.App.-Tyler 1979, no writ).

17     The decision of the federal district court to return the proceedings regarding validity of the protest waiver to the Commission seems prescient, considering that it predated by less than a year the legislature's amendment of the TMVC to give the Commission original, exclusive jurisdiction over issues regarding sale and distribution and other issues governed by the Code and to require abatement of a suit seeking DTPA and other damages pending an administrative determination of Code-based issues that would govern the remainder of the case. *See Subaru of Am., Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 222 (Tex.2002) (interpreting legislature's amendment to Section 3.01(a) of the Code, Act of May 18, 2001, 77th Leg., R.S., ch. 155, § 5, 2001 Tex. Gen. Laws 313, 327).

18     As mentioned above, the trial court's findings of fact and conclusions of law do not expressly state that Chrysler breached the AESSA (as opposed to the Settlement Agreement), but only the AESSA contains a best efforts clause.

19     Out-of-pocket expenses are reliance damages designed "to reimburse the plaintiff for expenditures made toward execution of the contract, in order to restore the status quo before the contract." *See Foley v. Parlier,* 68 S.W.3d 870, 884–85 (Tex.App.-Fort Worth 2002, no pet.) (contrasting reliance or out-of-pocket damages with expectancy or benefit-of-the-bargain damages).

20     Despite the vast number of cases purporting to define "consequential damages" by repeating the same time-honored but general definitions and distinctions between consequential and direct damages, the meaning remains elusive. *See, e.g., T.Co Metals, L.L.C. v. Dempsey Pipe & Supply, Inc.,* 592 F.3d 329, 341 (2nd Cir.2010) (citing White & Summers, Uniform Commercial Code § 10–2 (5th ed. 2006) (noting "reasonable persons often differ whether an item of damage is 'consequential' "); *Applied Data Processing, Inc. v. Burroughs Corp.,* 394 F.Supp. 504, 508 (D.Conn.1975) (discussing Michigan law and stating neither in Michigan nor elsewhere does the term "consequential damages" have a clearly established meaning); *see also* Glenn D. West, Sara G. Duran, *Reassessing the "Consequences" of Consequential Damage Waivers in Acquisition Agreements,* 63 Bus. Law 777, 780 (May 2008) (suggesting that few transactional lawyers can define " 'consequential' damages accurately and many misconstrue the impact a waiver of such damages may have"); Gregory K. Morgan & Albert E. Phillips, *Design Professional Contract Risk Allocation: The Impact of Waivers of*

*Consequential Damages and Other Limitations of Liabilities,* 33 J.C. & U.L. 1, 13 (2006) (stating "no one knows what consequential damages are or may be, at least not with predictability or uniformity").

Chrysler intimates that the AESSA is only a letter of intent for which Manuel paid Chrysler nothing. But Manuel gave up his longstanding, successful Chrysler line at his Richardson dealership (Manuel's lost profits that he would have received from the Richardson dealership as the result of the delay while he waited to build and open his new dealership constituted his alternative measure of damages) and agreed to waive his own rights to protest any other relocations or new dealerships in Project 2000. Moreover, Chrysler has not argued that the AESSA was not binding, nor has it challenged the trial court's conclusion that the AESSA (as well as the Settlement Agreement) is valid and enforceable. Letters of intent may be enforceable as valid contracts where parties agree on material terms even where they leave open other terms for later negotiation. *Foreca, S.A. v. GRD Dev. Co.,* 758 S.W.2d 744, 746 (Tex.1988) (holding intent to be bound is essential element of enforceable agreement); *John Wood Grp. USA, Inc. v. ICO, Inc.,* 26 S.W.3d 12, 19 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) (noting intent to be bound by letter of intent may be found as a matter of law).

We agree with our sister court in *Cherokee County* that *Tooke* should not be extended beyond the governmental-immunity context. *See* 305 S.W.3d at 315 n. 8 (noting that lost profits are consequential damages under local government code section 271.153) (quoting *City of Houston v. Petroleum Traders Corp.,* 261 S.W.3d 350, 359 (Tex.App.-Houston [14th Dist.] 2008, no pet.)).

*See also Penncro Assocs., Inc. v. Sprint Spectrum, L.P.,* 499 F.3d 1151, 1156 (10th Cir.2007) (holding direct lost profits allowed where clause provided "no consequential damages are recoverable includ[ing], but ... not limited to, lost profits, lost revenues and lost business opportunities").

The Houston court contrasted those direct loss of profits from inability to sell the gas with profits lost on its contracts for sale of *electricity* produced from the gas at its cogeneration facility, which would be consequential damages. *Id.* at n. 12; *see also Tenn. Gas,* 2008 WL 3876141, at \*8 (holding gas pipeline suffered consequential damages when sellers failure to timely deliver purchased *equipment* prevented it from selling gas to its customers).

Chrysler also argues that the waiver of "other compensatory damages" (in addition to the waiver of consequential damages) in the AESSA is more specific and controls over the more general retention of liability for "actual damages" in the Settlement Agreement (applying the specific-over-general rule of construction, so as to preclude recovery of all lost profits). But the ordinary meanings of the terms "actual damages" and "compensatory damages" are that they are synonymous. *See Tate v. Hernandez,* 280 S.W.3d 534, 541 (Tex.App.-Amarillo 2009, no pet.) (holding "actual damages" and "compensatory damages" have same meaning); *Anderson v. Alcus,* 42 S.W.2d 294, 296 (Tex.Civ.App.-Beaumont 1931, no writ) (noting "actual damages" are synonymous with "compensatory damages"). Chrysler's only suggestion to resolve this conflict is to ignore the provision in the Settlement Agreement allowing recovery of actual damages. Application of that rule of construction here would require that we simply disregard that provision in violation of the basic rule that we avoid interpreting contracts so as to render terms meaningless. Second, we are at a loss to see how one synonymous term can be more specific than another. Third, Chrysler overlooks the provision that the Settlement Agreement "prevails" in the event of a conflict with the AESSA, so that the parties' retention of liability for "actual damages" in the Settlement Agreement trumps the waiver of "other compensable damages" in the AESSA.

Manuel, citing *Wilburn v. Mo.-Kan.-Tex. Ry. Co. of Tex.,* 268 S.W.2d 726, 731 (Tex.Civ.App.-Dallas 1954, no writ) (op. on reh'g) (stating that "[a] contract will not be construed to limit the remedial rights of the parties unless such an intention is clear"), argues that the limitation-of-damages clauses are ambiguous, which renders them unenforceable. While we agree that the clauses are ambiguous as discussed below, this rule of construction is inapplicable here because the contracts provide that their terms will not be strictly construed against either party. Moreover, this rule of strict construction does not apply in the context of commercial contracts between sophisticated parties. *See Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 387 (Tex.1997) (holding no-damages-for-delay clause enforceable in agreement between experienced parties familiar with such risk-shifting clauses).

Moreover, a limitation or waiver of damages in a contract is an affirmative defense, so that Chrysler, rather than Manuel, had the burden of proof to offer any parol or other extrinsic evidence that the parties' true intent was to preclude recovery of the damages claimed by Manuel. *See Leahy,* 132 S.W.3d at 475; *Regency Advantage Ltd. P'ship v. Bingo Idea–Watauga, Inc.,* 928 S.W.2d 56, 63 (Tex.App.-Fort Worth 1995), *rev'd in part on other grounds,* 936 S.W.2d 275 (Tex.1996) (per curiam).

The amount of damages awarded by the trial court was within the range of and less than half of Chrysler's own estimate and, as indicated by the trial court in a letter to the parties, amounts to approximately four months' of lost profits. The amount could have tied to the four-month period, from June 7, 2000, when the federal district court denied relief to Chrysler, to October 4, 2000, the date of Chrysler's ultimate settlement with Meador.

Contemporaneously with settling Meador's protest in late September or early October 2001, Chrysler offered to reimburse Manuel's attorney's fees in connection with the suit against Meador if Manuel would immediately drop the suit against Meador, which offer Manuel summarily rejected.

Manuel did not prevail on its claim for those attorney's fees and expenses in this case in the trial court and has not pursued recovery of those amounts by cross-appeal.

One of our sister courts of appeals explained this rule as follows:

> A court may take judicial notice of the laws of another jurisdiction at any point in a proceeding. The issue of a choice-of-law determination is distinct from the court's power to generally take judicial notice of a foreign state's law. Thus, the mere fact that the court may take judicial notice of foreign laws does not mean that choice-of-law issues may be raised at any point in the proceeding. *A preliminary motion is, therefore, necessary to assure the application of the laws of another jurisdiction.* The court may undertake a choice of law analysis sua sponte, but rule [of civil procedure] 202 does not compel this action.

*Pittsburgh Corning Corp. v. Walters,* 1 S.W.3d 759, 769 (Tex.App.-Corpus Christi 1999, pet. denied) (citations omitted) (emphasis added).

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

359 S.W.3d 620
Supreme Court of Texas.

ETAN INDUSTRIES, INC. and Etan Industries, Inc., d/b/
a CMA Cablevision and/or CMA Communications, Petitioner,

v.

Ronald LEHMANN and Dana Lehmann, Respondents.

No. 10−0318.   |   Dec. 16, 2011.   |   Rehearing Denied March 30, 2012.

**Synopsis**

**Background:** Landowners brought trespass claim and request for declaratory judgment against cable television provider arising out of provider's installation of lines on landowners' property. Following jury trial, the District Court, Lee County, Terry L. Flenniken, J., entered judgment for landowners. Provider appealed. The Austin Court of Appeals, 308 S.W.3d 489, affirmed. Review was granted.

**Holdings:** The Supreme Court held that:

[1] two-year statute of limitations applicable to landowners' trespass claim was not tolled by any fraudulent concealment of cause of action, and

[2] declaratory relief was not warranted.

Reversed and rendered.

West Headnotes (6)

**[1]    Limitation of Actions** 🗝 Causes of action in general

> 241   Limitation of Actions
> 241II   Computation of Period of Limitation
> 241II(A)   Accrual of Right of Action or Defense
> 241k43   Causes of action in general
>
> Generally, a cause of action accrues for purposes of a statute of limitations when a wrongful act causes a legal injury.

11 Cases that cite this headnote

**[2]** **Limitation of Actions** 🔑 Questions for Jury

241 Limitation of Actions

241V Pleading, Evidence, Trial, and Review

241k199 Questions for Jury

241k199(1) In general

The date a cause of action accrues for purposes of a statute of limitations is normally a question of law.

8 Cases that cite this headnote

**[3]** **Limitation of Actions** 🔑 Concealment of Cause of Action

241 Limitation of Actions

241II Computation of Period of Limitation

241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action

241k104 Concealment of Cause of Action

241k104(1) In general

Two-year statute of limitations applicable to landowners' trespass claim against cable television provider was not tolled by any fraudulent concealment of cause of action; landowners were aware more than two years prior to bringing suit that provider did not have an easement to put cable on landowners' property, that provider needed its own easement to use poles belonging to electric company, and that provider had failed to produce any documentation suggesting that it had a right to use landowners' property.

4 Cases that cite this headnote

**[4]** **Limitation of Actions** 🔑 Concealment of Cause of Action

241 Limitation of Actions

241II Computation of Period of Limitation

241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action

241k104 Concealment of Cause of Action

241k104(1) In general

A defendant's fraudulent concealment of wrongdoing can toll the running of a statute of limitations; however, the estoppel effect of fraudulent concealment ends when a party learns of facts, conditions, or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the concealed cause of action.

7 Cases that cite this headnote

**[5]** **Declaratory Judgment** 👈 Alternative, substitute or supplemental remedy

**Declaratory Judgment** 👈 Easements and water rights

118A   Declaratory Judgment

118AI   Nature and Grounds in General

118AI(C)   Other Remedies

118Ak43   Alternative, substitute or supplemental remedy

118A   Declaratory Judgment

118AII   Subjects of Declaratory Relief

118AII(H)   Property and Conveyances

118Ak185   Easements and water rights

Declaratory relief was not warranted in landowners' trespass claim against cable television provider; provider had removed its lines from landowners' property prior to trial, declaratory judgment claim merely duplicated issues in trespass claim, and the only apparent benefit to landowners from declaratory judgment was the award of attorney fees under Uniform Declaratory Judgments Act. V.T.C.A., Civil Practice & Remedies Code § 37.009.

13 Cases that cite this headnote

**[6]** **Declaratory Judgment** 👈 Nature and scope of remedy

118A   Declaratory Judgment

118AI   Nature and Grounds in General

118AI(A)   In General

118Ak1   Nature and scope of remedy

The Uniform Declaratory Judgment Act (UDJA) is intended as a means of determining the parties' rights when a controversy has arisen but before a wrong has been committed and thus is preventative in nature.

13 Cases that cite this headnote

**Attorneys and Law Firms**

**\*620** Karen Ann Piotrowski, Gardere Wynne Sewell LLP, Dallas, TX, Edward D. Burbach, Leslie Ritchie Robnett, Gardere Wynne Sewell LLP, Austin, TX, **\*621** C.E. Clover Jr., Conner Cantey Clover Chaney & Walters, Sealy, TX, for Petitioner.

Ronald Lehmann, Giddings, TX, pro se.

Dana Lehmann, Giddings, TX, pro se.

Max E. Roesch, Max E. Roesch, P.C., Giddings, TX, for Respondents.

D. Gibson Walton, Hogan Lovells US LLP, Houston, TX, for Amicus Curiae Texas Cable Association.

**Opinion**

PER CURIAM.

Defendant Etan Industries, Inc. contends that the tort claims against it are barred by the two-year statute of limitations. It also argues that the declaratory judgment against it was unwarranted. We agree and accordingly reverse and render judgment for Etan.

Etan, a cable television and internet provider, had cable lines running on two properties owned by Ronald and Dana Lehmann (the Lehmanns). The properties were located on Highways 77 and 290. Etan's cable lines were placed on poles belonging to Bluebonnet Electric Cooperative, Inc., an electricity provider. Bluebonnet had easements on the Lehmann properties allowing it to place and operate "an electric transmission or distribution line or system" on the properties. Etan and Bluebonnet [1] had written agreements known as joint use or pole attachment agreements. The agreements allowed Etan to make use of Bluebonnet's poles, but only "to the extent [Bluebonnet] may lawfully do so," and stated that Etan was responsible for obtaining its own easements and rights-of-way from property owners.

The Lehmanns purchased the Highway 77 property in 1986. At the time, Bluebonnet had lines running within an easement on this property. In December 2000, Etan hung a cable on Bluebonnet's poles. Ronald's brother Steven also owned property along Highway 77. Steven immediately noticed Etan's cable on his own property and on Ronald's property, and notified Ronald. Steven thereafter had several conversations with employees of Bluebonnet and Etan, described below. Steven testified that he would always "fully apprise" Ronald of the conversations. Ronald likewise confirmed that Steven "told me everything" about the conversations.

Ronald and Steven decided Steven would call Bluebonnet about the new line. The day after noticing the line, Steven called Bluebonnet and was told the line belonged to Etan. Steven called Etan and spoke to Etan employee Jerry Smith. Smith told Steven that Etan had an easement and that Smith would send a copy of it to Steven. Steven waited for "a while" and called Smith back. Smith told Steven he was having trouble locating the easement but would find it and send it. In Summer 2001, Steven called Smith again. This time, Smith told Steven that Smith had been mistaken and Etan did not have an easement on the Highway 77 property. Smith claimed however that Etan had an oral agreement with Bluebonnet allowing Etan to use Bluebonnet's easements. According to

Ronald's testimony, Smith told Steven that Etan was "like in partnership" with Bluebonnet, and Etan could use Bluebonnet's easement. Based on this representation, "[w]e just dropped it."

In December 2002, Ronald read a newspaper article about *Marcus Cable Associates, L.P. v. Krohn,* 90 S.W.3d 697 (Tex.2002). In that case, we held that an easement permitting an electric cooperative to construct and maintain "an electric transmission **\*622** or distribution line or system" did not allow a cable television provider under a joint use agreement to place cable television lines in the easement. *Id.* at 699, 706–07. The Lehmann brothers both testified that they understood the case to hold a cable company could not hang a communication line in an electrical transmission easement. According to Steven, the *Krohn* decision "just threw up a red flag and I went to investigate it some more." The brothers decided to contact Bluebonnet. In December 2002, Steven spoke to a Bluebonnet representative, who informed Steven that Etan could use the Bluebonnet poles under the pole attachment agreements but that Etan was required to obtain its own easements from property owners. Bluebonnet informed Steven that without a separate easement Etan was trespassing. Steven understood Bluebonnet's position—that Etan was required to obtain its own easements—to contradict Smith's earlier representation that Etan did not need a separate easement. Ronald, likewise, understood that "[w]e had two conflicting stories." Bluebonnet told Steven that it would contact Etan "and try to get this thing worked out," but Steven and Ronald did not hear back from Etan or Bluebonnet. Also during this time period, Ronald went to the courthouse to look for property records of easements. Ronald was not a lawyer but had some experience conducting real estate transactions and reviewing real property records. He was unable to locate any Etan easements on his properties.

Steven and Ronald eventually decided to contact a lawyer in mid to late 2003. The lawyer contacted Bluebonnet and requested documentation regarding the easements on his clients' properties. Bluebonnet informed the lawyer that locating the documents would take some time. In July 2004, the lawyer received documents from Bluebonnet. No Etan easement was produced. The documents included Bluebonnet easements on the properties, and also included pole attachment agreements stating that "[e]ach party shall be responsible for obtaining its own easements and rights-of-way." In or about August 2004, Ronald and Steven met with their lawyer and reviewed the documents.

Steven filed suit against Etan for trespass in December 2004. Steven's case settled in September 2005. In October 2005, Ronald and Dana Lehmann filed suit pertaining to the Highway 290 property. In April 2006, the Lehmanns added claims pertaining to their Highway 77 property. Ronald testified that he waited to sue on the Highway 77 property because Steven had sued on his Highway 77 property, and Ronald decided to "watch and see" what happened in Steven's suit.

The jury rejected trespass and other tort claims pertaining to the Highway 290 property, and found that Etan had obtained a prescriptive easement on this property.

With respect to the Highway 77 property, the jury found that Etan had trespassed on and made a negligent misrepresentation concerning this property. On the issue of limitations, the jury found in Question 5 that the Lehmanns filed their claims within two years of the date they discovered or in the exercise of reasonable diligence should have discovered the injury to their property. The jury found in Question 6 that Etan fraudulently concealed its wrongful conduct pertaining to the trespass and misrepresentation claims. It found in Question 7 that the Lehmanns knew or in the exercise of reasonable diligence should have known of Etan's fraudulent concealment on July 1, 2004, the date their attorney received the above-described documents relating to the easements and pole attachment agreements. The trial court rendered judgment on the verdict for actual damages of $15,000 and **\*623** attorney's fees of $65,000, and also awarded a declaratory judgment and a permanent injunction. The court of appeals affirmed, with one justice dissenting. 308 S.W.3d 489 (Tex.App.–Austin 2010).

[1] [2] We agree with Etan that the Lehmanns' common-law tort claims were barred by limitations. The applicable statute of limitations runs for two years from the day the cause of action accrues. TEX. CIV. PRAC. & REM.CODE § 16.003. Generally, a cause of action accrues when a wrongful act causes a legal injury. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 221 (Tex.2003). The date a cause of action accrues is normally a question of law. *Id.; Exxon Corp. v. Emerald Oil & Gas Co.,* 348 S.W.3d 194, 202 (Tex.2011).

[3] [4] The Lehmanns contend that Etan's fraudulent concealment made their claims timely. A defendant's fraudulent concealment of wrongdoing can toll the running of the limitations period. *Kerlin v. Sauceda,* 263 S.W.3d 920, 925 (Tex.2008). However, even if we fully credit the Lehmanns' contention that Etan misrepresented that it had a legal right to use the Bluebonnet easements, and assume without deciding that these statements can be characterized as a fraudulent concealment under Texas law, the legal effect of that concealment does not extend the limitations period indefinitely. "The estoppel effect of fraudulent concealment ends when a party learns of facts, conditions, or circumstances which would cause a reasonably prudent person to make inquiry, which, if pursued, would lead to discovery of the concealed cause of action." *Borderlon v. Peck,* 661 S.W.2d 907, 909 (Tex.1983); *see also BP Am. Prod. Co. v. Marshall,* 342 S.W.3d 59, 67 (Tex.2011).

As described above, in December 2000, the Lehmanns discovered that a cable had been placed on their property on the day it was placed there, and knew the next day that Etan had installed the line.

In December 2002, the Lehmanns learned about this Court's *Krohn* decision, and correctly understood it to hold that an electric utility's easement could not be used by a cable television company. Also by this date, (1) Etan had admitted to the Lehmanns that Etan did not have an easement on the property, (2) Bluebonnet had informed the Lehmanns that Etan needed its own easement to use the Bluebonnet poles on the Lehmanns' properties and that without a separate

easement Etan was trespassing, (3) the Lehmanns knew they had received conflicting information from Etan and Bluebonnet, and (4) Etan had failed to produce, and Ronald had not independently uncovered, any documentation suggesting that Etan had a right to use the Lehmann property, despite Etan's prior representations that it would provide such documentation.

On these facts, we hold as a matter of law that the estoppel effect of the alleged fraudulent concealment ended in December 2002 at the latest. By that date, the Lehmanns were apprised of facts, conditions, and circumstances sufficient to cause a reasonable person to make inquiry that would lead to the discovery of the concealed cause of action. Because the Lehmanns did not file suit until more than two years after this date, their claims were time-barred. *See Kerlin,* 263 S.W.3d at 925 (rejecting fraudulent concealment finding because, as a matter of law, plaintiff could have discovered existence of claims through reasonable diligence before limitations expired); *Marshall,* 342 S.W.3d at 69 (same); *Emerald Oil,* 348 S.W.3d at 209 (concluding as a matter of law that assertion of fraudulent concealment was unavailing because plaintiffs had "actual knowledge of alleged injury-causing conduct" more than two years before filing suit); *PPG Indus., Inc. v. JMB/ Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 94 (Tex.2004) (holding that limitations begins **\*624** to run as a matter of law once claimant is on notice that "something is amiss").

**[5]** Etan also challenges the trial court's award of declaratory relief. The trial court awarded a declaratory judgment stating that neither Bluebonnet's easements nor Etan's pole attachment agreements with Bluebonnet provided Etan with easements or other rights-of-way on the Lehmanns' properties.

Etan argues that the claims for declaratory judgment were moot because Etan had removed its lines from the Lehmanns' properties prior to trial. We agree. We have recently noted that a request for declaratory judgment is moot if the claim presents "no live controversy." *Tex. A & M Univ.- Kingsville v. Yarbrough,* 347 S.W.3d 289, 290 (Tex.2011). We further explained that declaratory relief is not warranted unless the claim presents a "substantial controversy" of "immediacy and reality." *Id.* at 291 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)). The trial court had no reason to declare that Etan could not place lines on the Lehmanns' property in the future, absent a reasonable basis for concluding that without a declaratory judgment Etan might do so in defiance of the court's judgment finding it liable for trespass. We see no basis for reaching this conclusion on this record. *Cf. Krohn v. Marcus Cable Assocs., L.P.,* 201 S.W.3d 876, 882 (Tex.App.-Waco 2006, pet. denied) (holding that property owner's request for injunctive relief against cable company was moot once the cable in issue was removed).

**[6]** The Uniform Declaratory Judgment Act (UDJA) is not appropriately employed to remedy a trespass occurring prior to trial that is the subject of a separate common-law trespass claim. As the Lehmanns themselves describe the purpose of the Act in their brief, it is intended as a

means of determining the parties' rights when a controversy has arisen but before a wrong has been committed, "and is preventative in nature." *See Cobb v. Harrington,* 144 Tex. 360, 190 S.W.2d 709, 713 (1945) (describing Act as instrumentality wielded "in the interest of preventative justice," and intended as a remedy "when a real controversy has arisen and even before the wrong has actually been committed").

Further, the only apparent benefit to the Lehmanns from the declaratory judgment was the award of attorney's fees under the UDJA. *See* TEX. CIV. PRAC. & REM.CODE § 37.009. We have held that simply repleading a claim as one for a declaratory judgment cannot serve as a basis for attorney's fees, since such a maneuver would abolish the American Rule and make fees "available for all parties in all cases." *MBM Fin. Corp. v. Woodlands Operating Co.,* 292 S.W.3d 660, 669 (Tex.2009). When a claim for declaratory relief is merely "tacked onto" statutory or common-law claims that do not permit fees, allowing the UDJA to serve as a basis for fees "would violate the rule that specific provisions should prevail over general ones." *Id.* at 670. The declaratory judgment claim must do more "than merely duplicate the issues litigated" via the contract or tort claims. *Id.*

By these standards the declaratory judgment and attorney's fees awarded thereunder were not warranted. The declaratory judgment simply duplicated the issues litigated under the trespass claim by declaring, consistent with the Lehmanns' theory of trespass, that neither Bluebonnet's easements nor the pole attachment agreements between Bluebonnet and Etan gave Etan the right to place its lines on the Lehmanns' properties. We agree with the court of appeals' dissent "that declaratory relief was improper because the declarations in this case add **\*625** nothing to what would be implicit or express in a final judgment for the other remedies sought in the same action." 308 S.W.3d at 518 (Waldrop, J., dissenting).[2]

Accordingly, we grant Etan's petition for review, and without hearing oral argument, TEX.R.APP. P. 59. 1, we reverse the court of appeals' judgment and render judgment that the Lehmanns take nothing on their claims.

## All Citations

359 S.W.3d 620, 55 Tex. Sup. Ct. J. 219

## Footnotes

[1]   Herein, Etan refers to Etan Industries, Inc., d/b/a CMA Cablevision, and relevant predecessors in interest. Bluebonnet refers to Bluebonnet Electric Cooperative, Inc. and relevant predecessors in interest.

[2]   Etan also challenges, on various grounds, the trial court's award of a permanent injunction and damages. These remedies are available only if liability is established under a cause of action. *See Valenzuela v. Aquino,* 853 S.W.2d 512, 514 n. 2 (Tex.1993) ("No final relief, including a permanent injunction, can be granted in a contested case without a determination of legal liability...."); *Cooper v. Litton Loan Servicing, LP,* 325 S.W.3d 766, 769 (Tex.App.-Dallas 2010, pet. denied) (noting that "[a] permanent injunction is not

a cause of action but an equitable remedy," and that "[t]o obtain an injunction a party must first assert a cause of action"). Because, for the reasons above, the Lehmanns' causes of action cannot be sustained, we need not reach these issues.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

165 S.W.3d 310
Supreme Court of Texas.

FROST NATIONAL BANK, Petitioner,
v.
L & F DISTRIBUTORS, LTD., Respondent.

No. 04–0074.  |  May 27, 2005.

**Synopsis**

**Background:** Assignee of motor vehicle lease brought declaratory judgment action against lessor after it refused to sell vehicles to assignee before end of lease terms. The 370th District Court, Hidalgo County, Noe Gonzalez, J., awarded final summary judgment to assignee. Lessor appealed. The Corpus Christi Court of Appeals, Dori Contreras Garza, J., 122 S.W.3d 922, affirmed. Review was granted.

**[Holding:]** The Supreme Court held that assignee could exercise the purchase option only at expiration of the lease.

Reversed and remanded.

West Headnotes (6)

**[1]  Contracts**  Language of Contract

95  Contracts
95II  Construction and Operation
95II(A)  General Rules of Construction
95k147  Intention of Parties
95k147(2)  Language of Contract

In construing a contract, courts must ascertain and give effect to the parties' intentions as expressed in the document.

109 Cases that cite this headnote

**[2]  Contracts**  Construction as a Whole

95  Contracts
95II  Construction and Operation

95II(A)  General Rules of Construction

95k143.5  Construction as a Whole

Courts consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement.

96 Cases that cite this headnote

**[3]    Contracts** 👈 Subject, Object, or Purpose as Affecting Construction

**Contracts** 👈 Reasonableness of Construction

95  Contracts

95II  Construction and Operation

95II(A)  General Rules of Construction

95k143  Application to Contracts in General

95k143(4)  Subject, Object, or Purpose as Affecting Construction

95  Contracts

95II  Construction and Operation

95II(A)  General Rules of Construction

95k151  Language of Instrument

95k154  Reasonableness of Construction

Courts construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served and will avoid, when possible and proper, a construction which is unreasonable, inequitable, and oppressive.

108 Cases that cite this headnote

**[4]    Contracts** 👈 Existence of Ambiguity

**Contracts** 👈 Ambiguity in General

95  Contracts

95II  Construction and Operation

95II(A)  General Rules of Construction

95k143  Application to Contracts in General

95k143(2)  Existence of Ambiguity

95  Contracts

95II  Construction and Operation

95II(A)  General Rules of Construction

95k176  Questions for Jury

95k176(2)  Ambiguity in General

If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and is construed as a matter of law.

48 Cases that cite this headnote

**[5]    Contracts** 👈 Existence of Ambiguity

95 Contracts

95II Construction and Operation

95II(A) General Rules of Construction

95k143 Application to Contracts in General

95k143(2) Existence of Ambiguity

A contract is ambiguous if it is susceptible to more than one reasonable interpretation.

33 Cases that cite this headnote

[6] **Bailment** ☞ Termination, Rescission, and Option to Purchase Property

50 Bailment

50k22 Termination, Rescission, and Option to Purchase Property

Lease allowed lessee's assignee to purchase the vehicles only at the end of the sixty-month lease term; although the terminal rental adjustment clause entitled the lessee to purchase the vehicles by giving written notice at least ninety days before expiration, it required payment of fair market value on the last day of expiration, the lease ended on expiration date after sixty months and used the term "termination" to describe end of lease before the expiration, and allowing exercise of the option before expiration would permit the assignee to purchase the vehicles for twenty percent of the original invoice price at any point during the five-year lease.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*310** David M. Gunn, Russell S. Post, Beck, Redden & Secrest, L.L.P., Houston, Frank Weathered, Dunn Weathered Coffey Rivera Kasperitis & Rodriguez, P.C., Corpus Christi, Daniel H. Byrne, Fritz Byrne Head & Harrison, LLC, Austin, Francisco Enriquez, Law Offices of Frank Enriquez, McAllen, for Petitioner.

Charles C. Murray, Lisa Powell, Atlas & Hall, L.L.P., McAllen, for Respondent.

Karen Sue Neeley, John Mark Heasley, Texas Bankers Association, Austin, for Amicus Curiae.

**Opinion**

**\*311** PER CURIAM.

This case involves the interpretation of a term equipment-lease agreement with a purchase option provision. The lessee attempted to exercise the purchase option and buy the equipment a little over a year into the five-year lease term, but the lessor refused, contending that the contract only

allowed the lessee to purchase the equipment when the lease term ended. The trial court and the court of appeals agreed with the lessee's interpretation, but we agree with the lessor's. Accordingly, we reverse the court of appeals' judgment, render judgment in part for the lessor, and remand the case to the trial court for further proceedings.

Frost National Bank purchased fourteen new delivery vehicles and leased them to Williams Distributors, Inc., a beer distributor. Frost and Williams entered into a sixty-month equipment lease agreement. [1] The lease's purchase option provision, known as a terminal rental adjustment clause, or TRAC, gave the lessee (Williams) the right to purchase the vehicles by giving the lessor (Frost) ninety days' written notice and provided for payment to be made "on the last day of [the lease's] Expiration [in] an amount in cash equal to the then Fair Market Value as hereafter defined in this section, of such Equipment." The agreement then clarified that the lessor would collect an amount equal to twenty percent of the original invoice price of the vehicles when they were sold, whether to the lessee or to a third party; specifically, if the vehicles were sold to a third party, the lessor would pay the lessee any proceeds in excess of that amount, and, should the lessor receive less than the twenty percent from the sale, the lessee would owe the difference as a final rental payment.

Just over a year into the lease term, Williams assigned the lease, with Frost's consent, to L & F Distributors, Inc., another beer distributor. Shortly thereafter, L & F notified Frost of its intent to exercise the purchase option. Before Frost responded, L & F sued Frost for a declaratory judgment, and L & F later amended its petition to add a claim for specific performance. L & F also sent Frost a letter with a payment of $169,874.99, which amounted to twenty percent of the original invoice price of the vehicles. Frost rejected and returned L & F's payment, refusing to sell the vehicles until the last day of the lease term, and also counterclaimed for declaratory relief and breach of contract when L & F stopped paying rent on the vehicles. The parties agreed to narrow the scope of the dispute to the declaratory judgment requests and to limit Frost's claim for damages. Both parties filed motions for summary judgment.

The trial court partially granted L & F's motion for summary judgment and denied Frost's motion, declaring that Frost breached the lease agreement by refusing to sell the vehicles when L & F tendered payment. The trial court also awarded L & F its attorney's fees. The court of appeals affirmed, holding that the lease agreement was unambiguous and allowed L & F, as lessee, to purchase the vehicles with proper notice at any time on or before the end of the term. [2] *122 S.W.3d 922, 933.*

 **[1]    [2]    [3]    [4]    [5]**    In construing a contract, we must ascertain and give effect to the parties' **\*312**  intentions as expressed in the document. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003); *Lopez v. Muñoz, Hockema & Reed, L.L.P.,* 22 S.W.3d 857, 861 (Tex.2000). We consider the entire writing and attempt to harmonize and give effect to all the provisions of the

contract by analyzing the provisions with reference to the whole agreement. *Webster,* 128 S.W.3d at 229. We construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and "will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex.1987). If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law. *Webster,* 128 S.W.3d at 229. On the other hand, a contract is ambiguous if it is susceptible to more than one reasonable interpretation. *Id.*

 **[6]** The following provisions of the lease agreement, including the purchase option provision discussed above, are particularly relevant to the parties' dispute:

## MASTER EQUIPMENT LEASE AGREEMENT

....

Section 2. Terms; Rental; Unconditional Obligations; Security.

A. The lease of each item shall begin on the date of the related Schedule (the "Acceptance Date") and end on the Expiration Date specified in the Schedule (the "Expiration") or on the date of any earlier or later termination hereunder (the "Termination").

....

## LEASE SCHEDULE TO MASTER EQUIPMENT LEASE AGREEMENT

....

C. Term Expiration. *(60) Sixty months* (the "Expiration" or "Expiration Date").

....

### Lease Schedule to Master Equipment Lease Agreement

### Optional Provisions

....

Section 3. Purchase; Terminal Rental Adjustment

A. Provided no Event of default shall have occurred and then be continuing, Lessee shall have, by giving not less than ninety (90) days prior written notice to Lessor, the right to purchase all but not less than all the Equipment on or before the Expiration. Purchase shall be made by

paying to Lessor on the last day of such Expiration an amount in cash equal to the then Fair Market Value as hereafter defined in this section, of such Equipment....

The court of appeals held that the purchase option provision (section 3(A) of the Optional Provisions) is unambiguous. 122 S.W.3d at 931. Specifically, the court of appeals noted that the first sentence allows L & F to buy the vehicles either on or before the expiration of the lease, the only qualifications being that L & F cannot be in default, must buy all the vehicles, and must give Frost at least ninety days' notice of the purchase. *Id.* The court of appeals then held that the second sentence, which requires payment to be made "on the last day of such Expiration," does not create an ambiguity or call for payment only at the end of the sixty-month lease term. *Id.*

Were we to consider the purchase option provision in isolation, we might agree with the court of appeals' reading. However, when both sentences of the provision are properly considered in conjunction with each other and the rest of the agreement, particularly the contractual definition of **\*313** the term "Expiration," the agreement unambiguously allows L & F to purchase the vehicles only at the end of the sixty-month lease term. [3]

The court of appeals ignored pertinent language in the lease schedule when it held that, should L & F choose to exercise the purchase option before the end of sixty months, the lease would simply expire and payment would be due at the time of purchase. *Id.* The agreement specifically states that the lease ends on the "Expiration" or "Expiration Date," which occurs at sixty months. A different contractual term, "Termination," describes the agreement's being terminated on an earlier or later date. By calling for payment "on the last day of such Expiration [of] an amount in cash equal to the then Fair Market Value," the agreement provides that, should L & F give the requisite notice of its intent to exercise the purchase option, it will pay Frost at the end of the sixty-month lease term the then-fair market value of the vehicles, which will effectively come out to twenty percent of the invoice price. To reach the court of appeals' conclusion requires either substituting the word "Termination" for "Expiration" in the purchase option provision or amending the contractual definition of "Expiration," neither of which is appropriate in construing an agreement.

In addition, L & F's and the court of appeals' construction is "unreasonable, inequitable, and oppressive." *Reilly,* 727 S.W.2d at 530. Such a construction allows the lessee to terminate the lease and purchase the vehicles for the same price (twenty percent of the original invoice price) at any point during the five-year lease term with the requisite notice. At the lessee's discretion, then, the lessor would essentially have to forgo almost the entire rental value of the equipment and sell it almost new for twenty percent of its value, the same price it would receive for selling the equipment at the end of the lease term after collecting rent on it for sixty months. Bearing in mind that our primary goal is to ascertain the intent of the parties when they entered into the agreement, we find such a construction unreasonable. Because there is only one reasonable interpretation of the lease, we construe it as a matter of law.

\* \* \* \* \*

We hold that the lease is unambiguous and provides that, while the lessee may give notice at any time during the lease term that it intends to exercise the purchase option, the lessee can actually purchase the vehicles only at the lease's expiration, which occurs sixty months after the lease term begins. Accordingly, without hearing oral argument, Tex.R.App. P. 59.1, we reverse the court of appeals' judgment, render judgment for Frost on its declaratory judgment claim, and remand the case to the trial court for further proceedings consistent with this opinion.

## All Citations

165 S.W.3d 310, 48 Tex. Sup. Ct. J. 803

Footnotes

1      The parties actually entered into two essentially identical agreements, one concerning eight of the vehicles and one concerning the other six, but for simplicity we will refer to them as a single agreement.

2      The court of appeals also affirmed the trial court's denial of Frost's motion to transfer venue. 122 S.W.3d at 927–29. Frost does not challenge the venue ruling in this Court.

3      Frost also argues that the Uniform Commercial Code, as adopted in Texas, allows us to consider course of dealing, course of performance, and usage of trade to "explain or supplement" the lease. *See* Tex. Bus. & Com. Code § 2A.202. Because the plain language of the contract is clear and supports Frost's interpretation, we need not consider such evidence for explanatory purposes.

**End of Document**                                                  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5889109

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Supreme Court of Texas.

Kachina Pipeline Company, Inc., Petitioner,

v.

Michael D. Lillis, Respondent

NO. 13–0596   |   Argued March 24, 2015
  |   OPINION DELIVERED: October 9, 2015

ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS Argued March 24, 2015

JUSTICE BROWN delivered the opinion of the Court, in which JUSTICE JOHNSON, JUSTICE WILLETT, JUSTICE GUZMAN, JUSTICE LEHRMANN, and JUSTICE BOYD joined.

**Opinion**

Jeffrey V. Brown, Justice

 **\*1** We deny the motion for rehearing filed by Kachina Pipeline Company, Inc. We withdraw our opinion of June 12, 2015, and substitute the following in its place.

In this case we interpret a written natural-gas-purchase agreement between a natural-gas producer and a pipeline operator. On summary judgment, the trial court declared the agreement entitled the pipeline operator to deduct the costs of compression from its payments to the producer. The court further declared the agreement gave the pipeline operator the option to extend the arrangement for an additional five-year term. The court of appeals reversed, holding the agreement unambiguously allows neither the disputed deductions nor a five-year extension. We agree and thus affirm the court of appeals' judgment.

## I

Kachina Pipeline Company, Inc., owns and operates a natural-gas gathering system and pipeline. It purchases gas from several producers and transports it for resale to Davis Gas Processing at one

of Davis's processing plants. Michael Lillis is one of those producers, and he has sold gas from his wells to Kachina since at least 2001. In 2003, Kachina installed the Barker Central Compression Station on its pipeline. That compression allows Kachina to resell to Davis at its high-pressure inlet, for which Davis pays a higher per-volume price. Kachina installed additional compression in 2007.

In 2005, Kachina and Lillis entered into a new Gas Purchase Agreement naming Kachina as "Buyer" and Lillis as "Seller." Under the Agreement, Lillis would transfer gas from his wells into Kachina's gathering system at specified delivery points and Kachina would pay Lillis a percentage of the proceeds it obtained through resale to Davis. A producer can successfully deliver gas only if its pressure is sufficient to overcome the working pressure in the gathering system, and the Agreement addresses the parties' rights and responsibilities as to pressure. It specifies that "neither party hereto shall be obligated to compress any gas" but provides that "[i]f Buyer installs compression to effect delivery of Seller's gas, Buyer will deduct from proceeds payable to Seller hereunder a value equal to Buyer's actual costs to install, repair, maintain and operate compression plus 20% of such costs to cover management, overhead and administration."

The Agreement provides it is effective for an "initial period" expiring May 2010, at which point it continues month-to-month and is cancelable by either party upon thirty days' notice. "Upon termination or cancellation of [the] Agreement, prior to Seller selling gas to a third party," Kachina has the option to "continue the purchase of gas under the terms of [the] Agreement with such adjustments in the price hereunder as may be required to yield the same economic benefit to Seller, as would be derived from the proposed third[-]party offer."

Kachina bought, transported, and resold Lillis's gas according to the Agreement. It deducted from Lillis's share of the proceeds "marketing fees," which included his pro rata share of compression costs. In 2008, Lillis entered into a purchase agreement directly with Davis and constructed his own pipeline to its plant. Around the same time, he objected to the compression fees Kachina had been deducting.

**\*2** Lillis then sued, asserting that the Agreement did not authorize deduction for compression occurring after he delivered the gas to Kachina and that Kachina thus breached the Agreement by deducting those compression fees. He sought a declaration that Kachina was in breach and an accounting. He also brought a fraud claim, asserting that Kachina represented it would release him from the Agreement and that he built the new pipeline in reliance on that representation. Kachina counterclaimed, asserting Lillis breached the Agreement by failing to notify it of Davis's third-party offer. Kachina sought declarations that it had the right to deduct compression charges under the Agreement and that it exercised its option, extending the Agreement's term through May 2015.

Both parties moved for summary judgment, with Kachina filing a no-evidence motion for partial summary judgment on the fraud claim and a motion for traditional partial summary judgment on the declarations it sought. The trial court denied Lillis's motion for summary judgment and granted both of Kachina's, ordering that Lillis take nothing on his claims. The court declared in its final judgment that Kachina "has the right under the 2005 Gas Purchase Agreement to deduct from [Lillis's] monthly net proceeds compression costs" and that Kachina "duly exercised its option rights under the 2005 Gas Purchase Agreement so that the termination date of the Agreement has been extended to May 31, 2015." It further awarded Kachina attorney's fees and expenses.

The court of appeals reversed those declarations. No. 03–10–00784–CV, 2013 WL 3186261, at *7, * 9 (Tex.App.–Austin June 18, 2013) (mem.op.). It held the Agreement unambiguously does not allow Kachina to charge for compression that occurs after the gas transfers to Kachina, and thus it refused to consider extraneous evidence Kachina offered in an attempt to show that Lillis intended to assume such costs. *Id.* at *8. It also held that the option provided for in the Agreement does not allow for a five-year extension. *Id.* at *6. It consequently reversed the award of attorney's fees and remanded for consideration of Lillis's accounting claim. *Id.* at *11, *12. Kachina sought our review.

## II

A declaratory judgment granted on a traditional motion for summary judgment is reviewed de novo. *See Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). Under the traditional standard for summary judgment, the movant has the burden to show that no genuine issue of material fact exists and that judgment should be granted as a matter of law. TEX. R. CIV. P. 166a(c). "When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Knott,* 128 S.W.3d at 215.

At issue here is the trial court's construction of the Agreement's compression-cost provision and construction of its option provision. The construction of an unambiguous contract is a question of law, also reviewed de novo. *Tawes v. Barnes,* 340 S.W.3d 419, 425 (Tex.2011). When the agreement as written is ambiguous, however, the parties' intent becomes a fact issue. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.,* 341 S.W.3d 323, 333 (Tex.2011). Whether a contract is ambiguous is itself a legal question for the court. *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.,* 294 S.W.3d 164, 168 (Tex.2009).

## A

Whether the trial court properly declared the Agreement authorized deduction of the disputed costs depends on whether the compression-cost provision applies to the compression here. Kachina's deductions included Lillis's share of total system compressor costs, based on the proportion of gas moved through the system that originated from his wells. The Barker station was in place and operating at the time the parties entered into the Agreement. In 2007, Kachina added compression equipment to "enhance operations and move more gas through the system for delivery to Davis," according to Kachina's president.

**\*3** Kachina argues the provision authorizes deductions for any compression that aids in the final delivery to Davis of gas bought from Lillis. Under this interpretation, Kachina rightfully deducted Lillis's share of the costs of all compression. Lillis, on the other hand, argues the provision's plain language allows deductions only for compression that Kachina installs if Lillis fails to deliver at pressures that overcome Kachina's working pressure at the point of transfer. He thus argues Kachina must show (1) Lillis has become unable to deliver against Kachina's working pressure, and (2) the compression equipment was installed after the Agreement's execution. This interpretation would preclude deduction for the pre-existing compression at the Barker station. And though the compression added in 2007 would satisfy Lillis's second requirement, Kachina does not argue and the record does not support it was installed because one of Lillis's wells failed to deliver.

"In construing a contract, a court must ascertain the true intentions of the parties as expressed in the writing itself." *Italian Cowboy,* 341 S.W.3d at 333. We may consider the facts and circumstances surrounding a contract, including "the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give context to the parties' transaction." *Americo Life, Inc. v. Myer,* 440 S.W.3d 18, 22 (Tex.2014). But while evidence of circumstances can be used to "inform the contract text and render it capable of only one meaning," extrinsic evidence can be considered only to interpret an ambiguous writing, not to create ambiguity. *See, respectively,id.*; *Friendswood Dev. Co. v. McDade & Co.,* 926 S.W.2d 280, 283 (Tex.1996). "A contract is not ambiguous simply because the parties disagree over its meaning." *Dynegy,* 294 S.W.3d at 168. Rather, "[i]f a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995) (per curiam).

"When discerning the contracting parties' intent, courts must examine the entire agreement and give effect to each provision so that none is rendered meaningless." *Tawes,* 340 S.W.3d at 425. "We give contract terms their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning." *Dynegy,* 294 S.W.3d at 168. "Moreover, we have stated that a court should construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served." *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.,* 925 S.W.2d 565, 574 (Tex.1996). "No single provision taken alone will be given controlling effect; rather, all

the provisions must be considered with reference to the whole instrument." *Tawes,* 340 S.W.3d at 425 (quoting *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983)).

Applying these rules of interpretation, we agree with Lillis that the provision unambiguously allows Kachina to deduct only the costs of compression installed during the term of the Agreement if required to overcome the working pressure in Kachina's system. A paragraph titled "Delivery Point" defines the point of transfer:

> Seller agrees to deliver and Buyer agrees to receive the gas deliverable hereunder at the outlet of Buyer['s] ... metering facilities to be located at a mutually agreeable point(s) at or near Seller's well(s). Such point shall constitute the delivery point for all gas to be delivered hereunder.

The next paragraph provides, "Title of all gas delivered hereunder shall pass to Buyer at the delivery point." A paragraph titled "Pressure" generally addresses the pressure differential at that point:

> *Pressure:* Seller shall deliver the gas deliverable hereunder, at the above [-]described delivery point at a pressure sufficient to enter Buyer's pipeline against the working pressure maintained therein from time to time. Seller will regulate its[ ] pressures so as to not exceed the maximum allowed operating pressure (MAOP) as set from time to time by Buyer for deliveries into Buyer's gas pipeline. However, it is expressly understood and agreed that neither party hereto shall be obligated to compress any gas under the terms of this Agreement and if the well is no longer capable of delivering gas against the working pressures maintained at the delivery point and neither party elects to install a compressor, then Buyer shall, upon request from Seller, release such well and the gas produced therefrom from the terms and provisions of this Agreement. ***If Buyer installs compression to effect delivery of Seller's gas, Buyer will deduct from proceeds payable to Seller hereunder a value equal to Buyer's actual costs to install, repair, maintain and operate compression, plus 20% of such costs to cover management, overhead and administration.***

**\*4** (emphasis added).

The Pressure paragraph recognizes transfer into Kachina's line depends on the producer's well's pressure being sufficient to overcome Kachina's working pressure, and it imposes the duty to maintain sufficient pressure on the producer. If a well fails to overcome Kachina's working pressure, the paragraph gives Kachina two options. It may do nothing, in which case the well will be released from the Agreement. Or it may elect to install compression so that the well can overcome the working pressure. If Kachina elects the latter, it has the right to deduct costs incurred.

The contingent nature of that right is unavoidable—it arises only "[i]f [Kachina] installs compression to effect delivery." *See Solar Applications Eng'g, Inc. v. T.A. Operating Corp.,* 327

S.W.3d 104, 109 (Tex.2010) ("In order to make performance specifically conditional, a term such as 'if' ... or some similar phrase of conditional language must normally be included." (quoting *Criswell v. European Crossroads Shopping Ctr., Ltd.,* 792 S.W.2d 945, 948 (Tex.1990))). We must reach two conclusions to make sense of this contingent phrasing. First, it does not apply to preexisting compression. It makes little sense that the parties would have made deductions contingent on installation if they intended the provision to also cover the compression already in place at the time of the Agreement. Second, only compression installed for the purpose of overcoming Kachina's working pressure is installed to "effect delivery." The sentence immediately preceding the compression-cost provision contemplates a scenario in which "a well is no longer capable of delivering gas against the working pressures" and "neither party elects to install a compressor." Generally, well pressure tends to diminish over time as the reservoir is depleted; the Pressure paragraph creates an elective scheme that addresses this reality. Indeed, the ordinary meaning of the verb "effect" is "to bring about; to make happen." BLACK'S LAW DICTIONARY 628 (10th ed.2014). If a well's natural pressure is sufficient to overcome the working pressure at the delivery point, added compression can hardly be said to bring about delivery that would occur without it. To construe the compression-cost provision to apply to any compression would ignore its plainly contingent language and the elective scheme it creates.

Kachina argues that "delivery" includes final delivery to a third party—here, Davis—because the provision does not expressly limit "delivery" to mean only transfer into its system. When considering the Agreement as a whole and the specific context in which the provision appears, this cannot be so. The Agreement does not define the term "delivery," but it uses "deliver" or "delivery" dozens of times throughout, almost exclusively to refer to transfer from Lillis to Kachina. And, as discussed, the Pressure paragraph containing the compression-cost provision specifically addresses pressure issues at those points of transfer.

**\*5** In contrast, the Agreement refers to re-delivery to a third party only twice. Once is in a paragraph titled "Reservation of Gas by Buyer," which allows Kachina to except from the Agreement gas to operate compression that is "required to provide gas to third[-]party purchasers." Thus, the Agreement contemplates Kachina may need to compress the gas for resale, but it uses the term "provide" rather than "deliver." And though Kachina may use gathered gas to fuel that compression, the provision is silent as to who bears the compression's cost. The other usage is in the price provision, which sets the price based on the net volume "delivered to and resold by the Buyer based on the price received by the Buyer for resale of same said gas delivered at the outlet of the Buyer's System." That single usage of "delivery" to refer to transfer to a third-party purchaser at the outlet of Kachina's system cannot outweigh the consistency with which it is otherwise used throughout the Agreement and in the compression provision's specific textual environment.

Kachina's fall-back position is that even if "delivery" means transfer at the delivery point and not to the Davis plant, the Barker compressor "effects delivery" by creating a suction, thereby

lowering the upstream pressure and aiding the flow of gas through the delivery point and into Kachina's line. The CHIEF JUSTICE agrees. While we do not question that downstream compression may function as Kachina suggests, that factual assertion does not help interpret the Agreement's language. Both Kachina and the CHIEF JUSTICE assume any compression that aids in delivery "effects delivery." But, respectfully, neither offers an alternative interpretation of the contract language that would harmonize this position with the provision's contingent phrasing and immediate context. *See FPL Energy, LLC v. TXU Portfolio Mgmt. Co.,* 426 S.W.3d 59, 63 (Tex.2014) ("We consider the entire writing to harmonize and effectuate all provisions such that none are rendered meaningless.").

The CHIEF JUSTICE also states that the evidence shows that Lillis would not be able to deliver to Kachina without compression. We disagree. Compression is clearly necessary for re-delivery to Davis's high-pressure intake, but the record shows Davis can also take low-pressure sales at less than 50 pounds per square inch gauge. Lillis delivers to Kachina at 50 and 80 pounds per square inch gauge, and the record establishes gas could flow from the leases through Kachina's line and to Davis without compression if Kachina had not opted for the high-pressure sale. In any case, the summary-judgment burden is Kachina's, and Lillis need not establish the compression here was not necessary for delivery to Kachina.

The Pressure paragraph acknowledges Kachina's options if faced with an underpressurized well and shifts costs of compression installed to remedy such a situation. But there is no evidence in the record presented that Kachina ever faced an underpressurization issue. The record supports only that Kachina constructed the Barker compression station to take advantage of the higher price Davis pays for high-pressure resales and added the 2007 compression to increase the amount of gas gathered and transported. The Agreement does not address these decisions.

We do not mean to say, however, that the compression's location is determinative. The court of appeals held that "the provision does not expressly speak to whether Kachina may seek recovery for compression that occurs after gas has been transferred." 2013 WL 3186261, at *8. We disagree with the court's implicit assumption that compression occurring on Kachina's side of the delivery point cannot "effect delivery." As Kachina and two pipeline-industry amici point out, compression not only increases downstream pressure, it reduces upstream pressure, which can decrease the working pressure at the delivery points to facilitate transfer from a low-pressure well. *See, e.g.,Parker v. TXO Prod. Corp.,* 716 S.W.2d 644, 645 (Tex.App.–Corpus Christi 1986, no writ) (noting pipeline operator "installed compressors to better deliver the gas from the wells into [its] pipeline system"). If a well fails to deliver, Kachina can effect delivery by decreasing the working pressure in that manner. The provision allows deductions only for compression that serves that purpose, but it does not speak to the compression's location. In fact, the Agreement provides Lillis has "exclusive control and possession of the gas deliverable hereunder" until title transfers at the delivery point, and it gives Kachina no right to install any equipment upstream from

the delivery point. The court of appeals' implied limitation would effectively require the parties to act beyond the rights the Agreement affords in order to give the provision effect.

**\*6** The record reflects that Kachina had been deducting compression costs as part of its marketing fees since at least 2003 under the 2001 contract. Kachina points to Lillis's acquiescence to those fees as evidence that he knew he would share those costs. The 2001 compression-cost provision was written more broadly than its counterpart in the 2005 Agreement, however, and such acquiescence does not establish a course of dealing that supports Kachina's interpretation. *See* TEX. BUS. & COM. CODEE §§ 1.303(b), 2.202(1) (defining course of dealing and allowing course of dealing to explain express terms). The 2001 contract allows deduction of a compression fee "[s]hould Seller at any Point of Delivery deliver gas into one of Buyer's pipelines whereon compression facilities are installed." That provision would certainly apply to all compression here. That the provision's language changed so drastically between the 2001 and 2005 contracts supports our interpretation of the Agreement's language. The CHIEF JUSTICE argues it makes no sense that Lillis would cease to assume his share of costs. But our task is to interpret the Agreement's language, not to justify the bargain it memorializes. *See FPL Energy,* 426 S.W.3d at 65 ("We must respect and enforce this [contract's] assignment of risk." (citing *Gym–N–I Playgrounds, Inc. v. Snider,* 220 S.W.3d 905, 912 (Tex.2007))).

In support of its contention that Lillis understood the Agreement allocated his share of costs of all compression, Kachina also points to Lillis's continued acquiescence to the marketing fees under the 2005 Agreement as well as deposition testimony in the record that suggests Lillis understood he would be allocated compression costs under the Agreement. A party's interpretation of an agreement is parol evidence and cannot be used to create ambiguity or show motive. *Anglo–Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.,* 352 S.W.3d 445, 452 (Tex.2011); *see also Italian Cowboy,* 341 S.W.3d at 333–34 ("Only where a contract is ambiguous may a court consider the parties' interpretation ...." (quoting *David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447, 450–51 (Tex.2008) (per curiam))). Both Lillis's acquiescence and his testimony are evidence of subjective intent that we cannot consider to contradict the provision's unambiguous legal meaning. *Sun Oil Co. (Del.) v. Madeley,* 626 S.W.2d 726, 732 (Tex.1981) (holding method of accounting in administering a contract was inadmissible evidence of a party's interpretation).

Amici have made it clear that downstream centralization of compression is both common and critical to the efficient transportation of gas to market. We do not doubt that, and we do not doubt that producers often contract to share in such costs. But the Agreement does not express an objective intent that Lillis would do so, and industry custom cannot impose obligations beyond those within the written Agreement. *See Nat'l Union,* 907 S.W.2d at 521–22 (refusing to consider evidence of industry-wide discussions because it directly conflicted with express language). Absent evidence that compression installed during the term of the Agreement was required to

overcome the working pressure in Kachina's system, the Agreement does not authorize Kachina to deduct compression costs. The trial court erred to the extent it declared otherwise.

**B**

The Agreement's term provision requires Lillis to give Kachina notice of any purchase offer made by a third party, and it gives Kachina the option to "continue the purchase of gas under the terms of this Agreement with such adjustments in the price hereunder as may be required to yield the same economic benefit to [Lillis], as would be derived from the proposed third [-]party offer." The court of appeals correctly decided this provision does not support a five-year extension.

Kachina argues the provision's language supports such an extension because the five-year initial period is a "term of this Agreement." Certainly, in exercising its option, Kachina remains bound by the Agreement's original terms. But the option right granted is not the right to a new or renewed agreement; it is the right to *continue the purchase of gas* under the Agreement's terms. The five-year initial period is one of those terms. Another is that the Agreement would become month-to-month in May 2010. The express language does not subject the parties to a new agreement with a new initial term.

**\*7** Kachina points to the proposed agreement between Lillis and Davis, which it says also sets a fixed price for a five-year term. The provision, however, allows adjustments only in *price* based on the outside third-party agreement. It does not import any other term from a third-party offer. Kachina's rights are confined to the Agreement regardless of the content of the Lillis–Davis agreement, price notwithstanding.

Kachina argues that because the market price of gas fluctuates, a new five-year term is required to confer the same economic benefit on Lillis as he would have received through his deal with Davis. While it may be true that generally a contract's economic value is to some extent a function of its term period and that our interpretation should be informed by that commercial context, the plain language here still does not entitle Kachina to an additional five-year term. Further, the provision protects Lillis by ensuring he receives the economic benefit of any outside deal he procures after rightfully cancelling or terminating the contract. It does not confer any additional rights on Kachina, and to construe it as forcing Lillis into an extended commitment runs contrary to its purpose.

Finally, Kachina argues our construction yields the absurd result that Lillis may cancel the Agreement every month, requiring Kachina to perpetually exercise its option. The reality, however, is not so absurd. While Lillis is entitled to cancel on the first day of any month once the initial term expired, his only reason to do so would be that a third party had offered a

better price. The provision recognizes that Lillis may pursue a better deal, and it indeed requires Kachina to match that deal if it is to continue purchasing from Lillis. Kachina, however, insists the business of natural-gas transportation requires substantial upfront investment in equipment and maintenance and therefore is not suited to such an unpredictable short-term arrangement. Those general concerns are not implicated here where Kachina's upfront investment has already taken place. Kachina has had the initial five-year commitment to secure a return on that investment, and it could have specifically contracted for a longer fixed term if the economics required. The option provision does not render the month-to-month term any more at odds with industry realities than it is on its own.

The trial court's declaration that Kachina extended the term of the Agreement to May 31, 2015, is inconsistent with the Agreement's express language, and the court of appeals correctly reversed it.

### III

Because the court of appeals correctly reversed the trial court's declarations, its reversal of the attorney's-fees award and remand to the trial court on the issue were proper. Kachina argues that because it prevailed on several issues and because some of the declarations concerning the contract issues remain intact, reversal of the entire fee award is error. Under the Uniform Declaratory Judgments Act, a trial court has discretion to award costs and attorney's fees. TEX. CIV. PRAC. & REM. CODEE § 37.009. When an appellate court reverses a declaratory judgment, it may reverse an attorney's fee award, but it is not required to do so. *SAVA gumarska in kemijska industria d.d. v. Advanced Polymer Scis., Inc.,* 128 S.W.3d 304, 324 (Tex.App.–Dallas 2004, no pet.) ("[A]fter a declaratory judgment is reversed on appeal, an award of attorneys' fees may no longer be equitable and just."). Kachina may be correct that there remain grounds on which a trial court may award fees. But because we decide Kachina did not prevail on two of the primary issues in dispute, we remand the issue to determine the appropriate award of costs and fees.

**\*8** Kachina also asserts that Lillis inadequately briefed the attorney's-fees issue at the court of appeals and thus waived the issue. There, Lillis requested remand of the issue of fees and costs "if the Court sustains one or more of its declaratory-judgment challenges." "[W]e liberally construe issues presented to obtain a just, fair, and equitable adjudication of the rights of the litigants." *El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.,* 8 S.W.3d 309, 316 (Tex.1999). Lillis phrased the request conditionally and presented it in a footnote, but he nonetheless made the request and preserved the issue. The issue was properly before the court of appeals, just as it is properly before us.

* * *

The court of appeals correctly reversed the declarations concerning the compression-cost deductions and the Agreement's term. We affirm that court's judgment and remand to the trial court for further proceedings consistent with this opinion.

CHIEF JUSTICE HECHT filed an opinion concurring in part and dissenting in part, in which JUSTICE GREEN and JUSTICE DEVINE joined.

**All Citations**

--- S.W.3d ----, 2015 WL 5889109

**End of Document**                         © 2015 Thomson Reuters. No claim to original U.S. Government Works.

292 S.W.3d 660
Supreme Court of Texas.

MBM FINANCIAL CORPORATION, et al., Petitioners,

v.

The WOODLANDS OPERATING COMPANY, L.P., Respondent.

No. 08–0390.　|　Argued March 12, 2009.　|　Decided Aug. 28, 2009.

**Synopsis**

**Background:** Equipment lessee brought action against lessor for declaratory relief, breach of contract, and fraud with respect to lease and maintenance agreements. Following a bench trial, the 9th District Court, Montgomery County, Frederick E. Edwards, J., awarded $1,000 in damages and $145,091.59 in attorney fees. Lessor appealed. The Beaumont Court of Appeals, Steve McKeithen, C.J., 251 S.W.3d 174, affirmed in part, reversed and rendered in part, and reversed and remanded in part. Lessor's petition for discretionary review was granted.

**Holdings:** The Supreme Court, Brister, J., held that:

[1] damages were not sustainable as actual or nominal, and

[2] lessee could not recover attorney fees under Declaratory Judgments Act.

Reversed and rendered.

West Headnotes (23)

**[1]**　**Damages** ⚬ Particular cases

**Fraud** ⚬ Amount awarded

115　Damages
115VII　Amount Awarded
115VII(D)　Breach of Contract
115k140　Particular cases
184　Fraud
184II　Actions
184II(E)　Damages
184k62　Amount awarded

Award of $1,000 to lessee of copiers in action against lessor for breach of contract and fraud was not sustainable as actual damages; the only damages mentioned at trial related to wasted time lessee spent trying to get lessor's cooperation, but no evidence was presented regarding value, quantity, or cost of wasted time, and trial court could not pull figure from thin air.

Cases that cite this headnote

**[2]    Damages** 🔑 Amount of nominal damages

**Fraud** 🔑 Elements of compensation

115    Damages

115II    Nominal Damages

115k14    Amount of nominal damages

184    Fraud

184II    Actions

184II(E)    Damages

184k60    Elements of compensation

Award of $1,000 to lessee of copiers was not "nominal damages" in action against lessor for breach of contract, fraud and declaratory relief; usual meaning of nominal damages was one dollar, a trifling sum, and $1,000 hardly fell in that category.

6 Cases that cite this headnote

**[3]    Damages** 🔑 Nature and theory of award

115    Damages

115II    Nominal Damages

115k8    Nature and theory of award

Nominal damages are available for breach of contract.

5 Cases that cite this headnote

**[4]    Damages** 🔑 Amount of nominal damages

115    Damages

115II    Nominal Damages

115k14    Amount of nominal damages

The usual meaning of nominal damages refers to an award of one dollar.

2 Cases that cite this headnote

**[5]    Damages** 🔑 Amount of nominal damages

115    Damages

115II    Nominal Damages

115k14  Amount of nominal damages

Nominal damages are supposed to be a trifling sum.

4 Cases that cite this headnote

**[6]    Damages** ⚷ Nominal or Substantial Damages

**Damages** ⚷ Extent of damage not shown

115  Damages
115II  Nominal Damages
115k10  Nominal or Substantial Damages
115k11  In general
115  Damages
115II  Nominal Damages
115k10  Nominal or Substantial Damages
115k12  Extent of damage not shown

Nominal damages are not for compensation; they are for cases in which there are no damages, or none that could ever be proved.

4 Cases that cite this headnote

**[7]    Damages** ⚷ Nominal or Substantial Damages

115  Damages
115II  Nominal Damages
115k10  Nominal or Substantial Damages
115k11  In general

Nominal damages are not available when the harm is entirely economic and subject to proof.

4 Cases that cite this headnote

**[8]    Damages** ⚷ Weight and Sufficiency

115  Damages
115IX  Evidence
115k183  Weight and Sufficiency
115k184  In general

While mathematical precision is not required to establish the extent or amount of damages, plaintiff must bring forward the best evidence of the damage of which the situation admits.

Cases that cite this headnote

**[9]    Appeal and Error** ⚷ Failure to recover nominal damages

30  Appeal and Error
30XVII  Determination and Disposition of Cause

30XVII(D)   Reversal

30k1171   Amount or Extent of Recovery

30k1171(6)   Failure to recover nominal damages

Where the record shows as a matter of law that plaintiff is entitled only to nominal damages, appellate court will not reverse merely to enable him to recover such damages.

2 Cases that cite this headnote

**[10]   Costs**    Contracts

102   Costs

102VIII   Attorney Fees

102k194.24   Particular Actions or Proceedings

102k194.32   Contracts

To recover attorney fees under statute that allows such recovery in breach of contract cases, a litigant must do two things: (1) prevail on a breach of contract claim, and (2) recover damages. V.T.C.A., Civil Practice & Remedies Code § 38.001.

57 Cases that cite this headnote

**[11]   Costs**    Leases

102   Costs

102VIII   Attorney Fees

102k194.24   Particular Actions or Proceedings

102k194.34   Leases

Attorney fee award to copier lessee who prevailed in suit against lessor could not be based upon breach of contract claim because lessee could not recover actual damages. V.T.C.A., Civil Practice & Remedies Code § 38.001.

12 Cases that cite this headnote

**[12]   Costs**    Leases

102   Costs

102VIII   Attorney Fees

102k194.24   Particular Actions or Proceedings

102k194.34   Leases

Lessee of copiers was not entitled to attorney fees in action against lessor for fraud, even if fraud claim arose from breach of contract.

3 Cases that cite this headnote

**[13]   Costs**    American rule;  necessity of contractual or statutory authorization or grounds in equity

102   Costs

102VIII   Attorney Fees

102k194.16   American rule; necessity of contractual or statutory authorization or grounds in equity

Attorney fees are recoverable for pre-litigation conduct only if a contract or statute so provides.

19 Cases that cite this headnote

**[14]   Costs** 🔑 Bad faith or meritless litigation

102   Costs

102VIII   Attorney Fees

102k194.44   Bad faith or meritless litigation

Copier lessee's allegations that lessor's breach of contract was in bad faith or its fraud vexatious did not change result that it could not recover attorney fees based on breach of contract or fraud.

9 Cases that cite this headnote

**[15]   Declaratory Judgment** 🔑 Contracts in general

118A   Declaratory Judgment

118AII   Subjects of Declaratory Relief

118AII(G)   Written Instruments and Contracts

118AII(G)1   In General

118Ak142   Contracts in general

Declaratory relief for contract claim that is fully matured and predicated on a terminated relationship is explicitly allowed by the Declaratory Judgments Act. V.T.C.A., Civil Practice & Remedies Code § 37.004(b).

7 Cases that cite this headnote

**[16]   Declaratory Judgment** 🔑 Moot, abstract or hypothetical questions

118A   Declaratory Judgment

118AI   Nature and Grounds in General

118AI(D)   Actual or Justiciable Controversy

118Ak65   Moot, abstract or hypothetical questions

Party cannot immunize itself against declaratory relief by simply terminating any ongoing relationship. V.T.C.A., Civil Practice & Remedies Code § 37.001 et seq.

1 Cases that cite this headnote

**[17]   Declaratory Judgment** 🔑 Contracts in general

118A   Declaratory Judgment

118AII  Subjects of Declaratory Relief

118AII(G)   Written Instruments and Contracts

118AII(G)1   In General

118Ak142   Contracts in general

Declaratory Judgments Act does not bar declarations of non-liability in contract cases. V.T.C.A., Civil Practice & Remedies Code § 37.003(b).

10 Cases that cite this headnote

[18]   **Declaratory Judgment**  Existence and effect in general

118A   Declaratory Judgment

118AI   Nature and Grounds in General

118AI(C)   Other Remedies

118Ak41   Existence and effect in general

Existence of another adequate remedy does not bar the right to maintain an action for declaratory judgment. V.T.C.A., Civil Practice & Remedies Code § 37.001 et seq.

3 Cases that cite this headnote

[19]   **Declaratory Judgment**  Existence and effect in general

118A   Declaratory Judgment

118AI   Nature and Grounds in General

118AI(C)   Other Remedies

118Ak41   Existence and effect in general

Declaratory Judgments Act cannot be invoked when it would interfere with some other exclusive remedy, or some other entity's exclusive jurisdiction. V.T.C.A., Civil Practice & Remedies Code § 37.001 et seq.

5 Cases that cite this headnote

[20]   **Costs**  Declaratory judgment

102   Costs

102VIII   Attorney Fees

102k194.24   Particular Actions or Proceedings

102k194.40   Declaratory judgment

Declaratory Judgments Act allows attorney fee awards to either party in all cases. V.T.C.A., Civil Practice & Remedies Code § 37.009.

11 Cases that cite this headnote

[21]   **Costs**  Declaratory judgment

102   Costs

102VIII   Attorney Fees

102k194.24 Particular Actions or Proceedings

102k194.40 Declaratory judgment

Party cannot use the Declaratory Judgments Act as a vehicle to obtain otherwise impermissible attorney fees. V.T.C.A., Civil Practice & Remedies Code § 37.009.

26 Cases that cite this headnote

**[22] Costs** ⚷ Declaratory judgment

102 Costs

102VIII Attorney Fees

102k194.24 Particular Actions or Proceedings

102k194.40 Declaratory judgment

While the Legislature intended the Declaratory Judgments Act to be remedial, it did not intend it to supplant all other statutes and remedies regarding recovery of attorney fees. V.T.C.A., Civil Practice & Remedies Code § 37.009.

4 Cases that cite this headnote

**[23] Costs** ⚷ Declaratory judgment

102 Costs

102VIII Attorney Fees

102k194.24 Particular Actions or Proceedings

102k194.40 Declaratory judgment

Copier lessee that recovered no damages on contract claim in suit against lessor for breach of contract and fraud could not recover attorney fees under Declaratory Judgments Act, although lessee obtained five declarations; declarations merely duplicated issues already before the trial court in contract and fraud claims, and attorney fees were not available pursuant to those claims. V.T.C.A., Civil Practice & Remedies Code §§ 37.009, 38.001.

70 Cases that cite this headnote

**Attorneys and Law Firms**

**\*662** Jennifer Bruch Hogan, Richard P. Hogan Jr. and Matthew E. Coveler, Hogan & Hogan, L.L.P., Phillip R. Livingston and Deanna H. Livingston, Livingston & Livingston, LLC, Houston, for Petitioners.

Karen D. Smith, Kirby D. Hopkins and Rachael McDonell Rolon, Drucker, Rutledge & Smith, L.L.P., The Woodlands, for Respondent.

## Opinion

**\*663** Justice BRISTER delivered the opinion of the Court.

Since *Jarndyce v. Jarndyce,* [1] there have been charges that some cases benefit the lawyers more than the clients. But suits cannot be maintained solely for the attorney's fees; a client must gain something before attorney's fees can be awarded. While making losing parties bear their own attorney's fees may add injury to insult, the American Rule has long been that each party pays its own lawyers.

In this case, the plaintiff obtained a judgment for $1,000 in damages and almost $150,000 in attorney's fees. But there was no evidence to support the amount of the $1,000 award, and it is too large to constitute nominal damages. As the award to the client must be set aside, the attorney's fee award must also. Accordingly, we reverse and render a take-nothing judgment.

## I. Background

The Woodlands Operating Company leased the 19 copiers at issue here from MBM Financial Corporation [2] and installed them in late 2000 and early 2001. Each machine was covered by a separate four-year lease, with annual renewals thereafter unless notice was sent between 90 and 180 days before the end of the existing term. The leases required the Woodlands to return the copiers to a location MBM specified.

The Woodlands decided not to renew the leases in mid–2004 and asked MBM for the end-of-term dates and instructions for return. MBM employees provided the dates and approved a draft termination letter from the Woodlands. But when the actual termination letter arrived (viewing the evidence in the light favorable to the trial court's judgment), [3] MBM's president unilaterally changed the dates so the notice would be untimely and demanded rent for another year. To bolster MBM's position, he signed the leases and inserted commencement dates for the first time after the Woodlands filed suit. Until suit was filed, MBM also refused to designate a return location for the bulky equipment.

The Woodlands sued, asserting claims for breach of contract, fraud, and declaratory relief. MBM counterclaimed for additional rent of $160,000, though it later dropped that claim. After a two-day bench trial, the trial court rendered judgment awarding the Woodlands $1,000 in damages and $145,091.59 in attorney's fees through trial. The court of appeals affirmed the damages and part of the fee award. [4] On appeal, MBM challenges both.

## II. Nominal Damages & Breach of Contract

**[1]** At trial, the Woodlands requested only nominal damages. The judgment describes the $1,000 award as "actual damages," but the trial court's findings and conclusions describe them as "actual damages in the form of nominal damages." **\*664** We agree with MBM that no evidence supports $1,000 as either.

The only damages mentioned at trial related to wasted time the Woodlands spent trying to get MBM's cooperation. But there was no evidence about the value of that time—either the quantity or the cost of it. The Woodlands blamed this gap on the difficulty of tracking the lost time, but never explained why it could not have been estimated. If the difficulty of proof always discharged the burden of proof, many litigants would simply not bother.[5] While the Woodlands could have estimated the value of wasted time, it could not ask the trial court to pull a figure from thin air.

**[2]** **[3]** Nevertheless, the Woodlands argues the award was justified as nominal damages. We agree nominal damages are available for breach of contract, as this Court has stated at least a dozen times.[6] As we wrote in 1853:

> The law is, that if the contract is proven to be broken, the law would give some damage, sufficient to authorize a verdict for the plaintiff, although, in the absence of proof of special loss, the damages would be nominal only.[7]

We are hardly alone in recognizing nominal damages for breach of contract; so do the First and Second Restatements,[8] Williston,[9] Corbin,[10] and Black's Law Dictionary.[11] While more generous damage measures make nominal damages rare, and some judges have questioned the reason behind them,[12] we agree that nominal **\*665** damages may be recovered for breach of contract.

**[4]** **[5]** But $1,000 is not nominal damages. "[T]he usual meaning of the phrase 'nominal damages' refers to an award of one dollar."[13] Despite substantial changes over the centuries in what a dollar will buy, it remains the standard award in federal cases,[14] and in Texas cases as well.[15] A few cases have awarded nominal damages of $10 and even $100,[16] but nominal damages are supposed to be a "trifling sum,"[17] and $1,000 hardly falls in that category.[18]

**[6]** **[7]** **[8]** It appears from the record that the trial court awarded $1,000 as rough compensation for the wasted time the Woodlands incurred. But nominal damages are not for compensation; they are for cases in which there are no damages, or none that could ever be proved.[19] While a few older

cases hold otherwise, [20] in recent decades the rule in Texas has been that nominal damages are not available when the harm is entirely economic and subject to proof (as opposed to non-economic harm to civil or property rights). [21] Thus, in *Gulf States Utilities* **\*666** *Co. v. Low*, we rejected nominal damages because actual damages had been incurred, yet the plaintiff failed to prove the amount. [22] "While mathematical precision is not required to establish the extent or amount of one's damages, one must bring forward the best evidence of the damage of which the situation admits...." [23] On this record, the $1,000 damage award to the Woodlands cannot be sustained as either actual or nominal damages.

**[9]** While we normally remand for a new trial when there is some evidence to support an amount of actual damages, [24] in this case there was no evidence about the amount of damages at all. And "where the record shows as a matter of law that the plaintiff is entitled only to nominal damages, the appellate court will not reverse merely to enable him to recover such damages." [25] Accordingly, we must render judgment that the Woodlands take nothing as damages on its breach of contract claim.

### III. Attorney's Fees: Breach of Contract

**[10]** Chapter 38 of the Civil Practices and Remedies Code allows recovery of attorney's fees in breach of contract cases: "A person may recover reasonable attorney's fees ... in addition to the amount of a valid claim and costs, if the claim is for ... an oral or written contract." [26] To recover fees under this statute, a litigant must do two things: (1) prevail on a breach of contract claim, and (2) recover damages. [27] The second requirement is implied from the statute's language: for a fee recovery to be "in *addition* to the amount of a valid claim," the claimant must recover some amount on that claim.

**[11]** While *some* damages are necessary to recover fees under this statute, [28] this Court has never said whether *nominal* damages are enough. But as the Woodlands can recover neither actual nor nominal damages, that question is not before us. Accordingly, the Woodlands' fee award cannot be affirmed based on Chapter 38.

### IV. Attorney's Fees: Fraud Arising From Breach of Contract

**[12]** Alternatively, the Woodlands argues it is entitled to attorney's fees based on fraud arising from a breach of contract, pointing to this Court's reference to such an award in *Gill Savings Ass'n*

*v. Chair* **\*667** *King.* [29] But in Gill we merely reinstated bankruptcy and appellate fees; we did not address the court of appeals' award of fees for both contract and fraud on the basis that they were inextricably intertwined. [30] We explicitly rejected this intertwining exception in *Tony Gullo Motors I, L.P. v. Chapa* and reiterated that fees are not allowed for torts like fraud. [31] Thus, even if the Woodlands' fraud claim arose from a breach of contract, that is no basis for an attorney's fee award.

## V. Attorney's Fees: Bad Faith & Vexatious Conduct

**[13]** **[14]** The Woodlands also argues it is entitled to attorney's fees because MBM "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." The rules of civil procedure allow fees as a sanction against a party who files pleadings in bad faith [32] or abuses the discovery process. [33] But the Woodlands filed no motion for sanctions pursuant to those rules. Its fee claim was not based on MBM's *litigation* conduct but on its *pre-litigation* conduct; such fees are recoverable only if a contract or statute so provides. As the Woodlands cannot recover fees based on contract or fraud, allegations that the breach was in bad faith or the fraud vexatious do not change that result.

## VI. Attorney's Fees: Declaratory Judgment & Breach of Contract

The court of appeals affirmed part of the attorney's fee award based on the Declaratory Judgments Act. [34] MBM asserts four reasons why declaratory relief was improper and cannot support a fee award. We disagree that declaratory relief was improper but agree it cannot support the fee award here.

**[15]** **[16]** First, MBM argues that declaratory relief is not available for contract claims (like those here) that are "fully matured and predicated upon a terminated relationship." But the Act says relief is available in contract cases "before *or after* there has been a breach," [35] so a matured breach is explicitly covered by the Act. [36] Further, declaratory relief is often available after a relationship has been terminated, as in cases concerning noncompetition covenants signed by former employees, [37] or offsetting judgments between former litigants. [38] MBM notes that we justified declaratory relief in **\*668** *BHP Petroleum Co. v. Millard* by referring to an "ongoing and continuing relationship," but that was solely to show that the defendant's counterclaim (relating to the parties' future rights) went beyond the plaintiff's claim (relating to past damages alone). [39] We disagree that a party can immunize itself against declaratory relief by simply terminating any ongoing relationship.

**[17]** Second, MBM urges that declarations of non-liability should be barred in contract cases, just as they are in tort cases. As we said in *Abor v. Black*:

> Because [the Act] appears to give the courts jurisdiction over declarations of non-liability of a potential defendant in a tort action, we find that the ... District Court had jurisdiction over the suit. However, we hold that the trial court should have declined to exercise such jurisdiction because it deprived the real plaintiff of the traditional right to choose the time and place of suit. [40]

But the "real plaintiff" and the "traditional right to choose the time and place of suit" are materially different in contract and tort cases. The "real" plaintiff in a tort action is the injured party, yet both parties often suffer injury if a contract collapses. When each party claims the other breached (as is usually the case), [41] it is hard to say who ought to be the "real" plaintiff. Here, for example, why should MBM get to choose the time and place of suit rather than the Woodlands? The Act itself specifically contemplates declarations that are negative (non-liability) as well as affirmative (liability). [42] And historically, declarations of non-liability under a contract have been among the most common suits filed under the Act, including:

- suits by insurers to declare non-liability under a duty-to-defend clause, [43]

- suits by employees to declare non-liability under a covenant not to compete, [44] and

- suits by a party to declare non-liability for higher or additional payments. [45]

Extending the bar against declarations of non-liability from tort to contract cases would drastically handicap declaratory-judgment practice in Texas.

 **\*669 [18] [19]** Third, MBM argues that declaratory judgments are available only if there is no adequate alternative cause of action. But this has never been the rule in Texas. Shortly after the Legislature passed the Act in 1943, [46] this Court adopted exactly the opposite rule, stating that "the existence of another adequate remedy does not bar the right to maintain an action for declaratory judgment" and finding this rule supported by "better reasoning." [47] The federal courts follow the same rule, as Federal Rule of Civil Procedure 57 makes clear: "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." We agree the Act cannot be invoked when it would interfere with some other exclusive remedy [48] or some other entity's exclusive jurisdiction. [49] But prohibiting declaratory judgments whenever a breach of contract claim is available would negate the Act's explicit terms covering such claims. [50]

**[20]  [21]**  Yet while declaratory relief may be obtained under the Act in all these circumstances, that does not mean attorney's fees can too. Texas has long followed the "American Rule" prohibiting fee awards unless specifically provided by contract or statute.[51] By contrast, the Declaratory Judgments Act allows fee awards to either party in all cases.[52] If repleading a claim as a declaratory judgment could justify a fee award, attorney's fees would be available for all parties in all cases. That would repeal not only the American Rule but also the limits imposed on fee awards in other statutes. Accordingly, the rule is that a party cannot use the Act as a vehicle to obtain otherwise impermissible attorney's fees.[53]

**\*670  [22]**  The Act was originally "intended as a speedy and effective remedy" for settling disputes before substantial damages were incurred.[54] It is "intended to provide a remedy that is simpler and less harsh than coercive relief, if it appears that a declaration might terminate the potential controversy."[55] But when a claim for declaratory relief is merely tacked onto a standard suit based on a matured breach of contract, allowing fees under Chapter 37 would frustrate the limits Chapter 38 imposes on such fee recoveries. And granting fees under Chapter 37 when they are not permitted under the specific common-law or statutory claims involved would violate the rule that specific provisions should prevail over general ones.[56] While the Legislature intended the Act to be remedial,[57] it did not intend to supplant all other statutes and remedies.[58]

**[23]**  At trial, the Woodlands recovered no damages on its breach of contract claim, so it cannot recover fees under Chapter 38. Allowing it to recover the same fees under Chapter 37 would frustrate the provisions and limitations of the neighboring chapter in the same Code.[59] Accordingly, we hold the Woodlands cannot recover attorney's fees under the Declaratory Judgments Act.

Nevertheless, the Woodlands argues it is entitled to fees because the declaratory relief it sought did more than merely duplicate the issues litigated in its contract and fraud claims. The five declarations the Woodlands obtained in the judgment were:

1. that the Woodlands "complied with its contractual obligations to provide notice of its intent not to renew";

2. that MBM "improperly failed to timely designate a carrier and location for the return";

3. that MBM's manipulation of the termination dates barred it from making "any claim that [the Woodlands] failed to provide timely notice";

4. that the Woodlands "relied to its detriment on the termination dates provided by MBM"; and

5. that the Woodlands "has suffered damage as a direct result of its detrimental reliance upon the termination dates provided by MBM."

**\*671** Whether the Woodlands sent timely notice of cancellation and MBM failed to designate a return location were part and parcel of the Woodlands' contract claim. And whether MBM misrepresented the termination dates and the Woodlands relied on those misrepresentations were duplicative of the Woodlands' fraud claim. Thus, the declarations sought by the Woodlands merely duplicated issues already before the trial court.

\* \* \*

It is easy to understand the Woodlands' frustration with MBM. Viewing the evidence in the proper light, MBM withheld information, changed renewal dates, and manipulated the truth to try to get more rent than it was entitled to. It raised dodges, defenses, and counterclaims at various stages that all eventually collapsed in a heap, but only after forcing the Woodlands to incur legal fees and costs. But to recover those fees, the Woodlands had to recover damages for breach of contract. That it failed to do. As Chief Justice Calvert wrote for this Court almost 50 years ago:

> Perhaps every successful litigant should be permitted to recover his attorney fees from the opposite party. But whether that policy would be wise is for the Legislature, not the courts, to decide. Apparently the Legislature has not thought it wise. [60]

Accordingly, we reverse the judgment of the court of appeals and render judgment that the Woodlands take nothing.

Justice O'NEILL did not participate in the decision.

**All Citations**

292 S.W.3d 660, 52 Tex. Sup. Ct. J. 1221

Footnotes

1    CHARLES DICKENS, BLEAK HOUSE (1853).

2    The equipment was leased from MBM Financial Corporation, now known as MBM Financial Interest L.P., and serviced by Marimon Business Systems, Inc. The two companies were operated from the same location by the same employees, and Anthony Marimon was the chief operating officer of both. Because the parties and judgment treat the two corporations as the same, we refer to both herein as "MBM," the party listed as lessor.

3    *See City of Keller v. Wilson,* 168 S.W.3d 802, 819–21 (Tex.2005) (discussing jury verdicts). The same standard of review applies to a trial court's findings following a bench trial. *See Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994).

4    251 S.W.3d 174, 184.

5    *See, e.g., Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 937 (Tex.1998) ("[T]hat proof of causation is difficult does not provide a plaintiff with an excuse to avoid introducing some evidence of causation." (quoting *Schaefer v. Tex. Employers' Ins. Ass'n,* 612 S.W.2d 199, 205 (Tex.1980))).

6    *See, e.g., Lubbock Mfg. Co. v. Sames,* 598 S.W.2d 234, 237 (Tex.1980); *Travelers Ins. Co. v. Employers Cas. Co.,* 380 S.W.2d 610, 614–15 (Tex.1964); *Woodward v. Harlin,* 121 Tex. 46, 39 S.W.2d 8, 9 (1931); *Malakoff Gin Co. v. Riddlesperger,* 108 Tex. 273, 192 S.W. 530, 532 (1917); *Porter v. Kruegel,* 106 Tex. 29, 155 S.W. 174, 175 (1913); *Raymond v. Yarrington,* 96 Tex. 443, 73 S.W. 800, 804 (1903); *Davis v. Tex. & P. Ry.,* 91 Tex. 505, 44 S.W. 822, 823 (1898); *Seibert v. Bergman,* 91 Tex. 411, 44 S.W. 63, 64 (1898); *East Line & Red River R.R. v. Scott,* 72 Tex. 70, 10 S.W. 99, 102 (1888); *Stuart v. W. Union Tel. Co.,* 66 Tex. 580, 18 S.W. 351, 352 (1885); *Moore v. Anderson,* 30 Tex. 224, 231 (1867); *Hope v. Alley,* 9 Tex. 394, 395 (1853); *McGuire v. Osage Oil Corp.,* 55 S.W.2d 535, 537 (Tex. Comm'n App. 1932, holdings approved); *see also* Note, *Pleading—Necessity of Damage to Cause of Action,* 9 TEX. L. REV. 111, 112 (1930) (citing cases).

7    *Hope,* 9 Tex. at 395.

8    RESTATEMENT (SECOND) OF CONTRACTS § 346(2) (1981) ("If the breach caused no loss or if the amount of the loss is not proved under the rules stated in this Chapter, a small sum fixed without regard to the amount of loss will be awarded as nominal damages."); *accord* RESTATEMENT(FIRST) OF CONTRACTS § 328 (1932).

9    *See* 24 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 64:6 (4th ed. 2002) ("An unexcused failure to perform a contract is a legal wrong. An action will therefore lie for the breach although it causes no injury. Nominal damages may then be awarded.").

10   *See* 11 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 55.10 (rev. ed. 2005) ("[F]or every breach of contract, a cause of action exists.... If the aggrieved party has suffered no compensable damages, a judgment for nominal damages will be entered.").

11   BLACK'S LAW DICTIONARY 418 (8th ed. 2004) (defining nominal damages as "[a] small amount fixed as damages for breach of contract without regard to the amount of harm").

12   *See Chronister Oil Co. v. Unocal Ref. & Mktg. (Union Oil Co. of Ca.),* 34 F.3d 462, 466 (7th Cir.1994) (Posner, C.J.) (stating that "for reasons we do not understand every victim of a breach of contract, unlike a tort victim, is entitled" to nominal damages).

13   *Harkins v. Crews,* 907 S.W.2d 51, 61 (Tex.App.-San Antonio 1995, writ denied); *accord ITT Commercial Fin. Corp. v. Riehn,* 796 S.W.2d 248, 257 (Tex.App.-Dallas 1990, no writ) (stating that "nominal damages [are] traditionally the sum of one dollar or perhaps ten dollars"); *see also* PERILLO, *supra* note 10 ("The usual amount of nominal damages is six cents or one dollar....").

14   *See, e.g., Faragher v. City of Boca Raton,* 524 U.S. 775, 783, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Farrar v. Hobby,* 506 U.S. 103, 107, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992); *Carey v. Piphus,* 435 U.S. 247, 267, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

15   *See, e.g., Henry S. Miller Co. v. Evans,* 452 S.W.2d 426, 434 (Tex.1970); *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.,* 219 S.W.3d 563, 584 (Tex.App.-Austin 2007, pet. denied); *State v. Miles,* 458 S.W.2d 943, 944 (Tex.Civ.App.-Waco 1970, writ ref'd n.r.e.); *Lucas v. Morrison,* 286 S.W.2d 190, 192 (Tex.Civ.App.-San Antonio 1956, no writ); *Caswell v. J.S. McCall & Sons,* 163 S.W. 1001, 1002 (Tex.Civ.App.-Austin 1913, no writ).

16   *See, e.g., Williams v. Kaufman County,* 352 F.3d 994, 1014–15 (5th Cir.2003) (nominal damages of $100); *Malakoff Gin Co. v. Riddlesperger,* 108 Tex. 273, 192 S.W. 530, 532 (1917) (nominal damages of $10); *see also* David Pearce & Roger Halson, *Damages for Breach of Contract: Compensation, Restitution and Vindication,* 28 OXFORD J. LEGAL STUD. 73, 76 n. 25 (2008) (noting that English cases can be found awarding nominal damages of £1, £2, £5, £10, and £15).

17   BLACK'S LAW DICTIONARY 418 (8th ed. 2004).

18   *See, e.g., Nicholas v. Pa. State Univ.,* 227 F.3d 133, 146 (3rd Cir.2000) (Alito, J.) (holding trial court properly reduced nominal damages award from $1,000 to $1).

19   BLACK'S LAW DICTIONARY 418 (8th ed. 2004) (defining nominal damages as "[a] trifling sum awarded when a legal injury is suffered but when there is no substantial loss or injury to be compensated"); *see County of Dallas v. Wiland,* 216 S.W.3d 344, 356 (Tex.2007) (noting that denial of procedural due process justified award of nominal damages when no harm resulted); *see also Malakoff Gin Co.,* 192 S.W. at 532; *Raymond v. Yarrington,* 96 Tex. 443, 73 S.W. 800, 804 (1903); *McGuire v. Osage Oil Corp.,* 55 S.W.2d 535, 537 (Tex. Comm'n App.1932, holdings approved); WILLISTON & LORD, *supra* note 9.

20   *See State v. Jackson,* 388 S.W.2d 924, 926 (Tex.1965); *Davis v. Tex. & P. Ry.,* 91 Tex. 505, 44 S.W. 822, 823 (1898); *Moore v. Anderson,* 30 Tex. 224, 231 (1867); *Hope v. Alley,* 9 Tex. 394, 395 (1853).

21   *See Gulf Coast Inv. Corp. v. Rothman,* 506 S.W.2d 856, 858 (Tex.1974) (rejecting claim for nominal damages when evidence showed plaintiff suffered no economic damage); *see also Coastal Oil & Gas Corp. v. Garza Energy Trust,* 268 S.W.3d 1, 12 n. 36 (Tex.2008)

(stating that nominal damages are available for mere trespass against possessory interest, but reversionary interest owner must prove actual economic damages); *Wiland,* 216 S.W.3d at 356–57 (stating that nominal damages are available for denial of procedural due process); *St. Paul Surplus Lines Ins. Co. v. Dal–Worth Tank Co.,* 974 S.W.2d 51, 53 (Tex.1998) (per curiam) (stating that nominal damages are available for loss of credit reputation).

22    79 S.W.3d 561, 567 (Tex.2002).

23    *Rothman,* 506 S.W.2d at 858.

24    *See Guevara v. Ferrer,* 247 S.W.3d 662, 670 (Tex.2007); *Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 314–15 (Tex.2006).

25    *Travelers Ins. Co. v. Employers Cas. Co.,* 380 S.W.2d 610, 614–15 (Tex.1964); *accord* WILLISTON & LORD, *supra* note 9 ("[A] judgment for the defendant will not be reversed merely to give the plaintiff nominal damages unless some substantial right of the plaintiff will thereby be protected.").

26    TEX. CIV. PRAC. & REM.CODE § 38.001.

27    *Mustang Pipeline Co. v. Driver Pipeline Co.,* 134 S.W.3d 195, 201 (Tex.2004) (per curiam); *Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 390 (Tex.1997); *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 437 (Tex.1995).

28    *Mustang Pipeline Co.,* 134 S.W.3d at 201; *Green Int'l,* 951 S.W.2d at 390; *Beaston,* 907 S.W.2d at 437.

29    797 S.W.2d 31, 31 (Tex.1990) (per curiam).

30    *See* 783 S.W.2d 674, 680 (Tex.App.-Houston [14th Dist.] 1989), *aff'd as modified,* 797 S.W.2d 31 (Tex.1990).

31    212 S.W.3d 299, 311–14 (Tex.2006).

32    *See* TEX. R. CIV. P. 13.

33    *See, e.g.,* Tex. R. Civ. P. 215.1(d), 215.2(b)(8), 215.4(b), 215.5(b).

34    251 S.W.3d 174, 183–84.

35    TEX. CIV. PRAC. & REM.CODE § 37.004(b) (emphasis added).

36    *See* RESTATEMENT (SECOND) OF JUDGMENTS § 33 cmt. a (1982) ( "But while the declaratory action is perhaps most important as a kind of preventive device, its use is not so restricted; it is also sometimes permitted after the wrong has been committed, when a coercive remedy could be awarded to or against the plaintiff in the declaratory action.").

37    *See Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 852 (Tex.2009) (declaring former employee's noncompetition covenant enforceable); *see also Lowenberg v. City of Dallas,* 261 S.W.3d 54, 59 (Tex.2008) (per curiam) (affirming declaratory judgment regarding unlawful tax that had been repealed).

38    *Bonham State Bank v. Beadle,* 907 S.W.2d 465, 468 (Tex. 1995).

39    800 S.W.2d 838, 841–42 (Tex.1990).

40    695 S.W.2d 564, 566 (Tex.1985).

41    *See, e.g., Mustang Pipeline Co. v. Driver Pipeline Co.,* 134 S.W.3d 195, 200 (Tex.2004) (per curiam); *Bennett v. Cochran,* 96 S.W.3d 227, 228 (Tex.2002) (per curiam); *Callahan & Assocs. v. Orangefield Indep. Sch. Dist.,* 92 S.W.3d 841, 842 (Tex.2002) (per curiam); *State ex rel. Dep't of Criminal Justice v. VitaPro Foods, Inc.,* 8 S.W.3d 316, 321 (Tex.1999); *Stuart v. Bayless,* 964 S.W.2d 920, 921 (Tex.1998) (per curiam); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 43 (Tex.1998); *Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 386 (Tex.1997); *Stewart Title Guar. Co. v. Aiello,* 941 S.W.2d 68, 70 (Tex.1997); *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex.1990).

42    TEX. CIV. PRAC. & REM. CODE § 37.003(b) ("The declaration may be either affirmative or negative in form and effect, and the declaration has the force and effect of a final judgment or decree.").

43    *See, e.g., Fairfield Ins. Co. v. Stephens Martin Paving, LP,* 246 S.W.3d 653 (Tex.2008); *Farmers Tex. County Mut. Ins. Co. v. Griffin,* 955 S.W.2d 81 (Tex.1997) (per curiam); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchants Fast Motor Lines, Inc.,* 939 S.W.2d 139 (Tex.1997) (per curiam); *Liberty Mut. Fire Ins. Co. v. Sanford,* 879 S.W.2d 9 (Tex.1994) (per curiam).

44    *See, e.g., Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844 (Tex.2009); *In re AutoNation, Inc.,* 228 S.W.3d 663 (Tex.2007).

45    *See, e.g., Yzaguirre v. KCS Res., Inc.,* 53 S.W.3d 368, 370 (Tex.2001); *VitaPro Foods, Inc.,* 8 S.W.3d at 321.

46    Uniform Declaratory Judgments Act, 48th Leg., R.S., ch. 164, 1943 Tex. Gen. Laws 265.

47    *Cobb v. Harrington,* 144 Tex. 360, 190 S.W.2d 709, 714 (1945); *accord Tex. Liquor Control Bd. v. Canyon Creek Land Corp.,* 456 S.W.2d 891, 895 (Tex.1970); *Crow v. City of Corpus Christi,* 146 Tex. 558, 209 S.W.2d 922, 924 (1948); *see also McKinley v. McKinley,* 496 S.W.2d 540, 542 (Tex.1973).

48    *See, e.g., Martin v. Amerman,* 133 S.W.3d 262, 267 (Tex.2004) (noting that the Property Code describes trespass-to-try-title actions as "*the* method for determining title"); *John G. & Marie Stella Kenedy Mem'l Found. v. Dewhurst,* 90 S.W.3d 268, 289 (Tex.2002) (noting that Natural Resources Code provisions authorizing declaratory suits by coastal property owners do not provide for fees).

49    *See, e.g., In re Sw. Bell Tel. Co.,* 235 S.W.3d 619, 625 (Tex.2007) (holding declaratory relief unavailable until administrative remedies were exhausted); *Thomas v. Long,* 207 S.W.3d 334, 342 (Tex.2006) (same); *State v. Morales,* 869 S.W.2d 941, 942 (Tex.1994) (holding civil courts can declare criminal laws unconstitutional only in limited circumstances); *Canyon Creek Land Corp.,* 456 S.W.2d at 894 (holding civil courts generally should not entertain declaratory actions to overturn an administrative agency's interpretation of a penal statute the agency is to enforce); *Cobb,* 190 S.W.2d at 714 ("We do not hold that the declaratory judgment procedure may be used when a statute provides an administrative board or other special tribunal or special procedure for the particular type of case in hand as, for example, a workmen's compensation case.").

50    *See* TEX. CIV. PRAC. & REM.CODE § 37.004(a), (b) (stating that "[a] contract may be construed either before or after there has been a breach," and that "[a] person interested under ... writings constituting a contract ... may have determined any question of construction or validity arising under the ... contract").

51    *See Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 310–11 (Tex.2006).

52    *See* TEX. CIV. PRAC. & REM.CODE § 37.009.

53    *See Martin,* 133 S.W.3d at 267; *THPD, Inc. v. Cont'l Imports, Inc.,* 260 S.W.3d 593, 619–20 (Tex.App.-Austin 2008, no pet.); *Warrantech Corp. v. Steadfast Ins. Co.,* 210 S.W.3d 760, 770 (Tex.App.-Fort Worth 2006, pet. denied); *Sani v. Powell,* 153 S.W.3d 736, 745 (Tex.App.-Dallas 2005, pet. denied); *City of Houston v. Texan Land & Cattle Co.,* 138 S.W.3d 382, 392 (Tex.App.-Houston [14th Dist.] 2004, no pet.); *Sw. Guar. Trust Co. v. Hardy Road 13.4 Joint Venture,* 981 S.W.2d 951, 957 (Tex.App.-Houston [1st Dist.] 1998, pet. denied); *Boatman v. Lites,* 970 S.W.2d 41, 43 (Tex.App.-Tyler 1998, no pet.).

54    *Cobb,* 190 S.W.2d at 713.

55    RESTATEMENT (SECOND) OF JUDGMENTS § 33 cmt. c (1982).

56    *See, e.g.,* TEX. GOV'T CODE § 311.026(b) (requiring that specific statutory provisions prevail over general ones in statutory construction); *Strong v. Garrett,* 148 Tex. 265, 224 S.W.2d 471, 475 (1949) (noting the "general rule" that specific descriptions in deeds prevail over general ones).

57    *See* TEX. CIV. PRAC. & REM.CODE § 37.002(b).

58    *Crow v. City of Corpus Christi,* 146 Tex. 558, 209 S.W.2d 922, 924 (1948) ("[T]he remedy afforded by the Declaratory Judgment Act is additional and does not supplant any existing remedy."); RESTATEMENT (SECOND) OF JUDGMENTS S S § 33 cmt. c ("[D]eclaratory actions are to supplement rather than supersede other types of litigation.").

59    *Cf. City of Waco v. Lopez,* 259 S.W.3d 147, 153–55 (Tex.2008) (holding the Legislature did not intend to allow claimants to elect between Human Rights and Whistleblower Acts because differing procedures and remedies would frustrate legislative goals).

60    *Van Zandt v. Fort Worth Press,* 359 S.W.2d 893, 896 (Tex.1962).

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

907 S.W.2d 517
Supreme Court of Texas.

NATIONAL UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PENNSYLVANIA, et al., Petitioners,

v.

CBI INDUSTRIES, INC., Respondents.

No. D–4353.    |    Argued Sept. 20, 1994.    |    Decided Oct. 5, 1995.

Insured brought action against its general liability insurers seeking damages, injunctive relief and declaration of coverage for underlying personal injury and property damage claims arising out of accidental release of large cloud of hydrofluoric acid from oil refinery. The 234th District Court, Harris County, Scott Brister, J., granted summary judgment for insurers, and insured appealed. The Houston Court of Appeals, First District, 860 S.W.2d 662, reversed and remanded, and insurers applied for writ of error. In a substituted opinion following overruling of motion for rehearing, the Supreme Court held that: (1) insured was not entitled to attempt to create latent ambiguity in application of absolute pollution exclusion, through discovery of parol evidence concerning insurers' understanding of breadth of exclusion and its applicability to construction accidents, and (2) exclusion unambiguously precluded coverage.

Judgment of Court of Appeals reversed and judgment of trial court affirmed.

West Headnotes (14)

[1]    **Insurance** ☞ Application of Rules of Contract Construction

217  Insurance
217XIII  Contracts and Policies
217XIII(G)  Rules of Construction
217k1806  Application of Rules of Contract Construction
(Formerly 217k146)

Insurance policies are controlled by rules of interpretation and construction which are applicable to contracts generally.

53 Cases that cite this headnote

[2]    **Contracts** ☞ Language of Contract

95  Contracts
95II  Construction and Operation

95II(A)   General Rules of Construction

95k147   Intention of Parties

95k147(2)   Language of Contract

Court's primary concern in construing written contract is to ascertain true intent of parties as expressed in the instrument.

[145 Cases that cite this headnote](#)

**[3]   Contracts** ☞ Existence of Ambiguity

95   Contracts

95II   Construction and Operation

95II(A)   General Rules of Construction

95k143   Application to Contracts in General

95k143(2)   Existence of Ambiguity

Written contract is not "ambiguous" if it is so worded that it can be given definite or certain legal meaning, but it is "ambiguous" if it is subject to two or more reasonable interpretations.

[266 Cases that cite this headnote](#)

**[4]   Evidence** ☞ Grounds for Admission of Extrinsic Evidence

157   Evidence

157XI   Parol or Extrinsic Evidence Affecting Writings

157XI(D)   Construction or Application of Language of Written Instrument

157k448   Grounds for Admission of Extrinsic Evidence

Parol evidence is not admissible for purpose of creating ambiguity in contract.

[28 Cases that cite this headnote](#)

**[5]   Contracts** ☞ Ambiguity in General

95   Contracts

95II   Construction and Operation

95II(A)   General Rules of Construction

95k176   Questions for Jury

95k176(2)   Ambiguity in General

Whether contract is ambiguous is question of law for court to decide by looking at contract as whole in light of circumstances present when contract was entered.

[100 Cases that cite this headnote](#)

**[6]   Contracts** ☞ Construction by Parties

**Evidence** ☞ Grounds for Admission of Extrinsic Evidence

95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k170 Construction by Parties
95k170(1) In General
157 Evidence
157XI Parol or Extrinsic Evidence Affecting Writings
157XI(D) Construction or Application of Language of Written Instrument
157k448 Grounds for Admission of Extrinsic Evidence

Courts may consider parties' interpretation of contract and admit extraneous evidence to determine its true meaning only where contract is first determined to be ambiguous.

143 Cases that cite this headnote

**[7]** **Contracts** Existence of Ambiguity

95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k143 Application to Contracts in General
95k143(2) Existence of Ambiguity

"Patent ambiguity" in contract is ambiguity that is evident on contract's face.

35 Cases that cite this headnote

**[8]** **Contracts** Existence of Ambiguity

95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k143 Application to Contracts in General
95k143(2) Existence of Ambiguity

"Latent ambiguity" arises when contract which is unambiguous on its face is applied to subject matter with which it deals and ambiguity appears by reason of some collateral matter.

97 Cases that cite this headnote

**[9]** **Evidence** Latent Ambiguity

157 Evidence
157XI Parol or Extrinsic Evidence Affecting Writings
157XI(D) Construction or Application of Language of Written Instrument
157k449 Nature of Ambiguity or Uncertainty in Instrument
157k452 Latent Ambiguity

Parol evidence is admissible for purpose of ascertaining true intention of parties as expressed in their contract if contract contains latent ambiguity.

169 Cases that cite this headnote

**[10] Pretrial Procedure** 🔑 Insurance, Matters Relating To

307A   Pretrial Procedure
307AII   Depositions and Discovery
307AII(A)   Discovery in General
307Ak36   Particular Subjects of Disclosure
307Ak37   Insurance, Matters Relating To

Insured was not entitled to attempt to create latent ambiguity in application of absolute pollution exclusion in its general liability policies, through discovery of parol evidence concerning insurers' understanding of breadth of exclusion and its application to construction accidents, in dispute over coverage for underlying claims arising out of release of large cloud of hydrofluoric acid from oil refinery, as there was no need for additional facts to apply policies to their subject matter, since relevant facts concerning underlying claims appeared to be fully developed, and surrounding circumstances present when contract was entered were amply established.

101 Cases that cite this headnote

**[11] Insurance** 🔑 Admissibility

217   Insurance
217XIII   Contracts and Policies
217XIII(G)   Rules of Construction
217k1857   Evidence
217k1859   Admissibility
     (Formerly 217k155)

Evidence of intentions of parties to insurance policy cannot be used to create an ambiguity; rather, such evidence is admissible only if policy is first determined to be ambiguous.

28 Cases that cite this headnote

**[12] Insurance** 🔑 Questions of Law or Fact

**Judgment** 🔑 Insurance

217   Insurance
217XIII   Contracts and Policies
217XIII(G)   Rules of Construction
217k1863   Questions of Law or Fact
     (Formerly 217k155.1)
228   Judgment
228V   On Motion or Summary Proceeding
228k182   Motion or Other Application
228k185.3   Evidence and Affidavits in Particular Cases
228k185.3(12)   Insurance

Whether insurance policy contains ambiguity is matter of law for court, not inference it must make for purpose of deciding summary judgment motion.

27 Cases that cite this headnote

**[13] Insurance** 🔑 Pollution

    217  Insurance

    217XVII  Coverage—Liability Insurance

    217XVII(A)  In General

    217k2273  Risks and Losses

    217k2278  Common Exclusions

    217k2278(17)  Pollution

        (Formerly 217k435(1))

Absolute pollution exclusions in insured's liability policies unambiguously precluded coverage for underlying claims arising out of accidental release of large cloud of hydrofluoric acid from oil refinery, as language of exclusion was clear and susceptible of only one possible interpretation.

42 Cases that cite this headnote

**[14] Evidence** 🔑 Contracts in General

    157  Evidence

    157XI  Parol or Extrinsic Evidence Affecting Writings

    157XI(A)  Contradicting, Varying, or Adding to Terms of Written Instrument

    157k397  Contracts in General

    157k397(1)  In General

Extrinsic evidence is inadmissible to contradict or vary meaning of explicit language of parties' written agreement if language is not susceptible of more than one legal meaning or construction.

56 Cases that cite this headnote

**Attorneys and Law Firms**

**\*518** David W. Prasifka, Diane M. Guariglia, Barbara Lynn Hawley, Daniel F. Shank, Daniel J. Petroski, Houston, M. Elizabeth Medaglia, Washington, DC, Robert N. Kelly, Houston, Richard S. Kuhl, Washington, DC, Gorge B. Hall, New Orleans, LA, Kent E. Westmoreland, James P. Wallace, Houston, for petitioners.

Jordan Stanzler, Palo Alto, CA, Robert Alan Johnson, New York City, Robert M. Roach, Jr., Houston, Eugene R. Anderson, New York City, Ronald E. Cook, Stephen R. Sulentic, Houston, for respondents.

**Opinion**

PER CURIAM.

The Motion For Rehearing is overruled. Our opinion of March 2, 1995, is withdrawn and the following opinion is substituted.

In this action for damages, injunctive relief, and a declaration of coverage, the issue is whether so-called "absolute pollution exclusions" in insurance policies unambiguously apply to exclude damage coverage from an accidental explosion producing a toxic hydrofluoric acid cloud over a city. The trial court granted summary judgment in favor of the defendant insurance companies. The court **\*519** of appeals reversed the summary judgment and remanded the cause to the trial court. 860 S.W.2d 662. We agree with the trial court that the provisions unambiguously apply under the circumstances presented. We reverse the judgment of the court of appeals and affirm the trial court's judgment.

CBI Industries, Inc. ("CBI") brought this action against various insurance companies which insured CBI under general liability policies. The insurers fall into three groups providing successive "layers" of coverage: (1) National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union"); (2) Anglo American Insurance Company, Ltd. and others (collectively "Anglo American"); and (3) Rome and Companies (collectively "Rome"). Each of the policies issued to CBI by these companies contained a version of what is known in the industry as an "absolute pollution exclusion." The National Union policy contained the following exclusion:

> This policy does not apply to ... any Personal Injury or Property Damage arising out of the actual or threatened discharge, dispersal, release or escape of pollutants, anywhere in the world; ... "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material. Waste materials include materials which are intended to be or have been recycled, reconditioned or reclaimed.

The Anglo American and Rome policies contained this exclusion:

> Notwithstanding anything to the contrary contained in this policy, this policy is amended in that it shall not apply to any claim or claims: For personal injuries or property damages directly or indirectly caused by seepage or pollution or

> contamination of air, land, water or any other property, however caused and whenever occurring.

In October of 1987, CBI, through its wholly owned subsidiary CBI Na–Con, Inc.[1], was working as a contractor for Marathon Petroleum Company ("Marathon") in connection with a periodic "turnaround" of Marathon's Texas City Refinery, during which the refinery is shut down and equipment removed for cleaning, maintenance and replacement. As contractor, CBI was supervising the removal by crane of the convection section of a heater unit. An accident occurred when the crane's load was dropped onto a pipe connected to a storage tank which contained hydrofluoric acid, a substance identified by the United States Environmental Protection Agency as a toxic waste.[2] CBI claims that Marathon, in contravention of standard industry practices, had failed to empty the storage tank prior to the commencement of the turnaround and that CBI was unaware of the presence of hydrofluoric acid in the tank prior to the accident.

In numerous lawsuits brought against CBI and others in connection with the accident, residents of Texas City and others alleged that they were injured when a large cloud of hydrofluoric acid was released as a result of the accident. CBI tendered these claims to National Union, Anglo American and Rome. All of the companies denied coverage and CBI filed this suit.

The insurance companies moved for summary judgment on the ground that the "absolute pollution exclusions" in their policies precluded coverage as a matter of law. CBI argued in response that the policies, by virtue of these exclusions, contained both patent and latent ambiguities. The trial court granted summary judgment for the insurance companies before CBI had the opportunity to obtain any documents through the discovery process. However, the trial court did accept for the record certain insurance industry documents which, CBI contends, indicate that "absolute pollution exclusions" such as those involved in this case are ambiguous and will not be read literally to exclude coverage for every situation involving the discharge of pollutants.[3]

 **\*520** **[1]** **[2]** **[3]** **[4]** Insurance policies are controlled by rules of interpretation and construction which are applicable to contracts generally. *See Forbau v. Aetna Life Insurance Company,* 876 S.W.2d 132 (Tex.1994); *Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 665 (Tex.1987). The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. *Forbau,* 876 S.W.2d at 133. If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983); *see also Universal C.I.T. Credit Corp. v. Daniel,* 243 S.W.2d 154, 157 (Tex.1951). Parol evidence is not admissible for the purpose of creating an ambiguity. *See Universal,* 243 S.W.2d at 157; *Lewis v. East Texas Finance Co.,* 136 Tex. 149, 146 S.W.2d 977, 980 (1941).

**[5]** **[6]** If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous. *See Glover v. National Insurance Underwriters,* 545 S.W.2d 755, 761 (Tex.1977); *see also Coker,* 650 S.W.2d at 393; *Universal,* 243 S.W.2d at 157. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. *See Coker,* 650 S.W.2d at 394; *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 518 (Tex.1980). Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation, *see Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 732 (Tex.1981), and admit extraneous evidence to determine the true meaning of the instrument. *See R & P Enterprises,* 596 S.W.2d at 518.

**[7]** **[8]** **[9]** An ambiguity in a contract may be said to be "patent" or "latent." A patent ambiguity is evident on the face of the contract. *See Universal Home Builders, Inc. v. Farmer,* 375 S.W.2d 737, 742 (Tex.Civ.App.—Tyler 1964, no writ). A latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter. [4] *See Murphy v. Dilworth,* 137 Tex. 32, 151 S.W.2d 1004 (1941); *see also Bache Halsey Stuart Shields, Inc. v. Alamo Sav. Ass'n,* 611 S.W.2d 706, 708 (Tex.Civ.App.—San Antonio 1980, no writ). If a latent ambiguity arises from this application, parol evidence is admissible for the purpose of ascertaining the true intention of the parties as expressed in the agreement. *See Murphy,* 151 S.W.2d at 1005.

In this case, the court of appeals did not decide that the contract was either patently or latently ambiguous. Rather, the court held that the trial court abused its discretion when it rendered summary judgment before allowing discovery. 860 S.W.2d at 666. On that basis alone, the court of appeals reversed and remanded to the trial court "without deciding whether there are ambiguities in the exclusions." 860 S.W.2d at 664. The court reasoned that "CBI was not given sufficient time to make reasonable attempts to discover evidence on the issue of 'applying the contract to the subject matter with which it deals,' and thereby raise a fact issue on latent ambiguity." *Id.* at 666. In support of its holding, the court summarized the industry-wide evidence in the record. *Id.* These items of evidence, the court opined, should have indicated to the trial court that with more time for discovery, CBI "*might* have raised a fact issue on latent ambiguity." *Id.* The discovery sought by CBI is of evidence that its insurers "knew and approved" of industry-wide discussions concerning the breadth of the absolute pollution exclusion and "understood that the pollution exclusions **\*521** would not exclude coverage in construction accident situations."

**[10]** **[11]** **[12]** The court of appeals relies on the *Bache* decision, which held that if a latent ambiguity is discovered when "applying the contract to the subject matter with which it deals," *then* the proponent of the ambiguity may introduce parol evidence to establish the parties' intent. *Bache,* 611 S.W.2d at 708. The ambiguity must become evident when the contract is read in context of the surrounding circumstances, not after parol evidence of intent is admitted to create an ambiguity.

Neither the court of appeals' opinion nor the parties' briefs have raised any need for additional facts to apply the insurance policies to the subject matter with which they deal. The facts relating to the accident, the release of hydrofluoric acid as a result of that accident, and the personal injury and property damage claims allegedly resulting from that release appear to be fully developed. The surrounding circumstances present when the contract was entered into were amply established for the purpose of determining whether an ambiguity exists in this case on these facts. The discovery sought by CBI is not necessary for the application of the contract to its subject matter, but rather goes to the issue of the parties' interpretation of the "absolute pollution exclusion." The court of appeals erred in holding, in effect, that CBI must be allowed an opportunity to discover parol evidence going to the parties' intentions in order to create a latent ambiguity. [5]

 **[13]**   The question to be decided here is whether these insurance policies, by virtue of their "absolute pollution exclusions," are patently or latently ambiguous. On its face, the language of the policies is clear and not patently ambiguous. Nor are the policies latently ambiguous. Applying the policies' language to the context of the claim here does not produce an uncertain or ambiguous result, but leads only to one reasonable conclusion: the loss was caused by a cloud of hydrofluoric acid, a substance which is clearly a "pollutant" for which coverage is precluded.

CBI correctly contends that the language of the policies must be interpreted with reference to both the facts of the claim *and* the facts within the contemplation of the parties at the signing of the policies. *See Coker,* 650 S.W.2d at 394. CBI argues that extrinsic evidence (such as trade usage, prior dealings, and prior negotiations) is relevant in interpreting the policies and must be considered to ascertain whether a latent ambiguity exists. Specifically, CBI argues that extrinsic evidence concerning industry-wide discussions of the exclusion at issue here shows that the parties shared a mutual, yet unstated, intent that the exclusions would not encompass "accidental" releases of pollutants.

 **[14]**   Extrinsic evidence may, indeed, be admissible to give the words of a contract a meaning consistent with that to which they are reasonably susceptible, *i.e.,* to "interpret" contractual terms. [6] If the contract language is not fairly susceptible of more than one legal meaning or construction, however, extrinsic evidence is inadmissible to contradict or vary the meaning of the explicit language of the parties' written agreement. **\*522** *Hubacek v. Ennis State Bank,* 317 S.W.2d 30, 32 (Tex.1958); *Lewis,* 146 S.W.2d at 980. In this case, the policies unequivocally deny coverage for damage resulting from pollutants, however the damage is caused. [7] The relevant facts and extrinsic evidence necessary to apply this contract exclusion language to the subject matter with which it deals in this case reveals no latent ambiguity.

Courts usually strive for uniformity in construing insurance provisions, especially where, as here, the contract provisions at issue are identical across the jurisdictions. Most courts which have examined the same or substantially similar absolute pollution exclusions have concluded that they

are clear and unambiguous. [8] "This pollution exclusion is just what it purports to be—absolute ..." *Alcolac,* 716 F.Supp. 1546, 1549 (D.Md.1989). We agree. The language in this pollution exclusion is clear and susceptible of only one possible interpretation in this case. Because there are no latent or patent ambiguities in the policies, there are no fact issues that merit discovery. We conclude that the record is sufficiently developed to support the trial court's summary judgment in favor of the defendant insurance companies. Accordingly, we reverse the judgment of the court of appeals and affirm the judgment of the trial court.

## All Citations

907 S.W.2d 517, 41 ERC 1279, 39 Tex. Sup. Ct. J. 7

## Footnotes

1       CBI Na–Con, Inc. was an additional named insured on all of the insurance policies at issue in this case.

2       40 C.F.R. § 261.33(f) (1992).

3       For example, during testimony at a 1985 hearing conducted by the Texas State Board of Insurance, Ward Harrel, a representative of Liberty Mutual Insurance Company, indicated that the pollution exclusion could be read literally to exclude coverage in situations where "no one would read it that way," noting that "our insureds would be at the State Board ... quicker than a New York minute if, in fact, everytime [sic] a bottle of Clorox fell off a shelf at a grocery store and we denied the claim because it's a pollution loss."

4       For example, if a contract called for goods to be delivered to "the green house on Pecan Street," and there were in fact two green houses on the street, it would be latently ambiguous.

5       In its brief to this Court, CBI argues that the insurance companies' summary judgment proof did not establish as a matter of law that the language of the exclusions was unambiguous "in light of the surrounding circumstances," i.e. that "[t]here remained genuinely disputed issues of material fact as to whether the parties intended to apply the pollution exclusions to CBI's construction accidents." As discussed above, however, no issue regarding the parties' intentions is raised *unless* the policy is ambiguous—and evidence of those intentions cannot be used to create an ambiguity. *See Universal,* 243 S.W.2d at 157; *Lewis,* 146 S.W.2d at 980; *Murphy,* 151 S.W.2d at 1005.

        CBI also contends that one of the inferences that should be made in its favor on summary judgment is that "the policies contain patent ambiguities that preclude summary judgment and cry out for discovery." Whether the policies contain ambiguities is a matter of law for the court, *see Coker,* 650 S.W.2d at 394; *R & P Enterprises,* 596 S.W.2d at 518, not an inference it must make for the purpose of deciding a summary judgment motion.

6       In cases involving "trade usage" evidence, for example, the meaning to which a certain term or phrase is most reasonably susceptible is the one which so regularly observed in place, vocation, trade, or industry so "as to justify an expectation that it will be observed with respect to a particular agreement." Restatement (2d) of Contracts § 222(1). *See also* TEX.BUS. & COM.CODE § 1.205(b).

7       The National Union policy applies to "any" pollution, and the Anglo American and Rome policies apply to pollution "however caused."

8       *See, e.g., Heyman Assoc. No. 1 v. Insurance Co. of State of Pennsylvania,* 231 Conn. 756, 653 A.2d 122 (1995); *Crescent Oil Co. Inc. v. Federated Mut. Ins. Co.,* 20 Kan.App.2d 428, 888 P.2d 869 (1995); *Independent Sch. Dist. No. 197, W.R. Grace & Co. v. Accident and Casualty Ins. of Winterthur,* 525 N.W.2d 600 (Minn.Ct.App.1995); *Essex Ins. Co. v. Tri–Town Corp.,* 863 F.Supp. 38 (D.Mass.1994); *Blackhawk–Central City Sanitation Dist. v. American Guarantee & Liab. Ins. Co.,* 856 F.Supp. 584 (D.Colo.1994); *Larsen Oil Co. v. Federated Serv. Ins. Co.,* 859 F.Supp. 434 (D.Or.1994); *American States Ins. Co. v. F.H.S., Inc.,* 843 F.Supp. 187 (S.D.Miss.1994); *American States Ins. Co. v. Skrobis Painting & Decorating, Inc.,* 513 N.W.2d 695 (Wis.Ct.App.1994); *Demakos v. Travelers Ins. Co.,* 205 A.D.2d 731, 613 N.Y.S.2d 709 (1994); *Union Mut. Fire Ins. Co. v. Hatch,* 835 F.Supp. 59 (D.N.H.1993); *Damar, Inc. v. U.S. Fire Ins. Co.,* 856 F.Supp. 679 (N.D.Ga.1993); *O'Brien Energy Systems, Inc. v. American Employer's Ins. Co.,* 427 Pa.Super. 456, 629 A.2d 957 (1993); *Vantage Dev. Corp. v. American Env't Technologies Corp.,* 598 A.2d 948 (N.J.Super.Ct.Law Div.1991); *Great Northern Ins. Co. v. Benjamin Franklin Fed. Sav. and Loan Ass'n,* 793 F.Supp. 259 (D.Or.1990), *aff'd,* 953 F.2d 1387 (table) (9th Cir.1992); *Budofsky v. The Hartford Ins. Co.,* 147 Misc.2d 691, 556 N.Y.S.2d 438 (Sup.Ct.1990); *Alcolac Inc. v. California Union*

*Ins. Co.,* 716 F.Supp. 1546 (D.Md.1989); *Hydro Systems v. Continental Ins. Co.,* 717 F.Supp. 700 (C.D.Cal.1989), *aff'd,* 929 F.2d 472 (9th Cir.1991); *League of Minn. Cities Insurance Trust v. City of Coon Rapids,* 446 N.W.2d 419 (Minn.Ct.App.1989); *Guilford Ind. Inc. v. Liberty Mut. Ins. Co.,* 688 F.Supp. 792 (D.Me.1988). *But see, e.g., Minerva Enterprises v. Bituminous Cas. Corp.,* 312 Ark. 128, 851 S.W.2d 403 (1993); *West American Ins. Co. v. Tufco Flooring East, Inc.,* 104 N.C.App. 312, 409 S.E.2d 692 (1991).

**End of Document**                                                 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

333 S.W.3d 392
Court of Appeals of Texas,
Amarillo,
Panel E.

OCCIDENTAL PERMIAN LTD., Appellant/Cross–Appellee,

v.

The HELEN JONES FOUNDATION, et. al., Appellees/Cross–Appellants,

v.

BP America Production Company, et. al., Cross–Appellees.

No. 07–09–00059–CV. | Jan. 31, 2011. | Rehearing Overruled April 12, 2011.

**Synopsis**

**Background:** Royalty interest owners brought action against current lease operators and two former lease operators, alleging underpaid royalties. The 286th District Court Hockley County, Andrew J. Kupper, J., granted summary judgment to operators on certain claims, and, after a jury trial, entered judgment against current lease operators and ordered that royalty owners take nothing from former operators. Royalty owners and current lease operators appealed.

**Holdings:** The Court of Appeals, James T. Campbell, J., held that:

[1] evidence was legally insufficient to support jury's findings of liability and damages for current operator's alleged failure to pay royalties according to amount-realized leases;

[2] evidence was legally insufficient to support jury verdict that current and former operators failed to reasonably market gas produced from proceeds leases;

[3] royalty owners' expert's testimony did not comport with state law as to determination of market value of casinghead gas, and thus did not support verdict that current and former lease operators underpaid royalties;

[4] expert's testimony as to market value of casinghead gas was unreliable, and thus provided no evidence to support royalty owners' claim of underpaid royalties; and

[5] current lease operator did not lose title to its personal-property carbon dioxide by injecting the carbon dioxide into hydrocarbon-producing formation to enhance oil recovery, and thus carbon dioxide was not subject to a royalty.

Affirmed in part, reversed in part, rendered in part, and remanded.

West Headnotes (26)

**[1]** **Evidence** 👈 Construction of written instruments

**Mines and Minerals** 👈 Actions

157 Evidence
157XII Opinion Evidence
157XII(F) Effect of Opinion Evidence
157k569 Testimony of Experts
157k571 Nature of Subject
157k571(5) Construction of written instruments
260 Mines and Minerals
260II Title, Conveyances, and Contracts
260II(C) Leases, Licenses, and Contracts
260II(C)3 Construction and Operation of Oil and Gas Leases
260k79 Rent or Royalties
260k79.7 Actions

Evidence was legally insufficient to support jury's findings of liability and damages for current lease operator's alleged failure to pay royalties according to amount-realized leases, in royalty interest owners' action against operators alleging underpaid royalties, even though royalty owners provided expert testimony that amount operators truly realized for casinghead gas was not proceeds it received under wellhead gas sales contracts; expert testimony did not comport with plain language of lease, and proceeds to which expert pointed to as basis for his theory were not proceeds of sale of gas as produced at wellhead but rather after processing.

Cases that cite this headnote

**[2]** **Mines and Minerals** 👈 In general; general rules of construction

260 Mines and Minerals
260II Title, Conveyances, and Contracts
260II(C) Leases, Licenses, and Contracts
260II(C)3 Construction and Operation of Oil and Gas Leases
260k73 In general; general rules of construction

An oil and gas lease is a contract and interpreted accordingly.

Cases that cite this headnote

**[3]  Mines and Minerals** 🔑 Amount and time of payment

260   Mines and Minerals
260II   Title, Conveyances, and Contracts
260II(C)   Leases, Licenses, and Contracts
260II(C)3   Construction and Operation of Oil and Gas Leases
260k79   Rent or Royalties
260k79.3   Amount and time of payment

"Amount realized," as used in oil or gas lease, means the proceeds received from the sale of gas or oil.

Cases that cite this headnote

**[4]  Mines and Minerals** 🔑 Amount and time of payment

260   Mines and Minerals
260II   Title, Conveyances, and Contracts
260II(C)   Leases, Licenses, and Contracts
260II(C)3   Construction and Operation of Oil and Gas Leases
260k79   Rent or Royalties
260k79.3   Amount and time of payment

"At the well," as used in an oil or gas lease, means before value is added by processing the raw gas for market.

Cases that cite this headnote

**[5]  Mines and Minerals** 🔑 Actions

260   Mines and Minerals
260II   Title, Conveyances, and Contracts
260II(C)   Leases, Licenses, and Contracts
260II(C)3   Construction and Operation of Oil and Gas Leases
260k79   Rent or Royalties
260k79.7   Actions

Evidence was legally insufficient to support jury verdict that current and former oil and gas lease operators failed to reasonably market gas produced from proceeds leases, in royalty interest owners' action against operators alleging underpaid royalties, even if lease operator engaged in self-dealing, where it was undisputed that current lease operator paid royalties according to proceeds under percentage gas sales contracts put in place by former operators, no witness opined that percentage sales contracts were unreasonable when signed, and there was no proof of what different marketing action was required of a reasonably prudent operator under same or similar circumstances.

Cases that cite this headnote

**[6]** **Mines and Minerals** ☛ Implied obligation

**Mines and Minerals** ☛ Extent of production, paying quantities, and marketing

**Mines and Minerals** ☛ Amount and time of payment

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

260k78 Testing or Working

260k78.1 Construction, Breach, and Penalties

260k78.1(2) Implied obligation

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

260k78 Testing or Working

260k78.1 Construction, Breach, and Penalties

260k78.1(8) Extent of production, paying quantities, and marketing

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

260k79 Rent or Royalties

260k79.3 Amount and time of payment

If silent on the subject, an oil and gas lease includes an implied covenant by the lessee to manage and administer the lease; this implied covenant places on the lessee the duty to market the oil and gas reasonably.

1 Cases that cite this headnote

**[7]** **Mines and Minerals** ☛ Extent of production, paying quantities, and marketing

**Mines and Minerals** ☛ Amount and time of payment

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

260k78 Testing or Working

260k78.1 Construction, Breach, and Penalties

260k78.1(8) Extent of production, paying quantities, and marketing

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

260k79 Rent or Royalties

260k79.3 Amount and time of payment

The focus in an action for breach of the duty to reasonably market oil and gas is on the conduct of the lessee and not other sales.

1 Cases that cite this headnote

**[8]** **Mines and Minerals** 🔑 Extent of production, paying quantities, and marketing

**Mines and Minerals** 🔑 Amount and time of payment

260 Mines and Minerals
260II Title, Conveyances, and Contracts
260II(C) Leases, Licenses, and Contracts
260II(C)3 Construction and Operation of Oil and Gas Leases
260k78 Testing or Working
260k78.1 Construction, Breach, and Penalties
260k78.1(8) Extent of production, paying quantities, and marketing
260 Mines and Minerals
260II Title, Conveyances, and Contracts
260II(C) Leases, Licenses, and Contracts
260II(C)3 Construction and Operation of Oil and Gas Leases
260k79 Rent or Royalties
260k79.3 Amount and time of payment

In an evaluation of the sufficiency of the evidence that lessee breached its duty to reasonably market casinghead gas, court's inquiry must focus on its behavior, not on evidence of other sales.

Cases that cite this headnote

**[9]** **Evidence** 🔑 Comparable sales or values

157 Evidence
157XII Opinion Evidence
157XII(D) Examination of Experts
157k555 Basis of Opinion
157k555.6 Value
157k555.6(10) Comparable sales or values

Royalty owners' expert's testimony did not comport with state law as to determination of market value of casinghead gas, and thus did not support verdict that current and former lease operators underpaid royalties to royalty owners, where market-value study to which expert testified was not conducted by comparing the dollars-per-thousand cubic foot (Mcf) or dollars-per-million British thermal unit (MMBTU) values of the prices on which royalty owners received royalty with royalties paid for comparable gas but rather was premised on idea that there was a market value for percentage of proceeds.

Cases that cite this headnote

**[10]** **Mines and Minerals** 🔑 Amount and time of payment

260 Mines and Minerals
260II Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3  Construction and Operation of Oil and Gas Leases

260k79  Rent or Royalties

260k79.3  Amount and time of payment

The market value of property, including gas sold at well, is the price it would bring when offered for sale by one desiring, but not obligated, to sell and bought by one under no necessity of buying it.

Cases that cite this headnote

### [11]  Evidence  ⚷ Sales of other property in general

157  Evidence

157IV  Admissibility in General

157IV(C)  Similar Facts and Transactions

157k142  Showing Value

157k142(1)  Sales of other property in general

Preferred method for determining market value of gas sold at well is that of examining comparable sales.

Cases that cite this headnote

### [12]  Mines and Minerals  ⚷ Amount and time of payment

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3  Construction and Operation of Oil and Gas Leases

260k79  Rent or Royalties

260k79.3  Amount and time of payment

To determine its market value, gas sold at well is valued as though it is free and available for sale.

Cases that cite this headnote

### [13]  Evidence  ⚷ Sales of other property in general

157  Evidence

157IV  Admissibility in General

157IV(C)  Similar Facts and Transactions

157k142  Showing Value

157k142(1)  Sales of other property in general

Market value of gas is generally determined by comparing the sale price to other sales comparable in time, quality, quantity, and availability of marketing outlets.

1 Cases that cite this headnote

## [14] Evidence ⬤ Sales of other property in general

157 Evidence

157IV Admissibility in General

157IV(C) Similar Facts and Transactions

157k142 Showing Value

157k142(1) Sales of other property in general

A sale of gas of comparable quality, in order to determine market value of gas, involves gas with similar physical properties such as sweet, sour, or casinghead gas.

1 Cases that cite this headnote

## [15] Evidence ⬤ Comparable sales or values

157 Evidence

157XII Opinion Evidence

157XII(D) Examination of Experts

157k555 Basis of Opinion

157k555.6 Value

157k555.6(10) Comparable sales or values

Proper expert testimony may make adjustments between sales of gas with differing physical properties so that the sales being compared truly are comparable in determining market value of gas.

Cases that cite this headnote

## [16] Evidence ⬤ Necessity and sufficiency

157 Evidence

157XII Opinion Evidence

157XII(D) Examination of Experts

157k555 Basis of Opinion

157k555.2 Necessity and sufficiency

It is the burden of the proponent of scientific or technical evidence to demonstrate the opinions of its expert are reliable.

Cases that cite this headnote

## [17] Evidence ⬤ Necessity and sufficiency

157 Evidence

157XII Opinion Evidence

157XII(D) Examination of Experts

157k555 Basis of Opinion

157k555.2 Necessity and sufficiency

Determining reliability of an expert's opinions focuses on the principles, research and methodology underlying the conclusions of the expert.

Cases that cite this headnote

**[18]** **Evidence** ☞ Necessity and sufficiency

**Evidence** ☞ Speculation, guess, or conjecture

157 Evidence
157XII Opinion Evidence
157XII(D) Examination of Experts
157k555 Basis of Opinion
157k555.2 Necessity and sufficiency
157 Evidence
157XII Opinion Evidence
157XII(D) Examination of Experts
157k555 Basis of Opinion
157k555.4 Sources of Data
157k555.4(2) Speculation, guess, or conjecture

Expert testimony is unreliable if it is not grounded in the methods and procedures of science and is no more than subjective belief or unsupported speculation.

Cases that cite this headnote

**[19]** **Evidence** ☞ Necessity and sufficiency

157 Evidence
157XII Opinion Evidence
157XII(D) Examination of Experts
157k555 Basis of Opinion
157k555.2 Necessity and sufficiency

Expert testimony is unreliable if there is too great an analytical gap between the data and the opinion proffered.

Cases that cite this headnote

**[20]** **Evidence** ☞ Necessity and sufficiency

157 Evidence
157XII Opinion Evidence
157XII(D) Examination of Experts
157k555 Basis of Opinion
157k555.2 Necessity and sufficiency

If an expert's testimony is not reliable, it is not evidence.

Cases that cite this headnote

**[21]** **Evidence** ☞ Comparable sales or values

157   Evidence
157XII   Opinion Evidence
157XII(D)   Examination of Experts
157k555   Basis of Opinion
157k555.6   Value
157k555.6(10)   Comparable sales or values

Royalty owners' expert's testimony as to market value of casinghead gas was unreliable, and thus provided no evidence to support royalty owners' claim of underpaid royalties by lease operators; casinghead gas sold under other contracts which expert compared was not comparable in quality to that produced from the two market-value leases at issue, and expert's intentional omission of high carbon dioxide content of the gas from comparability evaluation improperly injected subjective factor into what was properly an objective calculation.

1 Cases that cite this headnote

**[22]   Evidence** ⌐ Value

**Mines and Minerals** ⌐ Actions

157   Evidence
157XII   Opinion Evidence
157XII(F)   Effect of Opinion Evidence
157k569   Testimony of Experts
157k571   Nature of Subject
157k571(7)   Value
260   Mines and Minerals
260II   Title, Conveyances, and Contracts
260II(C)   Leases, Licenses, and Contracts
260II(C)3   Construction and Operation of Oil and Gas Leases
260k79   Rent or Royalties
260k79.7   Actions

No evidence supported verdict that oil and gas lease operator failed to pay royalty based on market value, in royalty interest owners' action against lease operator alleging underpaid royalties, where royalty owners' expert's testimony as to market value was unreliable, and no other evidence was presented to support market-value finding.

Cases that cite this headnote

**[23]   Damages** ⌐ Verdict and Findings

115   Damages
115X   Proceedings for Assessment
115k219   Verdict and Findings
115k219.1   In general

In the absence of liability findings, damages findings are immaterial.

Cases that cite this headnote

**[24] Mines and Minerals**  ⚬— Amount and time of payment

    260  Mines and Minerals

    260II  Title, Conveyances, and Contracts

    260II(C)  Leases, Licenses, and Contracts

    260II(C)3  Construction and Operation of Oil and Gas Leases

    260k79  Rent or Royalties

    260k79.3  Amount and time of payment

Lease operator did not lose title to its personal-property carbon dioxide by injecting the carbon dioxide into hydrocarbon-producing formation to enhance oil recovery, and thus carbon dioxide was not subject to a royalty; ownership of the gas as personal property was not altered either upon injection of gas in formation or upon later production of gas, and there was no evidence that lease operator had intent to abandon the carbon dioxide it injected and recovered.

Cases that cite this headnote

**[25] Judgment**  ⚬— Existence or non-existence of fact issue

    228  Judgment

    228V  On Motion or Summary Proceeding

    228k182  Motion or Other Application

    228k185  Evidence in General

    228k185(6)  Existence or non-existence of fact issue

A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

Cases that cite this headnote

**[26] Mines and Minerals**  ⚬— Title in general

    260  Mines and Minerals

    260II  Title, Conveyances, and Contracts

    260II(A)  Rights and Remedies of Owners

    260k47  Title in general

The "rule of capture doctrine" holds that a landowner is entitled to produce the oil and gas in place beneath his land, as well as the oil and gas which flows to the land as the result of physical conditions and natural laws relating to the migratory nature of oil and gas; recognizing that oil and gas are fugitive minerals that will migrate throughout a reservoir without regard to property lines, the rule provides that a landowner owns all the oil and

gas produced by a legally drilled well located on his land, even though the well may be draining minerals from nearby properties.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*395** Deborah G. Hankinson, Ryan D. Clinton, Hankinson Levinger LLP, Dallas, TX, John A. 'Jad' Davis, Joni J. Ogle, Davis, Gerald & Cremer, Midland, TX, Dennis Cameron, GableGotwals, Tulsa, OK, for Appellant/Cross–Appellee.

James Holmes, C.L. Mike Schmidt, The Schmidt Firm, LLP, Dallas, TX, Thomas E. Pitts, John Simpson, Splawn Simpson & Pitts, Lubbock, TX, Dick Watt, Watt, Beckworth & Thompson, L.L.P., Houston, TX, E. Lee Parsley, E. Lee Parsley, P.C., Austin, TX, for Appellees/Cross–Appellants.

Jeff Weems, Robert B. Boemer, Jennifer R. Bickley, Harrison, Bettis, Staff, McFarland & Weems, L.L.P., Houston, TX, for Cross–Appellees.

Before CAMPBELL and PIRTLE, JJ., and BOYD, S.J. [1]

## OPINION

JAMES T. CAMPBELL, Justice.

Owners of royalty interests [2] in lands in **\*396** the Slaughter Field [3] brought suit seeking damages for underpaid royalties on casinghead gas [4] against the current lease operator, Occidental Permian Ltd. ("OPL"), and two former operators of the leases. The royalty owners also asserted a claim against OPL for royalties on carbon dioxide. The trial court granted summary judgment for the operators on some claims, and a jury heard the remaining claims. After a verdict in favor of the royalty owners, the trial court signed a judgment disregarding the jury's award of attorney's fees against OPL but otherwise awarding the damages found by the jury as to OPL. The judgment ordered that the royalty owners take nothing from the former operators.

The royalty owners appeal the trial court's grant of summary judgment, its denial of their attorney's fees and the take-nothing judgment against the former operators. OPL appeals the judgment against it.

We will render judgment that the royalty owners take nothing from OPL. We will affirm the summary judgment, the denial of attorney's fees and the take-nothing judgment as to the former operators. We will remand the case for entry of a new judgment consistent with this opinion and law. We will otherwise affirm the judgment.

### Background

As to the royalties on casinghead gas, six oil and gas leases are at issue. The parties agree that the royalty on casinghead gas under four of the leases is one-eighth of the "amount realized from such sale" when gas is sold at the wells. The other two leases, the parties also agree, provide a royalty on casinghead gas of three-eighths of its "market value in the field."[5]

The six leases range in date from 1934 through 1944. The Slaughter Field is an oil-producing field, and the casinghead gas was flared until sometime in the 1940s when, according to testimony, the Railroad Commission prohibited the practice. In the late 1940s, eight lessees, including the defendants' predecessor Stanolind Oil and Gas Company, jointly constructed the Slaughter Gas Processing Plant. The plant began operation in 1949.

The lessees individually entered into Casinghead Gas Contracts, beginning in **\*397** 1947, by which they sold the casinghead gas produced on their leases to the plant owners. The gas contracts were "percentage of proceeds" contracts, by which the plant agreed to pay the lessees 50% of the proceeds from the sale of processed residue gas and 33.3% of the proceeds from the sale of natural gas liquids (NGLs) from the plant.[6] The term of these gas sales contracts was for the life of the Slaughter Plant.[7]

In the 1960s, units were formed for the purpose of conducting secondary recovery operations, such as waterfloods, to enhance production of oil in the field. Then in the 1980s tertiary recovery operations were commenced, by which carbon dioxide is injected into the producing formation, also for the purpose of maintaining and enhancing production of oil. The injected $CO_2$ becomes commingled with hydrocarbons in the producing formation and comes back to the surface along with the casinghead gas.

High levels of $CO_2$ interfere with the processing of gas in the Slaughter Plant.[8] As the $CO_2$-injection program expanded in the field, levels of $CO_2$ in the casinghead gas increased. And the injected $CO_2$ migrated to nearby units, so casinghead gas produced from wells outside the units in which $CO_2$ was being injected also experienced increased $CO_2$ levels. During the mid–1980s, the owners of the Slaughter Plant constructed the adjoining Mallet Plant to process gas with high $CO_2$ concentrations. The $CO_2$ extracted from the gas at the Mallet Plant is returned to the unit

operator for reinjection into the oil-producing formation. The $CO_2$ thus follows a continuous cycle of injection, recovery, processing and re-injection. The casinghead gas, shorn of $CO_2$, is piped from the Mallet Plant to the Slaughter Plant for further processing.

In 1996, BP America Production Company, then known as Amoco Production Company, became operator of the Slaughter and Mallet Plants and operator of the leases at issue in the litigation. It later was succeeded as operator of the plant and leases by Altura Energy Ltd. In 2000, OPL acquired both the leases and the plants. Thus, OPL now is both seller and buyer of the casinghead gas under the gas sales contracts.

Under the terms of the casinghead gas sales contracts, the casinghead gas is delivered to the buyer at or near the wellhead. Evidence showed that after the gas is gathered from the leases, and processed through the Mallet and Slaughter plants, the NGLs extracted from the gas stream, and the residue gas available for sale after processing, are transferred to OPL's affiliated company Occidental Energy Marketing, Inc. ("OEMI"). OEMI markets the extracted NGLs at Mont Belvieu, Texas, near the Houston Ship Channel, and the residue gas at Waha, an El Paso Natural Gas Co. marketing hub in Pecos County.

In their suit against BP America Production Company, Altura Energy Ltd. (who we will refer to jointly as BP) and OPL, the royalty owners contended (1) BP and OPL breached the four amount-realized leases by failing to pay royalty calculated on the actual amount they realized **\*398** from sale of casinghead gas; (2) BP and OPL breached an implied covenant in the amount-realized leases by failing to market the casinghead gas as would a reasonably prudent operator; (3) under the two market-value leases, BP and OPL did not calculate casinghead gas royalties on its market value in the field; and (4) OPL failed to pay a royalty on the $CO_2$ separated from the gas at the Mallet Plant. The royalty owners moved for partial summary judgment seeking a declaration that OPL owed a royalty on $CO_2$. By cross-motion, OPL sought a declaration that the $CO_2$ was not subject to its royalty obligation. The trial court agreed with OPL and granted a partial summary judgment accordingly. The remaining issues were tried to the jury.

The jury found for the royalty owners on all liability theories submitted and awarded them attorney's fees. The trial court granted judgment notwithstanding the verdict in favor of BP on its statute of limitations defense [9] and in favor of OPL on the award of attorney's fees. The court then rendered judgment that the royalty owners recover $7,064,674 from OPL and take nothing from BP. As noted, both OPL and the royalty owners appeal.

## Analysis

**Issues Tried to Jury**

Through three issues OPL contends no evidence supported the jury's findings of liability and damages for: (1) the failure to pay royalties according to the amount-realized leases; (2) the breach of the implied duty to market in the amount-realized leases; and (3) the underpayment of royalties on the market-value leases. BP raises the same arguments in response to the royalty owners' cross-appeal. [10] By cross-appeal, the royalty owners argue the trial court erred in granting judgment notwithstanding the verdict on BP's statute of limitations defense and in favor of BP and OPL on the royalty owners' request for attorney's fees.

When conducting a legal sufficiency review, we view the evidence in a light most favorable to the judgment and indulge every reasonable inference to support it, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 807, 822 (Tex.2005). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996). When evidence is so weak as to do no more than create "a mere surmise or suspicion" that a fact exists, the evidence does not exceed a scintilla. *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004) (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983)).

**The Amount–Realized Leases**

 [1]   As noted, the royalty clause of the four amount-realized, or proceeds, leases **\*399** specifies a royalty on casinghead gas sold at the wells of one-eighth of the amount realized from the sale. OPL contends the evidence conclusively shows it paid royalties in accordance with the royalty clause, and we agree.

 [2]   An oil and gas lease is a contract and interpreted accordingly. *Tana Oil & Gas Corp. v. Cernosek,* 188 S.W.3d 354, 359 (Tex.App.-Austin 2006, pet. denied). It is a basic tenet of our law that competent parties enjoy the utmost freedom of contract and courts will enforce a contract freely and voluntarily made for a lawful purpose. *Crutchfield v. Associates Investment Co.,* 376 S.W.2d 957, 959 (Tex.Civ.App.-Dallas 1964, writ ref'd). Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them used in a technical or different sense. *Valence Operating Company v. Dorsett,* 164 S.W.3d 656, 662 (Tex.2005).

 [3]    [4]   It is undisputed that the casinghead gas is sold at the wells, and that the lessor is entitled to royalties based on the amount realized from the wellhead sale. *See Tana Oil & Gas Corp.,* 188 S.W.3d at 360 (applying amount-realized royalty provision); *see generally Exxon Corp. v. Middleton,* 613 S.W.2d 240, 242–44 (Tex.1981) (construing "gas sold at the wells" royalty provision). "Amount realized" means the proceeds received from the sale of gas or oil. *Tana Oil*

*& Gas,* 188 S.W.3d at 360. "At the well" means before value is added by processing the raw gas for market. *Id.*

It is further undisputed that, at all times pertinent to this litigation, the life-of-the-plant gas sales contracts for the sale of the casinghead gas at the wellhead have remained in place, and that the lessees have paid royalties to the lessors based on the proceeds received by the lessees for the casinghead gas in accordance with the terms of the contracts. Nevertheless, the royalty owners contend, and the jury found, that the lessees failed to pay royalties in accordance with the leases.

The royalty owners' expert Charles Graham testified to his opinion that the amount OPL truly realizes for the casinghead gas is not the proceeds it receives under the wellhead gas sales contracts. [11] His opinion focused on the circumstance that OPL, through its acquisition of sole ownership of both the leases and the Slaughter Plant, is both seller and buyer of the casinghead gas. It follows, according to Graham, that the determination of the amount realized by OPL is no longer limited to that received under the gas sales contracts. His opinion was that the amount OPL realizes for the gas at the wellhead, properly calculated, equals 100% of the proceeds of the downstream sales of the extracted NGLs and residue gas less certain costs. [12] One eighth of that amount, Graham testified, is the royalty owed by OPL.

We find Graham's testimony provided no evidence OPL failed to pay royalties as required by the leases. First, his theory simply does not comport with the plain language of the leases. Under the four "amount-realized" leases, royalty is calculated on the amount realized from sale only if the gas is sold at the well; otherwise, royalty is payable on the market value of the gas. The gas royalty language from the 1934 Christine DeVitt "B" **\*400** lease is typical of the four amount-realized leases, stating that the royalty is "on gas produced from said land and sold or used off the land or in the manufacture of gasoline, including casinghead gas, the market price at the well of one-eighth of the gas so sold or used, provided that if and when lessee shall sell gas at the wells lessor's royalty thereon shall be one-eighth of the amount realized from such sales." There is no dispute that the "such sales" referred to are the sales of gas at the wells. Graham's theory necessarily makes use of the gas sales contracts to establish that the casinghead gas is sold at the wellhead (thus triggering the obligation to pay royalty on the amount realized from "such sales"), then ignores the provisions of the contracts [13] when determining the amount realized from the sale. [14] The royalty owners cannot have it both ways. If the gas sales contracts are effective to establish that the lessee is selling the gas at the wells, so as to trigger the obligation to pay royalty on the amount realized from "such sales," the terms of the same contracts cannot be disregarded in the determination of the amount realized from "such sales."

Moreover, the proceeds to which Graham pointed as the basis for his theory were not proceeds of the sale of gas as produced at the wellhead, but those of the sale of natural gas liquids and residue gas after processing. Graham testified that the amount OPL realized from the wellhead sale

equaled the proceeds of OEMI's sale of the NGLs at Mont Belvieu and its sale of the residue gas at Waha, less transportation and fractionation costs. Graham's version of the amount realized thus includes amounts OPL realized from its activities beyond the wellhead, including its gathering of the gas, its processing of the gas at the Mallet and Slaughter Plants and its marketing of the extracted liquids. *Cf. Tana Oil & Gas Corp.,* 188 S.W.3d at 360–61 (phrase "at the well" means before value is added by preparing the gas for market). Evidence of proceeds received by OEMI, an affiliated but different company, from sales of NGLs and residue gas at locations far removed from the wellhead is not evidence of the amount realized by OPL from a sale of raw gas at the well. [15]

We agree with OPL the undisputed evidence that royalties have been paid in accordance with the proceeds received under the casinghead gas sales contracts is conclusive evidence that royalties have been paid as required by the leases. *See Keller,* 168 S.W.3d at 814–15 (discussing conclusive evidence).

**The Implied Duty to Market Gas**

 **[5]**　BP and OPL next challenge the legal sufficiency of evidence supporting the **\*401** jury's findings of liability and damages for failure to reasonably market gas produced under the amount-realized leases.

 **[6]**　**[7]**　If silent on the subject, an oil and gas lease includes an implied covenant by the lessee to manage and administer the lease. *Yzaguirre,* 53 S.W.3d at 373. This implied covenant places on the lessee the duty to market the oil and gas reasonably. *Id.; Amoco Prod. Co. v. Alexander,* 622 S.W.2d 563, 568 (Tex.1981) (conduct of lessee is measured by that of reasonably prudent operator under same or similar circumstances). The focus in an action for breach of the duty to reasonably market is on the conduct of the lessee and not other sales. *Union Pac. Res. Group, Inc. v. Hankins,* 111 S.W.3d 69, 71 (Tex.2003).

We begin our discussion by noting our disagreement with one position taken by OPL. It argues that the Texas Supreme Court has limited breaches of the implied covenant to market to instances in which the proceeds received by the lessee were the result of fraud or sham. OPL relies on language in *Hankins,* 111 S.W.3d at 74, for this proposition. We do not agree that *Hankins* so held. As the court pointed out in *Bowden,* 247 S.W.3d at 700, the issue with which the court dealt in *Hankins* was whether there was a common legal question within a class consisting of lessors of market-value and proceeds leases. The court began its analysis of that issue in *Hankins* by listing the common issues the trial court had identified. 111 S.W.3d at 73. Searching the list for at least one issue of law or fact that both inhered in the complaints of all proposed class members and was subject to generalized proof, the court divided the trial court's list into a group of issues it found questioned whether the defendants breached the implied covenant by failing to obtain

arm's length prices and a group it characterized as questioning whether a defendant had engaged in a sham transaction with an affiliated company. *Id.* at 74. Reiterating the holding of *Yzaguirre* that no covenant to reasonably market is implied in market-value royalty leases, and finding that market-value royalty owners are protected from the effects of inter-affiliate transactions by their entitlement to receive royalty based on the "objective market value," the court went on to hold that none of the trial court's listed issues had application to market-value leases, depriving the proposed class of commonality. *Id.* at 74–75. The statement to which OPL points, "the question under a proceeds lease would be whether the proceeds actually received by the lessee were a fraud or a sham," *id.* at 74, must be seen in its context of the court's discussion of the issues identified by the trial court in that case. We do not believe the Supreme Court intended by the statement to limit the duty to reasonably market, when implied, to a duty in all cases simply to avoid fraudulent or sham marketing transactions. Nor do we see anything in the court's opinion in *Bowden,* which OPL also cites, to suggest such a limitation applicable in all cases. 247 S.W.3d at 700 (noting that "*Hankins* did involve similar allegations that the lessee's intra-affiliate sales transactions were a sham").

 **[8]**   We agree, though, with OPL that in an evaluation of the sufficiency of the evidence it breached its duty to reasonably market the casinghead gas, our inquiry must focus on its behavior, not on evidence of other sales. *Hankins,* 111 S.W.3d at 71. And we agree that the evidence of its breach of the duty is legally insufficient.

The charge asked whether BP and OPL failed to reasonably market gas produced from the proceeds leases. In conjunction with the question, the trial court instructed the jury that BP and OPL had "a duty to act as a reasonably prudent operator **\*402**  would act under the same or similar circumstances."

The royalty owners argue the evidence showed that selling the casinghead gas for such "meager proceeds," that is, a third of the liquids and half the residue gas, "breaches the duty to market because [a reasonably prudent operator] would not sell gas to a plant on such low proceeds—particularly when the [reasonably prudent operator] owns and controls the plant." But, as noted, it is undisputed that OPL has paid royalties according to the proceeds under the percentage gas sales contracts put in place by its predecessors. Moreover, no witness opined that the percentage sales contracts were unreasonable when signed. Graham testified that the lessees' entry into the percentage sales contracts when the Slaughter Plant was built was reasonably prudent. It is undisputed also that the terms of those contracts extended for the life of the plant. The allegedly breaching behavior of OPL, then, does not consist of any action on its part but merely its failure to change the terms of contracts that came with the properties it purchased.

The royalty owners emphasize the self-dealing nature of the gas sales contracts, referring to the contracts as OPL's "left hand" selling the gas to its "right hand." As a pattern for their implied covenant analysis, the royalty owners point to *Harding v. Cameron,* 220 F.Supp. 466

(W.D.Okla.1963), a diversity case applying Oklahoma law. *Id.* at 467. The royalty owners correctly note that *Harding* involved a lessee who occupied both the selling and buying sides of an arrangement for the compression of natural gas. On a complaint by his lessors of underpaid royalties, the court held the lessee had breached duties to exercise the diligence of a prudent operator and to obtain a market for the gas at the best price obtainable. *Id.* at 470. Citing his self-dealing, the court found that the lessee had acted primarily in his own interest and without regard to his obligations to the lessors. *Id.*

We do not find *Harding* persuasive authority on the issues involved here. First, under Oklahoma law, royalty was payable on the "value" or "market price" of the gas, and Texas does not recognize an implied duty to market under a lease with a market-value royalty provision. *Hankins,* 111 S.W.3d at 72; *Yzaguirre,* 53 S.W.3d at 374. [16] Second, the actions of the lessee in *Harding* involved setting up the offending gas marketing arrangements, not simply acquiring both sides of arrangements that were prudent when established. [17]

Certainly Texas implied covenant law takes self-dealing into account. The Texas Supreme Court has noted that the implied covenant to reasonably market oil and gas serves to protect a lessor from the lessee's **\*403** self-dealing or negligence. *Yzaguirre,* 53 S.W.3d at 374. But the royalty owners here seem to assume that a showing of self-dealing is all that is required to show a breach of the implied covenant. In fact, their evidence of OPL's breach of the duty to reasonably market the casinghead gas is dependent on its self-dealing. Under the royalty owners' theory, OPL has breached its duty to reasonably market by failing to modify the terms of the gas sales contracts precisely because it, acting alone, has the ability to do so. The royalty owners presented no evidence that a reasonably prudent seller of casinghead gas in OPL's position would have any ability to terminate or modify the life-of-the-plant gas sales contracts if it were not also the plant owner, nor did they present any evidence that the terms of a re-negotiated or modified gas sales contract for gas in the Slaughter Field, negotiated at arms-length, would be better for the seller than those of the existing contracts. [18] While the royalty owners produced substantial blocks of expert testimony and documentary exhibits supporting their claims, we agree with OPL there was no proof of what different marketing action was required of a reasonably prudent operator under the same or similar circumstances. *See Migl v. Dominion Oklahoma Texas Expl. & Prod., Inc.,* No. 13-05-0589-CV, 2007 WL 475318, at \*6, \*6–7, 2007 Tex.App. Lexis 1179, at \*18–\*19 (Tex.App.-Corpus Christi Feb. 15, 2007, no pet.) (mem. op.) (considering evidence of breach of implied covenant to reasonably market).

**Underpayment of Royalties on Market–Value Leases**

By their third cause of action, the royalty owners claimed BP and OPL failed to pay royalties based on the market value of gas in the field under the market-value leases. As noted, the royalty clauses of these leases provide a three-eighths royalty of the market value in the field of gas sold.

The jury gave a positive answer to the question asking whether OPL failed to pay royalty based on market value.

 **[9]**    The royalty owners relied at trial on the testimony of their market value expert, Christopher Kay Alguire. BP and OPL objected in the trial court and argue here that Alguire's testimony was irrelevant and unreliable, and therefore provided no evidence. Of the positions they advance supporting their argument, [19] we address two: that Alguire's definition of market value does not comport with Texas law, and that the gas sold under the contracts on which she formed her market value opinion was not comparable in quality to the gas produced on the OPL leases at issue in this litigation.

 **[10]**    **[11]**    **[12]**    The market value of property is the price it would bring when offered for sale by one desiring, but not obligated, to sell and bought by one under no necessity of buying it. *Yzaguirre,* 53 S.W.3d at 374 (citing *Middleton,* 613 S.W.2d at 246). Texas law recognizes two methods to determine market value of gas sold at the well. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 122 (Tex.1996). The preferred **\*404** method, and that used by the royalty owners' expert Alguire, is that of examining comparable sales. *See id.* at 122; *Texas Oil & Gas Corp. v. Vela,* 429 S.W.2d 866, 872 (Tex.1968). To determine its market value, gas is valued as though it is free and available for sale. *Middleton,* 613 S.W.2d at 246.

 **[13]**    **[14]**    **[15]**    "Market value is generally determined by comparing the sale price to other sales 'comparable in time, quality, quantity, and availability of marketing outlets.' " *Hankins,* 111 S.W.3d at 71 (quoting *Heritage Res.,* 939 S.W.2d at 122). A sale of gas of comparable quality involves gas with similar physical properties such as sweet, sour, or casinghead gas. *Middleton,* 613 S.W.2d at 246. Proper expert testimony may make adjustments between sales of gas with differing physical properties so that the sales being compared truly are comparable. *See id.* at 247 (referring to adjustments for gas of differing BTU content).

One presenting expert testimony must be properly qualified and her opinions must be relevant and based on a reliable foundation. *See* Tex.R. Evid. 702; *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 720 (Tex.1998) (citing *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995)). In determining whether an expert's testimony constitutes some evidence, "an expert's bare opinion will not suffice" rather "the substance of the testimony must be considered." *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). The expert must explain the basis of her statements to link her conclusions to the facts. *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999). "[A] claim will not stand or fall on the mere *ipse dixit* of a credentialed witness." *Burrow v. Arce,* 997 S.W.2d 229, 235 (Tex.1999).

 **[16]**    **[17]**    **[18]**    **[19]**    **[20]**    It is the burden of the proponent of scientific or technical evidence to demonstrate the opinions of its expert are reliable. *See Kerr–McGee Corp. v. Helton,* 133

S.W.3d 245, 254 (Tex.2004). Determining reliability of the expert's opinions focuses on the principles, research and methodology underlying the conclusions of the expert. *Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 629 (Tex.2002). "[E]xpert testimony is unreliable if it is not grounded in the methods and procedures of science and is no more than subjective belief or unsupported speculation." *Kerr–McGee,* 133 S.W.3d at 254 (internal quotation marks and citation omitted). Expert testimony is also unreliable if there is "too great an analytical gap between the data and the opinion proffered." *Id.* (quoting *Gammill,* 972 S.W.2d at 726). "If the expert's testimony is not reliable, it is not evidence." *Kerr–McGee,* 133 S.W.3d at 254 (citing *Havner,* 953 S.W.2d at 713).

Unlike the market-value studies reflected in other reported Texas cases, the market-value study to which Alguire testified was not conducted by comparing the dollars-per-Mcf or dollars-per-MMBTU values of the prices on which the royalty owners received royalty with royalties paid for comparable gas. *See, e.g., Middleton,* 613 S.W.2d at 247–48; *Amoco Prod. Co. v. First Baptist Church,* 579 S.W.2d 280, 282 (Tex.App.-El Paso 1979), *writ ref'd n.r.e.,* 611 S.W.2d 610 (1980) (per curiam). Like their claims under the amount-realized leases, the royalty owners' case under the market-value leases complained of the percentages of the post-processing sales prices allocated to the wellhead sale, not the product sales prices themselves. Their contention is not that OPL paid royalties based on below-market prices for casinghead gas but that the allocation of only 33.3% of the NGL revenue and 50% of the residue gas revenue to the wellhead **\*405** under the percentage of proceeds contracts resulted in royalties being paid on something less than the market value of the casinghead gas at the wellhead. Accordingly, Alguire testified she compared the 33.3% of NGLs, 50% of residue gas percentage of proceeds terms in place here with percentages of proceeds being paid under other contracts for casinghead gas gathered to a gas processing plant. As Alguire described it, her assignment from the royalty owners was "to provide, annually, percentage of proceeds that were representative of market value for the casinghead gas in the area."

The results of Alguire's study were described in the royalty owners' exhibit 296, which consisted of charts on which were plotted the percentages of the downstream resale prices for NGLs and residue gas received by the sellers under various contracts Alguire had reviewed. By plotting the contracts according to their date of signing, Alguire calculated a "market value" for percentages of proceeds for each year during the period 1990 through 2007. As an example, the chart for 1990 shows six contracts signed during that year for the sale of casinghead gas to a processing plant operator on a percentage of proceeds basis. Under one contract, the seller received for its casinghead gas 50% of the proceeds of the downstream sale of NGLs and 75% of the proceeds of the sale of residue gas. Other percentages reflected on the 1990 chart ranged from 35% to 75% of NGL proceeds. Based on those results, Alguire determined that the "market value" for such proceeds in 1990 was 60% of NGL proceeds. By her determinations, the "market value" proceeds ranged from 60% in the earlier years of her study to 80% in the years 2001 through 2007. Her conclusion was that "the 33 percent basis for the percentage of proceeds [under the OPL contracts] was below the range observed for comparable casinghead gas sales in the area."

As OPL points out, Alguire's study never resolves itself to a market value for the casinghead gas stated in dollars and cents. The study's premise is that there is a "market value" for percentages of proceeds. We agree with OPL that Alguire's study and testimony provide no evidence OPL failed to pay royalties based on the market value of the gas in the field.

The royalty owners argue that the downstream prices OPL receives for its processed residue gas and extracted NGLs were not at issue in the litigation and their amounts and sufficiency were not in dispute. The royalty owners insist that the only dispute with regard to the market-value leases was whether the 33.3% NGLs, 50% residue gas proceeds allocated to the wellhead by OPL constitute market value in the field. We recognize it is common for casinghead gas to be sold on percentage of proceeds terms, [20] and recognize the changes in recent decades in the marketing of natural gas and NGLs. Nonetheless, it seems to us that comparing percentages begs the question "percentage of what?" Without evidence of the downstream prices for which other gas plant operators sold their NGLs and residue gas, it seems to us impossible to reach a true market value conclusion. Evidence that a seller of gas received 50% of NGL proceeds is meaningless without knowledge of the amount of the proceeds.

**[21]** OPL also contends Alguire's testimony was unreliable, and thus provided no evidence, because the casinghead gas sold under other contracts she compared was not comparable in quality to that produced from the two Slaughter Field market-value **\*406** leases. We agree with this contention as well.

One of the two market-value leases is a part of the Slaughter Estate Unit, the other a part of the Northwest Mallet Unit. For the period the royalty owners claimed damages, the Slaughter Estate Unit was under $CO_2$ injection. A 2001 revenue audit report prepared by Alguire described the natural gas production as "extremely contaminated, mostly by carbon dioxide." The report stated carbon dioxide levels exceeded 80% of metered production on the Slaughter Estate Unit and " 'roughly 40%' " on the Northwest Mallet Unit. Alguire's trial testimony was consistent with her 2001 report. She said gas produced from the Slaughter Estate Unit during the period contained $CO_2$ levels in the 80–90% range. The Northwest Mallet Unit was not under $CO_2$ injection until the conclusion of Alguire's survey period. But carbon dioxide in the gas produced from this unit increased from the 20–30% range in the mid–1990s to the 60–70% range by 2007. Before injection began on the Northwest Mallet Unit, $CO_2$ migrated there from surrounding properties.

Alguire acknowledged that the comparable sales approach for obtaining market value requires consideration of the quality of the gas. But Alguire conducted her market value study on the premise that high levels of injected $CO_2$ should not be included as a comparability factor in the market value analysis. She explained the rationale for her methodology:

> I was hesitant about including injected $CO_2$ in the comparability standards because it would be effectively charging the cost of the $CO_2$ operations, either directly with the $CO_2$ removal fees, which haven't been charged, or indirectly by saying this gas isn't worth anything because it has got all of this $CO_2$ in it that we put there, even though, in this instance, in the Northwest Mallet Unit, it wasn't even put there by the operators. It seeped in from surrounding areas.

Alguire's intentional[21] omission of the high $CO_2$ content of the gas from her comparability evaluation[22] improperly injects an entirely subjective factor into the search for what Texas law describes as an objective calculation. *See Bowden,* 247 S.W.3d at 709 ("[m]arket value leases provide an objective basis for calculating royalties...."); *Yzaguirre,* 53 S.W.3d at 374; *Hankins,* 111 S.W.3d at 72 (both also referring to "objective basis for calculating royalties" provided by market-value royalty provisions). It represents, moreover, the kind of outcome-directed methodology condemned in *Robinson.* 923 S.W.2d at 559.

 **[22]**   Alguire presented lengthy and detailed testimony. But by not considering contracts for sale of gas with high $CO_2$ content in her evaluation of the market value of the Slaughter Estate and Northwest Mallet unit gas highly contaminated with $CO_2$, Alguire omitted a material step in the quality analysis required by the **\*407** comparable sales approach. Without a true comparison of hydrocarbon quality, too great an analytical gap stands between the data, assuming its accuracy, and Alguire's market value opinion. *See General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997) (opinion evidence connected to existing data by nothing but credentialed expert's *ipse dixit* is insufficient). Lacking reliability, the opinion is incompetent and amounts to no evidence that BP and OPL underpaid royalties on the market-value leases. In the absence of any additional evidence supporting the jury's implicit finding of comparable quality, we conclude its market-value finding is not supported by any evidence.

**Damages**

 **[23]**   Finding the jury's affirmative responses to the three questions inquiring of the liability of BP and OPL were supported by legally insufficient evidence, we turn to the jury's corresponding damage findings. "It is well established in Texas that no recovery is allowed unless liability has been established." *Mitchell v. Bank of Am., N.A.,* 156 S.W.3d 622, 627 (Tex.App.-Dallas 2004, pet. denied). In the absence of liability findings, damage findings are immaterial. *Fire Ins. Exch. v. Sullivan,* 192 S.W.3d 99, 107 (Tex.App.-Houston [14th Dist.] 2006, pet. denied). We therefore sustain OPL's first issue concerning the proceeds leases, its sub-issue concerning the implied duty to market, and its second issue concerning the market-value leases.

**The Royalty Owners' Cross–Appeal**

By their second issue on cross-appeal, the royalty owners contend the trial court erred in rendering judgment notwithstanding the verdict in favor of BP on its limitations defense. They argue the discovery rule tolls the applicable limitation period until each royalty owner knew or reasonably should have known facts giving rise to a cause of action. Because no evidence supports the three affirmative theories of relief the royalty owners asserted against BP, determining whether their claims were subject to a limitations defense or they could legally assert the discovery doctrine in avoidance of limitations are questions whose resolution is unnecessary to our disposition of this appeal. We, therefore, do not address the issue. *See* Tex.R.App. P. 47.1.

The royalty owners' third issue on cross-appeal presents the contention the trial court erred in rendering judgment notwithstanding the verdict in favor of BP and OPL on the royalty owners' claim for attorney's fees, recovery of which they sought under Chapter 38 of the Civil Practice & Remedies Code. Tex. Civ. Prac. & Rem.Code Ann. §§ 38.001–38.006 (West 2008).

To recover attorney's fees under § 38.01, a party must prevail on a cause of action authorizing recovery of attorney's fees, and recover damages. *Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 390 (Tex.1997); *Brent v. Field,* 275 S.W.3d 611, 621–22 (Tex.App.-Amarillo 2008, no pet.). Because we have concluded the royalty owners cannot prevail on a cause of action allowing recovery of attorney's fees they are not entitled to recover attorney's fees. For this reason, we overrule their third issue on cross-appeal.

**The Cross–Motions for Partial Summary Judgment**

[24]   By their first issue on cross-appeal, the royalty owners assert the trial court erred by denying their motion for partial summary judgment. The royalty owners and OPL filed cross-motions for partial summary judgment, each seeking a judgment declaring the character and ownership **\*408** of $CO_2$ that OPL injects into eight leases included in three units. Said simply, the royalty owners contended the $CO_2$ was subject to a royalty; OPL argued it was not. The trial court agreed with OPL and rendered partial summary judgment in its favor.

[25]   The movant for summary judgment has the burden of showing there is no genuine issue of material fact and it is entitled to summary judgment as a matter of law. Tex.R. Civ. P. 166a(c). Reviewing a summary judgment, we take evidence favorable to the nonmovant as true, and indulge every inference and resolve every doubt in the nonmovant's favor. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). A defendant "who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim." *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex.2004) (citing *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002)). A plaintiff moving for summary

judgment on its own cause of action must conclusively prove each element of the cause of action. *MMP, Ltd. v. Jones,* 710 S.W.2d 59, 60 (Tex.1986) (per curiam).

When parties file cross motions for summary judgment, and one motion is granted and the other denied, the appellate court reviews the summary judgment evidence presented by both sides and determines all questions presented. *Comm'rs Court of Titus County v. Agan,* 940 S.W.2d 77, 81 (Tex.1997). If the issue raised is based on undisputed and unambiguous facts, then the reviewing court may determine the question presented as a matter of law. *Gramercy Ins. Co. v. MRD Invs., Inc.,* 47 S.W.3d 721, 724 (Tex.App.-Houston [14th Dist.] 2001, pet. denied).

According to the summary judgment record, the $CO_2$ OPL injects into the hydrocarbon-producing formation to enhance oil recovery is transported to the Slaughter Field from New Mexico and Colorado. [23] The $CO_2$ is extracted from the produced gas stream at the processing plants, returned to the leases, and reinjected as part of the recovery operation. While the royalty owners agree that the transported $CO_2$ is OPL's personal property before its injection, they theorize that the extraneous $CO_2$ loses its personal property character on injection, is susceptible to capture in the producing formation, and OPL is authorized to capture, or recapture, the $CO_2$ through the grant of the leases and provisions of the unit agreements. As captured, they contend, the $CO_2$ is subject to OPL's royalty obligation. [24]

**[26]** The royalty owners' claims to a royalty on the injected $CO_2$ depend entirely on the correctness of their contention that OPL loses title to its personal-property $CO_2$ when it introduces the substance into the subsurface producing formation. Although the unit agreements, to which the royalty owners are parties, contain express authorization for the unit operator **\*409** to inject substances into the unitized formation, [25] and the unit agreements contain provisions concerning royalty payments, we do not understand the royalty owners to contend that the unit agreements contain a commitment by OPL to pay royalty beyond its royalty obligation under the leases. Before the trial court, the royalty owners asserted that the provisions of the unit agreements affecting royalties did not supersede the leases' royalty clauses, but simply constituted an "overlay" addressing the manner in which royalty would be paid under unit operations. [26] Thus we consider it undisputed that the unit agreements do not require payment of a royalty not already required under the leases. Similarly, the royalty owners make no contention here that the terms of any of the leases entitle them to royalty on the injected $CO_2$ whether or not it became subject to the rule of capture on its injection. Our inquiry, then, is whether, under Texas law, the rule of capture operates to subject extraneous $CO_2$ injected and recovered by OPL to a royalty obligation under its leases.

The "rule of capture" is a well established doctrine in Texas which holds that a landowner is entitled to produce the oil and gas in place beneath his land, as well as the oil and gas which flows

to the land as the result of physical conditions and natural laws relating to the migratory nature of oil and gas. Recognizing that oil and gas are fugitive minerals that will migrate throughout a reservoir without regard to property lines, the rule of capture provides that a landowner owns all the oil and gas produced by a legally drilled well located on his land, even though the well may be draining minerals from nearby properties.

*SWEPI, L.P. v. Camden Resources, Inc.,* 139 S.W.3d 332, 341 (Tex.App.-San Antonio 2004, pet. denied) (citations omitted).

While no Texas case directly addresses title and ownership of extraneous $CO_2$ injected into a formation for production enhancement, the ownership of extraneous natural gas injected into a storage formation was at issue in *Humble Oil & Refining Co. v. West.* 508 S.W.2d 812 (Tex.1974). OPL urges that our analysis of the claims to royalty on the injected $CO_2$ here should begin and end with *Humble Oil,* and a case on which it relied, *Lone Star Gas Co. v. Murchison.* 353 S.W.2d 870 (Tex.Civ.App.-Dallas 1962, writ ref'd n.r.e.).

In *Humble Oil,* deeds by the Wests to Humble in part recited "that the Wests 'except from this conveyance and retain unto themselves .... those certain royalties on oil, gas and other minerals which may be produced and saved from the lands hereby conveyed.' " Concerning gas, the conveyances described the retained royalty as " 'a royalty equal to the market value at the well of one-sixth (1/6) of the dry gas so sold or used; provided that on such dry gas sold at the wells the royalties shall be one-sixth (1/6) of the amount realized from such sale.' " *Id.* at 813.

As the field reservoir approached depletion, Humble obtained Railroad Commission authorization to use the reservoir for gas storage. *Id.* The Wests sued Humble **\*410** for injunctive and declaratory relief. The trial court ordered Humble to account to the Wests for their royalty interests in all gas produced irrespective of whether the gas was extraneous or native. *Id.* at 814. The court of civil appeals reversed with instructions for entry of a permanent injunction restraining Humble from injecting and storing gas in the reservoir until all native gas was produced. *Id.*

Before the supreme court, the Wests argued because of their royalty on all oil, gas and minerals produced and saved from the properties, Humble owed a royalty on all gas produced and saved, whether native or extraneous. *Id.* at 817. According to the Wests, a contrary holding would rewrite the conveyance documents. *Id.*

In its analysis, the court looked to *Murchison,* 353 S.W.2d 870. There, Murchison argued Lone Star lost title to extraneous gas it injected into a storage reservoir as the gas became like a wild animal, subject to capture. Rejecting the notion that the gas returned to its natural and wild state and was thus subject to the law of capture, the court in *Murchison* found the correct rule was "once [severed] from the realty, gas and oil, like other minerals, become personal property ... title to natural gas once having been reduced to possession is not lost by the injection of such gas into a natural reservoir for storage purposes." *Humble Oil,* 508 S.W.2d at 817 (quoting *Murchison,* 353

S.W.2d at 878 quoting *White v. New York State Natural Gas Corp., et al.,* 190 F.Supp. 342, 347, 349 (W.D.Pa.1960)) (additional quotation marks omitted). [27] Relying on *Murchison,* the Court in *Humble Oil* concluded the extraneous gas Humble injected into the storage reservoir was and remained the personal property of Humble.

The Wests argued that the obligation of Humble in the conveyance document to pay a royalty on all gas produced and saved distinguished *Murchison.* 508 S.W.2d at 817. Disagreeing, the supreme court found to adopt such reasoning would implicitly recognize the doctrine of *minerals ferae naturae* that *Murchison* rejected. *Id.* Thus the court held, "Humble's ownership of the gas as personal property is not altered either upon injection of the gas in the reservoir or upon later production of the gas. The language of the conveyance does no more than reserve the royalty interest in the native gas in the reservoir, and Humble's ownership of the extraneous gas is unaffected thereby." *Id.*

The analogy between stored natural gas and the injected $CO_2$ described in this record is not exact, but we find *Humble Oil* and *Murchison* sufficiently analogous to guide our decision. [28] This record does not describe differences in the injection of extraneous $CO_2$ to enhance oil production and the injection of natural gas for storage to require application of a different rule to the dispute before us. [29] Both involve injection of a gaseous substance into a well- **\*411** defined underground formation with Railroad Commission approval. [30] Nothing suggests OPL has an intent to abandon the $CO_2$ it injects and recovers. *See Murchison,* 353 S.W.2d at 870 (also finding no intent to abandon). Indeed, OPL's recycling and reinjection of the $CO_2$ removed at the Mallet Plant belies any intent to abandon the injected and recovered $CO_2$.

The royalty owners' heavy reliance on *Corzelius v. Harrell,* 143 Tex. 509, 186 S.W.2d 961 (1945) is misplaced. *Corzelius* concerns Railroad Commission orders regulating production of natural gas from a field in which a gas recycling operation was being conducted. 186 S.W.2d at 970. It was cited to the court in *Murchison,* which found it dealt with "the law of original capture," and not applicable to stored extraneous gas. 353 S.W.2d at 870.

*Corzelius* is not mentioned by the court in *Humble Oil. Corzelius* is more often cited in cases concerning assertions of subsurface trespass. *See, e.g., Coastal Oil & Gas v. Garza Energy Trust,* 268 S.W.3d 1, 13 n. 37 (Tex.2008); *Railroad Commission of Texas v. Manziel,* 361 S.W.2d 560, 568 (Tex.1962). Like the court in *Murchison,* 353 S.W.2d at 870, we find it inapplicable to the question before us.

For these reasons, we find the trial court did not err in granting OPL's motion for partial summary judgment and denying that of the royalty owners.

## Conclusion

Because no evidence supports the jury's findings of liability by OPL, we reverse the judgment of the trial court and render judgment that the royalty owners take nothing against OPL. We remand the case to the trial court for the entry of a new judgment consistent with this opinion and law. We otherwise affirm the judgment of the trial court.

## All Citations

333 S.W.3d 392, 177 Oil & Gas Rep. 1072

Footnotes

1    John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment.

2    The plaintiff royalty owners are: the CH Foundation; The Helen Jones Foundation, representing its own interests and by assignment those of Dorothy Gail Secrest Unitrust; James C. Arnold, Trustee for Arnold 2002 Trust; Wells Fargo Bank, Trustee and/or Agent with Power of Attorney for Frances Snyder Flood Testamentary Trust, Anne Snyder Testamentary Trust, and Dick Snyder Testamentary Trust; Cheryl Mattison, Executrix for Estate of Myron D. Mattison; LAGH, Ltd.; Community Bank of Raymore, Trustee and/or Agent with Power of Attorney for William L. Abernathy Trust, Abbie J. Burton Trust, Lynn G. Fayman Trust, Claudia Kenyon Trust, Kern E. Kenyon Trust, Milus D. Scruggs Trust, Thomas M. Scruggs, Jr. Trust, David L. Fayman Trust, and Faith Fayman Strong Trust; Texas Capital Bank Trustee and/or Agent with Power of Attorney for Dora Lee Langdon Mineral Trust, Jane Byars Roby Mineral Trust, and Dora Langdon Article V. Trust; Frost National Bank, Trustee and/or Agent with Power of Attorney for Johnson Oil Control (Trust Entity Incorporating Kathleen L. Webster Trust, Joseph M. Durkin Trust, Mark L. Johnson Trust, Sheila A. Johnson Trust, Catherine L. Johnson Tekstar Trust), Karen Hixon Trust, Dora Lee Langdon Article IV Trust, and Lee Kendall Langdon Trusts (F/B/O Clay Langdon and F/B/O Lee Kendall Langdon); Bank of America Trustee for J. Lee Johnson, Jr. Trust U/W F/B/O J. Lee Johnson, IV; Mark L. Johnson, Trustee for J. Lee Johnson III Descendants Revocable Trust and Executor for Estate of J. Lee Johnson III; KCJ Family Ltd. Partnership; Joseph A. Durkin, Executor and Trustee for Estate of Catherine J. Durkin; Kathleen D. Webster; Joseph M. Durkin; Teresa M. Durkin Wilkinson; Jack Wilkinson, Jr., Trustee for Teresa M. Durkin Wilkinson Trust; J.P. Morgan Chase, Trustee and/or Agent with Power of Attorney for Billie Lucille Parker Agency, Earle North Parker Irrevocable Trust, Lynsey Alison Edens Recovable Trust, and William Ashley Edens Recovable Trust; Pamela Allison Parker Clifton for Ruthie Young Parker Life Estate; Clay A. Parker; Albon Head, Jr.; Michael M. Gibson; David Chappell; Stanford Harrell; KHM Enterprises Ltd.; Martha Price; Jeanne Van Zant Sanders (Trustee of the Fred A. Sanders Testamentary Trust; Formerly, Est. of Frederick A. Sanders); Albert E. Sanders; Paula Day (Executrix of Est. of Sam J. Day); Winfred Hooper, Jr.; The Plum Foundation, representing the interests of Dorothy Gail Secrest; Olney Wallis, Trustee for Gary Macklyn Green Grantor's Trust; William Jewell College.

3    The leases at issue describe land located in Hockley, Terry and Cochran Counties, Texas.

4    "Casinghead gas" is statutorily defined as meaning "any gas or vapor indigenous to an oil stratum and produced from the stratum with oil." Tex. Nat. Res.Code Ann. § 86.002(10) (West 2001).

5    *See, e.g., Yzaguirre v. KCS Resources, Inc.,* 53 S.W.3d 368, 372 (Tex.2001) (distinguishing "market value" and "amount realized" or "proceeds" royalty provisions).

6    *See Bowden v. Phillips Petroleum Co.,* 247 S.W.3d 690, 708 (Tex.2008) (also describing percentage of proceeds contract).

7    Gas from the six leases at issue here is sold under one of three Casinghead Gas Contracts, two dated in 1947 and the third in 1954. They have been amended but the amendments are not germane to the issues in this case. For our purposes, the three contracts may be considered identical.

8    According to the testimony of an OPL employee, the Slaughter Plant can handle gas bearing a "composite" carbon dioxide and hydrogen sulfide content up to 12%.

The royalty owners filed suit in January 2006, seeking damages for the alleged wrongful conduct of BP from 1990 to 2000. They asserted the discovery doctrine in avoidance of the limitations defenses interposed by BP. OPL acquired the leases and plants in August 2000 but the royalty owners limited their claims against OPL to the period January 2002 through August 2008.

On liability and damage questions like those submitted against OPL, the jury made affirmative findings against BP. While the jury made findings supporting application of the discovery doctrine, as noted, the trial court granted judgment notwithstanding the verdict in favor of BP on limitations grounds. On appeal, BP argues the trial court correctly disregarded the findings supporting the discovery doctrine's application. BP further contends that even were this error, no evidence supported the liability and damage findings made against BP.

Graham testified that to establish the amount OPL realized from its sale of the casinghead gas, he looked not to the gas sales contracts but "what the defendants really realized" less "some costs."

*See Bowden,* 247 S.W.3d at 702 (describing, in class action certification appeal, similar distinction between wellhead prices and those received from downstream sales after processing).

Graham straightforwardly acknowledged that his analysis ignored the percentages stated in the gas sales contracts, opining that the contracts' percentage of proceeds formula was "not binding on" the lessors.

The royalty owners' contention here is thus distinguished from that described in *Texas Oil & Gas Corp. v. Hagen,* 683 S.W.2d 24 (Tex.App.-Texarkana 1984), *writ dism'd as moot,* 760 S.W.2d 960 (Tex.1988), in which the court of appeals affirmed trial court findings that a purported wellhead sale of gas by the producer to its wholly-owned pipeline subsidiary was a sham, and that the "true sale" of the gas was off the lease premises, making a market-value royalty provision applicable. *Id.* at 28.

Note, for example, the issues recited in proposed class litigation brought by royalty owners against affiliated defendants as including the issue whether the "corporate separateness" of affiliated defendants should be disregarded. *Union Pac. Res. Group, Inc. v. Hankins,* 111 S.W.3d 69, 73 (Tex.2003). Graham's opinion testimony simply assumed that receipt of proceeds by OPL's affiliate OEMI is to be equated with their receipt by OPL. The royalty owners do not support such an assumption by citation to Texas authority.

As to the substantial differences in the approaches taken by Texas and Oklahoma courts to the lessee's obligation to pay royalty on gas production, *see* John Burritt McArthur, *A Minority of One? The Reasons to Reject the Texas Supreme Court's Recent Abandonment of the Duty to Market in Market–Value Leases,* 37 Tex. Tech Law Rev. 271, 274 (2005) ("Oklahoma requires the lessee to share the price it receives in any sales contract into which it enters in good faith"); Bruce M. Kramer, *Interpreting the Royalty Obligation by Looking at the Express Language: What a Novel Idea?* 35 Tex. Tech Law Rev. 223, 248–49 (2004) (discussing *Tara Petroleum Corp. v. Hughey,* 630 P.2d 1269 (Okla.1981)).

*See Bowden,* 247 S.W.3d at 698 (in similar context, the litigation of disputes over natural gas agreements entered into in the 1940s, the court noting that despite the passage of decades and marked changes in the ways of marketing of natural gas, courts "interpret the obligations and rights of the parties according to their expressed intent when they entered the agreement").

The royalty owners do not contend that OPL's predecessors acted unreasonably as operators by initiating the $CO_2$ injection program or that OPL's maintenance of the injection program is unreasonable. It would seem then that analysis of the casinghead gas marketing actions required of a reasonably prudent operator under the same or similar circumstances necessarily would take the consequences of that program, including the resulting high $CO_2$ content of the gas, into account.

OPL also presents arguments that Alguire's opinions were based in part on sales too far removed geographically from those at issue here. We do not reach those arguments.

*See, e.g., Bowden,* 247 S.W.3d at 708.

Alguire's testimony makes clear that her omission of the injected $CO_2$ content from her analysis was intentional. It was a part of the instructions she received for preparation of her study.

Alguire candidly acknowledged on cross-examination, for instance, that her study did not include a single contract for gas containing $CO_2$ in the 50% range with a percentage of proceeds higher than the 33.3%, 50% percentages on which the royalty owners were paid royalty. Later in her cross-examination testimony, Alguire made reference to one contract in New Mexico under which gas containing 25% $CO_2$ was sold for 88% of proceeds. She acknowledged the contract would not be comparable to the higher $CO_2$ levels in the Slaughter Estate Unit gas.

Our discussion of this issue applies to the extraneous $CO_2$ transported to the field, injected by OPL into the producing formation and recovered along with the casinghead gas by OPL. The royalty owners contend the summary judgment evidence raised an issue of fact whether OPL is producing $CO_2$ that is "native" to the leased lands. We have examined the documents on which the royalty owners rely for the contention, which are an affidavit of their expert Charles Graham and a memorandum of one of their attorneys. We do not agree that either of those documents provides evidence precluding summary judgment on their claims for royalty on $CO_2$.

As we understand their theory, the royalty owners contend they are entitled to royalty each time the $CO_2$ is recycled through the producing formation.

The unit agreement for the Slaughter Estate Unit, for example, gives the working interest owners the right to inject into the unitized formation "any substances in whatever amounts [they] deem expedient."

Unit agreements for the Central Mallet Unit and the Slaughter Estate Unit, for example, contain provisions limiting royalties on certain "outside substances" injected into the unitized formation until other events occur. The parties disagree on the effect of that language but, as noted, we do not read the royalty owners' briefing to contend it would have the effect of requiring payment of royalty not required under the leases.

Relevant to the present facts, the court in *Murchison* found the law of original capture, which in general gives the owner of land the right to produce all the oil and gas that will flow from a well on the land, inapplicable to gas that was originally captured and subsequently restored. *Murchison,* 353 S.W.2d at 880.

And we emphasize that we deal here only with a claim for royalty by lessors on extraneous $CO_2$ injected and recovered by OPL. This case does not involve claims of trespass or the like, nor does it involve claims to ownership of $CO_2$ recovered by operators other than OPL. Any such case would involve considerations not present here.

The royalty owners' argument that language concerning gas or gaseous substances in the leases and unit agreements binds OPL to a royalty obligation for $CO_2$, would seem to underscore the similarity between $CO_2$ and natural gas for this purpose.

*See, e.g.,* Tex. Nat. Res.Code Ann. §§ 91.171, *et seq.* (West 2001) (underground natural gas storage); 16 Tex. Admin. Code §§ 3.46 (fluid injection into productive reservoirs); §§ 3.50 (enhanced oil recovery projects).

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

50 S.W.3d 70
Court of Appeals of Texas,
Waco.

Doyle D. REAGAN, Appellant,

v.

MARATHON OIL COMPANY, et al., Appellees.

No. 10–99–152–CV. | June 27, 2001.

Vendor of various parcels of land brought declaratory judgment action to determine ownership of mineral rights under two tracts of land that were part of a state highway. The District Court, Robertson County, Robert M. Stem, J., entered summary judgment in favor of oil company and various purchasers of property abutting the highway, denied oil company and purchaser's their trial attorney fees, and awarded them appellate attorney fees. Vendor appealed. The Court of Appeals, Davis, C.J., held that: (1) statements in pleadings of purchasers and oil company that vendor reserved mineral rights in land conveyed to the state that abutted purchasers' properties did not negate purchasers' and oil company's claims to mineral rights; (2) deeds that conveyed property abutting state highway did not rebut presumption that mineral rights were conveyed to center of highway; (3) deed that purported to convey an undivided one-half interest in executive rights in minerals conveyed all of vendor's mineral rights in the property; and (4) trial court should not have awarded purchasers and oil company their appellate attorney fees.

Reversed and rendered in part, reversed and remanded in part.

West Headnotes (15)

**[1]** **Appeal and Error** ☞ Extent of Review Dependent on Nature of Decision Appealed from

30 Appeal and Error
30XVI Review
30XVI(A) Scope, Standards, and Extent, in General
30k862 Extent of Review Dependent on Nature of Decision Appealed from
30k863 In General

When the parties have filed competing motions for summary judgment and some are granted while others are denied, an appellate court may consider the propriety of the denial as well as the granting.

1 Cases that cite this headnote

**[2] Appeal and Error** 👈 Power to Render Final Judgment

**Appeal and Error** 👈 Facts Found or Admitted

30 Appeal and Error

30XVII Determination and Disposition of Cause

30XVII(D) Reversal

30k1175 Rendering Final Judgment

30k1175(2) Power to Render Final Judgment

30 Appeal and Error

30XVII Determination and Disposition of Cause

30XVII(D) Reversal

30k1175 Rendering Final Judgment

30k1175(6) Facts Found or Admitted

If the pertinent facts are undisputed, the appellate court can determine the issues presented on appeal as a matter of law; and, in this situation, the appellate court will either affirm the judgment or reverse and render.

1 Cases that cite this headnote

**[3] Appeal and Error** 👈 Power to Remand

30 Appeal and Error

30XVII Determination and Disposition of Cause

30XVII(A) Decision in General

30k1106 Remand Without Decision

30k1106(1) Power to Remand

The appellate court may reverse and remand if resolution of the issues presented on appeal rests in disputed facts or if the parties' summary judgment motions rest on different premises.

Cases that cite this headnote

**[4] Judgment** 👈 Application of General Rules of Construction

228 Judgment

228XII Construction and Operation in General

228k524 Application of General Rules of Construction

A pre-judgment letter from the court advising the parties of its ruling does not constitute competent evidence of the court's ruling.

1 Cases that cite this headnote

## [5]    Evidence ⚷ Pleadings

157    Evidence
157VII    Admissions
157VII(E)    Proof and Effect
157k265    Conclusiveness and Effect
157k265(8)    Pleadings

Statements in pleadings of purchasers and oil company that vendor reserved mineral rights in land conveyed to the state that abutted purchasers' properties did not negate purchasers' and oil company's claims to mineral rights, where vendor's reservation was basis of claim and had vendor not reserved mineral rights, the rights would have passed to the state.

Cases that cite this headnote

## [6]    Judgment ⚷ Sufficiency of Pleading

228    Judgment
228V    On Motion or Summary Proceeding
228k181    Grounds for Summary Judgment
228k181(5)    Matters Affecting Right to Judgment
228k181(11)    Sufficiency of Pleading

Although pleadings do not constitute summary judgment proof, a party may obtain a summary judgment on the basis of the allegations in the non-movant's pleadings if the allegations conclusively negate an element of the non-movant's claim or defense.

Cases that cite this headnote

## [7]    Boundaries ⚷ Public Ways

59    Boundaries
59I    Description
59k19    Roads, Ways, and Public Grounds
59k20    Public Ways
59k20(1)    In General

Conveyance of land bounded on a public highway carries with it the fee to the center of the road as part and parcel of the grant; and such is the legal construction of the grant unless the inference that it was so intended is rebutted by the express terms of the grant.

Cases that cite this headnote

## [8]    Boundaries ⚷ Public Ways

59    Boundaries
59I    Description
59k19    Roads, Ways, and Public Grounds
59k20    Public Ways
59k20(1)    In General

A legal description which defines the property conveyed as extending only to the boundary of the highway does not expressly rebut the presumption that the conveyance extends to the center of the highway; nor do phrases such as "save and except" or "not including the road."

Cases that cite this headnote

**[9]  Mines and Minerals**  Kind, Quantity, and Location of Minerals Granted or Reserved

260   Mines and Minerals
260II   Title, Conveyances, and Contracts
260II(B)   Conveyances in General
260k55   Grants and Reservations of Minerals and Mining Rights
260k55(5)   Kind, Quantity, and Location of Minerals Granted or Reserved

The rule concerning rights-of-way created by an easement that even where the grantor owns at the time the land on both sides of the easement, his conveyance of a tract adjoining one side carries fee title to the center line also, applies to a mineral estate lying beneath a public highway in which the state holds a fee estate in the surface.

2 Cases that cite this headnote

**[10]  Mines and Minerals**  Kind, Quantity, and Location of Minerals Granted or Reserved

260   Mines and Minerals
260II   Title, Conveyances, and Contracts
260II(B)   Conveyances in General
260k55   Grants and Reservations of Minerals and Mining Rights
260k55(5)   Kind, Quantity, and Location of Minerals Granted or Reserved

Deeds that conveyed property abutting state highway did not rebut presumption that mineral rights were conveyed to center of highway, even though legal descriptions expressly extended only to boundaries of highway and other portions of legal descriptions expressly extended the property conveyed to center of other roads, where deeds did not make an express reservation of mineral rights extending from highway boundary to center of highway.

1 Cases that cite this headnote

**[11]  Deeds**  Construction and Operation of Reservations

120   Deeds
120III   Construction and Operation
120III(E)   Reservations
120k143   Construction and Operation of Reservations

A reservation in a deed is strongly construed against the grantor and in favor of the grantee.

Cases that cite this headnote

**[12]  Mines and Minerals** ⚷ Kind, Quantity, and Location of Minerals Granted or Reserved

> 260   Mines and Minerals
>
> 260II   Title, Conveyances, and Contracts
>
> 260II(B)   Conveyances in General
>
> 260k55   Grants and Reservations of Minerals and Mining Rights
>
> 260k55(5)   Kind, Quantity, and Location of Minerals Granted or Reserved

Deed that purported to convey an undivided one-half interest in executive rights in minerals conveyed all of vendor's mineral rights in the property, where vendor's predecessor conveyed one-half of the mineral rights to another, and vendor's mineral rights were limited to an undivided one-half interest.

Cases that cite this headnote

**[13]  Mines and Minerals** ⚷ What Are Minerals and Nature of Property in Minerals

> 260   Mines and Minerals
>
> 260II   Title, Conveyances, and Contracts
>
> 260II(A)   Rights and Remedies of Owners
>
> 260k48   What Are Minerals and Nature of Property in Minerals

There are five essential attributes of a severed mineral estate: (1) the right to develop-- the right of ingress and egress, (2) the right to lease--the executive right, (3) the right to receive bonus payments, (4) the right to receive delay rentals, and (5) the right to receive royalty payments.

1 Cases that cite this headnote

**[14]  Costs** ⚷ Attorney Fees on Appeal or Error

> 102   Costs
>
> 102X   On Appeal or Error
>
> 102k252   Attorney Fees on Appeal or Error

Trial court in declaratory judgment action to determine mineral rights to certain property, should not have awarded purchasers and oil company their appellate attorney fees, while denying their requests for trial attorney fees, after granting summary judgment in favor of purchasers and oil company, where only purpose of award was to serve as financial disincentive to vendor to pursue appeal.

Cases that cite this headnote

**[15]  Costs** ⚷ Declaratory Judgment

102 Costs

102VIII Attorney Fees

102k194.24 Particular Actions or Proceedings

102k194.40 Declarative Judgment

A trial court has broad discretion to award attorney fees as it deems reasonable and necessary in a declaratory judgment action.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*71** Bill Youngkin, Catlin, Bryan, Stacy & Dillard, Bryan, for appellant.

Albert Witcher, Keith C. Cameron, Naman, Howell, Smith & Lee, P.C., Waco, Kenneth P. Dougherty, Dougherty Law Firm, P.C., Tyler, Bryan F. Russ, Jr., Palmos, Russ, McCullough & Russ, L.L.P., Hearne, for appellee.

Before Chief Justice DAVIS, Justices VANCE and GRAY.

## **\*72 OPINION**

DAVIS, Chief Justice.

Doyle Reagan filed a declaratory judgment action against Marathon Oil Company, Brounkowski Oil and Gas Partnership, Ltd., Horace and Evelyn Bumpurs, and James Bumpurs to obtain a determination of the parties' respective rights to the minerals in two narrow tracts of land located under Texas Highway 7 in Robertson County. The parties (with the exception of James Bumpurs) filed competing motions for partial summary judgment. The court granted the defendants' motions and denied Reagan's motion, decreeing that Reagan take nothing by his suit. Several months later, the court signed a separate order granting the defendants their appellate attorney's fees but denying trial attorney's fees. In the attorney's fee order, the court included a Mother Hubbard clause to dispose of any remaining issues and make its judgment final.

Reagan claims in three points that the court erred in granting the defendants' summary judgment motions and denying his own because: (1) the plain language of the deeds at issue demonstrates that he retained ownership of the minerals in question and thus the strip-and-gore doctrine should not apply; (2) the judgment effectively deprives the State of its title to the surface estate of the property in question without the State's joinder or consent; and (3) Appellees (with the exception of James Bumpurs) judicially admitted that Reagan had reserved ownership of the minerals to himself.

Reagan argues in a fourth point that the court abused its discretion by awarding the defendants their appellate attorney's fees but not their trial attorney's fees because "such an award is calculated to sway [him] from appealing the trial court's ruling."

## BACKGROUND

Prior to the conveyances in question, Reagan owned a series of adjoining tracts of land in the Maria de la Concepcion Marquez Eleven Leagues Survey, Abstract No. 25 in Robertson County. An undivided one-half interest in the minerals in the western portion of this acreage had been conveyed to others by Reagan's predecessors in title.[1] In 1949, Reagan conveyed a 14.116 acre tract of land to the State for construction of Highway 7, reserving the oil, gas and sulphur in the property to himself. Reagan conveyed 55.25 acres to Horace Bumpurs and his wife Evelyn in 1957 without reserving any mineral interests. This tract lies on the northern side of Highway 7, and the legal description in the conveyance expressly follows "the north line" of the highway. 47.679 of these acres are involved in the current dispute. These 47.679 acres comprise Unit Tract Nos. 5, 6, and 9 on a well unit plat prepared **\*73** for Marathon Oil Company ("Marathon").

The Marathon plat appears as follows:



In 1958, Reagan conveyed to the State a 3.018 acre tract of land along the southern boundary of the previously-conveyed 14.116 acre tract. Reagan again reserved the oil, gas and sulphur in this property to himself. The 14.116 acre tract and the 3.018 acre tract which Reagan conveyed to the State traverse the disputed properties as follows:

**\*74**



Reagan and his wife Frances conveyed a 304.22 acre tract on the southern side of Highway 7 to Emil Kmiec and Esidor Brounkowski in 1970, purporting to reserve an undivided one-half mineral interest for life with right of survivorship. Similar to the Bumpurs conveyance, the legal description in the deed to Kmiec and Brounkowski expressly follows concrete highway markers set along the southern boundaries of the tracts Reagan conveyed to the State for Highway 7. Brounkowski Oil and Gas Partnership, Ltd. ("Brounkowski Oil") presently owns this 304.22 acre tract. 139.177 acres from this tract are involved in the present dispute. These 139.177 acres comprise Unit Tract Nos. 1, 2, 3, 10, and 11 on the Marathon plat.

Reagan and his wife Frances conveyed 1.026 acres to James Bumpurs and his wife Betty Jean in 1978. The legal description in this deed, like the conveyance to Horace and Evelyn Bumpurs, expressly follows "the south line" of Highway 7. The Reagans did not reserve any mineral interests in this conveyance. The Marathon plat designates this tract as Unit Tract No. 4. [2]

In 1993, the Brounkowskis, Horace and Evelyn Bumpurs, and James and Betty Jean Bumpurs executed mineral leases in favor of Marathon. [3] In April 1993, Reagan executed a document

ratifying the **\*75** Brounkowski lease. Marathon pooled these tracts with an adjoining tract to form the Brounkowski No. 1 Gas Unit. Marathon drilled a well in this unit which began to produce gas in November 1995.

After Marathon refused to pay Reagan royalties for his claimed interest in the minerals in and under the 17.134 acres he conveyed to the State, Reagan instituted this lawsuit to obtain a declaration of his ownership interest in the minerals located in and under the State's 17.134 acres. Marathon, Brounkowski Oil, Horace and Evelyn Bumpurs, and James Bumpurs all filed counterclaims for declaratory relief asserting that Brounkowski Oil and the Bumpurses own the disputed minerals.

Horace and Evelyn Bumpurs filed a motion for partial summary judgment alleging that Reagan's 1957 conveyance to them constituted a conveyance of the minerals to the center of Highway 7 as a matter of law because Reagan did not reserve any mineral interests to himself in the conveyance. Brounkowski Oil and Marathon filed similar motions alleging that the 1957 conveyance to the Bumpurses and the 1970 conveyance to Kmiec and Brounkowski conveyed the minerals to the center of Highway 7 as a matter of law because Reagan did not reserve any mineral interests in the conveyance to Horace and Evelyn Bumpurs and his attempted reservation in the Kmiec/ Brounkowski conveyance is ineffective because of the undivided mineral interests conveyed by his predecessors in title.

Reagan then filed a motion for partial summary judgment alleging that he is entitled to judgment declaring his ownership of the minerals in question as a matter of law because he expressly reserved the minerals in his deeds to the State and the legal descriptions of the tracts conveyed to Horace and Eugene Bumpurs and Kmiec/Brounkowski do not overlap the legal descriptions of the tracts conveyed to the State.

In a January 1999 order, the court granted the motions for partial summary judgment filed by Marathon, Brounkowski Oil, and Horace and Evelyn Bumpurs.[4] The court denied Reagan's motion. The court decreed that Reagan take nothing by his suit and rendered summary judgment in favor of the defendants "on all issues" except attorney's fees and court costs. The court subsequently received evidence from the parties on attorney's fees. The court signed an order in May 1999 denying defendants' trial attorney's fees and granting them appellate attorney's fees. The court denied Reagan's request for attorney's fees and concluded the order with a Mother Hubbard clause.

Although a "Mother Hubbard" clause does not necessarily make a judgment final, we treat such a judgment as final for purposes of appeal if it "actually disposes **\*76** of every pending claim and party." *Lehmann v. Har–Con Corp.,* 39 S.W.3d 191, 205 (Tex.2001). The partial summary judgment in this case expressly adjudicates the merits of every party's claim regarding the title to the disputed minerals and expressly disposes of "all issues except the recovery of attorneys'

fees and costs of court." The attorney's fee order expressly disposes of every party's attorney's fee claim and then concludes with the Mother Hubbard clause. For these reasons, we conclude that the court rendered a final, appealable judgment.

## STANDARD OF REVIEW

 **[1]** **[2]** **[3]** When the parties have filed competing motions for summary judgment and some are granted while others are denied, an appellate court may consider the propriety of the denial as well as the granting. *See Commissioners Court v. Agan,* 940 S.W.2d 77, 81 (Tex.1997); *Sarandos v. Blanton,* 25 S.W.3d 811, 814 (Tex.App.—Waco 2000, pet. denied). If the pertinent facts are undisputed, the court can determine the issues presented as a matter of law. *See Sarandos,* 25 S.W.3d at 814. In this situation, the court will either affirm the judgment or reverse and render. *See Jones v. Strauss,* 745 S.W.2d 898, 900 (Tex.1988); *Tobin v. Garcia,* 159 Tex. 58, 64, 316 S.W.2d 396, 400–01 (1958); *Sarandos,* 25 S.W.3d at 814. Because the facts in this case are not disputed, we will examine the summary judgment record to determine whether the facts establish that Reagan or Appellees are entitled to judgment as a matter of law. [5] *See Sarandos,* 25 S.W.3d at 814.

## THE LETTER RULING

 **[4]** Reagan contends in his second point that the court's decree effectively deprives the State of its title to the surface estate of the property in question without the State's joinder or consent. He points to a pre-judgment letter from the court advising the parties of its ruling and requesting that the defendants prepare an order reflecting the ruling. However, a pre-judgment letter does not constitute competent evidence of the court's ruling. *See Cherokee Water Co. v. Gregg County Appraisal Dist.,* 801 S.W.2d 872, 878 (Tex.1990); *Maddox v. Cosper,* 25 S.W.3d 767, 771 n. 5 (Tex.App.—Waco 2000, no pet.). Moreover, the language in the letter of which Reagan complains does not appear in the judgment. Accordingly, we overrule Reagan's second point.

## JUDICIAL ADMISSION

 **[5]** Reagan argues in his third point that Appellees judicially admit in their summary judgment motions that he reserved the oil, gas, and sulphur under the disputed acreage in his conveyances to the State. Appellees respond that Reagan's reservation of these minerals is essential to either side's recovery. Otherwise, the State would own the disputed minerals.

Reagan cites *Mendoza v. Fidelity and Guaranty Insurance Underwriters, Inc.* for the proposition that the assertions in Appellees' motions that he reserved these minerals constitute binding judicial admissions. 606 S.W.2d 692, 694 (Tex.1980). However, the Court in *Mendoza* was addressing the issue of when *testimonial* declarations, which are generally considered "quasi-admissions," can be binding on the declarant. *See id.* at 694; *accord Hennigan v. I.P. Petroleum Co.,* 858 S.W.2d 371, 372 (Tex.1993) (per curiam); *Hill v.* **\*77** *Spencer & Son, Inc.,* 973 S.W.2d 772, 776 (Tex.App. —Texarkana 1998, no pet.).

 **[6]** "Pleadings do not constitute summary judgment proof." *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979); *accord Morales v. Murphey,* 908 S.W.2d 504, 506 (Tex.App.—San Antonio 1995, writ denied). Nevertheless, a party may obtain a summary judgment on the basis of the allegations in the non-movant's pleadings if the allegations conclusively negate an element of the non-movant's claim or defense. *See Texas Dep't of Corrections v. Herring,* 513 S.W.2d 6, 9 (Tex.1974); *Brooks v. Center for Healthcare Servs.,* 981 S.W.2d 279, 283 (Tex.App.—San Antonio 1998, no pet.); *David Gavin Co. v. Gibson,* 780 S.W.2d 833, 835 (Tex.App.—Houston [14th Dist.] 1989, writ denied); *see also State v. Durham,* 860 S.W.2d 63, 68 (Tex.1993); *Trail Enters. ., Inc. v. City of Houston,* 957 S.W.2d 625, 632 (Tex.App.—Houston [14th Dist.] 1997, pet. denied) (both holding that summary judgment can be based on non-movant's pleadings which establish absence of right of action or insurmountable bar to recovery).

Appellees correctly argue that neither side can prevail in this matter had Reagan not reserved the minerals in question to himself when he conveyed the highway properties to the State. Thus, the statements in their pleadings that he reserved these minerals in his conveyances to the State do not conclusively negate Appellees' claim to the minerals nor do they conclusively establish Reagan's claim. Accordingly, we overrule Reagan's third point.

## THE STRIP–AND–GORE DOCTRINE

Reagan contends in his first point that the record evidence establishes his ownership of the minerals under the disputed 17.134 acre strip as a matter of law. Appellees respond that the court properly decided the matter by applying the strip-and-gore doctrine to the conveyances in question. The parties' dispute centers primarily on whether the strip-and-gore doctrine applies to Reagan's conveyances to Horace and Evelyn Bumpurs (hereinafter, the "Bumpurses") and to Kmiec and Brounkowski.

## PERTINENT LAW

**[7]** **[8]** Settled case law establishes:

> that a conveyance of land bounded on a public highway carries with it the fee to the center of the road as part and parcel of the grant. Such is the legal construction of the grant unless the inference that it was so intended is rebutted by the express terms of the grant.

*State v. Williams,* 161 Tex. 1, 4, 335 S.W.2d 834, 836 (1960) (quoting *Mitchell v. Bass,* 26 Tex. 372, 380 (1862)); *accord Krenek v. Texstar N. Am., Inc.,* 787 S.W.2d 566, 568 (Tex.App.—Corpus Christi 1990, writ denied). A legal description which defines the property conveyed as extending only to the boundary of the highway does not expressly rebut the presumption that the conveyance extends to the center of the highway. *See Williams,* 161 Tex. at 4, 335 S.W.2d at 836; *Krenek,* 787 S.W.2d at 569. Nor do phrases such as "save and except" or "not including the road." *See Haines v. McLean,* 154 Tex. 272, 281, 276 S.W.2d 777, 782 (1955); *Lewis v. East Tex. Fin. Co.,* 136 Tex. 149, 157, 146 S.W.2d 977, 981 (1941); *Moore v. Rotello,* 719 S.W.2d 372, 376 (Tex.App. —Houston [14th Dist.] 1986, writ ref'd n.r.e.).

In *Krenek,* the court noted that this doctrine does not apply if the grantor owns land abutting both sides of the highway. *See Krenek,* 787 S.W.2d at 569 (citing *Rio Bravo Oil Co. v. Weed,* 121 Tex. 427, 443, 50 S.W.2d 1080, 1086–87 (1932); **\*78** *Couch v. Texas & Pac. Ry. Co.,* 99 Tex. 464, 467, 90 S.W. 860, 860–61 (1906)). However, our research suggests that the Supreme Court has disavowed this supposed exception to the general rule. [6]

This exception appears to find its genesis in the *Couch* decision. In that case, John Couch owned the land on both sides of a railroad right-of-way. He sold forty acres of this land located on the east side of the right-of-way to Norton and McGown. The legal description in this conveyance followed the northern line of the right-of way. Thereafter, the railroad drilled a water well on the northern side of the track in the right-of-way. Couch sued the railroad for conversion of the water obtained from the well. *See Couch,* 99 Tex. at 466–67, 90 S.W. at 860–61.

The Court acknowledged the general rule recited above but then concluded that it did not apply in Couch's case. *Id.* at 467, 90 S.W. at 860–61. The Court stated:

> At the time the deed from Couch to Norton and McGown was made Couch owned the land on both sides of the railroad, and after the sale the entire right of way remained in connection with his land south of the railroad. Under this state of facts there is no ground for a presumption that Couch intended to convey that portion which lay between the line described in the deed and the railroad track.

*Id.* at 467, 90 S.W. at 861.

Twenty-six years later, the Court reviewed *Couch* and explained it as follows:

> It is thus made clear that the presumption was not applied in that case by the distinguished jurist who rendered the opinion for the obvious reason that the grantor owned lands on both sides of the railroad. His failure to convey to the center of the railroad right of way did not leave a narrow strip of land disconnected from any other tract. Such strip was as much an appurtenant to the grantor's remaining tract as it was to the tract conveyed. It was as valuable to him as a part and parcel of his remaining tract as it was to the grantee. Evidently Judge Brown declined to apply the presumption because of the recited fact that the grantor, at the time of the conveyance, owned land on both sides of the railroad right of way. There was no other reason for his stating such fact except for the purpose of showing that no basis existed for the application of this presumption.

*Weed,* 121 Tex. at 443, 50 S.W.2d at 1086–87. In our opinion, the Court began to disavow the *Couch* exception soon thereafter.

In *Cox v. Campbell,* T.M. Campbell owned property on both sides of the railroad right-of-way. He sold 108 acres along the northern side of the right-of-way to J.R. Castleberry in 1898. He sold fifty acres on the southern side of the right-of-way to G.B. Turner in 1904. The legal descriptions in both conveyances followed the northern and southern boundaries of the right-of-way rather than extending to the centerline. *See Cox v. Campbell,* 135 Tex. 428, 430, 143 S.W.2d 361, 361–62 (1940).

If the Court had followed *Couch,* it would have concluded that Campbell retained the entire right-of-way property when he made the first conveyance. *See Couch,* 99 Tex. at 467, 90 S.W. at 861. Six **\*79** years later, his conveyance to Turner would have carried with it the right-of-way property as an appurtenance to the southern tract. Campbell's heirs asked the Court to follow *Couch. See Cox,* 135 Tex. at 437, 143 S.W.2d at 365. The Court acknowledged *Couch* but observed that "[t]he opinion in the Weed case is the latest expression of this Court upon that question, and, unless overruled, should control here." *Id.* The Court concluded that *Weed* controlled and determined that Campbell's first conveyance conveyed the northern half of the right-of-way to Castleberry and his second conveyance transferred the southern half of the right-of-way to Turner.[7] *See Cox,* 135 Tex. at 437–38, 143 S.W.2d at 365–66.

The Court arguably overruled the *Couch* exception by implication in *Cox.* However, we believe that the Court more forcefully did so in *Haines.* In that case, the parties on both sides of four adjoining rights-of-way traced their title to William J. McLean. McLean conveyed the 259 acre tract to A.F. Grabow. A county road and two adjoining railroads crossed this acreage at the time of the McLean Grabow conveyance. Grabow conveyed 127.8 acres to the east of these rights-of-way to D.P. Yoder. Grabow retained the remainder of the acreage until his death, at which

time it passed to Lydia Grabow Haines as part of a voluntary partition with Grabow's other heirs. Haines subsequently conveyed a 100 foot wide strip of land on the western side of the three aforementioned rights-of-way to Scurry County for construction of U.S. Highway 84. The Yoder acreage passed by mesne conveyances to the Boothe plaintiffs, who with the Haines plaintiffs sought to quiet title to the minerals underneath the rights-of-way as against McLean's heirs. [8] *Haines,* 154 Tex. at 274–76, 276 S.W.2d at 778–79.

In trying to determine ownership of the disputed minerals as between the Boothe plaintiffs and the Haines plaintiffs, the Court of Civil Appeals discussed the potential application of *Couch. See Boothe v. McLean,* 267 S.W.2d 158, 168–69 (Tex.Civ.App.—Eastland 1954), *rev'd sub. nom. Haines v. McLean,* 154 Tex. 272, 276 S.W.2d 777 (1955). The Court determined that if *Couch* were applied Grabow would have retained for himself the entirety of the disputed minerals because of his continued ownership of the land to the west of the rights-of-way. *Id.* at 169, 90 S.W. 860. **\*80** The Court decided, however, that "since the Couch decision, under a fact situation that cannot be distinguished from those of the present case, our Supreme Court has held that the presumption does apply, despite the fact that the grantor who owned on both sides of a right-of-way conveyed the land on the other side and retained that on the other." *Id.* The Court concluded:

> Our Supreme Court has held that the presumption of an intention to convey to the center of an adjoining easement applies notwithstanding the fact that grantor owned on both sides of the easement and conveyed the land on one side only by a description that called for the grant to stop at the outer edge of the easement.

*Id.; see also Joslin v. State,* 146 S.W.2d 208, 210 (Tex.Civ.App.—Austin 1940, writ ref'd).

The Supreme Court reversed this decision because the lower court concluded that the Grabow Yoder deed effectively conveyed the eastern half of only the 60 foot right-of-way immediately adjoining the 127.8 acres conveyed, rather than the eastern half of the three adjoining rights-of-way. *See Haines,* 154 Tex. at 277, 276 S.W.2d at 780. Nonetheless, the Court fully endorsed the lower court's implied conclusion that *Couch* was no longer valid when the Court construed *Cox* and its progeny to mean that "even where the grantor owns at the time the land on both sides of the easement, his conveyance of a tract adjoining one side carries fee title to the center line." *Id.* at 281, 276 S.W.2d 777, 276 S.W.2d at 782. Thus, it appears that the Court overruled *Couch* by implication, if not in *Cox,* then certainly in *Haines.*

 **[9]**   The Supreme Court decisions cited above concern rights-of-way created by easements. Nevertheless, the same rule applies to a mineral estate lying beneath a public highway in which the State holds a fee estate in the surface. *See Krenek,* 787 S.W.2d at 567–69; *Melton v. Davis,* 443 S.W.2d 605, 610 (Tex.Civ.App.—Tyler 1969, writ ref'd n.r.e.).

## APPLICATION

Reagan contends that the strip-and-gore doctrine does not apply to his conveyances to the Bumpurses and to Kmiec and Brounkowski because the legal descriptions in these deeds expressly extend only to the boundaries of the highway property. However, the courts have held that this type of legal description does not rebut the presumption that a deed conveying property adjoining a public highway carries with it title to the center of the road. *See Williams,* 161 Tex. at 4, 335 S.W.2d at 836; *Krenek,* 787 S.W.2d at 569; *see also Haines,* 154 Tex. at 281, 276 S.W.2d at 782; *Lewis,* 136 Tex. at 157, 146 S.W.2d at 981; *Moore,* 719 S.W.2d at 376.

 **[10]** **[11]** Reagan goes farther, however, and refers to other portions of the legal descriptions which expressly extend the property conveyed to the center of other roads in the area. Nevertheless, to rebut the aforementioned presumption, a conveyance must contain an "express reservation" of the property in question. *Cox,* 135 Tex. at 435, 143 S.W.2d at 364 (quoting *Weed,* 121 Tex. at 438, 50 S.W.2d at 1084); *accord State v. Fuller,* 407 S.W.2d 215, 218 (Tex.1966) (quoting *Haines,* 154 Tex. at 288, 276 S.W.2d at 786); *Moore,* 719 S.W.2d at 376. Reagan's argument might support an *implied* reservation of the minerals in question. However, a reservation in a deed is "strongly construed against the grantor and in favor of the grantee." *Graham v. Kuzmich,* 876 S.W.2d 446, 449 (Tex.App.—Corpus Christi 1994, no writ) (citing **\*81** *Reeves v. Towery,* 621 S.W.2d 209, 212 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.)); *accord Holmstrom v. Lee,* 26 S.W.3d 526, 531 (Tex.App.—Austin 2000, no pet.). Accordingly, we conclude that the deeds in question do not contain express reservations sufficient to rebut the presumption that the conveyances carried with them title to the center of the highway.

For these reasons, we conclude that, when Reagan conveyed the northern tract to the Bumpurses, the conveyance carried with it title to the oil, gas and sulphur under the northern half of the 14.116 acre tract of land Reagan conveyed to the State in 1949. *See Haines,* 154 Tex. at 282–84, 276 S.W.2d at 783–84. [9] Reagan's conveyance of the southern tract to Kmiec and Brounkowski carried with it title to the oil, gas and sulphur under the southern half of the 14.116 acre tract and under the entirety of the 3.018 acre tract he conveyed to the State in 1958, subject to the mineral interest he reserved to himself and his wife in this conveyance. *Id.* at 284–88, 276 S.W.2d at 784–87.

## THE RESERVED MINERAL INTEREST

The conveyance from Reagan and his wife to Kmiec and Brounkowski comprises Unit Tract Nos. 1, 2, 3, 10, and 11 on the Marathon plat. Before this conveyance, Reagan owned an undivided one-

half interest in the minerals in Tract Nos. 1, 2, 10, and 11 and the entirety of the minerals in Tract No. 3. [10] The Kmiec/Brounkowski deed contains the following mineral reservation:

> Grantors, for the benefit of themselves and the survivor of them, for and during the lifetime of grantors and the survivor of them, do now reserve, save and except from the force and effect hereof and [sic] undivided one-half (½) interest in and to all of the oil, gas and other minerals in, on and under said premises together with all rights appurtenant thereto, including the right to receive bonuses, rentals and royalties as may be paid therefor and thereunder; provided, that all outstanding oil, gas or mineral interests or royalty interests in the premises described above shall be first satisfied out of the oil, gas and mineral interests herein reserved by grantors, so that grantees shall receive by this conveyance an undivided one-half (½) interest in and to the oil, gas and other minerals in, on and under the above described 304.22 acres of land, more or less, and grantees shall likewise receive an undivided one-half (½) interest in all of the delay rentals and royalties hereafter paid and received under such existing lease as it covers the above described 304.22 acres of land, more or less. It is further agreed that grantees **\*82** shall have the exclusive right to make, execute and deliver oil, gas and mineral lease(s) on all of the oil, gas and other minerals in, on and under said premises covered hereby including that portion thereof reserved herein to Sellers for the lifetime of them and the survivor of them and grantees further agree that in the event they shall enter into any oil, gas or other mineral lease(s) on said premises, to be held to account to grantors, and the survivor of them, with respect to grantors reserved mineral interests, for the highest price paid for oil, gas and mineral lease(s) on other property in the vicinity of said premises during the same period of time that grantees may be negotiating such lease(s); this shall apply to bonuses, delay rentals and royalties; this shall be construed as a covenant between the parties hereto and shall never be interepreted as being made for the benefit of any present or prospective lessee of the mineral interests and shall in no way be considered as limiting the exclusive right of grantees to make, execute and deliver such lease(s) on said premises. After the death of the survivor of grantors, all mineral interests so retained to them and the survivor of them shall revert to and become the property of the grantees, their heirs and assigns.

 **[12]**    Under this reservation, Reagan and his wife reserved a life estate with right of survivorship in whatever mineral interest they reserved. *See Deviney v. NationsBank,* 993 S.W.2d 443, 451 (Tex.App.—Waco 1999, pet. denied). The remainder will revert to the grantees, their heirs, or assigns at the death of the survivor of Reagan or his wife. Currently, Brounkowski Oil holds this reversionary interest.

 **[13]**    "There are five essential attributes of a severed mineral estate: (1) the right to develop (the right of ingress and egress), (2) the right to lease (the executive right), (3) the right to receive bonus payments, (4) the right to receive delay rentals, [and] (5) the right to receive royalty payments." *Altman v. Blake,* 712 S.W.2d 117, 118 (Tex.1986); *accord French v. Chevron U.S.A.,*

*Inc.,* 896 S.W.2d 795, 797 (Tex.1995); *Bank One, Tex., N.A. v. Alexander,* 910 S.W.2d 530, 532 (Tex.App.—Austin 1995, writ denied). In the Kmiec/Brounkowski conveyance, Reagan and his wife conveyed the executive rights in the minerals (attributes (1) and (2) in the *Altman* listing) to the grantees and reserved to themselves an undivided one-half interest in the remainder of the mineral rights. [11]

However, the Reagans' reservation is further burdened by the undivided one-half interest in the minerals conveyed to others by Reagan's predecessors in title. The reservation in question provides that any outstanding mineral interests:

> shall be first satisfied out of the oil, gas and mineral interests herein reserved by grantors, so that grantees shall receive by this conveyance an undivided one-half (½) interest in and to the oil, gas and minerals in, on and under the above described 304.22 acres of land, more or less.

Thus, as to the minerals in and under Tract Nos. 1, 2, 10, and 11, Reagan conveyed an undivided one-half interest to Kmiec and Brounkowski and reserved nothing for himself. Accordingly, Brounkowski Oil owns an undivided one-half interest **\*83** in the oil, gas and sulphur in and under the southern half of the 14.116 acre tract conveyed to the State in 1949 and in and under the entirety of the 3 .018 acre tract conveyed to the State in 1958, insofar as those tracts lie within Tract Nos. 2 and 10 on the Marathon plat. [12]

As to the portion of the southern half of the 14.116 acre tract and the entirety of the 3.018 acre tract which lie within Tract No. 3 on the Marathon plat, Reagan and his wife own an undivided one-half nonexecutive interest in the oil, gas, and sulphur for life with a right of survivorship. Brounkowski Oil owns the remainder of the oil, gas, and sulphur in this portion of Tract No. 3.

## SUMMARY

The undisputed facts in the summary judgment record establish as a matter of law that: (1) Horace and Evelyn Bumpurs own the oil, gas, and sulphur located in and under the northern half of the 14.116 acre tract Reagan conveyed to the State in 1949; (2) Brounkowski Oil owns the oil, gas, and sulphur located in and under the southern half of said 14.116 acre tract and in and under the entirety of the 3.018 acre tract Reagan conveyed to the State in 1958, subject to a life estate reserved by Doyle and Frances Reagan; and (3) Doyle and Frances Reagan own a life estate with right of survivorship in a portion of the oil, gas, and sulphur owned by Brounkowski Oil. Accordingly, we sustain Reagan's first point in part and overrule it in part.

## ATTORNEY'S FEES

**[14]** Reagan argues in his fourth point that the court abused its discretion by awarding the defendants their appellate attorney's fees but not their trial attorney's fees because "such an award is calculated to sway [him] from appealing the trial court's ruling." We agree.

**[15]** A trial court clearly has broad discretion to award such attorney's fees as it deems reasonable and necessary in a declaratory judgment action. *See Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex.1998). At the attorney's fee hearing, counsel for Reagan contended that Appellees should be entitled to minimal attorney's fees because their interests coincide.[13] Appellees' counsel responded that their clients have divergent interests. Counsel for the Bumpurses further argued:

> [W]e would ask the court to strongly consider awarding the appellate [attorney's] fees because the only person who is in control of that is Mr. Reagan, and my clients have already had to pay me a lot of money to defend the case, and we think it is just and equitable at a very minimum to award those appellate fees to compensate them for something that Mr. Reagan has the sole discretion to do.

The parties and their attorneys undoubtedly invested significant time and expense in pre-trial preparations and in the various hearings conducted in the trial court. However, the court declined to award Appellees any of their trial attorney's fees. Thus, the court's decision to award Appellees their appellate attorney's fees could serve only to place a financial disincentive before Reagan when deciding whether to take this appeal. *See* **\*84** *United Interests, Inc. v. Brewington, Inc.,* 729 S.W.2d 897, 906 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). Because of this, and particularly in light of the fact that a reversal is required in this cause, we conclude that the court abused its discretion in this regard. Accordingly, we sustain Reagan's fourth point.

## CONCLUSION

We have determined that the undisputed facts in the summary judgment record establish as a matter of law that Reagan and his wife have a life estate with right of survivorship in a portion of the oil, gas, and sulphur located in and under the 14.116 acre tract Reagan conveyed to the State in 1949 and in and under the 3.018 acre tract he conveyed to the State in 1958.

Accordingly, we reverse that portion of the court's judgment which adjudicates the ownership of the disputed minerals and render judgment that: (1) Horace and Evelyn Bumpurs own the oil, gas, and sulphur located in and under the northern half of the aforementioned 14.116 acre tract; (2) Brounkowski Oil owns the oil, gas, and sulphur located in and under the southern half of the

aforementioned 14.116 acre tract and in and under the entirety of the aforementioned 3.018 acre tract, subject to a life estate in a portion of said oil, gas, and sulphur owned by Doyle and Frances Reagan; and (3) Doyle and Frances Reagan own an undivided one-half nonexecutive interest in the oil, gas, and sulphur located in and under the southern half of the aforementioned 14.116 acre tract and in and under the entirety of the aforementioned 3.018 acre tract for life with right of survivorship, save and except for the oil, gas, and sulphur located in and under that portion of said tracts previously conveyed by Reagan's predecessors in title.

We reverse that portion of the judgment awarding attorney's fees to Appellees, sever, and remand that portion of this cause to the trial court for further proceedings consistent with this opinion.

## All Citations

50 S.W.3d 70, 153 Oil & Gas Rep. 71

## Footnotes

1    The present dispute involves 377.774 acres. The surface ownership of this acreage is as follows: the State owns 17.134 acres; Horace & Evelyn Bumpurs own 55.25 acres; Brounkowski Oil & Gas Partnership, Ltd. owns 304.22 acres; and James & Betty Jean Bumpurs own 1.170 acres. The easternmost 57.789 acres are not subject to the undivided ½ interest in minerals conveyed to others by Reagan's predecessors in title. These 57.789 acres encompass all of James & Betty Jean Bumpurs's acreage and portions of the tracts owned by the State, Horace & Evelyn Bumpurs, and Brounkowski Oil. According to a well unit plat prepared for Marathon Oil Company, these 57.789 acres comprise Unit Tract Nos. 3, 4, and 6. The acreage subject to the previously conveyed mineral interest includes Unit Tract Nos. 1, 2, 5, 9, 10, and 11. In this case, the parties seek to resolve the ownership of the oil, gas, and sulphur in and under the 17.134 acres owned by the State. This acreage runs between Unit Tract Nos. 5, 6, and 9 to the north, and Unit Tract Nos. 2, 3, 4, and 10 to the south.

2    The Marathon plat describes the tract owned by James and Betty Jean Bumpurs as containing 1.170 acres, while the Reagan Bumpurs deed describes the tract as containing 1.026 acres. Because James and Betty Jean are not participating in this appeal, we will not attempt to resolve this variance.

3    The Brounkowskis executed their lease to Marathon in January 1993. Horace and Evelyn Bumpurs executed theirs in March 1993. James and Betty Jean Bumpurs executed theirs in August 1993.

4    The court rendered a summary judgment in favor of James Bumpurs in addition to the other defendants. However, James did not file a summary judgment motion. Because Reagan does not contend that the court erred in this regard, the issue is not before us. *See Vawter v. Garvey,* 786 S.W.2d 263, 264 (Tex.1990) (per curiam); *Williams v. Bank One, Tex., N.A.,* 15 S.W.3d 110, 116 (Tex.App. —Waco 1999, no pet.). Although Reagan named James as an appellee, James has not filed an appellee's brief. Instead, Reagan and James have filed what appears to be a Rule 11 agreement with this Court. *See* TEX.R.CIV.P. 11. In this agreement, James agrees not to seek his appellate attorney's fees as awarded by the trial court and to be bound by "the ultimate decision of the appellate court of last resort" with respect to the dispute between Reagan and Horace and Evelyn Bumpurs. Reagan and James also agree that neither "shall be required to make further response in the appellate courts with reference to the issues between them herein." Pursuant to this agreement, we will not further discuss the dispute between Reagan and James.

5    We may also reverse and remand if resolution of the issues presented rests in disputed facts or if the parties' summary judgment motions rest on different premises. *See Sarandos v. Blanton,* 25 S.W.3d 811, 814 & n. 5 (Tex.App.—Waco 2000, pet. denied).

6    It appears that *Krenek* 's reliance on this exception had no bearing on the outcome of that case because it impacted only the court's conclusion that the appellants obtained the disputed minerals under the residuary clause of their mother's will rather than through devises of the adjoining acreage. *See Krenek v. Texstar N. Am., Inc.,* 787 S.W.2d 566, 567–68 & n. 1 (Tex.App.—Corpus Christi 1990, writ denied).

7    A sound argument can be made that *Couch* and *Weed* are factually distinct and that the exception found in the former could continue to apply after the latter decision. As previously stated, *Couch* involved a situation in which Couch owned the realty on both sides

of the right-of-way and continued to own the realty on the western side of the right-of-way after conveying the realty on the eastern side to Norton and McGowan. *See Couch v. Texas & Pac. Ry. Co.,* 99 Tex. 464, 467, 90 S.W. 860, 861 (1906). *Weed,* on the other hand, concerned a landowner Hebert who with his co-tenants partitioned a tract of realty into 8 lots. The partition resulted in four lots lying to the north of a railroad right-of-way and four lots to the south. Subject to this partition, Hebert conveyed the eastern ½ of Lot 6 to Weed. As a result of the partition however, Hebert did not own Lot 3 which lay across the right-of-way from Lot 6. *See Rio Bravo Oil Co. v. Weed,* 121 Tex. 427, 433–36, 50 S.W.2d 1080, 1081–83 (1932). Because Hebert did not own Lot 3, it could be argued that *Couch* would not apply to his conveyance of Lot 6. Nevertheless, the Supreme Court apparently failed to attach any significance to this distinction when it decided *Cox. See Cox v. Campbell,* 135 Tex. 428, 438, 143 S.W.2d 361, 366 (1940) ("We are unable to distinguish the rule applicable to the facts of this case from the rule announced in the Weed case").

8 The opinion of the lower court provides additional details regarding these transactions. *See Boothe v. McLean,* 267 S.W.2d 158, 160–61 (Tex.Civ.App.—Eastland 1954), *rev'd sub. nom. Haines v. McLean,* 154 Tex. 272, 276 S.W.2d 777 (1955).

9 In *Haines,* the dispute involved the minerals under four adjoining rights-of-way. However, only three of these rights-of-way existed when Grabow conveyed to Yoder the property east of the rights-of-way. Thus, the Court awarded to the Boothe plaintiffs title to the minerals under the eastern half of the three rights-of-way in existence at the time of the conveyance to their predecessor in title Yoder. *See Haines,* 154 Tex. at 282–84, 276 S.W.2d at 783–84. The Court awarded title to the minerals under the western half of these three rights-of-way to the Haines plaintiffs in addition to the minerals beneath the fourth right-of-way on the western side of the other three, which Lydia Grabow Haines had sold to Scurry County after the Grabow Yoder conveyance. *Id.* at 284–88, 276 S.W.2d at 784–87.

10 Actually, Reagan reserved only the oil, gas and sulphur in his conveyances of the highway tracts to the State. Thus, it appears that the State owns the remainder of the minerals in these 17.134 acres, subject to the undivided ½ interest in the minerals conveyed to others by Reagan's predecessors in title. Nonetheless, the present dispute involves gas, which Reagan did reserve in his conveyances to the State.

11 Although the Court in *Altman* described the right to lease as the executive right, "the right to develop is a correlative right and passes with the executive rights." *French v. Chevron U.S.A., Inc.,* 896 S.W.2d 795, 797 n. 1 (Tex.1995). Thus, the right to develop passed to the grantees in the Kmiec/Brownkowski conveyance with the right to lease.

12 Tract Nos. 1 and 11 do not adjoin the highway property.

13 Brounkowski Oil has its own counsel, the Bumpurses have their own counsel, and Marathon has its own counsel. Each of these attorneys (in addition to James Bumpurs's counsel) sought attorney's fees.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

421 S.W.3d 273
Court of Appeals of Texas,
San Antonio.

SPRINGER RANCH, LTD., Appellant,
v.
O.F. JONES III, Margaret Matthews, Ethel Matthews Rust,
Ethel Matthews Rust as the Guardian/Trustee for Elizabeth
Matthews, and Rosalie Matthews Sullivan, Appellees.

No. 04–12–00554–CV.   |   Dec. 20, 2013.

**Synopsis**
**Background:** Landowner brought action against neighbor and owners of adjoining mineral estates, seeking declaratory judgment with respect to agreement governing allocation of royalties from horizontal well for which well bore was located on owner's land, crossed boundary with neighbor, and ended on neighbor's land. The 81st Judicial District Court, La Salle County, Stella Saxon, J., entered summary judgment for defendants, and landowner appealed.

**Holdings:** The Court of Appeals, Luz Elena D. Chapa, J., held that:

[1] "surface estate" in agreement governing allocation of royalties from horizontal wells over adjoining mineral estates meant portions of earth over which estate owner held dominion after severance of mineral estate;

[2] horizontal well was situated on surface estates of both owner and neighbor;

[3] provision that royalties payable under oil and gas lease from any well or wells shall be paid to owner of surface estate on which such well or wells are situated, "without reference to any production unit on which such well or wells are located," meant that parties agreed to remove well's location in production unit that included acreage from adjoining parties as basis for one party demanding portion of royalties from well; and

[4] under agreement, "well" meant entire length of underground hole or shaft between owner's and neighbor's estates.

Affirmed.

West Headnotes (24)

**[1]** **Contracts** 🔑 Existence of ambiguity

**Contracts** 🔑 Ambiguity in general

95   Contracts
95II   Construction and Operation
95II(A)   General Rules of Construction
95k143   Application to Contracts in General
95k143(2)   Existence of ambiguity
95   Contracts
95II   Construction and Operation
95II(A)   General Rules of Construction
95k176   Questions for Jury
95k176(2)   Ambiguity in general

If a written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not "ambiguous" and the court will construe the contract as a matter of law.

Cases that cite this headnote

**[2]** **Contracts** 🔑 Language of contract

95   Contracts
95II   Construction and Operation
95II(A)   General Rules of Construction
95k147   Intention of Parties
95k147(2)   Language of contract

In construing an unambiguous contract, the court's primary concern is to ascertain the true intentions of the parties as expressed in the agreement.

Cases that cite this headnote

**[3]** **Contracts** 🔑 Extrinsic circumstances

95   Contracts
95II   Construction and Operation
95II(A)   General Rules of Construction
95k169   Extrinsic circumstances

When interpreting a contract, the parties' intentions should be understood in light of the facts and circumstances surrounding the contract's execution, so long as those circumstances inform, rather than vary from or contradict, the contract's text.

Cases that cite this headnote

**[4]** **Contracts** Intention of Parties

95 Contracts

95II Construction and Operation

95II(A) General Rules of Construction

95k147 Intention of Parties

95k147(1) In general

It is the parties' objective intent, as expressed in the document, not their subjective intent, which may not have been expressed, that controls the court's construction of the contract.

Cases that cite this headnote

**[5]** **Contracts** Construction as a whole

95 Contracts

95II Construction and Operation

95II(A) General Rules of Construction

95k143.5 Construction as a whole

When interpreting a contract, to ascertain the parties' objective intent, the court should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.

Cases that cite this headnote

**[6]** **Contracts** Language of Instrument

95 Contracts

95II Construction and Operation

95II(A) General Rules of Construction

95k151 Language of Instrument

95k152 In general

A court will give a contract's terms their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense.

Cases that cite this headnote

**[7]** **Contracts** Rewriting, remaking, or revising contract

**Contracts** Subject, object, or purpose as affecting construction

**Contracts** Reasonableness of construction

95 Contracts

95II Construction and Operation

95II(A) General Rules of Construction

95k143   Application to Contracts in General

95k143(3)   Rewriting, remaking, or revising contract

95   Contracts

95II   Construction and Operation

95II(A)   General Rules of Construction

95k143   Application to Contracts in General

95k143(4)   Subject, object, or purpose as affecting construction

95   Contracts

95II   Construction and Operation

95II(A)   General Rules of Construction

95k151   Language of Instrument

95k154   Reasonableness of construction

The court will construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served and will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive; however, parties make their own contracts, and it is not within the province of the court to vary their terms in order to protect them from the consequences of their own oversights and failures.

Cases that cite this headnote

**[8]    Contracts**  ⚷ Intention of Parties

95   Contracts

95II   Construction and Operation

95II(A)   General Rules of Construction

95k147   Intention of Parties

95k147(1)   In general

The intent of a contract is not changed simply because the circumstances do not precisely match the scenarios anticipated by the contract.

Cases that cite this headnote

**[9]    Mines and Minerals**  ⚷ Persons entitled in general; apportionment and division orders

260   Mines and Minerals

260II   Title, Conveyances, and Contracts

260II(C)   Leases, Licenses, and Contracts

260II(C)3   Construction and Operation of Oil and Gas Leases

260k79   Rent or Royalties

260k79.1   In General

260k79.1(3)   Persons entitled in general; apportionment and division orders

Division orders executed by royalty owners govern the distribution of oil and gas proceeds, directing to whom such proceeds will be paid and in what proportion.

Cases that cite this headnote

**[10]   Mines and Minerals**  ⚷ Persons entitled in general; apportionment and division orders

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

260k79 Rent or Royalties

260k79.1 In General

260k79.1(3) Persons entitled in general; apportionment and division orders

Division orders governing the distribution of oil and gas proceeds protect purchasers and operators in cases where they pay out the correct total of proceeds owed, but err in the distribution, overpaying some royalty owners and underpaying others.

Cases that cite this headnote

## [11] Mines and Minerals 👉 Persons entitled in general; apportionment and division orders

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

260k79 Rent or Royalties

260k79.1 In General

260k79.1(3) Persons entitled in general; apportionment and division orders

Division orders are only binding until revoked.

Cases that cite this headnote

## [12] Mines and Minerals 👉 Mode of working in general

260 Mines and Minerals

260III Operation of Mines, Quarries, and Wells

260III(A) Statutory and Official Regulations

260k92 Mode of working in general

A "well" is a shaft or hole bored or sunk in the earth through which the presence of minerals may be detected and their production obtained.

Cases that cite this headnote

## [13] Mines and Minerals 👉 Use and enjoyment of premises; surface rights and liabilities

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

260k73.1 Premises Demised and Rights Acquired

260k73.1(6) Use and enjoyment of premises; surface rights and liabilities

The "surface estate," within the context of a mineral lease, strictly construed, is not "land" or any other kind of physical or corporeal structure on which a well may be situated; instead, it is a legal unit of ownership in the physical land.

Cases that cite this headnote

**[14] Mines and Minerals** 🔑 Use and enjoyment of premises; surface rights and liabilities

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

260k73.1 Premises Demised and Rights Acquired

260k73.1(6) Use and enjoyment of premises; surface rights and liabilities

It is fair, when construing an agreement relating to mineral estates, to equate the "surface estate" with the physical or corporeal structures of the earth over which the surface estate owner has dominion, or owns.

1 Cases that cite this headnote

**[15] Mines and Minerals** 🔑 Requisites and validity

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(B) Conveyances in General

260k55 Grants and Reservations of Minerals and Mining Rights

260k55(1) Requisites and validity

Separate surface and mineral estates do not come into existence until there is a grant of the minerals in a deed or lease, or a reservation in a conveyance.

Cases that cite this headnote

**[16] Mines and Minerals** 🔑 Use and enjoyment of premises; surface rights and liabilities

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

260k73.1 Premises Demised and Rights Acquired

260k73.1(6) Use and enjoyment of premises; surface rights and liabilities

"Surface estate" in agreement governing allocation of royalties from horizontal wells over adjoining mineral estates meant portions of earth over which estate owner held dominion after severance of mineral estate.

1 Cases that cite this headnote

**[17] Mines and Minerals** 🔑 Kind, quantity, and location of minerals granted or reserved

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(B)  Conveyances in General

260k55  Grants and Reservations of Minerals and Mining Rights

260k55(5)  Kind, quantity, and location of minerals granted or reserved

A mineral estate may include more than simply the ownership of hydrocarbons, if there was a general grant or reservation of minerals.

Cases that cite this headnote

**[18]  Mines and Minerals** ⚷ Rights or interests acquired in general

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(C)  Leases, Licenses, and Contracts

260II(C)3  Construction and Operation of Oil and Gas Leases

260k73.1  Premises Demised and Rights Acquired

260k73.1(2)  Rights or interests acquired in general

Ownership of the hydrocarbons that are pushed into a well drilled into the earth does not give the mineral estate owner ownership of the earth surrounding those substances.

1 Cases that cite this headnote

**[19]  Mines and Minerals** ⚷ Title in general

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(A)  Rights and Remedies of Owners

260k47  Title in general

While a mineral rights owner has a real interest in oil and gas in place, this right does not extend to specific oil and gas beneath the property; rather, ownership must be considered in connection with the law of capture, which is recognized as a property right as well, pursuant to which the mineral rights owner is entitled, not to the molecules actually residing below the surface, but to a fair chance to recover the oil and gas in or under his land, or their equivalents in kind.

Cases that cite this headnote

**[20]  Mines and Minerals** ⚷ Title in general

260  Mines and Minerals

260II  Title, Conveyances, and Contracts

260II(A)  Rights and Remedies of Owners

260k47  Title in general

If there are no minerals beneath the surface that is the subject of mineral lease, the mineral estate owner owns the legal fiction of an estate that is nothing.

Cases that cite this headnote

**[21] Mines and Minerals** 🔑 Persons entitled in general; apportionment and division orders

    260  Mines and Minerals

    260II  Title, Conveyances, and Contracts

    260II(C)  Leases, Licenses, and Contracts

    260II(C)3  Construction and Operation of Oil and Gas Leases

    260k79  Rent or Royalties

    260k79.1  In General

    260k79.1(3)  Persons entitled in general; apportionment and division orders

Horizontal well, for which shaft or hole bored through land on owner's property and which crossed over boundary and ended on neighbor's land, was situated on surface estates of both owner and neighbor, within meaning of agreement providing that "all royalties payable under... Oil and Gas Lease from any well or wells... shall be paid to the owner of the surface estate on which such well or wells are situated," thus requiring allocation of royalties from well between owner and neighbor.

Cases that cite this headnote

**[22] Mines and Minerals** 🔑 Persons entitled in general; apportionment and division orders

    260  Mines and Minerals

    260II  Title, Conveyances, and Contracts

    260II(C)  Leases, Licenses, and Contracts

    260II(C)3  Construction and Operation of Oil and Gas Leases

    260k79  Rent or Royalties

    260k79.1  In General

    260k79.1(3)  Persons entitled in general; apportionment and division orders

By including provision of agreement that royalties payable under oil and gas lease from any well or wells shall be paid to owner of surface estate on which such well or wells are situated, "without reference to any production unit on which such well or wells are located," predecessors in interest of owner of mineral estate on whose land horizontal well shaft was bored and neighbor on whose land well ended agreed to remove well's location in production unit that included acreage from adjoining parties as basis for one party demanding portion of royalties from well, and that parties agreed to allocate royalties on basis of well's situation on a party's property and not on the basis of well's location in production unit comprised of adjoining parties' acreage.

Cases that cite this headnote

**[23] Mines and Minerals** 🔑 Nature and distinctions; bonus

    260  Mines and Minerals

    260II  Title, Conveyances, and Contracts

260II(C)   Leases, Licenses, and Contracts

260II(C)3   Construction and Operation of Oil and Gas Leases

260k79   Rent or Royalties

260k79.1   In General

260k79.1(2)   Nature and distinctions;  bonus

A "royalty" is a fraction of a well's production, free of the costs of production, paid to the mineral lessor.

Cases that cite this headnote

**[24]   Mines and Minerals** 👈 Persons entitled in general;  apportionment and division orders

260   Mines and Minerals

260II   Title, Conveyances, and Contracts

260II(C)   Leases, Licenses, and Contracts

260II(C)3   Construction and Operation of Oil and Gas Leases

260k79   Rent or Royalties

260k79.1   In General

260k79.1(3)   Persons entitled in general;  apportionment and division orders

Horizontal "well" for which well bore was located on owner's land and ended on neighbor's land meant entire length of underground hole or shaft running between owner's and neighbor's estates, within meaning of agreement between adjoining mineral estate owners that royalties payable under oil and gas lease from any well or wells shall be paid to owner of surface estate on which such well or wells are situated, and therefore, well was situated on two surface estates, i.e., owner's and neighbors, such that royalties from lease were to be allocated between owner and neighbor.

Cases that cite this headnote

## Attorneys and Law Firms

**\*276** Mark C. Harwell, Cotham, Harwell & O'Conor, P.C., Houston, TX, for Appellant.

O.F. Jones, Law Offices of O.F. Jones, III, Victoria, TX, David E. Jackson, John Matthew Sjoberg, Jackson, Sjoberg, McCarthy & Townsend, L.L.P., Austin, TX, for Appellee.

Sitting: KAREN ANGELINI, Justice, PATRICIA O. ALVAREZ, Justice, LUZ ELENA D. CHAPA, Justice.

## OPINION

Opinion by: LUZ ELENA D. CHAPA, Justice.

In this appeal from a declaratory judgment, we must construe a 1993 contract to determine the allocation of royalties from a horizontal well that begins on the property of the appellant, Springer Ranch, Ltd., but ends under the property of Rosalie Matthews Sullivan, one of the appellees. Our construction will also govern the allocation of royalties to future horizontal wells covered by the contract. The trial court held the contract required royalties from the horizontal well in dispute, and any future horizontal wells crossing the parties' property lines, must be allocated based on the productive portions of the well underlying the parties' properties. We affirm.

## BACKGROUND

### *Origin of the Parties' Interests*

The parties to this appeal are the heirs or successors-in-interest to Alice Burkholder, who owned 8,545 acres of land in La Salle County, Texas, and Webb County, Texas. The property is centered around Encinal, Texas. Alice executed an oil and gas lease on the entire property in 1956 that is still in force today. Upon her death, Alice's will devised her property interest as a life estate in her husband, Joseph Burkholder. The will divided the remainder interest into three tracts and devised the tracts to the parties' predecessors-in-interest. Joseph passed away in 1990, and the land was divided in accordance with the will. Springer Ranch, successor-in-interest **\*277** to Barbara Welhausen Springer, holds the portion of the original Burkholder tract "lying North of the Krugerville Road and West of Highway 81 [now U.S. Interstate 35]." Rosalie Matthews Sullivan, successor-in-interest to Lawrence Matthews, holds the "land lying on the East side of Highway 81 [I–35]." The "land lying South of the Krugerville Road and West of Highway 81" is held by some combination of O.F. Jones III, Margaret Matthews, Ethel Matthews Rust, and Elizabeth Matthews, as successors-in-interest to Anthony Matthews. Springer Ranch and Sullivan own the entire undivided interests in their tracts of land and the lease benefits from their tracts. O.F. Jones and the remaining Matthews parties have entered into a partition agreement with respect to the third tract.

In 1993, the parties to this appeal or their predecessors-in-interest executed the contract at issue in this case. The contract recites in part:

> WHEREAS, a question has arisen as to the ownership of royalties payable under the [Burkholder] lease to the owners of the various tracts of land above described; and

> WHEREAS, the parties wish to settle such question by means of this instrument;

The operative language of the agreement provides:

> [the parties] contract and agree with each of the other parties, that all royalties payable under the above described Oil and Gas Lease from any well or wells on said 8,545.02 acre tract, shall be paid to the owner of the surface estate on which such well or wells are situated, without reference to any production unit on which such well or wells are located....

This agreement affected six vertical wells at the time it was made with two wells situated on each subdivided tract.

### *Present Controversy*

This 1993 contract operated for almost two decades prior to the drilling of the first horizontal well under the Burkholder lease. This well, the Springer Ranch No. 2 well ("the SR2 well"), begins on Springer Ranch's property, crosses the boundary line between Springer Ranch's property and Rosalie Matthews Sullivan's property, and terminates under Sullivan's property. When Sullivan became aware of the nature of the SR2 well, she negotiated with Springer Ranch to receive a portion of the royalties from that well. After those negotiations failed, she made a demand for a portion of the royalties to the well's operator. The operator ceased paying royalties until the dispute was resolved between Springer Ranch and Sullivan. We have reproduced the following image from the record to illustrate the situation of the SR2 well.



**\*278** With respect to the SR2 well, Springer Ranch is in the position of "Surface Owner A," and Sullivan is in the position of "Surface Owner B." The illustration does not purport to be to scale.

Springer Ranch then sued Sullivan and the other parties in a declaratory judgment action. It moved for summary judgment, seeking a declaration that it was entitled to receive all the royalties from the SR2 well under the 1993 contract, and that the same allocation applied to future horizontal wells covered by the contract. Its proposed construction at trial and on appeal is succinctly stated in its brief:

> The words in the Royalty Agreement work in harmony to establish a very simple mechanism by which the parties' 1992–93 controversy was settled. "All" royalties, meaning 100% without division, were to be paid to "the" owner, meaning a single exclusive owner, who owned the "the surface estate on which such well [is] situated," meaning the visible location on the land from which hydrocarbons exited, "without reference to any production unit on which such well or wells are located," meaning without any regard to the acreage that "can reasonably be considered to be productive of hydrocarbons." That is what is required by the plain meaning of the words. That construction employs and harmonizes all the words used.

The defendants (collectively referred to as "the Matthews") filed a competing motion for summary judgment, asking the trial court to allocate the royalties to the SR2 well between Springer Ranch and Sullivan based on the location of the productive portions of the well. Their argument rests on the premise that the SR2 well is "situated on" both Springer Ranch's and Sullivan's "surface estates" within the meaning of the 1993 contract. Thus, Springer Ranch and Sullivan are entitled to "all" the royalties from the "productive portions" of the SR2 well "situated" on their "surface estates." As part of their summary judgment evidence, the Matthews offered the affidavit of a petroleum engineer to show how "all" the royalties from the portions of the well "situated on" the respective "surface estates" could be **\*279** determined and allocated. They also sought a declaration that the same formula be applied to future horizontal wells.

The trial court held a hearing on the parties' motions. After the hearing, the court issued this judgment:

> (i) the June 3, 1993 agreement referred to by the parties as the Royalty Agreement, concerning ownership of royalties under the October 5, 1956 oil and gas lease recorded in Volume 5, Page 151 of the Oil and Gas Records of La Salle County, Texas, is unambiguous; (ii) the Royalty Agreement requires that the royalties from the Springer Ranch No. 2 well be divided between Defendant Rosalie Sullivan and Plaintiff Springer Ranch Ltd. based on the productive portions of the well situated on their properties; (iii) Defendant Rosalie Sullivan is entitled to receive royalty of .08500689 of production from the well and Plaintiff Springer Ranch, Ltd. is entitled to receive royalty of .03999311 of production from the well; (iv) royalties from any future horizontal wells that are subject to the Royalty Agreement and that are situated on more than one tract of land and owned by any of the parties to this suit or their heirs, successors,

and assigns will be allocated in proportion to the producing portions of the well situated on each of the respective tracts.

Springer Ranch appeals from this judgment.

## STANDARD OF REVIEW

"We review the trial court's summary judgment de novo." *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). "When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Id.* "When both parties move for partial summary judgment on the same issues and the trial court grants one motion and denies the other, as here, the reviewing court considers the summary judgment evidence presented by both sides, determines all questions presented, and if the reviewing court determines that the trial court erred, renders the judgment the trial court should have rendered." *Id.*

## CONTRACT INTERPRETATION

 **[1]    [2]    [3]    [4]    [5]    [6]**   "If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex.1983). In construing an unambiguous contract, our primary concern is to ascertain the true intentions of the parties as expressed in the agreement. *Valence Operating,* 164 S.W.3d at 662. The parties' intentions should be understood in light of the facts and circumstances surrounding the contract's execution so long as those circumstances inform, rather than vary from or contradict, the contract's text. *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.,* 352 S.W.3d 462, 469 & n. 25 (Tex.2011) (citing *Sun Oil Co. (Del.) v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981)). It is the parties' objective intent, as expressed in the document, not their subjective intent, which may not have been expressed, that controls our construction of the contract. *Matagorda County Hosp. Dist. v. Burwell,* 189 S.W.3d 738, 740 (Tex.2006) (per curiam). To ascertain the parties' objective intent, we "should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Valence Operating,* 164 S.W.3d at 662. We give the contract's terms their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Id.*

 **\*280    [7]    [8]**   We also "construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.' " *Frost Nat'l Bank v. L & F*

*Distribs., Ltd.,* 165 S.W.3d 310, 312 (Tex.2005) (quoting *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex.1987)). However, " 'parties make their own contracts, and it is not within the province of this court to vary their terms in order to protect them from the consequences of their own oversights and failures....' " *Provident Fire Ins. Co. v. Ashy,* 139 Tex. 334, 162 S.W.2d 684, 687 (1942) (quoting *Dorroh–Kelly Mercantile Co. v. Orient Ins. Co.,* 104 Tex. 199, 135 S.W. 1165, 1167 (1911)); *see also Tenneco Inc. v. Enter. Prods. Co.,* 925 S.W.2d 640, 646 (Tex.1996) ("We have long held that courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained."). Therefore, "[t]he intent of a contract is not changed simply because the circumstances do not precisely match the scenarios anticipated by the contract." *SAS Inst., Inc. v. Breitenfeld,* 167 S.W.3d 840, 841 (Tex.2005).

## DISCUSSION

### The Surrounding Circumstances

The impetus for the 1993 contract was the division of the original Burkholder property—and thus the benefits of the outstanding mineral lease over the property—at Joseph Burkholder's death. During the time between the lease's execution in 1956 and Joseph's death, the original lessee-operator carved out portions of its mineral interest under the Burkholder lease and assigned those interests to other operators, who in turn subdivided and assigned their interests to other operators. When the parties' remainder interests became present interests in 1990, it became apparent that the property boundary lines of their interests, as established by Alice's will, did not match with and were crossed by the boundary lines separating the operators who held portions of the lessee's interest under the Burkholder lease.

 **[9]    [10]    [11]**    Once the mismatch became apparent, one of the operators stopped paying royalties and would not resume royalty payments until the parties executed division orders. [1] The parties did execute division orders. However, one of the parties questioned the division orders after discovering that a well situated on an adjoining party's property was located within a "production unit," almost half of which included acreage from his property. [2] The operator again suspended royalty payments until the 1993 agreement was reached.

In 1993, each of the three sets of parties had two vertical wells on their "surface **\*281** estates," whose "production units" included acreage from an adjoining party's property. Therefore, the parties agreed each party would receive all the royalties from the wells "situated on" their "surface estate" and would forego any claims to the royalties from wells on the adjoining parties' surface estates. Bearing in mind the surrounding circumstances, we turn to the contract's text.

*"all royalties payable under the above described Oil and Gas Lease from any well or wells on said 8,545.02 acre tract, shall be paid to the owner of the surface estate on which such well or wells are situated .... "*

- **"well"**

Because the contract allocates the royalties payable from wells based on where the wells are situated, we begin by construing the term "well." The Matthews parties argue that "well" should be understood as "the entire underground orifice from which oil and gas are produced." Springer Ranch does not discuss or advocate for a particular definition of "well," but its construction requires "well" to be only the topmost portion of the hole on the surface where hydrocarbons exit the earth or the structure overlying the well. [3]

 **[12]**  Legal and lay authorities agree that "[a] well is a shaft or hole bored or sunk in the earth through which the presence of minerals may be detected and their production obtained." *Kothmann v. Boley,* 158 Tex. 56, 308 S.W.2d 1, 3 (1957); *accord* BLACK'S LAW DICTIONARY 1732 (9th ed. 2009) (defining "well" as "a hole or shaft sunk into the earth to obtain a fluid, such as water, oil, or natural gas"); SHORTER OXFORD ENGLISH DICTIONARY 3604, at 5, 5 spec. (b) (6th ed. 2007) (defining "well" as "any shaft or pit sunk or dug into the ground ... a shaft sunk in the ground to reach and tap a supply of oil, brine, gas, etc."); MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY 1342, at 2b (10th ed. 1999) (defining "well" as "a shaft or hole sunk to obtain oil, brine, or gas"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2594, at 4c (2002) (defining "well" as "a shaft or pit dug or bored in the earth ... a shaft or hole sunk to obtain oil, brine, or gas"). The Matthews' summary judgment evidence also included the affidavit of a petroleum engineer, who stated "[w]hile the surface location of the wellhead is on Springer Ranch property, the well is situated on both Ms. Sullivan's and Springer Ranch property."

The Matthews' expert's affidavit suggests, and we agree, that Springer Ranch's construction requires "well" to be conflated with the term "wellhead," which is the top of the hole from which hydrocarbons exit, or the visible structure over the well. *See* SHORTER OXFORD ENGLISH DICTIONARY 3606, at 2 b (defining "wellhead" as "[a] structure erected over an oil well or gas well"); Merriam–Webster's Collegiate Dictionary 1342, at 3 (defining "wellhead" as "the top of or a structure built over a well"); Webster's Third New International Dictionary 2595, at 3 a, b (defining "wellhead" as "the top of a well ... a structure built over the top of a well."). In its brief, Springer Ranch states "[t]here is no other surface location for the well other than the wellhead located on Springer Ranch's property." However, Springer Ranch does not cite any support for their necessarily limited definition of "well" or its conflation of "well" and "wellhead." Although we are aware "well" may be colloquially used in this way, we decline to  **\*282**  construe the word in a way that contravenes its technical, legal, and dictionary definitions.

**• "on"**

Springer Ranch contends that, because the contract describes a well "on" a surface estate, it must mean only that part of the well that is visible on the surface of its property. It is true that "on" is often used to mean in contact with the top surface of a thing. SHORTER OXFORD ENGLISH DICTIONARY 2000, at 1, 2; MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY 811, at 1 a, b; WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1574, at 1 a, c. But "on" is a versatile preposition and also denotes other spatial relations, including within the limits or bounds of something. SHORTER OXFORD ENGLISH DICTIONARY 2000, at 5; MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY 811, at 2 c; WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1574, at 1 c. For instance, oil is said to be "on" one's property. *See, e.g., Fleming v. Ashcroft,* 142 Tex. 41, 175 S.W.2d 401, 404 (1943) ("[O]n account of discovery of oil on the tract...."). "On" is sometimes used in this sense with "well." *See, e.g., BP Am. Prod. Co. v. Marshall,* 342 S.W.3d 59, 63 (Tex.2011) (referring to "good-faith efforts to develop a well on the Marshall lease...."). Both parties argue that their definition of "on" is the only one consistent with the other uses of "on" in the contract's operative language: "from any well or wells *on* said 8,545.02 acre tract" and "without reference to any production unit *on* which such well or wells are located." Because "on" is so versatile, that argument is not persuasive for either party's construction.

**• "surface estate"**

**[13]  [14]  [15]  [16]**   We next examine the meaning of the term "surface estate." The "surface estate," strictly construed, is not "land" or any other kind of physical or corporeal structure on which a well may be situated. Instead, it is a "legal unit of ownership in the physical land." *Averyt v. Grande, Inc.,* 717 S.W.2d 891, 894 (Tex.1986) (" 'Land' is the physical earth in its natural state, while an estate in land is a legal unit of ownership in the physical land."). But it is fair, when construing a writing, to equate the "surface estate" with the physical or corporeal structures of the earth over which the surface estate owner has dominion, or owns. *See, e.g., Dunn–McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.,* 630 F.3d 431, 442 (5th Cir.2011) (citing *Averyt,* 717 S.W.2d at 894). In this case, such a construction is necessary if the 1993 contract is to be given meaning under either party's construction. Separate surface and mineral estates do not come into existence until there is a grant of the minerals in a deed or lease, or a reservation in a conveyance. *See Moser v. U.S. Steel Corp.,* 676 S.W.2d 99, 101 (Tex.1984). Therefore, in order to give meaning to the phrase "surface estate on which such well or wells are situated," we construe the term "surface estate" to mean the portions of the earth, over which the surface estate owner holds dominion after a severance of the mineral estate. *See Dunn–McCampbell,* 630 F.3d at 442; *Averyt,* 717 S.W.2d at 894; *Moser,* 676 S.W.2d at 101; BLACK'S LAW DICTIONARY 1580 (defining "surface interest" as "every right in real property other than the mineral interest").

[17]    To understand what mineral and surface estate owners actually own, we must discuss the relationship between hydrocarbons and the earth surrounding them. [4] *See generally* 2 ERNEST E. SMITH & **\*283** JACQUELINE LANG WEAVER, TEXAS LAW OF OIL AND GAS § 8.2[A]-[C], at 8–16.8–8–22 (LexisNexis Matthew Bender, 2nd ed. 2013); 1 W.L. SUMMERS, THE LAW OF OIL AND GAS § 4, at 4–17 (West 1954). Hydrocarbons reside within porous formations or reservoirs of rock under immense pressure from the overlaying earth. 2 SMITH & WEAVER, TEXAS LAW OF OIL AND GAS § 8.2[A], at 8–16.8; 1 SUMMERS, THE LAW OF OIL AND GAS § 4, at 10. When the porous reservoir is pierced by a well, the pressure of the impermeable earth above the reservoir and internal forces from within the reservoir, such as water trapped with the hydrocarbons, push the hydrocarbons out of the formation and into the well. 2 SMITH & WEAVER, TEXAS LAW OF OIL AND GAS § 8.2[A]-[C], at 8–16.8–8–22; 1 SUMMERS, THE LAW OF OIL AND GAS § 4, at 15.

[18]    With that understanding in mind, we note ownership of the hydrocarbons does not give the mineral owner ownership of the earth surrounding those substances. *Emeny v. United States,* 188 Ct.Cl. 1024, 412 F.2d 1319, 1323 (1969) (per curiam). In *Emeny,* the defendant mineral lessee was obtaining production from a gas formation. 412 F.2d at 1321. The defendant injected helium gas into the reservoir, which it had brought in from outside sources, and also injected helium gas from other producers who paid the defendant to store it in the reservoir. *Id.* at 1321–23. The injection of helium gas was unnecessary to the production of the hydrocarbon gas. [5] *Id.* at 1324. The court held that the right to use a gas reservoir for the storage of helium-gas mixtures and pure helium gas produced elsewhere was vested in the surface estate owners and not in the defendant mineral owner. *Id.* at 1320. The court explained "[t]he surface of the leased lands and everything in such lands, except the oil and gas deposits covered by the leases, were still the property of the respective landowners." *Id.* at 1323. "This included the geological structures beneath the surface, including any such structure that might be suitable for the underground storage of 'foreign' or 'extraneous' gas produced elsewhere." *Id.* That holding has been cited with approval by the Texas Supreme Court. *Humble Oil & Refining Co. v. West,* 508 S.W.2d 812, 815 (Tex.1974).

[19]    *Emeny* 's holding also accords with the nature of the mineral estate. *See Coastal Oil & Gas Corp. v. Garza Energy Trust,* 268 S.W.3d 1, 15 (Tex.2008); *Dunn–McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.,* 630 F.3d 431, 441–42 (5th Cir.2011). As the Texas Supreme Court has explained:

> While a mineral rights owner has a real interest in oil and gas in place, this right does not extend to *specific* oil and gas beneath the property; ownership must be considered in connection with the law of capture, which is recognized as a property right as well. The minerals owner is entitled, not to the molecules actually residing below the surface, but to a fair chance to recover the oil and **\*284** gas in or under his land, or their equivalents in kind.

*Coastal Oil,* 268 S.W.3d at 15 (internal quotation marks and citations omitted). Relying on *Coastal Oil,* the Fifth Circuit has determined that "Texas law establishes that the holder of a mineral estate has the right to exploit minerals, but does not own the subsurface mass." *Dunn–McCampbell,* 630 F.3d at 442; *see also id.* at 441 ("[T]he conveyance of mineral rights ownership does not convey the entirety of the subsurface.").

 **[20]**  Springer Ranch argues that relying on cases dealing with the disputes between the rights or boundaries of the surface and mineral estate owners (e.g., *Emeny* and *Dunn–McCampbell)* is improper because "[n]one of these cases concern the parties' identification, among competing 'mineral estate' owners, for the purpose of the payment of royalties for the actual production of oil and gas from the subsurface." We fail to see why the meaning of "surface estate" should vary from one context to another. Springer Ranch also argues that treating the well as situated on the surface estate conflates surface estate and mineral estate. We note that the physical structures and subsurface substances that the surface estate and mineral estate owners possess are inherently intertwined, at least with respect to hydrocarbons. *See* SMITH & WEAVER, TEXAS LAW OF OIL AND GAS § 8.2[A]-[C], at 8–16.8–8–22; 1 SUMMERS, THE LAW OF OIL AND GAS § 4, at 4–17. Some conflation is unavoidable. However, if there are no minerals beneath the surface, the mineral estate owner owns the legal fiction of an estate that is nothing. *Dunn–McCampbell,* 630 F.3d at 441.

 **[21]**  In light of the contract's language, physical facts of the mineral and surface estates, and the applicable case law, we conclude that the SR2 well—"the shaft or hole bored or sunk in the earth through which the presence of minerals may be detected and their production obtained"—is situated "on" more than one "surface estate," consistent with the Matthews' construction. Royalties from the well therefore should be allocated between Springer Ranch and Sullivan.

**"*without reference to any production unit on which such well or wells are located* "**
 **[22]**  The contract explicitly bars the payment of royalties on the basis that the SR2 well's "production unit" includes acreage from both Springer Ranch's and Sullivan's properties. Springer Ranch complains that the trial court violated this provision by allocating royalties "based on the productive portions of the well situated on [the parties'] properties," arguing that the 1993 contract bars any division or allocation of the royalties between adjacent parties of the subdivided Burkholder tract. We disagree.

As noted above, the parties have offered competing interpretations of "production unit," which is not a term that carries any standardized oil and gas meaning. Without choosing to apply one definition over the other, we note that this provision is at the heart of the 1993 contract in light of the surrounding circumstances. The contract was made because one of the parties questioned whether he should receive royalties from a well that, although it was on an adjacent party's

property, was located in a production unit which included much of its acreage from his property. [6] The contract's recitals and the surrounding circumstances **\*285** confirm that this dispute and the desire to promptly resume royalty payments was the impetus for the 1993 contract. The objective meaning of this provision was to remove a well's location in a production unit that included acreage from adjoining parties as a basis for one party demanding a portion of the royalties from the well. Therefore, the parties agreed to allocate royalties on the basis of a well's situation on a party's property and not on the basis of a well's location in a production unit comprised of adjoining parties' acreage.

We find it unnecessary to discuss the virtues of the parties' competing definitions of the term "production unit" because it is clear that the court's judgment does not allocate royalties based on the fact that the SR2 well's "production unit" includes acreage from both Springer Ranch's and Sullivan's properties. [7] That would have been prohibited under the 1993 contract. But the allocation of royalties on the basis that a well is situated on two surface estates does not contravene this provision and does carry out the intent of the earlier provision.

### *The Division and Allocation Formula*

Springer Ranch argues that if a well may be situated on more than one surface estate, the allocation of royalties based only on the "productive portions" of the SR2 well is incorrect, and that royalties should be allocated on the basis of the entire length of the well "on" the parties' property and not just the productive portions. We disagree, and conclude the trial court's allocation was a necessary consequence of the contract's language and was supported by the evidence before it.

 **[23]**   The contract allocates "all royalties payable under the above described Oil and Gas Lease from any well or wells ..." A royalty is a fraction of the SR2 well's production, free of the costs of production, paid to the mineral lessor. *See Heritage Res.,* 939 S.W.2d at 121–22. Production from a well, whether horizontal or vertical, is not obtained from the entire length of the well, but from the part of the well that pierces and drains the reservoir in which the hydrocarbons reside. *See* 2 SMITH & WEAVER, TEXAS LAW OF OIL AND GAS § 8.2[A]-[C], at 8–16.8–8–22; 1 SUMMERS, THE LAW OF OIL AND GAS § 4, at 15. A vertical well may produce hydrocarbons from different formations within its vertical line. *See* 16 TEX. ADMIN. CODE § 3.10 (2013) (Tex.R.R. Comm'n, Restriction of Production of Oil and Gas from Different Strata). A horizontal well only produces hydrocarbons from the part of the well that lies within the hydrocarbon-bearing reservoir, or "correlative interval." *See* 16 TEX. ADMIN. CODE § 3.86(a)(1) (2013) (Tex.R.R. Comm'n, Horizontal Drainhole Wells). Along the horizontal displacement are takepoints through which hydrocarbons flow into the well. *See Browning Oil Co. v. Luecke,* 38 S.W.3d 625, 634–35 (Tex.App.-Austin 2000, pet. denied). A royalty, as a fraction of production, is only obtainable from the part of the SR2 well actually within the correlative interval. Despite Springer Ranch's

argument that the calculation should be based on the whole length of the well, it is not the whole length of the well from which production is obtained. *See id.*

The Matthews' expert measured the total distance between the SR2 well's first **\*286** and last takepoints within the correlative interval, the distance between its first takepoint and the property line between Sullivan and Springer Ranch's properties, and the distance between the property line and the well's last takepoint. The expert multiplied the one-eighth royalty provided under the 1956 lease by the ratio of the total distance between the first and last takepoints to allocate the royalties. He calculated: "[i]f the royalty were divided based on the length of open drainhole situated on each respective tract, Ms. Sullivan's net revenue interest in the well based on the one-eighth lease royalty would be 0.08500689 (2,615.9/3,846.6 x 1/8) and Springer Ranch's share would be 0.03999311 (1,230.7/3, 846.6x 1/8)." Springer Ranch did not dispute the expert's measurements or calculations, nor did it offer evidence of any other basis for determining how much production was obtained from the parts of the well on the parties' respective surface estates. Therefore, there is summary judgment evidence supporting the trial court's judgment allocating "all royalties" payable from the SR2 well based on the "productive portions of the well situated on [Springer Ranch's and Sullivan's] properties." [8]

### *Our Construction*

**[24]** Having reviewed the contract's terms, we agree with the Matthews' construction as it is the only plausible construction. Their construction of the word "well" to mean the entire length of the underground hole or shaft, comports with the legal, technical, and dictionary meaning of the term. *See Valence Operating,* 164 S.W.3d at 662 (We give the contract's terms "their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense."). We see no basis in light of the surrounding circumstance or the text of the contract to limit the term or conflate it with "wellhead." The SR2 well is situated on two "surface estates." *See Emeny,* 412 F.2d at 1323; *Dunn–McCampbell,* 630 F.3d 431, 441–42 (citing *Coastal Oil,* 268 S.W.3d at 15).* Therefore, the royalties must be allocated on the basis that the productive portions of the SR2 well are situated on both Springer Ranch's and Sullivan's properties. But no royalties may be allocated on the basis that the production unit within which the SR2 well is located includes acreage from both Springer Ranch's and Sullivan's properties.

Springer Ranch argues the parties' past practice and history support its construction and point to evidence showing the royalties from previous wells located in production units with acreage from adjacent parties were allocated only to one party. *See Trinity Universal Ins. Co. v. Ponsford Bros.,* 423 S.W.2d 571, 575 (Tex.1968).* We disagree. Springer Ranch's argument presupposes that its construction was the correct one, but both Springer Ranch's and the Matthews' constructions were consistent with the past twenty years of vertical well drilling. In addition, we have explained that

the Matthews' construction does not allocate royalties on the basis of combined production unit acreage.

Springer Ranch also argues that the Matthews' construction improperly incorporates horizontal well concepts that were not contemplated at the time the parties entered into the 1993 contract and that the **\*287** failure of the parties to anticipate a change in technology does not justify rewriting the contract in favor of the Matthews. *See Marcus Cable Assocs. v. Krohn,* 90 S.W.3d 697, 703–06 (Tex.2002) (holding contractual easement for "electric transmission or distribution line or system" could not be construed in light of technological advances to permit installation of cable television lines). We have not altered the meanings of "well," "on," "surface estate," "production unit," or "royalties" to accommodate a change in technology. *Cf. id.* The intent of the parties was to allocate royalties from "wells" without respect to "production units," regardless of whether the parties contemplated the differences between vertical and horizontal wells. *Cf. Browning Oil,* 38 S.W.3d at 640 ("The intent of the parties was to authorize pooling, but to prevent the dilution of the Lueckes' royalties, whether the royalties represented production from vertical wells or horizontal wells."). We have integrated horizontal-well concepts into our construction of the word "royalties" because, unlike a vertical well, the SR2 well crosses the surface estate of more than one party and obtains royalties from takepoints along its entire length within the correlative interval. *Cf. id.* at 642–46 (holding jury charge on damages was erroneous because the remedy for breach of anti-dilution provisions must be based on the facts of horizontal-well drilling). We find Springer Ranch's complaint unpersuasive.

Another rule of contract construction supports our holding. The Texas Supreme Court has stated that a court should construe contracts " 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' " and " 'avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.' " *Frost Nat. Bank,* 165 S.W.3d at 312 (quoting *Reilly,* 727 S.W.2d at 530). In *Frost,* the Court held the court of appeals's construction of an equipment-lease agreement with a purchase option provision violated those precepts. *Id.* at 311. The lessee had attempted to exercise the purchase option and buy the equipment a little over a year into the five-year lease term, but the lessor refused, contending that the contract only allowed the lessee to purchase the equipment when the lease term ended. *Id.* The court of appeals construed the lease to allow the lessee to exercise its purchase right when it terminated the lease little more than a year after it began. *Id.* at 312.

The Court reversed and held the court of appeals committed two errors by construing the lease to permit the lessee to exercise the purchase option when it terminated the lease early. *Id.* at 312–13. First, the court of appeals committed error by interchanging the words terminate and expire, which were two distinct ways the lease could have ended. *Id.* at 313. The Court also held that

> In addition, L & F's and the court of appeals' construction is unreasonable, inequitable, and oppressive. Such a construction allows the lessee to terminate

the lease and purchase the vehicles for the same price (twenty percent of the original invoice price) at any point during the five-year lease term with the requisite notice. At the lessee's discretion, then, the lessor would essentially have to forgo almost the entire rental value of the equipment and sell it almost new for twenty percent of its value, the same price it would receive for selling the equipment at the end of the lease term after collecting rent on it for sixty months. Bearing in mind that our primary goal is to ascertain the intent of the parties when they entered into the agreement, we find such a construction unreasonable. Because there is only one **\*288** reasonable interpretation of the lease, we construe it as a matter of law.

*Id.* (internal quotation marks and citations omitted); *see also Fortis Benefits v. Cantu,* 234 S.W.3d 642, 650 n. 54 (Tex.2007) (declining to construe insurance policy in a way that allowed for subrogation of claims unrelated to the policy); *Reilly,* 727 S.W.2d at 530 (refusing to construe partnership agreement as a matter of law in a way that was "potentially oppressive towards the limited partners ... [and would] give the managing general partner the authority to drastically dilute the limited partners' [interests] so as to work a practical forfeiture."); *Shadow Dance Ranch P'ship, Ltd. v. Weiner,* No. 04–03–00926–CV, 2005 WL 3295664, at \*4 (Tex.App.-San Antonio Dec. 7, 2005, no pet.) (mem. op.) (holding that appellant's construction of partnership agreement "taken to its logical conclusion, would allow [appellant] to ignore dissolution notices indefinitely and continue to demand capital until [appellee's] ownership interest is eliminated ... thus produc[ing] an unjust, unreasonable, and oppressive result.") (internal quotation marks and alterations omitted).

We find the same criticisms applicable to Springer Ranch's proposed construction. When the 1993 contract was formed, each of the three sets of parties had two vertical wells on their respective tracts that included acreage from an adjacent party's property in their production units. The operator of some of those wells insisted that the parties agree on how the royalties from those wells would be allocated. To resume royalty payments, the parties agreed they would forego claims based on combined acreage within a production unit and would assign all royalties to the owner of the surface estate on which a well was situated. The intent of the parties to the 1993 contract was to bar claims for royalties based on "production units," not to allow one party to directly produce hydrocarbons from within the bounds of another's property. *Cf. Browning Oil,* 38 S.W.3d at 645 ("The intent of the parties as evidenced by the language of these leases was to award the Lueckes royalties for one-eighth of the oil and gas produced from *their* land, not to provide a punitive remedy for a breach of the pooling provisions.").

Sullivan is entitled to one-eighth of the minerals within the bounds of her property under the lease. *See Japhet v. McRae,* 276 S.W. 669, 670–71 (Tex.Com.App.1925, judgm't adopted) (holding that if a property is subject to a mineral lease and is later subdivided, the owners of the subdivided tracts are only entitled to royalties obtained from wells on their tract and are not entitled to the royalties from adjoining tracts simply because they were part of the original property); *Garza v.*

*De Montalvo,* 147 Tex. 525, 217 S.W.2d 988, 993 (1949) (affirming *Japhet's* non-apportionment rule was still Texas law); *see Coastal Oil,* 268 S.W.3d at 15 ("The minerals owner is entitled ... to 'a fair chance to recover the oil and gas in or under his land, *or* their equivalents in kind.' "). Over two-thirds of the SR2 well's horizontal length lies underneath Sullivan's property with the remaining one-third under Springer Ranch's property, and it is beyond cavil that the SR2 well produces hydrocarbons directly from within the bounds of Sullivan's property. *Cf. Coastal Oil,* 268 S.W.3d at 14 ("The gas produced through a deviated well does not migrate to the wellbore from another's property; it is already on another's property."). Springer Ranch's construction would have us hold that the parties intended that a party would have the right to produce and deplete the minerals directly from within another party's property. If we were to adopt its construction and take it to its logical conclusion, Springer Ranch would receive all of the SR2 well's royalties because **\*289** the wellhead was on its property, even if the well obtained *all* of its production directly from underneath Sullivan's tract. This is not a utilitarian construction in light of the business activity the contract pertains to and is unreasonable, inequitable, and oppressive. *See Frost Nat. Bank,* 165 S.W.3d at 312; *Fortis Benefits,* 234 S.W.3d at 650 n. 54; *Reilly,* 727 S.W.2d at 530; *Shadow Dance Ranch,* 2005 WL 3295664, at \*4; *cf. Browning Oil,* 38 S.W.3d at 647 ("The Lueckes are entitled to the royalties for which they contracted, no more and no less.").

## CONCLUSION

We construe the 1993 contract as requiring royalties to be allocated on the basis of the "productive portions" of the SR2 well underlying Springer Ranch's and Sullivan's properties. The uncontroverted and only evidence before us shows the productive portion of the SR2 well under Springer Ranch's property is the length of the well between the first takepoint and the property line. The productive portion under Sullivan's property is the length of the well between the property line and the last takepoint. The portion of the royalties to which Springer Ranch and Sullivan are entitled is determined by the ratio of the productive portions of the SR2 well on their respective properties to the entire length of the well, multiplied by the one-eighth lease royalty. The same proration of royalties shall apply to future horizontal wells on the parties' properties. We affirm the judgment of the trial court.

## All Citations

421 S.W.3d 273, 178 Oil & Gas Rep. 532

## Footnotes

1  Division orders executed by royalty owners govern the distribution of oil and gas proceeds, directing to whom such proceeds will be paid and in what proportion. *Condra v. Quinoco Petroleum, Inc.,* 954 S.W.2d 68, 70 (Tex.App.-San Antonio 1997, pet. denied). They protect purchasers and operators in cases where they "pay out the correct total of proceeds owed, but err in the distribution,

overpaying some royalty owners and underpaying others." *Gavenda v. Strata Energy, Inc.,* 705 S.W.2d 690, 692 (Tex.1986). But they are only binding until revoked. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 123 (Tex.1996).

2 The term "production unit" does not appear to carry any specialized oil and gas meaning. Springer Ranch argues that "production unit" is synonymous with "proration unit." In a separate reply brief, Jones argues that "production unit" referred to pooling units created by the various owners of the lessee's interest.

3 At oral argument, Springer Ranch conceded the normal meaning of "well" included the entire whole in ground.

4 The mineral estate may include more than simply the ownership of hydrocarbons, if there was a general grant or reservation of minerals. *Moser,* 676 S.W.2d at 101–02 ("We now hold a severance of minerals in an oil, gas and other minerals clause includes all substances within the ordinary and natural meaning of that word, whether their presence or value is known at the time of severance."). The original Burkholder lease contains a general grant. However, the parties' 1993 contract in this case clearly pertains only to hydrocarbons—which are produced from *wells.*

5 If it had been necessary for recovery, the mineral owner likely would have had the authority to inject the gas because "[t]he mineral owner, as owner of the dominant estate, has the right to make any use of the surface which is necessarily and reasonably incident to the removal of the minerals." *Moser,* 676 S.W.2d at 103.

6 Whether that was a valid legal basis for apportioning royalties is not a question before us.

7 Initially, the trial court forwarded a letter to the parties informing them of its summary judgment ruling. The letter stated "[t]he unambiguous meaning of the Agreement that 'royalties shall be paid to the owner of the surface estate on which the well is situated' is that the horizontal well in question is situated on both Sullivan and Springer Ranch's properties."

8 Springer Ranch argues that "producing portions of the surface estate" is nonsensical because the surface estate owner has no rights to minerals. That is true, but the question is not what rights do surface estate owners have to the minerals under their land but rather what "surface estate" means in the context of a contract that allocates royalties on the basis of a well's physical situation.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

399 S.W.3d 242
Court of Appeals of Texas,
San Antonio.

STATE FARM LLOYDS, Appellant

v.

Dora GULLEY, Appellee.

No. 04–12–00057–CV. | Sept. 5, 2012.

**Synopsis**
**Background:** Insured sued insurer for breach of contract to collect additional benefits under her homeowners policy. The 73rd Judicial District Court, Bexar County, John D. Gabriel, Jr., J., denied both parties' motions for summary judgment and authorized immediate interlocutory appeal. Insurer's notice of appeal was denied, 350 S.W.3d 204. Upon remand, the District Court, Gabriel, J., granted insured partial summary judgment. Insurer filed motion to enforce interlocutory appeal, which the Court granted. Insurer filed notice of appeal.

**[Holding:]** The Court of Appeals, Marion, J., held that insured did not agree to second interlocutory appeal.

Appeal dismissed.

West Headnotes (9)

**[1]** **Appeal and Error** 👉 Interlocutory and Intermediate Decisions

30 Appeal and Error
30III Decisions Reviewable
30III(D) Finality of Determination
30k67 Interlocutory and Intermediate Decisions
30k68 In general
Interlocutory orders not disposing of all parties are immediately appealable in only narrow situations permitted by statute.

1 Cases that cite this headnote

**[2]    Appeal and Error** 🔑 Interlocutory and Intermediate Decisions

30   Appeal and Error
30III   Decisions Reviewable
30III(D)   Finality of Determination
30k67   Interlocutory and Intermediate Decisions
30k68   In general

Statutes authorizing interlocutory appeals are strictly construed. V.T.C.A., Civil Practice & Remedies Code § 51.014(d) (2010).

Cases that cite this headnote

**[3]    Contracts** 🔑 Language of contract

95   Contracts
95II   Construction and Operation
95II(A)   General Rules of Construction
95k147   Intention of Parties
95k147(2)   Language of contract

The Court of Appeals' primary objective in construing written agreement is to ascertain and give effect to intentions the parties have objectively manifested in the instrument.

1 Cases that cite this headnote

**[4]    Compromise and Settlement** 🔑 Construction of Agreement

89   Compromise and Settlement
89I   In General
89k10   Construction of Agreement
89k11   In general

The Court of Appeals interprets Rule 11 agreements, between parties or attorneys, based on the intention of parties from language of entire agreement in light of surrounding circumstances, including state of pleadings, allegations therein, and attitude of parties with respect to issues. Vernon's Ann.Texas Rules Civ.Proc., Rule 11.

1 Cases that cite this headnote

**[5]    Contracts** 🔑 Construction as a whole

95   Contracts
95II   Construction and Operation
95II(A)   General Rules of Construction
95k143.5   Construction as a whole

Courts should examine and consider entire writing in an effort to harmonize and give effect to all provisions of contract so that none will be rendered meaningless.

Cases that cite this headnote

**[6]** **Contracts** Construction as a whole

95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k143.5 Construction as a whole

No single provision in agreement taken alone will be given controlling effect, but rather, all provisions must be considered with reference to whole instrument.

Cases that cite this headnote

**[7]** **Contracts** Intention of Parties

95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k147 Intention of Parties
95k147(1) In general

An agreement between parties will not be given greater effect than intended.

Cases that cite this headnote

**[8]** **Contracts** Presumptions and burden of proof

95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k175 Evidence to Aid Construction
95k175(1) Presumptions and burden of proof

The Court of Appeals presumes that parties to contract intend every clause to have some effect.

Cases that cite this headnote

**[9]** **Appeal and Error** On motion for judgment

30 Appeal and Error
30III Decisions Reviewable
30III(D) Finality of Determination
30k67 Interlocutory and Intermediate Decisions
30k70 Nature and Scope of Decision
30k70(8) On motion for judgment

Plaintiff's prior Rule 11 agreement to interlocutory appeal of summary judgment denials did not apply to second interlocutory appeal sought by defendant; agreement

unambiguously limited itself to first interlocutory appeal, and was silent as to further action parties would take in event first interlocutory appeal was not accepted. V.T.C.A., Civil Practice & Remedies Code § 51.014(d) (2010); Vernon's Ann.Texas Rules Civ.Proc., Rule 11.

2 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*243** Linda J. Burgess, Winstead PC, Austin, TX, for Appellant.

Darby Riley, Law Office of Darby Riley, San Antonio, TX, for Appellee.

Sitting: CATHERINE STONE, Chief Justice, SANDEE BRYAN MARION, Justice, MARIALYN BARNARD, Justice.

# OPINION

Opinion by: SANDEE BRYAN MARION, Justice.

The underlying litigation is a dispute over insurance coverage. Appellant, State Farm Lloyds ("State Farm"), filed this accelerated appeal on "a controlling question of law as to which there is a substantial ground for difference of opinion" pursuant to the version of Texas Civil Practice and Remedies Code section 51.014(d) in effect in 2010. Before we may reach the merits of the "controlling question of law," **\*244** however, we must first address the threshold issue of whether this court has jurisdiction over this interlocutory appeal. Because we conclude appellee, Dora Gulley, the plaintiff below, did not agree to this appeal, we do not have jurisdiction and we must dismiss this appeal.

# BACKGROUND

Gulley has maintained insurance on her house with State Farm since 1996. In 2007, Gulley filed a claim under her policy for damage caused by foundation movement resulting from a below-slab plumbing leak. State Farm determined the damage was covered under the policy's Dwelling Foundation Endorsement ("DFE") and made payment to Gulley, subject to the fifteen percent coverage limitation. Although she accepted this payment, Gulley later sued State Farm for breach of contract contending she was entitled to additional benefits under the policy's Water

Damage Endorsement. Gulley and State Farm filed cross-motions for summary judgment. In Gulley's October 2008 traditional motion for partial summary judgment, she argued the damage was covered under both endorsements. In State Farm's April 2009 motion for traditional summary judgment, State Farm argued the damage was covered under only the DFE and was, therefore, subject to the fifteen percent cap. State Farm's motion also included a no-evidence portion with respect to Gulley's claim for additional living expenses.

On July 10, 2009, the trial court signed an order denying both summary judgment motions. Thereafter, Gulley filed a second motion for partial summary judgment with additional evidence, and State Farm filed a motion to reconsider its cross-motion for summary judgment as well as a new "Motion for Summary Judgment Regarding Actual Injury Rule, Non–Fortuitous Loss, and Non–Segregation of Claimed Damage." On June 9, 2010, the trial court signed an order denying all motions, and the case was set for trial on August 23, 2010. On the eve of trial, Gulley's attorney suggested the parties pass the trial date and seek an interlocutory appeal. On August 23, 2010, State Farm's attorney sent the following letter to Gulley's attorney, which Gulley's attorney signed as "Agreed":

> Pursuant to our conversation this morning, I am writing to confirm that we will not be trying this case at this time. If we receive notice from the court that we have been assigned, we agree to [1] pass on that assignment, [2] inform the court that we have decided at this time to pursue an interlocutory appeal under Section 51.014 ... and [3] request that we be given a new trial date within the next 90 days in the event we are unable to secure an interlocutory appeal for some reason. If you are in agreement, please indicate by signing below and returning this letter to me so that it can be filed as a Rule 11 Agreement with the Court....

In the meantime, also in August 2010, both parties filed motions to reconsider their summary judgment motions. On January 12, 2011, the trial court ruled that both parties' summary judgment motions were denied. Within the same written order, the court authorized an immediate interlocutory appeal under section 51.014(d). On January 25, 2011, State Farm's attorney sent the following letter to Gulley's attorney, which Gulley's attorney signed as "Agreed":

I am writing to confirm the terms of our agreement regarding the contents of the order authorizing an interlocutory appeal.... It is my understanding that you will agree to sign our proposed order **\*245** which involves only one controlling question of law: [the same as above].

In return, State Farm will agree that in the event the Court of Appeals accepts this interlocutory appeal [under section 51.014(d) ], State Farm will agree not to assert in any trial following the decision from the Court of Appeals its defenses based on the Actual Injury Rule or the Non–Fortuitous Loss argument. If the Court of Appeals does not accept this interlocutory appeal,

State Farm will still be entitled to assert any and all defenses in any trial following the rejection of the interlocutory appeal by the Court of Appeals.

....

After State Farm filed its notice of appeal, a panel of this court declined to hear the appeal. This court held that by denying both motions for summary judgment and declining to adopt any interpretation of the policy's endorsements, "the trial court failed to comply with its duty to rule on the substantive legal issue, instead opting to ask this Court to make the initial 'matter of law' decision through an agreed interlocutory appeal." *Gulley v. State Farm Lloyds,* 350 S.W.3d 204, 207 (Tex.App.-San Antonio 2011, no pet.). The cause was reversed and remanded to the trial court to allow the court "to make a substantive decision on the 'matter of law' question presented by the parties' competing summary judgment motions." *Id.* at 208.

Following remand, the trial court considered Gulley's earlier-filed second motion for partial summary judgment and State Farm's earlier-filed motion to reconsider its cross-motion for summary judgment. On August 17, 2011, the trial court granted Gulley's motion and denied State Farm's. Sometime in November 2011, Gulley's attorney informed State Farm that Gulley no longer wanted an interlocutory appeal, but instead, wanted to go to trial. In December 2011, State Farm filed a "Motion to Enforce Rule 11 Agreement" based on Gulley's refusal to pursue an interlocutory appeal.

At the January 11, 2012 hearing on the motion to enforce, State Farm's attorney stated, "[i]t has been State Farm's position all along that this really was a matter of law issue and that it should have been decided by summary judgment, which is why we came back twice trying to get that done." Gulley argued that the reason the parties initially agreed to an interlocutory appeal was "neither one of us had a trial ruling on the basic question. Had we had one, we wouldn't need an interlocutory appeal because we would have been able to either settle it or try it based on a [trial] court ruling." Gulley also argued:

> ... We thought we could get the Court of Appeals to help us out. They would not do so. And so now we're back where we started at square one, except we do have a trial court ruling. There's no reason for an interlocutory appeal.

....

> The basic point is that the Rule 11 [agreement] requires that the Fourth Court have accepted that appeal. And we knew that they might not, because we had not found a case like this where the trial court had not ruled on a summary judgment motion.....

State Farm's attorney responded that Gulley's attorney was referring to the January 25, 2011 letter, but the purpose of the August 23, 2010 letter was that the parties agreed they would not go to trial. State Farm's attorney stated he was trying to enforce only the August 23, 2010 agreement, which "clearly says we're going to pass on the trial, and we're going to pursue the appeal." The trial court, from the bench, initially decided to overrule the motion to enforce, but after hearing additional **\*246** arguments, decided to take the matter under advisement. On January 12, 2012, the trial court granted the motion to enforce, and, on January 27, 2012, State Farm again appealed to this court.

On February 1, 2012, Gulley filed an "Objection on Jurisdictional Grounds to Defendant State Farm's Notice of Agreed Interlocutory Appeal." Gulley argued that because this court "rejected" and "did not accept" the first interlocutory appeal, the Rule 11 agreement was no longer binding on her.

## JURISDICTION OVER THIS APPEAL

We must determine whether the court has jurisdiction over this interlocutory appeal. Gulley asserts that although she agreed to an interlocutory appeal from the trial court's two orders *denying* both parties' motions for summary judgment, such agreement was conditioned on this court "accepting" that first appeal. Gulley contends this court did not "accept" the first interlocutory appeal and she has not agreed to a second interlocutory appeal of the trial court's August 17, 2011 order granting her motion and denying State Farm's motion. State Farm counters that the Rule 11 agreement does not restrict the interlocutory appeal to any specific order, and the agreement "manifests" the parties' intent to pursue an interlocutory appeal in order to have this court determine the "controlling question of law." State Farm urges this court to interpret and enforce the parties' agreement as it would any other Rule 11 agreement.

 **[1]** **[2]** Interlocutory orders not disposing of all parties are immediately appealable in only narrow situations permitted by statute. *State Fair of Tex. v. Iron Mountain Info. Mgmt., Inc.,* 299 S.W.3d 261, 262 (Tex.App.-Dallas 2009, no pet.); *see Gross v. Innes,* 988 S.W.2d 727, 729 (Tex.1998); *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 272 (Tex.1992). Statutes authorizing interlocutory appeals are strictly construed. *W. Dow Hamm III Corp. v. Millennium Income Fund, LLC,* 237 S.W.3d 745, 751 (Tex.App.-Houston [1st Dist.] 2007, no pet.). The version of the Texas Civil Practice and Remedies Code in effect in 2010 authorized an interlocutory appeal as follows:

(d) A district court, county court at law, or county court may issue a written order for interlocutory appeal in a civil action not otherwise appealable under this section if:

(1) the parties agree that the order involves a controlling question of law as to which there is a substantial ground for difference of opinion;

(2) an immediate appeal from the order may materially advance the ultimate termination of the litigation; and

(3) *the parties agree to the order.*

Former TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(d) (emphasis added). [1]

**[3]** **[4]** **[5]** **[6]** **[7]** **[8]** To determine whether Gulley agreed to this second interlocutory appeal, we must construe the parties' August 23, 2010 and January 25, 2011 agreements (collectively, "the Rule 11 agreement"). As with any other contract, our primary objective in construing a Rule 11 agreement is to ascertain and give effect to the intentions the parties have objectively manifested in the written instrument. *Trudy's Tex. Star, Inc. v. City of Austin,* 307 S.W.3d 894, 914 (Tex.App.-Austin 2010, no pet.). We interpret Rule 11 agreements based on the intention of the parties **\*247** from the language of the entire agreement in light of the surrounding circumstances, including the state of the pleadings, the allegations therein, and the attitude of the parties with respect to the issues. *Garza v. Villarreal,* 345 S.W.3d 473, 479 (Tex.App.-San Antonio 2011, pet. denied). Courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *Id.* We presume that the parties to a contract intend every clause to have some effect. *Ogden v. Dickinson State Bank,* 662 S.W.2d 330, 332 (Tex.1983). An agreement between parties will not be given greater effect than intended. *Austin v. Austin,* 603 S.W.2d 204, 207 (Tex.1980).

**[9]** The August 23, 2010 agreement stated as follows:

Pursuant to our conversation this morning, I am writing to confirm that we will not be trying this case *at this time.* If we receive notice from the court that we have been assigned, we agree to [1] pass on that assignment, [2] inform the court that we have decided at this time to pursue an interlocutory appeal under Section 51.014 ... and [3] request that we be given a new trial date within the next 90 days *in the event we are unable to secure an interlocutory appeal **for some reason.*** If you are in agreement, please indicate by signing below and returning this letter to me so that it can be filed as a Rule 11 Agreement with the Court. [Emphasis added.]

....

The January 25, 2011 agreement stated as follows:

I am writing to confirm the terms of our agreement regarding the contents of the order authorizing an interlocutory appeal.... It is my understanding that you will agree to sign our proposed order which involves only one controlling question of law....

In return, State Farm will agree that *in the event the Court of Appeals accepts this interlocutory appeal* [under section 51.014(d) ], State Farm will agree not to assert in any trial following the decision from the Court of Appeals its defenses based on the Actual Injury Rule or the Non–Fortuitous Loss argument. *If the Court of Appeals does not accept this interlocutory appeal,* State Farm will still be entitled to assert any and all defenses in any trial *following the rejection of the interlocutory appeal by the Court of Appeals.* [Emphasis added.]

....

At the time the parties reached their Rule 11 agreement, the trial court had denied both motions, and the parties sought recourse with this court by filing the first—agreed—interlocutory appeal in an attempt to obtain a ruling on the "controlling question of law." We believe the parties' intention as expressed in the agreement was that trial would be stayed and certain defenses would be foregone on the condition this court accepted the first interlocutory appeal. Both the August 23, 2010 and the January 25, 2011 agreement are silent as to any further actions the parties would take in the event this court did not "accept" the interlocutory appeal. There is nothing in the Rule 11 agreement that indicates the parties intended the agreement to apply to more than one interlocutory appeal. In fact, the language of the agreement unambiguously limits itself to "this [the first] interlocutory appeal."

 **\*248**  With this court having refused to "accept" the first appeal and the parties finally obtaining a ruling from the trial court, we conclude Gulley did not agree to a second interlocutory appeal. Therefore, the trial court erred when it granted State Farm's motion to enforce the Rule 11 agreements over Gulley's objection. Because Gulley did not agree to this interlocutory appeal, we do not have jurisdiction and must dismiss. For this reason, we do not reach the merits of the "controlling question of law" raised on appeal.

## All Citations

399 S.W.3d 242

## Footnotes

1    Amended by Acts 2011, 82nd Leg., R.S., ch. 203 (H.B. 274), § 3.01, effective Sept. 1, 2011. All further references are to section 51.014 effective when the parties signed the Rule 11 agreement.

977 S.W.2d 328
Supreme Court of Texas.

UNIROYAL GOODRICH TIRE COMPANY, Petitioner,
v.
Roberto O. MARTINEZ and Juanita Martinez, Individually and as next friend
s of Robert Martinez, Jr., and John Mathew Martinez, Minors, Respondents.

No. 95–1159. | Argued Oct. 2, 1996. | Decided
Oct. 15, 1998. | Rehearing Overruled Nov. 12, 1998.

Mechanic who was injured when 16–inch tire he was attempting to mount on 16.5–inch wheel exploded brought products liability action against tire manufacturer, alleging that tire was defectively designed due to its use of 0.037" gauge multi-strand weftless bead, rather than 0.050" single strand programmed bead. The 79th District Court, Brooks County, Benjamin Martinez, J., entered judgment on jury verdict which found that tire manufacturer was strictly liable based on defective design. Manufacturer appealed. The San Antonio Court of Appeals affirmed in relevant part, 928 S.W.2d 64. Manufacturer filed application for writ of error. On overruling of motion for rehearing, the Supreme Court, Phillips, C.J., held that: (1) manufacturer who knew of safer alternative product design may be strictly liable for injuries caused by use of its product that user could have avoided by following product's warnings; (2) tire was unreasonably dangerous; (3) evidence supported finding that 0.050" single strand programmed bead was safer, available alternative; (4) evidence that rim was defective did not bind jury; (5) manufacturer failed to conclusively prove that mechanic was contributorily negligent; (6) evidence of 34 other lawsuits brought against manufacturer was admissible; (7) evidence that after explosion, manufacturer redesigned its radial light truck tires was admissible; and (8) refusal to bifurcate liability and punitive damages phases of trial was harmless error.

Affirmed.

Hecht, J., filed a dissenting opinion, in which Enoch and Baker, JJ., joined, and in which Owen, J., joined in part.

West Headnotes (21)

**[1]    Appeal and Error** 👈 Total failure of proof

30   Appeal and Error
30XVI   Review

30XVI(I)  Questions of Fact, Verdicts, and Findings

30XVI(I)2  Verdicts

30k1001  Sufficiency of Evidence in Support

30k1001(3)  Total failure of proof

A no evidence point of error will be sustained when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact.

384 Cases that cite this headnote

**[2]    Products Liability** 🔑 Types of defects actionable

313A  Products Liability

313AII  Elements and Concepts

313Ak118  Nature of Product and Existence of Defect or Danger

313Ak122  Types of defects actionable
    (Formerly 313Ak11, 313Ak8)

A product may be unreasonably dangerous because of a defect in manufacturing, design, or marketing. Restatement (Second) of Torts § 402A.

9 Cases that cite this headnote

**[3]    Products Liability** 🔑 Risk-utility test

313A  Products Liability

313AII  Elements and Concepts

313Ak126  Design

313Ak129  Risk-utility test
    (Formerly 313Ak11)

To prove a design defect in a strict liability case, a claimant must establish, among other things, that the defendant could have provided a safer alternative design; however, the safer alternative design must be reasonable, i.e., capable of being implemented without destroying the utility of the product. Restatement (Second) of Torts § 402A.

22 Cases that cite this headnote

**[4]    Products Liability** 🔑 Risk-utility test

**Products Liability** 🔑 Warnings or Instructions

313A  Products Liability

313AII  Elements and Concepts

313Ak126  Design

313Ak129  Risk-utility test
    (Formerly 313Ak11)

313A   Products Liability
313AII   Elements and Concepts
313Ak132   Warnings or Instructions
313Ak133   In general
    (Formerly 313Ak11)

To determine whether a reasonable alternative design exists in a strict liability design defect case, and if so whether its omission renders the product unreasonably dangerous, the finder of fact may weigh various factors bearing on the risk and utility of the product; one of these factors is whether the product contains suitable warnings and instructions. Restatement (Second) of Torts § 402A.

12 Cases that cite this headnote

**[5]**   **Products Liability** Warnings or Instructions

313A   Products Liability
313AII   Elements and Concepts
313Ak132   Warnings or Instructions
313Ak133   In general
    (Formerly 313Ak14)

Texas courts shall not follow the now-superseded Comment j to Restatement (Second) of Torts § 402A, which provides that a product bearing a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous. Restatement (Second) of Torts § 402A comment; Restatement (Third) of Torts: Products Liability § 2 comment.

6 Cases that cite this headnote

**[6]**   **Products Liability** Alternative design, in general

**Products Liability** Warnings or Instructions

313A   Products Liability
313AII   Elements and Concepts
313Ak126   Design
313Ak128   Alternative design, in general
    (Formerly 313Ak11)
313A   Products Liability
313AII   Elements and Concepts
313Ak132   Warnings or Instructions
313Ak133   In general
    (Formerly 313Ak14)

Warnings and safer alternative designs are factors, among others, for the jury to consider in determining whether the product as designed is reasonably safe. Restatement (Third) of Torts: Products Liability § 2 comment.

5 Cases that cite this headnote

**[7]** **Products Liability** 🔑 Tires and wheels

**Products Liability** 🔑 Design defect

313A   Products Liability
313AIII   Particular Products
313Ak202   Automobiles
313Ak205   Tires and wheels
     (Formerly 313Ak83.5)
313A   Products Liability
313AIV   Actions
313AIV(C)   Evidence
313AIV(C)4   Weight and Sufficiency of Evidence
313Ak387   Design defect
     (Formerly 313Ak83.5)

Evidence supported jury's finding that 16–inch tire that exploded when plaintiff mechanic attempted to mount it on 16.5–inch wheel was unreasonably dangerous due to defective design, even though prominent warning label attached to tire warned against mounting it on 16.5–inch wheel; evidence showed that accident can occur despite warning label, that redesigned tire would have prevented accident, that manufacturer's competitors had incorporated safer design by early 1980s, and that manufacturer itself adopted this design in 1991, one year after manufacturing tire that injured mechanic. Restatement (Second) of Torts § 402A; Restatement (Third) of Torts: Products Liability § 2 comment.

4 Cases that cite this headnote

**[8]** **Products Liability** 🔑 Tires and wheels

**Products Liability** 🔑 Design defect

313A   Products Liability
313AIII   Particular Products
313Ak202   Automobiles
313Ak205   Tires and wheels
     (Formerly 313Ak83.5)
313A   Products Liability
313AIV   Actions
313AIV(C)   Evidence
313AIV(C)4   Weight and Sufficiency of Evidence
313Ak387   Design defect
     (Formerly 313Ak83.5)

Evidence in strict liability design defect case arising from explosion of 16–inch tire which plaintiff mechanic attempted to mount on 16.5–inch wheel supported finding that 0.050" single strand programmed bead was safer, available alternative to design used in tire in question, i.e., 0.037"gauge multi-strand weftless bead; it was undisputed that single strand

programmed bead was more resistant to breaking in mismatch situations, and, although manufacturer's agents offered some evidence that the single strand programmed bead would have introduced other dangers of equal or greater magnitude due to risk of "in service" blow-outs, neither agent could testify as to specific instance in which person was injured by "in service" explosion of 16" tire on 16.5" rim. Restatement (Second) of Torts § 402A; Restatement (Third) of Torts: Products Liability § 2 comment.

17 Cases that cite this headnote

**[9]    Products Liability** 👈 Tires and wheels

**Products Liability** 👈 Design defect

313A   Products Liability
313AIII   Particular Products
313Ak202   Automobiles
313Ak205   Tires and wheels
       (Formerly 313Ak88.5)
313A   Products Liability
313AIV   Actions
313AIV(D)   Questions of Law or Fact
313Ak406   Design defect
       (Formerly 313Ak88.5)

Undisputed expert testimony and lay opinion testimony that 16.5" tire rim was defective did not bind jury in mechanic's strict liability design defect action against manufacturer of 16" tire that exploded as he tried to mount it on rim in question; once feasible alternative design was shown, jurors could form their own opinions and determine whether rim as designed was unreasonably dangerous because its size was not clearly marked or because its design allowed mismatched tire to be placed on it. Restatement (Second) of Torts § 402A; Restatement (Third) of Torts: Products Liability § 2 comment.

8 Cases that cite this headnote

**[10]    Evidence** 👈 Testimony of Experts

157   Evidence
157XII   Opinion Evidence
157XII(F)   Effect of Opinion Evidence
157k569   Testimony of Experts
157k570   In general

The judgments and inferences of experts or skilled witnesses, even when uncontroverted, are not conclusive on the jury or trier of fact, unless the subject is one for experts or skilled witnesses alone, where the jury or court cannot properly be assumed to have or be able to form correct opinions of their own based upon evidence as a whole and aided by their own experience and knowledge of the subject of inquiry.

12 Cases that cite this headnote

**[11]** **Evidence** ⬦ Opinions of Witnesses in General

**Evidence** ⬦ Testimony of Experts

157 Evidence
157XII Opinion Evidence
157XII(F) Effect of Opinion Evidence
157k568 Opinions of Witnesses in General
157k568(1) In general
157 Evidence
157XII Opinion Evidence
157XII(F) Effect of Opinion Evidence
157k569 Testimony of Experts
157k570 In general

Where the subject matter is not solely for experts, uncontroverted opinion testimony is not conclusive, regardless of whether it comes from an expert or a lay witness.

9 Cases that cite this headnote

**[12]** **Products Liability** ⬦ Tires and wheels

**Products Liability** ⬦ Design defect

313A Products Liability
313AIII Particular Products
313Ak202 Automobiles
313Ak205 Tires and wheels
   (Formerly 313Ak88.5)
313A Products Liability
313AIV Actions
313AIV(D) Questions of Law or Fact
313Ak406 Design defect
   (Formerly 313Ak88.5)

Evidence that 16.5" tire rim could have been redesigned to prevent 16" tire from being mounted on it and that size was not prominently marked on rim, independent of opinion testimony, presented questions for jury on whether rim was defective and was producing cause of injuries to mechanic who brought strict liability design defect action against manufacturer of 16" tire that exploded as he tried to mount it on rim in question.

2 Cases that cite this headnote

**[13]** **Appeal and Error** ⬦ Sufficiency of Evidence in Support

30 Appeal and Error
30XVI Review
30XVI(I) Questions of Fact, Verdicts, and Findings

30XVI(I)2   Verdicts
30k1001   Sufficiency of Evidence in Support
30k1001(1)   In general

In reviewing a conclusive evidence point, the court must determine whether the proffered evidence as a whole rises to a level that reasonable people could not differ in their conclusions.

17 Cases that cite this headnote

**[14] Products Liability** 👈 Tires and wheels

**Products Liability** 👈 Contributory and comparative fault in general;  apportionment

313A   Products Liability
313AIII   Particular Products
313Ak202   Automobiles
313Ak205   Tires and wheels
    (Formerly 313Ak83.5)
313A   Products Liability
313AIV   Actions
313AIV(C)   Evidence
313AIV(C)4   Weight and Sufficiency of Evidence
313Ak394   Defenses and Mitigating Circumstances
313Ak396   Contributory and comparative fault in general;  apportionment
    (Formerly 313Ak83.5)

Defendant tire manufacturer failed to conclusively prove in strict liability design defect case that plaintiff mechanic was contributorily negligent for attempting to mount 16" tire on 16.5" rim, which resulted in tire's explosion; mechanic and his co-worker testified that, because they had removed 16" tires from rims on which they were working, they assumed that rims were also 16," evidence was conflicting as to whether mechanic could have used available tire-changing machine to secure tire, and there was no evidence that other safety devices referenced in tire warning were available to mechanic.

Cases that cite this headnote

**[15] Appeal and Error** 👈 Evidence in General

30   Appeal and Error
30XVI   Review
30XVI(J)   Harmless Error
30XVI(J)10   Admission of Evidence
30k1050   Prejudicial Effect in General
30k1050.1   Evidence in General
30k1050.1(1)   In general

To reverse a judgment based upon erroneously admitted evidence, the complaining party must show that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment or was such that it prevented the complaining party

from making a proper presentation of the case to the appellate court. Rules App.Proc., Rule 61.1.

4 Cases that cite this headnote

**[16]** **Evidence** 👉 Other injuries or accidents from same or similar causes

157 Evidence
157IV Admissibility in General
157IV(C) Similar Facts and Transactions
157k141 Other injuries or accidents from same or similar causes

Evidence of 34 other lawsuits brought against tire manufacturer arising from explosions of 16" tires on 16.5" rims was admissible in strict products liability action against manufacturer arising from such explosion, even though warning on tire in question included pictographic warnings, unlike tires involved in 33 of 34 prior lawsuits; earlier accidents resulted from mounting 16" tire with tape bead on 16.5" rim, and absence of pictographic warnings did not render those accidents so dissimilar as to preclude their admission, but merely went to weight of evidence. Restatement (Second) of Torts § 402A; Restatement (Third) of Torts: Products Liability § 2 comment.

6 Cases that cite this headnote

**[17]** **Evidence** 👉 Strict liability cases

157 Evidence
157VII Admissions
157VII(A) Nature, Form, and Incidents in General
157k219.10 Subsequent Remedial Measures
157k219.30 Strict liability cases

Because rule pertaining to evidence of subsequent remedial measures does not apply to strict products liability actions, it did not preclude mechanic who brought strict liability design defect action against tire manufacturer from introducing evidence that, after mechanic was injured in tire explosion, manufacturer redesigned its radial light truck tires to incorporate single strand programmed bead, despite manufacturer's claims that radial tires are fundamentally different from bias-ply tire that injured mechanic, and that bead change was not made in radial tires for safety reasons. Rules of Civ.Evid., Rule 407(a) (Repealed).

1 Cases that cite this headnote

**[18]** **Evidence** 👉 Strict liability cases

157 Evidence
157VII Admissions
157VII(A) Nature, Form, and Incidents in General

157k219.10 Subsequent Remedial Measures

157k219.30 Strict liability cases

(Formerly 313Ak81.5)

Mechanic who brought strict liability design defect action against tire manufacturer to recover for injuries he suffered in tire explosion that occurred when he attempted to mount 16" tire on 16.5" rim was entitled to introduce evidence that after explosion, manufacturer redesigned its radial light truck tires to incorporate single strand programmed bead, despite manufacturer's claim that jury could have improperly inferred that, because manufacturer incorporated single strand programmed bead into its radial tires, such redesign was feasible and necessary for bias-ply tire involved in this accident; there was independent evidence that single strand programmed bead was feasible for bias-ply tires well before tire in question was manufactured, and that programmed bead was safer. Restatement (Second) of Torts § 402A; Restatement (Third) of Torts: Products Liability § 2 comment.

1 Cases that cite this headnote

**[19] Evidence** Maps, plats, and diagrams

157 Evidence

157X Documentary Evidence

157X(C) Private Writings and Publications

157k358 Maps, plats, and diagrams

Charts and diagrams that summarize, or perhaps emphasize, testimony are admissible if the underlying information has been admitted into evidence, or is subsequently admitted into evidence.

4 Cases that cite this headnote

**[20] Evidence** Maps, plats, and diagrams

157 Evidence

157X Documentary Evidence

157X(C) Private Writings and Publications

157k358 Maps, plats, and diagrams

"Timeline" chart was admissible in evidence in mechanic's strict liability design defect action against tire manufacturer to recover for injuries he suffered in tire explosion that occurred when he attempted to mount 16" tire on 16.5" rim, despite manufacturer's claim that chart contained highly prejudicial hearsay evidence such as one line reading "numerous 16/16.5 mismatch explosions resulting in serious injury or death"; all evidence contained on chart was already in evidence, principally through testimony of mechanic's expert, and manufacturer did not object to its introduction.

1 Cases that cite this headnote

**[21]** **Appeal and Error** ⚷ Interlocutory Proceedings

**Trial** ⚷ Particular Issues, Separate Trial of

30 Appeal and Error
30XVI Review
30XVI(J) Harmless Error
30XVI(J)6 Interlocutory and Preliminary Proceedings
30k1043 Interlocutory Proceedings
30k1043(1) In general
388 Trial
388I Notice of Trial and Preliminary Proceedings
388k3 Separate Trials in Same Cause
388k3(5) Particular Issues, Separate Trial of
388k3(5.1) In general

Refusal to bifurcate liability and punitive damages phases of trial in strict liability design defect action against tire manufacturer arising from tire explosion was error, as manufacturer's motion therefor was timely; however, error was harmless, as no evidence of manufacturer's net worth was introduced, and, even though mechanic asked for $500,000 for each of 34 other tire explosion cases filed against manufacturer so as to send "message," other suits were properly in evidence on issue of liability.

2 Cases that cite this headnote

## Attorneys and Law Firms

**\*331** John B. Kyle, Jack Pew, Jr., Dena L. Mathis, Frank C. Vecella, Dallas, for Petitioner.

Steve T. Hastings, Corpus Christi, Todd W. White, Rockwall, Karen Kennedy, Corpus Christi, Revecca E. Hamilton, Rockwall, Guy H. Allison, Corpus Christi, for Respondents.

## Opinion

PHILLIPS, Chief Justice, delivered the opinion of the Court, in which GONZALEZ, SPECTOR, ABBOTT and HANKINSON, Justices, join.

Petitioner's motion for rehearing is overruled. We withdraw our opinion of July 3, 1998, and substitute the following opinion.

We must decide whether a manufacturer who knew of a safer alternative product design is liable in strict products liability for injuries caused by the use of its product that the user could have avoided by following the product's warnings. The court of appeals held that the mere fact that a product

bears an adequate warning does not conclusively establish that the product is not defective. 928 S.W.2d 64. Because we agree, we affirm the judgment of the court of appeals.

# I

Roberto Martinez, together with his wife and children, sued Uniroyal Goodrich Tire Company ("Goodrich"), The Budd Company, and Ford Motor Company for personal injuries Martinez suffered when he was struck **\*332** by an exploding 16" Goodrich tire that he was mounting on a 16.5" rim. Attached to the tire was a prominent warning label containing yellow and red highlights and a pictograph of a worker being thrown into the air by an exploding tire. The label stated conspicuously:

## D A N G E R

NEVER MOUNT A 16" SIZE DIAMETER TIRE ON A 16.5" RIM. Mounting a 16" tire on a 16.5" rim can cause severe injury or death. While it is possible to pass a 16" diameter tire over the lip or flange of a 16.5" size diameter rim, it cannot position itself against the rim flange. If an attempt is made to seat the bead by inflating the tire, the tire bead will break with explosive force.

•••

NEVER inflate a tire which is lying on the floor or other flat surface. Always use a tire mounting machine with a hold-down device or safety cage or bolt to vehicle axle.

NEVER inflate to seat beads without using an extension hose with gauge and clip-on chuck.

NEVER stand, lean or reach over the assembly during inflation.

•••

Failure to comply with these safety precautions can cause the bead to break and the assembly to burst with sufficient force to cause serious injury or death.

Unfortunately, Martinez ignored every one of these warnings. While leaning over the assembly, he attempted to mount a 16" tire on a 16.5" rim without a tire mounting machine, a safety cage, or an extension hose. Martinez explained, however, that because he had removed a 16" tire from the 16.5" rim, he believed that he was mounting the new 16" tire on a 16" rim. Moreover, the evidence revealed that Martinez's employer failed to make an operable tire-mounting machine

available to him at the time he was injured, and there was no evidence that the other safety devices mentioned in the warning were available.

In their suit, the Martinezes did not claim that the warnings were inadequate, but instead alleged that Goodrich, the manufacturer of the tire, Budd, the manufacturer of the rim, and Ford, the designer of the rim, were each negligent and strictly liable for designing and manufacturing a defective tire and rim. Budd and Ford settled with the Martinezes before trial, and the case proceeded solely against Goodrich.

At trial, the Martinezes claimed that the tire manufactured by Goodrich was defective because it failed to incorporate a safer alternative bead design that would have kept the tire from exploding. This defect, they asserted, was the producing cause of Martinez's injuries. Further, they alleged that Goodrich's failure to adopt this alternative bead design was negligence that proximately caused Martinez's injury.

The bead is the portion of the tire that holds the tire to the rim when inflated. A bead consists of rubber-encased steel wiring that encircles the tire a number of times. When the tire is placed inside the wheel rim and inflated, the bead is forced onto the bead-seating ledge of the rim and pressed against the lip of the rim, or the wheel flange. When the last portion of the bead is forced onto this ledge, the tire has "seated," and the air is properly sealed inside the tire. The bead holds the tire to the rim because the steel wire, unlike rubber, does not expand when the tire is inflating. The tire in this case was a 16" bias-ply light truck tire with a 0.037" gauge multi-strand weftless bead, or tape bead, manufactured in 1990. A tape bead consists of several strands of parallel unwoven steel wires circling the tire with each layer resting on top of the last, similar to tape wound on a roll. After a number of layers have been wound, the end of the bead is joined, or spliced, to the beginning of the same bead to form a continuous loop.

The Martinezes' expert, Alan Milner, a metallurgical engineer, testified that a tape bead is prone to break when the spliced portion of the bead is the last portion of the bead to seat. This is commonly called a **\*333** hang-up. Milner testified that an alternative bead design, a 0.050" gauge single strand programmed bead, would have prevented Martinez's injuries because its strength and uniformity make it more resistant to breaking during a hang-up. Milner explained that the 0.050" single strand programmed bead is stronger because it is 0.013" thicker and that it is uniform because it is wound, or programmed, by a computer, eliminating the spliced portion of the bead that can cause the tire to explode during a hang-up.

According to Milner, Firestone was the first to document that tape beads were prone to break during hang-ups in a 1955 patent application. This application, which was granted three years later, stated in part:

> It has developed that in tires of the type now in common use that the grommet of wire used becomes ruptured or broken too frequently at or near the end of the

wire splice when the tire bead is forced onto the rim bead seat during mounting of the tire. Applicant has discovered that such breaking of the bead wire occurs most frequently when the spliced portion of the bead wire grommet is located in the last portion of the tire bead to be seated on the rim, and they have noted that when an end of the said wire ribbon was disposed on the radial inner surface of the bead grommet that the break started at or adjacent to that point.

Milner testified that the design of the bead in the Goodrich tire in question was the same design criticized in the patent. Milner also testified, relying on an internal memorandum that was admitted into evidence, that in 1971 General Tire, one of Goodrich's competitors, knew its tape bead design was prone to break during hang-ups.

In 1966, 16.5" wheel rims were first introduced into the American market.[1] Milner testified that Uniroyal, Inc. and B.F. Goodrich Company, who in 1986 merged to form Goodrich, soon became aware that mismatching their 16" tires with the new wheel rims often caused hang-ups that resulted in broken beads. The minutes of a 1972 meeting of the Rubber Manufacturers Association ("RMA"), of which both Uniroyal, Inc. and B.F. Goodrich were members, provided:

Mounting of LT [light truck] tires. Attention was drawn to reports that there have been instances where 16" LT tires have been mounted on 16.5" rims and 14" tires on 14.5" rims. It was proposed and approved to request the Service Managers Committee to add a cautionary statement to RMA documents.

Similarly, the minutes from a 1972 meeting of the Tire and Rim Association, of which Uniroyal, Inc. and B.F. Goodrich were both members, provided:

It was reported that there have been incidents where 14" and 16" tires have been mounted on 14.5" and 16.5" rims that have resulted in broken beads. The Rim Subcommittee of the Technical Advisory Committee was requested to consider some method of marking 15" Drop Center rims and wheels to avoid this practice.

Finally, Milner testified that B.F. Goodrich's own testing department was aware by at least 1976 that a 16" tire mounted on a 16.5" rim would explode during a hang-up. A B.F. Goodrich "test request" of that year was entered into evidence indicating that a 16" tire would explode when mounted on a 16.5" rim at 73 psi (pounds of pressure per square inch). The test request further indicated that "inspection revealed break was at [illegible] ends of bottom layer of [bead] wires as anticipated." The stated "Object of Test" was: "To develop demonstrative evidence & data for use in lawsuits involving broken beads."

Milner explained that the computer technology required to manufacture the programmed bead was developed in 1972 and widely available by 1975. Milner testified that Goodyear began using

a 0.051" gauge single strand programmed bead in its radial light truck tires in 1977, and that Yokohama began using a single strand programmed bead in its radial light truck tires in 1981. Milner also testified that General Tire began **\*334** using a single strand programmed bead in its bias-ply light truck tires in 1982. Finally, Milner testified that Goodrich itself began using the single strand programmed bead in its 16" radial light truck tires in 1991. [2] Based upon this evidence and his expert opinion, Milner testified that the tire manufactured by Goodrich with a tape bead was defective and unreasonably dangerous. Because Goodrich had also been sued in thirty-four other lawsuits alleging accidents caused by mismatching Goodrich tires, Milner asserted that Goodrich was grossly negligent in failing to adopt the 0.050" single strand programmed bead in it bias-ply 16" light truck tires.

Milner also testified that the rim designed by Ford and manufactured by Budd was defective because its size was not clearly marked on it and because it could have been redesigned to prevent a 16" tire from passing over its flange.

The jury found that Goodrich's conduct was the sole proximate cause of Martinez's injuries and that Goodrich was grossly negligent. Furthermore, the jury found that the tire manufactured by Goodrich was defective, while the wheel rim designed by Ford and manufactured by Budd was not defective. The jury allocated 100% of the producing cause of Martinez's injuries to the acts and omissions of Goodrich.

The jury awarded the Martinezes $5.5 million in actual damages and $11.5 million in punitive damages. After reducing the award of actual damages by $1.4 million pursuant to a settlement agreement between the Martinezes, Ford, and Budd, reducing the punitive damages to the amount of actual damages pursuant to a pretrial agreement between Goodrich and the Martinezes, and awarding prejudgment interest, the trial court rendered judgment for the Martinezes for $10,308,792.45.

The court of appeals affirmed the award of actual damages, holding that there was legally sufficient evidence to support the finding of a design defect based upon its examination of the following factors: (1) the availability of safer design alternatives; (2) similar accidents involving the same product; (3) subsequent changes or modifications in design; (4) out-of-court experiments indicating Goodrich's knowledge of a design defect; and (5) expert testimony claiming a design defect. 928 S.W.2d at 70. The court rejected Goodrich's argument that Martinez's failure to heed the product's warnings was a complete defense to the product defect claim. However, the court of appeals reversed and rendered the award of punitive damages, holding that there was no evidence to support the jury's finding of gross negligence.

Only Goodrich applied to this Court for writ of error. As in the court of appeals, Goodrich's principal argument here is that no evidence supports the jury finding that the tire was defective

because "the tire bore a warning which was unambiguous and conspicuously visible (and not claimed to be inadequate); the tire was safe for use if the warning was followed; and the cause of the accident was mounting and inflating a tire in direct contravention of those warnings."

 **[1]**   We will sustain a no evidence point of error when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *See Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990) (citing Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361, 362–363 (1960)).

## II

### A

 **[2]**   **[3]**   This Court has adopted the products liability standard set forth in section 402A of the Restatement (Second) of Torts. *See Firestone Steel Prods. Co. v. Barajas,* 927 S.W.2d 608, 613 (Tex.1996); *McKisson v. Sales Affiliates, Inc.,* 416 S.W.2d 787, 788–89 (Tex.1967). Section 402A states:

 **\*335** (1) one who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

RESTATEMENT (SECOND) OF TORTS § 402A (1965). A product may be unreasonably dangerous because of a defect in manufacturing, design, or marketing. *See Caterpillar, Inc. v. Shears,* 911 S.W.2d 379, 382 (Tex.1995); *Technical Chem. Co. v. Jacobs,* 480 S.W.2d 602, 604–05 (Tex.1972). To prove a design defect, a claimant must establish, among other things, that the defendant could have provided a safer alternative design. *See Caterpillar,* 911 S.W.2d at 384 ("[I]f there are no safer alternatives, a product is not unreasonably dangerous as a matter of law."). Implicit in this holding is that the safer alternative design must be reasonable, *i.e.,* that it can be implemented without destroying the utility of the product. *See id.* (" 'Texas law does not require

a manufacturer to destroy the utility of his product in order to make it safe.' ") (quoting *Hagans v. Oliver Mach. Co.,* 576 F.2d 97, 101 (5th Cir.1978)). [3]

**[4]** The newly released Restatement (Third) of Torts: Products Liability carries forward this focus on reasonable alternative design. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITYYYYYYYYYYYYYYYYYYY § 2(b). Section 2(b) provides:

> A product ... is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe.

To determine whether a reasonable alternative design exists, and if so whether its omission renders the product unreasonably dangerous (or in the words of the new Restatement, not reasonably safe), the finder of fact may weigh various factors bearing on the risk and utility of the product. *See Caterpillar,* 911 S.W.2d at 383–84*; Turner v. General Motors Corp.,* 584 S.W.2d 844, 848 (Tex.1979). [4] One of these factors is whether the product contains suitable warnings and instructions. *See Turner,* 584 S.W.2d at 847. The new Restatement likewise carries forward this approach:

> A broad range of factors may be considered in determining whether an alternative design is reasonable and whether its omission renders a product not reasonably safe. The factors include, among others, the magnitude and probability of the foreseeable risks of harm, *the instructions and warnings accompanying the product,* and the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing.... The relative advantages and disadvantages of the product as designed and as it alternatively could have been designed may also be considered. Thus, the likely effects of the alternative design on production costs; the effects of the alternative design on product longevity, maintenance, repair, and esthetics; and the range of consumer choice among products are factors that may be taken into account....
> RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. f (emphasis added).

**[5]** Goodrich urges this Court to depart from this standard by following certain language from Comment j of the Restatement (Second) of Torts. Comment j provides in part:

> **\*336** Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.

RESTATEMENT (SECOND) OF TORTS § 402A cmt. j (1965). The new Restatement, however, expressly rejects the Comment j approach:

> Reasonable designs and instructions or warnings both play important roles in the production and distribution of reasonably safe products. In general, when a safer design can reasonably be implemented and risks can reasonably be designed out of a product, adoption of the safer design is required over a warning that leaves a significant residuum of such risks. For example, instructions and warnings may be ineffective because users of the product may not be adequately reached, may be likely to be inattentive, or may be insufficiently motivated to follow the instructions or heed the warnings. However, when an alternative design to avoid risks cannot reasonably be implemented, adequate instructions and warnings will normally be sufficient to render the product reasonably safe. *Compare* Comment *e. Warnings are not, however, a substitute for the provision of a reasonably safe design.*

RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. *l* (emphasis added). The Reporters' Notes in the new Restatement refer to Comment j as "unfortunate language" that "has elicited heavy criticism from a host of commentators." RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2, Reporters' Note, cmt. *l* (citing Latin, *Good Warnings, Bad Products, and Cognitive Limitations,* 41 U.C.L.A. L.REV. 1193 (1994) (utilizing the work of cognitive theorists to demonstrate that warnings should only be used as a supplement to a design that already embodies reasonable safety and not as a substitute for it); Twerski, *et al., The Use and Abuse of Warnings in Products Liability: Design Defect Comes of Age,* 61 CORNELL L.REV. 495, 506 (1976)). Similarly, this Court has indicated that the fact that a danger is open and obvious (and thus need not be warned against) does not preclude a finding of product defect when a safer, reasonable alternative design exists. *See Caterpillar,* 911 S.W.2d at 383. ("A number of courts are of the view that obvious risks are not design defects which must be remedied. (citations omitted). However, our Court has held that liability for a design defect may attach even if the defect is apparent.").

The drafters of the new Restatement provide the following illustration for why courts have overwhelmingly rejected Comment j:

> Jeremy's foot was severed when caught between the blade and compaction chamber of a garbage truck on which he was working. The injury occurred when he lost his balance while jumping on the back step of the garbage truck as it was moving from one stop to the next. The garbage truck, manufactured by XYZ Motor Co., has a warning in large red letters on both the left and right rear panels that reads "DANGER—DO NOT INSERT ANY OBJECT WHILE COMPACTION CHAMBER IS WORKING—KEEP HANDS AND FEET AWAY." The fact that adequate

warning was given does not preclude Jeremy from seeking to establish a design defect under Subsection (b). The possibility that an employee might lose his balance and thus encounter the shear point was a risk that a warning could not eliminate and that might require a safety guard. Whether a design defect can be established is governed by Subsection (b).

RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. *l*, illus. 14.[5] In fact, Goodrich recognized at trial that warnings are an imperfect means to remedy a product defect. In response to a question posed by the Martinezes' attorney, Goodrich engineer Stanley Lew answered:

Q: Is that why designs of a product are more important than warnings on a product because people may not see warnings but they are always going to encounter the design?

A: Yes, that's correct. It's the products they deal with.

**\*337** For these reasons we refuse to adopt the approach of Comment j of the superseded Restatement (Second) of Torts section 402A.

## B

 **[6]** We do not hold, as the dissenting justices claim, that "a product is defective whenever it could be more safely designed without substantially impairing its utility," *post* at 344, or that "warnings are irrelevant in determining whether a product is reasonably safe." *Post* at 345. Rather, as we have explained, we agree with the new Restatement that warnings and safer alternative designs are factors, among others, for the jury to consider in determining whether the product as designed is reasonably safe. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. f. While the dissenting justices say that they also agree with the Restatement's approach, they would, at least in this case, remove the balancing process from the jury. Instead, they would hold that Goodrich's warning rendered the tape bead design reasonably safe as a matter of law.

 **[7]** The dissenting justices first argue that Goodrich's warning was clear and that it could have been followed, and consequently Martinez was injured only by "[i]gnoring ... his own good sense." *Post* at 343. Even if this were true,[6] it is precisely because "it is not at all unusual for a person to fail to follow basic warnings and instructions," *General Motors Corp. v. Saenz,* 873 S.W.2d 353, 358 (Tex.1993), that we have rejected the superseded Comment j. The dissent also notes that there have been few reported mismatch accidents involving tires with this particular warning label. While this is certainly relevant, and perhaps would persuade many juries, we cannot say that it conclusively establishes that the tire is reasonably safe when weighed against the other evidence. The jury heard firsthand how an accident can occur despite the warning label, and how a redesigned

tire would have prevented that accident. The jury also heard evidence that Goodrich's competitors had incorporated the single strand programmed bead by the early 1980s, and that Goodrich itself adopted this design in 1991, a year after manufacturing the tire that injured Martinez. Under these circumstances, there is at least some evidence supporting the jury's finding of product defect.

# III

 **[8]**   Goodrich argues that even if its Comment j argument does not prevail, it is still entitled to judgment as a matter of law because no safer alternative was available. In response, the Martinezes point to the evidence that Goodrich's competitors, and eventually Goodrich itself, adopted the safer 0.050" single strand programmed bead. Goodrich counters that this alternative design is not in fact safer because if the tire is matched to the wrong size rim the bead will never seat on the rim and it will inevitably explode during use.

We agree with the general proposition that a manufacturer should not be liable for failing to adopt an alternative design that would, under other circumstances, impose an equal or greater risk of harm. To prevail in a design defect case, a plaintiff should be required to show that the safety benefits from its proposed design are foreseeably greater than the resulting costs, including any diminished usefulness or diminished safety. *See* Owen, *Toward a Proper Test for Design Defectiveness: "Micro–Balancing" Costs and Benefits,* 75 TEX. L. REV. 1661, 1690 (1997). As the new Restatement explains:

> When evaluating the reasonableness of a design alternative, the overall safety of the product must be considered. It is not sufficient that the alternative design would have reduced or prevented the harm suffered by the plaintiff if it would also have introduced into the product other dangers of equal or greater magnitude.

RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. f.

The Martinezes, however, offered some evidence that their alternative design not only would have prevented the injury to Martinez, but also that it would not have introduced **\*338** other dangers of equal or greater magnitude. It is undisputed that the single strand programmed bead is more resistant to breaking in mismatch situations. Goodrich expert Tom Conner testified that in a mismatch situation the tape bead may break at 60 psi, while a single strand bead will not break until at least 130 psi. Conner also testified that he has never heard of a single strand bead breaking during the inflating of a mismatched tire. Goodrich representative Stanley Lew testified that the single strand bead is more resistant in a mismatch situation. Lew also testified that if the

tire inflated by Martinez had a single strand bead it would not have exploded. Both Conner and Lew testified that they would prefer a tire inflated by their loved one to have a single strand bead.

It is true that Goodrich also offered some evidence that the single strand programmed bead would have introduced other dangers of equal or greater magnitude because of the risk of "in service" blow-outs. Lew testified that even if a 16" tire was successfully mounted on a 16.5" rim, the tire will fail when used on the road. Conner, a forensic scientist, also stated that both laboratory and road testing revealed that if a 16" tire was mounted on a 16.5" rim the tire will blow out when driven on the road. However, Conner testified that in his 25 years of experience in the tire industry he has never heard of a "single person in the world" that has been hurt by a 16" tire on a 16.5" rim "out in service." Lew testified on direct examination:

> Q: Have you personally seen any examples of where the Goodyear programmed single strand bead used in some but not all of its tires failed in service on the wrong sized wheel?
>
> A: No; I haven't seen any.

Lew further testified:

> Q: Tell me one person's name from any tire you have ever seen where it's failed in service when a 16's mounted on a 16.5.
>
> A: Fine and I told you at my deposition that no; I don't know a single name.
>
> Q: All right. Tell me one single name of a persons [sic] that's been injured in a mismatch explosion of a single strand bead?
>
> A: Again, I don't know of any.

This evidence does not conclusively prove that the programmed bead would have introduced into the product other dangers of equal or greater magnitude. There was thus a fact issue regarding whether a reasonable alternative design existed, which the jury resolved in favor of the Martinezes.

## IV

 **[9]**   Goodrich next asserts that the evidence conclusively establishes that the tire rim designed by Ford Motor Company and manufactured by the Budd Company was defective and that such defect contributed to Martinez's injuries, so that the court of appeals erred in affirming the trial court's judgment based on the jury's answers that the rim was not defective and did not contribute to the injury. Goodrich points to Milner's undisputed testimony that the rim was defective because it could have been redesigned to prevent a 16" tire from passing over its flange.

**[10]**   The general rule is that opinion testimony, even when uncontroverted, does not bind the jury unless the subject matter is one for experts alone:

> [T]he judgments and inferences of experts or skilled witnesses, even when uncontroverted, are not conclusive on the jury or trier of fact, unless the subject is one for experts or skilled witnesses alone, where the jury or court cannot properly be assumed to have or be able to form correct opinions of their own based upon evidence as a whole and aided by their own experience and knowledge of the subject of inquiry.

*McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986) (citing *Coxson v. Atlanta Life Ins. Co.,* 142 Tex. 544, 179 S.W.2d 943, 945 (1944)). *See also* TEX.R. CIV. P. 166a(c) (uncontroverted expert testimony may establish right to summary judgment only "as to subject matter concerning which the trier of fact must be guided by the opinion testimony of experts"). Goodrich argues that this subject **\*339** matter is for experts alone because the jury could not have determined, without the benefit of expert testimony, that a safer, feasible, alternative design existed.

We agree that expert testimony was probably necessary to show the feasibility of the alternative rim design which would have prevented a mismatched tire from passing over the rim flange. Once a feasible alternative design was shown, however, the question remained whether the rim as designed was unreasonably dangerous. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2(b) (product is defective in design when risks could have been reduced by adoption of reasonable alternative design *and* omission of the alternative design renders the product not reasonably safe). We conclude that the jury could properly determine whether the rim as designed was unreasonably dangerous, and that it was not required to follow expert testimony on this issue. Milner's expert testimony thus does not conclusively establish that the rim was defective. *Cf. McGalliard,* 722 S.W.2d at 697 (house repairs); *Broussard v. Moon,* 431 S.W.2d 534, 537 (Tex.1968) (dishwasher repairs); *Coxson,* 179 S.W.2d at 945 (sound health of insured at time policy was issued).

**[11]**   The dissent argues that, even if the jury was not required to accept the *expert* testimony of rim defect, it was required to accept the lay opinion of Martinez and Martinez's co-worker on this issue. Of course, the fact that the dissent places such weight on this lay testimony supports our conclusion that the subject matter is not solely for experts. Moreover, where the subject matter is not solely for experts, uncontroverted opinion testimony is not conclusive, regardless of whether it comes from an expert or a lay witness. The rule of *McGalliard* quoted above—that expert testimony is generally not conclusive——follows not because the testimony is from an expert, but because it is *opinion* testimony. Unless the subject matter is solely for experts, jurors are capable of forming their own opinions from the record as a whole. *See Coxson,* 179 S.W.2d at 945 (expert testimony is conclusive only where jurors "cannot properly be assumed to have, or be able to form, correct

opinions of their own based upon the evidence as a whole and aided by their own experience and knowledge of the subject of inquiry"). Thus, the jury was entitled to reject the opinion testimony that the rim was defective, regardless of whether it was from an expert, Martinez, or Martinez's co-worker.

 [12]  The dissent also argues that, even without any opinion testimony, the record conclusively establishes that the rim was defective. Milner testified that the rim could have been redesigned to prevent a 16" tire from being mounted on it, possibly by filling the wheel well so that it was not as deep. However, while this is some evidence of a feasible alternative design, it is not conclusive evidence of an unreasonably dangerous product, given the factors that a jury must balance under the Restatement. See RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. f. For example, there was no evidence of whether the alternative design would affect production costs, the rim's road characteristics, or the relative ease of mounting and dismounting the *correct* size tire.

The dissent also argues that the rim is defective as a matter of law because its size was not prominently marked on it. Milner and Conner both testified that the rim's size should be displayed close to the valve stem to reduce the risk of an accidental mismatch. Milner further testified that the size should also be displayed in the wheel well, as some other manufacturers had done. Milner pointed out, however, that "this wheel's probably been cleaned since [the accident] so that the existence of [a size marking] wouldn't necessarily mean that [Martinez] would see it." Indeed, Martinez's co-worker testified that at the time of the accident the wheel was so covered with caliche that "it looked white." Based on this evidence, the jury could have concluded that a size marking near the valve stem would have been obscured, and would not have been seen by Martinez. Similarly, the jury was entitled to conclude that Martinez would not have seen a size marking or warning in the well of the wheel while he was in the process of mounting a tire on the wheel. Thus, even if the dissent were correct that the rim was defective as a matter of law because its size was not clearly marked,  **\*340**  the evidence does not conclusively establish that any such defect was a producing cause of Martinez's injury. Because the issues of rim defect and producing causation were both submitted to the jury in one broad-form question, the jury's negative answer to that question is not contrary to the conclusive evidence.

## V

Goodrich also argues that the evidence conclusively establishes that Martinez was negligent and that he contributed to his own injuries. Specifically, Goodrich argues that unless some defect in the warning hinders a plaintiff's ability to see and heed it, the failure to see and heed a warning is conclusive proof of contributory negligence.

**[13]** **[14]** In reviewing a conclusive evidence point, we must determine whether the proffered evidence as a whole rises to a level that reasonable people could not differ in their conclusions. *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994); Powers & Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEX. L.REV. 515, 523 (1991) ( "Ultimately, the test for 'conclusive evidence' ... is similar to the test for 'no evidence' ...; the court asks whether reasonable minds could differ about the fact determination to be made by the jury."). The jury was asked to decide whether Martinez was negligent, that is, whether he failed to exercise ordinary prudence. Both Martinez and his co-worker Ramundo Regalado testified that, because they had removed 16" tires from the rims on which they were working, they assumed that the rims were also 16". Also, although there was a tire-changing machine on the premises, the evidence was conflicting as to whether Martinez could have used it to secure the tire. Rene Vera, Martinez and Regalado's employer, testified that the tire-changing machine, although inoperable for dismounting tires, could have nonetheless been used to secure the tire during inflation. Regalado testified, however, that the tire-changing machine did not work, despite his repeated requests to the safety foreman to have it repaired, and that had it worked he and Martinez would have been using it on the day of the accident to secure the tire. Thus, Goodrich failed to conclusively prove that Martinez was negligent in failing to use the machine. There is no evidence that the other safety devices referenced in the tire warning—a safety cage or an extension hose— were available to Martinez. Further, Goodrich offered no evidence as to whether it was practical or feasible under the circumstances for Martinez to bolt the rim to a vehicle axle in order to inflate the tire and seat the bead. Both Martinez and Regalado testified that the manner in which Martinez was inflating the tire was customary in their shop. Based upon this evidence, we cannot conclude that reasonable people could not differ about whether Martinez failed to exercise ordinary prudence under the circumstances.

Because we conclude that Goodrich did not conclusively establish that Martinez was negligent, we do not address Goodrich's argument that there is no evidence to support the jury's allocation of causation.

## VI

**[15]** Goodrich next argues that even if it is not entitled to a rendition of judgment, it is entitled to a new trial because of three reversible evidentiary rulings. These rulings were: (1) the admission of evidence of thirty-four other lawsuits against Goodrich involving mismatched tires; (2) the admission of evidence that Goodrich had subsequently redesigned its radial light truck tires to incorporate the single strand programmed bead; and (3) the admission of a "time line" used by the Martinezes' expert. To reverse a judgment based upon erroneously admitted evidence, the complaining party must show that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment or was such that it prevented the complaining party from

making a proper presentation of the case to the appellate court. *See Texas Dep't of Human Servs. v. White,* 817 S.W.2d 62, 63 (Tex.1991); *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989); TEX.R.APP. P. 61.1.

 **[16]**    First, as to the other lawsuits, Goodrich asserts that thirty-three of these thirty-four lawsuits involved tires without pictographic warnings. Therefore, they were not **\*341** substantially similar and were admitted without proper predicate. Evidence of earlier accidents that occurred under reasonably similar but not necessarily identical circumstances is admissible. *Missouri–Kansas– Texas R. Co. v. May,* 600 S.W.2d 755, 756 (Tex.1980); *Missouri Pac. R.R. v. Cooper,* 563 S.W.2d 233, 236 (Tex.1978); *see also Jackson v. Firestone Tire & Rubber Co.,* 788 F.2d 1070 (5th Cir.1986) (applying Texas law). Like this case, the earlier accidents resulted from mounting a 16" Goodrich tire with a tape bead on a 16.5" rim. The absence of pictographic warnings on the tires does not render the accidents so dissimilar as to preclude their admission, but merely goes to the weight of the evidence. The trial court did not commit error by admitting evidence of the thirty-four earlier accidents caused by mismatching Goodrich tires. [7]

 **[17]**    Goodrich next complains that the trial court erred by admitting evidence that Goodrich subsequently redesigned its radial light truck tires to incorporate the single strand programmed bead, because radial tires are fundamentally different from the bias-ply tire that injured Martinez, and the bead change was not made in the radial tires for safety reasons. Goodrich first argues that, under these circumstances, the evidence regarding radial tires violates Texas Rule of Civil Evidence 407(a).

Rule 407(a) states:

> Subsequent Remedial Measures. When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent remedial measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent remedial measures when offered for another purpose, such as proving ownership, control or feasibility of precautionary measures, if controverted, or impeachment. *Nothing in this rule shall preclude admissibility in products liability cases based on strict liability.*

TEX.R. CIV. EVID. 407(a) (emphasis added). Goodrich argues that this rule only permits the admission of subsequent remedial measures involving the product at issue, and that such measures must have been made for safety reasons. However, the rule does not contain these limitations. Rather, under the express language emphasized above, Rule 407(a) simply does not apply in products liability cases based on strict liability. Thus, the trial court did not violate Rule 407(a). [8]

**[18]** Goodrich further argues that, because of the differences between radial tires and bias-ply tires, the evidence regarding the redesign of its radial tires is not relevant to the issue of design defect in its bias-ply tires. Goodrich appears to argue that it was harmed by this evidence because the jury could have improperly inferred that, because Goodrich incorporated the single strand programmed bead into its radial tires, such redesign was feasible and necessary for the bias-ply tire involved in this accident. However, there was independent evidence that the single strand programmed bead *was* feasible for bias-ply tires as early as 1982, when General Tire adopted that design, and that the programmed bead was safer. Under these circumstances, the trial court did not commit reversible error by admitting **\*342** evidence of Goodrich's redesign of its radial tires.

Raising similar arguments, Goodrich also contends that the trial court erred by admitting evidence of Goodrich's redesign of its "space saver" spare tires. For the reasons discussed above regarding the radial tires, the trial court did not commit reversible error by admitting this evidence.

Goodrich's final evidentiary complaint is that the trial court committed reversible error by admitting a "time line" chart prepared by the Martinezes' expert and used by him during trial. Specifically, Goodrich complains that the time line contained a self-serving compilation of hearsay evidence both irrelevant to the issues in this lawsuit and unfairly prejudicial to Goodrich.

**[19]** **[20]** Charts and diagrams that summarize, or perhaps emphasize, testimony are admissible if the underlying information has been admitted into evidence, or is subsequently admitted into evidence. *See Speier v. Webster College,* 616 S.W.2d 617, 618–19 (Tex.1981); *Cooper Petroleum Co. v. LaGloria Oil & Gas Co.,* 436 S.W.2d 889, 891 (Tex.1969); *Champlin Oil & Ref. Co. v. Chastain,* 403 S.W.2d 376, 389 (Tex.1965). In this case, Goodrich complains that the chart contained highly prejudicial hearsay evidence such as one line reading "numerous 16/16.5 mismatch explosions resulting in serious injury or death." However, all the evidence contained on the chart was already in evidence, principally through Milner's testimony, and Goodrich did not object to its introduction. The trial court did not err by admitting the time line.

## VII

**[21]** Finally, Goodrich complains that the trial court committed reversible error by not bifurcating the liability and punitive damages phases of the trial as required by this Court's subsequent decision in *Transportation Insurance Co. v. Moriel,* 879 S.W.2d 10 (Tex.1994). The Martinezes argue that consideration of this point is unnecessary because the court of appeals reversed and rendered the jury's punitive damage award, holding there was no evidence to support the verdict on those damages. However, in *Moriel* we instructed trial courts to bifurcate the liability and punitive damages phases of the trial because certain evidence admissible solely for the purpose of proving punitive damages "has a very real potential for prejudicing the jury's determination of other

disputed issues in a tort case." *Id.* at 30. Thus, we must determine whether the trial court erred in refusing to bifurcate the punitive damages phase of the trial, and if so, whether the error was harmful.

In *Moriel* we held that "a trial court, if presented with a timely motion, should bifurcate the determination of the amount of punitive damages from the remaining issues." *Id.* at 30. We stated further that bifurcation applies "to all punitive damages cases tried in the future." *Id.* at 26. Shortly thereafter, in *Ellis County State Bank v. Keever,* 888 S.W.2d 790 (Tex.1994), we applied *Moriel* retroactively. In *Keever,* we stated that "[a]lthough *Moriel* was decided after the court of appeals' decision in this case, its holding should be applied to a pending case in which a party has preserved the complaint that the court of appeals failed to properly scrutinize a punitive damage award." *Id.* at 799. Since Goodrich presented the trial court with a timely motion, the trial court, consistent with our ruling in *Keever,* should have bifurcated the determination of the amount of punitive damages from the remaining issues.

Having determined that the trial court erred in refusing to bifurcate the trial, we must determine whether the trial court's error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *See* TEX.R.APP. P. 61.1 The rationale given for bifurcation in *Moriel* was that "evidence of a defendant's net worth, which is generally relevant only to the *amount* of punitive damages, by highlighting the relative wealth of a defendant, has a very real potential for prejudicing the jury's determination of other disputed issues in a tort case." *Moriel,* 879 S.W.2d at 30. Here, the jury was not presented with any evidence of Goodrich's net worth. While we do not hold that net worth evidence is the only prejudice that may result from trying actual and punitive **\*343** damage claims together, there is no prejudice in this case requiring a reversal of the judgment. Goodrich argues that the Martinezes were free to indulge in inflammatory argument for a high punitive damage award that would not have been permitted in the liability phase had bifurcation been granted. Specifically, Goodrich argues that it was severely prejudiced by the Martinezes' plea for $500,000 for each of the thirty-four other lawsuits filed against Goodrich so as to send a "message back to Akron." Because the other suits were properly in evidence on the issue of liability, however, we conclude that this jury argument was not so prejudicial to the actual damages claim as to require a reversal.

\* \* \*

Because we conclude that there is some evidence to support the judgment of the court below on the theory of products liability, we need not consider Goodrich's claim that there is no evidence as to negligence. For the foregoing reasons, we affirm the judgment of the court of appeals.

HECHT, J., files a dissenting opinion, in which ENOCH and BAKER, JJ., join, and in which OWEN, J., joins in all but Part II.

HECHT, Justice, joined by ENOCH and BAKER, Justices, and by OWEN, Justice, in all but Part II, dissenting.

The Court's revision of its opinion on rehearing requires a responsive revision in this dissent. The dissenting opinion issued July 3, 1998 is accordingly withdrawn, and this opinion substituted.

Having changed about a thousand tires in his life, Roberto Martinez admits he knew better than to lean over a tire while inflating it. Besides, he had seen the pictographic warning on the very tire he was changing which showed a worker being hurt by an exploding tire and warned: "NEVER stand, lean or reach over the assembly during inflation." Ignoring this warning and his own good sense, Martinez was leaning over the tire, inflating it, when it exploded in his face.

The 16" tire exploded because it would not fit the 16.5" wheel on which Martinez was trying to mount it. Martinez knew it was very dangerous to try to mount a 16" tire on a 16.5" wheel, and he would never knowingly have tried to do it, but the size of the wheel was not marked where he could find it. He understood that his co-worker had taken a 16" tire off the wheel, and he was simply trying to put the same size tire back on. The Budd Company, which manufactured the wheel to Ford Motor Company's specifications, knew, as did Ford, that people sometimes try to mount 16" tires on 16.5" wheels, not realizing that tire and wheel are mismatched. To minimize the risk of such mistakes, Budd and Ford could have changed the design of the wheel to prevent mounting mismatched tires, but they did not do so. Budd could also have simply stamped the size in plain view on the outboard side of the wheel near the valve stem where it was almost sure to be seen, but it did not do that, either. Instead it encoded the size in small letters on the inboard side, where it was hard to find if the wheel was clean, and indecipherable if the wheel was dirty, as it was in this case.

Although a 16.5" wheel can be designed so that a 16" tire cannot be mounted on it, a 16" tire cannot be designed so that it cannot be mounted on a 16.5" wheel. A tire manufacturer's only options to reduce the risk of injury from attempting to mount a 16" tire on a 16.5" wheel are to place a warning on the tire or to design the bead wire so that it will withstand higher inflation pressure before exploding. The Uniroyal Goodrich Tire Company, which made the tire Martinez was using, chose to put a prominent, pictographic label on it, which, as I have said, Martinez actually saw but did not heed. Had he done so, he would not have been injured. In fact, according to the record, only one other person has ever claimed to have been injured attempting to mount a 16" tire with a warning label like Goodrich's on a 16.5" wheel, although thousands of labeled tires and more than thirty million 16.5" wheels have been manufactured in the past two decades.

Now as among Martinez, the wheel manufacturers, and Goodrich, how should responsibility **\*344** for Martinez's accident be apportioned? The reader may be surprised at the answer in this case. Martinez, though negligent by his own admission, is held to bear no responsibility for the accident. The wheel manufacturers, too, are held to be free of responsibility (they settled with Martinez before trial) although the undisputed testimony by both Martinez's and Goodrich's experts is that Budd and Ford defectively designed the wheel. Only Goodrich is held liable—and for providing a warning on the tire that would have prevented Martinez's accident altogether instead of redesigning the bead wire so that the accident would only have been less likely. This aberrant result flows from four serious flaws in the Court's opinion which, even more importantly, misstate the law that will be applied in other cases.

First, the Court holds that a product can be found to be defective whenever it could be more safely designed without substantially impairing its utility. This is not, and should not be, the law. As the *Restatement (Third) of Torts: Products Liability* advises, a "broad range of factors" besides the utility of a reasonable alternate design should be considered in determining whether its use is necessary to keep the product reasonably safe, including "the magnitude and probability of the foreseeable risks of harm [and] the instructions and warnings accompanying the product".[1] When the undisputed evidence is that the magnitude and probability of a risk are low, an alternative design could reduce but not eliminate that risk, and the instructions and warnings given do eliminate the risk, the product should be determined not to be defective as a matter of law.

Second, the Court holds that whether a wheel is defectively designed "because its size is not clearly marked or because its design allows a mismatched tire to be placed on it" can be decided by "lay jurors, based on their own experience and common sense," unaided by expert opinion.[2] It follows that a plaintiff, by offering no evidence other than his own lay opinion, could prove that a wheel was defectively designed—that is, that risks of harm were foreseeable, that there was a reasonable alternative design that would reduce and avoid them, and that the omission of the design rendered the product not reasonably safe. I doubt whether such lay testimony would support a judgment in any design defect case.[3] The record in this case proves that such evidence could not possibly support a judgment for Martinez.

Third, the Court holds that evidence of thirty-four other claims of injury over fifteen years from trying to mount 16" Goodrich tires on 16.5" wheels was admissible without proof that any of the claims were valid—some were undisputedly invalid—or that they arose out of accidents similar to Martinez's. A few weeks ago the Court held that evidence of anticipated or unpaid punitive damage claims is irrelevant and inadmissible to show punitive damage liability.[4] Today the Court holds that evidence of other claims—whether proven or not, and whether similar or not—is relevant and admissible to show liability. The Court also holds that an expert may testify that a product has caused serious injury and death when no basis at all has been shown for the statement.

Fourth, the Court holds that the district court's refusal to bifurcate the punitive damages part of the trial was harmless error because Martinez did not offer evidence of Goodrich's net worth. But while net worth evidence can unfairly prejudice the jury's consideration of liability issues, it is not the sole source of prejudice. Today's opinion undermines the bifurcation requirement of *Transportation Insurance Co. v. Moriel.*[5]

Because I disagree with all these holdings, for reasons I now explain in more detail, I respectfully dissent.

## *345  I

Comment j to Section 402A of the *Restatement (Second) of Torts* states:

> Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.[6]

We have followed the first clause of comment j, but only to the extent of holding that a plaintiff is entitled to a rebuttable presumption that had he been adequately warned of the dangers of a product, he would have avoided injury, despite the fact that experience teaches that "it is not at all unusual for a person to fail to follow basic warnings and instructions."[7] The presumption is merely a procedural device to obviate the necessity of plaintiff's self-serving testimony that he would have heeded adequate warnings.[8] In making the presumption rebuttable we recognized that the first clause is not always true. Further, we have never followed the second clause of comment j, and now the *Restatement (Third) of Torts: Products Liability* has withdrawn comment j altogether as "unfortunate language" that "has elicited heavy criticism from a host of commentators."[9] The Court's firm rejection of comment j, which the Court has never adopted and the *Restatement* has now itself rejected, is perhaps beating a dead horse, but I agree that comment j does not correctly state what the law is or should be.

Since it is human nature to disregard instructions, a rule that any product is reasonably safe as long as it bears an adequate warning of the risks of its use is not feasible. Such behavior, however, does not warrant the opposite rule that warnings are irrelevant in determining whether a product is reasonably safe. I agree with the Court that comment *l* to Section 2 of the *Restatement (Third) of Torts: Products Liability* now has it about right:

> Reasonable designs and instructions or warnings both play important roles in the production and distribution of reasonably safe products. In general, when a safer design can reasonably be implemented and risks can reasonably be designed out of a product, adoption of the safer design is required over a warning that leaves a significant residuum of such risks. For example, instructions and warnings may be ineffective because users of the product may not be adequately reached, may be likely to be inattentive, or may be insufficiently motivated to follow the instructions or heed the warnings. However, when an alternative design to avoid risks cannot reasonably be implemented, adequate instructions and warnings will normally be sufficient to render the product reasonably safe. Warnings are not, however, a substitute for the provision of a reasonably safe design. [10]

I do not agree, however, that the Court correctly reads or follows comment *l*. Comment *l* limits but does not foreclose the role of warnings in making products reasonably safe, even when there is a safer alternative design. The Court stresses the last sentence of comment *l* and brushes past the first sentence. Taken as a whole, the comment says, correctly, I think, that a safer alternative design that eliminates a risk is required over a warning that leaves a significant residuum of risk because product users may not get the warning, may be inattentive, or may not be motivated to heed the warning. The illustration accompanying comment *l* is of a worker whose foot is severed by a garbage truck's blade and compaction chamber when he loses his balance jumping onto the back of the truck. [11] A warning on the truck, "keep hands and feet away", does little to protect **\*346** against a worker's foreseeable inadvertence or misstep in the usual discharge of his job. But the warning might well be adequate admonishment to the merely curious, even if the garbage truck could be designed to be safer, if the residuum of risk were insignificant. Even if the risk that a worker will lose his balance and slip is significant enough to warrant designing additional protections in the truck, the risk that someone will intentionally stick his hand in a place where it obviously may be hurt when he is effectively warned not to do so may not warrant design changes.

Section 2(b) of the *Restatement (Third) of Torts: Products Liability* states the applicable rule:

> A product ... is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, *and* the omission of the alternative design renders the product not reasonably safe. [12]

There are two components to this rule: the possibility of a safer, reasonable alternative design, *and* a product that is not reasonably safe without that design. Both are required. Even if a reasonable alternative design would make a product safer, the product is not defective unless the omission of

the design makes the product not reasonably safe. The comparison is not between the two designs, but between the product alternatively designed and the product including any warning. Comment f to Section 2 explains:

> Subsection (b) states that a product is defective in design if the omission of a reasonable alternative design renders the product not reasonably safe. A broad range of factors may be considered in determining whether an alternative design is reasonable and whether its omission renders a product not reasonably safe. The factors include, among others, the magnitude and probability of the foreseeable risks of harm, the instructions and warnings accompanying the product, and the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing. The relative advantages and disadvantages of the product as designed and as it alternatively could have been designed may also be considered. [13]

The Reporters' Note gives an example of how factors other than a safer alternative design affect the determination whether a product is defective:

> Comment *f* lists among the factors a court may consider in determining whether an alternative design is reasonable and whether its omission renders a product not reasonably safe the following: (1) magnitude and probability of the foreseeable risks of harm; (2) the instructions and warnings accompanying the product; and (3) the nature and strength of consumer expectations. A recent California case is in agreement. In *Hansen v. Sunnyside Products, Inc.*, 55 Cal.App.4th 1497, 65 Cal.Rptr.2d 266 (1997), the court held that in a claim alleging defective design of a household cleaner containing hydrofluoric acid, the availability of an alternative safer design was not dispositive of liability. The factfinder could consider the warnings on the bottle describing the danger of exposing a user's skin to the cleaner in risk-utility balancing to decide whether the product was unreasonably dangerous. [14]

*Hansen* explained its rationale as follows:

> We do not think that the risk to the consumer of the design of many household products can be rationally evaluated without considering the product's warnings. Thus, for example, what is the risk of the design of a power saw, or other power tools or equipment, without considering the product's directions and warnings? We dare say that the risk would be astronomically, and irrationally, high. The same could be said about common garden pesticides, or even the household microwave oven. In our view, were we to ask **\*347** jurors to evaluate the risks

of the design of many household products without considering their directions or warnings, the practical result would be the withdrawal from the market of many useful products that are dangerous in the abstract but safe when used as directed. [15]

Another example the *Hansen* court might have picked is aerosol cans. Such cans are not defective merely because they could be redesigned so as not to explode if punctured or incinerated. A warning against such misuse ought to be sufficient.

The Court protests that it has not disregarded the effect of warnings in determining whether the possibility of a safer alternative design makes a product defective but has merely left the matter to the jury. But the question remains: can any product be shown not to be defective as a matter of law if a reasonable alternative design could have avoided plaintiff's injury? The Court suggests no such possibility. The *Restatement* appears to contemplate that a product is not defective as a matter of law if the safer design does not eliminate the risks, or if the warning on the product does not leave a significant residuum of risk, as when "users of the product may not be adequately reached, may be likely to be inattentive, or may be insufficiently motivated to follow the instructions or heed the warnings." [16] The present case illustrates this rule. Concededly, the evidence favorable to Martinez shows that the Goodrich tire's bead wire can be redesigned, mostly to increase its strength, without significantly reducing the tire's utility or increasing the danger of blowouts at highway speeds. Such an alternative design is thus reasonable and safer. But it only reduces—it does not eliminate —the risk that a tire being mounted on a mismatched wheel will explode. The undisputed evidence in this case is that a 16" tire cannot be mounted on a 16.5" wheel, and that if the tire continues to be inflated in an effort to force it to seat on the wheel rim, it will explode. Redesigning the bead wire only means that the tire will withstand higher inflation pressure before exploding. Although there was evidence that the alternate design would prevent the tire from exploding at ordinary mounting pressures, nothing about the design precludes the person mounting the tire from continuing to increase the pressure in an effort to force it to seat on the rim. Because the risk of explosion cannot be eliminated, omission of the alternative design may not make the tire not reasonably safe under comment l of the *Restatement.*

Nor was Goodrich's warning ineffective, another factor under comment l. Goodrich's warning label showed a picture of a person being injured by an exploding tire and stated in bright colors:

**D A N G E R**

NEVER MOUNT A 16"

SIZE DIAMETER TIRE

ON A 16.5" RIM.

Mounting a 16" tire on a 16.5" rim can cause severe injury or death. While it is possible to pass a 16" diameter tire over the lip or flange of a 16.5" size diameter rim, it cannot position itself against the rim flange. If an attempt is made to seat the bead by inflating the tire, the tire bead will break with explosive force.

...

NEVER inflate a tire which is lying on the floor or other flat surface. Always use a tire mounting machine with a hold-down device or safety cage or bolt to vehicle axle.

NEVER inflate to seat beads without using an extension hose with gauge and clip-on chuck.

NEVER stand, lean or reach over the assembly during inflation.

...

Failure to comply with these safety precautions can cause the bead to break and the assembly to burst with sufficient force to cause serious injury or death.

Martinez does not question the adequacy of the warning. It cautions not only against mismatching tires and wheels but against **\*348** inflating tires in certain ways under *any* circumstances. The record in this case does not show that a warning against mismatching tires and wheels will not reach users. On the contrary, Martinez testified that he saw the warning on the tire, and anyway, he knew that it would be very dangerous to try to mount a 16" tire on a 16.5" wheel. As Martinez put it, "common sense also tells you that where you have a mismatch you can get injured." Martinez was not inattentive, as the garbage truck worker who lost his balance. He knew better than to lean over a tire—any tire—while inflating it. None of the reasons in comment l that warnings may be ineffective apply in this case.

Nor were the warnings impractical. Despite the fact that Martinez was not provided with any of the safety devices prescribed in the warning—a workable tire mounting machine, a cage, or an extension hose with gauge and clip-on chuck—and may not have been able to bolt the wheel back on the trailer from which it had been removed before mounting the tire, he could have avoided injury by simply not leaning over the tire while inflating it. Martinez testified as follows:

Q Now, I believe you have also testified, Roberto, that while you are inflating a tire you would not want to be leaning over the tire as you inflate it.

A No.

Q And by that I mean when you are airing it up during the mounting process you would want to lean away from it; would you not?

A Well, just don't get over it, you know, just be right beside it.

Q Why would you not want to be leaning over it?

A Because that's the way I was caught.

Q Okay. Do you feel it would be a safety consideration, to be safer to not be over the tire—

A Yes.

Q —while you're inflating it?

A Yes.

The inboard side of the tire, next to the ground, exploded. Martinez was injured when the wheel struck his head. The wheel also struck the roof of the shop overhead and dented it. Clearly, had Martinez not been leaning over the wheel, as he knew not to do and as the tire label warned against, the tire would not have struck his head.

Given the ease with which injury can be avoided, there is no evidence that redesigning the bead wire will eliminate a "significant residuum of risk" in the tire as designed with the warning label. In fact, Martinez's own evidence is to the contrary. The record establishes that there has been only one other claimed injury caused by attempting to mount a 16" tire with a warning label on a 16.5" wheel. The record does not reflect whether that claim was ever proved. Thousands of 16" tires have been manufactured with warning labels; millions of 16.5" wheels have been manufactured without warning labels. Martinez's evidence (which should not have been admitted) shows thirty-four claims against Goodrich for injuries caused by mismatching unlabeled 16" tires on 16.5" wheels. There has been one other claim involving a labeled tire. The tire industry should not be compelled to redesign bead wires to make tires harder to explode—or pay damages for failing to do so—simply because one or perhaps two mechanics over the years failed to follow directions or their own good sense.

> From a fairness perspective, requiring individual users and consumers to bear appropriate responsibility for proper product use prevents careless users and consumers from being subsidized by more careful users and consumers, when the former are paid damages out of funds to which the latter are forced to contribute through higher product prices. [17]

Thus, under comment *l*, there is no evidence that omission of the safer bead wire design made Goodrich's tire not reasonably safe. The risk of explosion could not be eliminated, the warning was clear, effective, and easy to follow, and thus no significant residuum of risk remained in the tire as designed with the warning label attached. In the Court's view, a product manufacturer **\*349** may be liable for failing to make any feasible design change that does not significantly impair a product's utility, if only to prevent rare mishaps from conscious disregard of adequate warnings. That is all the evidence in this case shows. The Court appropriately rejects one extreme position —comment j to Section 402A of the *Restatement (Second) of Torts*—but then adopts the opposite and equally extreme position. In so doing, the Court swings toward strict liability.

## II

The evidence is undisputed that the wheel was defectively designed, and that the defect helped cause the accident. Martinez's expert testified:

Q And in your opinion the Budd wheel, Exhibit 2, is defective.

A Yes, sir.

Q And it was a cause of the accident.

A Yes, one of the causes.

Martinez's expert explained that a 16.5" wheel can be designed to prevent mounting a 16" tire, but that the tire cannot be designed to prevent attempts to mount it on the wheel. Moreover, the expert explained that stamping the size on the wheel in plain sight, as some wheel manufacturers do, would reduce the risk of mismatching. Martinez acknowledged that it "makes sense" that the size of the wheel be stamped on the outboard side near the valve stem where it can easily be seen. Martinez's co-worker also testified:

Q If when you were working with this wheel you had seen the number 16.5 you wouldn't have proceeded, would you?

A No, sir.

Q You knew based on your experience that you do not mix different sizes?

A No.

Q That's something every mechanic knows?

A Yes, sir.

Q If the wheel that you were working on had the warning ..., "To avoid personal injury during mounting of tire to wheel mount only 16.5 inch diameter tire," you would not have proceeded because that would have told you that the wheel really was 16.5?

A Yes, sir.

The undisputed evidence is that Budd and Ford did not design their wheel to prevent 16" tires from being mounted on it, and did not stamp the size where it could be seen. Rather, the size was included in a string of numbers stamped on the inboard side of the tire that were hard to find and harder to decipher. The wheel Martinez was working on was so covered by caliche that it would have been virtually impossible to find the tire size.

Goodrich argues that the evidence conclusively establishes that the wheel rim was defectively designed and that the defective design was a cause of Martinez's injuries. The Court rejects this argument, using the rule that "opinion testimony, even when uncontroverted, does not bind the jury unless the subject matter is one for experts alone". [18] The Court concedes that "expert testimony was probably necessary to show the feasibility of the alternative rim design which would have prevented a mismatched tire from passing over the rim flange." [19] Thus, in the Court's view, with which I agree, the evidence establishes one component of defective design—the possibility of a safer, reasonable alternative rim design. [20] The second component—that the rim was not reasonably safe without the alternative design [21] —is not in this context, according to the Court, a matter for experts alone. Thus, the Court concludes, the evidence does not conclusively establish that the wheel rim was defectively designed. But the Court's conclusion does not follow from its premise. That is, even if the jury was free to disregard expert testimony that the wheel rim was unreasonably dangerous as designed, including the testimony on Martinez's own expert, *because the subject was not one for experts alone,* the **\*350** matter may nevertheless be conclusively established by the evidence.

As a general rule, the testimony of a party or a witness who has an interest in the outcome of a suit cannot conclusively establish a matter but raises an issue of credibility on which the jury must pass. [22] But there are exceptions. Even summary judgment can be granted on "uncontroverted testimonial evidence of an interested witness ... if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." [23] As we explained in *Collora v. Navarro:*

First, the general rule governing the finality to be given to testimony of an interested witness is by no means an absolute one to be applied in a cut-and-dried fashion. Rather, it is flexible and its application must turn on the facts of each case. Certainly there will be cases where the credibility of an interested witness or party is so suspect that it must go to the jury, even though the testimony is uncontradicted. Then there will also be cases where the testimony of the witness is so clear that the jury should not be allowed to speculate as to his veracity. Between these two extremes lies a broad spectrum of possibilities. Our courts have recognized this in the past by setting forth certain standards by which the rule and its exceptions are to be measured: Is the testimony clear, direct, and positive? Is it internally consistent? Is it contradicted or corroborated by other witnesses? Does the opposing party possess the means to verify or dispute the testimony? Does he have a way to test the witness' credibility? Obviously no one factor automatically can be dispositive in every case. [24]

*Collora* was a suit for partition of real property in which plaintiff claimed an interest as defendant's common law wife. Plaintiff testified that she and the defendant had agreed to be husband and wife—one of the elements of a common law marriage—and the evidence conclusively established the other elements. Defendant did not testify or offer evidence in rebuttal. The trial court directed a verdict for the plaintiff, based on her uncontradicted testimony. The court of civil appeals reversed, holding that the plaintiff's testimony did not conclusively establish the existence of an agreement to be husband and wife because the jury could have chosen not to believe her, and thus reasonable minds could differ over the conclusions to be drawn from her testimony. [25] This Court reversed the court of civil appeals, holding that the directed verdict was proper.

The testimony of Martinez and his co-worker, as well as Martinez's expert witness, that the wheel rim was unreasonably dangerous was contrary to Martinez's interest in the case. It was to Martinez's benefit that the percentage responsibility for causing his injuries assigned to the wheel manufacturers be as low as possible, since he had already settled with them. Testimony that the wheel rim was defectively designed undercut Martinez's position that Goodrich alone was responsible. Because there was nothing to cast suspicion on Martinez's testimony or that of his co-worker and his expert witness concerning whether the wheel rim was unreasonably dangerous as designed, the jury was bound by that testimony. Their testimony, contrary to Martinez's interest, was more like testimony by a disinterested witness. Professors William Powers, Jr. and Jack Ratliff have explained the considerations for determining whether a disinterested witness's testimony is binding on the jury:

> Must the jury accept [the uncontradicted testimony by a disinterested witness]? That is, does such testimony, if uncontradicted, [conclusively establish a fact]? The prevailing and better view is that the reasonable minds test should apply here. If there is nothing to cast suspicion on the testimony—that is, if reasonable minds could not differ—then the jury must accept **\*351** it. But, if the testimony

is impeached, inconsistent, or otherwise suspect (even though not directly controverted)—that is, if reasonable minds might or might not accept it—then the jury may reject it. McDonald aptly observes that disinterested testimony is, in fact, treated much the same as interested testimony, except that courts are more inclined in the case of interested testimony to find suspicious circumstances that would allow the jury to reject it. [26]

Even without the testimony of Martinez, his co-worker, and his expert, the record establishes that the wheel rim was defectively designed. As already noted, the factors to be considered in determining whether a product is unreasonably dangerous include the magnitude and probability of the foreseeable risks of harm, the instructions and warnings accompanying the product, the nature and strength of consumer expectations regarding the product, and the relative advantages and disadvantages of the product as designed and as it alternatively could have been designed. [27] Concerning these factors: the risk of injury from mismounting a tire was the same for the defectively designed wheel rim as for the defectively designed tire; the wheel bore no warnings, as the tire did; consumer expectations were no different for the wheel than for the tire; and there was no evidence that the wheel rim design was advantageous or the alternate design disadvantageous. In sum, the evidence established that the tire was less dangerous than the wheel rim, because the tire at least had a warning label and the wheel had none.

The Court states that Martinez's expert's testimony that the wheel was defective was not evidence that it was unreasonably dangerous. But the expert was directed by Martinez's counsel to assume that "defect is defined by the Court as being unreasonably dangerous." The Court states that the expert's opinion was not conclusive, given the factors the jury was to balance. But the only factors the jury was instructed in the charge to consider were "the utility of the product and the risk involved in its use." Moreover, Martinez's expert testified that the defect in the wheel could have been remedied simply and without difficulty. Specifically, the expert testified as follows:

Q From the moment it came on the market the 16–1/2–inch rim could have been changed so that you couldn't get the wrong sized tire on it.

A I believe it could, yes.

Q The same thing is not true for the 16–inch tire. There is no way to design or alter the 16–inch tire so that somebody by mistake doesn't try to put it on a 16–1/2–inch wheel. That is true; isn't it?

A I don't know of a way to do it, no. I have not seen a way to do that.

Q In your view, if the wheel companies were going to come out with a new 16–1/2–inch size which actually looks somewhat smaller than the 16 they should have designed that new wheel in such a fashion that it looked very different from the old 16; isn't that correct?

A I would certainly recommend that, yes.

Q In your opinion, that could have been done.

A I think it could, yes.

Q That would not have been difficult to do.

A No; I can see where one could do it.

Q And it is further your opinion that once it occurred to the wheel companies that they had done something that was, in fact, causing a substantial problem, they then could have taken what they had and altered its configuration so that you couldn't get the wrong sized tire on it.

A In subsequent productions they could, yes.

Q And that could have been done by something as simple as filling in the well so **\*352** that it wasn't quite so deep; is that a fair statement?

A That's one way to do it. There may be other ways to do it as well, but that's one way to do it.

Q Well, the one way that I just mentioned is one that you have specifically advocated yourself.

A I have done that myself, yes.

Q You not only did it, but you wrote a paper on it.

A Yes, sir.

The Court also states that the jury was free to speculate that marking the wheel size on the wheel itself might not have prevented Martinez's injury because the marking might have been covered by caliche or not seen by Martinez. But Martinez's expert's testified that if the size had been stamped in the drop center or the well of the wheel, it could not have been obscured. Specifically, the expert testified as follows:

Q Well, the language here where it says, quote, use only 16.5 tires, that was stamped on Kelsey–Hayes wheels starting at about 1980.

A Yes.

Q Exactly where you wanted it to be, near the valve hole.

A Well, I think, I think you are quoting me a little out of context. I said it wouldn't be a good idea, it would be a good idea for that to be there. But the best place for it is in the drop center where there is more room for it and where it is not obstructed by dirt and paints.


\* \* \*


Q Okay. Let's be sure that we understand that in plain and simple English. It means, one, that in 1980 General Motors directed its supplier Kelsey–Hayes to stamp something near the valve hole and to place this warning in the well of every wheel it made after that.

A That is right.

Q And Ford never directed Budd to do anything until Budd stopped making the wheel in 1983.

A That's my recollection, yes.

Had the wheel size been stamped or labeled in the drop center or well of the wheel, it could not have been obscured, no matter how dirty the wheel became, and Martinez could not have missed it.

The evidence, including the testimony of Martinez's own expert, conclusively established that the wheel manufacturers bore some responsibility for Martinez's injuries. Since the evidence did not establish the precise percentage of responsibility attributable to the wheel manufacturers, Goodrich is entitled only to a new trial.


### III

Martinez offered, and the district court admitted in evidence, a list of thirty-four lawsuits against Goodrich involving claims for injuries suffered in attempting to mount 16" Goodrich tires on 16.5" wheels. Goodrich complains that Martinez never laid a predicate for admitting this evidence, showing the similarity of the other lawsuits to this one. The Court dismisses Goodrich's complaint in a sentence: "The absence of pictographic warnings on the tires does not render the accidents so dissimilar as to preclude their admission, but merely goes to the weight of the evidence." [28]

The Court has not met the substance of Goodrich's argument. First, Goodrich argues that Martinez laid no predicate whatever for admission of the evidence. Martinez does not, and cannot, dispute this. The district court admitted the list of lawsuits based solely on the statement of Martinez's

counsel that the information had been produced by Goodrich in answer to an interrogatory in discovery. The interrogatory and answer were never offered in evidence (and are not in our record), nor was there any other proof to show the nature of the cases listed. A plaintiff who offers evidence of other accidents is "required to show that the earlier accidents occurred under reasonably similar but not necessarily identical circumstances." [29] Martinez made no showing **\*353** whatever. Thus, the Court holds that evidence of other claims may be admitted with no more predicate than counsel's argument that the claims are similar to the case in which they are offered. This, of course, eviscerates any meaningful evidentiary standard.

Second, although Goodrich argued that the presence or absence of pictographic labels was a significant difference in claims of injury due to mismatch tires, that was not the only difference Goodrich claimed was significant. Other differences in the cases, according to Goodrich's counsel, were how experienced the injured person was in changing tires, what safety equipment was available, what kind of tire was involved and whether it was radial or bias ply, and what the result was in the case. At least two of the cases were dismissed against Goodrich. The burden was not on Goodrich to show that the other cases were different; the burden was on Martinez to show that they were similar. [30] Nevertheless, Goodrich pointed out important differences to the court.

Third, the presence of pictographic labels may have been a significant distinction in the cases. Of the thirty-four on the list Martinez offered, only two involved pictographic labels. It may be that fewer accidents involved labeled tires because the labels were effective, or because fewer tires were manufactured with labels, or because labels had been used for only a short time, or perhaps for other reasons. Such arguments would go merely to the weight to be given the evidence, not its admissibility. But without any predicate at all offered by Martinez, it is impossible to say that the presence of the label was not significant.

Finally, admission of the list was extremely prejudicial to Goodrich. Martinez's counsel told the court before trial that "[i]n all these cases we keep talking about ... they keep killing and injuring people". Martinez's counsel asked his own expert witness: "And some tire companies it only takes twenty-nine or thirty people to get killed or injured before they come to the conclusion that maybe they ought to change their bead." Martinez's counsel asked Goodrich's expert: "So how many people have you all killed?" Without any predicate whatever, Martinez's counsel was permitted to use the list of lawsuits to insinuate repeatedly that others had been injured or killed in circumstances similar to those in this case. This was plainly error.

The lawsuit list was not the only exhibit erroneously admitted. The district court also admitted a chart sponsored by Martinez's expert witness showing the history of changes in bead wire design. The Court's conclusion that "all the evidence contained on the chart was already in evidence" [31] is simply false. There is absolutely no evidence of the very prejudicial reference on this time-line to "numerous 16/16.5 mismatch explosions resulting in serious injury or death." It should go without

saying that a party should not be permitted to assert repeatedly that an opponent's product has killed and injured people without proof that it is actually so.

Only a few weeks ago the Court held in *Owens–Corning Fiberglas Corp. v. Malone* that evidence of anticipated or unpaid punitive damage claims is irrelevant and therefore inadmissible to show punitive damage liability.[32] If anticipated or unpaid punitive damage claims are not probative of punitive damage liability absent evidence of whether such claims have succeeded, I fail to see how actual damage claims are probative of liability for actual damages absent the same evidence. Today's holding that evidence of other claims—whether proven or not, and whether similar or not—is relevant and admissible to show liability directly conflicts with our decision in *Owens–Corning* and essentially destroys any standard for admitting evidence of other claims.

## IV

The Court holds that the district court erred in denying Goodrich's motion to bifurcate **\*354** the actual and punitive damages phases of the trial, but that the error was harmless because Martinez offered no evidence of Goodrich's net worth and the evidence of other lawsuits against Goodrich was properly admitted. I have already shown that the list of lawsuits should not have been admitted without a predicate showing of similarity between each of the lawsuits and this case. But even if the list of other lawsuits was properly admitted, it alone required a bifurcation of the actual and punitive damage claims.

As the Court notes, "[i]n *[Transportation Insurance Co. v.] Moriel* we held that 'a trial court, if presented with a timely motion, should bifurcate the determination of the amount of punitive damages from the remaining issues."[33] Although we reasoned in *Moriel* that evidence of a defendant's net worth offered on a punitive damage claim could unfairly prejudice a defendant on plaintiff's claim for actual damages, we did not suggest that net worth evidence was the only prejudice in trying actual and punitive damage claims together. In the present case, Martinez's counsel's repeated references to other claims against Goodrich were plainly intended to insinuate that if others had been injured trying to mount Goodrich's 16" tires on 16.5" wheels, the tire was defective, and the defect caused Martinez's injuries. The list of other lawsuits, even if properly admitted, unfairly prejudiced Goodrich on Martinez's liability claim as much as evidence of its net worth would have.

The district court refused Goodrich's motion to bifurcate the trial before evidence was offered and without regard to whether Martinez would offer evidence of net worth. The record shows that the district court refused to follow *Moriel* because Martinez did not want a bifurcated trial. The court's error clearly prejudiced Goodrich.

\* \* \* \* \*

The record in this case shows that Goodrich's tire including the warning label was not defectively designed as a matter of law. Even if that were not so, Goodrich is entitled to have its liability determined in a fair trial in which at least some responsibility for the accident is assigned to Martinez and the wheel manufacturers, evidence of other claims against Goodrich is excluded until a proper predicate is laid for its admission, and punitive damages are tried separately as required by *Moriel.* Because the Court denies Goodrich any relief, I respectfully dissent.

## All Citations

977 S.W.2d 328

## Footnotes

1    The rim involved in this case was manufactured in 1979. The Budd Company ceased manufacturing 16.5" rims in 1983.

2    Goodrich has ceased manufacturing bias-ply light truck tires.

3    Although not applicable to the present case, the Texas Legislature has recently codified the "reasonably safe alternative" requirement. TEX. CIV. PRAC. & REM.CODE § 82.005 (safer alternative design must be shown by preponderance of the evidence in design defect case).

4    While there is language in *Turner* suggesting that whether a safer alternative design exists is merely one of the factors to be weighed by the jury, *see* 584 S.W.2d at 846–47, we made clear in *Caterpillar* that a safer alternative is a prerequisite to a finding of design defect, *see* 911 S.W.2d at 384. Our approach in *Caterpillar* is reflected in the new Restatement.

5    This illustration is based on *Uloth v. City Tank Corp.,* 376 Mass. 874, 384 N.E.2d 1188 (1978).

6    As discussed in part V of this opinion, we uphold the jury's finding that Martinez was not negligent.

7    We disagree with the dissenting justices that the trial court admitted evidence of these accidents "with no more predicate than counsel's argument that the claims are similar to the case in which they were offered." *Post* at 353. At the pretrial hearing on this issue, the Martinezes' counsel informed the court that Goodrich had identified these accidents in response to an interrogatory asking, "How many people do you acknowledge have been injured as a result of mounting or attempting to mount 16 inch diameter tires manufactured by you on a 16.5 inch diameter rim?" While the interrogatory itself may not be in our record, the Martinezes' counsel read it into the record at the pretrial hearing, and no one disputes its wording or that Goodrich identified the thirty-four accidents in response to it. Thus, the Martinezes established that each of the other accidents involved an injury resulting from mounting a 16" Goodrich tire on a 16.5" rim. Further, it was undisputed that each of the other accidents involved a tape bead like that involved in this accident. Under these circumstances, there was an adequate predicate on which to admit the other accidents.

8    We thus need not address the court of appeals' conclusion that Goodrich failed to properly preserve this complaint. *See* 928 S.W.2d at 74.

1    RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2, cmt. f, at 23 (1998).

2    *Ante* at 334.

3    *See Watkins v. Telsmith, Inc.,* 121 F.3d 984, 991 (5th Cir.1997) (suggesting that expert testimony would be required in design defect cases).

4    *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 41 (Tex.1998).

5    879 S.W.2d 10 (Tex.1994).

6    RESTATEMENT (SECOND) OF TORTS § 402A, cmt. j, at 353 (1965).

7    *General Motors Corp. v. Saenz,* 873 S.W.2d 353, 358 (Tex.1993); *see Magro v. Ragsdale Bros., Inc.,* 721 S.W.2d 832, 834 (Tex.1986); *Technical Chem. Co. v. Jacobs,* 480 S.W.2d 602, 606 (Tex.1972).

8    *Saenz,* 873 S.W.2d at 359.

9    RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2, Reporters' Note, cmt. *l*, at 101 (1998).

10    RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2, cmt. *l*, at 33 (1998) (citation omitted).

11    *Id.,* illus. 14, at 33.

12    RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2(b), at 14 (1998) (emphasis added).

13    *Id.* § 2, cmt. f, at 23 (citation omitted).

14    *Id.* § 2, Reporters' Note, cmt. f, at 94.

15    *Hansen v. Sunnyside Prods., Inc.,* 55 Cal.App.4th 1497, 65 Cal.Rptr.2d 266, 278 (1997).

16    RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2, cmt. *l*, at 33 (1998).

17    *Id.* § 2, cmt. a, at 16.

18    *Ante* at 338.

19    *Ante* at 339.

20    *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2(B), at 14 (1998).

21    *See id.*

22    *Collora v. Navarro,* 574 S.W.2d 65, 69 (Tex.1978).

23    TEX.R. CIV. P. 166a(c).

24    *Id.*

25    *Navarro v. Collora,* 566 S.W.2d 304 (Tex.Civ.App.—Corpus Christi), *rev'd,* 574 S.W.2d 65 (Tex.1978).

26    William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence"*, 69 TEX. L.REV. 515, 524 (1991) (citing 3 R. MCDONALD, TEXAS CIVIL PRACTICE § 11.28.6, at 209 (1984)). *See* 4 MCDONALD TEXAS CIVIL PRACTICE § 21.58, at 149–151 (1992).

27    RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2(b), cmt. f, at 23 (1998) (emphasis added).

28    *Ante* at 341.

29    *Missouri Pac. R.R. Co. v. Cooper,* 563 S.W.2d 233, 236 (Tex.1978) (citing *Karr v. Panhandle & Santa Fe Ry. Co.* 153 Tex. 25, 262 S.W.2d 925, 928, 932 (1953),* and *Dallas Ry. & Terminal Co. v. Farnsworth,* 148 Tex. 584, 227 S.W.2d 1017, 1020 (1950)).

30    *Id.*

31    *Ante* at 342.

32    972 S.W.2d 35, 41 (Tex.1998).

33    *Ante* at 342 (quoting *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 30 (Tex.1994)).

729 S.W.2d 897
Court of Appeals of Texas,
Houston (14th Dist.).

UNITED INTERESTS, INC., Appellant,
v.
BREWINGTON, INC., Appellee.

No. C14–86–033–CV.  |  March 19, 1987.  |  Rehearing Denied April 30, 1987.

Following notification from lessor's successor that parking area used by sublessee's employees had been leased to used car company, sublessee brought action for injunction and declaration of rights under sublease. Lessor's successor counterclaimed for declaration of rights under leases. The 125th District Court, Harris County, Michael O'Brien, J., entered judgment for sublessee, granted permanent injunctive relief and awarded attorney fees on appeal, and lessor's successor appealed, and sublessee cross-appealed. The Court of Appeals, Junell, J., held that: (1) parol evidence was admissible on issue of whether ambiguous parking provision in sublease permitted sublessee to use parking lot south of building; (2) trial court was authorized to interpret sublease provision and to uphold sublessee's rights thereunder by enjoining lessor's successor from interfering with such rights; and (3) award of attorney fees to sublessee on appeal was abuse of trial court's discretion.

Affirmed in part; reversed and rendered in part.

West Headnotes (25)

**[1]    Contracts**  Construing whole contract together

95  Contracts
95II  Construction and Operation
95II(A)  General Rules of Construction
95k147  Intention of Parties
95k147(3)  Construing whole contract together

In interpreting contract, court's primary concern is to ascertain and to give effect to parties' intentions as expressed in instrument, examining and considering entire instrument so that none of its provisions will be rendered meaningless.

Cases that cite this headnote

**[2]    Contracts**  Existence of ambiguity

95  Contracts

95II Construction and Operation

95II(A) General Rules of Construction

95k143 Application to Contracts in General

95k143(2) Existence of ambiguity

Contract is ambiguous only where application of pertinent rules of interpretation results in genuine uncertainty as to which one of two or more meanings is proper.

Cases that cite this headnote

## [3] **Landlord and Tenant** Construction and Operation of Subleases

233 Landlord and Tenant

233IV Particular Kinds of Tenancies and Attributes Thereof

233IV(B) Assignment and Subletting

233IV(B)6 Construction and Operation of Subleases

233k790 In general

(Formerly 233k80(3))

Sublease provision stating that general parking shall be in front and on north side of general parking area, without defining "general parking" or "general parking area," was ambiguous; provision could be interpreted as requiring that employees and customers of sublessee park in front of and on north side of both north and south parking areas or in front and on north side of building.

Cases that cite this headnote

## [4] **Landlord and Tenant** Rights and liabilities of sublessees

233 Landlord and Tenant

233IV Particular Kinds of Tenancies and Attributes Thereof

233IV(B) Assignment and Subletting

233IV(B)6 Construction and Operation of Subleases

233k795 Rights and liabilities of sublessees

(Formerly 233k80(3))

Sublease providing that sublessee agreed to accept premises as is, excepting repairs of parking lot and facade made at lessee's expense, without addressing whether repairs were to be restricted to certain part of parking lot, and providing that sublessee's employees and customers park in front and on north side of general parking area, without defining general parking area, was ambiguous as to sublessee's parking rights and obligations.

Cases that cite this headnote

## [5] **Evidence** Leases

157 Evidence

157XI Parol or Extrinsic Evidence Affecting Writings

157XI(D) Construction or Application of Language of Written Instrument

157k449 Nature of Ambiguity or Uncertainty in Instrument

157k450 In General
157k450(4) Leases

Parol evidence of sublessee's need for, as well as prior use of, parking lot south of building was admissible in action seeking declaration of rights under sublease, where sublease was ambiguous as to whether sublessee's employees and customers were entitled to park in front of and on north side of both north and south parking areas or only in front and on north side of building.

Cases that cite this headnote

**[6] Appeal and Error** ⚷ Incompetent evidence disregarded

30 Appeal and Error
30XVI Review
30XVI(G) Presumptions
30k931 Findings of Court or Referee
30k931(6) Incompetent evidence disregarded

There is presumption that trial court in bench trial did not consider hearsay.

Cases that cite this headnote

**[7] Appeal and Error** ⚷ Admissions, declarations, and hearsay

30 Appeal and Error
30XVI Review
30XVI(J) Harmless Error
30XVI(J)10 Admission of Evidence
30k1050 Prejudicial Effect in General
30k1050.1 Evidence in General
30k1050.1(8) Particular Types of Evidence
30k1050.1(10) Admissions, declarations, and hearsay

Any error in admission of hearsay evidence concerning sublessee's employee's conversations about certain parking lot with lessee's representatives was harmless in trial for determination of rights under sublease, where there was direct testimony regarding sublessee's need for and prior use of parking lot and testimony of sublessee's president that he understood lease area to include parking lot.

Cases that cite this headnote

**[8] Evidence** ⚷ Leases

157 Evidence
157XI Parol or Extrinsic Evidence Affecting Writings
157XI(D) Construction or Application of Language of Written Instrument
157k449 Nature of Ambiguity or Uncertainty in Instrument
157k450 In General
157k450(4) Leases

Upon determination that certain paragraphs in sublease were ambiguous, trial court was authorized to admit parol evidence to determine parties' intentions and was then authorized to interpret sublease, taking all parts together and giving them such meaning as would carry out and effectuate fullest extent of parties' intention.

1 Cases that cite this headnote

**[9]  Contracts** ⚷ Mutual mistake

95  Contracts
95I   Requisites and Validity
95I(E)   Validity of Assent
95k93   Mistake
95k93(5)   Mutual mistake

"Mutual mistake of fact" occurs where both parties to transaction have belief in present existence of thing, material to transaction, that does not exist, such as where parties to contract have common intention, but written contract erroneously reflects intention because of mistake in writing agreement.

4 Cases that cite this headnote

**[10]  Reformation of Instruments** ⚷ Admissibility

328   Reformation of Instruments
328II   Proceedings and Relief
328k42   Evidence
328k44   Admissibility

Parol evidence is admissible to show that due to mistake, writing incorrectly reflects parties' true agreement.

2 Cases that cite this headnote

**[11]  Reformation of Instruments** ⚷ Mutuality of Mistake

328   Reformation of Instruments
328I   Right of Action and Defenses
328k15   Grounds for Reformation
328k19   Mutuality of Mistake
328k19(1)   In general

Equitable remedy of reformation is available to correct mutual mistake of fact in written instrument.

1 Cases that cite this headnote

**[12]  Reformation of Instruments** ⚷ Admissibility

328 Reformation of Instruments

328II Proceedings and Relief

328k42 Evidence

328k44 Admissibility

Evidence that sublease was copied from another sublease and, in the process, several paragraphs were overlooked supported sublessee's argument that parking paragraph also was overlooked and thus, trial court was authorized to admit parol evidence to show that sublease incorrectly reflected true agreement of parties in regard to sublessee's parking rights.

Cases that cite this headnote

**[13] Appeal and Error** ☞ On Trial Without a Jury

30 Appeal and Error

30XVI Review

30XVI(J) Harmless Error

30XVI(J)10 Admission of Evidence

30k1054 On Trial Without a Jury

30k1054(1) In general

Any error in admission of hearsay evidence to show mutuality of mistake in parking provision in sublease was harmless in bench trial where there was sufficient direct evidence of mutual mistake.

Cases that cite this headnote

**[14] Reformation of Instruments** ☞ Mutuality of Mistake

328 Reformation of Instruments

328I Right of Action and Defenses

328k15 Grounds for Reformation

328k19 Mutuality of Mistake

328k19(1) In general

(Formerly 336k19(1))

Upon determination that there was mutual mistake of fact concerning parking rights in sublease, trial court was entitled to reform terms of sublease.

Cases that cite this headnote

**[15] Injunction** ☞ Other particular uses and restrictions

212 Injunction

212IV Particular Subjects of Relief

212IV(D) Property in General

212k1221 Covenants as to Use of Property

212k1230 Other particular uses and restrictions

(Formerly 212k62(2), 212k39)

Upon determination that there was mutual mistake of fact in sublease provisions regarding sublessee's parking rights, trial court was authorized to interpret parking provisions and to uphold sublessee's rights thereunder by permanently enjoining lessor's successor from interfering with such rights.

Cases that cite this headnote

**[16] Declaratory Judgment** Contracts

118A   Declaratory Judgment
118AIII   Proceedings
118AIII(E)   Evidence
118Ak345   Weight and Sufficiency
118Ak347   Contracts

Evidence that sublessee was located on south side of building and access to business by employees, customers and delivery persons was enhanced by access to south parking lot and that there were too few spaces in front and north lots to accommodate all of building's tenants and their customers was sufficient to support trial court's implied determination, in interpreting ambiguous parking provision of sublease, that use of south parking lot was incidental and necessary to sublessee's business.

Cases that cite this headnote

**[17] Declaratory Judgment** Discretion of Court

118A   Declaratory Judgment
118AI   Nature and Grounds in General
118AI(A)   In General
118Ak5   Discretion of Court
118Ak5.1   In general
    (Formerly 118Ak5)

Entry of declaratory judgment is within discretion of trial judge.

1 Cases that cite this headnote

**[18] Declaratory Judgment** Leases

118A   Declaratory Judgment
118AII   Subjects of Declaratory Relief
118AII(H)   Property and Conveyances
118Ak186   Leases

Denying request of lessor's successor for declaratory judgment declaring successor's rights under sublease was not abuse of trial court's discretion in action brought by sublessee seeking declaration of rights under sublease, particularly where declaration of sublessee's rights under sublease effectively determined rights of lessor's successor.

Cases that cite this headnote

**[19] Declaratory Judgment** 🔑 Contracts

118A   Declaratory Judgment
118AIII   Proceedings
118AIII(E)   Evidence
118Ak345   Weight and Sufficiency
118Ak347   Contracts

Evidence that lessor's successor planned to re-develop property and had discussed with tenants possibility of moving them, had assessed excessive maintenance charges against sublessee, had wrongfully declared sublessee in default and had leased parking area used by sublessee to use car company supported trial court's conclusion that lessor's successor had attempted to constructively evict sublessee.

Cases that cite this headnote

**[20] Costs** 🔑 Declaratory judgment

102   Costs
102VIII   Attorney Fees
102k194.24   Particular Actions or Proceedings
102k194.40   Declaratory judgment
      (Formerly 102k173(1))

Award of attorney fees in declaratory judgment action is discretionary. V.T.C.A., Civil Practice & Remedies Code § 37.009; Vernon's Ann.Texas Civ.St. art. 2524–1, § 10 (Repealed).

3 Cases that cite this headnote

**[21] Costs** 🔑 Declaratory judgment

102   Costs
102VIII   Attorney Fees
102k194.24   Particular Actions or Proceedings
102k194.40   Declaratory judgment
      (Formerly 102k173(1))

Refusal to award attorney fees to either party for trial was not abuse of trial court's discretion in action wherein lessor's successor and sublessee each sought declaration of rights under sublease; trial court recognized both parties had legitimate rights to pursue. V.T.C.A., Civil Practice & Remedies Code § 37.009; Vernon's Ann.Texas Civ.St. art. 2524–1, § 10 (Repealed).

12 Cases that cite this headnote

**[22] Costs** ⚷ Declaratory judgment

102 Costs
102VIII Attorney Fees
102k194.24 Particular Actions or Proceedings
102k194.40 Declaratory judgment
(Formerly 102k173(1))

Absent sufficient cause to justify award of attorney fees through trial court, award of attorney fees to sublessee should lessor's successor appeal was abuse of trial court's discretion in action wherein sublessee and lessor's successor each sought declaration of rights under sublease. V.T.C.A., Civil Practice and Remedies Code § 37.009; Vernon's Ann.Texas Civ.St. art. 2524–1, § 10 (Repealed).

12 Cases that cite this headnote

**[23] Declaratory Judgment** ⚷ Necessity, utility and propriety

118A Declaratory Judgment
118AI Nature and Grounds in General
118AI(A) In General
118Ak7 Necessity, utility and propriety

Trial court may grant declaratory judgment if judgment will serve useful, beneficial purpose.

3 Cases that cite this headnote

**[24] Declaratory Judgment** ⚷ Leases

118A Declaratory Judgment
118AII Subjects of Declaratory Relief
118AII(H) Property and Conveyances
118Ak186 Leases

Trial court which declared that sublessee had not defaulted under sublease and that master lease would henceforth govern sublessee's obligations was not required to declare rights and obligations under master lease, absent conflict involving master lease.

Cases that cite this headnote

**[25] Declaratory Judgment** ⚷ Subjects of relief in general

118A Declaratory Judgment
118AII Subjects of Declaratory Relief
118AII(A) Rights in General
118Ak81 Subjects of relief in general

Anticipation of conflict is not proper subject for declaratory relief.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*900**  Anthony J. Sadberry, Phillip R. Livingston, Houston, for appellant.

Daniel Kistler, Houston, for appellee.

Before JUNELL, DRAUGHN and ELLIS, JJ.

## OPINION

JUNELL, Justice.

United Interests, Inc. (appellant) appeals from a judgment rendered in a non-jury trial granting permanent injunctive relief to Brewington, Inc. (appellee). At issue is the construction of certain written leases. In nineteen points of error, appellant challenges the trial court's findings of ambiguity and mutual mistake, its issuance of the injunction, its refusal to declare the rights of appellant under a sublease and its award of attorney's fees. Appellee also challenges the award of attorney's fees in a cross-point. The trial court's judgment is affirmed in part and reversed and rendered in part.

On May 12, 1967, Jack G. Jones, Trustee, and SCM Corporation executed a "build to suit" lease covering the land located at 5702 Hillcroft in Houston. Jones agreed to construct an office-warehouse building and lease it and the property to SCM for twenty years. Three land areas remained after construction of the building—one on the front and one each on the north and south sides of the building.

On July 21, 1983, SCM subleased approximately 6,168 square feet of the building to Sabel's T.V. Service, Inc. (Sabel). This lease was made subject to the Jones—SCM or master lease, with paragraph 20 stating the following:

> 20. *Parking of Automobiles.* General parking shall be in the front and on the north side of the general parking area and there shall be no assigned parking spaces provided for any Tenant in these areas.

On January 12, 1984, SCM subleased another 7,224 square feet of the building to Brewington, Inc. under the following arrangement. SCM (more commonly known as Smith-Corona) was engaged in the business of selling and repairing business machines; however, that company decided to close its factory service station in Houston and turn the servicing over to an authorized representative, who would make repairs on SCM's behalf and then bill SCM. SCM selected Brewington, a local typewriter company, as its representative and stipulated that Brewington move into its premises. SCM wanted the repair station to stay at that location because customers were familiar with it and because certain literature and the machines themselves contained that service address and phone number.

SCM appears to have copied the Brewington sublease from the Sabel sublease. Indeed, paragraph 8 of the Brewington sublease is identical to paragraph 9 of the Sabel sublease, which states that "Tenant shall be entitled to use the Demised Premises **\*901** for the service and repair and sales of televisions and other related electronic equipment." Brewington sells and repairs typewriters and computer printers, but not televisions and other related electronic equipment. The Brewington sublease also was made subject to the master lease, and parking (paragraph 19) was provided for in language identical to that in the Sabel sublease.

On August 1, 1984, with SCM's consent, Brewington subleased 2,700 square feet of its lease space to Amstar Satellite Systems, Inc. Once again, the Sabel sublease appears to have been used as the model for this new sublease, though the "use" paragraph (paragraph 8) was changed to reflect Amstar's actual business. The parking paragraph (paragraph 19) once again remained unchanged.

On December 25, 1984, Jack G. Jones, Trustee, conveyed all of the property and the Hillcroft building to United Interests, Inc., Trustee, which purchased the property as trustee for a partnership consisting of United Interests, Inc. and others. One month later, SCM assigned all of its rights as lessee under the master lease to United Interests.

United Interests notified Brewington of the SCM assignment by letter of February 7, 1985, and also advised that a physical inspection of the premises was in progress. On February 20th, United Interests wrote Brewington that the inspection was complete, enclosed a copy of the repair bid and requested from Brewington a proportionate share (50% or $27,560.00) of the repair expenses. Thereafter, on March 18th, United Interests informed Brewington that, due to the latter's failure to contribute its share of the repair expenses or to make arrangements for the repairs, United Interests was giving formal notice of default under the Brewington sublease and reserved the right to terminate the sublease unless Brewington contributed to or arranged for repairs within thirty days.

There was no further communication until July 11, 1985, when United Interests' attorney wrote Brewington that property immediately to the south of the building had been leased to CSI Collision

Specialist, Inc. (d/b/a CSI Used Cars). The letter advised Brewington that this property included a portion of the parking area south of the building and that parking on the south side by Brewington's employees and customers would not be permitted. Almost immediately, Brewington filed suit for an injunction and a declaration of its rights under its sublease. United Interests counterclaimed for a declaration of its rights under the leases in question. CSI filed a related action for injunctive relief and damages against Brewington, and the causes of action were consolidated for trial. Following the trial, the court entered judgment for Brewington and filed Findings of Fact and Conclusions of Law. CSI is not a party to this appeal.

In points of error one through four, United Interests asserts that the trial court erred as a matter of law in finding ambiguity in the Brewington sublease; in allowing the admission of parol evidence to vary its terms; in allowing the admission of hearsay evidence to explain its terms; and in reforming the terms of the sublease.

 **[1]**   **[2]**   In Conclusion of Law No. II, the trial court concluded that paragraphs 8 (use) and 19 (parking) of the sublease between SCM and Brewington were ambiguous. We agree. The question of whether a contract is ambiguous is one of law for the court. *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 518 (Tex.1980). When interpreting a contract, a court's primary concern is to ascertain and to give effect to the parties' intentions as expressed in the instrument. To do so, the court must examine and consider the entire instrument so that none of its provisions will be rendered meaningless. A contract is ambiguous only when the application of the pertinent rules of interpretation leaves it genuinely uncertain which one of two or more meanings is the proper one. If a contract is determined to be ambiguous, then extrinsic evidence is  **\*902** admissible to discover its true meaning. *Id.* at 518–19. With these precepts in mind, we examine the sublease in question.

 **[3]**   Paragraph 19 concerning parking is ambiguous in and of itself. Neither "general parking" nor "general parking area" is defined. The term "general parking" implies that there is also some other kind of parking. "General parking area" equates with the entire parking lot, and the paragraph could be interpreted as requiring that employees and customers park in the front of or on the north side of both the north and south parking areas. Finally, the paragraph does not read "in the front and on the north side of the *building* ", which would more readily comport with United Interests' desired interpretation.

 **[4]**   The ambiguity is compounded when paragraph 19 is considered with the rest of the sublease, particularly paragraph 15, which concerns remodeling of the premises. Brewington agreed to accept the premises "as is" "excepting repairs of parking lot and facade made at SCM's expense" (a phrase interlineated by Brewington's president). The paragraph did not address whether repairs were to be restricted to a certain part of the parking lot. Indeed, trial testimony confirmed that repairs were made to both the north and south parking areas and paid for by SCM. Brewington's

concern about repairs to the parking lot suggests that a well-maintained one was essential to its occupancy of the building. This renders even more ambiguous a lease term that would then restrict the use of that lot.

 **[5]**   The trial court found that the interlineation of paragraph 15 and the general ambiguity of paragraph 19 allowed parol evidence of Brewington's need for, as well as prior use of, the south parking lot. Again, we agree. Preston Whitfill was a service manager for SCM at the Hillcroft location. When Brewington contracted to do SCM's warranty work in the Houston area and moved into SCM's leased space, Whitfill went to work for Brewington. He, therefore, was in a position to know what transpired during the tenures of both companies. Whitfill testified that SCM employees had parked on the south side of the building and that Brewington's employees continued to do so after the move. He further testified that deliveries to both companies were made to the back door on the south side of the building because the service department was located there and because delivery through the front of the building was difficult due to a narrow hallway and several sharp turns.

Johnny Johnson, Brewington's president, testified that the company utilizes the south lot in its day-to-day business. It is where employees and customers park, deliveries are received and sent and the trash dumpster is located. Were the south lot not available for Brewington's use, business would be adversely affected.

Both Lee Sabel, owner of Sabel's T.V. Service, Inc., which subleased from SCM, and Charles Harvey, owner of Amstar Satellite Systems, Inc., which subleased from Brewington, testified that Brewington's employees generally park in the south lot. Furthermore, the men stated that their employees also had used the south lot when the north and front lots were full (with Whitfill's and, later, Brewington's permission).

 **[6]**    **[7]**   United Interests next complains of the admission of hearsay evidence to explain the terms of the SCM-Brewington sublease. This complaint appears to center on Preston Whitfill's testimony concerning his conversations about the parking lot with certain SCM representatives, particularly Sandy Swartzberg, a regional service manager. In a trial before the court, the presumption is that the court did not consider hearsay. *Landscape Design and Construction, Inc. v. Harold Thomas Excavating, Inc.,* 604 S.W.2d 374, 378 (Tex.Civ.App.—Dallas 1980, writ ref'd n.r.e.). Further, any error in its admission is harmless because there was sufficient evidence, without the hearsay, to resolve the ambiguity. *Id.* We refer to the above-cited  **\*903**  testimony regarding Brewington's need for and prior use of the south parking lot, as well as Johnny Johnson's testimony that he understood the lease area to include that lot.

 **[8]**   Finally, United Interests' argument that the trial court erred in reforming the terms of the sublease is without merit. The trial court did not reform the terms of the sublease. Once the

court found that certain paragraphs in the sublease were ambiguous, it admitted parol evidence to determine the parties' intentions and then interpreted the sublease, taking all its parts together and giving them such meaning as will carry out and effectuate to the fullest extent the parties' intention. *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 519 (Tex.1968). Points of error one through four are overruled.

In points of error five through eight, United Interests argues that the trial court erred as a matter of law in finding mutual mistake in the execution of the Brewington sublease; in allowing the admission of parol evidence to vary its terms; in allowing the admission of hearsay testimony to explain its terms; and in reforming the terms of the sublease.

In Conclusion of Law No. I, the trial court found that the Brewington sublease was entered into as a result of mistake and/or mutual misconceptions in regard to paragraphs 8 and 19. We agree.

 **[9]   [10]    [11]**    A mutual mistake of fact occurs when both parties to a transaction have a belief in the present existence of a thing, material to the transaction, that does not exist. Such would be the case where the parties to a contract have a common intention, but the written contract erroneously reflects that intention because of a mistake by both parties in writing the agreement. *Turberville v. Upper Valley Farms, Inc.,* 616 S.W.2d 676, 678 (Tex.Civ.App.—Corpus Christi 1981, no writ). Parol evidence is admissible to show that the writing, because of the mistake, incorrectly reflects the true agreement, and the equitable remedy of reformation is available to correct the mistake. However, the party claiming relief must show what the parties' true agreement was and that the instrument incorrectly reflects that agreement because of a mutual mistake. *Estes v. Republic National Bank of Dallas,* 462 S.W.2d 273, 275 (Tex.1970).

 **[12]**    Upon examination of the Sabel and Brewington subleases, it is clear that the latter was copied from the former. They are identical in format and vary only in certain provisions specific to each company, such as rent and term of lease. This would explain the fact that the use paragraphs (9 in Sabel and 8 in Brewington) are exactly the same, regardless of the fact that Brewington sells and repairs typewriters rather than "televisions and other related electronic equipment" (Sabel's business). Clearly, the use paragraph was overlooked in the revision process, and this lends credence to Brewington's argument that the parking paragraph also was overlooked. The trial court thus properly admitted parol evidence to show that the lease incorrectly reflected the true agreement of the parties.

Johnny Johnson testified that when SCM stipulated that Brewington take over SCM's lease area as part of their arrangement, he understood that area to include the south parking lot. No one ever indicated to him that SCM would retain the right to lease that lot to a third party. He also understood that the only limitation in paragraph 19 on Brewington's use of the parking lot was that

there were to be no assigned parking spaces. Johnson further testified that when he interlineated the language in paragraph 15 about repairs to the lot, he was referring to the south lot.

Taken in the context of the evidence concerning SCM and Brewington's prior use of the south lot, the repairs to it and the need for access to that lot, Johnson's testimony tends to establish what the parties' true agreement was. In addition, there is Preston Whitfill's testimony that as a principal **\*904** SCM employee during the period of negotiations between SCM and Brewington, he was never notified that the south parking lot was to be excluded from the lease area. Furthermore, he remembered discussing the repairs of that lot with Sandy Swartzberg, who agreed to do the repairs for Brewington at SCM's expense. Whitfill also testified that after the dispute over the parking lot arose between Brewington and United Interests, he called Swartzberg, who told him United Interests did not have the right to lease out the south parking area because that was part of the Brewington property.

Turning to the evidence that the sublease incorrectly reflects the agreement between SCM and Brewington because of a mutual mistake by both parties, we reiterate that the Brewington sublease clearly was copied from the Sabel sublease and, in the process, several paragraphs were overlooked. During trial Lee Sabel verified that the Sabel sublease provided for parking on the north side for his approximately thirty employees. Both Whitfill and Johnson testified that the Brewington sublease was prepared by the SCM legal department in New York City rather than in Houston. Whitfill also testified that Janice Smith in that department had acknowledged that the Brewington sublease was Sabel's sublease (with the implication that the allotted parking space was also Sabel's).

Johnny Johnson had an opportunity to review and change the parking paragraph in the sublease during both the original negotiations and the later leasing of space to Amstar and did not do so. Appellant argues this indicates that parking was not a material term of the sublease. However, the testimony regarding Brewington's utilization of the south lot in its day-to-day business disputes that assumption. It is equally possible that use of the south lot was so material to the agreement that both parties assumed it had been properly resolved. Indeed, when asked if it were possible that SCM planned to lease the lot to a third party, Preston Whitfill responded, "Wouldn't make sense gaining money off of one side they would be taking it from the other because they would be screwing up the guarantee station."

 [13]   United Interests also objects to the admission of hearsay evidence to show the mutuality of the mistake. Again, we note that in a bench trial, the presumption is that the court did not consider hearsay, and any error in its admission is harmless as there was sufficient evidence without it to show mutual mistake. *Landscape Design,* 604 S.W.2d at 378.

 **[14]**   **[15]**   As to United Interests' contention in point eight that the trial court erred in reforming the terms of the Brewington sublease, the court was entitled to do so once it determined the existence of a mutual mistake.  *Estes,* 462 S.W.2d at 275.  In this case, however, the court simply filed conclusions of law stating both the intent of paragraph 8 and the most reasonable interpretation of paragraph 19 and then, in its judgment, permanently enjoined United Interests from interfering with Brewington's use of the south parking lot incidental to its rights under its sublease. Points of error five through eight are overruled.

 **[16]**   In points of error nine and ten, United Interests maintains that the court erred in declaring that the right to exclusive use and occupancy or the right to use any part of the south parking lot was and is incidental and necessary to Brewington's business and the effectuation of the intent of the sublease. In points eleven and twelve, United Interests argues that the court erred in declaring that Brewington has a right under the sublease to the exclusive use and occupancy of any portion of that lot. Point of error thirteen states that the court abused its discretion in issuing the injunction against United Interests.

As noted above, in its judgment the trial court permanently enjoined United Interests from interfering with Brewington's use of the south parking lot incidental to its rights under its lease. Nowhere did the  **\*905**  court declare that Brewington has the right to exclusive use and occupancy of the lot. Neither did the court declare that use of the lot is incidental and necessary to Brewington's business, though in its closing statements, the court made clear this was a key reason for ruling as it did. As previously discussed, the evidence supported this determination. Brewington is located on the south side of the building and access to the business by employees, customers and delivery persons is enhanced by access to the south parking lot, particularly as the service department is located at the back end of the south side. Furthermore, there are too few spaces in the front and north lots to accommodate all of the building's tenants and their customers, as evidenced by Lee Sabel's testimony that when the north lot was full, his employees parked in the south lot.

The trial court's judgment did not *declare* Brewington's rights under the sublease but rather upheld Brewington's rights under the sublease to use the lot. In its Conclusion of Law No. IV, the court interpreted those rights as including primary parking in the south lot, without limitation to use any of the parking areas on the leased premises, subject to the sole limitation that no tenant has the right to specifically reserve assigned parking places. Once the court found ambiguity and mutual mistake in the lease, it was then entitled to interpret it. *City of Pinehurst,* 432 S.W.2d at 519; *Estes,* 462 S.W.2d at 275.

Finally, United Interests' point of error that the trial court abused its discretion in issuing the injunction is without merit. This follows from our disposition of points one through twelve. Points of error nine through thirteen are overruled.

 **[17]**    **[18]**    In point of error fourteen, United Interests asserts that the trial court erred in refusing to declare the rights of United Interests under the sublease. The entry of a declaratory judgment rests within the discretion of the trial judge. *Crawford v. City of Houston,* 600 S.W.2d 891, 894 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). Denying the losing party's requested relief is not an abuse of that discretion. Further, in its argument, United Interests states, "The question of United Interests' rights may best be addressed through a determination of Brewington's rights under its sublease with respect to the use of the South parking lot." In effect, this is what the trial court has done. By decreeing that Brewington has the right to use the south parking lot without interference, the court necessarily implies that United Interests does not have the right to interfere with that use. Yet, the sublease continues in full force and effect as to the other landlord/tenant rights. The fourteenth point of error is overruled.

 **[19]**    In point of error fifteen, United Interests complains that the trial court erred in declaring that the acts of United Interests constituted an attempted constructive eviction of Brewington and that those acts provided a legal basis to enjoin United Interests from pursuing its rights under the sublease. In his bench statements, the trial judge stated that the attempt to restrict Brewington's use of the south parking lot was tantamount to constructive eviction. There is evidence in the record that United Interests planned to re-develop this property and had discussed with its tenants the possibility of moving them. This evidence, coupled with the acts of United Interests in assessing excessive maintenance charges against Brewington, in declaring Brewington in default of its lease agreement and in leasing the south parking lot to CSI, supports the trial court's conclusion. Whether that conclusion may have provided the court with a legal basis for the injunction is immaterial. In actuality the court found that under the sublease Brewington had the right to use the south parking lot without interference and properly enjoined United Interests from so interfering. Point of error fifteen is overruled.

In point of error sixteen United Interests complains of the trial court's award of attorney's **\*906** fees on appeal. In a cross-point Brewington attacks the trial court's failure to award it attorney's fees for legal services through the trial court. Brewington presented evidence of more than $26,000 in attorney's fees through the trial court, $2,500 for appeal through the court of appeals, and $1,000 for appeal to the supreme court. United Interests presented evidence of its attorney's fees in excess of $30,000 through the trial court, $3,000 for appeal through the court of appeals, and $2,000 for appeal to the supreme court.

The court awarded neither party attorney's fees through the trial court; however, it did award Brewington $10,000 should United Interests appeal to the court of appeals and Brewington prevail, and an additional $5,000 should United Interests apply for a writ of error and Brewington again prevail. United Interests argues that the court abused its discretion in its award of fees for appeal because it refused to award fees for trial and because the attorney's fees awarded for appeal are

clearly excessive and unreasonable. Brewington charges the court with an abuse of discretion in failing to award it attorney's fees for legal services through the trial court.

 [20]   [21]   Regarding the cross-point, Brewington argues that given the evidence of United Interests' bad faith, an award of attorney's fees for trial was justified. The award of attorney's fees in a declaratory judgment action is discretionary. Tex.Civ.Prac. & Rem.Code § 37.009 (Vernon 1986) (formerly Tex.Rev.Civ.Stat.Ann. art. 2524–1 § 10 (Vernon 1965)). In supplemental findings of fact the court stated that it found no sufficient cause to justify the award of attorney's fees to either party for the trial phase. It is clear from this finding and from bench statements that the court recognized both parties had legitimate rights to pursue and, therefore, each should bear its own attorney's fees through the trial court. Given the facts of this case, this was not an unreasonable action by the trial court. Therefore, Brewington's cross-point is overruled.

 [22]   Next we consider the trial court's award to Brewington of attorney's fees on appeal. Under the record before us we cannot understand how there could be sufficient cause to justify the award of attorney's fees on appeal, there being no sufficient cause to justify the award of such fees through the trial court. On this record and in light of the trial court's finding regarding attorney's fees through the trial court, we hold the trial court erred and abused its discretion in awarding to Brewington any attorney's fees on appeal.

United Interests' points of error seventeen, eighteen and nineteen concern the trial court's failure to declare the rights of the parties under the master lease after declaring that obligations for repair and maintenance were to be controlled in the future by that lease; the failure to declare the parties' obligations for repair and maintenance under the Brewington sublease as they existed prior to final judgment; and the court's error in declaring the parties' rights and Brewington's obligations under its sublease in such a manner that the controversy was not ended and indeed created piecemeal litigation.

 [23]   [24]   [25]   A trial court may grant a declaratory judgment where it would serve a useful, beneficial purpose. *Standard Fire Insurance Co. v. Fraiman,* 514 S.W.2d 343, 346 (Tex.Civ.App.—Houston [14th Dist.] 1974, no writ). In its final judgment, the trial court declares that no default by Brewington exists under the sublease. By further declaring that the master lease will henceforth govern Brewington's obligations, the court provides the framework within which both parties should operate. To declare rights and obligations under the lease anticipates a conflict which may well be resolved by the court's action regarding the use of the south parking lot. Anticipation of a conflict is not a proper subject for declaratory relief. *See Southern National Bank of Houston v. City of Austin,* 582 S.W.2d 229, 237 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.). Entry of a declaratory judgment is discretionary,  **\*907** *Crawford,* 600 S.W.2d at 894, and we find no abuse of that discretion in this case. We therefore overrule points of error seventeen through nineteen.

The trial court's judgment is affirmed except as to the award to Brewington of attorney's fees on appeal. As to said attorney's fees the judgment is reversed and rendered.

## All Citations

729 S.W.2d 897

**End of Document**                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

781 S.W.2d 322
Court of Appeals of Texas,
San Antonio.

Julia Authelia WINSLOW, et al.

v.

Edwin V. ACKER, et al.

No. 04–88–00507–CV.  |  Sept. 13, 1989.  |  Rehearing Denied Oct. 18, 1989.

Nonexecutive owners of a portion of a four-fifths interest in mineral estate of land filed action to recover their share of overriding royalties as well as breach of fiduciary duty and conspiracy and tortious interference with contractual rights. Executive owners counterclaimed to obtain declaration of their right to overriding royalties and attorney fees under the Declaratory Judgments Act. The 343rd District Court of McMullen County, Ronald M. Yeager, J., entered summary judgment for executive owners, and nonexecutive owners appealed. The Court of Appeals, Biery, J., held that: (1) partition under which nonexecutive owners were granted four-fifth of a one-eighth royalty interest clearly limited their right to payment to a set fraction of production and thus was a proper matter for summary judgment; (2) there was no breach by executive receiving overriding royalty interests where nonexecutives were entitled to participate only in a fraction of production from property; and (3) trial court properly allowed executive owners declaratory judgment counterclaim to remain on file.

Affirmed.

West Headnotes (7)

**[1]    Judgment**  👈 Evidence in General

228  Judgment
228V   On Motion or Summary Proceeding
228k182   Motion or Other Application
228k185   Evidence in General
228k185(1)   In General

Although construction of an ambiguous document generally presents a question of fact, making summary judgment improper, undisputed parol evidence could be used to resolve ambiguity as a matter of law.

5 Cases that cite this headnote

**[2]** **Evidence** 🔑 Deeds

157 Evidence

157XI Parol or Extrinsic Evidence Affecting Writings

157XI(D) Construction or Application of Language of Written Instrument

157k449 Nature of Ambiguity or Uncertainty in Instrument

157k450 In General

157k450(3) Deeds

Partition deed was clear that nonexecutive owners parted with any rights to participate in bonuses, rentals, oil payments and production over and above that amount, and thus extrinsic evidence could not be considered to determine the intent of the parties.

Cases that cite this headnote

**[3]** **Evidence** 🔑 Meaning of Words, Phrases, Signs, or Abbreviations

157 Evidence

157XI Parol or Extrinsic Evidence Affecting Writings

157XI(D) Construction or Application of Language of Written Instrument

157k454 Meaning of Words, Phrases, Signs, or Abbreviations

157k455 In General

Partition deed's use of the term "base" and "basic" one-eighth royalty were not ambiguous, as terms merely indicated type of royalty from which fractional interest was to be reserved and clearly were not intended to expand or contract fractional royalty interest reserved by grantors in deed; thus court could not resort to extrinsic evidence to determine meaning of deed.

3 Cases that cite this headnote

**[4]** **Mines and Minerals** 🔑 Nature of Estate Granted or Reserved

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(B) Conveyances in General

260k55 Grants and Reservations of Minerals and Mining Rights

260k55(4) Nature of Estate Granted or Reserved

Under partition deed contractually limiting grantees' participation in production from property to sharing in their proportionate part of the one-eighth royalty, with no rights to participate in bonuses, rentals, oil payments and production above their four-fifths of the base one-eighth royalty, the grantees were not entitled to share in overriding royalties received by grantee who received executive rights and right to receive all benefits derived from leasing the estate, including overriding royalties.

1 Cases that cite this headnote

**[5]** **Mines and Minerals** ⟜ Nature of Estate Granted or Reserved

260   Mines and Minerals

260II   Title, Conveyances, and Contracts

260II(B)   Conveyances in General

260k55   Grants and Reservations of Minerals and Mining Rights

260k55(4)   Nature of Estate Granted or Reserved

There could be no breach of duty by the executive owner receiving an overriding royalty interest under a mineral lease where the nonexecutive owners were entitled to participate only in a fraction of the production from the property.

1 Cases that cite this headnote

**[6]** **Declaratory Judgment** ⟜ Counterclaim for Declaratory Relief in Other Action

118A   Declaratory Judgment

118AIII   Proceedings

118AIII(D)   Pleading

118Ak323   Counterclaim for Declaratory Relief in Other Action

Court could allow counterclaim for declaratory judgment where nonexecutive owners of a portion of a four-fifths interest in a mineral estate sought recovery of their alleged proportion of overriding royalty interest assigned to executive owners, while declaratory judgment counterclaim filed by executive owners could settle all future disputes as to granting of royalties under partition deed.

9 Cases that cite this headnote

**[7]** **Declaratory Judgment** ⟜ Dismissal Before Hearing

118A   Declaratory Judgment

118AIII   Proceedings

118AIII(F)   Hearing and Determination

118Ak361   Dismissal Before Hearing

118Ak361.1   In General

    (Formerly 118Ak361)

Trial court was within its discretion in denying plaintiffs' motion to dismiss defendants' declaratory judgment counterclaim where plaintiffs had filed no special exceptions to defendants' counterclaim for declaratory relief and motion was not filed until several months after deadline for amendments to pleadings.

7 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*323**  T. Kellis Dibrell, Samuel D. Dibrell, Dibrell, Dotson, Dibrell, & Dibrell, San Antonio, for appellants.

J.R. Schneider, J.R. Schneider, Jr., Schneider & McWilliams, George West, for appellees.

Before BUTTS, CHAPA and BIERY, JJ.

## OPINION

BIERY, Justice.

This appeal follows a suit filed by appellants, who are non-executive owners of a portion of a four-fifth ($^4/_5$) interest in the mineral estate of certain lands located in McMullen County, Texas. Appellants sought to recover from appellees their share of overriding royalties assigned to Johnie Lorene Acker and her husband, Edwin V. Acker, Sr., as well as overriding royalties assigned to their son, Edwin V. Acker, Jr. Appellants also claimed breach of fiduciary duty and conspiracy by appellees in obtaining the overriding royalties. In addition, appellants claimed that Edwin V. Acker, Jr. tortiously interfered with appellants' contractual rights and should pay exemplary damages as a result of such interference.

Appellees answered and counterclaimed to obtain a declaration of their right to the overriding royalties and for attorney fees under the Declaratory Judgments Act. [1] Subsequently, appellees moved for summary judgment, and the appellants responded. The trial court indicated that the summary judgment would be granted but wanted to resolve the matter of attorney fees before signing the final judgment. Prior to the hearing on attorney fees, appellants filed a motion to strike appellees' counterclaim for declaratory relief and for attorney fees under the Declaratory Judgments Act. At the hearing, the trial court overruled appellants' motion to strike. Appellees non-suited their claim for attorney fees after appellants requested a jury for the determination of attorney fees.

On August 17, 1988, the trial court entered a summary judgment in favor of appellees. The summary judgment declared that the non-executives had no right, title or interest in either the overriding royalties assigned to Johnie Lorene Acker and her husband, Edwin V. Acker, Sr., or the overriding royalty assigned to Edwin V. Acker, Jr. The judgment also decreed that the non-executives had reserved unto themselves, their heirs and assigns, an undivided **\*324** four-fifths ($^4/_5$) of one-eighth (#) royalty, and granted to Johnie Lorene Acker the executive rights and the

right to receive all benefits derived from leasing the mineral estate, including overriding royalties and royalties over and above four-fifths ($^4/_5$) of one-eighth (#).

Appellants advance four points of error in which they challenge the trial court's denial of appellants' motion to strike appellees' counterclaim for declaratory relief and request for attorney fees under the Declaratory Judgments Act, as well as the trial court's granting summary judgment in favor of appellees. We affirm the judgment of the trial court.

Before we address appellants' points of error, we will review the relevant facts. Johnie Lorene Acker was one of five children of J.E. Murphy, deceased. In the partition of Murphy's estate, two tracts of land in McMullen County, Texas, aggregating 1,200 acres, were awarded and set apart to Johnie Lorene Acker by partition deed (the "Acker Partition Deed") from her sisters, Edna Mae Jones, Mabel Mullin Snowden and Julia Authelia Akers (who is now Julia Authelia Winslow, an appellant herein) and her brother, Emmett Granvel Murphy. The partition deed to Johnie Lorene Acker setting apart to her the 1,200 acres of land therein described contained the following reservation:

> Provided, however, it is expressly understood and agreed by each and all of the parties hereto that no part of the oil, gas, or other minerals in, on, or under the above-described lands are hereby conveyed or are intended or affected by this instrument except as hereinafter provided, and the parties hereto, their respective heirs and assigns, shall continue to own and hold in common all of the oil, gas and other minerals, in, on, and under all of the above-described lands in the same undivided proportion that said parties now own and hold said oil, gas and other minerals together with the right to ingress and egress at all times for the purposes of mining, drilling and exploring said lands for oil, gas and other minerals and removing the same therefrom, and none of the royalties, reversionary interests, or other rights of said parties under existing oil, gas and mineral leases shall be affected in any manner by this instrument; it being further provided, however, anything in the foregoing to the contrary notwithstanding, that the grantee of the surface estate herein, Johnie Lorene Acker, shall have the exclusive right to execute, without the joinder of any of the grantors herein, any oil, gas or mineral lease that she desires on any such terms as she may desire, and receive, as her separate property, such bonuses, oil payments, and rentals as may be paid under said oil, gas and mineral leases so executed by her, except that she shall reserve in each oil, gas, and mineral lease so executed by her a base one-eighth (#) royalty interest for the benefit of herself and the other four children of J.E. Murphy, deceased, grantors herein, in the same proportion they now own same.

In the partition of the Estate of J.E. Murphy, the other partition deeds were all executed in October, 1948, by the same five children. One of the partition deeds awarded and set apart to Edna Mae Jones certain lands in McMullen County, Texas. One of the partition deeds awarded to Julia Authelia Akers (now Julia Authelia Winslow) certain lands upon which she and her husband were then living in LaSalle County, Texas. One of the partition deeds awarded and set apart to Emmett Granvel Murphy certain lands in McMullen and Duval Counties, Texas. Each of the four partition deeds contained identical provisions.

Mabel Mullin Snowden, one of the children of J.E. Murphy, had acquired a tract of land prior to his death. These lands were situated in LaSalle and Dimmit Counties, Texas, conveyed to her by deed on September 28, 1945, and recorded in the deed records of LaSalle County, Texas. This conveyance to Mabel M. Snowden included the oil, gas and mineral estate in the lands therein described. Following the death of her father and by deed dated October 27, 1948, Mabel M. Snowden conveyed to her sisters, Edna Mae Jones, Johnie Lorene Acker, Julia Authelia Akers and **\*325** her brother, Emmett Granvel Murphy, in equal shares, an undivided four-fifths ($^4/_5$) interest in and to all the oil, gas and minerals acquired by her by such deed (the "Snowden Deed") of September 28, 1945. Edna Mae Jones, Johnie Lorene Acker, Mabel Mullin Snowden, Julia Authelia Akers and Virginia Gertrude Akers Murphy (the surviving wife of Emmett Granvel Murphy) entered into a Declaration and Agreement, dated December 9, 1953, and recorded it in the deed records of LaSalle County, Texas. This deed confirmed the parties' intentions with respect to the rights of the surface owner and the sharing of any royalties by the surface owner.

Johnie Lorene Acker executed four oil and gas leases, each conveying a portion of the lands awarded and set apart to her in the partition deed to her, each lease being to Murphy H. Baxter, as lessee. Murphy H. Baxter assigned to Johnie Lorene Acker and her husband, Edwin V. Acker, Sr., a five and one-half percent (5½%) overriding royalty in and to the four leases by assignment dated March 24, 1981, and recorded in the deed records of McMullen County, Texas.

Johnie Lorene Acker died April 8, 1983, and her interest in the overriding royalty passed to her sons, Edwin V. Acker, Jr. and Emmett A. Acker, as independent co-executors and trustees under her will. Edwin V. Acker, Sr., died November 4, 1987, and Edwin V. Acker, Jr. and Emmett A. Acker were appointed independent co-executors of his estate and have been substituted as legal representatives of Edwin V. Acker, Sr., in his stead in this cause.

In their first point of error, appellants contend that the trial court erred in finding that the terms "base one-eighth royalty" in the four partition deeds; "basic one-eighth royalty," in the Declaration and Agreement and "above the one-eighth royalty" in the Snowden Deed, should be construed together and interpreted as limiting the non-executives' mineral interest to only four-fifths ($^4/_5$) of a one-eighth (#) royalty.

Appellants have referred to alleged findings by the trial court and the basis for the trial court's decision throughout their argument. Appellants' conclusions and assertions as to the trial court's findings and the basis for the trial court's decision are unsupported by the record. The trial court made no findings of fact and the trial court gave no specific reasons for its decision. Further, findings of fact are not made in summary judgment proceedings. Even if the court were to give an incorrect reason for its judgment, the judgment must be upheld on any legal theory before this Court. *Guaranty County Mutual Ins. Co. v. Reyna,* 709 S.W.2d 647, 648 (Tex.1986).

Appellants' argument under point of error one contains two interrelated contentions. First, appellants allege that a question of fact exists due to an ambiguity relating to the terms "base one-eighth royalty," and "basic one-eighth royalty" in the Acker Partition Deed. Second, appellants assert that the Snowden Deed is subject to the ambiguous language contained in the Acker Partition Deed, thereby raising a fact question as to the construction of the Snowden Deed. We disagree with appellants' initial contention that the Acker Partition Deed is ambiguous. Therefore, appellants' argument concerning the application of the Acker Partition Deed to the Snowden Deed is moot.

 **[1]**   In considering appellants' argument concerning an alleged ambiguous term, we must first determine whether the document is in fact ambiguous. If we so conclude, then extrinsic evidence may be considered to determine the intent of the parties. Generally, construction of an ambiguous document presents a question of fact, and summary judgment would, therefore, be improper. However, undisputed parol evidence may resolve the ambiguity as a matter of law. *Security Savings Ass'n v. Clifton,* 755 S.W.2d 925, 931 (Tex.App.—Dallas 1988, no writ).

The interpretation of an unambiguous deed presents a question of law for the court. *Altman v. Blake,* 712 S.W.2d 117, 118 (Tex.1986). The parties' intent must be ascertained by applying the "four corners rule." *Id.* In so doing, the court must recognize that the parties "intend every **\*326** clause to have some effect and in some measure to evidence their agreement." *Id.*

Appellants contend that the trial court erred by failing to subject the reservation in the Acker Partition Deed to the applicable rules of interpretation and construction, so as to give effect and harmonize every provision contained in the reservation. Appellants then claim that the legal interpretation of the reservation yields a different result than that reached by the trial court. Finally, appellants conclude that the trial court's construction of the Acker Partition Deed has the effect of rendering meaningless the broad mineral interest in the first part of the reservation clause.

The first portion of the deed declares that no part of the minerals are conveyed or affected "except as hereinafter provided." That portion of the reservation concludes that "none of the royalties, reversionary interests, or other rights of said parties under existing oil, gas and mineral leases shall be affected in any manner by this instrument," thereby limiting the foregoing language to those rights of the parties existing under leases in existence at the time of the execution of the partition

deed. The second portion of the reservation begins, "it being further provided, however, anything in the foregoing to the contrary notwithstanding," and then strips the grantors of four of the five essential elements of a mineral interest, leaving only the right of the grantors to receive a portion of the royalties under future leases. *See Altman v. Blake,* 712 S.W.2d 117, 118 (Tex.1986) (holding that the five essential elements of a severed mineral estate, are (1) the right to develop [the right of ingress and egress]; (2) the right to lease [the executive right]; (3) the right to receive bonus payments; (4) the right to receive delay rentals and (5) the right to receive royalty payments). By its express terms, the second part of the reservation controls the preceding portion.

The gist of appellants' argument is that the deed is unclear as to whether they are entitled to a set fraction of production or fractions of subsequent royalties to be determined by the terms of future leases.

 **[2]**   Appellants' assertions are viable only if we ignore the introductory phrase of the second part of the reservation. Ironically, their arguments can be supported only if we disregard the case law they attempt to use to support their argument.

In *Tiller v. Tiller,* 685 S.W.2d 456 (Tex.App.—Austin 1985, no writ) and *Helms v. Guthrie,* 573 S.W.2d 855 (Tex.Civ.App.—Fort Worth 1978, writ ref'd n.r.e.), the owners of an interest in a fraction of production were limited to that fraction and were not entitled to a "fraction of royalty" to be determined upon execution of some future lease. Appellants are attempting to construe the language under the Acker Partition Deed so as to permit the appellants to share in four-fifths ($^4/_5$) of whatever royalties may be contracted for, so long as such royalty is at least a royalty of one-eighth (#).

Appellants cite *Flippen v. Flippen,* 628 S.W.2d 462 (Tex.App.—Eastland 1981, no writ) to support their construction of the reservation. Under the partition deeds in *Flippen,* the parties were given a specific fractional interest "of the oil royalty, gas royalty, and royalty in casinghead gas, gasoline and royalty in all other minerals." *Id.* at 465. The same clause which reserved the undivided interest later provided that any future lease shall provide for at least a royalty "of the usual [one-eighth] #." *Id.* The court held that the later restriction on the grantees' authority to make oil and gas leases did not create an ambiguity or alter the specific reservation of royalty as provided for in the partition deeds. *Id.* at 466. The language in the *Flippen* deeds is clearly distinguishable from the reservation in the Acker Partition Deed.

In the Acker Partition Deed, the parties expressly agreed and contracted that Johnie Lorene Acker "shall reserve in each oil, gas and mineral lease so executed by her, a base one-eighth (#) royalty interest for the benefit of herself and the other four children of J.E. Murphy, deceased, grantors herein, in the same proportion they now own the same." Appellants in effect reserved four-fifths

($^4/_5$) of one-eighth (#), or **\*327** four-fortieths ($^4/_{40}$), of production from the lands described in the Acker Partition Deed.

The court in *Tiller, supra,* held that while the partition deed in question in one section used the phrase "all of the # lease hold rights," the deed apparently conveyed outright ownership of the mineral estate to each individual under his respective tract. The court further held that:

Each tract was subject to a # royalty interest which was to be shared among the partitioners. The owner of each individual tract would receive $^2/_9$ of the # royalty with each remaining partitioner receiving $^1/_9$ of # (which was clearly expressed as $^1/_{72}$) of the minerals in and under the tracts conveyed to their copartitioners.

The partition deed expressly granted the owner of each individual tract all rights regarding the execution of oil and gas leases on his tract as well as the right to receive all bonus monies or other considerations. The only restriction on the individual owners as to the development of their mineral estate was a provision that any lease must provide at least a # royalty interest to be shared, as described above, among the original partitioners and their successors.

685 S.W.2d at 458. *Tiller* cites with approval *Helms v. Guthrie,* 573 S.W.2d 855 (Tex.Civ.App. —Fort Worth 1978, writ ref'd n.r.e.), which held that reservation of "½ of the #th royalty (same being a $^1/_{16}$th of the total production) of oil, gas and minerals" was a contractual limitation and concluded that Helms owned a 'fractional royalty,' of $^1/_{16}$th of the total production, not a 'fraction of royalty,' determinable upon the execution of some future lease." *Id.* at 857. In addition, *Tiller* held that the partition deed contained clear and unambiguous language that conveyed $^1/_9$ of the # royalty, ($^1/_{72}$) of all the oil, gas and other minerals produced from said land." Therefore, the court rejected the arguments that the deed was ambiguous. 685 S.W.2d at 458.

 **[3]**   Appellants also argue that ambiguity exists in the Acker Partition Deed due to the varying interpretations of the terms "base" and "basic" one-eighth royalty. Appellants have attempted to create an ambiguity by focusing on out-of-context words or phrases, as opposed to interpreting such words or phrases within the context of the document as a whole.

The use of the terms "base" and "basic" were clearly not intended to expand or contract the fractional royalty interest reserved by the grantors in the Acker Partition Deed. The grantors reserved their portion ($^4/_5$) of the one-eighth (#) royalty for future leases. The terms "base" and "basic" are descriptive, not modifying, terms indicating the type of royalty from which the fractional interest was to be reserved.

Appellants' complaints concerning their interest in the Snowden Deed are premised on their incorrect argument that the Acker Partition Deed is ambiguous. Therefore, the remainder of appellants' argument under this point of error is moot. Point of error one is overruled.

In their second point of error, appellants contend that the trial court erred in finding that they were not entitled to share in the overriding royalties received by Johnie Lorene Acker and her husband, and by Edwin V. Acker, Jr. Appellants assert that appellees identified certain mineral interest fees as bonus payments rather than royalties and that appellants are entitled to $^4/_5$ of these proceeds.

 **[4]**   Questions concerning the classifications of royalty and mineral interests are immaterial to our disposition of this case. It is clear from the Acker Partition Deed that appellants parted with any rights to participate in bonuses, rentals, oil payments and production over and above an undivided four-fifths ($^4/_5$) of a base one-eighth (#) royalty. The grantees in the Acker Partition Deed contractually limited their participation in the production from the property to sharing in their proportionate part of the one-eighth (#) royalty. Appellants are entitled to nothing more. Point of error two is overruled.

In their third point of error, appellants argue that the trial court erred in granting **\*328** summary judgment where certain fact questions remained. Specifically, appellants assert that the following fact questions are in contention: whether the executive holder breached her duty of utmost good faith and fair dealing by obtaining overriding royalties to the exclusion of the non-executives; whether the appellees conspired to obtain assignments of overriding royalties with the intent to defraud the non-executives of their proportionate interest in oil and gas production; and whether appellee Edwin V. Acker, Jr. tortiously interfered with appellants' contractual rights.

 **[5]**   There can be no breach of duty by the executive receiving an overriding royalty interest where the non-executives are entitled to participate only in a fraction of the production from the property. This is the effect of the holdings in *Helms* and *Tiller.* Furthermore, the questions of conspiracy and tortious interference of contract become moot, because there can be no conspiracy to deprive appellants of an interest which they are not entitled to receive. Nor could Edwin V. Acker, Jr. have interfered tortiously with appellants' contract rights if appellants were not entitled to share in more than their proportionate part of four-fifths ($^4/_5$) of one-eighth (#) royalty. Point of error three is overruled.

In their fourth point of error, appellants argue the trial court erred in failing to strike appellees' counterclaims for declaratory relief and request for attorney fees under the Declaratory Judgments Act. Appellants assert that the subject matter of the counterclaim was already pending before the court, and the declaratory relief was sought for the sole purpose of providing a vehicle to obtain attorney fees. [2]

The Declaratory Judgments Act is not available to settle disputes already pending before the court. *John Chezik Buick Co. v. Friendly Chevrolet Co.,* 749 S.W.2d 591, 594 (Tex.App.—Dallas 1988, writ denied). However, when a declaratory judgment counterclaim has greater ramifications than the original suit, the court may allow the counterclaim. *See Placid Oil Co. v. Louisiana Gas Intrastate, Inc.,* 734 S.W.2d 1, 5 (Tex.App.—Dallas 1987, writ ref'd n.r.e.).

 **[6]**   In this case, appellants' lawsuit sought recovery of their alleged proportion of the overriding royalty interests which were assigned to appellees. The counterclaim filed by appellees would have the effect of settling all future disputes as to the granting of royalties under the partition deed. Thus, the trial court did not err in allowing the appellees' counterclaim to remain on file.

 **[7]**   In any event, appellants have failed to preserve this point of error. The trial court signed a docket control and pre-trial order on February 1, 1988. The trial court set the deadline for amendments to pleadings by appellants for February 19, 1988. Appellants filed no special exceptions to appellees' counterclaim for declaratory relief. Appellants' motion to strike the counterclaim for declaratory relief was filed on or about August 12, 1988. Therefore, on that ground alone, the trial court was within its discretion in denying appellants' motion. Appellants' fourth point of error is overruled.

The judgment of the trial court is affirmed.

## All Citations

781 S.W.2d 322

## Footnotes

1    TEX.CIV.PRAC. & REM.CODE ANN. § 37.001 *et seq.* (Vernon 1986).

2    Appellees non-suited their claim for attorney fees.

---

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

194 S.W.3d 622
Court of Appeals of Texas,
Houston (14th Dist.).

XCO PRODUCTION COMPANY, Appellant,

v.

Bruce L. JAMISON and B.L. Jamison Family Limited Partnership, Appellees.

No. 14–03–01198–CV.    |    April 28, 2006.

**Synopsis**

**Background:** Working-interest partner in tax partnership involving interest in oil and gas properties brought breach-of-contract action against other partner. Following a jury trial, the 11th District Court, Harris County, Mark Davidson, J., entered judgment in favor of working-interest partner. Other partner appealed.

**Holdings:** On motion for rehearing, the Court of Appeals, Eva M. Guzman, J., held that:

[1] other partner could allocate to working-interest partner only intangible drilling costs, general and administrative costs, and depreciation until working-interest partner recouped his initial investment;

[2] working-interest partner's claim did not accrue when operator of the properties issued erroneous accounting statements to partnership; and

[3] claim was not subject to limitations clause incorporated in operating agreements for the properties.

Affirmed.

West Headnotes (26)

**[1]    Mines and Minerals** 🔑 Rights of partners inter se

260  Mines and Minerals
260III   Operation of Mines, Quarries, and Wells
260III(B)   Mining Partnerships and Companies

260k96   Partnerships

260k99   Rights and Liabilities of Partners

260k99(2)   Rights of partners inter se

Under memorandum of agreement, which created tax partnership in which working-interest partner would acquire interest in other partner's non-operator interest in oil and gas properties, other partner could allocate to working-interest partner only intangible drilling costs, general and administrative costs, and depreciation until working-interest partner recouped his initial investment, and thus other partner could not allocate all costs, including lease operating expenses.

Cases that cite this headnote

**[2]   Contracts** 🔑 Intention of Parties

95   Contracts

95II   Construction and Operation

95II(A)   General Rules of Construction

95k147   Intention of Parties

95k147(1)   In general

Court's primary concern in interpreting a contract is ascertaining the true intent of the parties.

2 Cases that cite this headnote

**[3]   Contracts** 🔑 Construction as a whole

95   Contracts

95II   Construction and Operation

95II(A)   General Rules of Construction

95k143.5   Construction as a whole

When construing a contract, the court examines the writing as a whole in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.

4 Cases that cite this headnote

**[4]   Contracts** 🔑 Presumptions and burden of proof

95   Contracts

95II   Construction and Operation

95II(A)   General Rules of Construction

95k175   Evidence to Aid Construction

95k175(1)   Presumptions and burden of proof

Court presumes that the parties to a contract intend every clause to have some effect.

6 Cases that cite this headnote

**[5]** **Contracts** 🔑 Language of Instrument

95 Contracts

95II Construction and Operation

95II(A) General Rules of Construction

95k151 Language of Instrument

95k152 In general

Courts give contractual terms their plain, ordinary, and generally accepted meaning unless the contract shows the parties used them in a technical or different sense.

1 Cases that cite this headnote

**[6]** **Contracts** 🔑 Existence of ambiguity

95 Contracts

95II Construction and Operation

95II(A) General Rules of Construction

95k143 Application to Contracts in General

95k143(2) Existence of ambiguity

Contract is not ambiguous if it can be given a certain or definite meaning as a matter of law.

3 Cases that cite this headnote

**[7]** **Contracts** 🔑 Existence of ambiguity

95 Contracts

95II Construction and Operation

95II(A) General Rules of Construction

95k143 Application to Contracts in General

95k143(2) Existence of ambiguity

Contract's lack of clarity does not create an ambiguity.

Cases that cite this headnote

**[8]** **Contracts** 🔑 Existence of ambiguity

95 Contracts

95II Construction and Operation

95II(A) General Rules of Construction

95k143 Application to Contracts in General

95k143(2) Existence of ambiguity

Contract is not ambiguous simply because the parties advance conflicting interpretations.

1 Cases that cite this headnote

**[9]  Contracts** ⟜ Existence of ambiguity

95  Contracts

95II  Construction and Operation

95II(A)  General Rules of Construction

95k143  Application to Contracts in General

95k143(2)  Existence of ambiguity

Contract is ambiguous if it is subject to two or more reasonable interpretations after applying the pertinent rules of construction.

3 Cases that cite this headnote

**[10]  Contracts** ⟜ Ambiguity in general

95  Contracts

95II  Construction and Operation

95II(A)  General Rules of Construction

95k176  Questions for Jury

95k176(2)  Ambiguity in general

If a contract is ambiguous, a fact issue exists on the parties' intent.

Cases that cite this headnote

**[11]  Contracts** ⟜ Construction as a whole

**Contracts** ⟜ Extrinsic circumstances

**Customs and Usages** ⟜ Explanation of Contract

95  Contracts

95II  Construction and Operation

95II(A)  General Rules of Construction

95k143.5  Construction as a whole

95  Contracts

95II  Construction and Operation

95II(A)  General Rules of Construction

95k169  Extrinsic circumstances

113  Customs and Usages

113k9  Application and Operation

113k15  Explanation of Contract

113k15(1)  In general

In determining whether a contract is ambiguous, court looks to the contract as a whole, in light of the circumstances present when the contract was executed; these circumstances include the commonly understood meaning in the industry of a specialized term, which may be proven by extrinsic evidence such as expert testimony or reference material.

5 Cases that cite this headnote

## [12] **Evidence** ⚬ Technical, trade, or local terms

157 Evidence

157XI Parol or Extrinsic Evidence Affecting Writings

157XI(D) Construction or Application of Language of Written Instrument

157k454 Meaning of Words, Phrases, Signs, or Abbreviations

157k457 Technical, trade, or local terms

Parol evidence rule did not bar working-interest partner's attorney, who drafted memorandum of agreement concerning tax partnership involving interest in oil and gas properties, from testifying about meaning of agreement and circumstances present when agreement was drafted, in breach-of-contract action that was brought against other partner; testimony was not admitted to create ambiguity or vary terms of the parties' agreement, but rather to explain the agreement's specialized terms.

4 Cases that cite this headnote

## [13] **Evidence** ⚬ Contracts in General

**Evidence** ⚬ Grounds for admission of extrinsic evidence

157 Evidence

157XI Parol or Extrinsic Evidence Affecting Writings

157XI(A) Contradicting, Varying, or Adding to Terms of Written Instrument

157k397 Contracts in General

157k397(1) In general

157 Evidence

157XI Parol or Extrinsic Evidence Affecting Writings

157XI(D) Construction or Application of Language of Written Instrument

157k448 Grounds for admission of extrinsic evidence

Under parol evidence rule, extrinsic evidence is not admissible to create an ambiguity or vary the terms of an unambiguous agreement.

1 Cases that cite this headnote

## [14] **Contracts** ⚬ Extrinsic circumstances

**Evidence** ⚬ Grounds for admission of extrinsic evidence

95 Contracts

95II Construction and Operation

95II(A) General Rules of Construction

95k169 Extrinsic circumstances

157 Evidence

157XI Parol or Extrinsic Evidence Affecting Writings

157XI(D) Construction or Application of Language of Written Instrument

157k448 Grounds for admission of extrinsic evidence

When determining whether an agreement is ambiguous, a court may examine extrinsic evidence to interpret the terms used by the parties and extrinsic evidence of the circumstances surrounding execution of the agreement.

3 Cases that cite this headnote

**[15] Appeal and Error** &#128273; Submission of Issues or Questions to Jury

**Mines and Minerals** &#128273; Rights of partners inter se

30 Appeal and Error
30XVI Review
30XVI(J) Harmless Error
30XVI(J)17 Submission of Issues or Questions to Jury
30k1062.1 In general
260 Mines and Minerals
260III Operation of Mines, Quarries, and Wells
260III(B) Mining Partnerships and Companies
260k96 Partnerships
260k99 Rights and Liabilities of Partners
260k99(2) Rights of partners inter se

Trial court erred, in working-interest partner's breach-of-contract action against other partner in tax partnership regarding oil and gas properties, in submitting a jury question regarding interpretation of the partnership agreement, given that the agreement was unambiguous as a matter of law in working-interest partner's favor; however, the error was harmless, in light of jury's correct interpretation of the agreement in favor of working-interest partner. Rules App.Proc., Rule 44.1(a)(1).

2 Cases that cite this headnote

**[16] Contracts** &#128273; Breach by failure of performance

95 Contracts
95V Performance or Breach
95k315 Breach by failure of performance

A breach of contract occurs when a party fails or refuses to do something he has promised to do.

4 Cases that cite this headnote

**[17] Contracts** &#128273; Questions for Jury

95 Contracts
95V Performance or Breach
95k323 Questions for Jury
95k323(1) In general

In a breach-of-contract action, the court determines what conduct is required by the parties under the contract, and, insofar as a dispute exists concerning the failure of a party to perform the contract, the court submits the disputed fact questions to the jury.

2 Cases that cite this headnote

**[18]    Limitation of Actions** 👉 Verdict, findings and judgment

241   Limitation of Actions
241V   Pleading, Evidence, Trial, and Review
241k201   Verdict, findings and judgment

Where reasonable minds may differ as to the inferences to be drawn from the evidence, it is incumbent upon the party asserting limitations to secure findings sustaining the plea of limitations.

Cases that cite this headnote

**[19]    Appeal and Error** 👉 Requests and Failure to Give Instructions

30   Appeal and Error
30V   Presentation and Reservation in Lower Court of Grounds of Review
30V(B)   Objections and Motions, and Rulings Thereon
30k214   Instructions
30k216   Requests and Failure to Give Instructions
30k216(1)   In general

The failure to request a jury instruction on an affirmative defense results in waiver of that ground by the party relying on it unless the issue was conclusively established. Vernon's Ann.Texas Rules Civ.Proc., Rule 279.

6 Cases that cite this headnote

**[20]    Trial** 👉 Insufficiency to support other verdict; conclusive evidence

**Trial** 👉 Uncontroverted facts or evidence

388   Trial
388VI   Taking Case or Question from Jury
388VI(A)   Questions of Law or of Fact in General
388k139.1   Evidence
388k139.1(5)   Submission to or Withdrawal from Jury
388k139.1(17)   Insufficiency to support other verdict; conclusive evidence
388   Trial
388VI   Taking Case or Question from Jury
388VI(A)   Questions of Law or of Fact in General
388k141   Uncontroverted facts or evidence

When facts are undisputed or conclusively established, there is no need to submit those issues to the jury.

6 Cases that cite this headnote

**[21] Limitation of Actions** ⬥ Breach of contract in general

241 Limitation of Actions
241II Computation of Period of Limitation
241II(A) Accrual of Right of Action or Defense
241k46 Contracts in General
241k46(6) Breach of contract in general

Working-interest partner's breach-of-contract action against other partner in tax partnership regarding oil and gas properties did not accrue for limitations purposes when operator of the properties issued accounting statements to the partnership that allegedly demonstrated improper deduction of expenses from working-interest partner's account; operator and other partner were separate corporate entities, other partner represented to working-interest partner that it would correct the accounting statements, other partner's revenues had been frozen by court order, and other partner reassured working-interest partner that he would receive his payout when the revenues were released by court. V.T.C.A., Civil Practice & Remedies Code § 16.004.

Cases that cite this headnote

**[22] Corporations and Business Organizations** ⬥ Presumptions and burden of proof

101 Corporations and Business Organizations
101II Disregarding Corporate Entity; Piercing Corporate Veil
101k1079 Actions to Pierce Corporate Veil
101k1086 Evidence
101k1086(2) Presumptions and burden of proof
(Formerly 101k1.7(2))

Texas law presumes that two separate corporations are distinct entities, and a party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation.

Cases that cite this headnote

**[23] Limitation of Actions** ⬥ Causes of action in general

241 Limitation of Actions
241II Computation of Period of Limitation
241II(A) Accrual of Right of Action or Defense
241k43 Causes of action in general

A cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy.

1 Cases that cite this headnote

**[24] Limitation of Actions** 🔑 Causes of action in general

**Limitation of Actions** 🔑 In general; what constitutes discovery

241 Limitation of Actions

241II Computation of Period of Limitation

241II(A) Accrual of Right of Action or Defense

241k43 Causes of action in general

241 Limitation of Actions

241II Computation of Period of Limitation

241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action

241k95 Ignorance of Cause of Action

241k95(1) In general; what constitutes discovery

A cause of action can generally be said to accrue when the wrongful act effects an injury, regardless of when the plaintiff learned of such injury.

5 Cases that cite this headnote

**[25] Appeal and Error** 🔑 Submission of Issues or Questions to Jury

30 Appeal and Error

30XVI Review

30XVI(J) Harmless Error

30XVI(J)17 Submission of Issues or Questions to Jury

30k1062.1 In general

Trial court's error, in working-interest partner's breach-of-contract action against other partner in tax partnership regarding oil and gas properties, in submitting a jury question regarding the discovery rule, asking whether working-interest partner discovered or should have discovered his claim more than four years before bringing his suit, was harmless; other partner did not establish that the breach of contract occurred outside the four-year limitations period. V.T.C.A., Civil Practice & Remedies Code § 16.004.

Cases that cite this headnote

**[26] Mines and Minerals** 🔑 Rights of partners inter se

260 Mines and Minerals

260III Operation of Mines, Quarries, and Wells

260III(B) Mining Partnerships and Companies

260k96 Partnerships

260k99 Rights and Liabilities of Partners

260k99(2) Rights of partners inter se

Working-interest partner's breach-of-contract action against other partner concerning distribution of revenues from tax partnership regarding interest in oil and gas properties

was not subject to the limitations clause incorporated in operating agreements for those properties, although memorandum of agreement between working-interest partner and other partner incorporated operating agreements; clause applied to accounting procedures between operator and non-operators, other partner was a non-operator, working-interest partner purchased portion of other partner's non-operator interest, and working-interest partner's dispute was not with operator.

Cases that cite this headnote

## Attorneys and Law Firms

**\*624** Harvey F. Cohen, Austin, Roger D. Townsend, Houston, for appellant.

**\*625** Bruce L. Jamison, Edward J. Hennessy, Houston, for appellees.

Panel consists of Chief Justice HEDGES and Justices EDELMAN and GUZMAN.

## SUBSTITUTE OPINION

EVA M. GUZMAN, Justice.

We overrule the Motion for Rehearing filed by Appellant. We withdraw the opinion issued on May 26, 2005, and we issue the following substitute opinion in its place.

Appellees, Bruce L. Jamison and B.L. Jamison Family Limited Partnership (collectively "Jamison"), sued appellant XCO Production Company ("XCO") for breach of a contract governing Jamison's purchase of an interest in certain oil and gas properties. The parties disagree over the interpretation of the contract. After a jury returned its verdict interpreting the contract in Jamison's favor, the trial court entered judgment for Jamison.

In three issues, XCO contends (1) the trial court erred by submitting a jury question regarding interpretation of the contract because it is unambiguous and in XCO's favor as a matter of law, (2) Jamison's claim is barred by the four-year statute of limitations, and (3) Jamison's claim is barred by a two-year contractual limitations period. We agree that the contract is unambiguous as a matter of law, but in Jamison's favor. Therefore, we conclude any error in submitting the jury question was harmless. We further conclude XCO failed to prove that Jamison's breach of contract claim is barred by the four-year statute of limitations or a contractual limitations period. Accordingly, we affirm.

# I. BACKGROUND

XCO is an oil and gas exploration company owned by Robert Gray. The company owned working interests in oil and gas properties in Louisiana. Southampton Mineral Corporation was the operator for these properties. In 1991, Jamison, who was interested in a low-risk investment opportunity that would provide tax advantages and future income, was introduced to Gray by one of Jamison's friends.

Jamison and XCO entered into a written "Memorandum of Agreement" ("Partnership Agreement") effective December 13, 1991, whereby Jamison purchased a portion of XCO's working interest in several Louisiana properties. The Partnership Agreement created a tax partnership ("Partnership") between Jamison and XCO.[1] Under the Partnership Agreement, Jamison made a $500,000.00 capital contribution to the partnership, and XCO contributed its working interest in the properties. The disputed portion of the Partnership Agreement, paragraph 9, concerns allocation of income and costs between XCO and Jamison:

9. Partnership Allocations. Each item of income, gain, loss or deduction shall be allocated between XCO and JAMISON as follows:

    (a) First, all [intangible drilling costs] and general and administrative costs paid from December 13, 1991 through December 31, 1992, shall be allocated to JAMISON, provided, however, that no such amounts shall be allocated to Jamison which would cause his fair market value capital **\*626** account to become negative or increase its negative position;

    (b) Second, all depreciation with respect to tangibles held by the Tax Partnership or with respect to the Weldon Operating Agreement and allocable to the XCO–JAMISON partnership shall be allocated to JAMISON, provided, however, that such allocations, in the aggregate, shall not cause his fair market value capital account to become negative or increase its negative position;

    (c) All costs other than those set forth in paragraphs 9.a and 9.b of this Memorandum of Agreement shall be allocated to XCO;

    (d) 30% of the XCO–JAMISON Partnership's net revenues, after adjustment for the items of cost set forth in paragraphs 9.a, b and c of this Memorandum of Agreement, shall be allocated to JAMISON until such time as he has received $500,000.00 in

distributions from the XCO–JAMISON Partnership ("Payout"); the balance of the net revenues shall be allocated to XCO during such period.

(e) After Payout, Jamison shall receive 1.25% of the net profits of the XCO–Jamison Partnership; the balance of the XCO–JAMISON Partnership's revenues, and all of its expenses, shall be allocated after Payout to XCO.

The parties urge different interpretations of paragraph 9. In summary, XCO claims paragraph 9 allowed XCO to deduct *all* costs, including lease operating expenses, intangible drilling costs, general and administrative costs, and depreciation, from net revenues to determine Jamison's Payout (30% of net revenues). In contrast, Jamison claims XCO could allocate to him only the costs listed in subparagraphs (a) and (b) (intangible drilling costs, general and administrative costs, and depreciation); and once $500,000.00 in costs were allocated to him, he was entitled to 30% of net revenues, without regard to costs, until he recouped his initial $500,000.00 investment.

Beginning in 1992, Southampton issued revenue and expense statements to the XCO–Jamison Partnership. The statements showed the gross income, taxes, royalties, and operating expenses of the various properties, and the net profit or loss allocable to the aggregated working interests that partnered with Southampton in the properties. The statements did not directly show the amounts to be billed or credited to the XCO–Jamison Partnership, but instead listed the amounts of "Net to XCO" and "Jamison Net Profit." "Net revenues" to Jamison, as addressed by paragraph 9(d) of the Partnership Agreement, were not addressed by these statements; however, the statements did reflect that Southampton deducted expenses from "Jamison Net Profit" which were not included in paragraphs 9(a) or 9(b) of the Partnership Agreement.

In mid–1992, an unrelated lawsuit involving the properties was filed against XCO in Louisiana. The Louisiana court ordered that all XCO's revenues be paid into the registry of the Louisiana court. The revenues were not released until early 1996. At that time, XCO told Jamison he would receive no money because costs had greatly exceeded revenues.

In 1999, Jamison sued XCO for breach of contract alleging that XCO failed to pay monies due and improperly charged costs to him. Jamison also alleged the Partnership Agreement was ambiguous. After hearing the evidence, the trial court determined that the Partnership Agreement was ambiguous and submitted a jury question regarding its meaning. Specifically, **\*627** the jury was asked, "Did [XCO] and [Jamison] agree that [Jamison] would be paid 30% of net revenues after Jamison's $500,000[.00] investment was expended only on costs allocated to Jamison in Paragraph 9(a) and 9(b) of the parties' [Partnership] Agreement?" The jury answered "yes," thus interpreting the Partnership Agreement in Jamison's favor. The trial court entered judgment awarding Jamison $417,173.00 in actual damages and $111,500.00 in attorneys' fees, as well as pre-judgment and post-judgment interest.

## II. INTERPRETATION OF THE PARTNERSHIP AGREEMENT

 **[1]**   In its first issue, XCO contends the trial court erred in submitting the jury question regarding interpretation of the Partnership Agreement because the contract is unambiguous in XCO's favor as a matter of law. [2]

### A. CONSTRUCTION OF CONTRACTS

 **[2]**   **[3]**   **[4]**   **[5]**   Our primary concern in interpreting a contract is ascertaining the true intent of the parties. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996); *Hewlett–Packard Co. v. Benchmark Elecs., Inc.,* 142 S.W.3d 554, 561 (Tex.App.-Houston [14th Dist.] 2004, pet. denied).* We examine the writing as a whole in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983); *Hewlett–Packard,* 142 S.W.3d at 561. We presume that the parties to a contract intend every clause to have some effect. *Heritage Res.,* 939 S.W.2d at 121. We give terms their plain, ordinary, and generally accepted meaning unless the contract shows the parties used them in a technical or different sense. *Id.*

 **[6]**   **[7]**   **[8]**   **[9]**   **[10]**   A contract is not ambiguous if it can be given a certain or definite meaning as a matter of law. *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.,* 121 S.W.3d 742, 746 (Tex.2003); *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex.1996). Lack of clarity does not create an ambiguity. *Universal Health Servs.,* 121 S.W.3d at 746; *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 134 (Tex.1994). Further, a contract is not ambiguous simply because the parties advance conflicting interpretations. *Columbia Gas Transmission Corp.,* 940 S.W.2d at 589; *Forbau,* 876 S.W.2d at 134. Rather, a contract is ambiguous if it is subject to two or more reasonable interpretations after applying the pertinent rules of construction. *Universal Health Servs.,* 121 S.W.3d at 746; *Columbia Gas Transmission Corp.,* 940 S.W.2d at 589. If a contract is ambiguous, a fact issue exists on the parties' intent. *Columbia Gas Transmission Corp.,* 940 S.W.2d at 589.

 **[11]**   In determining whether a contract is ambiguous, we look to the contract as a whole, in light of the circumstances present when the contract was executed. *Sun Oil Co. (Del.) v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981); *Mescalero Energy, Inc. v. Underwriters Indem. Gen. Agency, Inc.,* 56 S.W.3d 313, 319 (Tex.App.-Houston [1st Dist.] 2001, pet. denied); *see also Hewlett–Packard,* 142 S.W.3d at 561 ("We construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served."). These circumstances include the commonly understood meaning in the industry of a **\*628**  specialized term, which may be proven by extrinsic evidence such as expert testimony or reference material. *See Mescalero,* 56 S.W.3d at 320, 323;

*Zurich Am. Ins. Co. v. Hunt Petroleum (AEC), Inc.* 157 S.W.3d 462, 465 (Tex.App.-Houston [14th Dist.] 2004, no pet.).

Accordingly, to determine whether the Partnership Agreement is ambiguous, we first examine the words of the Partnership Agreement, and considering the business activity to be served, determine the meaning of any specialized term as it is interpreted in the industry. We then must decide whether both parties' interpretations are reasonable. If only one reasonable interpretation is offered, we will not find the Partnership Agreement ambiguous, but will enforce the Partnership Agreement according to its terms. After examining the Partnership Agreement and the circumstances present when it was made, we conclude that XCO's construction is *not* reasonable, but Jamison's interpretation *is* reasonable.

## B. XCO'S INTERPRETATION

In support of its argument that only its interpretation is reasonable, XCO points to subparagraph 9(d) which provides, "30% of the XCO–JAMISON Partnership's net revenues, *after adjustment for the items of cost set forth in paragraphs 9.a, b and c* ... shall be allocated to JAMISON ...." (emphasis added). According to XCO, "after adjustment" means "subtract"; thus, *all* costs, including the costs set forth in subparagraphs (a), (b), and (c), are to be subtracted from net revenues before determining Jamison's 30% Payout. [3]

XCO states that because Jamison purchased a "working interest" in the properties and a "working interest" is a cost-bearing interest, all costs had to be deducted from net revenues for Jamison's interest to be a "working interest." The court-appointed auditor who examined the Agreement in connection with this suit opined in his report that all costs were to be deducted from net revenues to determine Jamison's Payout. This interpretation of subparagraph (d), however, creates several conflicts with the rest of paragraph 9. *See J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003) (stating that in construing contracts, no single provision taken alone will be given controlling effect; rather, the court must consider the entire contract to harmonize and give effect to all its provisions, so that none will be rendered meaningless).

First, under XCO's interpretation, subparagraph (d) conflicts with subparagraphs (a) and (b). Subparagraphs (a) and (b) state that certain costs are to be allocated to Jamison's capital account. However, according to XCO, under subparagraph (d), these same costs are to be subtracted from net revenues to determine Jamison's Payout. Therefore, XCO's interpretation creates a conflict as to how the costs are to be treated.

Further, under XCO's interpretation, subparagraph (d) conflicts with subparagraph (c). Subparagraph (c) provides that all costs *other* than intangible drilling costs, general and administrative costs, and depreciation are to be allocated to XCO. But, subtracting these "other"

costs from net revenues to calculate Jamison's Payout, as urged by XCO, would effectively **\*629** allocate a portion of these costs to Jamison in contravention of subparagraph (c).

In addition, under XCO's interpretation, there is no limit on the amount of costs that may be deducted from net revenues to determine Jamison's Payout. That reasoning, however, conflicts with subparagraphs (a) and (b) which provide that "no such amounts shall be allocated to Jamison that would cause his fair market value capital account to become negative or increase its negative position." Allocating all costs, regardless of amount, to Jamison could cause his capital account ($500,000.00) to become negative.

Finally, XCO's interpretation does not reconcile the use of the term "net revenues" in subparagraph (d) with the use of the term "net profits" in subparagraph (e). According to XCO, under subparagraph (d), all costs are to be subtracted from "net revenues" to determine Jamison's Payout. However, under subparagraph (e), after Jamison's Payout reaches $500,000.00, he then receives 1.25% of "net profits." If "net revenues" include all costs as urged by XCO, then the use of the term "net profits" in subparagraph (e) is rendered meaningless; it would be merely synonymous with "net revenues." By using different terms, the parties recognized the difference between the two terms and manifested their intention to treat "net revenue" separately from "net profit." *See Sun Oil Co.,* 626 S.W.2d at 728 (where parties used different terms for oil and gas in a lease, it was apparent the parties understood the difference and intended to treat them separately). XCO's interpretation fails to explain how Jamison's interest converts from a "net revenues" interest to a "net profits" interest if all costs are already being deducted from "net revenues."

Because XCO's interpretation creates several internal conflicts in paragraph 9, we conclude that XCO's interpretation is not reasonable.

## C. JAMISON'S INTERPRETATION

[12] [13] [14] To substantiate his interpretation of paragraph 9, Jamison relies on the testimony of Shelly Cashion, his tax lawyer who drafted the Partnership Agreement.[4] Cashion testified the Partnership Agreement was an "odd duck" because it included accounting methodology unique to tax partnerships. According to Cashion, in oil and gas taxation, "allocate," "adjust," "net revenues," and "net profits" are terms of art. Cashion defined these terms as follows:

"*Allocate* ": means to divide tax items among partners.

"*Adjust* ": is the consequence of that "allocation." "Adjust" does not mean "subtract" or "deduct." Rather, tax **\*630** items are "allocated" to a partner, and the partner's capital account is "adjusted" to account for that "allocation."

"*Net revenues* ": means the cash from oil and gas production minus severance taxes and royalties only.

"*Net profits* ": means "net revenues" minus "lease operating expenses," which are the operating costs of the business.

Applying these definitions to paragraph 9, Cashion explained that pursuant to subparagraphs (a) and (b), intangible drilling costs, general and administrative expenses, and depreciation are *allocated* to Jamison's capital account until his capital account reaches zero. In other words, Jamison receives a total allocation of no more than $500,000.00 in intangible drilling costs, general and administrative expenses, and depreciation. Pursuant to subparagraph (c), all other costs are allocated to XCO's capital account.

Next, Cashion explained the operation of the disputed subparagraph (d). She testified that the phrase "after adjustment for the items of cost set forth in paragraphs 9(a), (b), and (c)" does not require that all the costs outlined in subparagraphs (a), (b), and (c) be subtracted from net revenues to determine Jamison's Payout. Rather, the phrase is a "timing mechanism." After these costs are allocated to the respective capital accounts pursuant to subparagraphs (a), (b), and (c) and Jamison's capital account reaches zero, Jamison receives 30% of net revenues until he recoups his $500,000.00 capital contribution. Thus, Jamison does not receive a percentage of net revenues until his capital account is exhausted. Further, because the term "net revenues" is used, Jamison receives 30% of net revenues without regard to costs, including lease operating expenses. In sum, the Partnership spends Jamison's $500,000.00, then pays Jamison a percentage of net revenues until Jamison's initial $500,000.00 is repaid in full.

Cashion then stated that pursuant to subparagraph (e), once Jamison recoups his $500,000.00, his interest would convert to receiving 1.25% of "net profits," which means he is then charged with a proportionate share of *all* costs, including lease operating expenses.

We conclude Cashion's explanation of paragraph 9 is reasonable because, inter alia, her definitions of "allocate" and "adjustment" resolve any conflicts between the subparagraphs. Further, Cashion's distinction between "net revenues" and "net profits" explains the parties' decision to use the term "net revenues" in subparagraph (d), and "net profits" in subparagraph (e).[5] It is also consistent with the **\*631** way in which tax partnerships use those terms, and with Gray's own use of the terms in negotiating the Partnership Agreement.

Jamison's interpretation is also consistent with the circumstances existing when the contract was executed and the "particular business activity" to be served. *See Hewlett–Packard,* 142 S.W.3d at 561 ("We construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served"). It is undisputed that, from the outset of their relationship, Jamison consistently represented to Gray that he wanted a low-risk investment with maximum tax

advantages and an opportunity to get his capital back. In return, Jamison was willing to receive only a small percentage of the net profits over the long term. If the parties had agreed that revenues could be reduced by all potential costs before calculating Jamison's Payout, as urged by XCO, Jamison's investment would not have been low-risk.

The most significant evidence of the circumstances present when the contract was made is a letter from Gray to Jamison outlining XCO's proposal. Gray stated that XCO anticipated incurring a certain amount of general and administrative costs and intangible drilling costs in a short time period with respect to the properties. Gray proposed that Jamison "reimburse" XCO for these costs. Gray also proposed that Jamison

> would receive a defined percentage of XCO's monthly production *revenues* on *a preferential basis computed without regard to expense.* After [Jamison] had recouped the value of his investment, his interest in the partnership would *convert to a 'net profits interest'* such that he would receive a significantly reduced percentage of the net profits attributable to the partnership.

(emphasis added).[6] This proposal is consistent with Jamison's argument that only certain costs were to be allocated to him; then, he would recoup his investment out of net revenues without regard to operating costs before his interest converted to a net profits interest.[7]

Nevertheless, Gray testified that the portion of his proposal offering to return Jamison's investment "on a preferential basis computed without regard to expense" was not embodied in the final Partnership Agreement. According to Gray, Cashion and XCO's tax lawyer advised him that his proposal could not be utilized because it created, in effect, a cost-less interest that would not allow Jamison any tax deductions.

At trial, however, Cashion explained her concerns with the initial proposal. She stated that Gray's proposal would result in Jamison's immediately recouping his investment out of net revenues. Cashion feared the IRS might view such an arrangement as a loan, rather than an investment, and thus disallow any deductions. Therefore, she and XCO's tax attorney decided to draft the Partnership **\*632** Agreement so as to postpone Jamison's participation in net revenues until his investment had been exhausted through allocation of the costs outlined in subparagraphs (a) and (b).[8] Therefore, Gray's proposal that Jamison recoup his investment on a "on a preferential basis computed without regard to expense" *was* embodied in the final Partnership Agreement. However, Cashion's tax concerns were alleviated by modifying the timing for Jamison to recoup his investment.[9]

 [15]   In sum, Jamison's interpretation is reasonable because it reconciles the subparagraphs of paragraph 9 and is consistent with the circumstances present when the Partnership Agreement

was made and the particular business activity to be served. Because the Partnership Agreement is subject to only one reasonable interpretation, it is unambiguous as a matter of law. *See Universal Health Servs., Inc.,* 121 S.W.3d at 746; *Columbia Gas Transmission Corp.,* 940 S.W.2d at 589. Therefore, the trial court erred in submitting a jury question regarding interpretation of the Partnership Agreement. *See Transcon. Gas Pipeline Corp. v. Texaco, Inc.,* 35 S.W.3d 658, 665 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) (stating that a trial court errs when it does not construe an unambiguous provision as a matter of law, and instead, submits the issue to a fact finder). However, the error is harmless because the jury interpreted the Partnership Agreement in Jamison's favor. *See* TEX.R.APP. P. 44.1(a)(1); *see also Med. Towers, Ltd. v. St. Luke's Episcopal Hosp.,* 750 S.W.2d 820, 826 (Tex.App.-Houston [14th Dist.] 1988, writ denied) (absent a showing of some prejudice, submission of a question of law to the jury is harmless since the trial court can always use the jury's findings as advisory only). Accordingly, we overrule XCO's first issue.

## III. FOUR–YEAR STATUTE OF LIMITATIONS

In its second issue, XCO contends that Jamison's breach of contract claim was barred by the four-year statute of limitations as a matter of law. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.004 (Vernon 2002).

## A. ACCRUAL OF THE CAUSE OF ACTION

[16] [17] [18] [19] [20] A breach of contract occurs when a party fails or refuses to do something he has promised to do. *Townewest Homeowners Ass'n, Inc. v. Warner Communication Inc.,* 826 S.W.2d 638, 640 (Tex.App.-Houston [14th Dist.] 1992, no writ). The court determines what conduct is required by the parties, and, insofar as a dispute exists concerning the failure of a party to perform the contract, the court submits the disputed fact questions to the jury. *Meek v. Bishop, Peterson & Sharp, P.C.,* 919 S.W.2d 805, 808 (Tex.App.-Houston [14th Dist.] 1996, writ denied). Where reasonable minds may differ as to the inferences to be drawn from the evidence, it is incumbent upon the party asserting limitations to secure findings sustaining the plea of limitations. *Intermedics, Inc. v. Grady,* 683 S.W.2d 842, 845 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.). The failure to request a jury instruction on an affirmative defense results in waiver of that ground by the party relying on it unless the issue was conclusively established. *See* TEX.R. CIV. P. 279; *Abraxas Petroleum Corp. v. Hornburg,* 20 S.W.3d 741, 764 (Tex.App.-El Paso 2000, no pet.). *\*633* When facts are undisputed or conclusively established, there is no need to submit those issues to the jury. *Sullivan v. Barnett,* 471 S.W.2d 39, 44 (Tex.1971); *Meek,* 919 S.W.2d at 808.

[21] XCO contends that Jamison's claims are barred by the statute of limitations; therefore, the burden fell on XCO to plead and prove that the cause of action accrued more than four years before Jamison filed suit on July 30, 1999. *See Woods v. William M. Mercer, Inc.,* 769 S.W.2d

515, 517 (Tex.1988) (limitations is an affirmative defense, which the asserting party must prove); *Brown v. Zimmerman,* 160 S.W.3d 695, 702 (Tex.App.-Dallas 2005, no pet.) (the party asserting an affirmative defense has the burden of pleading and proving its elements). XCO argues that Jamison's cause of action accrued "when XCO allegedly breached the contract by deducting more than $500,000.00 in workover costs when calculating net revenue." XCO alleges that if a breach occurred, it occurred "when XCO sent Jamison the February and March 1993 [accounting] statements."

Jamison responds that these statements do not prove the breach of contract occurred in 1993 for several reasons, including (1) Jamison's receipt of erroneous accounting statements by Southampton does not constitute a breach of contract by XCO, particularly where XCO admits that the statements are erroneous; (2) XCO did not refuse to pay Jamison's share of net revenues in February 1993 because the revenues were frozen by a court, and therefore, XCO either had no "net revenue," or if it did, the distributions were not due and payable while they were sequestered by court order; (3) the time for performance was extended by XCO's reassurances that Southampton's statements were erroneous, and that the accounting would be corrected and funds distributed after the funds were released from the court; (4) XCO admits that the accounting statements contain errors; (5) Southampton's 1993 account statements could amount to no more than an anticipatory breach by XCO, and the statute of limitations begins to run on a promisor's breach/repudiation of a contract only if the repudiation is adopted by the non-repudiating party; and (6) even if a breach occurred in 1993, the statute of limitations was tolled while the funds were held in the registry of the court.

### 1. Southampton's Statements Are Not Attributable to XCO.

XCO is not only the appellant, but also bore the burden of proof to establish its limitations defense at trial; we therefore address its argument first.

XCO contends that to the extent it breached the contract, the breach occurred when XCO sent Jamison accounting statements in 1993 that allegedly demonstrated XCO's improper deduction of expenses from Jamison's account; but, Jamison correctly points out that the statements relied upon by XCO were actually issued by Southampton to the XCO–Jamison Partnership. XCO responds that Southampton's accounting statements to the Partnership constitute XCO's statements to Jamison because the Partnership Agreement states that Southampton is the Operator, and because XCO's president is also the president of Southampton. Additionally, XCO points out that Southampton's office address shown on the statements is the same as XCO's office address.

 **[22]**   Texas law presumes that two separate corporations are distinct entities, and "a party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation."  **\*634** *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 798 (Tex.2002). Although XCO's arguments on appeal treat the two entities as one, none of the

parties took the position in their pleadings or at trial that XCO and Southampton are constructively the same entity, nor was the jury asked to find that either company owned, controlled, or dominated the other. [10] The Partnership Agreement also treats XCO and Southampton as separate entities. Moreover, Southampton's statements to the Partnership do not purport to represent XCO's accounting of the intra-Partnership allocations required by the Partnership Agreement. [11] The statements bear no indication that they were prepared by XCO, make no mention of the Partnership Agreement, do not report on XCO and Jamison's capital accounts, and do not perform the calculations required by the Partnership Agreement.

 **[23]**   **[24]**   We further note that a cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 514 (Tex.1998). Stated another way, a cause of action can generally be said to accrue when the wrongful act effects an injury, regardless of when the plaintiff learned of such injury. *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990). Even assuming that Jamison could have complained of errors in Southampton's statements, we are aware of no authority to support the proposition that Southampton's statements triggered Jamison's right to a judicial remedy *against XCO.* The statements were not prepared pursuant to or in accordance with the Partnership Agreement, and imply nothing regarding XCO's intent to abide by its terms. Moreover, XCO did not claim that Southampton's statements were correct; to the contrary, XCO admitted that the statements contained errors. XCO did not represent to Jamison that it would adopt the Southampton's accounting conclusions; to the contrary, XCO represented that it would correct the accounting statements and pay Jamison the net revenue due him when the funds were released from the Louisiana court. Finally, XCO has not shown that Southampton's erroneous statements injured Jamison. *See Southwell v. Univ. of the Incarnate Word,* 974 S.W.2d 351, 354–55 (Tex.App.-San Antonio 1998, pet. denied) (to prove an action for breach of contract, the plaintiff must establish the defendant's breach caused injury). Under these circumstances, Southampton's statements would not have supported a breach of contract claim by Jamison against XCO.

 **\*635**  However, our analysis does not end here. Because the arguments and evidence adduced by Jamison offer independent grounds for affirmance, we address those as well.

### 2. XCO Did Not Refuse to Pay Net Revenue Before 1996.

Jamison contends that XCO's failure to pay Jamison in 1993–1995 was not the result of a breach of contract, but was instead caused by the Louisiana court's retention of the funds from 1992 until the early part of 1996. Specifically, Jamison claims that prior to 1996, XCO did not refuse to pay net revenues that were "due and payable" because (a) there was no refusal to pay, (b) there was no net revenue, and (c) if there was net revenue, it was not "due and payable" until released by the court.

XCO argues that Southampton's accounting statements should have alerted Jamison that XCO would not pay Jamison in accordance with the Partnership Agreement; however, both Jamison and Gray testified that the first time Gray or any of XCO's representatives ever told Jamison or any of Jamison's representatives that Jamison would not be paid was between January and March of 1996. According to Jamison, while the revenues were frozen, XCO reassured Jamison that he would receive his Payout when the revenues were released. Specifically, Jamison testified without contradiction that while the revenues were frozen, he asked Gray periodically about the status of the Louisiana suit. Gray responded that the suit was going well and said, "don't worry [,] your money is in there. Once we wrap this up, you're going to get your money. You are due your money, your net revenue." Jamison also testified that during 1992, he addressed with Gray whether his $500,000.00 investment was being properly allocated. Gray responded that XCO's accounting was a "mess," and "we really don't know whether it is expended or not expended or whatever, but it doesn't matter because you're ... going to get paid on this anyway because you're going to get your $500,000[.00]." Thus, the first "refusal to pay" occurred in 1996, fewer than four years before Jamison filed suit.

Moreover, the existence and extent of "net revenue" available to the Partnership is a question of fact that was not presented to the jury. Because XCO claimed Jamison's suit was time-barred, XCO bore the burden to obtain findings of fact necessary to support this affirmative defense. Having failed to do so, we cannot say that Jamison's cause of action accrued during a time when net revenues were not proven. [12]

**\*636** **[25]** In sum, we conclude XCO did not prove as a matter of law that Jamison's claim accrued more than four years before Jamison filed suit. [13]

## IV. CONTRACTUAL STATUTE OF LIMITATIONS

**[26]** In its third issue, XCO contends that Jamison's breach of contract claim was also barred by a contractual time limitations clause. This argument was raised for the first time in XCO's motion for judgment notwithstanding the verdict. Although an answer filed jointly by XCO, Robert Gray, and Southampton asserts that "any claims for an accounting are restricted by the applicable limitations period of the Joint Operating Agreements attached to the [Partnership Agreement]," XCO did not assert that the agreements between Southampton and the non-operators barred Jamison's claim that XCO breached its Partnership Agreement with Jamison.

The Partnership Agreement gives Jamison a part of XCO's share in the Lake Boeuf Operating Agreement, the Weldon Operating Agreement, and the Lake Boeuf Tax Partnership (collectively, the "Operating Agreements"). The terms of each of these Operating Agreements, "except to the extent expressly inconsistent [with the Partnership Agreement]," are incorporated into the

Partnership Agreement. The Operating Agreements incorporate the "Accounting Procedure and Joint Operations" agreement ("APJO Agreement") between Southampton, as the operator, and the non-operator parties to the Operating Agreements. The APJO Agreement addresses Southampton's statements and billings to non-operators, and provides in pertinent part:

> [A]ll bills and statements rendered to Non–Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four month period a Non–Operator takes written exception thereto and makes claim on Operator for adjustment.

According to XCO, this provision imposed a two-year limitations period for Jamison to sue XCO regarding improper deductions from net revenues during a given year. We disagree.

This provision applies to accounting procedures between the operator and the non-operators. Southampton is the operator for these properties; XCO and other entities were the non-operators. Jamison purchased a portion of XCO's non-operator interest in the properties under a separate Partnership Agreement, and his dispute is with XCO over the terms of that Partnership Agreement. Jamison's dispute is not with Southampton. In short, this dispute is not between the operator and a non-operator. Rather, this dispute is between two partners who together constitute a single non-operator. Therefore, this provision does not impose a two-year contractual limitations period on Jamison with respect **\*637** to his breach of contract claim against XCO. [14] We overrule XCO's third issue.

### V. CONCLUSION

In sum, we hold the Partnership Agreement is unambiguous as a matter of law, but in Jamison's favor. We further hold that XCO failed to prove that Jamison's breach of contract claim was barred by the four-year statute of limitations or a contractual limitations period. Accordingly, we affirm the judgment of the trial court.

**All Citations**

194 S.W.3d 622, 163 Oil & Gas Rep. 605

Footnotes

XCO and Jamison were considered partners for federal income taxation purposes only. They were not considered partners with respect to liabilities and obligations under state law. Jamison's tax attorney testified that the federal government permits this type of arrangement to stimulate oil and gas investment.

In its brief, XCO frames its first issue in several different ways. However, the theme of its complaint is that the trial court erred in submitting the jury question because the Partnership Agreement is unambiguous as a matter of law. XCO does not challenge the sufficiency of the evidence supporting the jury's finding.

According to XCO, these costs include all lease operating expenses, in addition to intangible drilling costs, general and administrative costs, and depreciation. The lease operating expenses are at the center of this dispute. There is evidence that lease operating expenses are the primary type of other costs addressed in subparagraph (c). Further, XCO deducted large amounts of lease operating expenses from net revenues pursuant to its interpretation of the Partnership Agreement.

XCO contends that Cashion's testimony, as well as all evidence regarding the parties' intent, is inadmissible parol evidence. Extrinsic evidence is not admissible to create an ambiguity or vary the terms of an unambiguous agreement; however, when determining whether an agreement is ambiguous, we may examine extrinsic evidence to interpret the terms used by the parties and extrinsic evidence of the circumstances surrounding execution of the agreement. *See Balandran v. Safeco Inc. Co. of Am.,* 972 S.W.2d 738, 741 (Tex.1998); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.,* 907 S.W.2d 517, 521 (Tex.1995); *Sun Oil Co.,* 626 S.W.2d at 731. Expert testimony may be particularly useful in explaining the "commonly understood meaning in the industry of a specialized term." *Mescalero,* 56 S.W.3d at 320, 323; *Zurich Am. Ins. Co.,* 157 S.W.3d at 465. Jamison offered the testimony of Ms. Cashion, as well as the testimony of its expert who reviewed the Partnership Agreement in connection with this suit for this purpose. XCO also offered the report of the court-appointed auditor, who agreed with XCO's interpretation. This evidence was not admitted to create an ambiguity or to vary the terms of the Partnership Agreement, but to explain its specialized terms.

XCO has not offered a contrary definition for the terms used in the Partnership Agreement that is reasonable. In his report, the court-appointed auditor stated that a "net revenues" interest is substantially the same as a "net profits" interest for purposes of this Partnership Agreement. This fails to explain the use of the two different terms in subparagraphs (d) and (e). Further, the auditor stated that his audit was based on Council of Petroleum Accounting Societies (COPAS) principles. Jamison's expert testified that COPAS explicitly defines "net revenues" as gross proceeds less royalties and severance taxes; and COPAS explicitly defines "net profits" as gross proceeds less royalties, severance taxes, *and* operating expenses. In fact, later in his report, the auditor seems to acknowledge that the terms are not the same. In particular, the auditor later summarizes the partnership's revenues, costs, and Jamison's interest. The auditor has two separate categories entitled: "Net Revenues allocated to Jamison (per paragraph 9d of the [Partnership Agreement] )" and "Net Profit Interest (per paragraph 9e of the [Partnership Agreement] )." With respect to the latter category, the auditor notes that the net profit interest "[i]s not applicable until such time that the Net Revenue distribution reaches $500,000[.00]."

Gray attached a pro forma projecting production from the properties on a monthly basis and Jamison's corresponding potential return on his investment. Gray proposed two alternatives based on Jamison's contribution of $500,000.00 or $1 million. The pro forma shows Jamison's potential return under both scenarios. Under both scenarios, Jamison's return is 30% of net revenues without regard to expenses.

Craig Crawford, Jamison's friend who introduced him to Gray, testified that Gray outlined a general proposal during their initial meetings. Gray represented that Jamison would be given "preferential treatment" on the "front end" until he recouped $500,000.00; Jamison would then receive a smaller residual interest on the "tail end."

XCO's tax attorney did not testify, and, thus, did not controvert Cashion's explanation.

Cashion also testified regarding two other changes between the proposal and final Partnership Agreement, as well as a subsequent amendment. However, these changes and amendment are not pertinent to this dispute.

Robert Gray owns 100% of XCO and 50% of Southampton. Although Jamison alleged that Gray was the alter ego of XCO and Southampton, the allegation was denied by Gray, XCO, and Southampton.

For example, Southampton's February 1993 accounting statement lists the gross revenue, taxes, royalties and operating expenses associated with the various properties, and from these figures, calculates the "net to working interests." The statement then lists "net to XCO" and "Jamison net profit," though it is undisputed that Jamison had not received $500,000.00 in distributions at this time. In contrast, the Partnership Agreement requires the calculation of Jamison's net revenue—not net profit—until he receives $500,000.00 in distributions. Thus, Southampton's calculation of "Jamison net profit" is not the equivalent of XCO's required calculation of Jamison's net revenue. This particular statement also indicates that a "workover" expense of $869,700.00 for the St. Charles Church well was charged against the "net to working interests" and deducted in part from both "net to XCO" and "Jamison net profit." Southampton therefore lists "Jamison net profit" as a negative number, despite the fact that Jamison had not reached "Payout" and his interest had not yet converted from net revenue to net profit.

Jamison additionally argues that, under the doctrine of impossibility, a party prevented by a government order from performing his contractual obligation is excused. *See Centex Corp. v. Dalton,* 840 S.W.2d 952, 954 (Tex.1992). Reasoning that it was impossible for

XCO to distribute Jamison's net revenue while it was held in the registry of the court, Jamison argues that the statute of limitations should therefore be tolled as well. XCO responds that this proposition has never been part of the law of limitations. *But see Fed. Trust Co. v. Brand,* 76 S.W.2d 142, 144 (Tex.Civ.App.-Amarillo 1934, writ ref'd.) ("It is settled law in Texas and elsewhere, so far as we have been able to ascertain, that limitation does not run while property is in the custody of the law."); *see also Madeksho v. Abraham, Watkins, Nichols & Friend,* 112 S.W.3d 679, 688 (Tex.App.-Houston [14th Dist.] 2003, no pet.) (en banc) (per Brister, C.J., with three justices concurring and one justice concurring in result only) ("funds in the registry of the court are held in custodia legis, and thus exempt from claims by third parties. There is no point in requiring an earlier interpleader if *no one can file claims to the funds until after the mandate issues and the funds are released.*") (emphasis added). Because the existence and extent of "net revenue" due to Jamison were not determined at trial, we do not reach this issue.

XCO also asserts that the trial court erred by submitting a jury question that asked if, prior to July 30, 1995 (i.e., four years before suit), Jamison discovered or should have discovered facts causing him to believe he had a claim for breach of the Partnership Agreement. The jury answered, "no." Because XCO failed to prove that Jamison's cause of action accrued more than four years before suit, the discovery rule is inapplicable. However, submission of the jury question was harmless, because XCO did not establish that a breach of the Partnership Agreement occurred before July 30, 1995. *See also City of Brownsville v. Alvarado,* 897 S.W.2d 750, 752 (Tex.1995) ("Submission of an improper jury question can be harmless error if the jury's answers to other questions render the improper question immaterial.").

On appeal, XCO contends for the first time that this limitations provision applies to accounting disputes between XCO and Jamison because Gray was an officer of both XCO and Southampton, Southampton issued Jamison's checks, and Southampton sent Jamison accounting statements from the same address as XCO. These facts do not change the terms of the Operating Agreements or the APJO Agreement. Those agreements state, and XCO admits, that Southampton is the operator. This limitations provision governs accounting between the operator and non-operator. It does not impose a limitations period on Jamison's suit against XCO.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.